**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO. 1:06CV20**

| | | |
|---|---|---|
| **STATE OF NORTH CAROLINA,** | ) | |
| ***ex rel.*, ROY COOPER, ATTORNEY** | ) | |
| **GENERAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **ORDER** |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendant's motion to

dismiss, Plaintiff's response in opposition, and Defendant's reply thereto.

## I.  PROCEDURAL HISTORY

On January 30, 2006, the Plaintiff State of North Carolina through its

Attorney General filed this complaint against the Tennessee Valley

Authority ("TVA") "to address emissions of air pollution from TVA's coal-

fired electric generating units ("EGU's") installed in electric generating

stations ("power plants") located in Tennessee, Alabama, and Kentucky[.]"

**Complaint, filed January 30, 2006, ¶ 1.**  Plaintiff asserts that these

emissions adversely affect "the health and welfare of citizens of [North Carolina], damage [the State's] natural resources and economy, and harm [the State's] finances." *Id.* The complaint further alleges that TVA operates its power plants in a manner that "creates a common law public nuisance in North Carolina, and in other states in the region." *Id.* The State seeks injunctive relief "to abate the harm caused by TVA's emissions . . . and seeks its fees and costs incurred in this action." *Id.*

On April 3, 2006, TVA filed its motion to dismiss and supporting brief pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that Plaintiff's claims "are not justiciable under controlling authority of the [Fourth Circuit], the discretionary function doctrine, and the Supremacy Clause of the United States Constitution." **Tennessee Valley Authority's Motion to Dismiss ("Defendant's Motion"), filed April 3, 2006, at 1;** *see also,* **Memorandum of Law in Support of Defendant's Motion to Dismiss ("Defendant's Memorandum"), filed April 3, 2006.** Plaintiff filed its responsive brief on April 20, 2006, and the Defendant filed a reply brief May 4, 2006. The matter is now ripe for disposition.

## II.  STANDARD OF REVIEW

The Defendant's motion under Rule 12(b)(1) challenges the authority of this Court "to adjudicate the type of controversy involved in the action." ***Carlisle v. United States*, 517 U.S. 416, 434-35 (1996) (internal quotations and citations omitted).**  Subject matter jurisdiction may not be waived, and if the Defendant here is correct, the action must be dismissed. ***Moodie v. Fed. Reserve Bank of New York,* 58 F.3d 879, 882 (2d Cir. 1995).**  Where, as here, jurisdiction is challenged on the basis that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as [it] would receive under a Rule 12(b)(6) consideration."  ***Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).**  Additionally, in ruling on the motion the Court may consider the pleadings as evidence on the issue and look beyond them without converting the motion to one for summary judgment. ***Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).**

### III. ANALYSIS

TVA asserts that the State of North Carolina has no justiciable claims against it for alleged air pollution. Early Twentieth Century precedent suggests otherwise. Cross boundary disputes of this or a similar nature were found to be justiciable long before clean air and water acts were enacted by Congress.

> The state owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possibly, at least, is small. This is a suit by a state for an injury to it in its capacity of quasi-sovereign. In that capacity the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.

*State of Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907).

> When the states by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining quasi-sovereign interests; and the alternative to force is a suit in this court.

*Id.* (citing *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) (bill in equity to prevent discharge of sewers into the Mississippi River)); *see also*, *Louisiana v. Texas*, 176 U.S. 1 (1900) (*parens patriae* action could rest on assertion of a "quasi-sovereign" interest).

Defendant Tennessee Valley Authority asserts three bases upon which it contends the instant matter is non-justiciable: (a) direct precedent from the Fourth Circuit Court of Appeals in *Ferris v. Wilbur*, 27 F.2d 262 (4th Cir. 1928), prohibits this action; (b) the "discretionary function" doctrine bars North Carolina's nuisance claim; and (c) Plaintiff's claim is precluded by the Supremacy Clause of the United States Constitution. **See, Defendant's Motion, at 1; Defendant's Memorandum, at 9, 11, 22.**

**A. *Ferris v. Wilbur***

The Court finds Defendant's reliance on *Ferris* misplaced. **See, Defendant's Memorandum, at 9-11; Reply Brief in Support of Tennessee Valley Authority's Motion to Dismiss ("Defendant's Reply"), filed May 4, 2006, at 8-15.** *Ferris* involved a nuisance law challenge to the location of a naval mine depot. The plaintiffs in *Ferris* sought to prohibit the use of a particular parcel of land as a depot even though the federal government had specifically designated the land for such use and appropriated funds therefor. In affirming the dismissal of the plaintiffs' case, the Fourth Circuit stated that "it is unthinkable that the courts should enjoin as a nuisance the use of government property by a

coordinate branch of the government, the executive, where such use is authorized by a valid act of the other coordinate branch, the legislative." **Ferris**, 27 F.2d at 264-65.

Unlike in *Ferris*, however, this case does not involve a plaintiff seeking to obtain an injunction that would prohibit the use of particular land.  Plaintiff here does not seek an injunction forcing TVA to stop operating coal-fired electric generating units, or an injunction forcing TVA to stop operating such units in a particular place.  Rather, Plaintiff seeks only to alter the manner in which operations on particular land are conducted.  In other words, whereas the plaintiffs in *Ferris* argued that the mere existence of the naval mine depot in the designated location constituted a nuisance and should be enjoined, Plaintiff in this case argues simply that the *manner* in which TVA is carrying out its operation is a nuisance.  Such a challenge is not precluded by *Ferris*.  **See, e.g., Bd. of Supervisors of Fairfax County v. United States, 408 F. Supp. 556, 560-61 (E.D. Va. 1976), *appeal dismissed*, 551 F.2d 305 (4th Cir. 1977) ("This case, then, is unlike *Ferris v. Wilbur* . . . where the Court refused to enjoin the use of certain land as a munition depot.  In**

***Wilbur*, it was the *location* of an activity that was drawn in issue and not the *manner* in which the activity was pursued.").**

## B. Discretionary Function Doctrine

Defendant next contends that the "discretionary function" doctrine prohibits North Carolina's claim.  TVA asserts that because it is a governmental agency, and its decisions regarding the level of pollutants involve a level of choice and are made after consideration of competing policies, it is not subject to suit for such decisions.

### 1.    Express Limitations on Suability

TVA is a hybrid creature.  It was created by Congressional charter in 1933, yet structured to operate much like a private corporation.  ***See*, 16 U.S.C. § 831 (creating "a body corporate by the name of the 'Tennessee Valley Authority'"); *Natural Res. Def. Council, Inc. v. Tennessee Valley Auth.*, 459 F.2d 255, 257 (2d Cir. 1972) ("[T]he TVA operates in much the same way as an ordinary business corporation[.]"); *Alabama ex rel. Graddick v. Tennessee Valley Auth.*, 636 F.2d 1061, 1066 (5th Cir. 1981) (Congress intended the TVA "'have**

**much of the essential freedom and elasticity of a private business corporation'" (quoting H.R. Rep. No. 130, 73d Cong., 1ˢᵗ Sess. 19 (1933))).** In establishing this hybrid entity, Congress endowed TVA with some features governmental in nature, yet deprived it the benefit of others. ***See*, 16 U.S.C. § 831c(h) (granting TVA power "to exercise the right of eminent domain").** One of the governmental features specifically denied to TVA was the right to sovereign immunity, which Congress withheld by virtue of the TVA Act's "sue-and-be-sued" clause. **16 U.S.C. § 831c(b) (providing that TVA "[m]ay sue and be sued in its corporate name").** Such clauses have long been recognized as broad waivers of sovereign immunity, and the "sue-and-be-sued" clause was specifically intended to be a broad waiver when included in the TVA Act. ***See, e.g., F.H.A. v. Burr*, 309 U.S. 242, 245 (1940); *Queen v. Tennessee Valley Auth.*, 689 F.2d 80, 85 (6ᵗʰ Cir. 1982) ("The legislative history of the TVA Act, 16 U.S.C. § 831 *et seq.*, indicates that this language [in § 831c(b)] was intended to be a broad waiver of sovereign immunity.").** Given the broad waiver of sovereign immunity in the TVA Act, there is certainly no indication that Congress included or intended to include an express "discretionary function" exemption in the TVA Act.

**2.     Implied Limitations on Suability**

Despite the fact that Congress effectuated a broad waiver of sovereign immunity as to TVA by virtue of the "sue-and-be-sued" clause, the Supreme Court has nevertheless recognized that in some instances such a broad waiver must be reined-in.  Those instances, however, are very limited:

> "[W]hen Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that [1] certain types of suits are not consistent with the statutory or constitutional scheme, [2] that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or [3] that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.  *In the absence of such showing, it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be*."

*Loeffler v. Frank*, 486 U.S. 549, 554-55 (1988) (quoting *Burr*, 309 U.S. at 245) (emphasis added); *see also*, *FDIC v. Meyer*, 510 U.S. 471, 480 (1994).

The first question, then, is whether a nuisance suit relating to TVA's emission of air pollutants is inconsistent with the statutory or constitutional scheme. TVA has identified no such inconsistencies, and the Court has found none. **See, Defendant's Memorandum; Defendant's Reply.**

Even where no inconsistency would result from allowing a particular claim, an implied limitation must be recognized if such limitation is necessary "'to avoid grave interference with the performance of a *governmental* function.'" ***Loeffler, supra* (emphasis added).** TVA has argued that it must be considered as always performing a governmental function, relying principally on the language of early and middle Twentieth Century tax cases that evidenced an unwillingness on the part of the Supreme Court to give effect to a "governmental" versus "non-governmental" distinction. ***See*, Defendant's Reply, at 10-14, 27 (citing, *inter alia*, *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95 (1941) and *Federal Land Bank of Wichita v. Bd. of County Comm'rs of Kiowa County, State of Kansas*, 368 U.S. 146 (1961)).** However, whatever principle these cases may have established in the realm of taxation or the other contexts in which they arose, they are not controlling here. Where, as here, the question is one of recognizing

implied limitations on an otherwise broad waiver of sovereign immunity for an entity like TVA, that has been "authorize[d] . . . to engage in commercial and business transactions with the public" and for which Congress has clearly indicated its intention that the entity be subject to suit as if it were privately owned, the plain language of the *Loeffler-Burr* line of cases requires that a "governmental" versus "non-governmental" distinction be made.[1]  **Loeffler, *supra* (referring to "'engag[ing] in commercial and business transactions'" and "'interference with the performance of a *governmental* function'" (emphasis added) (quoting *Burr*)).**  TVA has not established that its production of electricity through the operation of

_____

[1] The appropriateness of such a distinction in this context can also be seen in previous cases in which a discretionary function exemption was implied in the TVA Act as to certain acts and functions engaged in by TVA. Rather than a wholesale adoption of such an exemption into the TVA Act, the courts have taken a careful approach and allowed an exemption for matters related to such things as the operation of dams and other clearly governmental functions.  ***See, e.g., Queen*, 689 F.2d at 85-86 (collecting cases, and stating that "[t]hese decisions demonstrate that in certain limited situations the TVA is exempt from liability arising out of the exercise of certain *wholly governmental functions*[.]" (emphasis added)); *Grant v. Tennessee Valley Auth.*, 49 F. Supp. 564, 566 (E.D. Tenn. 1942) ("But the functions of the [TVA] in the commercial field are entirely different.  Upon principle and authority, it is quite clear that the government should respond in damages for wrongs committed when it is engaged in the same activities as its citizens.").**

EGU's is a "governmental function,"[2] or, if so, that allowing the instant suit to proceed would "gravely interfere" therewith.  Consequently, TVA has failed to establish its entitlement, pursuant to the *Loeffler-Burr* mode of analysis, to an implied limitation of its otherwise broad waiver of sovereign immunity on the basis of grave interference with a governmental function.

Finally, a restriction on an otherwise broad waiver of sovereign immunity may be implied where "'it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.'"  **Loeffler, supra.**  In this case, all available evidence points to the conclusion that Congress intended TVA's waiver of sovereign immunity to be as *broad* as possible.  As the Sixth Circuit explained:

> "The Senate amendment limited the suability of the [TVA] solely to suits for the enforcement of contracts and the defense of property.  The House bill placed no limitations whatever upon the suability of the [TVA], so that all persons who had a cause of action against the corporation might have their day in court. The House provision was written into the conference amendment in the interest of justice."

---

[2] More specifically, TVA has not established that its production and sale of electrical power from EGU's – an operation conducted in the exact manner as a private power company – is a "wholly governmental function."  ***See, Edwards v. Tennessee Valley Auth.*, 255 F.3d 318, 322 (6th Cir. 2001).**

**Queen, supra,** **at 85 (quoting H.R. Rep. No. 48, 73d Cong., 1ˢᵗ Sess. 16**

**(1933));** **see also,** **28 U.S.C. § 2680(l) (excluding from the Federal Tort**

**Claims Act [FTCA] "[a]ny claim arising from the activities of the**

**Tennessee Valley Authority.");** **Smith v. Tennessee Valley Auth.,** **436**

**F. Supp. 151, 153 (E.D. Tenn. 1977) ("The** **Brewer** **court then noted the**

**principal reason the TVA was excluded from the [FTCA] was because**

**the TVA was amenable to suit prior to [its] enactment[.]").** Given the

express language of the TVA Act, the absence of *any* express exceptions

therein, and Congress' rejection of statutory language that would have

limited TVA's amenity to suit, it is clear that Congress did not intend for the

TVA Act's "sue-and-be-sued" clause to be used in a narrow sense.

TVA has failed to clearly establish any of the three bases for

recognizing an implied limitation on the TVA Act's otherwise broad waiver

of sovereign immunity. "'In the absence of such showing, it must be

presumed that when Congress launched [TVA] into the commercial world

and endowed it with authority to 'sue or be sued,' that [TVA] is not less

amenable to judicial process than a private enterprise under like

circumstances would be.'" **Loeffler, supra.** Therefore, the Court will not

imply a "discretionary function" limitation on TVA's suability for the

emission of air pollutants from its coal-fired electric generating units under the *Loeffler-Burr* mode of analysis.

The Court's inquiry, however, does not end here. TVA argues that neither the clear Congressional intent revealed by the express language of the TVA Act and its legislative history, nor the *Loeffler-Burr* requirements for implying limitations on otherwise broad waivers of sovereign immunity, are controlling. Rather, TVA asserts that the issue is one, not of sovereign immunity, but of separation-of-powers, and that the doctrine of separation-of-powers mandates recognition of a "discretionary function" exception in this case. ***See*, Defendant's Memorandum, at 11-22; Defendant's Reply, at 21-29 ("In sum, *constitutional separation of powers principles* require that discretionary decisions about social, economic, and political policies be made by the politically accountable branches of Government." *Id.*, at 26.).**

### 3. Separation-of-Powers

TVA argues that the separation-of-powers doctrine will be violated unless it is allowed the benefit of a "discretionary function" exemption for its air pollution decisions. TVA asserts that as a federal entity, created by

Congress and existing under the Executive Branch, any decision it makes that involves an element of choice and the weighing of policy concerns is an inappropriate basis for suit because it would result in the Judicial Branch's impermissible intrusion on the Executive Branch's discretion. According to TVA, because its decisions regarding air pollution emissions "require TVA to balance the practical consideration of generation cost against its necessary impact on TVA's objective of providing electricity at affordable rates, as well as considering TVA's other statutory objectives," the separation-of-powers doctrine entitles its emissions decisions to protection as "discretionary functions." **Defendant's Memorandum, at 20.**

The doctrine of separation-of-powers is rooted in the founding of our system of government.

> In applying the principle of separated powers in our jurisprudence, we have sought to give life to Madison's view of the appropriate relationship among the three coequal Branches. Accordingly, we have recognized, as Madison admonished at the founding, that while our Constitution mandates that "each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others," *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935), the Framers did not require - and indeed rejected - the notion that the three Branches must be entirely separate and distinct. *See, e.g.*, *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) (rejecting as archaic complete division of authority among the three Branches); *United States*

*v. Nixon*, 418 U.S. 683 (1974) (affirming Madison's flexible approach to separation of powers). Madison, defending the Constitution against charges that it established insufficiently separate Branches, addressed the point directly. Separation of powers, he wrote, "d[oes] not mean that these [three] departments ought to have no *partial agency* in, or no *controul* over the acts of each other," but rather "that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted." The Federalist No. 47, pp. 325-26 (J. Cooke ed. 1961) (emphasis in original). *See*, *Nixon v. Administrator of General Services*, 433 U.S., at 442, n.5. Madison recognized that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which "would preclude the establishment of a Nation capable of governing itself effectively." *Buckley v. Valeo*, 424 U.S. 1, 121 (1976).

**Mistretta v. United States**, 488 U.S. 361, 380-81 (1989) (alterations in original). In acknowledging the necessity for "some degree of overlapping responsibility," as well as the fallacy in calls for "a hermetic division among the Branches," the Supreme Court has instead focused, in a general sense, on "concern[s] of encroachment and aggrandizement." **Id., at 381, 382; see also, INS v. Chadha**, 462 U.S. 919, 999 (1983) (White, J., dissenting) ("[T]he history of the separation-of-powers doctrine is also a history of accommodation and practicality. Apprehensions of an overly powerful branch have not led to undue prophylactic measures that handicap the effective working of the National

**Government as a whole. The Constitution does not contemplate total separation of the three branches of Government.").**

More specifically, where the Executive Branch is involved, the proper inquiry is on the extent to which the Executive is prevented "'from accomplishing its constitutionally assigned functions.'" ***McMellon v. United States*, 387 F.3d 329, 341 (4th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005) (quoting *Nixon v. Administrator*, 433 U.S. at 443).** Where the Judicial Branch is involved, the Supreme Court has "expressed [its] vigilance against two dangers: first, that the Judicial Branch neither be assigned nor allowed 'tasks that are more properly accomplished by other branches,' . . . and, second, that no provision of law 'impermissibly threatens the institutional integrity of the Judicial Branch.'" ***Mistretta*, 488 U.S. at 383 (citations omitted); *see also*, *McMellon*, *supra*.** None of these concerns are implicated here.

First, refusing to recognize a discretionary function exception for TVA's emissions decisions would not, as TVA contends, prevent the faithful execution of the TVA Act. Here, should TVA not be afforded the benefit of the exemption and should the ultimate outcome of this case be unfavorable to TVA, the result is simply that the Executive Branch has an

additional consideration to take into account when making its emissions decisions.  The Executive's ability to decide the level of pollutants to emit within the allowed bounds, how best to address any necessary reduction in pollutants, how to allocate TVA's funds and other resources to such issue, and a myriad of other issues and decisions would remain untouched. "[T]he Executive . . . [would therefore] retain[ ] ample authority to" carry out the mandates of the TVA Act.  *Morrison v. Olson*, **487 U.S. 654, 692 (1988).**  In other words, at worst there would be the slight "degree of overlap" recognized by the Supreme Court and Madison as necessary for an effective government; there would be the allowed "partial agency" rather than the disallowed exercise of "the whole power of" the Executive Branch by the judiciary.  *Mistretta*, **488 U.S. at 380-81.**

Second, refusing to recognize a discretionary function exemption for TVA's emissions decisions would not place the judiciary in the position of performing tasks that are more properly accomplished by other branches. This is not a case where the Court is called upon to determine whether TVA is always (or never) entitled to a discretionary function exemption for all areas of operation.  *See, McMellon*, **387 F.3d at 342 ("Moreover, if *all executive-branch actions taking place in the maritime arena* were**

**subject to judicial review, the judiciary would be called upon to decide issues it is not equipped to resolve." (emphasis added)).**

Rather, the exemption issue here relates to decisions regarding a singular, distinct action - emission of pollutants from coal-fired electric generating units.  The appropriate level of pollution emissions is a matter, not for only one or two Branches, but rather for all three Branches of government. **See, e.g., 42 U.S.C. §§ 7401-7431 (Sub-chapter 1, Part A of the Clean Air Act, wherein Congress sets forth "air quality and emissions limitations"); 40 C.F.R. §§ 50.1-50.12 (wherein the Environmental Protection Agency sets forth "national primary and secondary ambient air quality standards"); Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit, 874 F.2d 332, 343 (6th Cir. 1989) (discussing the role of the courts in controlling air pollution).**  As the Supreme Court described it, air pollution "is, of course, one of the most notorious types of public nuisance in modern experience." **Washington v. General Motors Corp., 406 U.S. 109, 114 (1972).**  The interdependence of the Branches necessary to control and reduce this national threat is certainly not repugnant to the Constitution, and refusing to allow TVA to make unlimited emissions decisions under the protection of a discretionary

function exemption would not place the Judicial Branch in the position of performing tasks more properly accomplished by other Branches.

Finally, refusing to recognize a discretionary function exemption for TVA's emissions decisions would not threaten the institutional integrity of the judiciary.  This part of the separation-of-powers analysis generally examines whether the judiciary would be undermined, emasculated, or politicized, none of which would be in danger of occurring here.  *See, Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986); *Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993); *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1561 (10th Cir. 1993); *United States v. Schnepper*, 302 F.Supp.2d 1170, 1180 (D. Haw. 2004), *aff'd in part and remanded in part on other grounds*, 161 F. App'x 678 (9th Cir. 2006).  Furthermore, refusing TVA the exception it seeks and, consequently, allowing this nuisance action to proceed, would not "threaten, either in fact or appearance, 'the impartiality of the Judicial Branch.'"  *Schnepper, supra* (quoting *Mistretta*, 488 U.S. at 407).

The Court, having considered the possible effects on both the Judicial and Executive Branches, finds that separation-of-powers concerns

do not require recognition and application of a "discretionary function"

exception to TVA's decisions regarding the emission of air pollutants.

Further, this Court concludes that "'the challenged conduct is [not] of

the kind that the discretionary function exception was designed to shield.'"

**Edwards v. Tennessee Valley Auth., 255 F.3d 318, 322 (6th Cir. 2001)**

**(quoting United States v. Gaubert, 499 U.S. 315, 322 (1991) (other**

**citations omitted)).**


**C. Supremacy Clause**

Defendant TVA's third and final argument is that the Supremacy

Clause of the United States Constitution prohibits this suit.  **See, U.S.**

**Const. Art. VI, § 3, cl. 2; Defendant's Reply, 30-35.**  TVA argues that as

a federal agency, the Supremacy Clause forbids regulation by the State of

North Carolina.  Put another way, this suit is precluded because it

"interferes with the activities of a Federal agency operating pursuant to a

constitutional grant of authority."  **Defendant's Reply, at 33.**

As a general proposition, a state may not regulate a federal entity.

However, this principle of non-regulation is not absolute.  "It is well settled

that the activities of federal installations are shielded by the Supremacy

Clause from direct state regulation *unless* Congress provides 'clear and unambiguous' authorization for such regulation." ***Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citations omitted) (emphasis added); *see also*, *G ex rel RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 304-06 (4th Cir. 2003).** Here, such Congressional authorization exists by virtue of the "federal facilities" provision of the Clean Air Act.

Federal facilities, such as TVA, are treated like private entities where the issue involved is air pollution. ***See*, 42 U.S.C. § 7418 ("Control of pollution from Federal facilities").** Congress intended for this principle to be clear when the provision was originally enacted. ***See*, H.R. Rep. No. 294, 95th Cong., 1st Sess. 199, reprinted in 1977 U.S.C.C.A.N. 1077, 1276 ("In 1970, Congress enacted section 118 of the Clean Air Act. That provision declared the clear and unequivocal policy of the United States that the facilities, real and personal property, owned by the U.S. Government were to comply with all substantive and procedural requirements of Federal, State, interstate or local law intended to control air pollution.").** When the Supreme Court took a narrower view of the Act's federal facilities provision in *Hancock v. Train*, 426 U.S. 167 (1976), holding that federal facilities were not required to obtain an

operation permit required by a state's implementation plan, Congress immediately acted to amend the Act and reiterate its original intent that federal facilities be treated the same as private facilities.  Tiring of attempts by federal entities – including, expressly, the TVA – to side-step state attempts to control air pollution by flaunting their "federal nature," Congress enacted the 1977 amendments to the Clean Air Act in part to overturn *Hancock* and "to express, with sufficient clarity, the committee's desire to subject Federal facilities to all Federal, State, and local requirements – procedural, substantive, or otherwise – process, and sanctions."  **1977 U.S.C.C.A.N., at 1278; *see also*, 42 U.S.C. § 7418(a) ("Each department, agency, and instrumentality of the executive . . . branch[ ] of the Federal Government . . . engaged in any activity resulting, or which may result, in the discharge of air pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any non[-]governmental agency.").**

In addition to expressing its general intent that federal facilities be treated as private facilities where air pollution is involved, Congress also

expressed its intention that legal barriers which may inhibit such treatment

of federal facilities be removed.

> Adoption of section 118 of the Act was intended *to remove all legal barriers* to full Federal compliance, except as exemption authority was expressly provided in that section.  The historic defense of sovereign immunity was waived by Congress.  Consent to be sued was provided.  Constitutional arguments regarding the supremacy clause no longer permitted a refuge for unwilling or tardy federal agencies.

**1977 U.S.C.C.A.N., at 1278 (emphasis added); *see also*, 42 U.S.C. §**

**7418(a) ("[The federal facilities provision] shall apply notwithstanding**

**any immunity of such agencies, officers, agents, or employees under**

***any law or rule of law.*" (emphasis added)).**

Congress, through the federal facilities provision of the Clean Air Act,

provided "'clear and unambiguous' authorization for [direct state]

regulation" of federal installations where the issue involved is air pollution.

Given such authorization for treating federal entities as private entities for

air pollution purposes, and the fact that state law nuisance claims against

private entities for the abating of air pollution survived passage of the

Clean Air Act, it follows that TVA is likewise subject to suit, in nuisance, for

abatement of its emission of air pollutants.  ***See, e.g., Technical Rubber***

***Co. v. Buckeye Egg Farm, L.P.*, 2000 WL 782131, at \*5 (S.D. Ohio 2000)**

**("This Court therefore concludes that the Clean Air Act does not preempt plaintiffs' state common law nuisance claims[.]");** *Gutierrez v. Mobil Oil Corp.*, **798 F. Supp. 1280, 1285 (W.D. Tex. 1992) ("This Court holds that the Clean Air Act does not preempt the plaintiffs' various common law claims.");** *Her Majesty the Queen, supra* **(quoting** *Int'l Paper Co. v. Ouellette*, **479 U.S. 481, 497 (1987), for the proposition that nuisance suits are proper so long as brought pursuant to the law of the source state);** *Fisher v. Perma-Fix of Dayton, Inc.*, **2006 WL 212076 (S.D. Ohio 2006); 42 U.S.C. § 7418.**

Having considered the three bases for lack of subject matter jurisdiction proffered by Defendant TVA – the Fourth Circuit's decision in *Ferris v. Wilbur*, the discretionary function doctrine, and the Supremacy Clause of the United States Constitution – the Court concludes that none of these bases require dismissal of this suit.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Defendant Tennessee Valley Authority's motion to dismiss for lack of subject matter jurisdiction is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant shall file answer or otherwise respond to the complaint herein on or before 15 days from entry of this Order.

Signed: July 21, 2006

Lacy H. Thornburg
United States District Judge