UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

```
STATE OF NORTH CAROLINA      )
ex rel. Roy Cooper,          )
Attorney General,            )
                             )
          Plaintiff,         )   No. 1:06-CV-20
                             )
     vs.                     )   VOLUME 1B
                             )   (Pages 136-267)
TENNESSEE VALLEY AUTHORITY,  )
                             )
                             )
          Defendant.         )
_____)
```

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 14th, 2008

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

        JAMES C. GULICK, Senior Deputy Attorney General
        MARC BERNSTEIN, Special Deputy Attorney General
        North Carolina Department of Justice
        114 West Edenton Street
        Raleigh, North Carolina

        MICHAEL D. GOODSTEIN, Esquire
        ANNE E. LYNCH, Esquire
        Resolution Law Group, P.C.
        5335 Wisconsin Avenue NW, Suite 360
        Washington, DC

On Behalf of the Defendant:

        FRANK H. LANCASTER, Senior Attorney
        HARRIET A. COOPER, Assistant General Counsel
        THOMAS F. FINE, Assistant General Counsel
        MARIA V. GILLEN, Assistant General Counsel
        Tennessee Valley Authority
        400 West Summit Hill Drive
        Knoxville, Tennessee

         Cheryl A. Nuccio, RMR-CRR, Official Court Reporter

1                    I N D E X

2                                                        PAGE

3    PLAINTIFF'S WITNESSES

4    BROCK NICHOLSON
         Cross Examination by Ms. Cooper...............    139
5        Redirect Examination by Mr. Gulick...........    171

6    WILLIAM A. JACKSON
         Direct Examination by Mr. Gulick.............    178
7        Cross Examination by Mr. Fine................    243
         Redirect Examination by Mr. Gulick...........    265

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          I N D E X   O F   E X H I B I T S

2                                              OFFERED  RECEIVED

3  PLAINTIFF'S EXHIBITS

4  No. 5A...................................      178      178
   No. 14...................................      177      177
5  No. 15...................................      177      177
   No. 440..................................      242      243
6

7  DEFENDANT'S EXHIBITS

8  No. 45...................................      148      148
   No. 46...................................      153      153
9  No. 435..................................      258      258

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

BROCK NICHOLSON - CROSS

1   MONDAY AFTERNOON, JULY 14, 2008

2            MS. COOPER:  Your Honor, may I continue?

3            THE COURT:  Yes.

4                      BROCK NICHOLSON

5                 CROSS EXAMINATION (Cont'd.)

6   BY MS. COOPER:

7   Q.   Before the break, Mr. Nicholson, we were talking about

8   air quality standards, and I have a couple of questions to ask

9   you.

10  A.   Okay.

11  Q.   Isn't it true that the goal of North Carolina's

12  regulation of pollution under the Clean Air Act is

13  fundamentally to protect public health?

14  A.   And welfare.

15  Q.   So the answer is yes and no?

16  A.   Yes, public health and welfare, that's correct.

17  Q.   And the State of North Carolina implements a regulatory

18  program that protects public health by assuring that the

19  ambient air quality standards are attained and maintained;

20  isn't that true?

21  A.   The ambient air quality standards are certainly a

22  benchmark or a goal and item that we have to address in our

23  federal implementation plan that is submitted to EPA and we

24  have to design a strategy to do that.  I think clearly with

25  the recent standards that EPA has issued with --

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.    Well, before you go on to the standards that EPA has

2    issued, I'd like to ask you to take a look at Page 53 of your

3    April 2000 deposition.  And take a look at lines 9 through 14

4    and 15.

5        And during your deposition you were asked, "So the State

6    of North Carolina sets ambient air quality standards for

7    various kinds of pollutants?

8        "Yes."

9    A.    Yes.

10    Q.    "And then implements a regulatory program that protects

11    public health by assuring that those standards would be

12    attained.

13        "Answer:  That's correct."

14    A.    Right.

15    Q.    "And maintained."

16    A.    Right.

17    Q.    Wasn't that your answer?

18    A.    It is.

19    Q.    And that's true today, isn't it?

20    A.    That is true today, however --

21    Q.    I have another question.

22    A.    May I finish?

23        MR. GULICK:  Objection.

24        THE COURT:  Let the witness finish his answer.  Go

25    ahead.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE WITNESS:  I think, as we look at these standards

2     as an air quality management plan for the state, we realize

3     that we're dealing with standards that no longer have a

4     threshold below which there's not -- there's no longer need

5     for protection of public health.  So I think our view is a

6     little amended now in the standards.  And certainly they're a

7     requirement -- federal requirement.  We have to develop plans,

8     submit them to the EPA to be approved relative to the official

9     federal standard.  But whether or not that constitutes our

10     belief and policy that it's the limit on controlling for

11     protection of public health and welfare, I think that's a

12     policy that's getting outdated quickly, quite honestly.

13     Q.    But you agree --

14     A.    But we don't have to have -- I mean -- excuse me.  We

15     don't have to have ambient air quality standards to have

16     regulations that go below those or even standards in the

17     associated designations of nonattainment in order to put

18     forward an emissions control regulation.  Great examples are

19     the Clean Smokestacks Act which apply in areas not designated

20     as nonattainment and we have an inspection and maintenance

21     program that we expanded in the areas as a major theme of our

22     control strategy that doesn't rely on a designation related to

23     an ambient air quality standard.

24     Q.    Well, at your deposition you said, when asked that

25     question, that's correct and there was no buts, ands, ifs,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  howevers, amendments.

2  A.    And I certainly agree.  And that was over a year ago; and

3  quite honestly, as EPA keeps promulgating these standards, our

4  view of the appropriate state policy is, quite frankly, being

5  amended.  My view is.

6  Q.    Your view.  But the state hasn't actually lowered its

7  ambient air quality standards, has it?

8  A.    We have not.  As I said earlier, that would be a major

9  policy decision on the part of the state.  It would take a lot

10 of resources, in fact, to do that of very questionable value

11 such as placing us in the awkward position of having standards

12 inconsistent with all the other states and --

13 Q.    So it would be of questionable value to lower the

14 standards to protect public health?

15 A.    At this time in the face of having an adequate control

16 strategy to lower emissions.

17 Q.    Let me ask you, Mr. Nicholson.  You testified about the

18 Clean Smokestacks Act.  And I believe you said something to

19 the effect that the -- one of the center pieces of the Act was

20 the surrender of allowances by Duke and Progress.  Can you

21 tell me how many allowances Duke has surrendered under the

22 Act.

23 A.    They have not actually surrendered any yet because we

24 haven't --

25 Q.    Okay.  What about Progress?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   The same answer.  They haven't gotten to the point of

2  having created any yet.

3  Q.   They haven't created any under the Smokestacks Act, is

4  that what you're --

5  A.   Well, actually, a minor amount as an interim requirement

6  of going below 35 in this case, and 25, we haven't actually

7  received them yet.

8  Q.   So from 2002 to the present, there's been no surrender of

9  allowances.

10  A.   That's right.  But to our knowledge, there hasn't been

11  any other use by the two companies of those credits either.

12  Q.   Of course, it doesn't cover them in their other states of

13  operation, does it?

14  A.   The Clean Smokestacks Act applies in North Carolina.

15  Q.   Yes.

16  A.   Only.

17  Q.   Now, I believe you testified that in 2001 and 2002,

18  around the time the Smokestacks Act was being developed and

19  enacted, that there were no scrubbers in operation at either

20  of the two big utilities in North Carolina; isn't that right?

21  A.   That is correct.

22  Q.   Do you know how many scrubbers TVA had in operation at

23  that time?

24  A.   My understanding was six.

25  Q.   Do you know how many TVA had planned at that time?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   I am not aware of that.

2   Q.   Well, I'd like to --

3   A.   Unless that's the five additional ones at that point that

4   were talked about.

5   Q.   Yes.

6   A.   Okay.

7   Q.   And was that -- did you learn about that in about October

8   of 2001?

9   A.   I quite honestly don't remember when I learned about

10  that, but I've heard about it for a good while.

11  Q.   All right.  I'd like you to take a look at what's been

12  marked Defendant's Exhibit 45.  Can you identify that

13  document.

14  A.   Looks like a -- it's an e-mail that was sent from Hawley

15  Truax to Allen Klimek and myself which is forwarding an e-mail

16  from -- it's a little hard to read, but from James McCarter to

17  Governor Easley.

18  Q.   And if you take a look at the e-mail that was forwarded,

19  you'll see that it talks about TVA's decision to design, build

20  and operate five flue gas desulfurization systems or

21  scrubbers.

22  A.   Yes.

23  Q.   And then it goes on to mention that one of those

24  scrubbers will be on the Bull Run plant and two will be on the

25  Kingston plant; isn't that correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   I'm looking for Kingston.

2   Q.   It's on the second page.

3   A.   Okay.

4   Q.   At the top.

5   A.   Okay.  I see it now.

6   Q.   Now, isn't it true that Bull Run and Kingston are two of

7   the three Tennessee TVA plants closest to the North Carolina

8   border?

9   A.   That's my understanding, yes.

10  Q.   So in 2001 before the Smokestacks Act was passed, TVA

11  announced, said that it was going to build scrubbers at five

12  different places; isn't that right?

13  A.   That's what we understand by this.  Again, planned to

14  build.

15  Q.   Well, hasn't TVA built a scrubber at Bull Run?

16  A.   I don't personally know that, but I've been told that

17  scrubbers are being built.

18  Q.   Well, do you have any reason to think they're not being

19  built?

20  A.   Well, I'm aware that plans have changed over time, both

21  schedules and locations of scrubbers.  I think that's really

22  one of the issues we have here is that --

23  Q.   Well, let's --

24  A.   -- how definite are these plans and how enforceable are

25  they?

BROCK NICHOLSON - CROSS

1   Q.    How can you tell -- I'm, sorry that's a little
2   argumentative.
3         Do you know about the scrubbers at Kingston?  Do you know
4   how far along they are?
5   A.    I'm not specifically familiar.
6   Q.    Do you know anything about the scrubber that's mentioned
7   here at Paradise?
8   A.    I'm sorry, what location?
9   Q.    If you take a look down on about the fifth line, fourth
10  or fifth line, Page 2.
11  A.    Okay.
12  Q.    It talks about a scrubber at Unit 3 at Paradise Fossil
13  plant in Kentucky.
14  A.    I see that.
15  Q.    Do you know anything about that scrubber?
16  A.    I do not personally or specifically.
17  Q.    So your testimony is you don't really have any personal
18  knowledge of the progress of TVA's plans or the progress of
19  TVA's actions in controlling emissions as we stand here and
20  sit here.
21  A.    What I do know as of this month that there are actually
22  only seven scrubbers in operation in the TVA system.
23  Q.    That's not what I asked you.
24  A.    Well, I do not know the status of ones beyond the seven.
25  And I do understand that there is construction underway,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  but -- in some units and I don't have the specifics of that.

2  Q.  Did you have specifics in 2001 about TVA's plans?

3  A.  Well, apparently I obviously received a copy of this and

4  had -- and to be honest, I was aware that EPA -- or TVA's

5  talked about five additional scrubbers for a considerable

6  period of time.

7  Q.  Well, if it came to your attention that the Bull Run

8  scrubber was actually completed, would that surprise you?

9            MR. GULICK:  Object to the form of the question.

10  A.  Well, I am aware that there is a seventh scrubber --

11           THE COURT:  Overruled.  Go ahead.

12           THE WITNESS:  Excuse me, sir.

13           THE COURT:  You may answer.

14           THE WITNESS:  I am aware that there is a seventh

15  scrubber in operation and I don't recall exactly which

16  location -- what location that is.

17  Q.  Well, are you aware of when TVA's eighth scrubber is

18  projected to go online?

19  A.  I don't recall the exact date.

20  Q.  Do you recall the year?

21  A.  I do not recall the year.

22  Q.  Isn't it true, Mr. Nicholson, that in 2002 you met with

23  some TVA representatives to talk about their plans for

24  controlling emissions?

25  A.  I believe that's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And do you recall what they told you at that time?

2  A.   As I recall, there was discussion about tons of emissions

3  and the progress TVA is making or planning to make.

4  Q.   Okay.

5       MS. COOPER:  Before we go further on that, I'd like

6  to move into evidence Exhibit -- Defendant's Exhibit 45.

7       MR. GULICK:  Objection.

8       Your Honor --

9       THE COURT:  Yes, I've got your objection.  I'll rule

10  on it shortly.

11       MR. GULICK:  Okay.

12       (Pause.)

13       THE COURT:  I'll overrule that.  Go ahead.

14       MS. COOPER:  Thank you, Your Honor.

15       (Defendant's Exhibit Number 45 was received into

16  evidence.)

17  Q.   Mr. Nicholson, you testified on direct about reports that

18  DENR submits to the Environmental Review Commission and the

19  Joint Legislative Utility Review Committee under the

20  Smokestacks Act, correct?

21  A.   Correct.

22  Q.   And I'd like you to take a look at a portion of the

23  report that's dated May 30th, 2003.  It's Defendant's Trial

24  Exhibit 46.  And I'd like to direct your attention to the

25  third page of that exhibit which has got a number on the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  bottom ending in 09.

2  A.   Okay.

3  Q.   And let's take a look at the third paragraph on the page

4  about a meeting that we were just talking about.  Do you

5  recall that -- what was discussed at that meeting in August of

6  2002?

7  A.   My recollection is this is consistent with the items

8  discussed at that meeting.

9  Q.   I'm sorry?

10  A.   My recollection is what I'm reading here is consistent

11  with what I recall from that meeting, yes.

12  Q.   So in addition to the scrubbers, TVA told you that it

13  would have 25 boiler units controlled by 2005 with SCR; is

14  that correct?

15  A.   I don't see the reference to SCR on there.  It says, "TVA

16  plans to have 25 boiler units" --

17  Q.   The prior sentence says, "Regarding NOx control, TVA is

18  on schedule to have the first eight of its selective catalytic

19  reduction systems in place.

20  A.   I see that.

21  Q.   Then it goes on to talk about 25.

22  A.   Okay.

23  Q.   So in 2002 TVA told you that it had plans to build

24  some -- build five more scrubbers and a lot of SCRs; isn't

25  that right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    That's what I understand, yes.

2    Q.    Do you have any idea as we -- as we sit here and stand

3    here today how many of those have been completed, either

4    scrubbers or SCRs?

5    A.    My understanding on scrubbers is that there are a total

6    of seven that have been completed and in operation, I think

7    counting the original six.  To be honest, I don't know how

8    many remaining ones are under construction or ready to go

9    online.

10   Q.    How about scrub -- how about SCRs?

11   A.    SCR, I do not recall or am aware of the exact status of

12   the SCR or NOx control units.

13   Q.    In 2002 did Tennessee have a Clean Smokestacks Act?

14   A.    Not to my knowledge.

15   Q.    Did Kentucky?

16   A.    Not to my knowledge.

17   Q.    Did Alabama?

18   A.    No.

19   Q.    But TVA had plans to put in scrubbers and SCRs even

20   though there was no Smokestacks Act in the states that it

21   operated in; isn't that correct?

22   A.    Well, there is an understanding that NOx SIP Call was a

23   driver to a lot of NOx controls in each of the states covered

24   by that through federal provision, including the states that

25   you've listed, including North Carolina.  And that I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    understand TVA had six scrubbers already in place and that

2    there were plans for more.

3        Part of the issue in our discussing or having meetings

4    after the Clean Smokestacks Act with Tennessee and other

5    states was to try to encourage a similar bill requiring these

6    controls on a specific schedule.

7    Q.   I understand.  There was a -- was there a subsequent

8    meeting between you and other TVA personnel in January of '03?

9    A.   I believe there was.  I recall that.

10   Q.   What do you recall about that meeting?

11   A.   I believe, if I'm remembering -- I'm trying to remember

12   if John Ship was there.  Or Larry Galtney, I believe, was

13   there from TVA.

14   Q.   Is that all you remember about it?

15   A.   Well, I remember there was some discussion where we were

16   asking for information from TVA regarding plans and schedules

17   so that we could try to factor that into our ambient air

18   analysis.

19   Q.   Did you get the information you asked for?

20   A.   My understanding is we did.  And we did use what we could

21   of that.

22   Q.   Now, you also testified about the various provisions of

23   the Smokestacks Act.  I think one provision you didn't mention

24   was Section 11.  Section 11 includes a reporting requirement,

25   doesn't it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   I believe that's correct.

2  Q.   And it requires a report on the feasibility of obtaining

3  reductions in NOx and sulfur dioxide beyond those required by

4  the Smokestacks Act.

5  A.   That's correct.

6  Q.   And I believe the statute had an original date by which

7  the report was to be made.  Wasn't that date September 2005?

8  A.   It was.  And it was subsequently amended to 2007.

9  Q.   Has that report been made?

10  A.   We have made two reports under that provision to the

11  legislature to date.

12  Q.   Both such reports recommended postponing a substantive

13  report, didn't they?

14  A.   It -- there was a consideration of postponing; but

15  basically, what we said in the report was our sense is the

16  control required by the Clean Smokestacks does represent state

17  of the art at this point in time.  The essence of the

18  provision was that we review the technology and technological

19  feasibility and economic feasibility of going beyond the Clean

20  Smokestacks provisions.

21       MS. COOPER:  I'd like to move Exhibit 46 into

22  evidence, Your Honor.  That's the May 30, 2003, Smokestacks

23  Act report.

24       MR. GULICK:  Object to that, Your Honor, because

25  it's not a complete document.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MS. COOPER:  We can submit the complete document,

2     Your Honor, but we submit it specifically for the purpose of

3     talking about the one page in there that Mr. Nicholson has

4     agreed is correct.

5          THE COURT:  The objection is overruled.  Go ahead

6     with your question.

7          MS. COOPER:  All right.

8          (Defendant's Exhibit Number 46 was received into

9     evidence.)

10    Q.   Now, I'd like you to pull out what was previously

11    admitted as Plaintiff's Exhibit 10, which is the June 1, 2008,

12    Smokestacks Act report.  And I'd like you to direct your

13    attention to Page 9.

14    A.   That was Exhibit 10?

15    Q.   Exhibit 10.

16    A.   I believe you said Page 9?

17    Q.   Page 9.

18    A.   Okay.

19    Q.   Look down there at what is the first paragraph on the

20    page.  Not the continuation but the part that begins "Progress

21    Energy."  Do you see that?

22    A.   The one above the next paragraph heading?

23    Q.   Yes.

24    A.   The short paragraph.

25    Q.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.    Yes.

2  Q.    And according to this report, Progress reported that its

3  cost estimate for complying with Smokestacks was 90 percent

4  higher than the original 2002 cost estimate; isn't that

5  correct?

6  A.    That's correct.  And that was submitted in their report.

7  Q.    And Duke made a similar cost estimate of 23 percent

8  higher than the original 2002 estimate; isn't that correct?

9  A.    Correct.

10  Q.    Now, is the Smokestacks Act out ahead of most states in

11  terms of a state standard?

12  A.    I think certainly it might be viewed that way.  I think a

13  lot of states have talked about doing multi-pollutant

14  regulations and strategies.  The State of Maryland has also

15  adopted -- or enacted a similar program.  Other states have

16  talked about it.  We've talked to a number of states that have

17  been looking at development --

18  Q.    Well, have you talked about it that way?

19  A.    We have noted that we, perhaps, are out ahead of a number

20  of states as a point of encouraging others to come along,

21  quite frankly, and as the Clean Smokestacks -- or excuse me,

22  the SAMI analysis suggested that we need to be making these

23  reductions, yes.

24  Q.    Well, Mr. Nicholson, I'd like you to take a look at Page

25  33 from your 30(b)(6) deposition.  Do you have --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   I see it on the screen.

2   Q.   All right.  And you were asked a question about why DENR

3   didn't lower standards and you said, "I think just the

4   tradition of meeting the ambient standards in North Carolina,

5   as was the case in many states.  I think one can clearly see

6   that our Clean Smokestacks Act was out ahead of most states in

7   terms of a state initiated effort."

8        So didn't you yourself use that language in describing

9   the Smokestacks Act?

10  A.   I did and I still feel strongly that that's the case now.

11  We believe this is the right thing to do and even if it is up

12  against a given ambient air quality standard.

13  Q.   Thank you, Mr. Nicholson.

14       Let's turn now to Plaintiff's Exhibit -- I'm going to go

15  backwards, Plaintiff's Exhibit 11.  Let's make that

16  Plaintiff's Exhibit 13, which is the summary.

17       Now, I believe you previously identified the summary as a

18  summary of certain CAIR models; is that correct?

19  A.   That's correct.

20  Q.   And if you look at the heading on the page, it says,

21  "PM$_{2.5}$ Contributions From All Manmade Sources in Listed

22  States."

23  A.   Yes.

24  Q.   So the CAIR models all sources of pollution in those

25  states, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BROCK NICHOLSON - CROSS

1  A.   These are what are called zero outruns.

2  Q.   Isn't it true that there are many other pollution sources

3  in Alabama besides TVA?

4  A.   I'm sure there are other sources besides TVA.

5  Q.   And isn't the same thing true in Kentucky?

6  A.   I would agree.

7  Q.   And isn't even the same thing true in Tennessee?

8  A.   I would say that's likely true; however, an awful lot of

9  the emissions, particularly in Tennessee, 72 percent of the

10  $SO_2$ emissions are from TVA.

11  Q.   Well --

12  A.   Of the state's total emissions.

13  Q.   What's the date on that estimate, do you know?

14  A.   I think 2002, if I'm recalling correctly.  Or 2000 --

15  2002, I believe.

16  Q.   Well, the SAMI numbers were as of March 2005; isn't that

17  right?

18  A.   This is CAIR analysis.

19  Q.   I'm sorry, CAIR numbers as of March 2005; isn't that

20  right?

21      So the percentage that you used may have changed by

22  March 2005?

23  A.   Perhaps some.

24  Q.   You don't know what it is for March 2005?

25  A.   I cannot say exactly.  I doubt, though --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BROCK NICHOLSON - CROSS

1  Q.   In Alabama there are other power plants besides TVA;

2  isn't that right?

3  A.   I'm sorry, I didn't understand.

4  Q.   In Alabama there are power plants other than those

5  belonging to TVA; isn't that right?

6  A.   That's my understanding, yes.

7  Q.   And the same is true in Kentucky.

8  A.   That's also my understanding.

9  Q.   Now, CAIR didn't model TVA's emissions, did it?

10  A.   It modeled the emissions in this particular analysis, the

11  statewide emissions, yes.

12  Q.   No, I asked you whether it modeled TVA's emissions.

13  A.   It did as an inherent part of modeling the state

14  emissions from Tennessee.

15  Q.   But not separately.

16  A.   I don't have knowledge of that.

17  Q.   Thank you.

18       I'd like you to dig out Plaintiff's Exhibit 1 which is

19  the SAMI report.

20       Do you have that?

21  A.   I do.

22  Q.   All right.  The first thing I'd like to do is ask you to

23  turn to Page 2.6.

24          (Witness complied.)

25  Q.   Which is the SAMI 8-State Emissions Summary by Sector and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BROCK NICHOLSON - CROSS

1  Strategy.

2  A.    I have it.

3  Q.    You have it.

4        Do you see the line that's the second line in that says

5  "1990 A1, A2, B1, B2, B3?"

6  A.    I do.

7  Q.    Can you explain to us what those abbreviations mean.

8  A.    Okay.  Again, that's in the heading for the whole table.

9  And those are the designations for the particular strategy or

10  in the case of 1990, emissions base inventory which is

11  projected to 2010 without the strategy.  That's what the

12  meaning is.  In other words, the column below that reflects

13  the associated emissions of each pollutant as listed in the

14  table for each of the sectors listed in the table going down.

15  And going across, of course, is the range of strategies.

16  Q.    Well, do you remember what the A -- let's say what the B1

17  strategy was?

18  A.    Well, I don't remember in my head all of them, but they

19  do follow in a table just after this.  They're all listed for

20  each source category.

21  Q.    All right.  Let's take a look at Page 2.8.

22  A.    Okay.

23  Q.    You said you don't really remember what the A1, A2, B1,

24  B2 --

25  A.    Conceptually, absolutely; but specifically for each

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    source category which strategy we applied, I need to refer to

2    the table.

3    Q.    Well, conceptually what are they?

4    A.    Well, conceptually the A1 strategy, I believe, as I

5    explained before, and the A2 are basic strategies.

6          A1 is a strategy of emissions that would occur in each of

7    the two future projection years if we applied only those

8    regulatory programs that are currently on the books.  In other

9    words, enforceable on the books is A1.

10         We add to that in A2 to those programs that we expect,

11   fully expect with great certainty and SAMI participants agreed

12   in by consensus we should include in that.  Of particular note

13   is the NOx SIP Call and the Tier II standards for the federal

14   tailpipe standards.  Tier II is in A2.

15   Q.    And what about B1?

16   A.    B1, then, is additional emissions reduction strategies

17   applied to A2.

18   Q.    How much additional reduction strategies?

19   A.    Well, conceptually in B1, it's not that much more.  B2 is

20   greater.  B3 is even greater.  B1 conceptually contains

21   consideration of costs and technological feasibility currently

22   existing.  B2 goes beyond that, and B3 well beyond that in

23   that it's prototypes that might be existing now and less

24   consideration of cost and technical -- or economic feasibility

25   into the future, but one that we want to -- wanted in SAMI to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  understand if we could get to that point in 2010, 2040 --

2  Q.   Is there a -- excuse me.  Is there a common name that B1

3  is called?

4  A.   Well, B1 strategy as we ended up here.

5  Q.   Is there a common name that B2 is called?

6  A.   I'm not sure what you mean by common name.

7  Q.   A shorthand way to refer to it.

8  A.   We decided on the B strategies in the final analysis.

9  Q.   Have you -- are you familiar with the term B1 being

10  called "on the books?"

11  A.   A1 is "on the books."  A2 is "on the way."  B strategies

12  are beyond the base strategies of "on the books" and "on the

13  way."

14  Q.   But they had things of that -- names of that nature,

15  didn't they?

16  A.   Sure.

17  Q.   And what were they?

18  A.   In the B strategies?

19  Q.   Yes.

20  A.   Actually, quite honestly, I don't recall what we did, but

21  we did have shorthands and we decided that they weren't --

22  they might bring connotations of some control and we wanted to

23  have a description that was -- that didn't carry that.  So we

24  decided on just the label of B strategies.

25  Q.   Now, when your counsel was questioning, you looked at a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   number of state-by-state maps in the SAMI report, and those

2   maps talked about Kentucky, for example.  And when those maps

3   referred to Kentucky, they referred to all utility sources in

4   Kentucky not just TVA; isn't that correct?

5   A.   They referred actually to $SO_2$ emissions in the state of

6   Kentucky.

7   Q.   Whatever the source.

8   A.   Okay.  That's correct.

9   Q.   And the same is true for Alabama.

10  A.   And each of the states.

11  Q.   And each of the states.  And as far as you know, there

12  was no TVA specific modeling done with respect to SAMI; isn't

13  that right?

14  A.   Well, let me -- let me clar --

15  Q.   Let me -- let me make my question a little bit clearer.

16  A.   Okay.

17  Q.   That is, SAMI didn't identify that TVA's plants, coal-run

18  plant, for example, emitted X quantity of $SO_2$ which then

19  reached a certain location; isn't that correct?

20  A.   We did in our broad general modeling in SAMI.  We did

21  identify each emission point and we had the states and the

22  sources concur on a consensus basis that they were the right

23  emissions for the base year, projection years, to projection

24  years.  In the sensitivities -- and I'm drawing a distinction

25  between the broad modeling of all sources across all of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BROCK NICHOLSON - CROSS

1  full set of nine episodes that we modeled and the more

2  surgically specific sensitivity analysis per state.

3      So yes, we did factor in all of the utilities including

4  TVA and every other utility in the region in all eight states

5  and even --

6  Q.   But you didn't separate out, that was my question.

7  A.   Well, it separated out internally the model.  The model

8  handles it as a source within the model and it counts those

9  emissions when the mathematical model considers meteorology --

10  Q.   In the aggregate for the state, correct?

11  A.   No, let me -- well, I missed my point -- making my point.

12  In the broad modeling SAMI did, we counted all emissions in

13  the full eight states and we ran the full suite of

14  meteorological episodes to get the results in the broad air

15  quality model.

16      In addition to the broad air quality modeling, we did

17  state-by-state, region-by-region sensitivity analysis that we

18  went through earlier to show what the effect would be of

19  controlling in a certain region, a certain state.  By reducing

20  in a sensitivity context, say 10 percent, we showed the

21  qualitative relative benefit of doing that and where the

22  benefits would accrue.  We did really both if that wasn't

23  clear.

24      So yes, we have very clearly accounted for emissions of

25  Progress, Duke, TVA, Alabama Power, every one of them in our

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   broad analysis.

2   Q.   I don't think you've answered my question yet.  The

3   question --

4   A.   I'll try again.

5   Q.   -- is have they been accounted for?

6   A.   Yes, they have been accounted for.

7   Q.   The question -- that wasn't the question.  The question

8   was were they broken out separately to see their effects?

9   A.   In a sensitivity context not to my knowledge, no.

10  Q.   All right.  Now, let me ask you a little bit more about

11  that sensitivity analysis.  You were talking about a

12  10 percent reduction.

13  A.   Yes.

14  Q.   What was it a reduction from and to?

15  A.   It was a reduction from the A2 inventory that we just

16  talked about, that being the base inventory projected to a

17  future year applying both on-the-books and on-the-way

18  controls, and then we reduced that inventory for each state by

19  10 percent, the $SO_2$ inventory by 10 percent and then the NOx

20  inventory by 10 percent.

21  Q.   Do you remember the actual numbers?  How many emissions

22  were projected for $SO_2$ for the state of Tennessee and how much

23  was the reduction?

24  A.   No, I don't remember precisely what that number is.

25  Q.   Isn't it true that SAMI used a 1990 base?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   It is true.

2   Q.   So that the emissions you were looking to reduce from

3   were 18 years ago.

4   A.   No.  We projected -- we used that as a base inventory.

5   The concept of modeling is we have to form a base of

6   knowledge, that we have a complete inventory and then we take

7   that base and we grow it into future years --

8   Q.   Well, let me ask you another question about that.

9        MR. GULICK:  Your Honor, ask that the witness be

10  allowed to answer -- finish his answer.

11       THE COURT:  Yes, let the witness finish his answer

12  before you interrupt the question -- before you interrupt it.

13       Go ahead and finish your answer.

14       THE WITNESS:  Yes, it is true that we used a 1990

15  base, and realize this analysis was done in the mid '90s.  We

16  took that base and it was a known base and it was one that

17  everyone could agree historically go back and double check

18  what was actually emitted, so forth and so on.  And then the

19  technique in modeling is you take those broken out, factored

20  out by sources and source types and then you apply growth

21  factors.

22  Q.   Okay.

23  A.   And we, in fact, for the year 2010 and 2040 had those

24  emissions changes and growths confirmed by each of the

25  utilities, each of the states and all the industrial sectors

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  that were involved in the model, so --

2  Q.   All right.  Let me ask you another question about that.

3  Isn't there a more current and accurate emissions inventory

4  than the one that's been used?

5  A.   I'm sure there is.  One could be constructed, yes.

6  Q.   Hasn't one been constructed?

7  A.   I think for various purposes they have been.  And over

8  time with these kinds of air quality modeling analyses you do,

9  you update your inventory.

10  Q.   Is VISTAS one of those?  VISTAS.

11  A.   VISTAS, yes.  I'm sorry.

12  Q.   All right.  And didn't SAMI also use 1990 cost figures?

13  A.   I think these cost figures were updated and the cost, if

14  you remember -- in fact, I think some of them were to 2000

15  costs if I'm remembering correctly.  But they are adjusted

16  through analysis by people that are familiar with what

17  equipment costs are and dollars are adjusted to different

18  years.

19  Q.   They were from a 1990 baseline, correct?

20  A.   That's the original inventory baseline, correct.

21  Q.   Now, isn't it true that there have been more accurate and

22  up-to-date models that are able to be used than the ones that

23  SAMI used?

24  A.   Well, models have evolved over time.  Certainly we think

25  a lot of care was put into the SAMI modeling and it was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  carefully done.  As I said, it was done with an input of a lot

2  of people.  Certainly, one would reason -- I think others may

3  talk to this -- that we'll see more modern models, if you

4  will.  But I think clearly one of the things that SAMI did was

5  that one atmosphere model for the first time that we're aware

6  of be able to understand what all of these welfare related --

7  Q.  All right.  The question really had to go with to whether

8  there was a more modern --

9  A.  Well, I'm just explaining that we did in fact innovate in

10 SAMI at that time and there have been models since, certainly.

11 Q.  Now, SAMI didn't include any analysis of health benefits,

12 did it?

13 A.  Not directly, that's correct.

14 Q.  And the reason for that was that they were too uncertain;

15 is that not correct?

16 A.  No, the reason for that was that the purpose of SAMI was

17 to look at air-quality related values in the Southern

18 Appalachians which was visibility, damage or injury or effects

19 on streams, the terrestrial effects, and forests.  That was

20 the explicit purpose of SAMI.

21 Q.  Well, let me direct your attention to Page 8.1.  And near

22 the bottom of the middle paragraph, "Two topics - mortality

23 risk and competitiveness - were not taken to completion.  The

24 contractors fulfilled their obligations, but it was felt that

25 the draft reports on those topics were not comprehensive

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  enough to form conclusions given the uncertainness."  Isn't

2  that what SAMI reported?

3  A.   That's correct.  Let me add that, you know, the purpose

4  of SAMI was to look at these welfare related issues, not

5  health.  And while we may have had a contractor start to look

6  at it, we realized that wasn't the focus of SAMI.  So that was

7  part of the decision to not continue that.

8  Q.   SAMI itself said it was because of the uncertainties, not

9  because it wasn't consistent with the purpose, right?

10  A.   That's what got written in the report.

11  Q.   That's what the report says, that's correct.

12  A.   Yes.

13  Q.   Now, SAMI recognized that there were substantial

14  uncertainties throughout estimating emissions and projecting

15  their impact, didn't it?

16  A.   SAMI did recognize uncertainties and that varied by the

17  nature of the source and the nature of the pollutant.  In

18  fact, there are even tables in here that suggest relative

19  degrees of uncertainty depending on the pollutant and the

20  source, yes.

21  Q.   And the uncertainties had to do with everything from the

22  emissions inventory to the assumptions made in the computer

23  modeling and with the performance of the model itself, didn't

24  they?

25  A.   Well, let me -- let me again emphasize that the degree of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  certainty from power plants and other major stationary sources

2  was of the highest certainty and the least certain on ammonia

3  and some of the more area sources or agricultural sources.  So

4  it varied.  And yes, there are uncertainties inherent in all

5  simulation models.

6  Q.   And there were also uncertainties with respect to the

7  assessment of impacts on various kinds of resources, such as

8  aquatic and forest resources; isn't that right?

9  A.   That is correct.  All simulation models have inherent

10  uncertainties.

11  Q.   And there were uncertainties about projecting the

12  response of fish and forest to changes in acid deposition;

13  isn't that right?

14  A.   I'm not qualified to answer specifics on that, effects

15  modeling that we did, but certainly --

16  Q.   Well, didn't SAMI say that?

17  A.   I'd probably have to reread it.  But I -- again, I think

18  all simulation modeling has a certain degree of uncertainty of

19  varying nature.

20  Q.   Now, on your direct examination you testified about the

21  valuation of recreational visibility.

22  A.   Yes.

23  Q.   And isn't it true that SAMI concluded that the estimates

24  that you were talking about are uncertain and controversial?

25  A.   I think I would want to see those words in the context

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  that you're suggesting.

2  Q.  All right.  Well, let me direct your attention --

3  A.  Okay.

4  Q.  -- to Page 8.7, the first paragraph.

5      And the first line says, quote, "The estimates of

6  recreational and residential visibility valuation are

7  uncertain and controversial."  Isn't that what SAMI said about

8  those values that you testified about this morning?

9  A.  It does.  And I would say that we understood that and the

10 values that we're quoting do give ranges and that we

11 understand that uncertainty.  Doesn't mean that the values are

12 necessarily wrong.  It may not be precisely or absolutely

13 correct, but it certainly gives us an indication of the range.

14      THE COURT REPORTER:  I didn't get your question at

15 all with the answer going on.  Could you repeat your question.

16      THE COURT:  Let's get out of the habit of breaking

17 in the answer.

18      MS. COOPER:  Sorry, Your Honor.

19      THE COURT:  Let the witness finish.

20      THE WITNESS:  What I was saying is that while -- and

21 it's true, we do recognize uncertainties here; but again, in

22 this type of analysis, part of the effort is to get a feel for

23 and a ballpark of the range of values in this particular

24 socioeconomic analysis.  Doesn't necessarily mean it's wrong,

25 but certainly the uncertainties with it.  And as in any

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 analysis, there will be a range of values that one might

2 associate with a more certain end of the range or a less

3 certain end of the range.

4 Q.   Okay.  Isn't it true that SAMI also concluded that under

5 the entire range of its control strategies from what was on

6 the books to a very aggressive strategy, that the changes to

7 forests would likely be small?

8 A.   I think, as I recall, in a very general way that there

9 will not be an overall significant shift in the forest area --

10 and other experts will talk about this -- basal area, but

11 there will be some competitiveness issues among species of

12 forests across the region.

13 Q.   Well, let me ask you to take a look at Page 5.16, Key

14 Finding Number 6.

15 A.   I'm sorry, was that 16, 5.16?

16 Q.   5.16.

17 A.   Okay.

18 Q.   In response to "Ozone Changes Under SAMI Strategies,

19 Changes in total basal area in the forest and the SAMI region

20 are likely to be small."  Isn't that what the report said?

21 A.   I'm not seeing the exact sentence, but that's --

22 Q.   That's the first sentence of Key Finding Number 6.

23 A.   Number 6, okay.

24 Q.   It goes on to say, "Tree mortality in direct response to

25 ozone is not expected."  Is that correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   That is correct.

2          MS. COOPER:  Your Honor, I have no further questions

3   of this witness.

4          THE COURT:  Any redirect?

5          MR. GULICK:  Yes, Your Honor.

6          THE COURT:  All right.

7                      REDIRECT EXAMINATION

8   BY MR. GULICK:

9   Q.   Starting from the back, Mr. Nicholson.  You'd indicated

10  before that SAMI was a consensus product.

11  A.   That's correct.

12  Q.   Is that right?

13       Did SAMI decide that the residential -- that the

14  valuations of visibility were worthy of publication in the

15  final report?

16  A.   It did, even recognizing the uncertainties.

17  Q.   With respect to the -- I've lost the page number, but

18  there was a -- you were asked about, I think at Page 8.1,

19  about the health reports.  If you would go back to that,

20  please.

21  A.   Okay.

22  Q.   Did you find that location?

23  A.   I did.  I have it.

24  Q.   So this is in the left-hand column.

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And didn't it indicate that the -- doesn't it indicate

2  that it was felt that the reports on these topics were not

3  comprehensive enough?

4  A.   (No response.)

5  Q.   Have you found where it is?

6  A.   I'm looking, reading now.

7  Q.   It's in the lower half of the left-hand column of 8.1,

8  the same place that counsel for TVA directed your attention

9  to.

10  A.   Starting in "Two Topics?"

11  Q.   Yes.

12  A.   Well, I'll just -- okay.  I'll read it.

13       Well, it simply says -- and I think I do recall this

14  discussion.  "Two topics - mortality risk and competitiveness

15  - were not taken to completion as opposed to the other six

16  areas that were looked at.  The contractors fulfilled their

17  obligation, but it was felt that the draft reports on these

18  topics were not comprehensive enough to form conclusions given

19  the uncertainties.  Therefore, these two topics did not result

20  in finished reports."

21  Q.   So is it correct that there was a determination that the

22  reports were not comprehensive enough --

23  A.   I think that was the determination.

24  Q.   -- to draw conclusions.

25  A.   Pardon?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.    Isn't the conclusion that the reports were not

2  comprehensive enough to draw conclusions?

3  A.    That is correct.  And that was two of the six areas, I

4  should clarify that point, not six others.

5  Q.    With respect to Blue Ridge Paper which was mentioned to

6  you by counsel for TVA, is Blue Ridge Paper a utility?

7  A.    No, they are not.

8  Q.    How -- what sector, with respect to SAMI's

9  characterizations, in what sector would you put Blue Ridge

10  Paper?

11  A.    That would be an industrial or nonutility.  Point source

12  type source.

13  Q.    And do you know whether or not the State of North

14  Carolina has value -- has done an evaluation of Blue Ridge

15  Paper?

16  A.    We actually have done a fairly extensive evaluation of

17  Blue Ridge Paper as part of their Regional Haze Program where

18  we are required to both look at what's called Best Available

19  Retrofit Technology, BART, under that haze rule for those

20  sources that were built in a 15-year period prior to the '77

21  amendments, and we in fact did that.  And also, in addition to

22  that, we were to evaluate other remaining nonBART, as we call

23  them, sources to see if they should be controlled under

24  provisions of the regional haze and that's called Regional

25  Progress Analysis.  We did in fact do that as a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    comprehensive -- part of a comprehensive effort where we

2    looked at all the sources within certain distances in all the

3    Class I areas and we did in fact conclude at this time that

4    it's very cost prohibitive to require further controls on that

5    source.

6          And if we're talking -- I'll just use the reference

7    earlier, the 8,000 tons versus many more thousands of tons at

8    the utilities, the decision was that given the cost, cost

9    being maybe upwards of ten or more times up to 14,000 or in

10   one case maybe a hundred thousand dollars per ton reduce

11   versus the 13ish or so to $1,900 a ton for a utility, that we

12   would not require that as part of our Regional Haze Program.

13         However, we have put them on notice.  We sent a letter to

14   Blue Ridge Paper as well as others saying that in the next

15   round of analysis for regional haze, they are on notice that

16   they will be evaluated for further control.  But in the realm

17   of priorities and issue for getting emissions reductions, they

18   are in the next round.  They're in the queue for the next

19   analysis, if you will.

20   Q.   With respect to the National Ambient Air Quality

21   Standard, also known as NAAQS, N-A-A-Q-S, did the State of

22   North Carolina have occasion to comment to EPA on the fine

23   particulate or $PM_{2.5}$ NAAQS?

24   A.   We did.

25   Q.   The last time that it was considered?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.   We did.

2    Q.   I'd like to show you what is Plaintiff's Exhibit 14.  You

3    don't need to look for it.

4         MR. GULICK:  Bear with us, Your Honor.  We had to

5    make an adjustment to the electronic equipment.

6         THE COURT:  Plaintiff's 14?

7    BY MR. GULICK:

8    Q.   Mr. Nicholson, do you know what this letter is?

9    A.   Yes, I do.

10   Q.   And what is it?

11   A.   It is our comments made to the docket, USEPA docket

12   relative to the promulgation of a standard, NAAQS standard for

13   particulate matter.

14   Q.   And do you know what the comment of the Division of Air

15   Quality was?

16   A.   I think the key comment that the Division of Air Quality

17   made was that given our concern about there being no level

18   below which we aren't protective of -- well, are protective,

19   if you would, of adverse health effects, we recommended that

20   the administrator consider the Clean Air Science Advisory

21   Group when setting the standard for particulate.

22   Q.   Do you know what the advice of the Clean Air Science

23   Advisory Group was?

24   A.   In a general notion, yes.

25   Q.   And what was that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    That was that -- I don't know if I see it referenced on

2    here.  That they set it considerably lower than what the

3    administrator ended up choosing.

4    Q.    Are you aware whether the administrator had ever rejected

5    the advice of his science advisors before?

6    A.    We believe that that was probably the case in the ozone

7    standard -- well, subsequent to that, the ozone standard, but

8    not prior to this date.

9    Q.    So the ozone standard was a later situation?

10   A.    It was a later standard, yes.

11   Q.    So is this the first time that you're aware of --

12   A.    That's my understanding, that it is the first time.

13   Q.    I would like to draw to your attention to Plaintiff's

14   Exhibit 15.

15         Are you familiar with this document?

16   A.    I am.

17   Q.    And what is this document?

18   A.    This is a letter to the administrator of the USEPA from

19   our attorney general.

20   Q.    And what is the subject of this?

21   A.    The subject is Comments on the Proposed Rule to Set a

22   National Standard for Particulate Matter.

23   Q.    And do you recall what the recommendation of this letter

24   was?

25   A.    As I recall, that essentially the same recommendation,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  that the administrator should follow the Science Advisory

2  Board in setting that standard or consider the recommendations

3  of the Clean Air Scientific Advisory Committee.  CASAC for

4  short.

5  Q.   And again, was the advice of the Scientific Advisory

6  Committee to lower the NAAQS for $PM_{2.5}$?

7  A.   Lower than the administrator proposed or ended up

8  setting.

9  Q.   In fact, the administrator did not change that standard

10  for an annual standard.

11  A.   That's correct.

12          MR. GULICK:  Your Honor, I would move the admission

13  of these two letters into evidence.

14          THE COURT:  That's 15 and what's the other?

15          MR. GULICK:  14, Your Honor.

16          THE COURT:  All right.

17          (Plaintiff's Exhibits Numbers 14 and 15 were

18  received into evidence.)

19          MR. GULICK:  Your Honor, we had some question in our

20  mind as to whether we had moved the admission of our Exhibit

21  Number 5A, which was the chart, into evidence.  I may have

22  missed it.

23          THE COURT:  You have not admitted -- or requested

24  that 5A be admitted.

25          MR. GULICK:  I would move that it be admitted.  That

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    was an oversight, Your Honor.

2              THE COURT:  Let that be admitted.

3              (Plaintiff's Exhibit Number 5A was received into

4    evidence.)

5              THE COURT:  All right.  Does that complete your

6    redirect?

7              (Co-counsel conferred.)

8              MS. COOPER:  Nothing further, Your Honor.

9              THE COURT:  Any further recross?

10             MS. COOPER:  No, Your Honor.

11             THE COURT:  All right.  The witness may be excused.

12             THE WITNESS:  Thank you, sir.

13             THE COURT:  Thank you.

14             (Witness stepped down.)

15             THE COURT:  Call your next witness.

16             MR. GULICK:  Your Honor, we would call Mr. Bill

17   Jackson.

18                     WILLIAM A. JACKSON,

19   being first duly sworn, was examined and testified as follows:

20                     DIRECT EXAMINATION

21   BY MR. GULICK:

22   Q.   Would you state your full name.

23   A.   William A. Jackson.

24   Q.   Where do you live, Mr. Jackson?

25   A.   I live here in Asheville, North Carolina.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   Q.   Where did you receive your higher education?

2   A.   I received a Bachelor of Science in Biology from Albion

3   College.  It's in southern Michigan.  And I received a

4   Bachelor of Science in Forestry from the University of

5   Michigan.

6   Q.   And where are you currently employed?

7   A.   I'm employed with the U.S. Department of Agriculture.

8   The agency is called the Forest Service.

9   Q.   And what is your position with the United States Forest

10  Service?

11  A.   I'm currently an air resource specialist.

12  Q.   How long have you held the position of air resource

13  specialist?

14  A.   I've had this position since 1992.  Or 1991 -- 1992,

15  uh-huh.

16  Q.   When did you first start working for the U.S. Forest

17  Service?

18  A.   I began when graduating from the University of Michigan

19  back in 1982 taking summer appointments with them, and it was

20  about three years of what we call temporary work before I

21  became permanent full-time.

22  Q.   And with the U.S. Forest Service, could you tell us

23  what -- what the course of your employment has been in terms

24  of the jobs that you did, the work that you did.

25  A.   Sure.  The first part of my career really was working at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    insect and disease problems, forest and lands.  That could be
2    national forests as well as other governmental ownerships, for
3    example, national parks and Corps of Engineering sites, for
4    example.  In that work in my early career, I worked on surveys
5    to detect and quantify the presence of insects and diseases.
6         Now, in the middle of that also I did do basic research,
7    working for Forest Service research looking at biotechnology
8    techniques to look for disease resistance in forest trees, as
9    well as some other work with the University of Minnesota.
10        When I became permanent full-time, I was still what was
11   classified as a forestry technician, and there I had greater
12   responsibilities in terms of working with the other summer
13   crew members and carrying out the surveys that were designed
14   by the professionals as well as also had the responsibility of
15   conducting aerial surveys of federal lands, looking in
16   particular for insect defoliations.
17        Then I should go on to say after I became permanent
18   full-time, I received a job as a plant pathologist with the
19   Forest Service in Morgantown, West Virginia, and there I
20   worked in seven states helping state and federal clients
21   looking at their insects and disease problems that they had.
22   This would range from introduced insects and diseases as well
23   as native pests also.
24        But it was also during that same time period that I began
25   my work in air quality because air pollution is considered a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    tree disease.  And there I began working at ground-level ozone
2    impacts to forest trees as well as looking at nutrient
3    deficiencies in the red spruce forest at the high elevations
4    in West Virginia.
5    Q.   And since you have become -- was it after that that you
6    became an air resource specialist?
7    A.   It is.  When I left Morgantown, West Virginia, it was to
8    move here to Asheville to work solely on air pollution
9    problems.
10   Q.   Since 1992 you've worked as an air resource specialist
11   for the U.S. Forest Service?
12   A.   That is correct.
13   Q.   Describe what your responsibilities are as air resource
14   specialist.
15   A.   Well, there is really a range of responsibilities, but
16   one of the primary responsibilities I have is to advise -- and
17   this is a designation in the Clean Air Act Amendments of
18   1977 -- the federal land manager, in this case it's the forest
19   supervisor who resides here in Asheville, on whether a new
20   source of air pollution will cause adverse impacts to any
21   air-quality related values at a federally designated Class I
22   area.
23        So when permits come in, for example, let's say there's a
24   new coal-fired power plant or a facility wants to expand
25   production, I'm the technical contact for both the applicant,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    for the company, usually their consultants, as well as the

2    state air regulatory agency, and they provide me documentation

3    that I will review, provide a technical review on behalf of

4    the federal land manager and then provide recommendations to

5    the federal land managers so that they can make the final

6    decision on whether a new source of pollution has an adverse

7    impact or not.

8         Well, in order to make decisions, you need to have data.

9    And so I'm also responsible for conducting the inventory and

10   monitoring of the air-quality related values at these

11   federal -- at these federally mandated Class I areas.

12        And if I could pause a moment and say for the Forest

13   Service not only are we concerned about these Class I areas,

14   we care about the whole national forest.  So our surveys also

15   extend beyond just these three wildernesses that have Class I

16   designation in western North Carolina.

17        And also I work in eastern Tennessee.  I have worked in

18   eastern Tennessee and in the upstate of South Carolina, but my

19   role has been beyond that.

20        But in particular, we have installed fine particle

21   monitoring under the improved protocol that looks at what

22   kinds of fine particles are in the atmosphere, and that's very

23   relevant in terms of our role of visibility protection in the

24   Class I areas.

25   Q.   And just so we can, you did mention the air-quality

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  related values.

2  A.    Yeah.

3  Q.    What are the air-quality related values that are of

4  concern to the U.S. Forest Service?

5  A.    We have taken a broad stance on that in terms of how we

6  classify them.  But we talk about in terms of flora, fauna, as

7  well as visibility.  And visibility in particular because the

8  Clean Air Act Amendments of 1977 specifically direct the

9  federal land manager to protect visibility.  And so those are

10  some of the air-quality related values that we're trying to

11  look at.

12      Now, when we look at, for example, systems, we measure --

13  we will look at water.  We are looking at ambient

14  concentrations of ozone.  Those are our indicators to try and

15  give us an understanding of what's going on with the

16  air-quality related values.

17  Q.    I would like to draw to your attention, Mr. Jackson, to

18  Exhibit Number 440, Plaintiff's Exhibit 440.

19  A.    Uh-huh.

20  Q.    It should be on the screen in front of you.

21  A.    Yes.

22  Q.    And can you tell the court what this document is.

23  A.    This is my curriculum vitae talking about my educational

24  background as well as my special accomplishments that I've had

25  during my work career, and it would go on to say the specific

1    locations where I work and the major tasks that I performed.

2    Q.    I take it this includes the past history -- your past

3    history of employment that you've been describing to us

4    earlier.

5    A.    That is correct, yes.

6    Q.    I notice on Page 16 of this document, there is a

7    reference to a Southern Appalachian Assessment.

8    A.    Yes.

9    Q.    It says you were a team leader.

10   A.    Can you tell us -- Southern Appalachian Assessment, the

11   first paragraph, can you tell us what was going on with this

12   particular study.

13   A.    Uh-huh.  Well, this was in particular a study by the

14   federal agencies.  The Forest Service was certainly a leader

15   in this.  And it fell under the auspices of the Southern

16   Appalachian Man and the Biosphere.  SAMAB was the acronym.

17   And the Forest Service definitely was the leader in getting

18   this going under the SAMAB program of trying to take a

19   comprehensive ecological look at the whole Southern

20   Appalachians, but they had other partners, including EPA

21   Region 4, Tennessee Valley Authority, as well as other federal

22   agencies in the region that are part of the SAMAB program.

23   Q.    And what was the goal -- what did the Southern

24   Appalachian Assessment do?

25   A.    In a nutshell, it's really trying to compile the

WILLIAM JACKSON - DIRECT

1    available information at that particular time that we could
2    obtain just to describe what is the current conditions in the
3    Southern Appalachians.  And air quality was one of those focus
4    areas that was actually requested by the public.
5    Q.   And what aspects of air quality did it evaluate?
6    A.   We looked at what the emissions were up to that --
7    something about the emissions that we could gather at that
8    time.  We looked at the effects of acidic deposition to
9    terrestrial and aquatic systems.  We also looked at
10   particulate matter, and at that time we talked about PM10 and
11   how do we stand in relationship to the PM10 standard, as well
12   as ground-level ozone potential impacts to the forest as well
13   as in relationship to any issues regarding the National
14   Ambient Air Quality Standards.
15        I believe that those were the main areas.
16   Q.   Were there any conclusions that the Southern Appalachian
17   Assessment reached?
18   A.   It's been a while and I don't recall any at this time in
19   the sense of as we've heard about with SAMI.  Nothing to the
20   extent and conclusions like that.
21   Q.   Then let's turn to SAMI.  I see that you've indicated
22   you're involved with the Southern Appalachian Mountains
23   Initiative which is mentioned at the bottom of Page 1 and on
24   to Page 2.
25   A.   Uh-huh.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  Q.   Were you involved with SAMI?

2  A.   Yes, I was.

3  Q.   And during what period of time were you involved with

4  SAMI?

5  A.   Well, I like to kid around with people a little bit.  I

6  was involved with SAMI before there was a name called SAMI.

7  And so I was there from the very early meetings in terms of

8  the formation of a group of federal land managers wanting to

9  work with the states in terms of air quality issues that were

10 occurring.

11      But I was with SAMI once it did form.  I was on the

12 technical oversight committee and worked on helping develop

13 that was mentioned earlier, the Integrated Assessment in terms

14 of being able to pass emissions results into atmospheric

15 modeling, and then results from the atmospheric modeling were

16 then used in the effects models that we used.  And that was

17 quite unique that was done at that time.

18      So once that was set up and we had the contractors in

19 place, then -- and I can't remember how many years we're into

20 the process, perhaps five or six years that I did a lot of

21 work with the Technical Oversight Committee.  But during that

22 same period, all the way to the end, I worked quite a bit with

23 the Effects Subcommittee of SAMI.

24 Q.   And those effects were what subjects?

25 A.   They were for visibility, acidic deposition impacts to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  forests as well as water or aquatic systems, and ground-level

2  ozone impacts to vegetation.

3  Q.   Let's go back to the beginning of SAMI, and could you

4  give us your perspective of what the issues were that led to

5  the formation of SAMI.

6  A.   Sure.

7        MR. FINE:  Your Honor, I'll object.  I don't know

8  that this witness is competent to testify as to the

9  motivations of the formation of SAMI.  He can talk to his own

10  motivations and his participation, but not as to why all these

11  states gathered their resources with all these other

12  organizations to put SAMI together.

13        MR. GULICK:  Your Honor, I asked about the issues,

14  not the motivation --

15        THE COURT:  Having addressed that question, you're

16  overruled at this point.  Go ahead.

17        THE WITNESS:  At that time there was a strong sense

18  of frustration --

19        MR. FINE:  Your Honor, I'll restate my objection if

20  he's going to talk about a sense of frustration.

21        THE COURT:  I've ruled on it so let's let the

22  witness answer.

23        MR. FINE:  Very well, Your Honor.

24        THE WITNESS:  That during the new source review

25  process, that we -- new sources of air pollution were being

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    permitted at that particular time.  And yet, we had adverse

2    impacts already occurring to the air-quality related values.

3            For example, we knew that there was adverse impacts

4    occurring to visibility.  And the struggle that we were having

5    was how can we bring new sources on, how can we not make

6    adverse impacts determinations for every new source that comes

7    along when we know that the primary impacts that we're having

8    is really from older sources that are already permitted and in

9    operation.

10           And so the question really becomes is was there a

11   grounds, was there a way that beyond the recently implemented

12   Clean Air Act Amendments of 1990, because we felt that there

13   may -- there would need to be additional reductions of

14   pollutants beyond those levels to start remedying the adverse

15   impacts that were occurring, was there reasonable measures,

16   reasonable things that a state could do to reduce pollution so

17   that adverse impacts to the air-quality related values would

18   begin to subside or go away is really what we want.

19   Q.   At that time -- I take it this was in the early 1990s.

20   A.   Uh-huh.

21   Q.   Were there adverse effects occurring with respect to

22   other air-quality related values in visibility?

23   A.   We suspected that there was based upon the National

24   Atmospheric Precipitation Assessment Program, their results,

25   that's the NAPAP report, that talked about potential impacts

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   of sulfur deposition in particular to aquatic systems.

2       We had measurements, for example, in Virginia that showed

3   that base 10 ion depletion was occurring in that area, so that

4   was of concern to us.

5       And also, there was high concentrations of ground-level

6   ozone that were reported in scientific literature that were

7   occurring at Mt. Mitchell.

8   Q.   Thank you.  Now I'd like to step away for a while from

9   SAMI and ask for you to talk to us about visibility, what it

10  is and what the issues are with respect to visibility.

11      MR. FINE:  Your Honor, at this point I need to

12  interpose an objection.

13      Mr. Jackson is obviously going to be asked about

14  matters that will require him to render an expert opinion.

15  Mr. Jackson is not one of the experts who's favored us with a

16  report in this matter.  And I believe that on that basis as an

17  expert --

18      THE COURT:  Did you receive a copy of his vitae?

19      MR. FINE:  We did, Your Honor.

20      MR. GULICK:  Your Honor --

21      THE COURT:  Does that not speak to his

22  qualifications?

23      MR. FINE:  It does speak to his qualifications, Your

24  Honor, but we've not had a disclosure of the basis of his

25  expert testimony or any information as to the sum and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  substance of the opinions that he'll be rendering in his

2  testimony to the court today.

3      MR. GULICK:  Your Honor, Mr. Jackson has been on our

4  witness list and the general subject about which he would

5  testify from the very beginning in the 19 -- excuse me, in

6  2006.

7      He is not specially retained by the state.  He has

8  done no work for the state.  All of the knowledge that he has

9  he acquired in the performance of his work as an employee of

10  the U.S. Forest Service.  No doubt he has acquired special

11  knowledge and I believe that we could qualify him as an expert

12  witness.

13      However, all of the knowledge that he has -- and if

14  I must, I would -- I will go to that point.  He was not -- we

15  disclosed the nature of the substance that he would be able to

16  talk about to give them plenty of opportunity to take his

17  deposition.  As I say, he did no -- he was not retained by us

18  and did no special report for us and did no inquiry for us.

19  So all of his knowledge relates to what he learned and has

20  learned and done in the course of his employment with the U.S.

21  Forest Service.

22      And it's the case law of this circuit, Your Honor,

23  and I'm referring to *MCI Telecommunications Corp. versus*

24  *Wanzer*, and others, that the modern trend favors admission of

25  opinion testimony provided that it is well-founded on personal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  knowledge and is distinguished from hypothetical facts and

2  susceptible to cross examination.  Certainly --

3            THE COURT:  He appears to have adequate experience

4  to qualify him to proceed with the testimony that I've heard

5  so far, and I will let you proceed with your questioning given

6  that objection.

7            MR. FINE:  I'm sorry, Your Honor, I didn't quite

8  catch the last...

9            THE COURT:  The last was that you have the benefit

10  of an objection.

11            MR. FINE:  Thank you, Your Honor.

12            THE COURT:  Yes, sir.

13            And by the way, when you address the court, I expect

14  attorneys to stand.

15            MR. FINE:  I beg your pardon, Your Honor.

16            THE COURT:  Yes, sir, that's fine.  Now that we

17  understand each other, let's proceed.

18            MR. GULICK:  Bear with me a moment, Your Honor.

19  I've forgotten where I was.

20            Could you repeat back to me my last question.

21            THE COURT REPORTER:  Now I'd like to step away for a

22  while from SAMI and ask for you to talk to us about

23  visibility, what it is and what the issues are with respect to

24  visibility.

25            MR. GULICK:  Yes.  Thank you.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1          THE WITNESS:  Let me start with in terms of
2    visibility.
3          In surveys that were conducted by the Forest Service
4    research asking the public, you know, why do you want to visit
5    the national forest, and consistently over the years when
6    they've asked that question, the people that they've polled
7    have come back and said one of the reasons that they visit
8    national forests is for the views, for the scenery.  And
9    visibility, of course, is a very important part of that.
10          And as part of our role in terms of our federal land
11   management responsibilities and cooperating with EPA and
12   others, we monitor fine particles that are in the atmosphere.
13          For example, one of our monitoring sites is just off
14   the Blue Ridge Parkway near the Pisgah Inn.  That's called the
15   Frying Pan Monitoring Site and it's there to try and
16   represent -- to monitor the fine particles that could be
17   impacting Shining Rock Wilderness.  And what we have learned
18   from that particular data set is that the primary fine
19   particles that we measure in the atmosphere are sulfates and
20   those sulfates we know, based upon research that's been done,
21   based upon the studies, for example, like SAMI, they
22   originated as sulfur dioxide emissions.  And if we look at
23   what source categories are major contributors to sulfur
24   dioxide emissions, it's primarily the coal-fired utilities
25   that are emitting sulfur dixoide.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      So that sulfur dioxide that's emitted into the
2  atmosphere goes through a chemical transformation.  And part
3  of that transformation involves having oxident present in the
4  atmosphere.  Now, the primary oxident in the atmosphere is
5  ozone and so ozone does have a role in terms of forming
6  aerosol particles in the atmosphere.
7      The sulfates then are transported downwind as
8  they're going through this chemical transformation, and what
9  they are -- what they do is they can scatter light.  And
10 they're very efficient at scattering light because not only
11 does the sulfate particles by itself scatter light, but it's
12 also considered to be hydroscopic.  That is, in humid
13 atmosphere like we have here in the southeast during the
14 summer months, those sulfate particles -- let me back up one
15 moment to say as they're traveling through the atmosphere,
16 those sulfate particles are sticky and they can stick to one
17 another and they can scatter light.  But in a humid
18 atmosphere, they grow in size and they're very efficient at
19 scattering light.  And so we usually put more weight -- well,
20 we don't usually.  We put more weight on sulfate particles
21 that are present in the atmosphere because they are much more
22 efficient at scattering light at high relative humidities.
23     And so what we see in -- through our studies that
24 we've done before we did the fine particle measurements, we
25 actually had a camera located near Richland Balsam on the Blue

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   Ridge Parkway for Shining Rock.  We had other camera sites for

2   Joyce Kilmer and a separate site for Linville Gorge.  And we

3   took those pictures three times a day for four years.  And

4   what we learned from that is the primary visibility impairment

5   that we have is a uniform haze.  Combining that information

6   with what we know from the fine particle monitoring, we

7   believe -- we know that the majority of that uniform haze, and

8   it agrees with the scientific information that we have, that

9   uniform haze is being caused by sulfate particles.

10          Now --

11  Q.    Go ahead.

12  A.    Yeah, thank you.

13          And we also are measuring other fine particles at these

14  particular sites and the second most important fine particles

15  is classified as organics or volatile organic compounds.

16  You'll hear them referred to as VOC is their acronym.  And

17  those compounds are primarily emitted from vegetation.  There

18  are sources, manmade sources of VOCs.  For example, when we're

19  pumping gas into our vehicles and you smell some fumes, that's

20  VOCs, or when you're painting your house.  But by and large,

21  the primary VOCs that are released, especially here in the

22  Southern Appalachians, is from vegetation.  And if organics

23  were dominating visibility, we believe that we would have a

24  bluish cast to the mountains.  Hence, we have the name the

25  Blue Ridge Mountains.  But instead, what we see now on the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  poorest visibility days, those days that have fine particle

2  mass is you have what I describe as a white veil that occurs

3  and obscures our views, and that's an indication that you have

4  scattering of light that's occurring.  And as I mentioned

5  previously, that's due primarily to sulfate compounds in the

6  atmosphere.

7  Q.  Now, going back to SAMI for a moment.

8  A.  Uh-huh.

9  Q.  You were involved in the visibility study -- I think

10  you've already testified, the study that SAMI did, that

11  effects modeling.

12  A.  Yes, I was involved with the Effects Subcommittee,

13  uh-huh.

14  Q.  I'd like to draw your attention to Exhibit 1, Page 4.9.

15  I'm sorry, Page 71.  I'm sorry, I got that wrong.  Page 71,

16  Figure 4.9.

17          MR. FINE:  I'm sorry, what's the reference, counsel?

18          MR. GULICK:  I'm sorry, it's Exhibit 1, Page 71.

19          And Your Honor, it is on Page 4.1 of the physical

20  copy of Plaintiff's Exhibit 1.

21          THE COURT:  All right.  Go ahead.

22  Q.  Mr. Jackson, are you familiar with this figure?

23  A.  Yes, I am familiar with this figure, yes.

24  Q.  Could you explain what it shows.  You may have already

25  explained what it shows, but could you explain what this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  figure shows.

2  A.    Okay.  Well, this will take a couple moments to explain

3  it.

4        But first off, we have two graphics here.  One is for the

5  Great Smoky Mountains National Park in terms of results and

6  the other one is for Shenandoah National Park.  Now, what we

7  did here is we're just showing an example of a Class I area

8  from the southern end of the SAMI region and we're showing

9  results from the northern area or the northern portion of the

10 SAMI region.

11       Now, along the left-hand access, that is extinction.

12 Visibility sciences prefer to talk about the light extinction

13 and the units of measure there is inverse megameters.  Now,

14 sometimes you'll hear other units used, sometimes visual range

15 expressed in miles.  But here we have the results following

16 the atmospheric modeling results and accumulating all the days

17 that were modeled for the SAMI process showing the results for

18 the base case, which essentially is equivalent to the 1990

19 emissions, and then looking into the future.

20       Earlier today we talked and we saw reference to A1, A2,

21 B1, B2, B3.  But SAMI was becoming constrained with time and

22 resources and so the consensus was just to move forward with

23 the results for A2, B1 and B3.

24       Now, when we look at the individual bar charts, we're

25 looking at stack bar charts once again.  And the very bottom

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    of these bar charts says natural.  If there was no air

2    pollution in the atmosphere, the sun that's coming from space

3    from the sun, there is a certain amount of scattering that

4    occurs naturally.

5        When I went outside for lunch today, I looked up and we

6    have beautiful blue skies.  Well, the nitrogen compounds that

7    are in the atmosphere as well as the other gases cause a

8    scattering of the blue wavelengths of light.  And so you do

9    lose some energy, some wavelengths of light coming to the

10   earth's surface from the sun just due to what's also called

11   ray lay conditions.  That's another term that you'll hear.

12   But also are the -- that's natural loss -- natural scattering

13   of light.

14       Now, on top of that light blue bar in this graphic shows

15   a dark blue bar.  And that shows ammonium sulfates.  That's

16   the $NH_4$, that's in parenthesis, $_2SO_4$.  That's ammonium

17   sulfate.  That's usually how we look at the fine particle, the

18   sulfur portion of the fine particles as ammonium sulfate.

19       And this shows that in the base case for Great Smoky

20   Mountains and Shenandoah that it is ammonium sulfate particles

21   that are causing most of the light scattering that's observed

22   at these two Class I areas.

23       But let me say also that these results are the same also

24   for the other Class I areas, too.  These two were just put in

25   the report that way.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    As we look at emissions reduction strategies -- so in
2    1990 we have to remember what we had at that particular time
3    was the Clean Air Act Amendments had been -- Congress had
4    passed that and they were going to be implemented.  And so
5    that is part of A2, as well as, I believe Mr. Nicholson talked
6    about Tier II.  And there was other programs going on.
7        And so we see that what was being planned, what we knew
8    was on the way in terms of air laws and rules and regulations,
9    that the amount of sulfates contributing to visibility
10   impairment or to light extinction was going to be diminished
11   somewhat by 2010 and considerably more by 2040 because these
12   programs are taking time to be implemented.  And SAMI was
13   looked out to 2040 because, for example, the Clean Air Act
14   Amendments of 1990, I believe they're supposed to be fully
15   implemented by 2010.  Well, we look beyond that to see what
16   would be the benefits we hope for the resources out there.  So
17   we looked at a time period out into the future.
18       As you reduce sulfur dioxide emissions, you can see the
19   level of light extinction decreases, and we see that with the
20   B1 and B3 strategies especially when we look --
21   Q.   When you say the light extinction decreases, what does
22   that -- does that say something about visibility?
23   A.   Yeah.  If we have a high light extinction, it means I
24   can't see very well.  I can't see very far.  I can't see the
25   colors and textures of the mountains, for example, in our

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   particular case.  And so for light extinction, we want a low

2   number not a high number.

3   Q.    So if light extinction decreases, visibility increases?

4   A.    That is correct.  And also, based upon what we know from

5   SAMI, as light extinction decreases, we're also decreasing the

6   amount of fine particles in the atmosphere.

7   Q.    I'd like to draw your attention to two pages further

8   ahead, Page 73 in the electronic document, and -- which is

9   Figure 4.11.

10         MR. GULICK:  And Your Honor, it is Page 4.16 in the

11  hard copy.

12  Q.    There's a chart here as well.

13  A.    Uh-huh.

14  Q.    And could you tell us about this chart -- this figure and

15  how it may be different from the one we looked at before.

16  A.    Well, the first change -- or the first difference is this

17  left-hand access.  Instead of talking about extinction or beta

18  extinction, we're expressing the results in terms of miles.

19         In SAMI it was decided to use miles or to use standard

20  visual range because we felt that in order to make a

21  connection with policy makers and the public, that they could

22  probably relate to that a little bit better than talking about

23  something in inverse megameters.  These results here also are

24  showing the difference in change of visibility of looking at

25  that base case, the 1990 --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    Q.   And how would the base case be shown?

2    A.   We're looking at a change, a difference between the base

3    case and the modeling results for these different three

4    emission scenarios for 2010.  So we're looking at a change

5    between those two.

6    Q.   And what --

7    A.   In miles, that is.  In terms of standard visual range.

8    Q.   And what does it show with respect to those changes?

9    A.   Okay.  Now, what we're looking at here is we're looking

10   at the annual average, not the best visibility days or the

11   worst visibility days, but we're looking at what was

12   considered the annual average at these Class I areas.  And

13   these are the federally mandated Class I areas that SAMI

14   looked at in their assessment stretching from Sipsey

15   Wilderness in Alabama up to Dolly Sods in West Virginia.  And

16   what we're seeing here is that as you reduce fine particles in

17   the atmosphere in particular, as you're reducing sulfur

18   dioxide emissions in particular, you have improvements in

19   visibility.

20   Q.   I'd like to draw your attention to Page 76 of the

21   electronic document.

22        MR. GULICK:  Which is, Your Honor, Page 4.19 of the

23   hard copy of Exhibit 1.

24   Q.   And there is -- I'd like to draw your attention,

25   Mr. Jackson, to Figure 4.14 which is at the bottom of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   page.

2   A.   Uh-huh.

3   Q.   And can you tell us about this figure and what it is and

4   how it was done, if you will.

5   A.   Sure.  Let's first talk about how it was done.  This is

6   not real pictures.  This is a modeling simulation using a

7   program called WinHaze.  And there was consensus reached among

8   all parties that we could use this in the effects analysis for

9   visibility because to talk about a 13 -- or let's say a

10  16-mile improvement or a 3 -- I should say -- let me back up.

11       Between the base case in strategy A2 for Great Smokys, on

12  this particular day, July 15th, 1995, we're looking at a

13  3-mile improvement in visibility.  Well, what in the world

14  does that mean?  Well, we use pictures to try and convey that

15  message to policy makers and the public to help them

16  understand if we make these reductions, for example, in sulfur

17  dioxide emissions, what does it really mean for the person

18  that's viewing scenery in the Southern Appalachians?  So here

19  we have the range of responses for this one particular day

20  that was modeled in the SAMI analysis.

21  Q.   And so it reflects the changes based upon the different

22  strategy and the level of reduction of sulfate in particular?

23  A.   That is correct.  And also keep in mind that these

24  different days had different relative humidity factors, too,

25  and that would influence the results.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  Q.   But these are modeling against just that one day,

2  July 15, 1995; isn't that right?

3  A.   You are correct.  So on July 15th, this is the results

4  for that day.

5  Q.   And just so I understand, on the base day of July 15th,

6  1995, was the actual visual range 13 miles?

7  A.   I cannot support -- confirm that that actually was that.

8  This is the modeling results that came out of atmospheric

9  modeling.  So how to compare to what was measured in the

10  field, I don't have that information.  But this is the results

11  from the atmospheric model put into WinHaze.

12  Q.   Do you use photographic simulations of this kind from

13  WinHaze in your work?

14  A.   Yes, I do.

15  Q.   How do you use it?

16  A.   I use it when I mentioned earlier about new sources of

17  air pollution, and one of the things, of course, that we are

18  looking at is how would a new source of pollution impact

19  visibility at a Class I area?  And in order to convey to the

20  federal land manager what this might mean in terms of

21  visibility, WinHaze is one of the tools that we use so that

22  they can try and visualize that.

23       Also when I talk to the public and talk about air

24  pollution impacts that we know that are occurring in western

25  North Carolina or eastern Tennessee, I use WinHaze results

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  from that also to communicate what we know in terms of current

2  impacts and also trying to look at, perhaps in an optimistic

3  way, what the future holds as we continue doing emissions

4  reductions.

5  Q.    And so do you view the WinHaze software program as

6  generally accepted in the work that you do?

7  A.    Yes.  It's used among other air resource specialists in

8  the Forest Service, and it was also used as part of the SAMI

9  process as I mentioned.  We did reach consensus to use it and

10  that was a diverse group of people, as has been mentioned

11  previously, who was involved with SAMI.

12  Q.    You've indicated that reduction in sulfur dioxide

13  emissions -- was SAMI's conclusion that -- what was SAMI's

14  conclusion about the best way to improve visibility?

15  A.    Well, from what I recall, SAMI's conclusion was is that

16  to make the greatest improvements in visibility would be to

17  make reductions in sulfur dioxide emissions.

18  Q.    I'd like to draw your attention to -- this is in the same

19  Exhibit 1, Page 53, Figure 3.11.  And this is something we've

20  seen before, but you weren't on the stand.

21       Mr. Jackson, are you familiar with this figure?

22  A.    I am familiar with this figure, yes.

23  Q.    And with respect to the -- with respect -- with respect

24  to the Class I areas that are in -- well, let me be specific,

25  Joyce Kilmer, Look Rock and the Great Smoky Mountains National

1  Park and Shining Rock and Linville Gorge, do you have any

2  conclusion as to what needs to be done in order to improve

3  visibility at these sites?

4  A.    Uh-huh.  Well, when I've looked at this information in

5  the past, one of the things that I see, and we know this, that

6  the visibility problems that we have is a regional haze

7  problem and so reductions in sulfur or sulfate aerosol

8  concentrations in the atmosphere, which goes back, again, to

9  reducing sulfur dioxide emissions, are going to have to occur

10 throughout the region.  It's going to have to occur in more

11 than just North Carolina.

12     But in terms of when I look at these results, I see that

13 sulfur dioxide emissions from Tennessee are particularly

14 important in order to try and improve visibility in the four

15 Class I areas that you mentioned.

16     But also important as part of that, in particular for

17 Shining Rock and Linville Gorge, we see that improvements or

18 reductions of sulfur dioxide emissions also need to occur in

19 North Carolina.

20 Q.    Let me ask you, do you recall in SAMI whether the SAMI

21 model took into consideration the reductions that are being

22 required by the Clean Smokestacks Act in North Carolina?

23 A.    No.  This modeling predates the Clean Smokestacks Act.

24 But I can say that in looking at emissions recently, when you

25 look at -- between the B2 and B3 strategies, that is, in terms

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   of sulfur dioxide emissions from utilities, that is the range

2   in which the North Carolina Clean Smokestacks Act is

3   following.

4         But there is no SAMI modeling to try and look at what

5   benefits that the North Carolina Clean Smokestacks Act will

6   provide directly to visibility.  We're just inferring it.

7   Q.    In looking for the Clean Smokestacks -- excuse me.  In

8   looking for sulfur dioxide reductions, does SAMI provide any

9   information about where those -- where would be most effective

10  to get those reductions?

11  A.    I believe that for western North Carolina, those Class I

12  areas, there was reference made to specifically reductions

13  that need to occur in Tennessee, but also it made reference to

14  other states also.

15  Q.    And I think I was referring -- well, excuse me.  I was

16  looking -- with respect to a sector that you would look to, is

17  there a sector that you would look to?

18  A.    Oh, if I understand your question correctly, in terms

19  of -- the utilities is the sector in terms of where to look

20  for in terms of making emissions reductions in sulfur dioxide.

21  Q.    And why is that?

22  A.    Well, at that time, of course, costs are very -- are of

23  concern.  But also, what is technologically available, too.

24  And my understanding at that time, and I think it's still true

25  today, that as a nation, and the utilities as a group have put

WILLIAM JACKSON - DIRECT

1  considerable research into understanding what are available
2  control technologies for their sector.  And so there are
3  viable options in terms of removing sulfur dioxide from the
4  gas stream.
5       When we're working on permits, we're looking at in terms
6  of new sources of air pollution, we're looking at at least
7  90 percent reduction of sulfur dioxide.  But also, the cost
8  that's available.  And when we look at the source sector that
9  releases the greatest amount of sulfur dioxide emissions, that
10 is with the utilities.  And if we look at an individual
11 facility, with the large amounts of sulfur dioxide that are
12 being emitted from there, there is control technology that is
13 available and can do it at a reasonable cost.
14      Some of the numbers when I talk to state regulatory
15 agencies, a reasonable cost is a thousand dollars per ton of
16 $SO_2$ removal.
17 Q.   And that's for what sector?
18 A.   Well, for utilities.  But also, that number came up while
19 we were doing the Best Available Retrofit Technology, the BART
20 analysis, for sources under the Regional Haze Program.
21 Q.   I'd now like to refocus your attention back to the
22 subject of acidic deposition.
23 A.   Okay.
24 Q.   And first of all, I would like to have you describe
25 acidity, what that is.  What is acidic deposition?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MR. FINE:  Your Honor, I would object to this line

2     of questions.  TVA has a pending motion in limine on these

3     matters in terms of any testimony concerning acidic deposition

4     on the basis in the briefs we've already submitted on the

5     point.

6          We have -- we believe that under the *Clean Air*

7     *Markets Group versus Pataki* case, that the law is clear that

8     Congress has spoken as to how acidic deposition is to be

9     handled under Title 4 of the Clean Air Act, and that under the

10    *Pataki* decision, that is -- that preempts any additional

11    efforts, particularly as shown by North Carolina's interest in

12    eliminating the possibility of TVA obtaining or using

13    allowances for the control of acid rain in direct

14    contravention of the Congressional scheme.

15         MR. GULICK:  Your Honor, we disagree.  We believe

16    the question that the Clean Air Act does not in any respect

17    preempt a state nuisance action to reduce something which is

18    causing an actual problem in the state.

19         The Fourth Circuit has already looked at the general

20    question of whether or not a nuisance action is preempted and

21    determined -- agreed with this court that it does not.  There

22    is nothing about the subject or the question that I have put

23    to Mr. Jackson about talking about what sulfur -- what acid

24    deposition is that has anything to do with allowances that TVA

25    may or may not use.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1          And we believe that this is an untimely argument.

2     Sulfate testimony is clearly relevant to whether TVA is

3     creating a public nuisance.  TVA's $SO_2$ emissions clearly are

4     relevant to the question of whether or not there is visibility

5     problems and also as to whether or not there is -- and we

6     believe that's what the testimony will show, to acid

7     deposition.

8          Mr. Jackson has already alluded in his testimony to

9     the concern about sulfate -- sulfate deposition as part of

10    this issue.  This court has denied TVA's motion to dismiss.

11    There was a preemption issue there.  And *Pataki* involves a

12    scheme of the state that actually directly dealt with the

13    actual transfer of emission -- of allowances.  There's nothing

14    about the relief that the State of North Carolina is seeking

15    in this case against TVA that has to do with allowances.

16    We're seeking emissions reductions.

17         TVA has not established any of the required factors

18    for preemption, express preemption.  Congress has done nothing

19    in this in the CAA.  The exact contra is the case.  They have

20    not occupied the field.  The *Pataki* case expressly found that

21    the CAA Title 4 does not do this.  That it does not preempt

22    the field.  It's not sufficiently comprehensive.

23         And even where Congress has not completely displaced

24    state regulation in this specific area, state law cannot be

25    nullified unless it actually conflicts the relief that we seek

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    with the federal law.  There is nothing in what we seek in

2    this case that would actually conflict with the federal law or

3    the acid rain amendments.  If the state seeks further

4    reduction, there is nothing in that that conflicts with the

5    acid rain amendments, the primary purpose of which is in fact

6    to reduce acid rain and sulfur deposition.

7           We believe the equitable powers of this court are

8    broad and that you're entitled to take evidence with respect

9    to acid deposition and to determine whether or not it

10   constitutes a nuisance in the State of North Carolina.  Thank

11   you.

12          MR. FINE:  Your Honor, we're addressing a point --

13   this is conflict preemption, a direct conflict between the

14   scheme enacted by Congress for how Congress has chosen to

15   regulate acid deposition in this country.  It's not an

16   argument that's been previously presented to this court.  What

17   we're talking about is North Carolina seeking a remedy which

18   by its very nature would prevent TVA from taking advantage of

19   the Congressional scheme in terms of how it would choose to

20   control its emissions that could lead to acid deposition,

21   emissions of sulfur dioxide with particular reference.  And

22   that what we're talking about is North Carolina, much like New

23   York was trying to do in *Pataki*, is effectively trying to tell

24   TVA that we cannot use the allowance cap-and-trade system that

25   Congress has enacted.  We believe that oversteps the bounds of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  the state's authority in the face of the Congressional mandate

2  as to how acid rain is to be controlled.

3  　　　　MR. GULICK:  Your Honor, Section 116 of the Clean

4  Air Act expressly permits states -- gives states authority to

5  go beyond the Clean Air Act.  There is nothing about

6  seeking -- in this case there is nothing about using a common

7  law remedy which the Fourth Circuit has upheld to abate a

8  public nuisance that says that TVA -- if this court were to

9  direct that TVA must reduce its emissions, there is nothing

10 about that that directly conflicts with any trading scheme

11 anywhere.  It simply directs that TVA would have to reduce its

12 emissions to some particular level.  There's no direct

13 conflict there.  If that was a conflict, then the Clean

14 Smokestacks Act itself would be a conflict in the State of

15 North Carolina by requiring Duke and Progress to reduce their

16 emissions.  The effect of that, of course, compels them to

17 reduce their emissions, but it is -- we would seriously

18 contend that that would be a grave overreading of what

19 constitutes a direct conflict with the federal program.

20 　　　　THE COURT:  All right.  I think I have both your

21 points so let me take a minute here to review what you've

22 said.

23 　　　　(Pause.)

24 　　　　THE COURT:  All right.  I'm going to overrule your

25 objection.  I'm also going to take a 15 minute recess and then

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   we'll continue with this testimony.

2            You may step down.  Resume your seat in 15 minutes.

3            (Brief recess at 4:15 p.m.)

4            THE COURT:  All right.  Proceed.

5                      WILLIAM A. JACKSON

6            DIRECT EXAMINATION (Cont'd.)

7   BY MR. GULICK:

8   Q.   I believe -- thank you, Your Honor.

9        I believe my last question was what is acid deposition.

10  A.   Okay.  Well, acid deposition is the deposition of sulfur

11  and nitrogen compounds from the atmosphere.  It comes in three

12  forms, though.

13       We've talked about haze earlier on.  And when it's

14  suspended in the atmosphere, it's scattering light.  But as

15  that comes across the landscape, it can be deposited on the

16  trees and on the soils.  We call that dry deposition.

17       The next form that most people are commonly associated is

18  rainfall.  A lot in the '80s we heard about acid rain.  And so

19  the second form of deposition is rainfall or wet deposition.

20  So we have dry deposition, wet deposition.

21       And then the third area, a term is used occult or we talk

22  about cloud deposition.  And cloud deposition, acidic

23  compounds can be quite high.  Now, the compounds that we're

24  talking about are sulfur compounds as well as nitrogen

25  compounds.  And the emission sources for nitrogen compounds

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  include those sources that release nitrogen oxides, but also

2  ammonia.  And though they are of concern, especially in the

3  scientific literature, we haven't seen evidence of too much

4  nitrogen deposition on the national forest here in western

5  North Carolina.  But there is in the scientific literature.

6  For example, old growth spruce fur forest, those that are

7  found in the Great Smoky Mountains National Park, that may be

8  receiving too much nitrogen.  Because they're older forests,

9  they don't need as much nitrogen to grow and so there is

10 nitrogen being saturated from those systems.

11      In the national forest that we have here, much of the

12 area -- there's a few exceptions, Joyce Kilmer, the Little

13 Santeetlah Watershed and all of Linville Gorge that are actual

14 examples of old growth and there's other old growth forests in

15 isolated pockets on the national forest.

16      But by and large, these forests when you look at them,

17 they've been cut at least once and these are actively growing

18 forests and they use the nitrogen that is being deposited.

19      Well, the main compound that we're concerned with is

20 sulfur in terms of being deposited on the forest.  And again,

21 those come primarily from coal-fired electrical utilities as

22 the main source of sulfur dioxide being released in the eight

23 SAMI states, and in the eastern United States at large.  And

24 when that's deposited, it can have effects to the resources.

25 Q.  Could you describe what the effects are to the resources

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    when sulfur is deposited.

2    A.    Okay.  When that sulfur comes down, many times it can

3    come down as sulfuric acid, $H_2SO_4$.  And bear with me as I go

4    through this because there is some chemistry involved here,

5    but it is quite an interesting process of how it affects the

6    biogeo chemistry of the forest.

7        This sulfuric acid, when it's deposited on the ground,

8    can disassociate.  It breaks apart into two hydrogen atoms and

9    into a sulfate molecule.  So let's just talk about these

10    hydrogen atoms.  They both have a positive charge to them.

11    And soil has a negative charge to it.  And so those are

12    attracted together.  And over time you can have a build up of

13    the hydrogen ion concentration.  The way that we measure

14    hydrogen ion concentration is by the pH scale, and we will see

15    a decrease of the pH over time as we continue to build up the

16    hydrogen ion concentration.

17        Now, the sulfur molecule --

18    Q.    When you say decrease in pH, what does that mean?

19    A.    It means that the soils are becoming more acidic.  The pH

20    scale, neutral is 7, and we can go to one which is very, very

21    acidic.  So we've seen, for example, in Linville Gorge, when

22    we measure soils right now, the pH is 3.5 which is quite

23    acidic.  When pH gets below 4.5 aluminum, which is actually

24    one of the most abundant elements in the earth's crust,

25    becomes mobile and that aluminum can be biologically toxic.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    Now, I was talking about the sulfur compounds.  When the

2  sulfur is disassociated from the hydrogen ions, it can, in my

3  mind, really take two pathways.

4    Now, the sulfur is a sulfate molecule.  It has a 2 minus

5  to it.  And so it can actually combine to the aluminum or iron

6  that's found in our soils.  And that's one of the things to

7  keep in mind about the southeastern United States and the

8  geologies and the soils that have subsequently developed in

9  that sulfur has been retained in part over the historical

10  deposition that has occurred in the eastern United States.  We

11  typically look back to around 1860.  So as sulfur dioxide has

12  been released through industrialization, you know, and the

13  increased demand in terms of producing commodities and

14  electricity, a portion of that sulfur gets retained on the

15  soils and it's building up over time.  But there is a point at

16  which the sulfur will no longer be retained by the soils.

17  There is a maximum amount.

18    Now, for that portion of a sulfur that does not become

19  retained by the soil, it can move into the soil water

20  solution.  Now, when we talk about -- well, I think I'll be

21  getting to it.  Because it has a 2 minus to it, it is looking

22  for an equivalent amount of positive charge ions to attach to.

23  And the ones that are typically -- that it will attach to are

24  calcium which has a 2 plus, magnesium which has a 2 plus, and

25  potassium which is just a plus.  And so these three elements

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    are referred to as base cations.  They're really desirable to

2    have in forest soils.  Not only will it help the vegetation be

3    healthy, maintain a healthy status, but also a portion of

4    those -- it's a natural process for them to move down into the

5    aquatic system also which will benefit them, which we can get

6    to in a minute.

7          But calcium, magnesium and potassium are essential for a

8    healthy forest growth.  For example, if we think about trees

9    and we think about the large size of the trunk of the trees

10   and the crown with all the branches and with all the leaves,

11   there's a lot of cells that are there.  And the primary

12   component of cell walls is calcium.  So calcium is essential

13   for wooden structure in trees, but it's also essential for

14   cells in herbaceous vegetation also.

15         Magnesium I mentioned also.  And the leaves are green

16   because there is chlorophyl in the leaves and that -- those

17   leaves are used to produce simple sugars through a process

18   called photosynthesis.  This is primary production produced

19   food for that vegetation.  And in the center of that

20   chlorophyl molecule is magnesium, and so magnesium is needed

21   for photosynthesis also.

22         So these base cations are very essential for vegetation

23   and they are going through a constant cycling process.  So if

24   we're dealing with a hardwood forest, for example, in the fall

25   the leaves will fall.  It comes in contact with the forest

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    soils and eventually it becomes incorporated into the soil so

2    that it's available to be used by the vegetation again.

3        But when there's high concentrations of sulfur compounds

4    in the soil and it -- what has happened historically over time

5    as that sulfur moved into the stream water, it carried with it

6    an equivalent amount of calcium, magnesium, potassium removing

7    it from being cycled through the forest eco system.  And so we

8    have seen a loss of base cations over time.  Is base cation

9    loss a natural process?  Well, yes, it is in part.  But sulfur

10   deposition has accelerated the rate of base cation loss and

11   those base cations have been moved down into the stream water

12   and, of course, you know, they're out in the Gulf of Mexico or

13   some other places, you know, by this time.

14   Q.   You had mentioned earlier that -- you made mention of the

15   mobilization of aluminum.

16   A.   Uh-huh.

17   Q.   Can you tell us about that.

18   A.   Yes.  Well, aluminum, as I mentioned earlier, is one of

19   the most abundant elements in the earth's crust.  And when it

20   becomes available, which is typically below a pH of 4.5 in the

21   soils, that aluminum has a plus 3 charge to it, and it can

22   penetrate more easily into the fine roots of the vegetation.

23       Now, we care about what's going on with the fine roots

24   because that's where water uptakes can occur for the

25   vegetation as well as the nutrients.  But because of the 3

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  plus, this valence bonding, it can actually attach more easily

2  to the root systems than calcium, magnesium or potassium.  But

3  vegetation does not need aluminum to grow.  Matter of fact, at

4  high enough concentrations, it's biologically toxic.

5       And so what we have really is two things sort of going on

6  potentially over time.  One is that aluminum is taking up

7  sites along the fine roots and the base cations, calcium,

8  magnesium, potassium, are not able to penetrate into the fine

9  roots to be used by the vegetation for growth, and so you have

10  a nutrient deficiency that can occur.  But when aluminum is at

11  high enough concentrations, it begins to kill the fine roots

12  and there's only a certain amount of fine root mass that the

13  vegetation has at a particular time.  It is being replaced

14  every year, but if aluminum is killing the fine roots, then

15  that means there's less area for the uptake of these base

16  cations.

17       But also, there's less area for water uptake.  And water,

18  of course, is another essential thing to have healthy

19  vegetation.  So effects from drought could potentially be

20  exacerbated because of fine root mortality that's due to

21  aluminum.  And that's a big concern to us.  We have seen

22  evidence of that in Linville Gorge of where we have very low

23  calcium -- or calcium availability in the soils.  Mostly

24  calcium that is available at Linville Gorge is actually in the

25  trees in the overstory.  And we have very high concentrations

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  or what the scientists consider very high concentrations of

2  aluminum in the soil.  And we have -- one of the measures that

3  scientists look at in terms of risk is the ratio of calcium to

4  aluminum.  And generally speaking, below 1, that ecosystem may

5  be at risk of aluminum toxicity.

6      At Linville Gorge we have a .3 calcium to aluminum ratio,

7  so we don't have much calcium.  And we have high

8  concentrations of aluminum.  We have pH's that are well below

9  4.5.  I believe around the neighborhood of 3.5 is the pH in

10 the soils at Linville Gorge.  And so that represents a system

11 that is showing signs from effects from acidity.

12     But another thing to keep in mind also about the Linville

13 system is the geology that it was derived from and the geology

14 is such that it began with a low amount of base cations.  But

15 we've done retrospective modeling that perhaps I can talk

16 about in a few minutes on stream water.

17 Q.  Now, is there an effect on stream water as part of this

18 process?

19 A.  Yes, there is.  And again, there's a couple effects that

20 can occur.  I always have to remind the public when you see

21 the river rise, it's not because the rain fell directly in the

22 channel where the stream is.  It's because the water fell on

23 the watershed.  And as we have deposition coming down in the

24 rainfall or through dry or through cloud water, it's going to

25 react with the soils that are thin at these high elevations.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    There is low microbial activity.  And as it goes down into the

2    soil water, it will move downslope into the stream.  And in

3    certain situations where we have acidification going, the pH

4    can be dropped which can have an effect biologically to

5    aquatic organisms, as well as aluminum can reach high

6    concentrations in the stream water.

7        And we've had situations on the George Washington

8    National Forest in northern Virginia where trout have died,

9    brook trout in particular, which is actually considered a

10   relatively acid tolerant species.  But when they did autopsies

11   on these trout that they found floating downstream, they

12   looked at the gills and they found very high aluminum

13   concentrations.

14       What the fisheries biologists told us is that the

15   aluminum that was on the gills caused the gills to produce

16   mucous which caused the trout to suffocate due to lack of

17   oxygen.  So aluminum can have direct, you know, and indirect

18   effects to the mortality of brook trout also.

19       But one of the measures that we really rely upon, our

20   barometer, if I can use that analogy, is something called the

21   acid neutralizing capacity.  You'll also see it referred to as

22   ANC.  Now, how do we calculate ANC?  Well, I've talked about

23   how important base cations are:  Calcium, magnesium,

24   potassium.  We also add in sodium.  And what we hope is that

25   it's a really large, obviously positive number, a large

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  number.  And then what we're going to do is we're going to

2  subtract from it the acid anites, the sulfates and the

3  nitrates.  We also subtract chloride from that.  And what you

4  hope is that you have a large, positive number.  That means

5  that there's buffering capacity.  There's an ability for that

6  system to buffer acid inputs coming in.

7       So for example, the limestone areas in Kentucky, they

8  have fairly high ANC values because the limestone has an

9  abundance of base cations available to neutralize any acid

10 inputs.

11      But as I mentioned earlier, the geology here in western

12 North Carolina and the soil that developed from that had a low

13 amount of bases to start with.  And the replacement of bases

14 over time is a very slow process because we're talking about

15 the weathering of rock.

16      Now, another possible mechanism for base cations to

17 increase in soils is from dust in the atmosphere.  But those

18 numbers have really gone down over the decades due to no till

19 practices in the agricultural industry.  In other words, we're

20 keeping our topsoil in place.

21      So we have the base cations that we're losing.  They're

22 not being replaced at adequate rates.  So in the streams we

23 hope to have a high positive number in terms of acid

24 neutralizing capacity.  And we do have systems that have ANCs

25 greater than 50, a number considered by many scientists as an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    indicator that there's adequate buffering not only at that

2    time, but into the immediate future also.  But also we do have

3    systems like the Linville Gorge where the acid neutralizing

4    capacity, when we collect a water sample from the streams,

5    that are negative and they can be as low as negative 10,

6    negative 14 that we've observed in Linville Gorge.

7         So we have a range that we've collected.  We've collected

8    water samples -- well, this is -- this is really eastern

9    Tennessee, western North Carolina, and a portion of the

10   upstate of South Carolina, we've collected 256 water samples.

11   And as I've mentioned, we've looked at those in terms of their

12   ANC values and we feel that that's an initial indicator of the

13   health of those water streams.

14   Q.   Did the issue of acid deposition get examined in SAMI?

15   A.   Yes, it did.  It was one of the three effects areas that

16   were focused on.

17   Q.   And I'd like to draw your attention to Exhibit 1, Page

18   97.  That's the electronic page.

19        MR. GULICK:  And Your Honor, that's Page 6.4 of the

20   hardcover document.

21        If you could pull up this Table 6.1 at the bottom of

22   the page.

23   Q.   Are you familiar with this table, Mr. Jackson?

24   A.   Yes, I am.

25   Q.   Could you tell us about it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  A.    Uh-huh.  This is one way to use acid neutralizing

2  capacity values that are measured in streams to try and give

3  an indicator of the health of a stream.

4       Now, the research that's been done, a lot of attention

5  has been focused on brook trout.  And the reason why brook

6  trout has been looked at, it's the native trout species in the

7  Southern Appalachian Mountains.  It's of large interest to

8  fishermen and so a lot of the work that has been done at

9  Shenandoah National Park focused on brook trout.

10      And using their research findings that have been done --

11  that has been done at Shenandoah National Park, we have some

12  break points in terms of these ANC values.  And if we start at

13  the bottom of the table, looking at ANC or acid neutralizing

14  capacity values between 50 and 150, these are areas that are

15  considered suitable for brook trout.  But one of the things to

16  keep in mind, it doesn't mean that it's suitable necessarily

17  for other aquatic organisms.  For example, a group of

18  organisms called diatoms.  Or the fish -- the brook trout are

19  going to be feeding on insects in the streams, caddisflies and

20  mayflies.  They may be sensitive at this level or in the next

21  category down, between 20 and 50.  These -- the ANC values

22  between 20 and 50, these are potentially sensitive and these

23  are streams that we're quite concerned about in trying to

24  understand how sulfur deposition will hopefully improve these

25  systems or whether they will improve at all.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      And when we get to ANC values between 0 and 20, now these
2  are systems that are episodically acidic.  What do we mean by
3  that?  Well, there's probably refuges where the brook trout
4  and perhaps other trout species like brown trout can hang out.
5  Their populations, they may not be the healthiest, they may
6  not have great weight.  There might be certain life stages,
7  maybe a certain year's life stage is missing from the stream.
8  But in these streams, and we've actually made measurements of
9  this -- of a stream that was in this category.  But during
10  rain events, sometimes they can be quite acidic.  And what
11  we'll see is that for a short period of time, the ANC drops
12  from 20 down to negative values.  And so that's what we mean
13  by episodically acidic.  So you have this short-term high
14  acidity pulse that can occur in the stream and so we can see
15  biological effects at that time.
16      Now, when we get to ANC zero, basically, that's a system
17  that can't support brook trout at all.  Does it mean that
18  you'll never -- if you have a stream where you've measured ANC
19  zero, you might find brook trout in there because they might
20  be able to find little pockets to hang out.  But by and large,
21  you don't have fisheries available in that stream anymore.
22  Q.  I'd like to go to the next -- I believe it's the next
23  page, Page 98.  And it's 6.5, I believe, in the hard copy.
24      There's a table, there's a figure there 6.2 which I think
25  you now have up in front of you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   A.   Uh-huh, I do.

2   Q.   And this is a map.  What is this map and what does this

3   show?

4   A.   Okay.  Well, there's really a couple pieces of

5   information that are on here.  You'll notice first in the SAMI

6   boundary, and I guess I can sort of outline that a little bit

7   on the two sides.  But in this area here, this is where we

8   were doing the assessment going on.  And you see a green

9   shaded area.  This is the area where the geology is sensitive

10  to acidic deposition, but also this is high elevation, too.

11  So you have a combination based upon elevation and geology

12  that -- of areas in the Southern Appalachians that are

13  sensitive to acidic deposition.

14       The map is also showing the streams that were used in the

15  effects modeling, and the model that was used for this

16  particular case was the MAGIC model, and the MAGIC model was

17  used to evaluate the different SAMI scenarios in the future.

18  It shows streams here that have ANCs less than zero and we

19  have ANCs between zero and 20.  And when you look at those,

20  you can see how they're lining up with these areas at risk in

21  terms of the geology and elevation.

22       By the way, I have used this map for my work also to

23  identify areas at risk; and in part, we've used it to try and

24  go and look at other areas.  A lot of the work that we've done

25  recently has occurred after the time period that SAMI complied

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    their information.  So I talk about the 256 streams.

2    Q.   Let's go to Page 103 on the electronic copy.

3            MR. GULICK:  And that's Page 6.10, Your Honor, in

4    the hard copy.

5    Q.   And I wanted to draw your attention, Mr. Jackson, to the

6    figure, I think it's the figure above 6.6, if I can see

7    correctly.  It's the upper one.

8    A.   Uh-huh.

9    Q.   Are you familiar with this?

10   A.   Yes, I am.

11   Q.   And could you explain to us what's going on with this

12   figure.

13   A.   Sure.  Here we have a selection of Class I areas.  Again,

14   starting in the southwestern portion of the SAMI area, we have

15   Sipsey Wilderness, and proceeding towards the northeast we end

16   in Dolly Sods in West Virginia.  And these different Class I

17   areas are really showing what will happen or what the estimate

18   is for sulfur deposition as you go from a base case to having

19   greater sulfur dioxide reductions based upon the SAMI

20   strategies of A2, B1 and B3.

21       And what -- we've gone from emissions and once these were

22   put through the atmospheric modeling, the atmospheric modeling

23   results are showing that as you reduce sulfur dioxide

24   emissions, then especially when we look at B1 and B3, a lot of

25   those reductions are from the utility sector, but as you make

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   these sulfur dioxide reductions in terms of emissions, then in

2   effect you will be lowering the deposition in these Class I

3   areas.

4   Q.   I notice that the bars are higher in this one that's

5   above Noland Divide Great Smoky Mountain, North Carolina.  Is

6   there a reason for that?  It seems a lot higher than the

7   others.

8   A.   Well, there is a reason in that there is a -- this

9   particular site, because there was data collected during the

10  Mountain Cloud Chemistry Project on cloud water, at this

11  particular site SAMI chose to use the results from the

12  Mountain Cloud Chemistry Project in terms of estimating the

13  cloud deposition.

14       Let me try and make this simpler.  In terms of Sipsey,

15  it's a lower elevation site.  Cloud deposition is not much of

16  a problem.  And the assumptions used for James River Face,

17  White Oak and Dolly Sods in terms of cloud water was based

18  upon a historical statistical model called ASTRAP.  But Noland

19  Divide was treated differently and there was consensus reached

20  by the participants in SAMI to do that because we had cloud

21  water deposition near Noland Divide.

22       And this just shows, and I don't believe I've mentioned

23  this, in terms of deposition, cloud waters can have a very

24  high concentration of sulfur and nitrogen compounds.  A

25  general rule that we've used, and it's not always true, but if

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    you measure wet deposition and you want to estimate the dry

2    deposition portion, they'll be equivalent.  But if you want to

3    estimate the cloud water, add together wet deposition plus the

4    dry and that's equivalent to about what the cloud deposition

5    will be.  But that's just a general rule.  It's not, you know,

6    that's used by my people.  So the point I want to make is that

7    when we have clouds coming across the landscape, the

8    deposition can be very high.

9    Q.    I want to draw your attention to Exhibit 1, Page 53.

10   It's electronic -- we've been here before.

11        MR. GULICK:  It's Page 3.18, Your Honor, on the hard

12   copy.

13   Q.    And I want to ask you -- we've talked some about the

14   upper chart here before, but we've not talked about the figure

15   below.  Could you talk to us to about the Figure 3.12.

16   A.    Okay.  Well, this figure is showing a different pattern

17   than what we saw with the aerosol concentrations.  In Figure

18   3.11, again, that was concentrations of aerosols in the

19   atmosphere.  Remember I talked about the dry deposition coming

20   across the landscape.  Also, that figure is somewhat

21   representative of what we would anticipate from cloud

22   deposition.

23        But here with wet deposition, we start seeing different

24   regions, different -- I should say different states that are

25   contributing to the wet deposition.  The deposition that's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   coming in from the rainfall.

2       So if we look at Joyce Kilmer as well as Shining Rock and

3   Linville Gorge, we can see that sources from Alabama and

4   Georgia are important in terms of sulfur deposition.  Now, for

5   some of us, it's like, well, sure that makes sense because

6   our -- a lot of our rainfall comes out of the Gulf of Mexico.

7   And with that rainfall pattern, what states is it crossing

8   over?  Well, it's moving across Georgia as well as Alabama.

9       Now, we do see the importance of North Carolina in --

10  with Linville Gorge as well as the importance of Tennessee.

11  And so when I look at these results, I see that the terms of

12  reducing sulfur in rainfall, it's important that sulfur

13  dioxide reductions occur in the states of Alabama and Georgia

14  as well as Tennessee, and again in the case of North

15  Carolina -- I mean, in the case of Linville Gorge, excuse me,

16  North Carolina.  And we see to a lesser extent Kentucky and

17  other areas of the domain.

18  Q.   Once again, with respect to this chart as the other, does

19  this chart take into -- or does this figure take into

20  consideration the reductions that were being required -- were

21  being required by the Clean Smokestacks Act with respect to

22  North Carolina?

23  A.   This is a strategy that was done and so the emissions

24  were not reduced specifically for the North Carolina Clean

25  Smokestacks Act.  The A2 strategy does not have Clean

Cheryl A. Nuccio, RMR-CRR (704)350-7494

 1   Smokestacks Act built into it at all.

 2   Q.   That's because it predated it.

 3   A.   Exactly, yes, that is, uh-huh.

 4   Q.   Now, this talks about wet deposition, but I think you

 5   very quickly had mentioned the other chart that's above this

 6   on page -- the one right above Figure 3.11 with respect to

 7   acid deposition.  Is that -- is that figure also relevant to

 8   the acid deposition?

 9   A.   Well, it is.  When we look at the results in terms of

10   this chart, again, now we're talking about aerosol

11   concentrations in the atmosphere.  And as I mentioned, you

12   know, when they're suspended in the atmosphere, we care about

13   that in terms of its contributions to visibility impairment.

14   But as that air moves across the landscape, those particles

15   can get deposited on the forest canopy and on the soils, and

16   so that's dry deposition.

17        But also talking with the atmospheric modelers during the

18   time of SAMI, they suggested in terms of the two results that

19   in terms of cloud water, that the results here are -- would be

20   more representative of what -- in terms of making reductions

21   of sulfur and cloud water.

22        And so as I believe I mentioned earlier when we again

23   look at Joyce Kilmer and Shining Rock and Linville Gorge, we

24   see that sulfur dioxide emissions sources in Tennessee are

25   important in terms of reducing dry deposition and deposition

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 of cloud water. And based upon the emissions inventory, we

2 know that coal-fired utilities are the major contributors to

3 sulfur dioxide in Tennessee.

4     And again, though, when we look at Linville Gorge, we see

5 the importance of North Carolina, but also, we see

6 contributions in this chart from Alabama and Georgia, as well

7 as Kentucky and the central states.

8 Q.  Thank you. Since SAMI was completed, have you and those

9 that you work with in the Forest Service done further research

10 with respect to acid deposition?

11 A.  We have. Matter of fact, we started during the SAMI

12 process. And one of the first studies that I worked with in

13 terms of funding was with our Forest Service research lab

14 called Coweeta Hydrologic Lab and the researchers there. And

15 there we started a study. It took us, geez, I think it

16 probably took us five years to collect all the data and to run

17 the modeling, but we used the same model that SAMI did for the

18 terrestrial system and it's called the Nutrient Cycling Model.

19 The acronym is NUCM, N-U-C-M. And we started at Joyce Kilmer

20 collecting data for that. Actually, we were building upon

21 research that had already started, started at Joyce Kilmer in

22 the Little Santeetlah Watershed. The Little Santeetlah

23 Watershed is one of these unique areas in that it is an old

24 growth forest. It's well-known for the Joyce Kilmer Memorial

25 Forest where you will see old growth there. And Coweeta was

Case 1:06-cv-00020-LHT   Document 196   Filed 06/15/09   Page 95 of 132

WILLIAM JACKSON - DIRECT

1   doing some studies there.

2       And so I asked them to begin evaluating if we had sulfur

3   reductions and what that would mean.  And for the Coweeta

4   study we looked at a hundred percent increase in sulfur

5   deposition and a 50 percent decrease in keeping things

6   constant.

7       Once we got the model and the data collected for Joyce

8   Kilmer, then we next moved on to Shining Rock Wilderness.

9   Now, there we did things a little bit differently than Joyce

10  Kilmer.  One of the things in Joyce Kilmer is the plots were

11  spread from the high elevation near the ridge top down into

12  the cove forest.  But in Shining Rock, we found -- we selected

13  a sensitive area, an area that we thought was sensitive based

14  upon the geology.  And so we had a real narrow area where we

15  did the modeling or collected the data for the modeling.

16      And once we obtained the data that we needed to for

17  Shining Rock, the final area that we moved to was Linville

18  Gorge.  And in there we did our modeling in a sensitive area.

19  What I mean by sensitive area, sensitive to acidic deposition,

20  we believed, in Linville Gorge in the northeastern corner.

21  Q.   I'd like to draw your attention to Exhibit 313 and ask if

22  you can identify what this document is.

23  A.   This is a document, the results from a contractor for the

24  Forest Service, and I was the contracting officers'

25  representative.  I was the person that the contractor worked

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1    with.  I helped design this study also.  But we were looking

2    at what the future looked like in terms of stream chemistry,

3    specifically for Shining Rock Wilderness.

4         This is a report that uses the MAGIC model.  And this was

5    the first time beyond -- well, I had exposure to the SAMI

6    model -- excuse me, the MAGIC model during the SAMI process

7    and I became interested in trying to utilize that tool for the

8    national forest.  And so here, because SAMI emissions

9    reductions in modeling were available, we used those results

10   to try and understand what would happen at Shining Rock

11   Wilderness.  Now, the data set that we used --

12         MR. FINE:  Your Honor, if I may interpose an

13   objection on the grounds of hearsay.  This is a document that

14   was not prepared by any government agency.  It was prepared

15   for a government agency.  It was prepared by private

16   contractors as the face of the document itself indicates.

17         MR. GULICK:  Your Honor, Mr. Jackson has just

18   testified that he was the contracting agency and it was done

19   for the U.S. Forest Service by -- it may have been by private

20   contractors, but it was done for the U.S. Forest Service as it

21   says right on the face.  And Mr. Jackson has already testified

22   that he was the contracting -- the official -- I'm not sure

23   the quite word he used -- for the U.S. Forest Service for

24   this.

25         So I believe that the government frequently uses

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    private contractors to do government work for them and that

2    does not prevent it from being a public record of the U.S.

3    government.  And besides which, Your Honor, contracting

4    agencies -- agent, Mr. Jackson is here to testify about it and

5    he can be cross examined about it.

6              THE COURT:  What part did Mr. Jackson play in

7    obtaining this information?  What does he know about the

8    authenticity of it?

9              MR. GULICK:  I believe, Your Honor, that if we're

10   allowed to inquire, he'll be able --

11             THE COURT:  The credibility of it, I guess is a

12   better word.

13             MR. GULICK:  Excuse me, the credibility of it?

14             THE COURT:  Yes.

15             MR. GULICK:  He probably --

16             THE COURT:  Did he participate in it in any way?

17             MR. GULICK:  Well, Your Honor, I believe he said

18   that he was involved in designing the study.  Perhaps if we

19   were allowed to inquire, we'd be able to learn further about

20   that.  We'd be able to get the answer to that question.

21             THE COURT:  Tell me a little bit more about it.

22             THE WITNESS:  Okay.  I'll be happy to.  This was a

23   study using Forest Service funding where I worked with the

24   contractor in terms of the design as well as providing them

25   the field data in terms of water chemistry and soils data.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   That was from the NUCM study that I just talked about briefly,

2   and also worked with the contractor in terms of the different

3   strategies that should be used, and as well as working with

4   them in talking through what SAMI did and included in the

5   analysis.

6           I also was a reviewer of a draft report and the

7   contractor didn't get paid until I said it was final.

8           THE COURT:  I don't think we have enough evidence of

9   reliability here, so I'm going to sustain the objection unless

10  you can get some more information about how this was

11  developed.

12          All right.  Go ahead with your next question.

13          MR. GULICK:  Thank you, Your Honor.

14  Q.    Mr. Jackson, what is the -- what would be the result for

15  the national forest -- or the forest and the streams that you

16  described from further acid deposition if it continues at the

17  present rate?

18  A.    Okay.  If it continues at the present rate, and what our

19  current understanding is that right now is implementation of

20  the Clean Air Act Amendments of 1990, as well as the Clean

21  Smokestacks Act that's currently the sulfur dioxide emissions

22  reductions that are going to occur, and with that what we

23  expect is that many of our watersheds will continue to lose

24  base cations.  We'll be able to see indications of that if we

25  go out and do inventory and monitoring work in the future.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    And looking at streams that we've sampled in the past, we

2    wouldn't be surprised if we didn't see lower ANC values.

3         We are also going to see more systems become acidic.

4    That means they will not have buffering capacity for sulfur

5    compounds.  We anticipate that certain areas will increase --

6    or decrease in soil pH and aluminum will become mobile and we

7    would anticipate more areas will be experiencing that, and I

8    described about the effects in terms of aluminum toxicity that

9    would occur.

10        There is, within the realm of possibilities based upon

11   the scientific literature that we know, that, for example,

12   with Linville Gorge, it's not unexpected or unreasonable to

13   assume that we may begin to see crown diebacks in the

14   overstory of that -- that forest has never been harvested

15   before and it's an old growth forest.  And so in order to have

16   adequate supplies of calcium, the calcium is tied up in the

17   vegetation and the overstory and so the soils are no longer

18   going to be able to support the overstory at Linville Gorge.

19        There may be a few streams, there may be a few streams

20   that ANC will improve because they're near ANC 50 at the

21   current time.  And one of our benchmarks to look for

22   improvements is seeing streams move to ANC values above 50.

23   And based upon the current laws, rules and regulations that

24   are in place as of today, we expect some streams to improve.

25        But by and large, we expect most streams and watersheds

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    to continue to lose acid neutralizing capacity, especially

2    because they've been retaining sulfur for so long.  And as

3    they reach maximum sulfur absorption capacity, the sulfur that

4    is deposited from the atmosphere will move into the soil water

5    solution and carry with it an equivalent amount of base

6    cations, and so we'll continue to lose calcium, magnesium and

7    potassium from the soils.

8    Q.    So as the -- would you describe the acidification -- how

9    would you describe the acidification of the national forest in

10   the Southern Appalachians now?  Is the problem stable or is it

11   solved?

12   A.    No, we don't believe that it's solved and we don't

13   believe it's stable either.  We believe, based upon the

14   scientific evidence and the modeling that we've done, that

15   we're going to continue losing base cations.  That systems are

16   going to continue to acidify.  And we need to have really

17   major reductions in sulfur dioxide emissions in order to get

18   the sulfate deposition -- the total sulfur deposition down.

19   Our current estimates, based upon work that we've done, is

20   sulfur deposition right now for many of our catchments may be

21   between 20 and 40 kilograms per hectare.  That probably will

22   need to be reduced down to 3 to 5 kilograms per hectare in

23   order for a majority of these watersheds to turn around and

24   start improving in terms -- and seeing an increase in the acid

25   neutralizing capacity in the streams.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1   Q.    And what is it going to take to get that?

2   A.    That is going to take making emissions reductions in

3   those areas from those sources that are having an impact on

4   western North Carolina.  We've talked about some of those

5   things, but certainly the coal-fired utility industry as a

6   whole, we will be looking for them to make major reductions in

7   sulfur dioxide emissions; but those are going to have to occur

8   not only in North Carolina, but also adjoining states of

9   Tennessee and Georgia, also Alabama and Kentucky.  But really,

10  like the regional haze problem, it also is a regional problem

11  so we're going to need to have reductions in the eastern

12  United States also to really talk about the levels that we're

13  talking about, 3 to 5 kilograms per hectare of sulfur, we're

14  talking about a major reduction in sulfur dioxide emissions.

15  Q.    How would you describe the current situation of

16  visibility in the national forest?  Is that still an issue of

17  regional haze?

18  A.    Yes, it is.  It is a problem, especially on days when we

19  have stagnant atmospheric conditions.  And how I describe that

20  to people is you go outside, you can't really feel the wind on

21  your face.  There's very little wind movement that's going on.

22  And on days that are really hot, those are the days that we

23  have the greatest electrical generation going on in order to

24  meet our electrical demands to cool our homes and businesses.

25  And so during those times in particular when we have the worst

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    visibility are on those days.

2        And we still have a frequent occurrence of poor

3    visibility here in the Southern Appalachians.  We have been a

4    participant with the Regional Haze Program and we hope that

5    that will turn around by 2064, but the initial analysis that

6    was done, let's say between now and the year 2018, though

7    there was planned to be improvements -- and I need to be --

8    caution that because with the Clean Air Interstate Rule being

9    vacated last Friday, there's some questions on whether we will

10   be able to attain visibility improvements that were

11   anticipated with implementation of that ruling.

12   Q.   With respect to improving visibility and improving the

13   acid deposition situation in the Southern Appalachians that

14   you've been discussing, are reductions in emissions of $SO_2$

15   going to be required of the Tennessee Valley Authority to

16   achieve that?

17   A.   Yes.

18   Q.   And would that be in the state of Tennessee?

19   A.   Well, it would also -- not only the state of Tennessee,

20   but my understanding is the Tennessee Valley Authority also

21   has facilities in Alabama and Kentucky and it would

22   possibly -- it would involve those states potentially also.

23   Q.   Thank you.  Mr. Jackson, earlier today there had been in

24   the questioning of Mr. Nicholson, there had been brought up a

25   facility called Blue Ridge Paper.  Are you familiar with Blue

1  Ridge Paper?

2  A.   Yes, I am.

3  Q.   And you heard the description -- were you present in the

4  courtroom when Mr. Nicholson was testifying?

5  A.   Yes, I was.

6  Q.   And did you agree with -- is your understanding, then, of

7  the situation consistent with what you heard from

8  Mr. Nicholson?

9  A.   I believe it is, yes.

10 Q.   Does the -- does the U.S. Forest Service have concerns

11 about Blue Ridge Paper?

12 A.   Yes, we have and we made it part of the public record

13 with the Regional Haze State Implementation Program that North

14 Carolina put together.  And in there we did do some modeling

15 using the same model that was used by VISTAS for individual

16 sources.  It's a model called CALPUFF.  And in that we modeled

17 all the sources of sulfur dioxide as well as the other

18 emissions from -- excuse me, from Blue Ridge Paper.  And we

19 see that, you know, there's -- that particular source is a

20 significant contributor to visibility impairment at Shining

21 Rock Wilderness.

22      And so that facility does concern us and we believe in

23 order to attain the national goal of no manmade impairment in

24 Shining Rock, reduction of sulfur dioxide emissions will have

25 to occur at Blue Ridge Paper.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Have you communicated your concerns about that or the

2  Forest Service's concern about that to the Division of Air

3  Quality?

4  A.   Yes, that was in a letter from Marisue Hilliard who is

5  the forest supervisor for the national forest in North

6  Carolina.  But she also is federal land manager, and in her

7  comments on the North Carolina State Implementation Plan for

8  Regional Haze, she brought this issue up.

9  Q.   Have you discussed it with the Division of Air Quality

10 personnel?

11 A.   Yes, I have.  In particular, I remember discussing it

12 with Sheila Holman before -- I mean, common courtesy is to

13 call people, and I talked to her about the modeling results.

14 Q.   And to your knowledge, has the State of North Carolina

15 made a decision at this time with respect to the cost

16 effectiveness of reducing sulfur dioxide emissions of that

17 facility?

18 A.   In our conversations that we had face-to-face with Laura

19 Booth and other members of the North Carolina Division of Air

20 Quality as part of the process for the regional haze, they

21 expressed to Marisue Hilliard as well as myself of why

22 emissions reductions are not planned for the BART -- or for

23 the -- well, not only BART but nonBart sources at Blue Ridge

24 Paper.  That is, the costs are considered excessive at this

25 time in comparison to, for example, the utility industry.  My

WILLIAM JACKSON - DIRECT

1    understanding, if I recollect things, the utility industry,

2    you're looking at sulfur -- costs for sulfur dioxide

3    reductions of about a thousand dollars per ton.  And I believe

4    Blue Ridge Paper was considerably above that.  Three to six

5    thousand is the number that comes to my mind.

6         And so we understand that, you know, that these have to

7    be made on a case by case -- the utility industry represents a

8    different sector than pulp and paper.  The pulp and paper

9    industry has to compete in international markets and that may

10   be excessive at this time.  But what we were pleased to see

11   was making it a part of the public record, that North Carolina

12   Division of Air Quality has notified Blue Ridge Paper, this is

13   my words, you should expect by 2018, you know, to be making

14   reductions.  And a thousand dollars per ton may not be

15   reasonable at that time.  It may be considerably higher.

16        Also, I should note at the same time, even though

17   Progress Energy has made significant reductions at the Skyland

18   plant here in Asheville, they also received a letter

19   suggesting -- saying that they need to make further reductions

20   of sulfur dioxide prior to 2018 also.

21   Q.   And that was from --

22   A.   That was from --

23   Q.   -- Division of Air Quality?

24   A.   -- Division of Air Quality.

25        And that was part of the public record for the regional

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - DIRECT

1  haze in one of the appendices for North Carolina SIP.

2  Q.   May I ask you if you as a representative of the forest

3  service are satisfied with the current attention the State of

4  North Carolina is paying to Blue Ridge Paper?

5  A.   Yes, we are, but we are looking forward to the

6  opportunity of working with the state as well as Blue Ridge

7  Paper, perhaps other stakeholders, of really starting to

8  address this issue because we think it's going to take time to

9  find reasonable solutions.

10 Q.   You think that it is going to take time?

11 A.   Yes, we do.

12 Q.   I do want to ask you about the cost per ton for Blue

13 Ridge Paper.  Are you sure of your figures or is it possible

14 that they're higher than that?

15 A.   No, I'm not sure of my figures.  But I do know that --

16 what I do distinctly remember is that the cost -- what was

17 said to us -- dollar figure probably was given and I've

18 forgotten, but that the cost figure in terms of dollars per

19 ton is considerably -- considered considerably higher than

20 coal-fired utilities.

21         MR. GULICK:  Thank you.

22         Bear with me just a moment, Your Honor.

23         (Co-counsel conferred.)

24         MR. GULICK:  Your Honor, I would like to move into

25 evidence, Your Honor, his curriculum vitae which was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Plaintiff's Exhibit 440.

2              THE COURT:  All right.  Let that be admitted.

3              (Plaintiff's Exhibit Number 440 was received into

4    evidence.)

5              MR. GULICK:  And I have no further questions at this

6    time.  Reserve for redirect.

7              THE COURT:  All right.  Counsel for TVA.

8                        CROSS EXAMINATION

9    BY MR. FINE:

10   Q.   Good afternoon, Mr. Jackson.

11   A.   Good afternoon.

12   Q.   Good to see you again.

13   A.   Thank you.

14   Q.   I'm going to try and keep this as short as I can, but I

15   apologize if I don't.  I'm going to be doing a little jumping

16   around.

17   A.   Uh-huh.

18   Q.   So bear with me.

19   A.   Sure.

20   Q.   If I get you confused, you please let me know.

21   A.   I will do that.  Thank you.

22   Q.   I'd like to, first of all, just to hit a couple of points

23   in your curriculum vitae that's been introduced into evidence

24   as Plaintiff's Exhibit 440.

25   A.   Uh-huh.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Mr. Jackson, do you have a copy of that document up

2  there?

3  A.   No, I do not in front of me.

4  Q.   Just a moment, please.  That's the trouble with this

5  electronic world we live in, Mr. Jackson.  Sometimes the

6  actual hard copy is hard to find.

7  A.   Uh-huh.  I'm not seeing anything at this time.

8       (Pause.)

9       MR. FINE:  Thank you, Ms. Gillen.  I appreciate it.

10 And thank you, Madam Clerk.

11 Q.   Mr. Jackson, first of all, I'd like to draw your

12 attention to a point that's been made on Page 2 of your

13 curriculum vitae.  If I could direct your attention towards

14 the -- towards the middle of the page.  There's a heading

15 VSMOKE and VSMOKE-GIS.

16 A.   Yes.

17 Q.   Do you see that, sir?

18 A.   Uh-huh.

19 Q.   And correct me if I'm wrong, but I believe that's

20 referencing your role in the Prescribed Burning Program for

21 the Forest Service.

22 A.   That is correct.

23 Q.   And if you could, please describe for us what is your

24 role with the Prescribed Burning Program.

25 A.   Okay.  Well, we've talked an awful lot about how air

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1  pollution has impacted the national forest.  We've talked

2  about that.  But the Forest Service also by their management

3  activities has an effect on air quality, and one of the

4  largest ways that we impact air quality is through our

5  Prescribed Fire Programs.

6      And so what I've worked with here is developing what's

7  called a user interface of a model that was developed by a

8  Forest Service researcher to try and predict the downwind

9  concentrations of particulate matter from prescribed fires.

10  It also predicts carbon monoxide because that's a large

11  concern to our firefighters that are on the line.

12  Q.   Mr. Jackson, my understanding is that prescribed fire can

13  contribute to particulate matter emissions.

14  A.   That is correct.  Particularly $PM_{2.5}$.  We estimate that

15  70 percent of particulate matter emissions from prescribed

16  fires is $PM_{2.5}$.

17  Q.   So in a sense, the Forest Service can create some

18  problems for air pollution generally.

19  A.   That is correct.  And so we try and manage our air

20  pollution.  We have some -- there is some differences with us

21  also versus a stationary source.  Typically a stationary

22  source is in one spot.  You can't pick it up and move it.  And

23  most likely, it's going to be emitting pollutants every day.

24  Whereas, when we're doing prescribed fires, it could be

25  anywhere from between 20 acres in size up to perhaps

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1   1500 acres in size, but we're moving those around the

2   landscape.

3        Also, we're choosing which days to set those prescribed

4   fires and so we're looking for conditions in which we won't

5   burn too much of the woody material.  We call that available

6   fuels.  As well as we're looking for days when the atmosphere

7   is favorable to disperse the pollutants to a sufficiently low

8   concentration that we aren't having an impact on roads and

9   people as well as Class I areas.  These are considered smoke

10  sensitive targets and when our people are designing prescribed

11  fires and implementing those prescribed fires, they're taking

12  those smoke sensitive targets into consideration and

13  continually asking themselves am I going to have an impact on

14  a smoke sensitive target; and if I am, is there a way I can

15  mitigate?

16  Q.   Thank you, sir.

17  A.   Uh-huh.

18  Q.   If I can direct your attention now to Page 5 of your

19  curriculum vitae.  And I'm particularly interested in the

20  paragraph that begins "Inventory and Monitoring Activities."

21  Do you see that, sir?

22  A.   Yes, uh-huh.

23  Q.   Towards the end of that paragraph, in fact, the second to

24  last line of that paragraph is a parenthetical.  It says,

25  "Since sulfur deposition will continue to decrease."  Do you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  see that, sir?

2  A.   Yes, I do.

3  Q.   If I'm reading that correctly, it's your view that sulfur

4  deposition is decreasing and will continue to decrease in the

5  Southern Appalachians.

6  A.   At the time of the writing, that is what I believed

7  because when I wrote this, we had the Clean Air Interstate

8  Rule that was in place.  But I believe that the 1990 Clean Air

9  Act Amendments of -- are going to be fully implemented by

10  2010, so I do anticipate that there will be some further

11  decreases in the short-term.  But I don't know that I

12  necessarily see continued decreases out in the long-term.

13  Q.   I think we're all wondering about the future,

14  Mr. Jackson, but that's another question.

15  A.   Yeah.

16  Q.   If I heard you correctly in response to one of

17  Mr. Gulick's questions, I think you said that your current

18  estimates for the amount of sulfur deposition is something

19  between 30 to 40 kilograms per hectare?

20  A.   Yeah, that would be wet plus dry sulfur deposition.

21  Q.   And what areas are we looking at for that 20 -- 30 to

22  40 kilograms per hectare?

23  A.   We are -- these are watersheds that we looked at.  These

24  are high elevation.  They're located on national forest land

25  and we thought that they would be at risk for acidic

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1   deposition.  When we get above 2500 feet here in western North

2   Carolina, a large amount of that ownership, not all of it, but

3   a large amount is by the Forest Service and this area is

4   sensitive to acidic deposition based upon the elevation.  We

5   have colder soils that have a lower microbial activity as well

6   as thinner soil, less soil for the acidic compounds to be

7   buffered by on there.

8        So the estimates that I came up with, to get to your

9   question, I should, when we take a sample in a stream, we

10  believe that that's an indication of the watershed above that

11  point.  And we use Geographic Information Systems which is

12  computerized software for maps, and from that point we

13  estimate what is the watershed above that.  And then using

14  modeling results for deposition, we estimate what the wet

15  deposition is for that.  And then in order to estimate the dry

16  deposition, we use VISTAS results in terms of the relationship

17  between dry and wet deposition to come up with total

18  deposition.

19  Q.   Thank you, sir.

20  A.   Uh-huh.

21  Q.   So we're talking about the higher elevations in the --

22  essentially in the lands under Forest Service jurisdiction.

23  A.   That is correct, uh-huh.

24  Q.   Which of the Forest Service Class I areas in western

25  North Carolina are we talking about?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1  A.    Linville Gorge as well as Shining Rock Wilderness and
2  Joyce Kilmer Slick Rock.
3  Q.    All three of those areas are within this -- what I'm
4  going to call the band of concern to you?
5  A.    Yes.
6  Q.    And again, if I'm remembering correctly, you said that it
7  was your estimation that in order to start reversing the
8  current situation in terms of sulfur saturation to the soil
9  and acid neutralizing capacity in the surface waters, you need
10 to cut that 30 to 40 kilograms per hectare down to, was it 3
11 to 4 or 5 to --
12 A.    Three to 5 kilograms per hectare which is a major
13 reduction, you know.  And that would be to help the systems
14 that are chronically acidic or episodically acidic for them to
15 begin to turn around.
16 Q.    So as you say, that's a major reduction.
17 A.    That is a major reduction, yes.
18 Q.    From 30 to 40 to 3 to 5.
19 A.    Uh-huh.
20 Q.    And that would be a yes, Mr. Jackson?
21 A.    Excuse me, yes.
22 Q.    We have to remember the court reporter is trying to write
23 your words down.
24       Pursuing this -- the question of, I guess, acid
25 deposition for a few moments more.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   Uh-huh.

2  Q.   Again, in response to Mr. -- one of Mr. Gulick's

3  questions, I believe you talked about what I'm going to call a

4  historical pattern of sulfur deposition.

5  A.   Yes.

6  Q.   And sir, did you say that you take -- you did a

7  retrospective back to 1860?

8  A.   That is correct, yes.  And we need that in order to

9  operate the MAGIC model.

10  Q.   So what we're talking about in terms of the level of

11  sulfur in the soils, it's not just a matter of what's

12  accumulated there over the last few years, it's a matter of

13  what's accumulated since the 1860s.

14  A.   Yes, uh-huh.

15  Q.   And of course, then I believe you testified that has an

16  impact on both your sulfur saturation and your base cations in

17  the soil and in your acid neutralizing capacity in the surface

18  waters.

19  A.   That is correct.

20  Q.   Just so the record is clear, hectare is a metric measure

21  of land area.

22  A.   It is, yes.

23  Q.   It's somewhat equivalent to an English measure of an

24  acre.

25  A.   It is.  If we talk about 20 pounds of sulfur per hectare,

WILLIAM JACKSON - CROSS

1  it's almost -- I mean, 20 kilograms per hectare, if you do the

2  conversion, it's almost about 20 pounds per acre also.

3  Q.    Okay.  For those of us who are metrically challenged, I

4  thank you.

5        When we're talking about this kind of reduction,

6  Mr. Jackson, over what period of time would this reduction

7  need to be made in order -- before you started seeing a change

8  in the base cation representation or the mobility of the

9  aluminum or improvements with surface water ANC?

10 A.    The modeling that we did that I gave those estimates from

11 assumes that the reductions begin in 2009 and they're

12 completed by 2018, and then we see the benefits by the year

13 2100.

14 Q.    So that's 2100 from completing the reductions at 2018.

15 A.    Yes.

16 Q.    So some 80 years, roughly, into the future.

17 A.    Yeah, but these types of questions, of course, are going

18 to be policy type questions that develop, you know.

19 Q.    I understand that.  And again, if I understood you

20 correctly, Linville Gorge's situation is, in my term,

21 complicated by its geology.

22 A.    It is, uh-huh.

23 Q.    Because it's -- it was naturally base poor?

24 A.    It is.  It's among the most sensitive class in terms of

25 sensitivity in terms of its geology, or we use the term

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  lethology also.

2  Q.   And I think that you made mention of doing retrospective

3  modeling for Linville Gorge.

4  A.   Yes.

5  Q.   And what did you mean by that, sir?

6  A.   One of the questions that we need to try and understand

7  is if we go back to 1860, you know, what was the ANC of

8  Linville Gorge?  Is it reasonable to assume that an ANC of 50

9  is possible or has ever been present at Linville Gorge?  And

10 when we look at the retrospective studies going backwards for

11 Linville Gorge, our estimate is that the ANC there was about

12 30.

13 Q.   This is in 1860 the ANC was about 30?

14 A.   That's right.  So it was quite -- it was low.  It was

15 below 50.  And so it's not reasonable to assume that Linville

16 Gorge can attain an ANC of 50 in the future.

17 Q.   And 1860, of course, would be before the industrial

18 revolution really took hold in the south.

19 A.   Yes, uh-huh.

20 Q.   Mr. Jackson, if we can just explore for a moment this

21 concept of sensitive to acid deposition.

22 A.   Uh-huh.

23 Q.   And if we can just take -- look at Linville Gorge as at

24 least an example for the moment.

25 A.   Okay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Sir, my understanding of sensitive means that with a

2  small change, you have -- small change in input, you have a

3  major change in result.  Is that a reasonable way to think of

4  sensitivity?

5  A.   Well, it depends upon how you're using it.  In the case

6  of Linville Gorge, that would not be an appropriate way to

7  describe sensitivity.

8  Q.   Well, how would you describe it, sir?

9  A.   In that -- in terms of sensitivity, it does not have the

10 ability to offset acid inputs that are coming in.  It will not

11 have a large response to changes because of the amount of

12 sulfur that's been absorbed in the soils there.  It's near

13 maximum sulfur absorption capacity.

14 Q.   Would it be perhaps more accurate to speak of Linville

15 Gorge as having been sensitive at one point in the past and

16 now is no longer sensitive?

17 A.   Because the -- it no longer has buffering capacity?

18 Q.   Yes, sir.

19 A.   The addition of sulfur in that system, what we would

20 anticipate is that if we're not at the maximum capacity that

21 the soils can retain at this time, it will make it there.  And

22 then any calcium that becomes available, calcium, magnesium,

23 potassium, will be removed from that site.  So the loss of

24 base cations will be those that become available from the

25 overstory.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1  Q.  All right, sir.  If I could ask you, please, to look at a

2  document.  We're going to turn to the SAMI final report.

3  A.  Okay.

4  Q.  Which is Plaintiff's Exhibit Number 1.

5  A.  Uh-huh.

6  Q.  Ms. Gillen is going to help me again with this.

7      I'd like to direct your attention to Figure 6.3 which

8  appears on Page 6.6 of the hard copy of the SAMI report.

9      Do you see that in front of you on the screen,

10  Mr. Jackson?

11  A.  Yes, I do.

12  Q.  And I believe this -- as the heading shows, this is the

13  Percentage of Stream Lengths in the SAMI Region by ANC Class.

14  A.  That is correct.

15  Q.  And it's various relations are depending on the ANC

16  levels of those stream lengths.

17  A.  That is correct.

18  Q.  And if I'm reading this correctly, I'm going to say a

19  little bit better than 66 percent of the stream lengths have

20  an ANC greater than a hundred and 50.

21  A.  That is correct.

22  Q.  And another 27 percent have ANC somewhere between 51 and

23  a hundred and 50.

24  A.  That is correct.

25  Q.  And then we have the smaller representations for ANC

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   below 50.  Or 50 and below, I should say.

2   A.   Correct, and that's what I've talked about mainly today,

3   uh-huh.

4   Q.   Is the 50 and below.

5   A.   Yes.

6   Q.   I think -- you testified about the, what I'm going to

7   call the implications to the aquatic biota --

8   A.   Uh-huh.

9   Q.   -- of ANC at 50 and below.

10  A.   That is correct.

11  Q.   All right, sir.

12       And still looking at the exhibit -- Plaintiff's Exhibit

13  number 1, the SAMI report.  If I could direct your attention

14  to Page 4.20.  This is what I'm going to call the conclusions

15  page for the visibility chapter.

16  A.   Okay, uh-huh.

17  Q.   Is that correct?

18  A.   Yes, this says --

19  Q.   I'm going to ask Ms. Gillen to move the page down so we

20  can see the uncertainties.

21  A.   Uh-huh.

22  Q.   And Mr. Jackson, can you -- do you see that paragraph,

23  that first paragraph under uncertainties clearly enough to

24  read it for us?

25  A.   "The greatest source of uncertainties comes from the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   cumulative uncertainties in the emissions inventory and the

2   atmospheric model assumptions and performance.  The greatest

3   confidence is in sulfate and organic particles, intermediate

4   for elemental carbon and soil, and least for nitrate and

5   ammonium."

6   Q.   And those are uncertainties that affect SAMI's analysis

7   of visibility impacts.

8   A.   They do, uh-huh.

9   Q.   You mentioned control technologies for controlling the

10  emission of $SO_2$ in your testimony in response to Mr. Gulick.

11  A.   Yes.

12  Q.   And would it be correct to say that one of the control

13  technologies is what we were referring to as flue gas

14  desulfurization or scrubbers?

15  A.   Yes, uh-huh.

16  Q.   So installing a scrubber on a power plant would have,

17  obviously, a significant impact on how much $SO_2$ that plant

18  emitted.

19  A.   That is correct.  My experience, you know, talking about

20  these things, we would expect at least a 90 percent reduction

21  in sulfur dioxide emissions.

22  Q.   From a well-functioning scrubber.

23  A.   Right.  And hopefully higher.

24  Q.   And hopefully...

25  A.   Higher.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1    Q.    And hopefully higher.

2    A.    Or a greater amount, uh-huh.

3    Q.    Would also using lower sulfur coal be one of the methods

4    that you have -- would look to to reduce the emissions of

5    sulfur dioxide?

6    A.    Yes.  And I know of many facilities that have used that

7    as one of their options.

8    Q.    Mr. Jackson, Mr. Gulick asked you towards the end of your

9    examination about Blue Ridge Paper and you responded about the

10   letter that the Forest Service sent in.

11          MR. FINE:  If I could please ask Ms. Gillen to put

12   the document that's been marked for identification as

13   Defendant's Exhibit 435 on the screen.

14          Your Honor, that exhibit appears in book number 18

15   of TVA's exhibits.

16   Q.    Do you see the document that's been marked for

17   identification as Defendant's Exhibit 435, Mr. Jackson?

18   A.    I do see the document in front of me.

19   Q.    Is this the letter that you were referring to in your

20   testimony to Mr. Gulick?

21   A.    Yes, it is.

22   Q.    What role, if any, did you have in the preparation of

23   this letter and the enclosure to the letter?

24   A.    I produced the original draft of the letter and made

25   modifications that forest supervisor Marisue Hilliard

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  requested.

2  Q.   What about the enclosure?

3  A.   Yes, I also was the original author, if I can say, of

4  producing that document.

5  Q.   And just so it's clear in the record, what were the

6  circumstances or why did the Forest Service submit this letter

7  to the North Carolina Department of Environmental and Natural

8  Resources, Division of Air Quality?

9  A.   We wanted to go on record in terms of our comments

10 regarding the regional haze SIP, and in particular we wanted

11 to go on public record of our concern and our identification

12 of the potential impacts that we believe that Blue Ridge Paper

13 is having on visibility at Shining Rock Wilderness, and that

14 was based upon some modeling that I had done.

15 Q.   And I believe, sir, that this letter was sent to the

16 division -- to Mr. Keith Overcash at the Division of Air

17 Quality in October of 2007?

18 A.   That is correct.

19      MR. FINE:  Your Honor, I'd ask that Defendant's

20 Exhibit 435 be admitted into evidence.

21      THE COURT:  Let that be admitted.

22      (Defendant's Exhibit Number 435 was received into

23 evidence.)

24 Q.   Just a couple of points I'd like to get your help with on

25 this -- the document that's been admitted into evidence as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1  Defendant's Exhibit 435.

2  A.   Uh-huh.

3  Q.   If we could turn to the enclosure, which is the second

4  page of the -- of the exhibit.  And if I could direct your

5  attention to paragraph 3, towards the bottom of the page.  Do

6  you see that, sir?

7  A.   Yes, I do.

8  Q.   And if I'm looking at this correctly, the Forest Service

9  through you were commenting on the fact that Blue Ridge Paper

10  is projected to have about 10,150 tons of $SO_2$ emissions in

11  2018.

12  A.   That is correct, based upon data compiled by VISTAS.

13  Q.   So that's derived from the VISTAS inventory?

14  A.   Yes, it is.

15  Q.   And I believe you already discussed that this was going

16  to have, based on the modeling you did, using the CALPUFF

17  model, that these emissions were having impacts on

18  visibilities at Shining Rock.

19  A.   Yes, that is correct.

20  Q.   Using -- what was the -- what was the quantification, if

21  any, for the visibility impacts at Shining Rock from Blue

22  Ridge Paper?

23  A.   If I understand your question correctly, we looked at the

24  number of days of a change in something called deciview,

25  another visibility metric that I haven't talked about.  And

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    with that, one of the criteria that we looked at is how many

2    times -- or how many days a year do we have 1 deciview or

3    greater change in visibility.

4    Q.   And as you say, deciview is a measure of visibility?

5    A.   It is.  And it's -- the idea is that it's equivalent in

6    the idea of the decibel scale that so many people are familiar

7    with in terms of sound.  And a 1 deciview change by many

8    scientists, and we've also used with our work with new

9    sources, a 1 deciview change is considered a perceptible

10   change to most members of the public.

11   Q.   And I believe that deciviews are used by the

12   Environmental Protection Agency in the Regional Haze Rule?

13   A.   They did use deciview, that's correct.

14   Q.   And so you looked at the visibility impacts of Blue Ridge

15   Paper's emissions on visibility at Shining Rock.

16   A.   That is correct.

17   Q.   And what -- what did you conclude from your modeling?

18   A.   Based on our modeling, it appears that there is greater

19   than 200 days a year that visibility could be impaired 1

20   deciview or greater at Shining Rock Wilderness, and that's

21   just looking at just Blue -- the emissions from Blue Ridge

22   Paper.

23   Q.   Was there a chance of their having a greater visibility

24   impact at Shining Rock?

25   A.   Well, it depends upon the meteorological data that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    have.  Excuse me, yes.  That was 200 days greater than 1

2    deciview, if I understand your question.  But the maximum that

3    we measured, I believe there was at least one time period

4    where we estimated perhaps a 30 deciview change.

5    Q.   Thirty deciview change.

6    A.   Yes.

7    Q.   I believe, if I'm reading this correctly, and this is at

8    the very bottom of the page that I'm looking at.  I believe

9    you said, "Making significant sulfur reductions at the Blue

10   Ridge Paper facility alone may improve visibility more than 6

11   deciviews."

12   A.   That is correct.

13   Q.   What did you mean by that, sir?

14   A.   I would need to go back and look at my work, but probably

15   on average it would improve by 6 deciviews because the

16   Regional Haze Program was looking at average visibility not

17   just the worst visibility.

18   Q.   I know that your -- that your document -- that your

19   comments were talking about impacts at Shining Rock, but are

20   you aware of the visibility impacts from Blue Ridge Paper at

21   other Class I areas in western North Carolina?

22   A.   I did not look at modeling results for other Class I

23   areas in this exercise.

24   Q.   But are you aware whether Blue Ridge Paper is impacting

25   other Class I areas?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1    A.    I don't have any modeling results for that particular

2    source impacting other ones.  It would just be, what can I

3    say, conjecture on my part, you know, that it probably is

4    impacting other Class I areas, also.

5          Actually, the BART analysis that was done for Blue Ridge

6    Paper, excuse me, I believe that it showed impacts to Great

7    Smoky Mountains National Park.  But that was not all the

8    emission sources from Blue Ridge Paper.  That was just the

9    BART eligible sources from Blue Ridge Paper.

10   Q.    Just so that it's clear on the record, what's the

11   difference between a BART eligible source and a nonBart

12   eligible source?

13   A.    Well, the Clean Air Act Amendments of 1977 first talks

14   about the BART sources.  And I believe it's -- the sources

15   that were included are -- in the BART analysis had to be in

16   certain categories so it wasn't all sources of pollution.  And

17   they had to be in existence probably around 1962 or 61,

18   something like that.  So it doesn't -- there's a time period

19   and I can't -- I don't remember the exact dates, but there is

20   a time period.  And those sources that are in those

21   categories, those are the ones that are BART eligible.

22         And I think the idea of this is that, you know, even

23   Congress recognized in 1977 there was visibility impacts

24   occurring at that time, and this was one of the ways to start

25   dealing with visibility improvement.  Hopefully, the idea is

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1    that these BART sources were eventually also, as well as older

2    sources, eventually were going to be -- their boilers were

3    going to be replaced and then they would be subject to new

4    source -- new source review standards.  But many of these

5    sources are still around today.

6    Q.    So if I'm understanding you correctly, Mr. Jackson, some

7    of the boilers at Blue Ridge Paper are old or old enough to

8    fall outside of the BART analysis?

9    A.    That is correct.  And two -- I believe two of the boilers

10   are original to the plant and I believe the plant dates about

11   1920.

12   Q.    And what's the -- are those two of the larger or smaller

13   boilers, if you know?

14   A.    In terms of sulfur dioxide emissions, they're the larger

15   ones.

16   Q.    And if I can ask Ms. Gillen to show you the last page of

17   the enclosure.

18         We're talking about Blue Ridge Paper.  And this is -- if

19   I could direct your attention to the text that's below the

20   chart that you have there showing visibility impacts.  If I am

21   reading this correctly, the Forest Service through you is

22   telling the Division of Air Quality that we, referring to the

23   Forest Service, "believe emissions reductions at Blue Ridge

24   Paper should be accomplished before 2018 because emissions

25   from this facility clearly have a significant impact to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - CROSS

1  visibility at Shining Rock Wilderness."  Is that correct, sir?

2  A.   That is correct.

3  Q.   And at the very end of that paragraph, we, again

4  referring to the Forest Service, "are recommending a

5  facility-wide emission reduction plan be developed by 2013 and

6  the emission control measures be fully implemented before

7  2018."

8  A.   That is correct.

9  Q.   And if I'm understanding -- if I remember correctly, 2018

10  is critical because of the Regional Haze Rule where you're

11  supposed to be measuring your reasonable progress towards the

12  ultimate goal.

13  A.   Yes.  It's our next target date that we're looking at.

14  Q.   All right, sir.

15       Oh, just by the way, to your knowledge, is the Progress

16  plant here in Asheville also impacting Shining Rock

17  visibility?

18  A.   I have not performed any modeling -- or don't know of any

19  modeling that has been accomplished for the Skyland plant.  So

20  it would just be conjecture.

21            MR. FINE:  All right, sir.  Thank you.

22            A moment, if you please, Your Honor.

23            THE COURT:  All right, sir.

24            (Co-counsel conferred.)

25            MR. FINE:  Your Honor, that's all the questions I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - REDIRECT

1    have of this witness.  Thank you.

2            MR. GULICK:  I have just a few, Your Honor.

3            THE COURT:  All right.

4                    REDIRECT EXAMINATION

5    BY MR. GULICK:

6    Q.   Mr. Jackson, I'd like to go back to Exhibit 1, Page 53.

7            MR. GULICK:  Figure 3.11, Your Honor.  It's Exhibit

8    1, Page 53.

9            Your Honor, this is back to a more familiar chart,

10   3.18 of the hard document, I think.

11           Is that 3.18?

12           THE COURT:  Okay.  We have it now.

13   Q.   And Mr. Jackson, looking here at the SAMI evaluation of

14   the Annual Aerosol Response here, is it your understanding

15   that all of the -- when we're looking at North Carolina,

16   there's a light blue bar bar that represents the benefit

17   through the achievement of reductions in North Carolina, a

18   10 percent reduction in North Carolina?

19   A.   Yes, uh-huh.

20   Q.   And is that with the sources or would the source from

21   Blue Ridge Paper be included within that North Carolina $SO_2$

22   inventory?

23   A.   Yes, because this includes all sources of $SO_2$.

24   Q.   And is it not still the case that the -- in this

25   particular bar, that the Tennessee bar, the bar showing the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 pink or salmon color from Tennessee is considerably larger

2 than that for North Carolina?

3 A.   It is considerably larger.

4 Q.   And I just want to ask with respect to the Blue Ridge

5 Paper again.  Is it your understanding that North Carolina

6 went through the factor analysis that's called for under the

7 Regional Haze Rule in considering whether controls needed to

8 be required now for Blue Ridge Paper?

9 A.   Yes, they did go through that analysis.

10 Q.   And are you satisfied that they performed that analysis

11 correctly?

12 A.   Yes.

13 Q.   At this time?

14 A.   Uh-huh.

15 Q.   And it's your recommendation that it will be reviewed

16 again in 2013.

17 A.   That is correct, uh-huh.

18 Q.   To look for changes -- for action before 2018.

19 A.   Yes.  I mean, I think -- you know, I'd have to look in

20 our letter again because that is what we committed to.  But we

21 would hope that plans would be in place by 2013 so that they

22 can be implemented before 2018 so you can see the measure --

23 or see a measured response.

24 Q.   And you're expecting to work with the Division of Air

25 Quality in that connection.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM JACKSON - REDIRECT

1   A.   Yes, if we're invited we will participate.

2   Q.   And I believe you indicated before that you were

3   satisfied at the moment -- at this time with the response that

4   North Carolina has to this particular facility.

5   A.   Yes, we are satisfied.

6        MR. GULICK:  I have no further questions, Your

7   Honor.

8        THE COURT:  Further cross?

9        MR. FINE:  Nothing further, Your Honor.  Thank you.

10        THE COURT:  All right.  Marshal, take a recess until

11   tomorrow morning at 9 o'clock.

12        (Evening recess at 6:02 p.m.)

13   UNITED STATES DISTRICT COURT

14   WESTERN DISTRICT OF NORTH CAROLINA

15   CERTIFICATE OF REPORTER

16

17

18        I certify that the foregoing transcript is a true

19   and correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22        Dated this 14th day of July, 2008.

23

24                         s/Cheryl A. Nuccio
                          Cheryl A. Nuccio, RMR-CRR
25                         Official Court Reporter

Cheryl A. Nuccio, RMR-CRR (704)350-7494