UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA    )
ex rel. Roy Cooper,       )
Attorney General,         )
                       )
       Plaintiff,    )   No. 1:06-CV-20
                       )
     vs.           )   VOLUME 3B
                       )   (Pages 650-766)
TENNESSEE VALLEY AUTHORITY,  )
                       )
                       )
       Defendant.    )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 16th, 2008

APPEARANCES:

On Behalf of the Plaintiff:

    JAMES C. GULICK, Senior Deputy Attorney General
    MARC BERNSTEIN, Special Deputy Attorney General
    North Carolina Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina

    MICHAEL D. GOODSTEIN, Esquire
    ANNE E. LYNCH, Esquire
    Resolution Law Group, P.C.
    5335 Wisconsin Avenue NW, Suite 360
    Washington, DC

On Behalf of the Defendant:

    FRANK H. LANCASTER, Senior Attorney
    HARRIET A. COOPER, Assistant General Counsel
    THOMAS F. FINE, Assistant General Counsel
    MARIA V. GILLEN, Assistant General Counsel
    Tennessee Valley Authority
    400 West Summit Hill Drive
    Knoxville, Tennessee

     Cheryl A. Nuccio, RMR-CRR, Official Court Reporter

1                          I N D E X

2                                                      PAGE

3  PLAINTIFF'S WITNESSES

4  NEIL WHEELER
        Direct Examination by Mr. Goodstein...........      652
5       Cross Examination by Mr. Fine.................      709

6

7              I N D E X   O F   E X H I B I T S

8                                      OFFERED  RECEIVED

9  PLAINTIFF'S EXHIBITS

10  No. 127-134............................      658      659
    No. 136-138............................      658      659
11  No. 139................................      665      666
    No. 141................................      672      673
12  No. 142-149............................      691      691
    No. 150-157............................      691      691
13  No. 158-162............................      699      699
    No. 427................................      658      659
14

15

16

17

18

19

20

21

22

23

24

25

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    <u>WEDNESDAY AFTERNOON, JULY 16, 2008</u>

2              THE COURT:  Mr. Goodstein.

3              MR. GOODSTEIN:  Thank you, Your Honor.

4                    <u>NEIL WHEELER</u>

5              DIRECT EXAMINATION (Cont'd.)

6    BY MR. GOODSTEIN:

7    Q.   Mr. Wheeler, where we left off was your description of

8    the model performance confirmation that was done by VISTAS and

9    also your evaluation of whether 2002 was an appropriate base

10   year.

11   A.   Yes.

12   Q.   And we were turning your attention to Plaintiff's Exhibit

13   133 for identification.

14   A.   So the two things that we did, we looked at both the

15   fourth highest 8-hour ozone concentrations from 1999 to 2005

16   with the year 2002 when we modeled in the center of those

17   years.  We calculated from EPA's data the fourth highest

18   8-hour ozone concentration which is a -- is a metric that is

19   used with the standard for ozone.  And we averaged those

20   values over all sites in North Carolina and also averaged them

21   over all of the regions 3 and 4, those are the EPA regions

22   designations, which covered most of our modeling domain.

23        And so what we -- you can see here is that there's some

24   variation from year to year.  In 1999 the North Carolina

25   concentrations averaged at 92, and in year 2002 they were 94,

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1    and in 2005 they were 80.

2        We look at this variation -- this is very typical of the

3    meteorological variation over multiple years.  There may be

4    some changes in emissions over these years, but these are

5    generally produced by year-to-year variations in meteorology.

6    In picking a year for modeling, we like to have something that

7    is kind of in the average values for the years surrounding it.

8    Often -- we may want it a little bit higher than normal so

9    that we have some conditions that need to be controlled.

10       But looking at this particular plot, we see that these

11   are pretty typical years.  The year-to-year variations are not

12   very large.

13       On the other exhibit --

14   Q.    This is --

15   A.    -- which was 134.

16   Q.    Yes.

17   A.    Was the same sort of analysis for $PM_{2.5}$.

18   Q.    What did you confirm about using 2002 as the base year

19   for your modeling?

20   A.    This was a reasonable year.  It was consistent with the

21   selection criteria that VISTAS used for the model -- selected

22   modeling year.  And that there weren't significant deviations

23   from the following years either.

24   Q.    And what did you do to confirm that the VISTAS version of

25   the CMAQ model that you set up on STI's computers, your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  computer system, was performing right?

2  A.   We actually ran the base case simulations and reviewed

3  the results.  Compared them to the VISTAS results and

4  confirmed that we were replicating their base case simulation

5  for 2002.

6  Q.   And what did that show?

7  A.   What that showed was that there was adequate model

8  performance to use the modeling tool for future year controls

9  strategy simulations.

10 Q.   So what did VISTAS confirm about the performance of the

11 CMAQ model?

12 A.   What did the...

13 Q.   What did VISTAS confirm and then what did you confirm?

14 A.   Well, what VISTAS confirmed that model performance was in

15 that envelope I was talking about for all of the important

16 species and that it was suitable for running future year

17 scenarios and evaluating control scenarios.

18 Q.   So it was sufficiently accurate and precise for the

19 purposes of VISTAS and also for your purposes.

20 A.   Yes.

21 Q.   Can you describe for us the domain, the modeling domain

22 that you looked at in your modeling that you did in this case.

23 A.   May I approach the...

24 Q.   Sure.  And you can refer to Plaintiff's Exhibit 136.

25

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1         MR. GOODSTEIN:  With the court's permission, if

2   Mr. Wheeler can approach the exhibit.

3         THE COURT:  You may.

4         (Witness stepped down from the witness stand.)

5         THE WITNESS:  The modeling domain that VISTAS used,

6   as I mentioned earlier, included more than just the VISTAS

7   states.  We placed this on -- over a map of the eastern United

8   States, and the boundary around this is the VISTAS fine

9   resolution domain.  It was at 12 kilometer resolution.  The

10  boxes or the grid cells were 12 kilometers on the side

11  horizontally.  There's actually a much larger domain that's

12  run for VISTAS as well as the other RPOs that covers the

13  entire United States, so that each of the RPOs as they model

14  their particular region can provide inputs to the other

15  regions as well.

16        We've noted here that TVA coal-fired power plants

17  are centered in the -- almost the very center of the domain,

18  and that we put some annotation on here to show us where the

19  Great Smoky Mountains National Park is, the Blue Ridge Parkway

20  and the Appalachian Trail.

21        One of the things about this region, if we look at

22  the meteorology over many years, and particularly in 2002,

23  that the flows aloft over this section of the United States

24  are generally from west to east.  They are -- have some waves

25  in them that vary from day to day.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1          As we moved closer down to the surface, the winds

2    become more complicated.  They're affected by areas of high

3    and low pressure.  One of the features of southeastern

4    meteorology is that during the summer months when the ozone

5    and particulate matter reaches its highest concentrations,

6    there's a high pressure system that resides off the coast of

7    the southeast and the flow around that is clockwise like this

8    (indicating).  And that high from day to day can move up and

9    down, sideways a little bit.  And as it does that, the flows

10   over this region at the surface can go from sort of

11   northwesterly to westerly to southeasterly depending on the

12   position of that high pressure system.

13          So when we look at the transport in this region,

14   there is a tendency for the transport of pollutants to be from

15   west to east.

16   Q.   Thank you, Mr. Wheeler.

17          (Witness resumed the witness stand.)

18   Q.   You also, Mr. Wheeler, provided a close-up in your report

19   of the CMAQ model domain in North Carolina and Tennessee, and

20   I believe it's marked as Plaintiff's Exhibit 137.

21   A.   Yes, we did provide an image that shows a close-up of the

22   region.  We zoomed in to the center and focused along the

23   Tennessee and North Carolina border.  And we've annotated this

24   to help us as we did our analysis with key features, some

25   locations of interest, such as Grandfather Mountain, the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Biltmore Estate, we have the Class I areas we talked about
2    yesterday that are national parks and wilderness areas that
3    are protected for prevention of significant deterioration.
4    Here we have the Great Smoky Mountains National Park, Chimney
5    Rock State Park, Joyce Kilmer Slickrock, which is a Class I
6    area, and there's several others on this plot.
7         But this would allow us to be focusing on the impacts
8    from power plants along the North Carolina/Tennessee border.
9    And there are four power plants that are very close to the
10   border:  John Sevier, Bull Run, Kingston, and there's one
11   further down slightly, if we could move the plot down a little
12   bit, and to -- yes, that's great -- and Widows Creek.  And
13   these are the closest to North Carolina and are -- have a
14   large influence on the impacts in North Carolina due to the
15   wind flows in this region.
16   Q.   All right.  I'll refer your attention, Mr. Wheeler, to
17   Plaintiff's Exhibits 138, 98 -- these should be in your
18   book -- 99, 100.
19   A.   I see it.
20   Q.   Could you identify what those summary tables in your book
21   represent.
22   A.   These represent the emissions from North Carolina -- CP&L
23   and -- I mean, Duke -- Duke and Progress power plants in North
24   Carolina.  These show the 2002 emissions and the 2003
25   emissions that are projected based on the 2005 report on Clean

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Smokestacks.  These are the emissions that we modeled in North

2    Carolina for North Carolina in our modeling efforts.

3    Q.   And Plaintiff's Exhibit 98.

4    A.   The next exhibit is the NOx emissions from TVA coal-fired

5    power plants estimated for our 2013 base case.  That's our

6    on-the-books simulation.  And these were provided to us by

7    Dr. Staudt.  It continues for several pages.

8    Q.   Okay.  And Plaintiff's Exhibit 99.

9    A.   The next exhibit is the 2013, it's a -- this is 99?

10   Q.   Yes.

11   A.   These are the $SO_2$ emissions from the TVA coal-fired power

12   plants for our 2013 base case simulation.  These also were

13   provided by Dr. Staudt.

14   Q.   And Plaintiff's Exhibit 100.

15   A.   100 are the NOx emissions for the TVA coal-fired plants

16   with the additional controls sought by North Carolina.

17   Q.   And Plaintiff's Exhibit 101.

18   A.   And the final one is the $SO_2$ emissions with the

19   additional controls sought by North Carolina.  This, too, was

20   provided to us by Dr. Staudt.  All of these last four exhibits

21   were used to prepare the 2013 base case simulation, emissions

22   for that simulation and the 2013 control case.

23   Q.   All right.

24        MR. GOODSTEIN:  At this time, Your Honor, I want to

25   offer some exhibits into evidence.  Mr. Wheeler's CV, Exhibit

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   427, and then the exhibits we have covered so far in his

2   examination, 127, 128, 129, 130, 131, 132, 133, 134, 136, 137

3   and 138.

4          THE COURT:  All right.  Let those be admitted.

5          (Plaintiff's Exhibits Numbers 127, 128, 129, 130,

6   131, 132, 133, 134, 136, 137, 138 and 427 were received into

7   evidence.)

8          MR. FINE:  Mr. Goodstein, did you cover the ones you

9   just covered with him?

10         MR. GOODSTEIN:  The ones that we covered with

11  Dr. Staudt's emissions estimates have previously been

12  admitted.

13         MR. FINE:  Thank you, Mr. Goodstein.  I appreciate

14  that.

15         MR. GOODSTEIN:  Thank you.

16  Q.  All right.  Mr. Wheeler, you loaded these emissions up

17  into the CMAQ model and you produced some results.

18  A.  Well, actually, we ran three simulations with CMAQ with

19  the 2000 -- with the 2013 emissions.

20      The first simulation that we performed was with inert

21  tracers.  Inert tracers are chemical species that don't react

22  with any other compounds in the atmosphere.

23         MR. FINE:  Your Honor, I need to interpose an

24  objection before we get into any of this inert tracer

25  testimony.

1        As the witness has just said, they don't react with

2   anything.  They don't really show anything.  And the exhibits

3   that are drawn from this inert tracer, in fact, measure things

4   in parts per trillion.  Inert tracers, if they show anything,

5   tend to show which way the wind blows.  They have no physical

6   characteristics.  They're not reasonable simulacrums or

7   facsimiles for any known pollutants.  Have, as I say, no

8   physical characteristics at all.  We don't know whether

9   negatively or positively bouyant.  We don't know for what

10  species of pollutant they would be held to be representative

11  of.  So that the whole exercise ultimately shows nothing

12  that's of any value.

13       On those grounds we'd ask that this line of

14  questioning and any exhibits associated with it be excluded as

15  irrelevant.

16       MR. GOODSTEIN:  Your Honor, we respectfully request

17  that the expert who's qualified on the stand to testify about

18  these matters be allowed to testify about them.  At this point

19  we're just getting out in the record the simulations that

20  Mr. Wheeler ran.  The inert tracer, as Mr. Wheeler will

21  testify to, is an initial screening tool that's helpful for

22  modelers and air quality analysts to set up the model and

23  confirm various parameters about it and also gives them an

24  indication of the meteorology in the area.  And in fact,

25  Dr. Tesche, who will later in this trial testify for Tennessee

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Valley Authority, says right in his report that inert tracers

2    are an appropriate screening tool.

3          So we will lay the foundation with Mr. Wheeler and

4    then we can confirm it later on in the trial with Dr. Tesche

5    because that's right out of his report.

6          MR. FINE:  Just want to make it clear, Your Honor,

7    that these ultimately show nothing and that -- if there is --

8    if they're a useful screening tool, I don't know why we're

9    burdening the record with them since there's no controversy

10   about the adequacy of the CMAQ model for measuring -- for

11   modeling atmospheric impacts from emissions.  I think that

12   frankly, Your Honor, in all candor, this is a waste of the

13   court's time.

14         MR. GOODSTEIN:  And we will show, Your Honor, that

15   this is part of the scientific evidence that Mr. Wheeler and

16   his colleague Mr. Chinkin are relying on in this case in part.

17   So it's not a waste of anybody's time.  We're going to move

18   through it very quickly, but it's part of the analysis that

19   they did and in their field this is an important initial step

20   in the modeling analysis.

21         So I would submit that we ought to just let the

22   witness testify about the scientific evidence that he's

23   presenting as opposed to hearing from counsel about what it

24   shows.

25         THE COURT:  All right.  I'll let them in and make a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  final decision --

2          MR. GOODSTEIN:  Thank you, Your Honor.

3          THE COURT:  -- as to whether to consider them or of

4  what value they may be.  All right.

5          MR. GOODSTEIN:  Thank you, Your Honor.

6  Q.   All right.  Mr. Wheeler, you were telling us about the

7  modeling that you did.

8  A.   Yes.  Inert tracers are useful tools for diagnostic

9  purposes in the model to determine whether there are

10  inconsistencies in the meteorological fields that cause

11  unusual transport.  They're also used to determine potential

12  for transport.  Not necessarily that there's a specific

13  impact, but that there is a potential.

14      And the way we applied them here, we simulated a separate

15  tracer for each of the power plants, TVA's coal-fired power

16  plants and scaled the emissions of this inert tracer to their

17  $SO_2$ emissions.  That way we could look at the various range of

18  potential impact and compare them between sites -- between

19  sources.  And this gives us an idea of which ones might have

20  the greatest contribution, which ones have the most likelihood

21  of transporting to other parts of the modeling domain.  So

22  these are a useful tool for that purpose.

23      We in no way imply that these are impacts specifically,

24  but this is a first step in a lot of modeling studies because

25  we don't want to go into full chemistry modeling when there's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  no potential for impact in a particular region.  So it's a

2  first step in the analysis.

3  Q.   And what did your inert tracer analysis show,

4  Mr. Wheeler?  And feel free to --

5  A.   I have a series of exhibits.  We might show one of those

6  and then quickly move through those.

7  Q.   All right.  And what was your -- what was the -- what was

8  the overall conclusion that was reached?

9  A.   The overall conclusions were there was a potential of

10  impact from each of the sources that we modeled from TVA power

11  plants and that the -- not surprisingly, that the impacts or

12  potential for the impact were closer -- were larger nearer the

13  plants and less at further distances downwind.  But in all

14  cases, there was potential for impact into North Carolina and

15  many other states throughout the domain.

16  Q.   All right.  Can you -- referring to Plaintiff's Exhibit

17  139 in your book, please, show us what the results of these

18  initial inert tracer analyses provide.

19  A.   Yes.  We'll show quite a number of these sort of plots,

20  color contour plots.  And I might just orient everyone that in

21  each of these we have an axis indicating the color bands and

22  what the concentrations are.

23       In this case, as Mr. Fine pointed out, these are in parts

24  per trillion.  They're not reactive and shouldn't be

25  considered as a measure of impact, but they do show a measure

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  of potential for impact.

2       The -- in this one we see that the highest potential is

3  near the power plants, in this case it's for John Sevier.  And

4  there tends to be a greater extent of potential extending to

5  the east from the power plant than to the west.

6  Q.   All right.  Why don't you run through the series real

7  quickly.

8  A.   Sure.  The second one was at Bull Run.  Again, no

9  surprises here.  It looks very similar.  We see the extent --

10 potential extending further to the east than west.

11      If we go to Kingston, we see similar -- we see a much

12 broader pattern here.  This would be due to the higher

13 concen -- higher emissions rates at Kingston in our 2013 case.

14      And the next one is Widows Creek, a smaller footprint

15 from that one, but again, consistent in terms of impacts

16 extending further to the east.

17      I neglected to mention that these are annual averages so

18 it includes periods where there were storms coming through

19 during the course of the year and so there are some impacts

20 when flow was from east to west and that's why we see a

21 potential to the west as well.

22      The next one was at Gallatin.  Again, it's located a

23 little further to the north and further away from North

24 Carolina.  And again, we see a very similar sort of pattern.

25      And the next one was Paradise.  Paradise with impacts

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 further to the north and much higher potential impacts shown

2 in the purple area there.

3          And the next one is Cumberland.  Cumberland shows a

4 similar pattern.

5          And if we go to the next one, which is Colbert, again, a

6 very similar pattern.  Slightly higher potential around the

7 plant for impacts.

8          And the next one is Johnsonville.  Here we see a much

9 broader pattern of potential impact extending -- some of the

10 highest levels extending to, looks like one, two, three, four,

11 five, six other states.

12          And finally -- well, there's two more.  Shawnee.  Again,

13 a very similar pattern.

14          And then finally Allen.

15          As we see from these, that while -- what we concluded was

16 that obviously the potential for impact is highest nearest the

17 emissions source, but there is a potential for impact to North

18 Carolina in all of these.

19          So based on these analyses, we felt comfortable going

20 ahead with full chemistry simulations to assess impacts in

21 North Carolina through the region.

22          MR. GOODSTEIN:  We offer Plaintiff's Exhibit 139

23 into evidence, Your Honor.

24          MR. FINE:  We'll object to that, Your Honor.

25          THE COURT:  All right.  Let it be admitted.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1          (Plaintiff's Exhibit Number 139 was received into

2    evidence.)

3          MR. GOODSTEIN:  Thank you, Your Honor.

4    Q.    I want to refer your attention, Mr. Wheeler, to

5    Plaintiff's Exhibit 140 for identification.

6    A.    Okay.

7    Q.    Mr. Wheeler, as part of the results from your CMAQ

8    modeling analysis, were you able to do a visualization of

9    TVA's $SO_2$ emissions?

10   A.    Well, one of the things we did in developing the base

11   case simulations was to do what we call a visualization, a

12   three-dimensional visualization or a movie of air quality in

13   the region.  This is -- we used a tool called VIS-5D.  It's

14   been around for about 20 years in the meteorological community

15   and used over the last decade for air quality simulations.

16   And it's a diagnostic tool to help us understand the

17   three-dimensional nature of the atmosphere.

18         Usually when we're looking at these plots, like we were

19   looking at the inert tracer, they're a layer at the surface

20   and you don't get a sense of what's really going on in the

21   atmosphere; that, you know, thousands of feet in the area that

22   chemistry is going on, transport is going on.  And it's not

23   always apparent by looking at the ground level concentrations

24   how they arrive at that particular location.

25         So what we did is we prepared a visualization of a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    four-day period during our 2013 base case simulation and

2    visualized the SO$_2$ concentrations in the modeling domain.  So

3    this is actually results out of the CMAQ model.  And we also

4    visualized the sulfate aerosol that was produced in the

5    atmosphere.

6        And if you'd like, I can take and describe this

7    particular at the board.

8  Q.   Yes.

9        MR. FINE:  Your Honor, before we get too much

10   farther into this, I'm going to interpose an objection.  If I

11   understand the term isosurface, that means that this does not

12   show any particular concentrations so that all we have is an

13   amorphous brown cloud.  We don't know its altitude.  We don't

14   know its concentration.

15       We also note that contrary to what Mr. Wheeler says,

16   this appears to be showing sources other than TVA power plants

17   unless I'm misunderstanding the yellow plumes I see coming out

18   of Mississippi and southern Alabama, Georgia, South Carolina

19   and some other sites before they get swept up into our

20   amorphous brown cloud.

21       Again, Your Honor, I don't think this shows anything

22   of value other than to try and mislead the court as to the

23   potential impacts from TVA's emissions.

24       MR. GOODSTEIN:  Your Honor, that's an appropriate

25   subject for cross examination, I think.  Counsel will have a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  chance with this witness once we've passed him --

2           THE COURT:  Yes.

3           MR. GOODSTEIN:  -- but I think he should be --

4           THE COURT:  You'll have full opportunity to cross

5  examine him.

6           MR. GOODSTEIN:  Thank you, Your Honor.

7           MR. FINE:  Thank you, Your Honor.

8           THE COURT:  The objection is overruled.

9           We're dealing with 140?

10          MR. GOODSTEIN:  Your Honor, if we can have

11  Mr. Wheeler approach the exhibit so he can explain what it

12  shows.

13          THE COURT:  All right, sir.

14          (Witness stepped down from the witness stand.)

15          THE WITNESS:  This simulation included more than

16  TVA's facilities.  This is all in our 2013 base case, and I

17  did not make that statement.

18          But what we see here and the reason we do these sort

19  of visualizations is to help explain how gases convert into

20  particles in the atmosphere and are transported over long

21  distances.

22          What we've done here is we've indicated $SO_2$

23  concentrations in the atmosphere -- and this is $SO_2$

24  concentrations in the model's atmosphere -- in yellow and

25  created what we call isosurfaces.  They were selected at

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  concentration levels to depict common scales of plumes in the

2  region.

3          And what we see is we see a number of $SO_2$ emissions

4  various places.  Correct, from areas throughout the region.

5  We do see specifically here at Colbert and Johnsonville the

6  plumes from those.

7          And I think the key issue here is we see that the

8  sulfate forms downwind in the atmosphere.  And we've prepared

9  some movies of these from different angles.  That's the way

10  the tool is frequently used interactively saying I want to

11  look at it from this direction, from this elevation.  And we

12  provided some movies that show the simulation over a four-day

13  period to get an understanding of how transport and chemical

14  conversion occurs in the atmosphere.

15          MR. FINE:  Your Honor, I know that you've already

16  ruled on the admissibility of this exhibit, but I believe

17  based on Mr. Wheeler's testimony, the legend on this document

18  is incorrect.  It is not just visualizing TVA's $SO_2$ emissions,

19  but visualizing $SO_2$ emissions from a large range of emitting

20  sources, power plants, I'm assuming, for the most part,

21  throughout a large region.

22          MR. GOODSTEIN:  Which includes TVA's plants, Your

23  Honor.

24          THE COURT:  I'll note your statement, counsel.

25          MR. FINE:  Thank you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MR. GOODSTEIN:  Thank you, Your Honor.

2          (Witness resumed the witness stand.)

3          MR. GOODSTEIN:  Your Honor, if I may approach the

4    witness.  I have a copy of the DVD which has this simulation

5    on it that I'd like Mr. Wheeler to identify and then we can

6    run it for the court --

7          THE COURT:  All right.

8          MR. GOODSTEIN:  -- with your permission.

9          THE WITNESS:  Yes, this is one of the CDs I

10   prepared.

11         MR. FINE:  And before we have Wednesday afternoon at

12   the movies, Your Honor, I would interpose an objection.  I

13   understand Your Honor's prior rulings on this subject, but for

14   the record we would object to the playing of this movie.

15         THE COURT:  All right, sir.

16         MR. GOODSTEIN:  Thank you, Your Honor.

17         THE COURT:  Yes.  You may proceed.

18   BY MR. GOODSTEIN:

19   Q.   Mr. Wheeler -- maybe we can put it up on the monitor and

20   you can explain what it shows, Mr. Wheeler, because I

21   understand it's a loop so we're not going to be able to stop

22   it.  So maybe you can tell us what it shows and then we'll run

23   the loop.

24   A.   So as I mentioned, it's a four-day period.  And one of

25   the things that we see here, this is a top view looking down

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1    over the entire modeling domain.

2    Q.    I'm sorry.  Do you want to tell us what it's going to

3    show.  Or you can narrate while it goes.

4    A.    I can narrate.

5    Q.    All right.

6    A.    But what it's going to show is the general regional

7    transport in the region in this period of the presence of the

8    high pressure system off the coast of the southeast and that

9    general clockwise rotation.  Some days it's more westerly,

10   some days it's a little bit more from the southwest.  We also

11   see some periods where it flows across the Appalachians and

12   comes back down on the back side of them down into North

13   Carolina.

14   Q.    I'm sorry, I just wanted to make you -- give you a little

15   time to explain it.  So now let's run it.

16   A.    Okay.  As I mentioned earlier, the SO -- the sulfate or

17   $SO_4$ isosurfaces are in brown and the $SO_2$ concentrations are in

18   yellow.  And as I mentioned, we see that circulation like that

19   around the southeastern region.  We see transport across the

20   Appalachians, some penetration through the gaps in the area.

21   And as I said, it runs for four days.

22        We'll look at it again on a slightly angled view so you

23   can get a sense of the vertical extent of the $SO_2$ plumes and

24   that the reactions to the formation to sulfate occur at higher

25   elevations above the surface.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1       Normally we'd be looking at this interactively and
2   rotating it and trying to investigate where particular sources
3   are.
4       This is a close-up view focusing in over Tennessee and
5   North Carolina.  We can see the vertical extent of the plumes
6   in this somewhat, but we clearly see the conversion of $SO_2$ to
7   sulfate, that the concentrations of $SO_2$ decrease further
8   downwind from the sources and that the sulfate forms down --
9   further downwind.
10      And I believe that's it.
11  Q.   With regard to the transport of pollutants that are
12  emitted from TVA power plants, what were you able to conclude
13  based on this visualization?
14  A.   Well, I think in several cases we can see specific plumes
15  that do -- are transported from TVA power plants into North
16  Carolina and other parts of the region.  Sometimes those
17  are -- couldn't necessarily in this simulation identify each
18  TVA facility because in many cases the plumes, $SO_2$ plumes were
19  obscured by the sulfate plumes.
20  Q.   And were you able to identify any of the TVA plant
21  plumes?
22  A.   Yeah.  As I mentioned, it was very clear, the Colbert and
23  Johnsonville plumes, and I think on other periods we saw
24  several of those.
25           MR. GOODSTEIN:  Your Honor, we offer Plaintiff's

             Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Exhibit 141 into evidence.

2          MR. FINE:  Objection, Your Honor.

3          THE COURT:  Overruled.

4          (Plaintiff's Exhibit Number 141 was received into

5  evidence.)

6  Q.   Mr. Wheeler, can you tell us which scenarios you ran for

7  2013 and then show us your results.

8  A.   Yes.  As I mentioned, we did the inert tracer

9  simulations.  But the focus of our analysis was on the 2013

10  base case, the 2013 control case with the reductions sought by

11  North Carolina, and then we did differences between those

12  simulations.

13          Obviously, there's a lot of plots that can be generated

14  from these simulations.  We have 19 layers in the model,

15  nearly a hundred species that are being modeled, and we can

16  spend a lifetime looking at these.  We spent many days looking

17  at them to understand what the model is predicting.

18          To prepare this data to provide to the health effects

19  experts and ecosystem experts, we provided them all of that

20  data for their analysis.  But we needed to come up with some

21  summaries of those so that they could assess whether what

22  they're seeing in their analysis is consistent with our data.

23  They actually replicated some of our analyses to verify that.

24          So we looked at a couple of different types of summary

25  plots for these.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1     The first set were 24-hour average concentrations of

2  particulate matter, $PM_{2.5}$.  And we looked at some sample

3  dates, four days, one during each season, looking at the --

4  both the concentrations in the base case and the differences

5  or the decreases in concentrations under the control scenario.

6  We did that for four -- for four different days of the

7  annual -- for the 24-hour averages.

8     We also looked at the maximum 24-hour change over the

9  course of the year in each grid cell within the modeling

10 domain.

11    And then finally, we looked at the annual average $PM_{2.5}$

12 concentrations predicted by the model and the difference that

13 would occur, the improvements that would occur as a result of

14 the controls sought by North Carolina.

15    So those are displayed -- we -- in our report as summary

16 graphics.

17    And we also did a similar analysis for ozone as well.  We

18 looked at on several occasions the peak 8-hour ozone on those

19 days and the differences as a result of the additional

20 controls.

21    We also looked at the maximum improvement over the course

22 of a year in each grid cell as a result of the additional

23 controls.

24 Q.   All right.  Mr. Wheeler, thank you.

25    And referring your attention to Plaintiff's Exhibit 142.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1  Can you walk us through the results for the 24-hour $PM_{2.5}$

2  concentrations.  And I believe you have a few individual days.

3  A.    Yes, this was one of the days.  As I mentioned, we try to

4  pick a day from each season to give kind of a summary over the

5  course of the year.

6       Again, just to orient everyone on these scales, the scale

7  on the left indicates the concentrations for each of these

8  color bands in micrograms per cubic meter.  And then on the

9  right we have the differences between the base and the control

10  case.  And these are presented in this display of percent

11  improvement or percent decrease in concentrations.

12       And what we see on this particular one is that for most

13  areas there's generally a 1 to 3 percent improvement in

14  concentration on a daily basis.  There are a few places where

15  the differences increase.  I think the largest improvement was

16  12 percent improvement over the region.

17  Q.    All right.  If you could move us through the rest of the

18  individual day plots that you have for the 24-hour $PM_{2.5}$.

19  A.    Yes.

20  Q.    That will be 143 through 146 for identification.

21  A.    Yes.  This one is for April 18th, 2013 base case.  One is

22  the control scenario.  And what we see here is a little bit

23  more distinct, what I call plumes of improvement downwind of

24  TVA sources.  This is more typical of late spring and

25  summertime conditions.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1      The next plot was for July 27th, and later in the year

2 the temperature and other conditions for formation of $PM_{2.5}$ is

3 enhanced and we actually see a much larger change as a result

4 of the controls.  In this case it looks to be over, at the

5 maximum point, more than 30 percent improvement.

6 Q.   And just so we're clear, Mr. Wheeler, that the change

7 figure on the right represents the impacts of TVA facilities

8 and the changes in concentrations of these pollutants in the

9 domain resulting from the additional controls being applied.

10 A.   To be clear, these are not the total impacts from TVA

11 facilities.  This is a scenario where we're looking at the

12 difference between the base case and the initial controls

13 sought.  The total impact in what we call a zero-out emissions

14 sensitivity would be larger than this.

15 Q.   So you're showing the actual concentrations on the

16 left-hand figure.

17 A.   The predicted concentration of the absolute

18 concentration.

19 Q.   And on the right you're showing the change --

20 A.   In percent changes.

21 Q.   -- in TVA's emissions with and without the additional

22 controls sought by North Carolina.

23 A.   The right indicates the percent change in concentrations

24 as a result of the additional controls.

25 Q.   And can you see on the right, for example, in Plaintiff's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1    Exhibit 144, can you see some of the individual plume effects
2    from TVA power plants?
3    A.    Yes.  This is actually very clear in here where the
4    improvements, as I mentioned earlier, call them plumes of
5    benefit.  You can see the benefits emanating from the source
6    areas and we can pick out a whole number of those.
7    Q.    And these plumes emanating from Tennessee or the areas in
8    Alabama and Kentucky around Tennessee, those are associated
9    with the TVA power plants.
10   A.    Yes.
11   Q.    And what about Plaintiff's Exhibit 145 for
12   identification?
13   A.    Again, this is a similar sort of analysis for another
14   day, October 2nd.  And likewise, the impacts -- the area of
15   largest impacts is not as great, but on this particular day
16   there were significant improvements with the additional
17   controls in North Carolina.  We can see that right in this
18   area here (indicating).  And those are on the order of
19   24 percent improvement.
20   Q.    So the darkest blue area on this day in North Carolina
21   shows the maximum improvement area resulting from the
22   additional controls being applied to TVA's facilities.
23   A.    Yes, that's correct.
24   Q.    All right.  Mr. Wheeler, you also presented a figure in
25   Plaintiff's Exhibit 146 which also showed 24-hour average

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    $PM_{2.5}$ concentrations.  Can you explain to us what this figure

2    shows.

3    A.    Yes.  In this analysis we looked over the entire year and

4    looked at the maximum improvement in a 24-hour average of

5    $PM_{2.5}$ at any grid cell in the modeling domain, and then that

6    maximum improvement is plotted on this.  And this whole area

7    indicated in purple indicates that more than a 25 percent

8    improvement in those grid cells at least one day during the

9    simulation year.

10   Q.    And referring you to Plaintiff's Exhibit 147.  Can you

11   explain to us what those results show.

12   A.    Yes.  Similar plots on a daily basis, the 24-hour

13   averages.  We also did -- looked at the improvement over the

14   entire year.

15        So on the left is the model's prediction in 2013 of the

16   absolute $PM_{2.5}$ concentrations across the region.

17        And on the right-hand side shows the percent improvement

18   resulting from the additional controls on TVA's facilities.

19        And this is the statistic -- one of the statistics that

20   we provided to the health effects experts for assessing these

21   impacts.

22        And what we see here is that there are two areas in

23   Tennessee that have some very -- that have more than 4 percent

24   improvement on an annual average, which is really quite large

25   considering it's averaged over an entire year.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1      And the third area is in western North Carolina.

2      So these are not just particular days during the year

3  which it impacts; this is on an annual basis.  These are the

4  things -- these are the annual standard that have the greatest

5  impacts.

6  Q.   And how would you describe the impacts and the

7  improvement as far as aerial extent associated with the

8  additional controls sought by North Carolina?

9  A.   I think these are substantial impacts on air quality, in

10  particularly Tennessee and North Carolina, but throughout the

11  region.

12  Q.   Referring your attention to Plaintiff's Exhibit 148.  Can

13  you identify that figure and explain what it shows.

14  A.   This is a plot that we provided in our supplemental

15  report.

16  Q.   Uh-huh.

17  A.   Showing the differences resulting from the additional

18  controls based on an absolute basis in micrograms per cubic

19  meter.  The other ones were in percent.

20      And these show that there is greater than four-tenths of

21  a microgram on an annual average improvement in both North

22  Carolina and Tennessee, and that there are substantial impacts

23  that extend as far east as the coast.

24  Q.   All right.  And Plaintiff's Exhibit 148 has a second page

25  to it.  And can you tell us what that shows.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   This is a close-up of the same data that you saw in the

2   previous figure focusing in on Tennessee and western North

3   Carolina.  On this figure we've showed the power plants.

4   We've showed the PM$_{2.5}$ nonattainment areas outlined in black,

5   and the decrease in concentrations of PM$_{2.5}$ on an annual basis

6   resulting from the additional controls.

7   Q.   Mr. Wheeler, what are the counties that are circled in

8   black?

9   A.   The dark outlined counties are the nonattainment areas,

10  or at least they would be at the time this was plotted.

11  Q.   And what does that mean?

12  A.   That means they're in violation of the National Ambient

13  Air Quality Standards and that they are required to develop

14  control programs to attain the standard.

15  Q.   And when you see the blue improvement areas demonstrating

16  the changes in concentration resulting from the additional

17  pollution controls from TVA's plants and that darkened area

18  extends into some nonattainment counties, what do you conclude

19  from that?

20  A.   Well, that tells me that that may be an effective control

21  for reaching attainment as well in those areas.

22  Q.   What does --

23  A.   With the controls sought by North Carolina.

24  Q.   What does that mean as far as TVA's contribution to the

25  nonattainment status of those counties?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   That would tell me that there is some contributions to

2  nonattainment in those areas.

3  Q.   And that includes some counties in North Carolina.

4  A.   Yes.  We tend to focus on the darkest concentrations on

5  these maps, but there is some impact in every area, every

6  nonattainment area on this particular figure, whether it's in

7  North Carolina, Tennessee, Kentucky, et cetera.

8  Q.   When you say nonattainment county, can you tell us what

9  significance that has on the Clean Air Act.

10 A.   It requires them to adopt control programs to meet the

11 standards or alternatively be subject to various sanctions,

12 enforcement actions.

13 Q.   So what does this tell you about TVA's contribution to

14 the exceedance of National Ambient Air Quality Standards in

15 those counties?

16 A.   Yes.

17 Q.   And there are nonattainment counties also in Tennessee

18 that are being impacted by TVA's excess emissions?

19 A.   Yes, there are.

20      MR. FINE:  Your Honor, I'll object to the

21 argumentative nature of that question.

22      MR. GOODSTEIN:  Your Honor, we have to call it

23 something and we could say -- we have to call -- the delta

24 that we're looking at is the difference between emissions

25 from -- with -- from TVA plants with the controls sought by

1  North Carolina.  So we have to refer to that delta in some way

2  and I don't see any other way to refer to it other than excess

3  emissions or excessive emissions.

4          MR. FINE:  Your Honor --

5          MR. GOODSTEIN:  That's been established in the

6  evidence.

7          MR. FINE:  If you look at the scale on these things,

8  we're talking about amounts -- the greatest amount that seems

9  to be shown is .4 micrograms per cubic meter.  The idea of

10  calling .4 micrograms per cubic meter -- the NAAQS -- the

11  annual National Ambient Air Quality Standard for $PM_{2.5}$ is 15

12  micrograms per cubic meter.  Talking about 0.4 micrograms as

13  excessive strikes me as argumentative.

14          MR. GOODSTEIN:  Your Honor, we've had testimony --

15          THE COURT:  Yes, I'll overrule the objection.

16          MR. GOODSTEIN:  Thank you, Your Honor.

17          THE COURT:  Move along.

18  BY MR. GOODSTEIN:

19  Q.   Mr. Wheeler, I would like to refer your attention to

20  Plaintiff's Exhibit 149 for identification.  And can you tell

21  us what this summary that you prepared shows.

22  A.   Yes.  This is the exact same data you saw on the last

23  plot, but focused in on that map that we showed earlier that

24  focuses along the Tennessee/North Carolina border.  And here

25  we can see more clearly the potential benefits of the controls

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1  sought by North Carolina on both Tennessee and many of the

2  important natural resources in the region, the parks and

3  Class I areas as well as, you know, state parks and

4  nonattainment counties which are shown on here as well.

5  Q.   Can you tell us a little bit more about the

6  concentrations that are shown on here and the significance of

7  those as far as the magnitude of the improvement in annual

8  $PM_{2.5}$ concentrations with these additional controls on TVA's

9  power plants.

10 A.   Yes.  The scale is similar to the same one as before.  We

11 see areas where there's more than four-tenths.  Large area

12 extending into North Carolina where it's more than, looks like

13 more than two-tenths of a microgram.  And despite the

14 assertion that these are small concentrations, when we talk to

15 health effects and ecosystem experts, they say these are

16 substantial.

17         MR. FINE:  Your Honor, I don't wish to have this

18 witness testifying about what other people are going to be

19 testifying.

20         THE COURT:  All right.  I'll sustain your objection.

21 Q.   Mr. Wheeler, from your experience in your 30-plus years

22 in air quality analysis, what's your conclusion about these

23 changes?

24         MR. FINE:  Your Honor, that's an extraordinarily

25 open-ended question and I think outside the bounds of this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  witness's expertise.

2         THE COURT:  Yes, see if you can pin this down a

3  little more.

4         MR. GOODSTEIN:  Thank you, Your Honor.

5  Q.   Can you put these changes into context, Mr. Wheeler.

6  A.   These concentration -- these differences in concentration

7  are on the -- you know, on the order of a few percent of the

8  standard.  When I've looked at other areas trying to reach

9  attainment, we've looked at control strategies that get much

10 smaller benefits than these and I've -- you know, over the

11 years I've been in many of the hearings for state

12 implementation plans and federal implementation plans and we

13 usually hear that these are small contributions by industry.

14 What we find, though, is when they're combined with other

15 control programs, that they can produce substantial benefits

16 and reach attainment.

17 Q.   All right.  Mr. Wheeler, we've covered your summaries

18 regarding the $PM_{2.5}$ improvements resulting from the additional

19 controls sought by North Carolina and on TVA plants and now

20 I'd like you to go through and summarize the ozone results.

21        MR. GOODSTEIN:  And Your Honor, just by way of

22 explanation, a road map, Mr. Wheeler is going to be presenting

23 his data and offering it into evidence with this witness since

24 he was the primary person overseeing the air quality modeling

25 that was performed, and then we have Mr. Chinkin, his

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  colleague, who is going to do a little more detailed analysis

2  and interpretation of the results.

3         THE COURT:  All right.

4  Q.   Mr. Wheeler, let's go through the ozone plots, if you

5  will, please.  Let's start with Plaintiff's Exhibit 150.

6  A.   Yes.  With the $PM_{2.5}$ plots for these analyses, these

7  are -- the first four in the set are the peak 8-hour ozone

8  concentrations on the left for that particular day and on the

9  right the change in peak 8-hour ozone resulting from the

10  additional controls.  Like the PM2, we've selected four

11  example days to demonstrate the impacts.

12        On this day, May 24th -- we didn't go back into the

13  winter because ozone tends to be a summertime phenomenon.  And

14  what we see is high ozone concentrations in eastern Tennessee

15  and western North Carolina and along the coast of the

16  northeastern portion of the domain.

17        We see that there are benefits emanating from the

18  control -- the sources that have been controlled, and

19  extending far out into the -- into Virginia and some as far up

20  as into West Virginia and Pennsylvania and New York.  These

21  differences are on the order of a maximum of about 9 percent

22  reduction in peak 8-hour ozone.  Those are very close to the

23  sources.

24        One of the things we notice on ozone versus particulate

25  matter is we get high concentration -- or we get improvements

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1    immediately downwind of the sources and the amount of

2    improvement way downwind -- you know, several states is much

3    less.  Where with the sulfate -- with the $PM_{2.5}$ and the long

4    range transport of sulfate, they tend to have broader impacts

5    further downwind.

6    Q.   Let's move through the other days that you've shown in

7    your figures from your report for ozone.  Let's go to

8    Plaintiff's Exhibit 151, please.

9    A.   This is for July 27th.  Again, very similar patterns.  In

10   this one we're showing that there would be improvements in

11   this case, some better than 6 percent improvements in western

12   North Carolina.  And the benefits are extending well downwind

13   into central North Carolina and Virginia.

14   Q.   And Plaintiff's Exhibit 152.

15   A.   This is for August 12th.  Again, a similar pattern in

16   this case.  As I mentioned, the high pressure moves from day

17   to day.  And we do see some circulation.  This is more of a

18   flow from the south so that the benefits are impacting and are

19   greatest in Kentucky.  One of the things that we do see,

20   though, is some circulation back in Virginia and back into

21   North Carolina on the eastern slope of the Appalachian

22   Mountains.

23   Q.   And Plaintiff's Exhibit 153.

24   A.   This is for September 4th and this is a -- the prediction

25   in this case -- this is a different flow pattern.  This one

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1  the winds are more from the -- from the north on this

2  particular day.  This appears to be associated with a system

3  moving through the area, but we still do see benefits

4  extending down into the south -- to the states to the south of

5  Tennessee.  We also see from the area immediately along the

6  west -- along the western North Carolina area that we are

7  seeing impacts of greater than 6 percent improvement -- or

8  improvements of greater than 6 percent.

9  Q.  And Plaintiff's Exhibit 154 for identification.

10  A.  Like we did for the daily $PM_{2.5}$, we've calculated the

11  maximum in percent improvement in peak 8-hour ozone for each

12  grid cell over the year.  So the areas indicated by purple in

13  this case is that there are some areas in western North

14  Carolina and surrounding states with more than 10 percent

15  improvement on at least one day a year.

16  Q.  And Plaintiff's Exhibit 155 for identification, can you

17  tell us what that one shows.

18  A.  As we did with the $PM_{2.5}$, we've redisplayed the data

19  going from a percent basis to a concentration basis.  Ozone is

20  measured in parts per billion or ppb.  And here we see areas

21  in North Carolina that have improvements of 8 parts per

22  billion or more.  And the areas where there is 1 to 2 parts

23  per billion extend practically up into the states of Virginia,

24  West Virginia.

25  Q.  What do the darkened blue areas on this figure represent?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   The dark blue indicates that it's greater than 8 parts

2  per billion improvement resulting from the additional

3  controls.

4  Q.   And what's in the center of those dark blue areas?

5  A.   Excuse me?

6  Q.   What's in the center of those dark blue areas?

7  A.   In the center of the dark blue area are power plants,

8  generally.

9  Q.   All right.  And you have a second page to Plaintiff's

10  Exhibit 155.  I'd like you to identify that and explain what

11  it shows.

12  A.   Again, this is a display over the region focusing on

13  North Carolina and Tennessee and ozone nonattainment areas.  I

14  need to note that all of these may not be accurate at this

15  time because of recent redesignations.

16  Q.   What you're saying is the ozone standards have gone down?

17  A.   I'm sorry?

18  Q.   What you're saying is the ozone standard has recently

19  been lowered?

20  A.   Well, there's several things that have happened.  In some

21  cases they were not areas designated nonattainment.  That came

22  under a clean air action plan and those were redesignated

23  recently.

24       But the other issue is that these are the current

25  implemented air quality standards of nonattainment areas and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1    based on the 1997 acts.  Recent revision to acts for ozone
2    have reduced the threshold from 85 parts per billion to 75
3    parts per billion.  So many of the areas that aren't currently
4    nonattainment here will likely be designated nonattainment
5    when the new NAAQS are implemented.
6    Q.    All right.  Plaintiff's Exhibit 156 for identification.
7    Can you take a look at that and tell us what it shows.
8    A.    Yes.  Similar to the earlier plot, this is a close-up
9    along the North Carolina/Tennessee border.
10          We see, as mentioned, that some of the largest plants
11   have a large area of benefit downwind of them:  John Sevier
12   and Widows Creek.  But we also see that the improvements
13   extend throughout this region and they range from 1 part per
14   billion to greater than 8 parts per billion in certain
15   locations.
16          There is an area here extending over the North Carolina
17   border into western North Carolina where these improvements
18   are between 4 and 8 parts per billion:  In the areas near
19   Asheville, Great Smoky Mountains National Park and several of
20   the wilderness areas.
21   Q.    What does this tell you, Mr. Wheeler, about TVA's
22   contribution to ozone concentrations in the mountains around
23   Great Smoky Mountains National Park?
24   A.    Well, this indicates -- again, this is not the total
25   impact.  This is just the difference between the base case and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1  the sought after controls.  But it indicates that the impacts
2  on the parks in this region, this is looking at the maximum
3  over the course of the year, can be substantial in those parks
4  and wilderness areas.
5  Q.   And the darkened areas around the Widows Creek plant and
6  the John Sevier plant, what do those indicate on this figure?
7  A.   I'm sorry, could you repeat that.
8  Q.   The darkened blue areas around the Widows Creek plant and
9  the John Sevier plant, what do these indicate on this figure?
10 A.   Those indicate that the improvement as a result of the
11 additional controls would be greater than 8 parts per billion.
12 It also indicates that those areas are affected significantly
13 by the power plant itself.
14 Q.   Mr. Wheeler, I want to turn your attention to
15 deposition -- now that we've gone through $PM_{2.5}$ changes in
16 concentration resulting from the additional controls and the
17 ozone changes resulting from the additional controls sought by
18 North Carolina, I want to have you describe for us the
19 deposition results.  And maybe first can you give us a little
20 overview of the deposition that is modeled in the CMAQ model.
21 And we've got a figure out of your report marked as
22 Plaintiff's Exhibit 157 for identification.
23       MR. FINE:  Your Honor, for the record, we would
24 reinstitute the objection we earlier noted to any testimony
25 concerning sulfate deposition.  I understand Your Honor's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    prior rulings, but state it for the record again.

2                THE COURT:  You may proceed.  Overruled.

3                MR. GOODSTEIN:  All right.  Maybe before we go

4    forward with that description, Mr. Wheeler, I'll offer into

5    evidence, Your Honor, the summaries of the CMAQ modeling that

6    we just went over sponsored by Mr. Wheeler, Plaintiff's

7    Exhibits 142 through 149 for identification.

8                THE COURT:  All right.  Let them be admitted.

9                (Plaintiff's Exhibits Numbers 142 through 149 were

10   received into evidence.)

11               MR. GOODSTEIN:  And the ozone plots that we just

12   went over with Mr. Wheeler.  We offer at this time, Your

13   Honor, Plaintiff's Exhibits 150 for identification through

14   157.

15               THE COURT:  Let those be admitted.

16               (Plaintiff's Exhibits Numbers 150 through 157 were

17   received into evidence.)

18               MR. GOODSTEIN:  Thank you, Your Honor.

19   Q.   Mr. Wheeler, let's talk about deposition.  Can you

20   describe for us, please, the basics.

21   A.   Basically.  The CMAQ model models deposition.  That's the

22   removal process as I talked about as one of the key processes

23   in the modeling system.

24        The schematic gives a simple version of what happens in

25   the atmosphere.  As we have already covered, emissions are

NEIL WHEELER - DIRECT

1    emitted.  $SO_2$ and oxides of nitrogen can convert to sulfates

2    and nitrates.  There are many ways which these can be

3    deposited to the surface and removed from the atmosphere.

4         One process is called dry deposition where gases or

5    particles simply come in contact with the surface.

6         Another form of dry deposition is inhalation by humans

7    and animals.

8         They're also respirated by plants and that way removed

9    from the atmosphere.

10        One of the other processes is that these pollutants are

11   dissolved into cloud water and cloud droplets in the

12   atmosphere.  They undergo some chemical transformations in

13   that dissolving, and then they can be deposited to the surface

14   through precipitation.  And that's referred to as wet

15   deposition.

16        So these are the processes by which pollutants in the

17   atmosphere end up at the surface.

18   Q.   And can you now show us your results, Mr. Wheeler, for

19   the sulfate and the nitrate deposition changes, the

20   improvements that will result from the individual controls

21   sought by North Carolina on TVA plants.

22   A.   Yes.  We prepared two figures in our expert report:  One

23   for sulfate deposition and one for nitrate deposition.

24   Q.   All right.  I want to show you first Plaintiff's Exhibit

25   158 for identification.  And can you explain to us what that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   shows.

2   A.     In this plot, similar to the plots we saw for $PM_{2.5}$ and

3   ozone, the figure on the left reflects the total deposition

4   over the entire year.  This -- in this case it's sulfate being

5   deposited.  And from these plots we can see that many areas in

6   North Carolina are seeing from 10 to 20 -- 10 to 20 kilograms

7   per hectare deposition over the course of the year.  As we

8   move more into the areas along the Appalachians, particularly

9   in the western portions up into West Virginia, we see

10  deposition rates approach -- exceeding 20 kilograms per

11  hectare.  In fact, the maximum deposition here is 52 kilograms

12  per hectare in these regions.

13        The plot on the right is the change in deposition of

14  sulfate resulting from the additional controls from TVA

15  facilities.  And there we see that there's large decreases, on

16  the order of greater than 12 percent with a maximum of

17  46 percent, within the region in North Carolina, Kentucky and

18  extending briefly over the ridge into western North Carolina.

19        One of the things we know that there tends to be more

20  deposition on the upwind side of the Appalachians.  Uplifting

21  up over the mountains causes precipitation and dropping a lot

22  of the deposition right along the ridgeline.

23  Q.     All right.  And you also have a plot for nitrate

24  deposition, I believe identified in Plaintiff's Exhibit Number

25  159.

               Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1  A.    Yes.  And as we've indicated earlier, that sulfate is a

2  dominant $PM_{2.5}$ component in the eastern United States.  As a

3  result, the nitrate deposition patterns look similar to the

4  ones for sulfate, but they're considerably smaller.

5        In this case the maximum deposition rate, deposition on

6  an annual basis was 17 kilograms per hectare with -- again,

7  you can see some high -- higher values greater than

8  8 kilograms per hectare right along the ridgeline between

9  North Carolina and Tennessee.

10       In a similar fashion, with the additional controls, the

11 change in sulfate dep -- I mean, of nitrate deposition focuses

12 around the power plants.  It's not quite as broadly

13 distributed as the sulfate because a lot of the deposition

14 occurs closer to the facilities, but we do have some values of

15 more than a 3 percent decrease in nitrate deposition right

16 along the Tennessee and North Carolina border.  In general,

17 it's on the order of 1 percent or less through much of the

18 region.

19 Q.    Thank you, Mr. Wheeler.

20       Now, on all of these plots that we've seen for $PM_{2.5}$ for

21 ozone and now for sulfate and nitrate deposition, the

22 presentation of the improvements on the right side, do they

23 also show the impacts of TVA's excessive emissions from their

24 power plants?

25            MR. FINE:  Your Honor, again, I'd interpose an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  objection to the use of excessive as argumentative.

2          THE COURT:  Overruled.

3  A.   As I mentioned before, this doesn't show the total

4  impacts from TVA's power plants, but it's a first order

5  estimate by the -- looking at the reductions that were taken

6  with the additional controls.  So the actual impacts will be

7  larger than this.

8  Q.   But this shows the impacts, the change resulting from the

9  additional controls.

10  A.   Yes.

11  Q.   Mr. Wheeler, I'd like to now turn your attention to your

12  modeling results for visibility.  And if you could give us --

13  first, before we look at your specific results, could you just

14  give us an overview of this parameter for air quality

15  purposes.  What is visibility and how does the CMAQ model

16  project -- simulate visibility changes based on changes in

17  emissions controls?

18  A.   In the most basic terms, visibility is -- affects the

19  ability of distance and clarity of a view.  The key in air

20  quality models such as CMAQ is that it can estimate the

21  attenuation and scattering of light which when light is

22  scattered and absorbed in the atmosphere, the visibility is

23  reduced.

24      The model does this by looking at distribution of

25  particles that the model is predicting and we can convert that

1  to a couple of metrics that indicate visibility.  One of those

2  metrics is a deciview.  A deciview is considered a change in

3  visibility that is perceivable by humans, and that has been

4  used extensively by EPA and federal land managers as a metric.

5  The other way to present it in more human terms is visual

6  range, a representation of how far can you see.  And we've

7  looked at both of those in our analysis of the CMAQ model

8  output.

9  Q.   All right.  I'm referring your attention now to

10  Plaintiff's Exhibit 160 for identification.  And can you

11  identify that and explain what it shows.

12  A.   Yes.  This is a table from our expert report.  The first

13  analysis we did was to look at several of the Class I areas in

14  North Carolina and then extending to Shenandoah National Park,

15  and then added in Washington, D.C., as a distance receptor

16  source.

17       And what we did is that we looked at the change in

18  visibility resulting from the additional controls.  We took

19  the part -- the model takes the particle matter, particularly

20  matter concentrations, and converts those to visual range and

21  deciviews.  And we picked a number of days, which in -- and

22  these are selected for their maximum impacts, but during 2002

23  model simulations in each of these areas, the maximum

24  improvement during the year at that location.  For example, at

25  the Great Smoky Mountains National Park, we looked at

1    August 19th was the day with the greatest improvement and it

2    was a 68 percent improvement, from a 15.5 mile visual range in

3    the base case up to a 26.2 mile visual range in the control

4    case.

5        We did this for other sites as well.  As you can see,

6    there -- on September 27th at Joyce Kilmer Slickrock

7    Wilderness, there was a 51 percent improvement in visual

8    range.

9        At Shining Rock Wilderness, 103 percent improvement in

10   visual range.

11       At Linville Gorge, a 74 percent.

12       And even in Shenandoah National Park we saw a day when

13   there was a 23 percent improvement.

14       And 19 percent improvement in Washington, D.C.

15       So these were the worst cases.

16       We also looked at the frequency of occurrence of

17   improvements in visibility.

18   Q.   And how does sulfate from power plants impair visibility?

19   A.   As I mentioned, sulfate is the principle predominant

20   component of $PM_{2.5}$ in the eastern United States.  And sulfate

21   reduces visibility as a part of the $PM_{2.5}$.  And when you

22   reduce sulfur emissions, $SO_2$, you reduce sulfate in the

23   atmosphere, you reduce particle concentrations and you improve

24   visibility.

25   Q.   And did you prepare some other tables presenting

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  visibility results from your CMAQ model?

2  A.   Yes.  We did some analysis of the number of days per

3  year, the frequency of days where perceivable improvement in

4  visibility might be obtained.

5  Q.   Let's look at Plaintiff's Exhibit 161 for identification

6  next, please, Mr. Wheeler.

7  A.   Yes.  Exhibit 161 is a table from our report, which

8  looking at the locations in North Carolina in particular, that

9  one in seven or one in eight days during the year there would

10  be a perceivable improvement based on a 1 deciview change in

11  visibility resulting from the additional controls on TVA

12  facilities.

13  Q.   This shows you frequency of improvement.

14  A.   Yes, number of the days and frequencies in terms of how

15  often.  One in eight days.  Almost one day a week.

16  Q.   And then you also looked at the 20 percent worst

17  visibility days.

18  A.   Yes.  It's been noted in the literature that the worst

19  days are often associated with high concentration -- the

20  highest concentrations of $PM_{2.5}$.

21      What we did is we looked at the 20 percent -- is that

22  what I'm looking at?

23  Q.   Yes, Plaintiff's Exhibit 162 for identification, I'm

24  sorry.

25  A.   Oh.  Yes, we did look at the 20 percent worst days during

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  the year, meaning the worst visibility based on the CMAQ

2  estimates of visibility.  And what we found at the North

3  Carolina wilderness sites, that instead of one day a week

4  there would be improvement, that one in four days or one in

5  three days would have a perceivable improvement in visibility.

6  Q.   And why did you look at 20 percent worst visibility days?

7  A.   (No response.)

8  Q.   Why did you look at 20 percent worst visibility days?

9  A.   Well, a couple of reasons.  I started to mention that the

10 literature indicates that some of the largest improvements can

11 be achieved on low visibility days.  Those are the most

12 impacted by sulfate.  It's also used in the Regional Haze Rule

13 planning looking at the top 20 percent of days and the lowest

14 20 percent of days.

15      MR. GOODSTEIN:  Your Honor, at this time I offer

16 Plaintiff's Exhibits 157 through 162 into evidence.  And these

17 are the sulfate and nitrate deposition and visibility plots,

18 as well as the schematic showing acidification.

19      MR. FINE:  Once again, we interpose an objection to

20 the exhibit dealing with sulfate deposition, Your Honor,

21 understanding your prior rulings.

22      THE COURT:  All right, thank you.  The objection is

23 overruled.

24      (Plaintiffs Exhibits Numbers 157 through 162 were

25 received into evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.   Mr. Wheeler, based on your experience, 30-plus years of

2    experience in air quality analysis and modeling, how would you

3    characterize the improvements in visibility that you

4    summarized for us in your figures from the CMAQ model?

5    A.   I would characterize these as substantial.

6    Q.   And do you have an overall conclusion based on your

7    experience about the improvements in air quality throughout

8    the region and in North Carolina that will result from the

9    installation of these additional controls on TVA's coal-fired

10   power plants sought by North Carolina?

11   A.   Yes.  These improvements that would result from the

12   additional controls on TVA's plants, ozone, particulate matter

13   deposition, visibility are all substantial.

14   Q.   Mr. Wheeler, have you had an opportunity to review the

15   expert reports submitted regarding your modeling by TVA's

16   experts?

17   A.   Yes, I have.

18   Q.   So you've had a chance to review the reports prepared by

19   Dr. Tesche and Mr. Mueller, and in particular their comments

20   about the modeling that you've done on behalf of North

21   Carolina.

22   A.   I didn't hear the last part.

23   Q.   The modeling that you've done on behalf of North

24   Carolina.  You've been able to see Dr. Tesche and

25   Mr. Mueller's comments about the modeling you've done.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1   A.    Yes.  They commented that both the modeling that they did

2   with the base G emissions and the modeling that we -- that

3   they did and we replicated on the base F emissions were

4   sufficiently accurate and precise to perform emission control

5   simulations.

6   Q.    Did any of their comments on your modeling change your

7   conclusions or cause you to modify your results in any way?

8   A.    No, not at all.

9   Q.    And why not?

10  A.    Well, when we looked at what they had modeled, which

11  there were some -- it's basically the same modeling approach

12  using the VISTAS modeling system.  The main difference is

13  concerns over what the emissions would be in 2013.

14       When we evaluated their results in a complete context, we

15  found that they were finding the same results in terms of any

16  benefit for a particular decrease in emissions.  So on a

17  benefit for reductions basis we were the same.  The biggest

18  difference in their results were how they interpreted their

19  findings.

20  Q.    What about how they presented their findings,

21  Mr. Wheeler?  Did you see a marked difference between their

22  presentation of results and your own?

23  A.    Yes.  We looked at their presentation techniques.  They

24  had some criticism of us in terms of our techniques.  But we

25  found that the way that they displayed the benefits of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  controls tend to obscure the complete picture of where

2  benefits might be accrued.

3  Q.   And did you look at some of their results reapplied with

4  some different resolutions?

5  A.   Yes, we did.  We looked at one of the figures that they

6  provided in their -- both in their report and executive

7  summary.  They had provided us with their modeling results

8  from those simulations.  So we plotted them with a

9  finely-resolved non-linear scale.  That is typically used in

10  analysis of air quality data.

11  Q.   And when you replotted Dr. Tesche and Mr. Mueller's

12  results using a finely-resolved non-linear scale, what did it

13  show?

14  A.   It showed that there was impacts or benefits to be

15  obtained through most of the modeling domain.

16  Q.   I'd like to show you Plaintiff's Exhibit 165 for

17  identification, and can you identify that and explain to us

18  what it shows.

19  A.   Yes.  This is from our supplemental report.  On the left

20  is a copy of the figure from their report based on their TVA

21  plan that they used in their modeling to get the 2013 base.

22  We disagreed with that because it included controls that

23  weren't on the books.

24        MR. FINE:  Your Honor, before we proceed with this,

25  I'll have to render an objection -- make objection to the

1    legend that appears within the body of this exhibit.  It's

2    difficult to read on the screen, but based on -- it reads,

3    "Based on Tesche and Mueller's simulation to TVA's TCS plan,

4    which is unlikely to be implemented as proposed and which

5    included errors in emission inputs."  I would suggest that

6    that is argumentative and inappropriate and also inaccurate

7    based on Dr. Staudt's own testimony.

8              THE COURT:  Now, which exhibit are you referring to?

9              MR. FINE:  This is Plaintiff's Exhibit marked for

10    identification 165.

11              THE COURT:  All right.

12              MR. FINE:  And there's a legend in red that appears

13    on both sides of the exhibit which is argumentative at best

14    and inaccurate at worst based on Dr. Staudt's own testimony

15    concerning TVA's going forward with additional controls,

16    particularly at the Bull Run steam plant, the Kingston steam

17    plant, and the fuel switch at the Johnsonville steam plant,

18    and the upgrade from Dr. Staudt's estimation of the

19    performance of the scrubber at Paradise unit 3.

20              MR. GOODSTEIN:  Your Honor, this figure is in

21    Mr. Wheeler and Mr. Chinkin's report just like this.  And we

22    can take some testimony on this legend, but the background on

23    it, Your Honor, is we're trying to show the different

24    presentation scales and how Dr. Tesche and Mr. Mueller, TVA's

25    modelers, used a scale that tends to underestimate the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    benefits of the pollution controls.  So --

2              THE COURT:  That will be for the purpose of cross

3    examination.  If it's shown to be false, of course, the court

4    won't consider it.

5              MR. GOODSTEIN:  Thank you, Your Honor.

6              THE COURT:  What you're saying is that the experts

7    don't agree with each other, and I don't expect them to.

8              MR. GOODSTEIN:  Not much of a surprise.

9              Thank you, Your Honor.

10             THE COURT:  All right.  Go ahead with your

11   examination.

12   BY MR. GOODSTEIN:

13   Q.   All right.  Mr. Wheeler, when you were able to replot

14   Dr. Tesche and Mr. Mueller's presentation of this data, what

15   did it show?

16   A.   Yes.

17   Q.   What did it show when you were able to replot it?

18   A.   Well, I think at first after we looked at our analysis,

19   it really stood out when we looked at Tesche and Mueller's

20   plot that there appears to be no impact or very little impact

21   outside the state of Tennessee.  When we replotted, we find

22   that there are differences extending throughout the modeling

23   domain, albeit at low values, but those values are considered

24   significant by the users of this model output.

25             I think as a data analyst, we always try to show the full

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  set of data that describes the distribution of concentrations

2  throughout a region.

3      We also realize that the distribution of air quality, of

4  pollutants in the atmosphere is not linear and that there are

5  gradients that extend for long distances away from sources.

6  Q.   How would you describe the presentation by Dr. Tesche and

7  Mr. Mueller?

8  A.   I'm sorry?

9  Q.   How would you describe the presentation by Dr. Tesche and

10 Mr. Mueller?

11 A.   I would describe it as being -- trying to obscure some of

12 the results.

13 Q.   And I'd like to show you Plaintiff's Exhibit 164 for

14 identification.  And can you tell us what that figure shows.

15 In this figure -- these are our data from our simulation, the

16 difference between our base case and control scenario.

17     On the right is the plot of the differences based on our

18 non-linear finely-resolved scale.  This is what we presented

19 in our report.

20     If we look at the left is on the scale that Dr. Tesche

21 and Mr. Mueller used in their report.  And while our area of

22 benefit is much larger because we assumed a larger difference

23 between the base case and the control case, there appears to

24 be areas that clearly have some benefits in our plot that are

25 not seen in the alternate presentation on the left.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - DIRECT

1   Q.   So similar type of presentation by Dr. Tesche and

2   Mr. Mueller of these results.

3   A.   I'm sorry?

4   Q.   It's a similar type of presentation of the results as we

5   saw in the previous figure --

6   A.   Yes, it is.

7   Q.   -- by Dr. Tesche and Mr. Mueller.

8   A.   Yes.

9   Q.   And how would you describe this presentation result?

10  A.   This meaning?

11  Q.   Dr. Tesche and Mr. Mueller's presentation of results on

12  the left side of this figure.

13  A.   It doesn't give the complete picture of what's going on.

14  If I turn this over to a health effects expert to look at and

15  they get the impression that there was no impact --

16        MR. FINE:  Your Honor, I would object to his

17  testimony as to what a health effects expert would or would

18  not derive from this information.  It's outside his area of

19  expertise.

20        THE COURT:  Overruled.

21  Q.   So in summary, Mr. Wheeler, what did you take away from

22  the comments in Dr. Tesche and Mr. Mueller's report about your

23  presentation of data and your use of a non-linear scale?

24  A.   What I took away was it was obvious that they were either

25  obscuring information or they were unknowledgeable about data

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    analysis techniques.

2    Q.    And can you describe for us what is a finely-resolved

3    non-linear scale and why is that appropriate presentation of

4    this type of data?

5    A.    It is comprehensive in terms of the contribution -- the

6    benefits throughout the region.  This is a technique that is

7    routinely used to display measured air quality data and --

8    that's all I can say.

9    Q.    You also recall the comments by Dr. Tesche and

10   Mr. Mueller in their reports about the uncertainty --

11   A.    Yes.

12   Q.    -- of CMAQ model simulations.  Did that discussion cause

13   you to change your analysis?

14   A.    No, it didn't.

15   Q.    And why not?

16   A.    Well, we're working with a modeling system that's been 30

17   years in development.  I had some concerns about uncertainty

18   20 years ago, but there's been a constant effort to improve

19   the modeling systems to make them more comprehensive, more

20   reliable.

21        In using these systems, I don't see the uncertainties

22   that Dr. Tesche and Mr. Mueller described.  In fact, in one

23   sentence they say that it's acceptable -- appreciably

24   significantly precise and accurate for the type of modeling,

25   but then they say you've got to be careful about the

Case 1:06-cv-00020-LHT   Document 197   Filed 06/15/09   Page 58 of 117

1    uncertainties.  They also go on to misquote some of the work

2    of Dr. Hanna and myself on that topic of uncertainty, and I

3    think we're at a point in model development that these are

4    extremely reliable, precise and accurate tools and that

5    uncertainty is not a significant issue in the use of them the

6    way we did.

7    Q.   And in the type of analysis that you've done here where

8    you compare -- I'm sorry -- when you compare scenarios with

9    and without additional controls in a model year, how would you

10   describe the precision of the CMAQ model?

11   A.   I am very comfortable in describing the precision down to

12   a hundredth of a unit, even a part per million or microgram of

13   cubic meter.  I've done studies looking for the presence of

14   numerical noise in the simulations resulting from differences,

15   such as the base case and the control case, and I don't see

16   any noise simulations extending out to six or seven decimal

17   places.

18        I've also looked at the changes in air quality downwind

19   of sources that have been controlled in the model and they're

20   completely consistent physically and chemically in terms of

21   the response downwind, even to very low levels such as a

22   tenth -- I mean, to a hundredth of a microgram or part per

23   billion.  In fact, I've read several reports by Dr. Tesche

24   that also report response down to that level.

25   Q.   And this is the CMAQ modeling approach that was used in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - CROSS

1   the VISTAS program?

2   A.   I think they may have used CAMX in those cases.

3   Q.   I'm sorry.  You testified earlier that the CMAQ model was

4   used in VISTAS.

5   A.   Yes.

6   Q.   So you used that VISTAS version of CMAQ.  That's where

7   you received your modeling --

8   A.   Yes, I did.

9   Q.   -- inputs.

10  A.   Yes.

11  Q.   All right.

12        MR. GOODSTEIN:  No further questions of this witness

13  at this time, Your Honor.

14        THE COURT:  All right.  Mr. Fine, we'll take our

15  recess and then you may proceed.

16        MR. FINE:  Thank you, Your Honor.

17        (Brief recess at 4:02 p.m.)

18        MR. FINE:  Thank you, Your Honor.

19        THE COURT:  Yes.

20                    NEIL WHEELER

21                 CROSS EXAMINATION

22  BY MR. FINE:

23  Q.   Mr. Wheeler, before we get going, I know this is probably

24  not going to be as exciting as chasing tornados, but

25  ultimately probably less raising of blood pressure, too.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      A couple preliminary questions just to make sure or, if

2  you will, housekeeping matters.

3      Do you still have the book in front of you that your

4  attorneys were so kind enough to put together --

5  A.   Yes, I do.

6  Q.   -- with your exhibits?

7      And another thing is if you cannot hear my questions -- I

8  know you and Mr. Goodstein were having some problems.  If you

9  can't hear my questions, please let me know.

10 A.   I will.

11 Q.   Thank you.  I'm not a quiet person as a general rule and

12 I'll try and make myself heard.

13     Mr. Wheeler, you mentioned Dr. Tesche in your testimony

14 both in terms of his involvement with the VISTAS program and,

15 of course, his involvement with TVA modeling in this case.

16 That's correct?

17 A.   (No response.)

18 Q.   That's true, is it not?

19 A.   I didn't quite hear you.  What was it?

20 Q.   I'm sorry, sir.

21 A.   Yeah.

22 Q.   You did mention Dr. Tesche both in terms of his

23 involvement with VISTAS and his involvement with the modeling

24 for TVA in this case.

25 A.   Yes.

1  Q.   And you would agree with me, would you not, that he is an

2  experienced atmospheric modeler.

3  A.   Yes.

4  Q.   And has done extensive work both developing and running

5  atmospheric models.

6  A.   He has -- was involved early in his career in

7  development.  He's currently involved in applying.

8  Q.   And interpreting the results of -- from atmospheric

9  models, correct?

10  A.   Yes.

11  Q.   And he has, to your knowledge, an extensive publication

12  history, does he not?

13  A.   Yes.

14  Q.   I believe you've already discussed his work with the

15  VISTAS program.  I'm correct, am I not, that the State of

16  North Carolina was extensively involved with VISTAS, was it

17  not?

18  A.   Yes, North Carolina was a participant in VISTAS.

19  Q.   In fact, wasn't a member of the staff of the Division of

20  Air Quality, Sheila Holman, one of the people principally

21  involved with VISTAS?

22  A.   Yes, she was.

23  Q.   And you would agree with me, would you not, that

24  Dr. Tesche has done work for other governments and government

25  consortiums in the atmospheric modeling arena?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    Yes.

2    Q.    Mr. Wheeler, I appreciate your discussion and description

3    of the CMAQ model, C-M-A-Q model.  There is another model that

4    has been used in the modeling in this case, CAMX, C-A-M-X.

5    A.    Yes.

6    Q.    Sir, you would agree with me, would you not, that CAMX is

7    also a state-of-the-science atmospheric modeling tool?

8    A.    Yes, both CAMX and CMAQ are state-of-the-science tools.

9    They are both widely used in the United States.  There are

10   some differences between them, but they are both reasonably

11   good tools.

12   Q.    In fact, the Environmental Protection Agency has used

13   both of those tools, has it not?

14   A.    Yes, they have.

15   Q.    And if you'll bear with me just for a few moments longer.

16   It's my understanding, and correct me if I'm wrong, that CAMX

17   has a couple, what I call probing tools that go by -- at least

18   the ones I would like to discuss with you go by the initials

19   PSAT and OSAT.

20   A.    Yes, I'm familiar with those.

21   Q.    And could you, just for the sake of the court reporter

22   and the court, tell us what PSAT is.

23   A.    PSAT is Particulate Source Apportionment Tool.

24   Q.    And what is OSAT?

25   A.    Ozone Source Apportionment Tool.

1 Q.   Mr. Wheeler, the PSAT and OSAT tools for CAMX, would you

2 agree with me that they allow an investigator to study

3 contributions of particular sources to particulate matter and

4 ozone?

5 A.   Yes.  They're a screening tool for source apportionment.

6 Not as accurate as direct sensitivity analysis.

7        MR. FINE:  Your Honor, if I could approach the easel

8 for a brief moment, I'll try and be quick.

9        THE COURT:  All right, sir.

10       MR. FINE:  Madam court reporter, I apologize, I'm

11 going to be behind you for a few minutes.

12       THE COURT REPORTER:  I can hear you fine.

13 Q.   Mr. Wheeler, if you would do me the kindness, sir, of

14 looking at Plaintiff's Exhibit 138 which I believe is in your

15 book.

16 A.   138?

17 Q.   Yes, sir.  Do you have that in front of you?

18 A.   I do.

19 Q.   And if I understood your testimony, this was one -- this

20 was some of the information that Dr. Staudt provided to you

21 for your modeling.

22 A.   No, that's not correct.  This was provided by North

23 Carolina.  It was in the 2005 report on the Clean Smokestacks

24 Act.

25 Q.   I beg your pardon, sir.  I appreciate the correction.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1        If you will bear with me, Mr. Wheeler, I would like to
2    use Plaintiff's Exhibit 138 as you have described its source
3    for a very quick geography exercise.  If will you bear with me
4    and take a look at the map that has been placed back on the
5    easel.  I apologize for the smallness of the print, but
6    perhaps the two of us working together can work through it.
7    A.    Okay.
8    Q.    The first plant that's listed on Plaintiff's Exhibit 138
9    is the Asheville plant.  The denominee there is Carolina Power
10   and Light, CP&L.  Do you see that, sir?
11   A.    Yes.
12   Q.    And I believe that's now Progress Energy.
13   A.    Correct.
14   Q.    And then the next plant that's listed is again another
15   Progress plant, CP&L plant, Mayo.
16   A.    (Affirmative nod.)
17   Q.    And I believe that's up close to the border with
18   Virginia; is that correct, sir?
19   A.    Yes.
20   Q.    Towards the -- a little bit to the east of the center of
21   the -- of that state line between Virginia and North Carolina.
22   Would that be correct?
23   A.    Appears to be correct.
24   Q.    And then the next plant that's listed again for Progress
25   Energy is the Roxboro plant; is that correct, sir?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    Yes.

2    Q.    And that's a little bit to the west of the Mayo plant.

3    A.    Yes.

4    Q.    And then I'm following the list as it appears on

5    Plaintiff's Exhibit 138, and we're going to jump around a

6    little on the map.  But the next plant that's listed is one of

7    Duke Power's or Duke Energy's plants, the GG Allen plant.

8    A.    Yes.

9    Q.    And that's down near the Charlotte, North Carolina, area

10   close to the South Carolina border.

11   A.    Yes.

12   Q.    And then the next plant that's listed is Duke's Buck

13   plant which is very much almost in the geographic center of

14   North Carolina if I'm any judge.  Would that be correct, sir?

15   A.    That's approximately correct.

16   Q.    And then the Cliffside plant about which we've already

17   heard some testimony today is another one of the Duke plants a

18   bit west of Gastonia and Charlotte, again on the South

19   Carolina border.

20   A.    Yes.

21   Q.    Is that correct?

22         And then we have the Dan River plant for Duke, and we're

23   jumping back up to the -- near the border with Virginia.  This

24   is in Rockingham County.  You see where the Dan River plant is

25   located?

1  A.   Yes.

2  Q.   And then we have the Marshall plant for Duke located here

3  right near Catawba County.  Sort of in south central North

4  Carolina.

5  A.   I see that.

6  Q.   All right, sir.  And then we have Duke's Riverbend plant

7  which is just to the northwest of the Charlotte area here in

8  south central North Carolina.  Do you see that, sir?

9  A.   Yes.

10  Q.   And then we have the Sutton plant which I believe is a

11  Progress Energy plant though it's not listed as such.  That's

12  down near Wilmington; is that correct, sir?

13  A.   That appears to be correct.

14  Q.   And we have, then, another Progress plant, the Cape Fear

15  plant, which is back up towards the -- up towards the Raleigh

16  area just to the southwest or so of Raleigh; is that correct,

17  sir?

18  A.   That appears to be correct.

19  Q.   And we have the Lee plant from Progress is in east

20  Carolina in Wayne County.  That's another Progress plant right

21  there in the eastern part of North Carolina.

22  A.   Yes.

23  Q.   All right, sir.  And finally, in terms of the Progress

24  and Duke plants, we have the WH Weatherspoon plant for

25  Progress which is here in Robeson County -- I may be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    mispronouncing that -- down in sort of what I think of as the

2    southeastern part of Nrth Carolina not too far from the South

3    Carolina border; is that correct, sir?

4    A.    Yes.

5    Q.    And are you familiar with the Blue Ridge Paper facility

6    in Canton?

7    A.    Yes, I am.

8    Q.    And that's just to the west here of Asheville.

9    A.    Yes.

10   Q.    All right, sir.  Before I leave this little station, let

11   me ask you a few questions concerning your isosurface

12   visualization of $SO_2$ emissions.  I'm not going to ask you to

13   replay the movie at this point in time, but just so it's clear

14   in the record, this is not just simply TVA's $SO_2$ emissions.

15   A.    That's correct.

16   Q.    In fact, we're plotting, it would appear to me, plumes

17   from the panhandle of Florida, southern Alabama, southern

18   Mississippi, looks to be perhaps the Birmingham, Alabama, area

19   in Alabama, and then other sources in Florida, Georgia and

20   South Carolina, and some sources, frankly, I'm not sure which

21   states they're in.  The state boundaries are obscured.  Is

22   that correct, sir?

23   A.    That's correct.

24   Q.    Thank you.

25         You would agree with me, would you not, that the modeling

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  process depends to a large extent on the accuracy of the

2  inputs into that model?

3  A.   Yes.

4  Q.   I believe you testified in response to some of

5  Mr. Goodstein's questions that you took some care and

6  attention in terms of making sure that the inputs were

7  correct, particularly the meteorological inputs.

8  A.   That's correct.

9  Q.   And of course, one of the more important aspects of the

10 inputs would be the actual inventory of emissions; is that

11 correct?

12 A.   Yes.

13 Q.   And I believe that I'm correct in stating that under

14 EPA's general guidance for modeling, one of the things that

15 you're supposed to do for future years is to do a careful

16 assessment of what additional controls might be placed on a

17 particular power plant between the base year and the future

18 year.

19 A.   As I noted earlier, that the first stage is to apply

20 appropriate controls based on controls that are on the books

21 and attempt to put those appropriately, yes.

22 Q.   Let me just make sure that I'm being clear with you, sir.

23 What I'm trying to focus on is if you have -- if you're

24 looking at an emissions inventory for, let's use the case

25 we're talking about here, base case year of 2002 and you're

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  looking at your future year in terms of adding additional

2  controls of 2013.  Wouldn't it be appropriate to make sure

3  that the controls that are going to be installed between 2002

4  and 2013 are accurately reflected in your projections for

5  2013?

6  A.   Yes, to the extent possible.

7  Q.   Bear with me, sir, I'm going to be jumping around a

8  little and I'll try and be as clear as I can be and also as

9  quick as I can be.

10      I believe, sir, that you testified in your direct

11  testimony, and in fact, as is reflected in the documents that

12  have been tendered into evidence, that your source for the

13  emissions information for TVA for 2013 came from Dr. Staudt.

14  A.   Yes, that is correct.

15  Q.   So if Dr. Staudt -- let me again, so it will just be

16  clear in my own mind if nothing else.  What you were looking

17  at in your comparisons was a comparison between what

18  Dr. Staudt said was the base case for TVA in 2013 and what

19  Dr. Staudt said would be the case for TVA with the additional

20  controls sought by North Carolina in this instance.

21  A.   The impact -- the magnitude of the cap is the difference

22  between that, is what we're really modeling -- comparing

23  between the 2013 base and the control scenario.  It's the

24  sought after controls.

25  Q.   I'm sure it is due to my own fuzziness of brain,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Mr. Wheeler, but bear with me for a moment while I try to

2    understand exactly what you're telling me.

3         As I understood it, and you may need to correct me.  As I

4    understood it, what you were comparing -- let me just back up

5    and try and be coherent.

6         Dr. Staudt gave you a set of numbers where he thought

7    that that's what TVA would be emitting from its power plants

8    in 2013 if nothing further was ordered by this court.

9    A.    That's correct.

10   Q.    He also gave you a set of numbers based on his

11   assumptions as to what TVA's emissions would be in 2013 with

12   the additional controls sought by North Carolina in this case.

13   A.    That is correct.

14   Q.    And so the comparisons that you were running through

15   your -- with your modeling was comparing the impacts from

16   Dr. Staudt's base case versus what Dr. Staudt was proposing as

17   the control case for 2013.

18   A.    Yes.

19            MR. FINE:  Excuse me, Your Honor, I'm not

20   communicating well with my team.  If I could ask my colleague

21   Ms. Gillen to please display Plaintiff's Exhibit Number 54 on

22   the monitor, I would be in her debt even more so than I am

23   already.

24   Q.    Mr. Wheeler, I believe that you were in the courtroom

25   when Dr. Staudt was testifying concerning Plaintiff's Exhibit

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Number 54.

2  A.   I believe so, but I can't be certain.  This was not --

3  Q.   All right, sir.  I'm sorry.

4  A.   I didn't catch all of Dr. Staudt's testimony.

5  Q.   Very well, sir.  Then I will proceed accordingly.

6       I'm looking particularly, Mr. Wheeler, at the -- at

7  Dr. Staudt's 2013 base case numbers for sulfur dioxide, $SO_2$.

8  Do you see that column?

9  A.   Yes.

10 Q.   And Dr. Staudt's totals for $SO_2$ in his 2013 base case

11 for -- again, for $SO_2$, totaled nearly 449,000 tons; is that

12 correct, sir?

13 A.   That's what is shown there.

14 Q.   And correct me if I'm wrong, but it's my understanding

15 that in terms of the TVA system, that that 449,000 tons of $SO_2$

16 was what you used, you and Mr. Chinkin and your colleagues at

17 STI used for the modeling concerning sulfate that TVA will be

18 emitting in 2013.

19 A.   Yes.

20 Q.   And of course, when we're talking about $SO_2$, we're

21 talking about a pollutant that contributes to a number of what

22 I'll call results in the atmosphere, such as $PM_{2.5}$, sulfate

23 deposition in the form of acid deposition, and visibility

24 impacts, correct?

25 A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And in looking at this -- at the Plaintiff's Exhibit 54,

2  let me just ask you this question.  It would affect your

3  modeling for $SO_2$ and its -- I guess its consequences such as

4  $PM_{2.5}$, sulfate and visibility impacts, it would affect your

5  modeling if we took away some 138,000 tons of $SO_2$ from

6  Dr. Staudt's base case.

7  A.   What we were trying to model was a cap, not what might

8  happen.  So the difference between the base case and the

9  control case is the level of controls sought by North

10 Carolina.

11 Q.   Mr. Wheeler --

12 A.   Not what may have happened after the time we did that

13 modeling.

14 Q.   Mr. Wheeler, let me reask my question because I'm afraid

15 that I wasn't clear enough and I don't believe that you

16 answered it.

17      What I'm just asking you, sir, as a highly competent,

18 very experienced atmospheric modeler, would removing some

19 138,000 tons of $SO_2$ from the equation affect your modeling for

20 $SO_2$ and its effects in the atmosphere?

21 A.   It would if that's the objective we were looking at is to

22 look at a scenario where there were different emissions.  If

23 that were taken out, as I understand, that would be included

24 in the cap.  So, yes, changes in emissions do affect air

25 quality.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.    And they would affect your modeling.

2    A.    Models predict changes in air quality based on changes in

3    emissions.

4    Q.    All right, sir.  But if I understood your previous

5    testimony in response to one of my earlier questions, what

6    much of your modeling was looking at was the difference

7    between Dr. Staudt's 2013 base case and what is labeled here

8    on Exhibit 54 as Dr. Staudt's 2013 CSA-equivalent case.

9    A.    That's what we were modeling, yes.

10   Q.    All right, sir.  Mr. Wheeler, I think you answered some

11   questions for Mr. Goodstein concerning uncertainty.

12   A.    Yes, sir.

13   Q.    And your level of confidence in the results from your --

14   from the CMAQ modeling.

15   A.    Yes, I did.

16   Q.    It's true, is it not, that atmospheric modeling results

17   do have a range of uncertainty?

18   A.    There are uncertainties in all things, including modeling

19   results.

20   Q.    And you'd agree with me that atmospheric chemistry which

21   the modeling systems are trying to illustrate is very complex.

22   A.    And very comprehensive.

23   Q.    And you would also agree with me that the atmospheric

24   models such as CMAQ rely on inputs about weather conditions.

25   That's correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    That's correct.

2    Q.    And emissions both manmade and natural.

3    A.    Yes.

4    Q.    That's correct?

5          And that both the inputs about weather conditions and

6    emissions can lead to possible errors in projecting impacts

7    from emissions.

8    A.    Well, we have to understand how these are used in future

9    year simulations.  When we look at two scenarios like the base

10   case in 2013 and then the control case, that all of the

11   uncertainties that were in the original emissions inventory in

12   meteorology are the same.  So that cancels out a lot of the

13   uncertainty in the response of the model to emission

14   reductions.

15   Q.    Let me just be sure that I'm clear and that I'm

16   understanding you.  What you're telling me is that the

17   uncertainties inherent in atmospheric modeling are reduced but

18   not canceled out when comparing two future cases assuming

19   different control regimes.

20   A.    I couldn't quite follow that description, but, yes, we

21   can use these for controls and that is why we do the model

22   performance evaluation to understand that even with

23   uncertainties in the modeling system, that is within that band

24   of acceptable performance which tells us that the system, the

25   chemistry, the physics are operating sufficiently to be used

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    for emissions control comparisons.

2    Q.   Let me try this again, Mr. Wheeler.  When you're looking

3    at and you're comparing two future cases assuming different

4    control regimes, I think it's true to say that the

5    uncertainties in your view may be reduced.  But I would also

6    be correct in saying that they are not completely canceled

7    out.

8    A.   I would say that at a very high level, 95th percentile

9    level or more, that the uncertainties based on my experience,

10   that if there are some, they tend to bias the model towards

11   underestimating response to emission reductions so that when

12   we do an assessment like this, the benefits to be accrued from

13   additional emission controls may be actually underestimated,

14   and that's where the uncertainty lies.

15   Q.   Mr. Wheeler, I'd like to draw your attention, if I could,

16   to a document that's been previously introduced into evidence.

17   That's Plaintiff's Exhibit 132, which I believe is, again, in

18   the book in front of you.  It's the bugle chart or graph.

19   A.   What was the number again?

20   Q.   132.  It's what I think you referred to as a bugle graph.

21   A.   Okay.  I'm having difficulty locating it.  I'm familiar

22   with it, but I go in my book from 100 --

23   Q.   The numbers are not quite in order.

24   A.   Okay.  Let me look back.

25   Q.   I think they're in order of your testimony.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    I found it, yes.

2    Q.    I think this was Mr. Goodstein's organization and it

3    might be a bit confusing.

4         All right, sir.  You have that in front of you.

5    A.    Yes, I do.

6    Q.    And just so that it's clear in the record, I notice on

7    the right-hand side of the page, there is a, I guess a legend

8    for the various monitoring sites that were used for this

9    analysis.

10    A.    These are actually -- these were performed by VISTAS and

11    these are four different monitoring networks.

12    Q.    And that would be the Improved Network, the STN Network,

13    the Search Network, and the Cast Net Network.

14    A.    That's correct.

15    Q.    And just looking at this bugle graph, it would appear to

16    me that there was even some disagreement among the actual

17    monitors in the field.

18    A.    That's correct.

19    Q.    I believe that related to your point that there's

20    something of a disconnect, my term, between modeling results

21    and what actual field measurements you might obtain.

22    A.    That's correct.

23    Q.    I believe that you said that you -- a model might not be

24    able to predict what you might measure on the tabletop in

25    front of you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   That's correct.

2   Q.   If I could ask you to turn to the document you testified

3   about that has been introduced into evidence as Plaintiff's

4   Exhibit 139.  These are the inert tracer plots.

5   A.   Yes.

6   Q.   And again, just so it's clear, inert tracer plots do not

7   measure air quality impacts, do they?

8   A.   I'm sorry?

9   Q.   Inert tracer plots do not measure actual or even -- well,

10  let me back up and start over.

11       Inert tracer plots do not measure air quality impacts.

12  A.   I still didn't quite follow what you're...

13  Q.   Inert tracer plots do not measure air quality impacts.

14  A.   That's correct, as I testified.

15  Q.   All right.  And again, they are merely a tool to see if a

16  source could possibly impact a receptor.

17  A.   I said that as well, yes.

18  Q.   All right, sir.  Now, I think you probably heard me say

19  this when I objected to it, but wouldn't it be a fair

20  statement that inert tracer plots really do not show anything

21  more than how the prevailing winds blow?

22  A.   It's somewhat like that.  We think of these as trajectory

23  plots that are often used in air quality analysis with

24  dispersion.  So it's a little bit more than just a wind

25  climatology.  It looks at three-dimensional variations in wind

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   and how those might be transported.

2   Q.    Why the use of parts per trillion?

3   A.    We put these in -- if you were to take and put $SO_2$ into a

4   model and run it out for an entire year, the concentrations

5   would average over the region would be in parts per trillion.

6   If it was an inert species, that is.

7   Q.    And just so that it's clear in the record, I'm looking at

8   the scale that appears on the left side of the inert tracer

9   plots.

10  A.    Yes.

11  Q.    And the scale moves in what I will call a non-linear

12  fashion.

13  A.    That's correct.

14  Q.    So that we have zero to 5 and then the next jump is 5 to

15  20 and then 20 to 40, and if I'm reading the number correctly,

16  40 to 80.

17  A.    Yes.

18  Q.    And what's the top of the scale, if you know?

19  A.    It's greater than 80.  In this particular simulation, if

20  you were to look at the bottom of the chart, it gives you the

21  minimum and maximum values in the domain.  In this case it was

22  2,429 micrograms -- I mean, ppt of tracer material.

23  Q.    And that's somewhere off in the greater than --

24  A.    Actually, it's probably near the source.

25  Q.    All right, sir.  Help me, if you would, Mr. Wheeler.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Where in your reports did you use the results from these inert

2    tracer plots?

3    A.    I used this just in terms of a general interpretation of

4    the patterns of transport from individual power plants, what

5    they might look like.

6    Q.    Is that discussed in your -- in either of your reports?

7    A.    I'm sorry?

8    Q.    Is that discussed in either of your reports?

9    A.    No, it's not.

10   Q.    Did the tracer results alter in any way how you set up or

11   exercised the CMAQ model?

12   A.    No.  They verified the setup of the CMAQ model.

13   Q.    Did the tracer results alter in any way how you analyzed

14   the results of the full chemistry CMAQ simulations that you --

15   that you ran?

16   A.    In terms of my findings, they were helpful in

17   understanding the full chemistry simulations and where the

18   regions of impact might be from individual facilities.  As you

19   know, we modeled all of TVA's facilities jointly.

20   Q.    Is that discussed in either of your reports?

21   A.    No, I don't believe so.

22   Q.    Did you use the tracer results to select concentration

23   intervals for plotting any of the CMAQ gas phase or aerosol

24   model output?

25   A.    In a way we did.  It gave us some in our initial

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  plotting, and realizing that there are strong non-linear

2  ingredients within the model and the domain.  As a result of

3  these plots, we analyzed each of the full chemistry plots by

4  looking at the range of values in the modeling domain and

5  picking appropriate scales to depict the full range of

6  concentrations and impacts.

7  Q.   Again, sir, is that discussed in either of your reports?

8  A.   No.

9  Q.   And I believe in your direct testimony when you said --

10  you were describing the inert tracer plots, you're saying this

11  is an entirely nonreactive tracer.  I mean, that's, I guess,

12  what inert means.

13  A.   That's what it means.

14  Q.   So it doesn't have any particular molecular weight.

15  A.   I believe it may, if we picked $SO_2$ as a surrogate for it.

16  Q.   Is that indicated in the report?

17  A.   No, it's not.

18  Q.   So if you were picking $SO_2$ -- if you were picking sulfur

19  dioxide, $SO_2$, as a surrogate, would that be buoyant or heavier

20  than air?

21  A.   Well, it would be treated the same way as all of the $SO_2$

22  emissions from point sources.

23  Q.   But again, your report doesn't discuss the fact that you

24  were using $SO_2$ as a surrogate for the inert tracer.

25  A.   I -- I'd have to check my report.  I think we did say

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    that it was -- the tracers were proportional to the $SO_2$

2    emissions.

3    Q.    Did you evaluate the performance of the CMAQ model to

4    assess its accuracy and precision in simulating the tracers

5    you used?

6    A.    No, not with the tracers.  Obviously, we didn't have

7    measurements of tracers.  This is a standard technique for

8    looking at transport potential.

9    Q.    So under that circumstance, how do you know that the CMAQ

10   concentration fields for each of the 11 tracer plots bear any

11   resemblance to chemical species?

12   A.    I don't think we intended to say that they represented

13   chemical species.  I think what we said is these would show

14   the potential for transport in the modeling domain.  It's a

15   first order screening analysis, as we said.

16   Q.    All right, sir.  Did you run any tracer plots for the

17   North Carolina plants we discussed a little earlier in your

18   testimony?

19   A.    No, that was not the focus of our modeling effort.

20   Q.    Let's spend a few moments talking about what we've

21   been -- at least what I've been describing as the sulfate

22   movie.  We've already had some testimony about that.  And I'm

23   looking particularly at what I'm going to call the screen shot

24   from the sulfate movie that's displayed on the easel.

25   Plaintiff's Exhibit 140 if you want to look at it more close

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    up.

2        Do you have that in front of you, sir?

3    A.    I do.

4    Q.    Now, as I understand it, this -- the movie that we saw,

5    as demonstrated by the screen shot that appears in Plaintiff's

6    Exhibit 140, does not show concentrations of either sulfur

7    dioxide or sulfate.

8    A.    No.    This was intended to demonstrate the processes are

9    three dimensional and that chemical transformations do occur

10   both at the surface and aloft in models.    This is direct

11   output from our 2013 CMAQ simulation.    It is qualitative.

12   Q.    You're saying demonstrate the -- excuse me, I apologize.

13   The hour grows late and my tongue grows thick.

14        You talk about the vertical component of the

15   transformation of sulfur dioxide into sulfate, correct?

16   A.    Yes.

17   Q.    But there is no vertical scale provided in this

18   presentation, is there?

19   A.    Not on this particular plot, but it is on other -- other

20   views that we showed.    There's a bounding box that shows the

21   vertical extent.

22   Q.    In the movie that we played here earlier this afternoon?

23   A.    I believe so, the ones that are angled.    I'd have to go

24   back and look at that.    We generally look at the entire

25   domain.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   Q.   That would be sort of the -- and I'm going to -- this is

2   my characterization of it.  As if I was afloat out over the

3   Gulf of Mexico and looking back at the southeastern portion of

4   the country, that portion of the movie?

5   A.   That's correct.

6   Q.   And you're telling us that there was a vertical scale

7   associated with that?

8   A.   There's generally in this -- you can't see it on the

9   straight down view, but on angled views there's what they call

10  the bounding box which shows the extent of the vertical

11  domain.

12  Q.   I sit corrected, Mr. Wheeler.

13  A.   If you look at those, the top of the modeling domain is

14  about 15 kilometers.

15  Q.   About 15 kilometers?

16  A.   That's correct.

17  Q.   To the top of the brown cloud, would that be correct?

18  A.   To the what?

19  Q.   Top of the brown cloud.

20  A.   No.  Most of this process, if we looked at them, would be

21  in the range of, I'd say, 2 to 3 kilometers above the ground.

22  At the time we're at 15 kilometers, we're in the stratosphere.

23  Q.   All right, sir.  And I apologize for asking this,

24  Mr. Wheeler.  I suspect you've already testified to this, but

25  I frankly missed it in my notes.  This was showing, if I'm

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  correct -- well, if I'm incorrect, let me know.  But I believe

2  that this was showing the transformation of sulfur dioxide

3  into sulfate with Dr. Staudt's TVA base case for 2013; is that

4  correct?

5  A.   That is correct.

6  Q.   And again, as we've already established, this sweeps in a

7  number of sources other than TVA plants.

8  A.   Yes.

9  Q.   Mr. Wheeler, you were provided with information

10  concerning the -- let me back up and start over again.  Let's

11  look very -- just briefly again, if you would, please, sir, at

12  Plaintiff's Exhibit 138 you used for your geographic tour of

13  North Carolina.

14  A.   138.  Yes.

15  Q.   And this is information that, as I believe you corrected

16  me and I appreciate the correction, that you obtained from the

17  2005 Clean Air Act -- Clean Smokestacks Act report.

18  A.   Yes.

19  Q.   Did you or Mr. Chinkin or your colleagues at STI do any

20  modeling for the impacts from emissions from North Carolina's

21  own power plants?

22  A.   No.  As I mentioned, our charge was to evaluate the

23  impacts of TVA sources on North Carolina and the region, as

24  well as look at the potential benefits of additional controls.

25  Q.   And I believe you mentioned just a few moments ago that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - CROSS

1  the modeling you did on TVA was over the entire TVA fleet.

2  A.   You're talking about the movie?

3  Q.   Well, let me back up and be clear.  I apologize for that.

4  I'm being a little obscure and I'm sorry for that.

5       What I want to do is in terms of the modeling you did for

6  TVA's impacts in terms of $PM_{2.5}$, both the 24-hour and the

7  annual, the 8-hour ozone, and the -- I believe the sulfate and

8  nitrate deposition, as well as the impacts from visibility,

9  you looked at the TVA system as a whole, correct?

10 A.   Each facility was modeled separately.  The controls that

11 were developed by Dr. Staudt were based on a system wide cap.

12 TVA's system as a whole.

13 Q.   So you did model each TVA plant separately.

14 A.   Yes, we did.

15 Q.   But you did not report on those results, did you?

16 A.   No.  What I'm saying is we did not look at the impacts

17 from each separately, but each facility was modeled separately

18 within the domain.  I guess that's semantics.  We did not look

19 at controls plant by plant.

20 Q.   You didn't look at emissions impacts plant by plant

21 either, did you?

22 A.   No, we didn't.

23 Q.   So you're not able to tell me what the air quality

24 impacts would be from, for instance, TVA's plants in Kentucky,

25 Shawnee and Paradise.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   I could probably do an analysis based on the emission

2  levels from various plants and transport.  But no, we did not

3  do that as a part of this analysis.

4  Q.   Nor did you do an analysis of the air quality impacts

5  from TVA's plants just in Tennessee.

6  A.   Just in Tennessee?  As I just said, we treated these all

7  as a system because we were modeling a system wide cap.

8  Q.   And you'd give me the same answer for the TVA plants in

9  northern Alabama.

10 A.   Yes.

11 Q.   And just so that we're complete on this line of

12 questions, you can't give me the impacts from the individual

13 TVA plants that are in the eastern part of the system in

14 Tennessee:  John Sevier, Bull Run and Kingston.

15 A.   I cannot from this modeling.

16 Q.   You could have done that modeling if you'd been asked to

17 do it.

18 A.   I could have.  It was very time -- these modeling

19 simulations are very computation expensive.  Takes a lot of

20 time, months, in fact, to do angle simulations.  And to do

21 plants for an entire year case by case, we'd probably be

22 getting the results about now.

23 Q.   Mr. Wheeler, dealing with my own modelers, I have some

24 understanding of what you're saying.

25      I think you would agree with me, would you not, that the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 1:06-cv-00020-LHT   Document 197   Filed 06/15/09   Page 87 of 117

1  power plant further away from North Carolina is less likely to

2  have an air quality impact on North Carolina; isn't that

3  correct?

4  A.    Yes, that is correct.   Unless they were much larger than

5  the ones closer to North Carolina.

6  Q.    Mr. Wheeler, I believe you're familiar with North

7  Carolina Department of Environment and Natural Resources and

8  its air quality modeling capabilities.

9  A.    Yes.

10 Q.    Did you have -- did you make use of those capabilities in

11 this case?

12 A.    No, we did not, other than obtaining files for the VISTAS

13 modeling from them.

14 Q.    So as far as you know, sir, North Carolina's Department

15 of Environment and Natural Resources did not do any modeling

16 for STI in this case.

17 A.    They did not.   None to my knowledge, and that was --

18 nothing was incorporated in any of our reports or analysis.

19 Q.    And I believe this is probably implicit in answer to an

20 earlier question.   But STI did not do any modeling of North

21 Carolina's power plants' impact on air quality in North

22 Carolina or elsewhere.

23 A.    As I mentioned before, that was not the objective of

24 these analysis.   It was to look at impacts from TVA facilities

25 in the region and to look at the potential benefits of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - CROSS

1  additional emission controls.

2  Q.   So for instance, you did not model North Carolina power

3  plants' impacts on any of the North Carolina noncompliance

4  areas either for $PM_{2.5}$ or ozone.

5  A.   No, I did not.

6  Q.   Did you do any modeling -- did STI do any modeling of

7  Blue Ridge Paper's impact on air quality in North Carolina?

8  A.   No, I did not other than the fact that it's included in

9  the inventory.  So total concentrations in the region that we

10  calculated would include emissions from that plant.

11  Q.   Did you recommend to the North Carolina Department of

12  Justice that STI do model the impacts on air quality from

13  North Carolina's power plants?

14  A.   No.  It seemed inappropriate considering the action and

15  what was trying to be achieved in it.

16  Q.   Did you make any recommendation concerning modeling Blue

17  Ridge Paper's impacts on air quality?

18  A.   No, I did not.  Again, that was not the objective of the

19  study.

20  Q.   Mr. Wheeler, would you please turn to Plaintiff's Exhibit

21  146.  This is the CMAQ predicted maximum percent improvement

22  in 24-hour average $PM_{2.5}$ concentrations with additional

23  controls on TVA's coal-fired power plants.

24  A.   Yes.

25  Q.   Do you have that in front of you, sir?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.  I do.

2  Q.  I want to make sure I understood what you told

3  Mr. Goodstein in your direct testimony.  If I understood, this

4  shows for each grid cell the one day during the year that the

5  indicated percentage improvement occurred; is that correct?

6  A.  The one or could be more days.  But the maximum

7  improvement over the course of the year.  Just a different way

8  of displaying data.

9  Q.  So this could be reflective of -- this is not necessarily

10  the same day.

11  A.  This is correct.

12  Q.  So this could be a number of different days showing

13  maximum impact in that particular grid cell.

14  A.  That's right.  We try to do statistics that are --

15  accumulate over the course of the year and this is one way of

16  doing that.

17  Q.  So you -- looking at this particular plot, there's no way

18  of telling about the frequency of that maximum impact during

19  the year?

20  A.  I didn't quite follow that, excuse me.

21  Q.  Let me back up and try again.

22  A.  Thank you.

23  Q.  Looking at this plot, Plaintiff's Exhibit 146.

24  A.  Yes.

25  Q.  Looking at that, you can not infer anything from that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  plot as to the frequency of the impact during the year.

2  A.    That's correct, you cannot on the frequency.  The

3  frequency was in the data that we provided to Department of

4  Justice in terms of daily values that that could be analyzed

5  from and was used by -- in subsequent analysis by other

6  experts.

7  Q.    If I might ask, sir, which other experts?

8  A.    The health effects and ecosystem experts.  As I

9  mentioned, these are data summaries.  Not meant to be a total

10 analysis because of the large volume of data that must be

11 provided.

12 Q.    I appreciate your noting that, Mr. Wheeler.  That's

13 helpful.

14       But following along the same line as I was pursuing a

15 moment ago, looking at this plot, you cannot infer from it the

16 extent of the area affected by a particular percentage

17 improvement on any given day.

18 A.    Not on any given day.  What it does depict is that there

19 are potential benefits over a large area over the course of a

20 year.

21 Q.    Let's talk about that just in this context, Mr. Wheeler.

22 There's nothing in this plot that would indicate that the --

23 that the percent improvement that's measured in this plot

24 occurred on a day when the 24 hour $PM_{2.5}$ was high enough to be

25 of concern.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.    $PM_{2.5}$ and ozone, regardless of its concentration, is of

2  concern.  As research currently shows, while we have standards

3  that EPA puts on for level of concern, that health effects,

4  ecosystem effects accumulate at concentrations much below the

5  standard.

6  Q.    But you will agree with me that currently the

7  Environmental Protection Agency's National Ambient Air Quality

8  Standard for $PM_{2.5}$ has been set -- and I will quickly say I

9  don't remember off the top of my head the 24-hour standard,

10  but the annual standard is 15 micrograms per cubic meter.  I

11  believe the 24-hour standard is somewhat higher than that.

12  A.    Yes, it's 35 micrograms.  And only a few years ago it was

13  65 micrograms.

14  Q.    I understand that, sir.  But there is no way to tell from

15  this plot --

16  A.    This is not a plot to show benefits for attainment.  This

17  is to understand what the maximum impacts might be on human

18  health and ecosystems.

19  Q.    Just so it's clear in the record, what this plot does not

20  show is whether the maximum improvement in a particular grid

21  cell fell on a day when that grid cell was at or near or above

22  the 35 micrograms per cubic meter standard.

23  A.    It does not show that.  And as I've stated, they're still

24  important because we do not -- we know that there is not a

25  break line for health and ecosystem impacts.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.    Mr. Wheeler, I'd like to draw your attention, if I could,

2  to Plaintiff's Exhibit 165.

3  A.    Yes.

4  Q.    We'll return to this exhibit, but let me just ask this

5  question.  I'm referring particularly to the legend that

6  appears in red --

7  A.    Yes, sir.

8  Q.    -- in the exhibit.  And I understand that might be a

9  little difficult to read in the copy that's in the book.

10  A.    I'm familiar with the caveat.

11  Q.    All right.  I'd like to first of all direct your

12  attention to "TVA's TCS plan, which is unlikely to be

13  implemented."  Do you see that language in the red -- in the

14  red legend?

15  A.    Yes.

16  Q.    And sir, I believe -- well, you may not have been in the

17  courtroom, but you would agree with me, for instance, that at

18  least TVA is going forward with scrubbers at Bull Run and the

19  Kingston fossil plants?

20  A.    Based on testimony, I believe they're going forward.  At

21  the time of this report, we wanted to make sure that by our

22  reanalysis of Tesche and Mueller's analysis, that we didn't

23  imply that we agreed with this.  We discussed this with

24  Dr. Staudt at the time.  He indicated there was no indication

25  that these needed to be implemented during this time frame.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1     And the note about errors dealt with some errors that

2     Alpine Geophysics made in preparing the emission inventories

3     for their runs.

4   Q.   We'll address that in a moment, Mr. Wheeler.  But just so

5     that we're complete on this point.  When we're talking about

6     the unlikeliness of TVA implementing what is referred to here

7     as the TCS plan, or TVA's clean air compliance plan, that we

8     are in fact -- you will agree with me that TVA is proceeding

9     with scrubbers at Bull Run and at Kingston, and that Dr.

10    Staudt was mistaken as to the efficiency of the scrubber on

11    Paradise unit 3, and that Dr. Staudt also did not give us

12    credit for the ongoing fuel switch at the Johnsonville plant.

13  A.   As I said before, the purpose, as Dr. Staudt described

14    that if he hadn't given credits for those in the cap, then

15    there would have been additional -- I mean, there would have

16    been changes in other of your facilities.

17  Q.   Bottom line is, isn't it, Mr. Wheeler, that that

18    statement is no longer accurate?

19  A.   Well, I think it was accurate at the time.  I think --

20    I'm not certain of TVA's plan or what the legal requirements

21    are for that.  As I mentioned, when we run future base cases,

22    the first simulation like we did involves only required

23    controls, not from a particular plan or something that's on

24    the way.  So it represents the base for likely controls.

25  Q.   Mr. Wheeler, I confess to being puzzled.  My

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    understanding was, certainly from EPA modeling guidance, that

2    one of the things a modeler is supposed to do when trying to

3    predict what emissions will be in future years, to include in

4    the inventory allowances for additional control equipment that

5    is being planned by sources of air pollution.

6    A.    As I mentioned before, that's usually the second -- the

7    third phase of the model in looking at potential additional

8    controls, regulations that have been maybe promulgated but not

9    implemented.  Those are the on-the-way controls.  And you

10   may -- if you looked through the VISTAS reports, they model

11   both on-the-books and on-the-way controls.

12   Q.    And so you just modeled what you referred to as

13   on-the-books controls.

14   A.    Yes.

15   Q.    And did not model the on-the-way controls.

16   A.    That's correct.

17   Q.    All right, sir.  Now, returning to the comment you just

18   made in terms of the errors that were made by Alpine

19   Geophysics in terms of the emissions inventory from the TVA

20   plants.  You will agree with me, would you not, we're talking

21   about two of the three units at TVA's Allen fossil plant and

22   one of the units at TVA's Shawnee fossil plant.

23   A.    I can't remember the exact plants, but that's -- I

24   remember the facilities at Allen.  There was some

25   inconsistencies, I believe, in one other plant.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And if I represent to you that that was at the Shawnee

2  plant, you have no reason to disagree with that.

3  A.   I'd have to look at the tables for that.  I think

4  Mr. Chinkin will discuss that in his testimony.

5  Q.   But you will also agree with me, and you can refer to the

6  map that's up on the easel, that the Allen plant is located

7  outside of Memphis, Tennessee; is that correct?

8  A.   Yes.

9  Q.   About as far west as you can get in the TVA system.

10 A.   Yes.

11 Q.   And that the Shawnee plant is also located in

12 southwestern Kentucky; is that correct?

13 A.   Yes, that's correct.

14 Q.   And would you also agree with me that the unit at Shawnee

15 that was left out of the inventory was unit 10 which is the

16 atmosphere -- atmospheric fluidized bed combustion unit?

17 A.   I can't verify that with my knowledge at hand.

18 Q.   And you would agree with me that taking into account --

19 or evaluating the error in the -- the omission of these three

20 units, the two at Allen and the one at Shawnee, would produce

21 less than .01 micrograms per cubic meter of $PM_{2.5}$ over North

22 Carolina.

23 A.   Was that reported in Dr. Tesche and Mr. Mueller's report?

24 Q.   That was reported in Dr. Tesche and Mr. Mueller's

25 supplemental report.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   Right.  I don't remember the number.

2  Q.   All right, sir.

3       MR. FINE:  Pardon the lull, Your Honor.  I'm just

4  trying to keep myself organized.  My pardon to the witness as

5  well.  I know it's been a long day for him as well as the rest

6  of us.

7  Q.   Mr. Wheeler, do you still have Plaintiff's Exhibit 165 in

8  front of you?

9  A.   Let's see.  165, yes.

10  Q.   Thank you, sir.  I believe that looking at the right-hand

11  side of Plaintiff's Exhibit 165, and correct me if I'm wrong,

12  I believe you described this as your replotting of Dr. Tesche

13  and Mr. Mueller's plot that's represented on the left side of

14  this page.

15  A.   That is.

16  Q.   And this is using -- and I believe you -- and help me

17  with your terms, Mr. Wheeler, so I get it right.  That you

18  used a finely-resolved non-linear scale to represent those

19  results.

20  A.   Yes.

21  Q.   And I believe that you testified in response to a

22  question from counsel for North Carolina that the use of these

23  finely -- finely-resolved non-linear scales was appropriate in

24  air quality modeling.

25  A.   These are used and have been for decades in air quality

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  analysis.  As a modeler, I'm somewhat embarrassed that

2  modelers, particularly when they have to generate a lot of

3  plots, using the tool that we typically use with CMAQ, a

4  program called PAVE defaults to a linear plot and it takes

5  some effort to construct the non-linear plots and thus they're

6  not used a lot.

7  Q.   And of course, we've heard a great deal of discussion

8  about the Environmental Protection Agency's Clean Air

9  Interstate Rule and its vacation by the D.C. Circuit Court of

10  Appeals last Friday.  I think you're also aware that the EPA's

11  Clean Air Mercury Rule was also vacated by the court.

12  A.   Yes, sir.

13  Q.   Putting those results to one side, however, when EPA

14  promulgated those two rules, the Clean Air Mercury Rule and

15  the Clean Air Interstate Rule, part of the documentation when

16  they issued those rules was fairly extensive modeling.

17  A.   Yes, I'm familiar with that.

18  Q.   And I'd be correct in saying that the -- that the tile

19  plots they produced in that modeling used linear and not

20  non-linear scales.

21  A.   There's many different ways to do that.  As I said, not

22  everyone is trying to analyze to show all of the data.

23  Q.   If you would answer my question, Mr. Wheeler.  EPA used

24  linear scales.

25  A.   I believe they did.  I don't have the document in front

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   of me, but...

2   Q.   And if we can just look at the level of concentration

3   that we're talking about that are represented in the

4   right-hand portion of Plaintiff's Exhibit 165.  What is the

5   lowest concentration that you're representing in your

6   finely-resolved non-linear scale?

7   A.   It's one one-hundredth of a part per billion -- or this

8   is a microgram per cubic meter, excuse me.

9   Q.   One one-hundredth of a -- of a microgram per meter -- per

10  cubic meter.

11  A.   Yes.

12  Q.   And I would be correct in saying in terms of measuring

13  particulate matter in a field monitor, that the finest

14  resolution that you can get in the field monitor is

15  .5 micrograms per meter -- cubic meter.

16  A.   I believe they're often reported to a tenth.  However, as

17  I pointed out, there's a difference between measurements and

18  modeling.

19  Q.   But you would agree with me at some point there has to be

20  a connection between modeling and the real world, correct?

21  A.   Yes.

22  Q.   And you would agree with me that the concentrations that

23  you are displaying with your finely-resolved non-linear scales

24  are not measurable by several orders of magnitude by any field

25  monitor currently in existence?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.    I should point out these are not predictions of

2   concentrations.  These are the changes in concentrations

3   resulting from an emission control scenario.

4   Q.    But would you agree with me that these changes in

5   concentration are several orders of magnitude smaller than

6   would be registered on any known or current field monitor?

7   A.    Yes.  And as I mentioned during my testimony, that I

8   performed a number of analyses to understand whether these are

9   reasonable levels to present differences in concentration

10  resulting from these control modeling scenarios.  In fact,

11  these are the same levels that many organizations have

12  reported differences to both for ozone and $PM_{2.5}$.

13  Q.    Would I be correct in stating that your displaying these

14  concentrations out to these levels in the one hundredth of a

15  microgram per cubic meter is displaying a high level of faith

16  in the accuracy of the CMAQ model predictions for 2013 $PM_{2.5}$?

17  A.    I believe these are a level of the accuracy for

18  predicting differences in concentrations resulting from

19  control scenarios.

20  Q.    But you would agree with me that you're attempting --

21  that this is displaying a tremendous level of confidence, of

22  faith, in fact, in your modeling results.

23  A.    This is an indication of my faith in the modeling

24  results.

25  Q.    If I could ask you to turn to Plaintiff's Exhibit 160.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    Was that 150?

2    Q.    I'm sorry, 160.

3    A.    160.

4          Yes.

5    Q.    I believe, sir, that I've got the correct exhibit in

6    front of me.  This is the visibility improvements with

7    additional controls on TVA's coal-fired power plants.

8    A.    Yes.

9    Q.    And just so that we're clear, and I believe you already

10   testified to this, this lists the days with the largest

11   improvements to visibility.

12   A.    That is correct.

13   Q.    And it does not display the frequencies of the predicted

14   visibility improvements.

15   A.    We do in the additional tables, we show the frequency of

16   perceivable visibility improvement.

17   Q.    But this particular exhibit, Plaintiff's Exhibit 160,

18   does not display any frequencies.

19   A.    No, this does not.

20   Q.    All this displays is a particular day where you had

21   the -- where you modeled the maximum visibility impact.

22   A.    That's correct.

23   Q.    And isn't it true that under the Environmental Protection

24   Agency's Regional Haze Rule, that the EPA rejected looking at

25   just single days of maximum impact?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 A.    This is not a Regional Haze Rule analysis.  This is a

2 data display to indicate the maximum values that could be --

3 that were achieved in the modeling results.

4 Q.    I apologize, sir, if my question wasn't clear, but I

5 asked you whether the Environmental Protection Agency in its

6 Regional Haze Rule rejected the use of single days of maximum

7 impact --

8 A.    Yes, they did.

9 Q.    -- in favor -- they did.  Thank you.

10      And doesn't this visibility analysis portrayed in

11 Plaintiff's Exhibit 160, doesn't it also fail to take into

12 account natural phenomenon that could affect visibility, such

13 as fog or rain or snow?

14 A.    Visibility can be affected by those.  To the extent that

15 those are modeled, humidity, precipitation are covered in the

16 modeling system.  I think Mr. Molenar, our expert on

17 visibility, will be the more appropriate person to have a

18 discussion with.

19 Q.    You understand, sir, that I'm trying to pursue questions

20 on evidence that you have presented here today.

21 A.    Yes.

22 Q.    Mr. Wheeler, the attorney for North Carolina asked you, I

23 think, fairly early in your testimony, to identify for the

24 record the reports that you and Mr. Chinkin with the

25 assistance of your colleagues at STI prepared for this case.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    Yes.

2    Q.    And one of those reports that you identified was what's

3    labeled in your binder as a letter report?

4    A.    That's correct.

5    Q.    And I understand that it's only been identified by you at

6    this point, but it has been marked for identification as

7    Plaintiff's Exhibit 466.  I think at the very back of your

8    binder.

9    A.    Yes.

10   Q.    I believe, Mr. Wheeler, that -- and I'm looking now at

11   page 4 of this document that's been marked for identification

12   as Plaintiff's Exhibit 466.  Are you with me there, sir?

13   A.    Yes, I am.

14   Q.    And there's a heading that says Southern Appalachian

15   Mountain Initiative Modeling?

16   A.    Yes.

17   Q.    And that's what we've been referring to in this trial as

18   SAMI.

19   A.    That's correct.

20   Q.    Sir, you are familiar with the modeling used for SAMI,

21   are you not?

22   A.    I am.

23   Q.    And just so -- just some basics before we get into more

24   specific matters.  The SAMI modeling was conducted, oh, back

25   in a time period prior to 2002.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   Yes.

2  Q.   In fact, using an inventory that I think was built off of

3  1990 inventory data.

4  A.   I believe it was 1990, yes.

5  Q.   And you would agree with me, would you not -- in fact,

6  you testified to this in your direct testimony, that since the

7  SAMI modeling was performed, we've had major increases in

8  computing power.

9  A.   Yes.

10  Q.   That it's had a dramatic impact on how we perceive -- how

11  we can use computer-based atmospheric modeling.

12  A.   Yes.

13  Q.   And if I'm correct -- and if I'm not, please tell me so.

14  The SAMI modeling used a model that had the acronym URM-1ATM.

15  A.   Yes.   URM-1 Atmosphere Model.   It's a derivative of the

16  photochemical model developed by the California Institute of

17  Technology.

18  Q.   And you would agree with me that as worthy a model as

19  URM-1 Atmosphere may have been at one point in time, it's no

20  longer the state-of-the-science atmospheric modeling system.

21  A.   I believe SAMI is not current as state of the science as

22  the CMAQ and CAMX, yes.

23  Q.   And you'd also agree with me that the SAMI inventory,

24  both in terms of the emissions that were included in that

25  inventory and the methodology used in assembling that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  inventory is now dated.

2  A.   I think we might call it dated, although I have been able

3  to glean important information out of older inventories and

4  older modeling systems.  They give us considerable information

5  about impacts.  It may not be as accurate and precise as the

6  current modeling systems; but when analyzed properly, it

7  provides important information about impacts.

8  Q.   But you would agree with me, would you not, that the SAMI

9  inventory is not comparable in accuracy and reliability with

10  the VISTAS inventory.

11  A.   I'd agree with that.  Each generation provides better

12  inventories.

13  Q.   And so using the VISTAS inventory as opposed to the SAMI

14  inventory would produce more accurate and reliable results.

15  A.   Yes.  But as I said, there's still much to be gleaned

16  from earlier monitoring studies.  They tend to corroborate

17  more recent studies and put the impacts in a historical

18  perspective.

19  Q.   But again, SAMI, both in terms of its modeling, the

20  contents of its inventory and the methodology in assembling

21  that inventory is what I have termed dated.

22  A.   It is old.

23  Q.   And in fact, the URM-1 Atmosphere Model is now used

24  merely as a training tool for people beginning to study how to

25  be atmospheric modelers.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    I wasn't aware of that.

2    Q.    And the SAMI modeling -- again, this is -- I believe this

3    is a reflection of the computing power that was available at

4    the time.  The SAMI modeling modeled some nine episodes of

5    between three and seven days in length.

6    A.    Yes.  I don't remember the exact lengths, but it was a

7    composite of episodic modeling.

8    Q.    As opposed to the ozone season, full ozone season or, for

9    that matter, full year modeling that is now routinely done

10   with CMAQ and CAMX.

11   A.    Yes, that's most of the state of the science now.

12   Q.    The state of the science has moved on.

13   A.    It has.  But as I keep reminding you is that there are

14   useful results out of these older modeling applications.

15   Q.    Mr. Wheeler, it's -- I would be correct in stating that

16   you, in fact, did a review or participated in a review of the

17   SAMI Air Quality Modeling Draft Final Report.

18   A.    That's correct.

19   Q.    And in fact, wrote -- or cosigned a letter with comments

20   to the SAMI technical coordinator Pat Brewer in April of 2002

21   conveying your comments on the SAMI model.

22   A.    Yes.

23   Q.    And would you -- do you recall what your -- the general

24   tenor of your comments were?

25   A.    Our general tenor was there wasn't enough information

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  provided to accurately assess the modeling.

2  Q.   You would agree with me, would you not, that you said,

3  "While the available measurement data are probably adequate to

4  evaluate the model's performance for ozone, the IMPROVE

5  aerosol and the NAPAP wet deposition observations are too

6  limited to support a credible evaluation of these model

7  estimates.  The integrated assessment of changes in visibility

8  in forest effects from emission changes in the SAMI region is

9  seriously undermined by the sparse spatial and temporal

10  coverage of the aerosol and deposition date."

11  A.   I can't remember those exact words, but that may be the

12  tenor.

13  Q.   I can show them to you if that would refresh your

14  recollection.

15  A.   No, that seems the sort of information we would have

16  said.  This was a joint review by me and Fred Lurmann of STI.

17  Q.   And you went on to say, "The authors generally made

18  reasonable choices for modeling systems and model components

19  although some components were not the latest science when they

20  were selected in 1998.  For example, more scientifically

21  up-to-date versions of the SAPRC gas-phase chemical mechanism

22  and the secondary organic aerosol yield and partitioning

23  algorithm were available."

24  A.   Yes.

25  Q.   And as you said that "the sources of uncertainties are

1  broadly identified in the report.  The implications of

2  uncertainties are poorly quantified.  The discussion of

3  uncertainties is cursory and lacks depth."

4  A.   Yes.

5  Q.   And then you said, "The authors also are not very

6  critical of their modeling system and appear quite tolerant of

7  poor model performance."

8  A.   I believe that's true.

9  Q.   You went on to say, "Yet, the model's performance is very

10 disappointing for particulate matter, for PM, and deposition

11 and undermines the scientific integrity of the work."

12 A.   Yes.

13 Q.   And again, based on your evaluation of the draft modeling

14 report from SAMI, "In our opinion, the scope of the database

15 for PM and the deposition is inadequate, and the actual

16 performance of the model in simulating the limited data is

17 inadequate to achieve the stated purpose with scientific

18 integrity".

19 A.   Yes.

20 Q.   And again, sir, you said in evaluating the draft final

21 report, "Documentation of the emissions data and data

22 processing and of the diagnostic model testing and uncertainty

23 analysis are nonexistent or not referenced."

24 A.   I believe that's true.  It did not provide that

25 information to us.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And you went on to say, "We do not believe that the

2  unavoidable uncertainties have been adequately identified.

3  While a list of uncertainties is provided in the report, no

4  attempt to quantify or otherwise evaluate these uncertainties

5  was made.  The lack of evaluation and discussion of the impact

6  on these uncertainties in the actual simulations makes it

7  difficult to assess their impact on the report's conclusions.

8  However, this lack of information impacts the integrity of the

9  study and its conclusions."

10  A.   Yes.

11       THE COURT:  Now, if you want to read any more of

12  that, I want you to read it all at one time so we can speed

13  this up a little, Mr. Fine.

14       MR. FINE:  I beg your pardon, Your Honor.  I'll

15  proceed in that manner.

16       THE COURT:  Yes.  Read all of that that you want him

17  to respond to.

18       MR. FINE:  All right sir.

19  Q.   "Further, we believe that several of the uncertainties

20  described may have been avoidable.  For example, the mismatch

21  between measured and predicted species could have been

22  addressed in how the modeled species were defined.  Also, it

23  may have been possible to address the precipitation errors and

24  their impact on wet deposition through the use of observed

25  precipitation.

1    "A deficiency of the study, as reported, is the lack of

2    sensitivity analyses to investigate, understand and quantify

3    uncertainties."

4    And further into the document, "If well designed

5    performance goals had been established and met, the results of

6    this modeling might have been used quantitatively.  Given the

7    modeling system's performance and the lack of additional

8    information about model uncertainties, these results are best

9    used qualitatively.  As we have indicated in preceding

10   comments, the model performance problems and lack of

11   discussion or explanation of model response suggest that the

12   results should not be used quantitatively for SAMI's overall

13   assessments.

14   "Based on the model results presented, we have some

15   confidence that the model's response is directionally correct

16   on a gross basis.  However, this does not mean the directional

17   response is correct in all locations.  Because of the lack of

18   a detailed discussion of model performance issues and

19   uncertainties, we cannot say with any confidence that the

20   magnitude of the model's response to emissions reduction is

21   correct.

22   "Meteorological inputs, along with emission inputs, are

23   key drivers of an air quality model's performance and

24   response.  Our review of the meteorological modeling report

25   raised several concerns.  These include biases in wind speed,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  the lack of evaluations for cloud cover and mixing depth, and

2  the lack of evaluation for model-ready inputs.

3       "The assumptions and approach to establishing initial and

4  boundary conditions are generally reasonable given the data

5  available.  However, leaving hydrogen peroxide out of the

6  boundary conditions may be a significant flaw since it is most

7  produced in the clean air chemistry.

8       "We do not have much confidence in the $NH_3$ dry or $NH_4$ wet

9  deposition results.  The model significantly overestimates $NH_4$

10 deposition.

11      "The Direct Decoupled Method has been applied to evaluate

12 the air quality responses to changing emissions in each of the

13 SAMI states and in other regions of the SAMI modeling domain.

14 Please comment on your confidence in the DDM results.

15      "As we recall, one of the original objectives of the SAMI

16 modeling was to develop 'response surfaces' to aid in control

17 strategy design.  It appears that the modeling team has used

18 the DDM to meet this objective.  However, the DDM can, at

19 best, provide model sensitivity to small perturbations of the

20 base-case conditions (not large changes).  Furthermore, we

21 have some difficulty evaluating the methods robustness

22 considering the subjective nature of its comparison with the

23 'brute force' method.  Given the caveats presented, it is

24 difficult to see the utility of this method in designing

25 control strategies that often include emission reductions of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    50% or more in the future.

2         "While the report discusses uncertainties, it is lacking

3    any discussion of uncertainty analysis.  Without the

4    evaluation and quantification of uncertainties, it is

5    difficult to assess the utility of the study to support

6    decision-making.

7         "It is regrettable that there were insufficient efforts

8    to carry out the process outlined above for either the

9    meteorological or air quality modeling."

10        I'm almost coming to the end.

11        "Frankly, using only 7 layers to characterize a 13

12   kilometer troposhpere is not state-of-the-science for regional

13   modeling.

14        "Based on measurement and model sensitivity studies, it

15   is inappropriate to use zero boundary concentrations for

16   hydrogen peroxide.

17        "The general tendency for the model to underpredict high

18   values and overpredict low values is not adequately discussed

19   or interpreted.

20        "The use of the 10 percent emission reduction sensitivity

21   provides some information about pollutant response locally.

22   It is not clear whether these results have utility in

23   designing control strategies of the magnitude being

24   investigated by SAMI."

25        Do you recall making those comments?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   I don't recall every comment, but the general text is

2  consistent with our evaluation that the model did not -- did

3  not have enough information to assess its ability to model

4  qualitatively -- I mean, quantitatively.  That there is some

5  use in the model in terms of qualitative assessment of air

6  quality impacts.

7  Q.   All right, sir.

8           MR. FINE:  Your Honor, I have a few more specific

9  questions and I would like to be able to hopefully conclude my

10 cross today if that were possible.

11          THE COURT:  Go right ahead.  We're going to finish

12 this witness before we quit.

13          MR. FINE:  Very well, Your Honor.  I'll bear that in

14 mind.

15          THE COURT:  All right, sir.  I'll ask cross examiner

16 to do likewise.

17          MR. FINE:  I'm sorry, Your Honor, I didn't quite get

18 that.

19          THE COURT:  I say I'll ask -- apparently my mic

20 isn't working.  I'll ask the gentleman who does the cross

21 examination to do likewise.

22          MR. FINE:  Very well, Your Honor.

23          THE COURT:  Mr. Goodstein.

24          MR. FINE:  A moment, if you please, Your Honor.

25          THE COURT:  Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

NEIL WHEELER - REDIRECT

1             (Co-counsel conferred.)

2             MR. FINE:  Your Honor, in reviewing my notes and

3    consulting with my colleagues, that concludes my cross

4    examination.

5             MR. GOODSTEIN:  Very brief redirect, Your Honor.

6             THE COURT:  All right.

7             MR. GOODSTEIN:  Can we put up Plaintiff's Exhibit 1,

8    please, which has been admitted into evidence.

9                     REDIRECT EXAMINATION

10   BY MR. GOODSTEIN:

11   Q.   I have two quick questions for you on this, Mr. Wheeler.

12   This is the SAMI final report issued in August of 2002.  That

13   should be on your monitor.

14   A.   Yes.

15   Q.   You're familiar with this report.

16   A.   Yes.

17            MR. GOODSTEIN:  And can we go to page 2 of that

18   report.

19            THE WITNESS:  I'm sorry?

20   Q.   Are you familiar with the participants in the SAMI

21   study --

22   A.   Yes, I am.

23   Q.   -- that are listed on page 2?

24   A.   Yes.

25            MR. GOODSTEIN:  Should be on your monitor, Your

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Honor.

2            THE COURT:  Oh, okay.

3    A.   Yes.

4            MR. GOODSTEIN:  And can we see the whole page,

5    please, on the monitor.  Oh, I guess we are.

6    Q.   So let's look at the governing bodies at the top.

7    A.   Yes.

8    Q.   So these are the governing bodies that signed on to the

9    SAMI final report.

10   A.   That's correct.

11   Q.   Including the U.S. Environmental Protection Agency, U.S.

12   Forest supervisor, and many of the commissioners and

13   secretaries of the departments of environment in the various

14   states in the SAMI region.

15   A.   Yes, there was very high level participation in SAMI.

16   Q.   And all these bodies signed on to the final SAMI report.

17   A.   Yes, they did.

18   Q.   And its conclusions.

19        And was TVA involved in this study?

20   A.   Yes, they were.

21           MR. GOODSTEIN:  Can we pull up the organizations,

22   please, on the screen.

23   Q.   And was Alpine Geophysics the...

24   A.   I believe they had a role in it.

25           MR. GOODSTEIN:  Okay.  So let's look at the

1  organizations real quick.

2  Q.   And does Tennessee Valley Authority appear in the

3  organizations that signed on to the final report of SAMI's

4  study?

5       MR. GOODSTEIN:  If we could highlight that so Neil

6  can see -- sorry, Mr. Wheeler can see where it is.

7  Q.   Do you see where it is, Mr. Wheeler?

8  A.   Yes.

9  Q.   Do you recall that they were one of the organizations

10 that participated in this study?

11 A.   Yes, I do.

12      MR. GOODSTEIN:  And can we go to Page 3 of that

13 document also, please.  And can we blow up the contractors

14 that contributed to SAMI's research portion on Page 3.

15 Q.   And do you see Tennessee Valley Authority listed in that?

16 A.   Yes.  They actually were a contractor to do -- perform

17 the simulations.

18 Q.   And do you see Alpine Geophysics --

19 A.   Yes.

20 Q.   -- Dr. Tesche's firm, also listed there?

21 A.   Yes.

22 Q.   So all of these contractors contributed to the SAMI

23 effort and signed on to the final report.

24 A.   Yes.

25 Q.   And I am told that -- I am told that the VISTAS modeling

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  has corroborated SAMI's conclusions with regard to $SO_2$, sulfur

2  dioxide, and visibility.

3  A.   Yes, that's my understanding.

4  Q.   That's your understanding as well.

5  A.   Yes.

6       MR. GOODSTEIN:  We have no further questions, Your

7  Honor, of this witness.

8       THE COURT:  Mr. Fine.

9       MR. FINE:  Nothing further, Your Honor.

10      THE COURT:  All right.  That will conclude our work

11  for today.  And the witness is excused.

12      Thank you very much, Mr. Wheeler.

13      THE WITNESS:  Thank you, Your Honor.

14      THE COURT:  Take a recess until tomorrow morning at

15  9 o'clock.

16      (Evening recess at at 5:58 p.m.)

17  UNITED STATES DISTRICT COURT

18  WESTERN DISTRICT OF NORTH CAROLINA

19  CERTIFICATE OF REPORTER

20      I certify that the foregoing transcript is a true

21  and correct transcript from the record of proceedings in the

22  above-entitled matter.

23      Dated this 16th day of July, 2008.

24                    s/Cheryl A. Nuccio
                      Cheryl A. Nuccio, RMR-CRR
25                    Official Court Reporter

Cheryl A. Nuccio, RMR-CRR (704)350-7494