UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA      )
ex rel. Roy Cooper,          )
Attorney General,            )
                             )
            Plaintiff,       )    No. 1:06-CV-20
                             )
        vs.                  )    VOLUME 5A
                             )    (Pages 1019-1169)
TENNESSEE VALLEY AUTHORITY,   )
                             )
                             )
            Defendant.       )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 18th, 2008

APPEARANCES:

On Behalf of the Plaintiff:

        JAMES C. GULICK, Senior Deputy Attorney General
        MARC BERNSTEIN, Special Deputy Attorney General
        North Carolina Department of Justice
        114 West Edenton Street
        Raleigh, North Carolina

        MICHAEL D. GOODSTEIN, Esquire
        ANNE E. LYNCH, Esquire
        Resolution Law Group, P.C.
        5335 Wisconsin Avenue NW, Suite 360
        Washington, DC

On Behalf of the Defendant:

        FRANK H. LANCASTER, Senior Attorney
        HARRIET A. COOPER, Assistant General Counsel
        THOMAS F. FINE, Assistant General Counsel
        MARIA V. GILLEN, Assistant General Counsel
        Tennessee Valley Authority
        400 West Summit Hill Drive
        Knoxville, Tennessee

        Cheryl A. Nuccio, RMR-CRR, Official Court Reporter

1       I N D E X

2                                                                  PAGE

3    PLAINTIFF'S WITNESSES

4    JOHN LEVY
          Direct Examination by Mr. Goodstein...........    1021
5         Cross Examination by Mr. Lancaster............    1092
          Redirect Examination by Mr. Goodstein.........    1146
6
7    LELAND DECK
          Direct Examination by Mr. Goodstein...........    1149

8

9

10              I N D E X   O F   E X H I B I T S

11                                              OFFERED  RECEIVED

12   PLAINTIFF'S EXHIBITS

13   No. 225................................    1060     1060
     No. 226................................    1060     1060
14   No. 227................................    1091     1091
     No. 228-237............................    1074     1074
15   No. 239................................    1060     1060
     No. 242................................    1060     1060
16   No. 243................................    1074     1074
     No. 485................................    1029     1029
17   No. 486................................    1085     1085

18

19   DEFENDANT'S EXHBITS

20   No. 371................................    1146     1146
     No. 374................................    1146     1146
21   No. 377................................    1146     1146
     No. 378................................    1146     1146
22   No. 384................................    1146     1146

23

24

25

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    FRIDAY MORNING, JULY 18, 2008

2         THE COURT:  All right.  Let's have our witness come

3    back around.

4         MR. GOODSTEIN:  All right.  Dr. Levy.

5                   JONATHAN LEVY

6         DIRECT EXAMINATION (Cont'd.)

7    BY MR. GOODSTEIN:

8    Q.   Good morning, Dr. Levy.

9    A.   Good morning.

10   Q.   Have you come to a conclusion regarding the benefits to

11   public health that will accrue if TVA reduces its air

12   pollution emissions as North Carolina is seeking in this case?

13   A.   Yes, I have.

14   Q.   And can you give us a summary of that conclusion.

15   A.   Sure.

16        MR. LANCASTER:  Note my objection on the scientific

17   reliability grounds.

18        THE COURT:  All right.  Thank you.

19        All right.  You may proceed, Dr. Levy.

20   A.   Thank you.  So within the health impact assessment that

21   we conducted, this involved combining the emissions estimates

22   from Dr. Staudt and the atmospheric modeling from

23   Messrs. Chinkin and Wheeler.  Once we combined that with

24   information on the health effects of fine particulate matter

25   on ozone, population data and health outcome data, health

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  incidents data, we were able to estimate public health impacts

2  in the states surrounding the power plants and across the

3  region.

4      From our experience in conducting previous health impact

5  assessments of power plants, I would conclude that the impact

6  of what have been termed the excess emissions from the TVA

7  plants are substantial in magnitude and are contributing and

8  would contribute to both mortality effect and morbidity effect

9  or nonfetal illnesses, again, throughout the region in which

10  the atmospheric modeling was conducted.

11  Q.  And you also reached a conclusion regarding current

12  impact to public health resulting from excess emissions from

13  TVA's coal-fired power plants?

14  A.  Yes, I did.  The conclusions regarding the current

15  impacts are very similar to the benefits if the emissions were

16  reduced.  It would include the benefits as well as the impact

17  from the residual emissions, so the current impacts would be

18  certainly larger than the values that we calculated.  But the

19  methodology is identical and the qualitative conclusions are

20  identical.

21  Q.  Dr. Levy, can you identify the reports that you and

22  Dr. Spengler prepared in this case.  They should be in the

23  back of your notebook, Plaintiff's Exhibits 469, 470 and 471.

24  A.  Yes, I can.  These were the reports we prepared.

25          MR. GOODSTEIN:  Your Honor, we offer 469, 470 and

1  471 into evidence at this time.

2        MR. LANCASTER:  Your Honor, that's subject to the

3  objection on the scientific reliability grounds.  And it's

4  further subject to the objections, sir, that these reports

5  purport to quantify health impacts such as mortality in a

6  number of states that I understand Your Honor's ruling ruled

7  are not in issue, states such as Wisconsin and New York, far

8  away states.

9        Those are our two objections to the reports.  We

10  certainly don't mind the court having access to the reports.

11        THE COURT:  Okay.  Show the objections and the court

12  ruling of overruled.

13        All right.  Proceed.

14  BY MR. GOODSTEIN:

15  Q.   Dr. Levy, in order for us to understand your analysis, it

16  would be helpful if you could give us an overview of the

17  methodology that you used, the health impact assessment

18  methodology.

19  A.   Sure.  So health impact assessment as we have done it is

20  really a special case of risk assessment as a whole which I

21  described a little bit yesterday, but as a reminder has been

22  codified as a four-step process involving identification of

23  hazards, exposure assessment, dose response assessment and

24  then risk characterization.  These are the four steps

25  classically defined by the National Research Council in their

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    1983 Red Book report.  And then the work that I conducted

2    could be considered as an application of these risk assessment

3    methods.

4        If it would be helpful, I would often find this helpful

5    when I give one of the lectures in my risk assessment class, I

6    can draw the diagram that shows the steps in the risk

7    assessment process and how that ties into the efforts that we

8    conducted.

9        MR. GOODSTEIN:  With your permission, Your Honor, if

10   we could have Dr. Levy approach the pad, I think that would

11   assist us in understanding his methodology.

12       THE COURT:  All right, you may do so.

13       (Witness stepped down from the witness stand.)

14       THE WITNESS:  I will apologize in advance that my

15   handwriting is poor and this pad is somewhat small so I may

16   need to abbreviate a few things, but if you'll indulge me.

17       As I mentioned, risk assessment involves four steps

18   and I'm going to portray that as four boxes with connected

19   arrows here.

20       So the first step, as I mentioned, is called hazard

21   identification.  So I'm going to write that as shorthand as

22   hazard ID here.  And what that is defined as is a qualitative

23   step to basically consider do the pollutants that are being

24   considered in the risk assessment appear to have health

25   effects in the human population at the levels of exposure that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   are being considered?  So it's a qualitative step to determine
2   if the quantitative steps will be necessary.
3           The second step is exposure assessment.  And this is
4   generally defined as either measurement or modeling of
5   exposures to human populations.  In a case like this, as I'll
6   talk about in a little bit of detail in a moment, it involves
7   modeling because clearly we can't measure the impact in 2013
8   so we need to model what those impacts would be.
9           The third step is what is known as dose response
10  assessment, or in this case for air pollutants where we're
11  taking modeled estimates for the ambient air.  It's also
12  called concentration response assessment.  So at times I'll
13  use concentration response functions or dose response
14  functions which are not exactly interchangeable but in this
15  context are similar.
16          And the last step involves what is called risk
17  characterization, which I can't fit in the box, but that is
18  meant to say risk characterization.  And that basically
19  involves combining the exposure assessment data, the dose
20  response data and population data to arrive at quantitative
21  estimates of health risks.
22          So as mentioned, this -- this is a paradigm that was
23  really codified in 1983 in the Red Book.  It certainly existed
24  before that time.  The National Academy Committee came
25  together in '83 to really synthesize the risk assessment work

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  that had been happening in the 1970s related to asbestos,

2  nuclear power and other applications.  But, you know, this was

3  codified in that report and really has been accepted worldwide

4  as the standard approach for risk assessment.

5          So now on the right-hand side what I'm going to

6  portray is health impact assessment and specifically what we

7  did in this case, so this will be a set of four parallel

8  boxes.

9          So in the hazard identification step as, you know, I

10 can talk about in more detail, we look through the literature,

11 the epdemiologic literature, the toxicologic literature, the

12 full set of literature on the different potential air

13 pollutants.  When we did that, there's certainly a number of

14 air pollutants that could have been considered in this

15 assessment and that are associated with human health, but we

16 focused in on fine particulate matter or $PM_{2.5}$ and ozone.  And

17 we arrived at that decision because there's by far the largest

18 literature available on health effects of those pollutants.

19 There's strong and systematic evidence of both the biological

20 plausibility of their effects and evidence available that

21 would let us construct concentration response functions for

22 those pollutants.

23         So we certainly didn't mean to imply within our

24 assessment that other pollutants such as mercury or sulfur

25 dioxide or nitrogen oxides would have zero impacts, but that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   these we felt were the most important to consider.

2           The exposure assessment step, as already has been

3   alluded to involved looking at what I'll put in shorthand here

4   as delta emissions, which is basically the difference in

5   emissions between current emissions -- or rather, I should say

6   base case emissions for 2013 and the emissions that could be

7   achieved through application of controls as discussed by Dr.

8   Staudt.  So that was the first piece in the exposure

9   assessment.

10          And then that feeds into the CMAQ modeling that was

11  described by Mr. Wheeler and Mr. Chinkin to estimate the

12  changes in concentrations across the model region.  And so

13  that represented the exposure assessment piece that was

14  conducted by others in this application.

15          The dose response assessment involves, as I think I

16  alluded to yesterday, figuring out these concentration

17  response functions or the relationship between changes in

18  concentrations and changes in different health outcomes.  We

19  looked throughout the literature for a variety of health

20  outcomes and focused in on a subset of outcomes where the

21  literature was strong and robust.  And so this for PM and

22  ozone involves mortality and multiple morbidity outcomes,

23  which are described in more detail in our report.

24          And then the final step of risk characterization, as

25  mentioned, involves basically multiplying this change in

Case 1:06-cv-00020-LHT  Document 200  Filed 06/15/09  Page 9 of 151

1   concentration by the concentration response functions and

2   combining that also with population data, the number of people

3   who live in these different geographic areas and the rates of

4   disease or the rates of mortality in those locations.  So

5   unfortunately, this is a small box so I'll have to use more

6   shorthand.

7           And then the last thing I put here in very much

8   shorthand, U and V, and that says uncertainty and variability.

9   And part of the risk characterization step involves certainly

10  summarizing the risk, talking about the -- you know, obviously

11  calculating the risk including the population data and the

12  incidents data and considering uncertainty and variability.

13  Variability meaning differences across the population,

14  differences in different geographic areas.  And uncertainty

15  corresponding to sort of common parlance of uncertainty,

16  things that could lead one to different calculations and

17  different risk estimates.

18          I think it's important to recognize here up front, I

19  think, two things.  One is that risk assessment was developed

20  as an applied discipline and as a discipline to help decision

21  makers make decisions under uncertainty.  That is the

22  rationale for the tool and to synthesize evidence to help

23  those decisions be arrived at.

24          The second thing to recognize is that uncertainty

25  analysis can take many forms.  The World Health Organization a

JONATHAN LEVY - DIRECT

1  couple years ago laid out that -- they said there are four
2  levels of uncertainty analysis.  People can say that there are
3  more or fewer.  But essentially, that uncertainty analysis can
4  include qualitative descriptions of uncertainty, what they
5  call sort of range finding calculations, basically figuring
6  out how big or how small could the risk be, all the way to
7  very fancy statistical models of uncertainty.  And the key
8  thing that they pointed out and others have pointed out is
9  that there's no one right way to do uncertainty analysis.
10 Uncertainty needs to be considered and addressed, but that the
11 decision context dictates how uncertainty would be considered
12 within the assessment.
13       So I'll talk through a lot of these things in more
14 detail, but I think this lays out kind of the chain of
15 calculations that we conducted.
16       (Witness resumed the witness stand.)
17       MR. GOODSTEIN:  Your Honor, that's been marked as
18 Plaintiff's Exhibit 485 for identification and we offer it
19 into evidence at this time.
20       THE COURT:  485?
21       MR. GOODSTEIN:  485.
22       THE COURT:  485.
23       MR. GOODSTEIN:  Yes.
24       THE COURT:  All right.  Let it be admitted.
25       (Plaintiff's Exhibit Number 485 was received into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   evidence.)

2   Q.    Dr. Levy, why did you choose to use this type of health

3   impact assessment for this particular study?

4   A.    This is the standard methodology used when you want to

5   understand and to quantify the health benefits of emission

6   controls or the health implications of a delta emissions or a,

7   you know, excess emissions, a change in emissions.  This is

8   the approach that EPA uses within its regulatory impact

9   analyses for air pollution regulations that have potentially

10  large economic effects.  So they have used this since the mid

11  '90s to look at the benefits and costs of the Clean Air Act,

12  the benefits and costs of the Clean Air Interstate Rule,

13  Off-Road Diesel Rule.  It's been applied in the context of the

14  National Ambient Air Quality Standards.  So it's been used

15  quite a bit by EPA.  It's been used by the European Union, by

16  the World Health Organization, used in global burden of

17  disease assessments, and obviously within the academic

18  literature as well.  So it's a very standardized approach and,

19  you know, as hopefully the diagram illustrated, you know, it

20  really is an application of the classic risk assessment

21  approach, you know, focusing in on the questions that are

22  pertinent in this case.

23  Q.    So this method is recognized by many experts in the field

24  of environmental risk analysis.

25  A.    Yes.  I mean, the four steps as they're known in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   shorthand are, you know, universally accepted within the risk

2   assessment community and then this health impact assessment,

3   which is a special case of those four steps, are also very

4   widely accepted.

5   Q.   Many experts have used this methodology, the health

6   impact assessment methodology?

7   A.   Yes.  As mentioned, certainly the USEPA, regulatory

8   bodies in Europe and the WHO.  The California Air Resources

9   Board conducts a number of health impact assessments for

10  California specific regulations.  The EPA has even developed a

11  software package called BenMAP, B-e-n-m-a-p, that, you know,

12  takes the health impact assessment methodology and puts it in

13  a software package on the web site that's, you know,

14  reasonably user friendly, anyone can download, and then

15  conduct health impact assessments.  And that tool by EPA has

16  been used, obviously, by EPA and by a number of state agencies

17  as well.

18  Q.   And the health impact assessment methodology was used by

19  EPA at least as far back as 1997?

20  A.   That's correct.  I think -- it was certainly used even

21  prior to that time, but I think in large scale application it

22  started being used, I think, in that 1997 application, in part

23  stemming from President Clinton's executive order requiring,

24  you know, quantitative benefit cost analyses, you know, for

25  regulations that may have large economic impacts.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1    Q.    And can you give us some examples of recent applications

2    of the health impact assessment methodology by USEPA.

3    A.    Perhaps the most pertinent one to this case would be

4    their 2005 health impact assessment of the Clean Air

5    Interstate Rule or CAIR in which they conducted a health

6    impact assessment.  Looked at the reduction in emissions that

7    would occur with application of CAIR to power plants in the

8    eastern United States.  Used the CMAQ model to quantify the

9    changes in concentrations that would occur.  Applied

10   concentration response functions for particulate matter and

11   ozone and then calculated the risk throughout the region -- or

12   the health benefits, I should say, throughout the region to

13   compare with the costs of control.  It followed a very similar

14   paradigm to what we conducted within our reports.

15   Q.    Let's talk about your experience with performing health

16   impact assessments.  Have you performed them before the one

17   that you did for this case?

18   A.    Yes.  On a number of occasions, you know, spanning back

19   about ten years or so within the peer-reviewed literature as

20   described in my CV, the number of publications, developing

21   components of health impact assessment as well as full-bore

22   health impact assessments and then, you know, preparing this

23   report as well as a health impact assessment for a power plant

24   in Wisconsin as part of an administrative hearing.

25   Q.    So based on your experience, this methodology, as you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  performed it in this case, is reliable.

2  A.    Yes.  It's a very reliable, very well accepted

3  methodology.

4  Q.    In summary, how did you determine that the health impact

5  assessment you performed in this case yields reliable results?

6  A.    Well, certainly following the classic four-step approach

7  ensures that we're not leaving anything out and that we're

8  doing the calculations in a reasonable way.  You know, we

9  observed the quality assurance steps taken upstream, taken in

10  the emissions and concentration modeling and, you know, mapped

11  the concentration outputs ourselves to verify the output, so

12  we were comfortable with the input data to our assessment.

13      You know, we carefully and rigorously read the

14  epidemiologic and toxicologic literature to develop

15  concentration response functions for a variety of health

16  outcomes and in each case arrived at what we considered to be

17  the best estimate to use within a health impact assessment.

18      We used publicly available databases relied upon by USEPA

19  and many others to determine population data that came from

20  the U.S. Census to determine baseline health outcome data

21  which came from public CDC databases.

22      And then when we combined all that information together,

23  we conducted standard quality assurance measures to ensure

24  that there were no errors in the calculations as well as

25  comparing the outputs from our assessment with the outputs of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  other assessments to ensure that they were reasonable in

2  comparison with what other people had found for corresponding

3  changes in emissions.

4       So, you know, we, in each case, tried to rely on and did

5  rely on the best available evidence, the strongest databases

6  and the information that others, particularly USEPA, but many

7  others had also utilized in the similar calculations.

8  Q.   So let's look at step one of your analysis, Dr. Levy.

9  You mentioned that you determined that $PM_{2.5}$ and ozone were

10  the pollutants that you want to focus in on in your health

11  impact assessment.  Are there significant health effects

12  associated to exposure to fine particulate matter?

13  A.   Yes, there are.  And this is something that, you know,

14  there are volumes of published studies in the peer-reviewed

15  literature.  Just as an example, the USEPA criteria document

16  for $PM_{2.5}$ which was disseminated roughly three years ago, you

17  know, it was a voluminous 2000-page document with many

18  hundreds of references of many more studies that have come on

19  since that point.  And it's, you know, especially across the

20  last ten years, but in reality for probably 30 or 40 years,

21  it's been a heavily studied pollutant with a large amount of

22  literature, and particularly in recent years literature

23  developing the biological mechanisms for health effects and

24  establishing health effects at current levels of exposure.

25       And so, you know, looking at that large body of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  literature which many other expert groups have also looked at

2  and arrived at similar conclusions, we concluded that at

3  current levels of exposure and the levels of exposure

4  projected in 2013, health effects would be anticipated from

5  $PM_{2.5}$.

6  Q.    And you looked at whether these health effects are

7  biologically plausible and connectable to $PM_{2.5}$?

8  A.    That's correct.  In the hazard identification step,

9  especially when one is relying on epidemiologic evidence as

10 one does to develop concentration response functions, usually

11 go through a version of what are called the Hill's Causal

12 Criteria, which are a set of criteria laid out to try to

13 determine whether an exposure is causally contributing to a

14 health effect.  And, you know, there's a number of those

15 criteria.  You know, one is biological plausibility.  Others

16 are consistency across the literature, coherence with other

17 known facts about the pollutant, and outcome, you know, the

18 existence of dose response gradients.  Basically, you know,

19 when you're exposed to more of something, you see more of an

20 effect and so forth.

21       And so we went through those criteria and concluded that

22 for fine particulate matter it easily surpassed the hurdle

23 that would be laid out by Hill's Causal Criteria, including

24 biological plausibility, but also including the large

25 consistency of findings across many epidemiologic studies.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  Q.    And for $PM_{2.5}$, did you confirm the association with
2  premature mortality?
3  A.    Yes, I did.  We, in the hazard identification step,
4  looked broadly at the potential for health implications for
5  $PM_{2.5}$; but then, obviously, once it passed that screening
6  test, we need to figure out which outcomes were causally
7  associated with $PM_{2.5}$.  And so one of the outcomes that has
8  been consistently and strongly associated is premature
9  mortality in both cohort studies and in time series studies.
10      And just as a parenthetical, cohort studies are where
11  individuals are recruited into the study and then followed
12  over time and, in this case, to see who dies and to determine
13  whether those deaths are associated with air pollution or
14  other risk factors.
15      Time series studies look at day-to-day changes in air
16  pollution and day-to-day changes in outcomes like mortality or
17  hospital admissions.
18      And so there's a very large literature both from cohort
19  studies and time series studies that confirms the relationship
20  between $PM_{2.5}$ and mortality.
21  Q.    And you also confirmed that association between $PM_{2.5}$
22  pollution and cardiovascular problems and respiratory
23  problems.
24  A.    That's correct.  As Dr. Peden alluded to, there's good
25  biological plausibility for both respiratory and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  cardiovascular effects of $PM_{2.5}$ and those can certainly run

2  the gamut from a severe effect that would result in a hospital

3  admission down to an asthma attack or a respiratory symptom.

4  And so those effects were considered biologically plausible

5  and we looked at an array of nonfatal, both cardiovascular and

6  respiratory health effects.

7  Q.   And have these relationships been confirmed by the

8  National Research Council and the EPA?

9  A.   Yes.  The EPA has, within their regulatory impact

10  analyses, developed concentration response functions for $PM_{2.5}$

11  mortality relying on the cohort literature as we have done and

12  for a large number of morbidity outcomes, a larger list than

13  we considered in this case.  We considered a smaller number of

14  health outcomes than EPA normally considers.

15  Q.   And has the American Heart Association confirmed these

16  relationships of $PM_{2.5}$ pollution and health effects?

17  A.   Yes.  They had an article, I believe it was in the

18  journal Circulation, I may be mistaken about that, where a

19  large number of people associated with the American Heart

20  Association essentially said there's strong -- a strong

21  biological basis and biological plausibility for

22  cardiovascular effects of $PM_{2.5}$ and, you know, essentially

23  endorse the need for, you know, further control of fine

24  particulate matter exposures in the United States.

25  Q.   And based on your experience and review, do panel studies

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1    also support the relationship between $PM_{2.5}$ for pollution and

2    these health effects?

3    A.    Yes, they do, and there's very large literature out

4    there, only a subset of which we use to develop quantitative

5    concentration response functions.  But the panel studies help

6    us to understand mechanisms and understand biological

7    plausibility and effects.  And so there's many other studies

8    like panel studies, like exposure assessment studies that help

9    us understand what could be going on within the epidemiologic

10   literature.  Those panel studies are not quantitatively

11   represented within our assessment but they certainly provide

12   corroborative evidence.

13   Q.    And you also mentioned Dr. Peden's testimony and reports

14   in this case.

15   A.    Yes.

16   Q.    Do they support your conclusion about the association

17   between these health endpoints and $PM_{2.5}$ pollution?

18   A.    Yeah, they're very supportive.  I think his reports

19   described nicely the mechanisms by which both respiratory

20   effects could occur as well as cardiovascular effects and

21   contributing to disregulation of the heart and so forth which

22   can lead to a cascade, to hospital admissions and premature

23   death.  So it's very consistent with our approach and with the

24   epidemiologic literature we incorporated.

25   Q.    Let's talk about those.  Can you tell us what significant

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  health effects that you associated in your work here with
2  exposure to ground level ozone.
3  A.    Ozone has also had a voluminous amount of publications,
4  again a multi-thousand page criteria document from EPA laying
5  out that evidence.  And this includes evidence of both
6  premature mortality from time series studies related to
7  short-term changes in exposure as well as morbidity effects,
8  largely focused on respiratory effects, respiratory hospital
9  admissions, exacerbations of asthma or other sorts of
10  respiratory symptoms, and what has been termed minor
11  restricted activity days which is an unfortunate bit of jargon
12  but basically refers to days in which people can conduct some
13  of their regular activities but not all of them.  So maybe
14  they can go to work, but they can't go for a run or they can
15  go half a day for work and can't, you know, last the entire
16  day.
17  Q.    And what are the main health effects associated with
18  ground level ozone?
19  A.    Premature mortality has been, you know, consistently
20  associated with ground level ozone.  This was really well
21  established in the three meta-analyses that were conducted
22  back in 2005, one of which I was involved in, that all
23  confirmed that the epidemiologic literature was showing a
24  relationship between ozone and mortality.
25        The National Research Council in their report this year

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  endorsed that approach and said that there was a plausible

2  causative association between ozone and mortality.

3       And then ozone is associated with a cascade of nonfatal

4  health effects influencing the respiratory system.

5  Q.   And we heard about that yesterday from Dr. Russell.

6  A.   Yeah, that's correct.

7  Q.   And did you confirm the biological connection and

8  plausibility of these health endpoints with ozone pollution?

9  A.   Yes, I did.  Ozone has been a very well studied pollutant

10  for decades and there's good understanding of its effects on

11  the lungs and the ways in which it can contribute to

12  respiratory deficits.  And so it's -- there's a large

13  compendium of both panel studies, chamber studies, animal

14  studies, all of which confirm the health effects of ozone, and

15  then epidemiologic studies that reinforce those effects and

16  demonstrate effects at the current levels and projected 2013

17  levels of exposure.

18  Q.   And does Dr. Peden's testimony in this case and his

19  reports in this case also support those relationships of those

20  health effects that he mentioned and ozone pollution?

21  A.   Yes, they're very supportive of the type of health

22  effects and the nature of effects that we quantified.

23  Q.   Does the recent National Academy's ozone study that came

24  out this year also support those relationships?

25  A.   It mostly focused on the mortality effects and supported

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  the quantitative approach that we applied and supported that

2  this relationship between ozone and mortality can be put into

3  concentration response functions and used in regulatory

4  assessments.

5      They also provided some description, if I recall

6  correctly, of the mechanisms by which this could occur, the

7  plausibility of the effects and the likelihood that morbidity

8  effects would be exhibited not just mortality effects.  So it

9  is very confirmatory of the approach we used.

10 Q.   All right.  Let's talk about step two of your analysis,

11 Dr. Levy, if you will, please, the exposure evaluation.  How

12 did you determine the change in exposure to $PM_{2.5}$ and ozone?

13 A.   Well, that -- that, as mentioned, really relied on the

14 outputs from Messrs. Chinkin and Wheeler.  They applied the

15 CMAQ model which, you know, certainly is a state-of-the-art

16 model for conducting these sorts of assessments because it can

17 capture the effects of the changes in emissions over a large

18 geographic area, which is the common approach within these

19 health impact assessments.

20     And so, you know, we relied on the outcomes provided by

21 Messrs. Chinkin and Wheeler which gave these delta

22 concentrations or the effect of the excess emissions within

23 each of the model grid cells from their CMAQ modeling.

24 Q.   All right.  I'd like to show you Plaintiff's Exhibit 225

25 for identification which should be a figure out of your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   report, Dr. Levy.  It's on the screen as well as in your book

2   behind the next tab.

3   A.    Yes.

4   Q.    Plaintiff's Exhibit 225.

5         Is this the modeling domain that you considered in your

6   public health impact assessment for this case?

7   A.    Yes, it is.

8   Q.    And can you explain to us why you used this modeling

9   domain.

10  A.    I guess there's probably two responses to that.  You

11  know, one is the CMAQ model certainly is able to provide

12  effects of changes in concentrations over a large geographic

13  area.

14        And the second reason is that our previous studies that

15  we conducted on power plants in Massachusetts, Illinois, the

16  D.C. area and Georgia, in each case we confirmed that

17  quantifying the total health impacts requires a fairly large

18  spatial domain.  It can take time for secondary sulfates and

19  nitrates to form in the atmosphere, and when they form they

20  can travel a fairly large distance.

21        So in some of our earlier papers, we modeled, for

22  example, within a few hundred miles of the power plants and we

23  subsequently demonstrated that that would leave out, perhaps,

24  half of the health impacts in some cases and in some cases

25  much more.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    So we certainly concluded that a larger spatial scale

2  would be necessary for a comprehensive health impact

3  assessment and this larger spatial scale made available by a

4  model like CMAQ was therefore the appropriate approach to use.

5  Q.    And this is the modeling domain that CMAQ provided

6  results for.

7  A.    Yes, it is the identical domain.

8  Q.    And have you reviewed the changes in concentrations of

9  $PM_{2.5}$ and ozone that were provided to you by Messrs. Chinkin

10  and Wheeler?

11  A.    Yes.  Prior to conducting our assessment, we reviewed

12  their outputs.  We developed our own maps of the outputs to

13  reassure ourselves of the reasonableness of the outputs, as

14  well as the spatial patterns of those outputs.  And so we

15  confirmed that they, you know, appeared correct, appeared

16  reasonable and were useful for our application.

17  Q.    Let's move to step three of your analysis, Dr. Levy.  Can

18  you describe to us how you derived the concentration response

19  functions that you used for your analysis in this case.

20  A.    So for each health outcome, we really approached it

21  fresh.  Looked at the totality of the literature available at

22  the time that we developed our concentration response

23  functions and then quantitatively synthesized that evidence.

24    For ozone, as mentioned in our report, I had recently

25  conducted a health impact assessment in which we developed

JONATHAN LEVY - DIRECT

1  those functions just a few months prior to developing the

2  report.  So we felt confident that we had the most recent

3  literature available and we had a peer-reviewed and published

4  set of concentration response functions.

5      So we used those directly and we rederived the

6  concentration response functions for fine particulate matter,

7  including mortality and morbidity, again, by pulling the full

8  set of studies, synthesizing them, evaluating which were

9  applicable within this context, and then developing the

10 quantitative relationships.

11 Q.   All right.  Let's use as an example the $PM_{2.5}$ mortality

12 concentration response function.

13 A.   Okay.

14 Q.   Do you have a figure in your report that you can show us

15 which helps you explain how you determined which studies to

16 rely on to develop the concentration response function for

17 $PM_{2.5}$ mortality?

18 A.   Yes.

19 Q.   Let me show you Plaintiff's Exhibit 226 for

20 identification.  And can you explain, Dr. Levy, why you

21 included this in your report and what it shows.

22 A.   Well, there's a lot of detail in this table and I'm not

23 going to talk on all the detail, but, you know, big picture.

24      First of all, we synthesized the literature not from this

25 table but independently.  This table is from a paper by Pope

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  and Dockery in 2006 and provides a nice summary of most of the
2  key cohort studies looking at $PM_{2.5}$ mortality and provides us
3  a way, I think, to demonstrate how we look at the totality of
4  the literature and then figure out from that literature what
5  the best concentration response function would be.
6      And I'm going to attempt to draw some lines through this
7  on my touch screen to demonstrate the approach we followed.
8  Apologize if it's a little messy because I'm going to have to
9  try to draw small lines.
10     But you can see there's a large number of publications.
11 You know, in this case I'm focusing on all cause mortality.
12 Those arrows missed slightly, but focusing on the all cause
13 mortality columns, so for the time being we can neglect the
14 two other columns and just focus in on all cause mortality.
15     The left-hand column shows what the studies were and
16 obviously the next column the reference to the peer review
17 publication.  And part of the synthesis process involves not
18 just taking every study available, throwing it into a big soup
19 and coming out with a number.  We carefully look at them for
20 applicability within this context.  And so part of
21 applicability is the -- having the same kind of exposure
22 measure that we are using in our assessment and the same type
23 of at risk population as in our assessment.
24     So if we start from the bottom, from the last row, you
25 can see there's a study that is labeled cystic fibrosis.  And

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  that is a study of the effects of $PM_{2.5}$ in patients who have

2  cystic fibrosis.  And that is a very valuable study, but is

3  not a generalizable concentration response function to the

4  U.S. population or to the population in our domain.

5      Similarly, you can see the four studies just above cystic

6  fibrosis starting with Netherlands.  Again, I missed a little

7  bit on the line.  Thanks for helping out.  And all four of

8  those studies, again, valuable studies, but their exposure

9  increments, you can see, are either being near a major road or

10 you can see it says BS which stands for black smoke in this

11 context and that's a measure essentially of diesel-related

12 pollution.  That is not directly applicable for our

13 concentration response function.  So again, valuable

14 literature.  Important in some settings, not in our setting in

15 this case.

16     Now, if we keep working our way up the list, there's a

17 set of additional cohort studies.  For the moment I'm going to

18 bracket these two studies here that are labeled postneonatal

19 infant mortality.  Those studies we did use, but for now I'm

20 talking about mortality in adults so we're not going to really

21 address those at the moment.

22     And then we have the studies that are in between the blue

23 box and the yellow box and each of those studies had an issue

24 that made it not applicable in this case.  You know, for

25 example, we have the bottom study by Enstrom which solely

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    focuses on the elderly population of California and had

2    some -- we had some methodological concerns with that study.

3         The study above it labeled VA -- or rather, the two

4    studies above it labeled VA are studies of male military

5    veterans with mild to moderate hypertension receiving

6    treatment for that hypertension at VA hospitals.  So it's a

7    very specific cohort that is not generalized to the U.S. as a

8    whole.

9         The two lines above that did not provide concentration

10   response functions for $PM_{2.5}$ mortality and so those were

11   excluded.

12        And then the final set of studies, AHSMOG studies that

13   you can see here -- for some reason everything is coming out

14   on my screen a little bit higher than where I press it so

15   indulge my slightly errant arrows.  This is a study of Seventh

16   Day Adventists in California which is a fairly unique

17   population that generally abstains from smoking and alcohol

18   consumption and so forth, and so that study is also not

19   generalized to the U.S. as a whole.

20        And so what that leaves us with for, again, quantitative

21   concentration response functions are these set of publications

22   that do not have the arrows and the shading, all the ones that

23   begin with Harvard Six Cities or ACS.  ACS standing for

24   American Cancer Society.  And so that is the set of studies

25   that we felt, and a similar conclusion has been arrived at by

JONATHAN LEVY - DIRECT

1   EPA and the National Research Council and others, this is the
2   set of studies that could let us develop a quantitative
3   concentration response function.  We then certainly proceed to
4   look at the estimates from those studies and try to
5   quantitatively synthesize them.
6       And so you can see here in the exposure increment column
7   here, all the exposure increments here are 10 micrograms per
8   cubic meter of $PM_{2.5}$ on an annual average basis.  And in our
9   report we provided concentration response functions for 1
10  microgram per cubic meter of $PM_{2.5}$.  So our numbers will all
11  be a factor of 10 lower than the numbers in this column.  So
12  everything is just scaling up and down.
13      But you can see that the central estimates, those are the
14  numbers before the parentheses in this all cause column here.
15  Those numbers representing the best estimates within those
16  studies range in general from about 6 percent as the lowest
17  number up to 17 percent as the highest number; or in the scale
18  that we used, .6 percent up to 1.7 percent per microgram per
19  cubic meter.
20      We looked at that and then looked at other evidence and
21  other discussions of the two studies, weighted that and
22  decided that a value basically part way in between what the
23  different studies were providing was the most reasonable best
24  estimate.  So what we arrived at is a value of 1 percent per
25  microgram per cubic meter, again, within that range between

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1    the .6 percent and the 1.7 percent.

2        The last thing that I just want to highlight here

3    briefly, and I know that this has been going through this

4    table in some detail, is this row that -- here where there's

5    an 8 to 11 number which I have conveniently obliterated with

6    my circle, but what this is showing is some people had concern

7    that the American Cancer Society study may not be perfectly

8    representative of U.S. population because it's a higher

9    educated population than in the U.S. as a whole and a number

10   of studies have -- both these studies and the literature as a

11   whole has shown that lower education people may be at greater

12   risk of air pollution than higher education people related to

13   socioeconomic status.

14       So calculations were made saying what if the American

15   Cancer Society study had a population that had education like

16   the Six Cities study which was more representative of the U.S,

17   and that increased their numbers to something like 8 to

18   11 percent or .8 to 1.1 percent.

19       So that was one of many indications that the numbers --

20   the original numbers from the American Cancer Society study

21   might be a little bit too low for a general U.S. application.

22   So that helped to lead us to a value of 1 percent that we

23   thought was well supported by this variety of studies.

24       Actually, the last point I want to mention -- I know my

25   other point was also the last point -- is just to say each of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   these cohort studies has multiple publications and that's

2   because there's been a series of follow-on studies.  The

3   original publications.  The studies were then reanalyzed by

4   independent research teams.  That's the papers by Krewski et

5   al.  And then there were what are called the extended analyses

6   as more people in the cohorts died so there was more

7   statistical power to see effect.  So each of these cohorts has

8   been analyzed in multiple published studies by different sets

9   of authors.

10  Q.   And has there also been a recent expert panel impaneled

11  by the USEPA that looked at a similar mortality, premature

12  mortality concentration response function related to $PM_{2.5}$

13  pollution?

14  A.   Yes, there was.  EPA launched into a few different

15  efforts to better establish mortality concentration response

16  functions.  For ozone, as I mentioned, they funded myself and

17  others to conduct meta-analyses of the literature.

18       For $PM_{2.5}$ what they did was engaged in a formal expert

19  elicitation protocol to ask experts in the field what function

20  they would consider the totality of the evidence to provide.

21  And this is a very rigorous, lengthy, somewhat complex

22  exercise.  You know, it's not just calling 12 friends and

23  asking them so what do you think.  The experts were recruited

24  in a very systematic and rigorous process.  They received

25  lengthy lists of publications, both these cohort studies, time

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  series studies, toxicologic studies.  They went through a

2  systematic and rigorous peer-reviewed approach to elicit their

3  opinions to determine what they consider to be the best

4  estimates from the literature as well as a plausible range of

5  values.  And finally arriving at essentially these best

6  estimates and ranges across the 12 experts that could then be

7  utilized by EPA in better understanding the literature and in

8  developing a PM concentration response function for their

9  future regulatory impact analyses.

10  Q.  And did you include in your report, Dr. Levy, a summary

11  of where the experts in the -- what they refer to as the

12  expert elicitation, USEPA's expert elicitation where they came

13  out on the concentration response function for premature

14  mortality related to $PM_{2.5}$ emission?

15  A.  Yes, we did.

16  Q.  I'd like to show you Plaintiff's Exhibit 239 for

17  identification.  Could you identify this figure and tell us

18  what it shows.

19  A.  So this figure shows the --

20  Q.  And if you would, Dr. Levy, I'm sorry to interrupt you,

21  but you might be able to clear your screen.

22  A.  How do I do that?

23  Q.  By hitting one of the corners that's labeled clear.

24  A.  Oh, there you go.  Thank you.

25      So what this figure shows are the final opinions of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   12 experts impaneled in the study.  That's experts labeled A

2   through L, so the opinions are not matched to the individual

3   so it's somewhat anonymized, although the 12 experts' names

4   were identified in the report.

5       There are then the concentration response functions from

6   two of the major cohort studies, Pope et al 2002 here.  That's

7   one of the publications from the ACS study.  Dockery et al

8   1993.  That's one of the publications from the Six Cities

9   study.

10      And then the final column is showing the central estimate

11  that we used in our calculations.

12      And so you can see that the expert values certainly range

13  across the experts, but fall within a fairly narrow band.  And

14  you can see the vast majority of the central estimates which

15  are represented by the black dots in these functions tend to

16  fall between roughly 1.5 percent and .5 percent per microgram

17  per cubic meter of $PM_{2.5}$.  You can see one of the experts was

18  a little bit higher than the rest at 2 percent.  One of the

19  experts was a little bit lower than the rest at around

20  .4 percent.  But that the full body of opinions really sits

21  very close to a 1 percent value.  And you can see that our

22  value over here on the side falls right within the middle of

23  the range of the values that these experts provided.

24  Q.   And can you tell us what the -- what are they called,

25  box-and-whisker components of this figure?  Did I get that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   right?

2   A.   Yeah, that's correct.  The dot in the middle represents

3   the best estimate or, you know, the 50th percentile of the

4   distribution.  So this is part of the experts' uncertainty

5   distribution around those values.

6        The two sides of the boxes here and here, roughly, are

7   the 25th and 75th percentile of the distribution.  So

8   basically, you know, half of their distribution of

9   plausibility for this function lies within that box.

10       And then the bars go from their 5th percentile to their

11  95th percentile.  So these are sort of the broader bounding

12  values.

13       So if we take, you know, expert, you know, E, as an

14  example, he said that his best estimate was 2 percent, you

15  know, that his sort of range of plausible values for the

16  function from the 5th percentile to the 95th went from about

17  1 percent to 3 percent and then sort of the 25th to 75th

18  percentile, sort of the meaty part of the distribution is in

19  this box between, say, you know, 1.6 percent and 2.4 percent

20  roughly.

21       Clear all that.

22  Q.   And did EPA publish the results and the method of the

23  expert elicitation in a formal report?

24  A.   Yes, there was a report that was prepared by Industrial

25  Economics and then was published by the EPA in, I believe,

1  September of 2006.

2  Q.   Show you Plaintiff's Exhibit 242.  Is that a true and

3  correct copy of the expert elicitation report that was

4  published publicly by USEPA?

5  A.   Yes, it is.

6  Q.   And that contains a description of the method that they

7  used of selecting, impaneling this expert group and then

8  having them review the literature and develop their assessment

9  of concentration response functions for $PM_{2.5}$ exposure.

10  A.   Yes.  That's a very lengthy, detailed and rigorous

11  methodology.  You can see this is page 2 of 109.  So they, you

12  know, went through a very systematic approach to elicit these

13  opinions, to develop these functions and to arrive at the

14  values that could then be used in future health impact

15  assessments.

16  Q.   And can you just give us a short, couple minute overview

17  of that process.

18  A.   Sure.  It's, you know, actually pretty well captured in a

19  diagram that is labeled page 5 of 109 within the report.  And

20  yeah, it's up on the screen now.

21        And so you can see they went through a process, you know,

22  first developing a protocol.  A protocol meaning the means by

23  which they elicited the opinions of the experts on these

24  functions.  That protocol was developed over a series of, I

25  think, a year and a half or two years and involved pilot

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 applications, some pretesting, a symposium, gathering some

2 reviews from a number of experts in the field, testing out the

3 protocol both in this pilot phase and in a number of other

4 settings.

5     They then went through the expert selection process

6 which, as you can imagine, is a very important step in this

7 sort of elicitation. They essentially looked at the

8 peer-reviewed literature for publications over, I believe, the

9 last 50 years. They found the 32 authors who had the largest

10 publication record on the health effects of fine particulate

11 matter, and then contacted them and asked them who do you

12 think would be able to answer this question in a very clear

13 and unbiased fashion. And there's a lengthy description of

14 how they divided the 32 experts into four groups and asked

15 them differently formulated questions to try to come up with

16 those experts.

17     They then took the nominations, ranged them and started

18 contacting people from the top of the list working their way

19 down.

20     They then, since they wanted to make sure there was broad

21 representation of scientific opinions, and the panel they had

22 gotten to date through that process had largely

23 epidemiologists, they asked the Health Effects Institute,

24 which is a nonprofit entity jointly funded by EPA and

25 industry, to come up with nominations of toxicologists or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   other physicians not epidemiologists who could also be part of

2   the panel.  And they were contacted in a rank ordering

3   approach, ending up with the 12 experts.

4        You can see there's -- the next step in this flow chart,

5   briefing book development.  This involved pulling together

6   hundreds of publications in the literature so that all of the

7   authors -- I'm sorry, all the experts had all studies

8   available to them that they could reference.  I think there

9   was also a laptop computer present when they were doing their

10  elicitation so any study could be pulled up at any point in

11  time that they could review.

12       There was a workshop that the experts attended so they

13  could learn about potential biases in people's opinions, what

14  expert elicitation involves, trying to make sure that you're a

15  well calibrated expert -- meaning that, you know, when you

16  provide these uncertainty bounds, you're not wildly too large

17  or wildly too small in those bounds -- as well as discussing

18  what the evidence looked like, what the literature was and

19  letting the experts sort of hash through the nature of the

20  evidence.

21       They went through the interviews which were eight hour

22  interviews, full day, at the expert's office going through

23  these protocols.  They had real-time computer interface so

24  that at each step the expert, you know, gave an opinion, they

25  could immediately tell them what that would mean for their

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  quantitative function.

2      And it's a two person interviewing team, one of whom is

3  meant to be -- I'm sure there's a better term for it, but the

4  argumentative person.  So if the expert gives a high number,

5  the argumentative person points out the evidence that could

6  lead to lower estimates.  If they give a lower number, they

7  point out evidence that could lead to higher estimates and

8  force them to confront any issues in the literature.

9      They then had a post-elicitation workshop in which the

10 experts discussed the entire approach, gave their opinions

11 about it and then allowed the experts to, based on further

12 discussion of the literature, change any of their opinions if

13 at that stage they felt it needed to be changed.  There were

14 actually very, very few changes at that stage, but a couple of

15 experts made minor changes.

16     So it was a lengthy process.  It spanned a couple of

17 years.  Involved, you know, many people in very rigorously

18 developed protocols.

19 Q.  And the final expert list of the experts that were

20 selected and participated on the panel, are they on Page 6 of

21 109, the next page of this exhibit?

22 A.  Yes, they are.

23 Q.  And do you know these experts?

24 A.  I know some personally.  I know others by reputation.

25 But it certainly is a group of people who have thought about

1   this problem a lot and have published on it quite extensively.

2         MR. GOODSTEIN:  Can we blow that up on the screen,

3   please.

4         THE WITNESS:  We've got it up here.

5   Q.   And we noticed, Dr. Levy, that on the figure you showed

6   before, Plaintiff's Exhibit 239, that the experts were listed

7   by letter.  Can you tell us how that worked.

8   A.   Well, everyone was assigned a letter just to make sure

9   that the opinion could not be tied to an individual expert so

10  that that could let them be essentially free to express their

11  opinions so the world would not know precisely what they had

12  stated.  You know, it allowed them to, you know, really be

13  more open about their opinions on the literature.

14  Q.   So this list of experts on Page 6 of Plaintiff's Exhibit

15  242 are the experts that you list as A through L on your

16  summary, Plaintiff's Exhibit 239.

17  A.   That's correct.

18  Q.   And can we go back to Plaintiff's Exhibit 239 for a

19  moment.

20        So as you explained to us earlier, each of those experts

21  selected a concentration response function for $PM_{2.5}$ mortality

22  that was consistent with the one you and Dr. Spengler

23  selected.

24  A.   That's correct.  I think another thing to point out,

25  which is on the heading of this figure, is that, you know, the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  experts were not just asked one question about, you know, what

2  are the effects of PM mortality.  There was a series of

3  questions, including whether there were thresholds for the

4  effects and at what levels of ambient pollution those effects

5  were observed.  These are obviously critical questions from

6  the perspective of EPA in developing their future health

7  impact assessments.

8      So you can see the heading says these are the

9  coefficients at a baseline annual average $PM_{2.5}$ level of

10  7 micrograms per cubic meter.  So these were -- they asked the

11  experts what functions they thought would be applicable at a

12  level of 18 micrograms per cubic meter and they then asked

13  them what functions are applicable at 7.

14      Furthermore, they then let the experts put any shape on

15  the function that they wanted to put on it, you know, setting

16  a threshold anywhere they would like to set it, creating

17  non-linearities in the function if they wished to create them.

18      But what this figure shows extracted from the expert

19  elicitation report with our opinion appended on at the

20  right-hand side, shows the values that the experts gave at an

21  ambient level of 7 micrograms per cubic meter on an annual

22  average basis.

23  Q.  So how would you describe the relationship of your

24  concentration response function that you used for this case

25  and the concentration response functions derived by these

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   other experts?

2   A.   I think it's certainly very consistent.  I think there's

3   some experts who believe that we understated the effects.

4   There's some experts who believe we overstated the effects.

5   But I think that the value that we've arrived at is in the

6   center of the values that are provided here and provides a

7   best central estimate for health impact assessment.

8           MR. GOODSTEIN:  Your Honor, at this time I offer

9   Plaintiff's Exhibits 225, 226, 239 and 242 into evidence.

10          THE COURT:  Let those be admitted.

11          (Plaintiff's Exhibits Numbers 225, 226, 239 and 242

12  were received into evidence.)

13  Q.   All right, Dr. Levy.  We'd like to walk through your

14  results now.  And let's start with -- oh, we've got one more

15  background piece, I'm sorry.  We wanted to have you explain a

16  little bit, Dr. Levy, about how you link the air quality

17  modeling results to the population and -- population affected,

18  and this would be the last box in your analysis that we didn't

19  cover.  Apologize.  The risk characterization for the

20  analysis.

21  A.   Yes.  So as mentioned in the box, the exposure assessment

22  and dose response steps get us to the percentage change in

23  health outcomes that would be associated with the excess

24  emissions from the TVA facilities.  We then need to understand

25  how many people are exposed to these excess concentrations or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   excess changes in health effects and what the baseline rates

2   of those effects are.  The total health impacts are a product

3   or a multiple of the change in concentration, the

4   concentration response function, the number of people who are

5   exposed and their baseline rate of disease or of premature

6   death.

7        So for population data, we took data from the U.S. Census

8   for the year 2000.  We took those data at the Census tract

9   level which is a very small level of geographic aggregation,

10  averages about 4,000 people.  And then linked those data up

11  with the concentration model conducted with CMAQ which was at

12  a different level of spatial resolution.  So we used

13  Geographic Information Systems software to overlay one on the

14  other and calculate it on a similar spatial scale.

15       And then we used publicly available databases to get at

16  the baseline rates of death or disease.  For example, for

17  premature death, there's a database that CDC, Centers for

18  Disease Control, maintains called CDC Wonder and that has

19  mortality data by county across the United States.  And so we

20  used those historic data.

21       For other health outcomes, the data sources varied but

22  are described in our report and include different CDC

23  databases of rates of hospital admissions by region, for

24  example, or of emergency room visits by region.

25  Q.   All right.  And do you have an example in your reports of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1    the method you used to link the air quality modeling to the

2    population information?

3    A.    Yes, I do.

4    Q.    Referring you to Plaintiff's Exhibit 227 for

5    identification.  Can you describe for us what this shows.

6    A.    This shows the lines -- the grid lines correspond to the

7    grid cells from the CMAQ model conducted by Mr. Chinkin and

8    Mr. Wheeler.  The other boundary lines here correspond to

9    Census tracts here within North Carolina and then blown up

10   here around the Asheville area.  This shows that Census tracts

11   overlap the grid cells within the CMAQ model.  So we had to

12   figure out, for example, what fraction of the population in

13   this specific Census tract was located within each of the grid

14   cells.

15        So by doing this GIS overlay, we could say 42 percent of

16   the population is found here within this grid cell, 8 percent

17   of the population found in this grid cell, and so forth, and

18   so we could figure out, you know, by doing this for every

19   single Census tract how many people live within each of the

20   grid cells modeled by Chinkin and Wheeler.

21   Q.    All right.  So you talk about the baseline incidences of

22   these health outcomes that you used.  Can you describe for us

23   how you combined these inputs to estimate the impacts on these

24   health endpoints associated with TVA's emissions and the

25   benefits associated with the additional controls.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  A.    So it was just a direct calculation of the excess

2  concentrations associated with those emissions for $PM_{2.5}$ and

3  ozone, in each case using the averaging time appropriate for

4  the health outcome being considered and the concentration

5  response functions.  We linked that to the concentration

6  response functions that we derived, and then with the

7  population data in each case in the appropriate age bin for

8  the health outcome.  So for example, if the study of cohort

9  mortality only looked at adults age 30 and over, we only

10 considered those age 30 and over to be at risk for the health

11 outcome so that we're consistent with the epidemiologic

12 literature.

13      So within each of the cells we multiply it by the number

14 of people in the appropriate age group and then by their

15 baseline mortality rate or baseline incidence rate of various

16 health outcomes.  And so it's just the multiplication of those

17 four values within each cell and then aggregated up across

18 states and across the region.

19 Q.    Did you also look at population projections for 2013 in

20 addition to the 2000 Census population?

21 A.    We did.  For most of our calculations we relied on 2000

22 population which we know obviously will systematically

23 underestimate the number of people living in the United States

24 in 2013, but this was based on direct Census data and

25 represented, you know, good measured data with, you know,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   essentially no uncertainty.

2       We also did calculate what the effects would be for 2013

3   projected population data.  There's a company called Woods and

4   Poole who develops population projections for many purposes,

5   USEPA, regulatory impact analyses among those purposes.  So

6   relied on those Woods and Poole population projections for

7   some of our calculations.

8   Q.   All right.  And you presented your results both in a

9   summary fashion and also state by state?

10  A.   That's correct.

11  Q.   So let's walk through your results, then, Dr. Levy, out

12  of your reports starting with Plaintiff's Exhibit 228 for

13  identification.

14          MR. LANCASTER:  Your Honor, I need to interpose an

15  objection.  This exhibit tallies up the premature mortalities

16  and other health endpoint quantifications of Dr. Levy, not

17  just for North Carolina but for a, I believe it's a 33 state

18  area and includes matters which, as I understand the court's

19  rulings, are outside what's at issue here.

20          MR. GOODSTEIN:  Your Honor, the testimony has been

21  clear that this is the appropriate health impact assessment

22  methodology to use.  Both sides have modeled the CMAQ modeling

23  domain and looked at the impacts of these sources on regional

24  air pollution, including North Carolina.  North Carolina's

25  claimed in this case from day one that there are impacts

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  occurring in North Carolina from pollution from TVA power

2  plants.  They've also alleged that there's impacts on regional

3  air quality.

4          And we understand the court is not interested in us

5  focusing in on detailed impacts on states throughout the

6  region.  But what we've got here is a standard application of

7  the health impact assessment methodology that this court has

8  found to be reliable.  And Dr. Levy's going to walk through

9  these results in a couple of minutes here showing the totals

10  for the region, also showing the state-by-state results so

11  that the court can consider these results however it deems

12  appropriate.

13          THE COURT:  I already indicated that that would be

14  the general approach and that the primary results that I'm

15  considering are the four states involved in this lawsuit.

16          MR. GOODSTEIN:  All right, Your Honor.  And as we

17  laid out -- if I might take another minute at this point since

18  this is an important issue for the State of North Carolina.

19          We responded in detail to the motion in limine that

20  was filed by Tennessee Valley Authority on this.  They want to

21  take the position that the only thing that this court should

22  consider in this case is the impacts on air quality in North

23  Carolina.  This motion, as we laid out in our papers, Your

24  Honor, was late.  There was a deadline in the Case Management

25  Order of February of this year for any motions in limine

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  related to the scientific evidence.  So it was an untimely

2  motion.

3         This case has been litigated the way it was pled in

4  the complaint dealing with impacts to air quality in North

5  Carolina and the region and that's the way we did the

6  discovery in the case.  That's the way we did the expert

7  reports in the case.  That's the way we prepared for trial in

8  this case, Your Honor.

9         THE COURT:  We've been through that, I think,

10 Mr. Goodstein.

11        MR. GOODSTEIN:  Your Honor, if I could just take one

12 more minute of the court's time.

13        THE COURT:  Go ahead.

14        MR. GOODSTEIN:  This is -- this issue of impacts to

15 air quality throughout the region, while we're not going to

16 spend very much more time on it at all, we want the court to

17 know that is relevant to both liability in this case and

18 injunctive relief.  The court has found that the Restatement

19 of Torts and the explication of public nuisance law in the

20 Restatement as well as the law of the source states allows

21 this court to consider the impacts not only to the plaintiff

22 in this case but to the general public.  That's the essence of

23 public nuisance.  And now that this court has found that North

24 Carolina has standing here, Your Honor, it's the state's

25 position that the court should look at the benefits to the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  public as well as the benefits to North Carolina.

2      THE COURT:  I understand and I've heard your point

3  now on several occasions.

4      MR. GOODSTEIN:  Thank you, Your Honor.

5      THE COURT:  And you may look at my decision as to

6  how and what I considered to be appropriate in this case.

7      MR. GOODSTEIN:  Thank you, Your Honor.

8      THE COURT:  Yes, sir.

9  BY MR. GOODSTEIN:

10  Q.  All right.  Dr. Levy, can you tell us what Plaintiff's

11  Exhibit 228 shows.

12  A.  Yes.  This shows our best estimate using 2000 population

13  data of the reduction in mortality and morbidity across the

14  region that would be associated with the reductions that were

15  described by Dr. Staudt and then modeled by Messrs. Chinkin

16  and Wheeler.  This includes -- these are annual reductions so

17  benefits that would accrue each year.

18      This includes 1400 fewer premature deaths.  I won't read

19  each of the outcomes here to save the court's time, but you

20  can see a variety of morbidity outcomes that we've calculated,

21  hospital admissions for respiratory or cardiovascular disease,

22  emergency room visits for asthma, as well as asthma

23  exacerbations or asthma attacks, development of cases of

24  chronic bronchitis, minor restricted activity days and school

25  loss days.

JONATHAN LEVY - DIRECT

1  Q.    All right.  And can you now turn to Plaintiff's Exhibit

2  243 for identification and I ask you to explain what that

3  figure shows.

4  A.    This is the identical table to the prior one, the same

5  health outcomes, the same framework.  The only difference is

6  this is using the projected population for 2013 as conducted

7  by Woods and Poole.  You can see as expected the benefits

8  increase.  There's more people who are living in the region

9  and at risk.  The benefits increase by roughly 13 percent for

10 premature death as well as the morbidity outcomes.

11 Q.    All right.  And Plaintiff's Exhibit 229 for

12 identification.

13 A.    We're now going back to the 2000 population, and all the

14 remaining figures that we had are based off of 2000

15 population, so keep that in mind.

16        And this is looking at the benefits only associated with

17 fine particulate matter.  So this is dividing the total

18 benefits from two figures ago into the damages from fine

19 particulate matter and then later the damages associated with

20 ozone specifically.

21 Q.    All right.  And Plaintiff's Exhibit 230 for

22 identification.

23 A.    This is now the benefits associated solely with ozone in

24 the region, not including fine particulate matter, based on

25 2000 population data.  You can see that there are fewer health

JONATHAN LEVY - DIRECT

1  outcomes listed because some of the outcomes within our table
2  were solely attributable to fine particulate matter and not to
3  ozone, but the benefits included in this case premature
4  mortality as well as various morbidity outcomes.
5  Q.   And Plaintiff's Exhibit 233 for identification.
6  A.   This exhibit is a map from our report focusing on the
7  spatial distribution of the benefits.  This is based off of
8  2000 population data so these numbers, if you can add very
9  quickly, would sum up to the 1400 value I described before.
10      This is premature deaths averted.  You can see that
11  within Tennessee, that has the highest number of premature
12  deaths averted at 180 per year, approximately 99 within North
13  Carolina, 891 in Kentucky, 77 in Alabama, and so forth.
14  Q.   And Plaintiff's Exhibit 235 for identification, can you
15  please explain what that one shows.
16  A.   This is a similar map of the spatial distribution of
17  benefits, in this case focusing on hospital admissions.  This
18  is cardiovascular plus respiratory hospital admission, so
19  adding up those two rows in the table.  And again, how those
20  benefits are distributed across the states based on 2000
21  population data.  Again, greatest benefit exhibited in
22  Tennessee at 210 per year, North Carolina at 120 per year, and
23  so on.
24  Q.   Plaintiff's Exhibit 236 for identification.
25  A.   We're now looking at the outcome of lost school days.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Everything else is identical to previously, 2000 population

2  data utilized.  I'm looking at how those benefits are

3  distributed across the states.  Again, to sound like a broken

4  record, the greatest benefits exhibited in Tennessee at 7200

5  lost school days averted per year, 2300 lost school days

6  averted among children in North Carolina per year.

7  Q.  And Plaintiff's Exhibit 231 for identification, what does

8  that show?

9  A.  This is a table of the benefits solely occurring within

10  North Carolina.  You can see in the top row is the 99 that we

11  saw on the map a few figures ago and so this is based on 2000

12  population.  The benefits anticipated within the state of

13  North Carolina from the controls on the TVA facilities:  99

14  fewer premature deaths per year, 19,000 fewer asthma

15  exacerbations per year, and so forth as exhibited in the

16  table.

17  Q.  And for clarification, these are per year impacts and

18  benefits.

19  A.  Yes, they are annual benefits.

20  Q.  So for each year that the emissions are reduced from TVA

21  power plants as requested by North Carolina, would you expect

22  this type of health benefit to accrue in North Carolina and in

23  the other states that you've summarized?

24  A.  Yes, I would.  And to the extent that we used 2000

25  population data and then are using that for all years going

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   forward, the benefits would certainly be greater in subsequent

2   years as the population continued to grow.  So this would be a

3   somewhat conservative estimate of what those benefits would be

4   over time.

5   Q.   And Plaintiff's Exhibit 232 for identification, can you

6   explain what that shows.

7   A.   This is now dividing out the component of the previous

8   table focused solely on fine particulate matter.  So this is

9   the portion of the benefits from the controls on the TVA

10  facilities found in North Carolina just related to fine

11  particulate matter.  So 98 premature deaths avoided per year,

12  42,000 minor restricted activity days avoided per year, and so

13  forth in between.

14  Q.   Plaintiff's Exhibit 234 for identification, can you

15  explain what that shows.

16  A.   This shows everything in short-term.  I will not talk

17  about these numbers, but this is the impact broken out by

18  state and by health outcome for every state and every outcome

19  considered in the analysis.  And I should say the states are

20  ordered by the magnitude of the impact on premature mortality.

21  So largest impact down to smallest impact.

22  Q.   And Plaintiff's Exhibit 237 for identification.

23  A.   This is now essentially a blown up version of the prior

24  table focusing just on premature deaths, and again, sorted

25  from high to low.  Identical calculation as presented in the

JONATHAN LEVY - DIRECT

1   previous table year 2000 population base.

2   Q.   And Plaintiff's Exhibit 240 for identification, can you

3   explain what that one shows.

4   A.   This is a calculation that requires a little bit of an

5   explanation.  Certainly one of the things within our

6   assessment that we had to consider was the shape of the

7   concentration response function and whether a threshold was

8   exhibited.  There's certainly a variety of assumptions that

9   could be made within these calculations.  We felt that the

10  epidemiologic literature showed that effects were exhibited

11  down to the lowest levels found within the region.  But we

12  wanted to understand if we had assumed a threshold to be

13  present for effects, a threshold that I believe was suggested

14  by Dr. Anderson if I'm correct, what would the implication be

15  for our calculations?

16       And so this, I should say, should be considered as a

17  decidedly lower bound calculation.  I think the scientific

18  evidence first shows that there are effects below

19  10 micrograms per cubic meter.  There's also, within EPA

20  practice, when health impact assessments are conducted, if a

21  threshold is put into place when the evidence seems to

22  indicate a linear relationship, they use what's called a

23  hockey stick dose response function which basically is a flat

24  line out to the threshold, which in this case was 10, and then

25  a slope increasing upward from there.  And if you use a hockey

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   stick dose response, the slope on the upward part of the

2   hockey stick should be considered as higher than the linear

3   slope.

4        We didn't use a higher slope in this case which is -- the

5   higher slope is the practice EPA would utilize.  So we're

6   using what we would consider a threshold not supported by the

7   literature and not making that upward adjustment.  And this

8   shows that of our mortality and morbidity benefits calculated,

9   approximately 70 percent of them would occur in this region

10  above 10 micrograms per cubic meter.  Again, I would consider

11  that 70 percent to be an extreme lower bound calculation that

12  I don't feel is well supported by the evidence.

13  Q.   And we'll talk about the issue of a threshold and whether

14  there is any evidence of one in a minute, but this is

15  basically an exhibit that responded to some issues that were

16  raised by Dr. Anderson and Dr. Moolgavkar.

17  A.   That's correct.  It was taking their statements at face

18  value and what the implications of those would be.

19        MR. GOODSTEIN:  So I want to offer, Your Honor, the

20  results tables that Dr. Levy and Dr. Spengler included in

21  their reports and that we just went over.  These are

22  Plaintiff's Exhibits 228, 243, 229, 230, 233, 235, 236, 231,

23  232, 234 and 237 into evidence at this time.

24        THE COURT:  All right.  Let them be admitted.

25        MR. LANCASTER:  May I go ahead and note my objection

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  for the record, sir.

2        THE COURT:  I thought you already had.

3        MR. LANCASTER:  Okay.  I didn't know if I needed to

4  do it again.  Thank you.

5        THE COURT:  Certainly your objection is now on the

6  record.

7        MR. LANCASTER:  Thank you, sir.

8        (Plaintiff's Exhibits Numbers 228, 229 230, 231,

9  232, 233, 234, 235, 236, 237 and 243 were received into

10  evidence.)

11  Q.   Dr. Levy, with regard to the results that we just went

12  through, based on your experience, are these estimates of the

13  number of avoided health outcomes and impacts on health --

14  public health from TVA's current emissions, are these

15  reasonable and reliable estimates?

16  A.   Yes, they are.  As we described, they relied on standard

17  practice within health impact assessment, utilized the

18  state-of-the-art atmospheric dispersion model to estimate

19  exposures, relied on what a very large epidemiologic

20  literature as well as the corroboratory toxicologic literature

21  would say are the best concentration response functions, and

22  then relied on very standardized population databases in a

23  very straightforward calculation approach.

24        And so I think each of the steps represents best practice

25  in the field and the values that we've presented represent

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   what we would consider to be reasonable best estimates of the
2   benefits of controls.
3   Q.   And you've had an opportunity to review TVA's expert
4   reports in this matter, in particular the reports of
5   Dr. Moolgavkar and Dr. Anderson.
6   A.   Yes, I have.
7   Q.   And did any of their comments on your analysis change
8   your conclusions?
9   A.   No, they did not.
10  Q.   In particular, I want to ask you about a few issues.  We
11  talked earlier about the issue of whether or not there's any
12  scientific evidence of a threshold below which there are no
13  human health effects for either ozone or $PM_{2.5}$.  Do you recall
14  the portions of Dr. Anderson and Dr. Moolgavkar's reports that
15  dealt with this issue?
16  A.   Yes, I do.
17  Q.   Can you explain to us why those portions of their reports
18  didn't change your conclusion or Dr. Spengler's conclusion in
19  any way.
20  A.   Well, to determine whether there is or is not a threshold
21  for these pollutants and effects, we rely on the empirical
22  evidence, and so we look, for example, at the concentration
23  response functions that have been shown in studies like the
24  Six Cities study, the American Cancer Society study and other
25  published studies.  And what those studies have shown are

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1 functions that are quite linear down to the lowest

2 concentrations observed within those studies. The most recent

3 publications from the Six Cities study were showing effects

4 down to 7 micrograms per cubic meter on an annual average

5 basis.

6        And so these relationships are very consistent. They're

7 reasonable. And on its face it did not seem plausible to

8 think that within the range of values that happened to occur

9 within the epidemiologic studies, there was a strong

10 significant linear relationship that would then hit a brick

11 wall and stop precisely at the lowest value that happened to

12 be measured. So that did not seem like a plausible

13 interpretation of the literature, and time series studies as

14 well as cohort studies have demonstrated effects down to very

15 low levels.

16        So we felt that the empirical evidence did not support

17 their conclusions as well as even a theoretical consideration

18 of the likelihood of a threshold in this case.

19 Q.   Do you believe that the NAAQS, the National Ambient Air

20 Quality Standards, are an appropriate threshold below which

21 health effects from exposure to $PM_{2.5}$ or ozone do not occur?

22 A.   No, it is not such a threshold. EPA has articulated on

23 many occasions that their NAAQS is not meant to be a zero risk

24 level. When EPA conducts its health impact assessments, it

25 uses concentration response functions and quantifies benefits

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  below the National Ambient Air Quality Standards.  The
2  empirical evidence strongly supports the existence of health
3  effects below the current National Ambient Air Quality
4  Standards.
5      So I think it is quite clear that either on a theoretical
6  or empirical basis the NAAQS should not be considered as a
7  population threshold.
8  Q.   Do you agree with the use of a threshold at all in a
9  health impact assessment like the one you and Dr. Spengler
10  performed in this case?
11  A.   As stated, any threshold would have to be supported by
12  empirical evidence and the evidence does not indicate a
13  threshold down to the lowest levels that have been observed
14  within these cohort studies.  My interpretation would be that
15  a linear function down to the lowest levels within our domain
16  is then very well supported by the literature.
17      You know, whether a threshold exists at levels that are
18  not exhibited anywhere within this domain in 2013 and have not
19  yet been investigated, you know, is an interesting theoretical
20  question, but it is not a relevant question for our
21  application.  You know, the question is are health effects
22  exhibited in the range of concentrations that were projected
23  to occur in 2013 within this domain?  And the empirical
24  evidence strongly supports a linear concentration response
25  function without a threshold in that range.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  Q.   Did the experts, the 12 experts in EPA's recent expert

2  elicitation, did they provide opinions on the existence of a

3  threshold?

4  A.   They did.  As mentioned, this was part of the elicitation

5  to let the experts set thresholds wherever they thought was

6  appropriate and to look at any non-linearities in the

7  functions as a result.

8       I believe 11 of the 12 experts said there was no

9  indication that a threshold would exist either on a

10  theoretical or an empirical basis.  The twelfth expert thought

11  that there could be a threshold.  I believe he said there was

12  a 50 percent chance that there was and 50 percent chance that

13  there wasn't.  And if there was threshold, that it would most

14  likely be exhibited below 5 micrograms per cubic meter, and

15  with certainty at less that 10 micrograms per cubic meter.

16      So looking at the totality of the literature and thinking

17  about the biologic plausibility for a threshold as well as the

18  empirical evidence for one, it unanimously concluded that

19  effects would be exhibited above 10 and nearly unanimously

20  concluded that effects would be exhibited above 5 with one

21  small probability placed on a threshold between 5 and 10.

22  Q.   And 11 out of 12 experts, what did they conclude about

23  whether a threshold was consistent with the literature?

24  A.   They concluded that it was not consistent with the

25  literature.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  Q.   Dr. Anderson, one of TVA's experts in this case, she has

2  suggested in her reports the use of an assumed threshold of

3  10 micrograms per meter cubed and we alluded to this earlier.

4        MR. LANCASTER:  Your Honor, I object.  Of course,

5  the evidence will speak for itself, but that wasn't

6  Dr. Anderson's statement in her report.  I believe he's got

7  Dr. Anderson confused with Dr. Smith.

8        MR. GOODSTEIN:  I'll rephrase, Your Honor.

9        THE COURT:  All right.

10       MR. GOODSTEIN:  Thank you.

11  Q.   Are you familiar with the position espoused by at least

12  one of TVA's experts that there may be -- it may be

13  appropriate to assume a threshold of 10 micrograms per meter

14  cubed?

15  A.   I'm familiar with that.

16  Q.   Do you agree with that approach?

17  A.   I do not.  I think, you know, 10 is a number that,

18  frankly, I didn't see any rationale for or basis for.  It's a

19  number as good as any other number, but there's no rationale

20  for a threshold there.  There's not been one study that has

21  demonstrated a threshold at 10 micrograms per cubic meter.

22  Studies have exhibited effects below that level, so I don't

23  think there's any rationale for that value.

24  Q.   And are there studies published in peer-reviewed

25  literature that show effects from concentrations of $PM_{2.5}$

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  below 10 micrograms per cubic meter?

2  A.   Yes, there are.

3  Q.   And could you describe those for us, please.

4  A.   The most recent publication was an article by Schwartz

5  and colleagues in the journal Environmental Health

6  Perspectives, and this article was interesting from a few

7  perspectives.  I mean, one, it included lower concentrations.

8  It was a more extended follow-up of the Harvard Six Cities

9  study and so it had concentrations down to 7 micrograms per

10  cubic meter on an annual average basis.

11      The study also explicitly looked for thresholds and so

12  Dr. Schwartz and colleagues took 32 possible shapes of

13  concentration response functions with thresholds at different

14  points and then looked at how those thresholds were supported

15  or not supported by the empirical evidence and used sort of

16  statistical means to determine what shape of the concentration

17  response function was best supported.  And they concluded that

18  far and away the most supported shape is a straight line all

19  the way from 7 micrograms per cubic meter up to the highest

20  level, and that there was, you know, no empirical evidence

21  that was supportive of, you know, a hockey stick shape or a

22  threshold below 10 or below any of the levels observed within

23  the Harvard Six Cities study.

24  Q.   Can you tell us about the recent California Air Resources

25  Board report that you testified yesterday that you peer

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  reviewed.

2  A.   Yes.   CARB, or California Air Resources Board, has been

3  developing methods for health impact assessment in a variety

4  of contexts.   I think currently looking at their goods

5  movement initiative, trying to understand the effects of

6  moving goods around ports and roads in California.   And so

7  they wanted to develop an appropriate concentration response

8  function for PM mortality as a component of that.   So they

9  looked through the literature, prepared a report, had that

10  report reviewed by a number of experts.

11      And I think their key conclusions were, first, they

12  determined that an appropriate best estimate for the PM

13  mortality concentration response function was a 1 percent

14  increase per microgram per cubic meter of annual average

15  $PM_{2.5}$, so the same function that we determined.

16      They relied on the evidence from the expert elicitation

17  and considered that to be a very valuable and reliable

18  resource.   And they explicitly addressed the question of

19  possible thresholds or what they termed as cutoff points.

20  They felt that there was no evidence for a threshold, but they

21  wanted to look at the effect at a series of what they deemed

22  cutoff points.   They thought that the highest cutoff point

23  that was supported by the evidence was 7 micrograms per cubic

24  meter on an annual average basis, and then they looked at

25  other cutoff points down to nonanthropogenic background levels

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  in California.

2       And so basically said, you know, this function of 1

3  percent is very clearly indicated for levels of 7 micrograms

4  per cubic meter and higher.  It seems likely to be indicated

5  at lower ranges, and they tested the sensitivity to a few of

6  the alternative possible cutoff points.

7  Q.   Have you also reviewed TVA's experts' assertion that a

8  sigmoid curve is appropriate for population level health

9  effects?

10  A.   Yes, I have.

11  Q.   And can you explain to us what that means and whether you

12  agree with that proposition.

13  A.   I agree with it in principle, but in this application it

14  does not hold up.  And if I may use another sheet on the board

15  there.

16          MR. GOODSTEIN:  With Your Honor's permission, may

17  Dr. Levy approach the pad?

18          THE COURT:  Yes.

19          MR. GOODSTEIN:  Thank you, Your Honor.

20          (Witness stepped down from the witness stand.)

21          THE WITNESS:  So I'll try to be brief, but, you

22  know, just to understand what a dose response curve is and

23  what sigmoid is, it's helpful to sketch it out.

24          So it's very well accepted by toxicologists and by

25  most people in the human health field that as individuals, we

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   exhibit thresholds for pollutants.  So for myself, there is a
2   level below which I will not be affected by fine particulate
3   matter or ozone.  So if we draw my dose response curve, me as
4   an individual, it will look like this -- those are my key flat
5   lines -- where basically nothing happens for a while because
6   my body can repair the effects.  Then there's a level at which
7   I exhibit an effect and so this is sort of having an effect up
8   here and this is having no effect.  So it has this sort of
9   step look to it.  So this is very commonly accepted and this
10  is what one of TVA's experts referred to.
11       Now, one of the issues is that we are very heterogeneous.
12  Humans differ in their suseptibility and their sensitivity so
13  my curve might look like that.  Someone else in this
14  courtroom's curve might look like this.  Another person's may
15  look like that.  So we all as individuals have different
16  thresholds.  And when you add up those different distributions
17  of thresholds, what the curve usually looks like is this sort
18  of S-shaped function or the sigmoid function that was
19  described by one of TVA's experts.
20       But the question is how steep or how flat is this S
21  shape.  If everyone was identical, it would be very steep and
22  it would basically look like one of these curves.  It would be
23  totally flat, then it would jump up and then it would be flat.
24       And when you look at an animal study with a number of
25  rats that are generally inbred within a specific strain, they

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  exhibit some variability in their suseptibility, but not as

2  much.  They're inbred rats.  So their curves look in this very

3  S-shaped form.

4      Now, if you have humans who differ in their genetic

5  profiles, in whether they smoke or not, in whether they're

6  obese or not, in their exposures to air pollution, a number of

7  other effects, the S shape flattens out.

8      And so this is a curve where people don't differ that

9  much in their susceptibility.

10     This would be a curve where people start to differ more

11  in their susceptibility.

12     And if people differ a lot in their susceptibility, it

13  looks like a straight line.

14     And for the kinds of health outcomes we're concerned with

15  here, say cardiovascular disease, we know there's a lot of

16  genetic factors, dietary factors, smoking status, all sorts of

17  other things that can predispose one to cardiovascular

18  disease.  Humans are very, very heterogeneous creatures.  So

19  we would exhibit this sort of a shape in principle if we

20  didn't differ.  But in fact, we look more like this because

21  we're much more heterogeneous.

22     And so a linear dose response function for these

23  pollutants is very consistent with what we know about human

24  sensitivity and it's also very consistent with the theoretical

25  structure that TVA's experts laid out, but not with the fact

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    that we're not inbred rats.

2           (Witness resumed the witness stand.)

3           MR. GOODSTEIN:  Your Honor, we offer Plaintiff's

4    Exhibit 486 into evidence which is Dr. Levy's sketch.

5           THE COURT:  Let it be admitted.

6           (Plaintiff's Exhibit Number 486 was received into

7    evidence.)

8    Q.    I want to turn to nondifferential toxicity, which is just

9    what I'm using to characterize some of the comments in the TVA

10   expert reports about what's an appropriate weight of toxicity

11   for the constituents of $PM_{2.5}$, and where would particles

12   contributed by emissions from TVA's coal-fired power plants,

13   where would they fall in that spectrum of toxicity.  Is this

14   an issue that you considered in your analysis with

15   Dr. Spengler in this case?

16   A.    Yes, it is.

17   Q.    And you're familiar with the comments made by the TVA

18   experts on this issue.

19   A.    Yes, I am.

20   Q.    Can you explain to us what appropriate consideration you

21   gave to this argument of differential toxicity between

22   components of $PM_{2.5}$.

23   A.    It's certainly a complex topic there's a lot of ongoing

24   scientific research on, you know, but EPA, as one example, has

25   clearly indicated that there's no evidence at present that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  would allow specific constituents of $PM_{2.5}$ to be exonerated.

2  I think that has been clearly stated.  And within all their

3  health impact assessments, they further said there's no

4  evidence that would allow us to quantitatively deviate from

5  that base assumption of equal toxicity.

6       So our conclusion in this matter is very similar to -- in

7  fact, identical to EPA's conclusion and practices.

8       Moreover, we have examined the epidemiologic literature

9  and toxicologic literature for sulfate and nitrate particles.

10  The literature is far larger on sulfate particles than on

11  nitrate particles, but especially for sulfate particles there

12  is good evidence of effects that are comparable to the effects

13  to fine particulate matter.

14       The two cohort studies upon which we relied, the Six

15  Cities study and the American Cancer Society study, showed

16  concentration responses to sulfate particles that were higher

17  than those for $PM_{2.5}$ as a whole.

18       There are a number of time series studies that have found

19  effects of sulfate comparable to or greater than $PM_{2.5}$ as a

20  whole.

21       There's also a number of studies of nonclinical -- I'm

22  sorry, nonlethal endpoints that have been -- or preclinical

23  endpoints that have been considered in the epidemiologic

24  literature.  Studies looking at heart rate variability, for

25  example, which Dr. Peden described yesterday as an important

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1  step in the causal pathway for cardiovascular effect.  So
2  there have been multiple publications that have shown sulfate
3  particles attributed to changes in heart rate variability.
4      So, you know, looking at that totality of evidence,
5  looking at EPA's conclusions on this matter, we felt that
6  using identical toxicity for the different constituents was
7  well supported by the evidence.
8  Q.   And if you had to assign weight to the toxicity of
9  constituents of $PM_{2.5}$, where would the $PM_{2.5}$ particles from
10 TVA's coal-fired power plants fall in a range of toxicity?
11 A.   It's certainly a tough question to do quantitatively.
12 You know, one thing that one could do, for example -- you
13 know, a lot of the attention has been focused on PM mortality
14 since that's one of the more eye catching impacts.  If we had
15 applied the concentration response functions reported by the
16 authors for sulfate for mortality, our impacts would have gone
17 up somewhat.  We didn't feel that that was necessarily the
18 most appropriate thing to do.  We wanted to be somewhat
19 conservative in that regard.
20     So we used a value of identical toxicity, but relying on
21 the empirical evidence from that study as well as from some of
22 the published time series studies would have led to a slightly
23 higher estimate for sulfate particles than for $PM_{2.5}$ as a
24 whole.  I don't think I'd be prepared, and I think the
25 scientific community would agree, be prepared to assign

1  specific numeric values to a plausible range.

2      But I think any of the health impact assessments that

3  I've observed both by USEPA, in Europe, and in the

4  peer-reviewed literature have all used equal toxicity as the

5  base assumption and none have exonerated species such as

6  sulfates and nitrates which comprise a significant amount of

7  the fine particulate fraction in certainly most parts of the

8  United States.

9  Q.   And is there some evidence that sulfates derived from

10  fossil fuel combustion are more toxic than noncombustion

11  particles?

12  A.   There's certainly the studies I alluded to looking at

13  sulfate and $PM_{2.5}$.  There have been other studies on paper by

14  Laden and colleagues in 2000 that used factor analysis methods

15  to basically look at where the $PM_{2.5}$ was coming from and come

16  up with concentration response functions for PM from motor

17  vehicles, from coal combustion, and so forth.  And so they

18  found a function for coal that was lower than that for motor

19  vehicles, but roughly comparable to or I believe slightly

20  higher than that of the PM mass as a whole.  And there's other

21  studies that have similar corroboratory relationships.  As I

22  mentioned, the time series literature which on average shows

23  higher concentration response functions for sulfate versus

24  $PM_{2.5}$.

25  Q.   And you're familiar with the TVA expert reports that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   suggested that you and Dr. Spengler did not adequately

2   consider uncertainty in your analysis in this case.

3   A.    I'm familiar, yes.

4   Q.    Did that number of comments about uncertainty cause you

5   to reconsider your analysis here?

6   A.    No, it did not.  I mean, I think clearly, you know, as I

7   stated at the outset, you know, uncertainty is a key component

8   in risk assessment.  It's the reason why we do risk assessment

9   to shed light on problems where there is scientific

10  uncertainty.  And so we considered uncertainty along many

11  dimensions.  We explicitly talked about uncertainty in

12  sections of our report.

13       Just as a couple of examples, you know, as we develop the

14  concentration response functions for individual pollutants and

15  outcomes, the statistical method that we used to pool the

16  studies takes account of the uncertainty reported in the

17  individual studies and weighs the studies according to their

18  uncertainty so the more uncertain studies get less weight.

19       So that's a formal part of our statistical process for PM

20  mortality which is a somewhat more complicated issue given

21  that there's many publications from the same cohorts, so

22  simply pooling them together in a quantitative analysis isn't

23  necessarily the right way to go.

24       We looked at the evidence.  We explicitly described the

25  range of values that one could see across the different cohort

Case 1:06-cv-00020-LHT   Document 200   Filed 06/15/09   Page 71 of 151

1  studies, as I mentioned earlier, from .6 percent to

2  1.7 percent.  And we explicitly described in our report that

3  if you considered the low end of expert opinions and published

4  studies up to the high end of expert opinions and published

5  studies, it might increase or decrease our mortality estimate

6  by a factor of 2 in either direction.  So in other words, our

7  base value of 1400 premature deaths per year could be as high

8  as 2800 if you rely on certain sets of evidence, could be as

9  low as 700 if you rely on other sets of evidence.  But we felt

10  that our value of 1400 was the best available science, the

11  best available evidence and that that would provide the best

12  information to the court in trying to evaluate the evidence

13  and come to some determination.

14  Q.   So in conclusion, Dr. Levy, how would you describe the

15  values for health impacts that you have associated with TVA's

16  current excess emissions?

17  A.   I would describe the values as representing best

18  available science and best available practice and indicating

19  that the current emissions do provide a substantial public

20  health burden throughout the region, both in terms of

21  mortality effects and morbidity effects for an array of

22  cardiovascular and respiratory diseases.

23  Q.   And how would you describe the health benefits that you

24  have associated with the emissions reductions on TVA power

25  plants sought by North Carolina in this case?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - DIRECT

1   A.   I would similarly describe our quantitative values as

2   what the best available science indicates would be the case

3   and that those benefits that would accrue due to the controls

4   are substantial across the region on an annualized basis.  And

5   by substantial, I mean in comparison to the benefits that we

6   found previously in modeling the benefits of power plant

7   controls and for other sets of power plants in different areas

8   of the country, and relatively large in respect to some of the

9   national control strategies such as the Clean Air Interstate

10  Rule that EPA had evaluated and considered.

11          MR. GOODSTEIN:  Your Honor, if I could have a

12  moment.

13          THE COURT:  All right.

14          (Co-counsel conferred.)

15          MR. GOODSTEIN:  Your Honor, I think I neglected to

16  offer Plaintiff's Exhibit 227 for identification into evidence

17  and would so offer that at this time.

18          THE COURT:  All right.  Let that be admitted.

19          (Plaintiff's Exhibit Number 227 was received into

20  evidence.)

21          MR. GOODSTEIN:  We have no further questions of

22  Dr. Levy at this time, Your Honor.

23          THE COURT:  All right.  We'll take our midmorning

24  recess of 15 minutes and then we'll begin cross.

25          MR. LANCASTER:  Thank you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1          (Brief recess at 10:53 a.m.)

2          THE COURT:  Come back around.

3          (Witness resumed the witness stand.)

4          THE COURT:  Mr. Lancaster.

5          MR. LANCASTER:  Your Honor, if I may suggest that

6     the witness and the court pick up TVA Book 15.

7          And I'd also request permission to approach the

8     witness and the bench with a small notebook I have containing

9     a number of articles that Dr. Levy has published in case he

10    wishes to refer to them.

11         THE COURT:  All right, sir.

12              JONATHAN LEVY

13              CROSS EXAMINATION

14    BY MR. LANCASTER:

15    Q.   Dr. Levy, good morning.

16    A.   Good morning.

17    Q.   The calculations you made of health endpoints such as

18    premature mortalities avoided, those calculations depended on

19    inputs of information from others of the plaintiff's

20    witnesses, correct?

21    A.   That's correct, for the exposure component.

22    Q.   For example, Dr. Staudt specified the TVA emissions

23    assumptions both for the 2013 base case and the 2013 controls

24    case, correct?

25    A.   Correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   Q.   And you have not independently confirmed the accuracy of

2   either the base case or the controls case that Dr. Staudt

3   specified, have you?

4   A.   That's correct.

5   Q.   And you're relying on Dr. Staudt for those emissions

6   endpoints, correct?

7   A.   Correct.

8   Q.   And then as we learned over the next couple days after

9   Dr. Staudt's testimony, those emissions scenarios were run

10  through air dispersion modeling by Mr. Wheeler and

11  Mr. Chinkin, correct?

12  A.   Correct.

13  Q.   And you accepted the output of that modeling done by

14  Mr. Wheeler and Mr. Chinkin, correct?

15  A.   Correct.

16  Q.   You did not perform the air dispersion modeling.

17  A.   No, we did not.

18  Q.   And you have not independently verified the air

19  dispersion modeling performed by Mr. Chinkin and Mr. Wheeler.

20  A.   We did some quality assurance checks on the outputs, but

21  we did not obviously verify the full runs.

22  Q.   One of the health endpoints that you calculated was

23  premature mortalities avoided based on the modeling output

24  that showed lower levels of $PM_{2.5}$ in the air if the emissions

25  were at Staudt's controls case as compared to Staudt's base

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    case, correct?

2    A.    Correct.

3    Q.    On a county-by-county basis, you subtracted the $PM_{2.5}$

4    concentrations in the county, you subtracted the lower levels

5    under the base case from the higher levels under the -- excuse

6    me.  You subtracted the lower levels under the controls case

7    from the higher levels under the base case to get the

8    concentration difference in each county, correct?

9    A.    Correct.

10   Q.    And I think I'm going to be using the same word that you

11   drew on your chart, I'll call those concentration changes the

12   deltas.  Is that acceptable to you?

13   A.    Yes.

14   Q.    And you used these deltas to calculate the number of

15   premature mortalities avoided in each county, correct?

16   A.    Correct.

17   Q.    And then you added up all these county numbers to get

18   your total number, correct?

19   A.    Correct.

20   Q.    And in North Carolina, you calculated that in 2013 there

21   will be 98 premature mortalities avoided if TVA were to emit

22   at the so-called Clean Smokestacks equivalent case as compared

23   to the 2013 base case, correct?

24   A.    The number was 99, but...

25   Q.    For $PM_{2.5}$ was 98, was it not?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   $PM_{2.5}$ only?

2  Q.   Right.

3  A.   Yes, that was 98.

4  Q.   And the 99 was ozone; is that correct?

5  A.   That's correct.

6  Q.   If you would turn in your book to TVA's Exhibit 377.

7       And Exhibit 377 is a deposition that was marked at

8  your -- excuse me, is an exhibit that was marked at your

9  deposition as well.  And does it represent the $PM_{2.5}$

10 concentration levels in each county in North Carolina that

11 were provided to you by Mr. Chinkin and Mr. Wheeler modeling

12 the assumption that TVA would emit at the higher base case?

13 A.   I believe that does.  I'd have to look at the numbers

14 specifically.

15 Q.   And the longer document included a number of other states

16 and this extract includes the North Carolina portion that

17 begins on the second page with Alamance County, correct?

18 A.   Yes.  Correct.

19 Q.   And then Exhibit 378 is similar.  It is the modeling

20 output that Mr. Chinkin and Mr. Wheeler provided you for each

21 county in North Carolina showing the $PM_{2.5}$ levels in the

22 county if TVA were to operate its plants at the lower controls

23 case scenario, correct?

24 A.   Correct.

25 Q.   And they're all lower, aren't they?

1 A. Yes.

2 Q. And so the deltas would be obtained from subtracting

3 the -- for each county the number in 378 from the number in

4 377, correct?

5 A. Correct.

6 Q. And Exhibit 371 is a table summarizing for each of the

7 counties in North Carolina the results of that subtraction.

8 Do you see that?

9 A. Yes, I do.

10 Q. And for example, in Alamance County, the model levels

11 were 9.39 micrograms per cubic meter if TVA operated at the

12 higher base case, dropping to 9.25 micrograms per cubic meter

13 if TVA operated at the lower control case, correct?

14 A. Correct.

15 Q. For a difference of .14 micrograms per cubic meter,

16 correct?

17 A. Correct.

18 Q. And this chart summarizes for each of those counties

19 simply the results of the subtraction of Exhibit 378 numbers

20 from 377 numbers, correct?

21 A. That's correct.

22 Q. And the highest delta in any county in North Carolina is

23 .31 micrograms per cubic meter, isn't it?

24 A. I don't have all the numbers in front of me, but I'll

25 accept that at this point.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1   Q.   All right.  The -- it's also in your book if you'd like

2   to look at it, if you'd like to check it.

3   A.   Okay.  I'll presume your number is correct.

4   Q.   The lowest number, the lowest, the smallest delta is

5   projected to occur in Dare County which is on Page 1 and is

6   0.4 micrograms per cubic meter, correct?

7   A.   0.0.

8   Q.   I'm sorry, thank you for correcting me.

9   A.   0.04.

10  Q.   So the range of deltas you used in calculating 98

11  premature mortalities in North Carolina is 0.04 to

12  0.31 micrograms per cubic meter, correct?

13  A.   Yes.

14  Q.   Those are the amounts of the air quality improvements

15  that your testimony is will avoid 98 premature mortalities,

16  correct?

17  A.   That's correct.

18  Q.   And the baseline concentrations against which these

19  deltas occur range from as low as about 5 micrograms per cubic

20  meter in Dare County up to near 12 micrograms per cubic meter

21  in Mecklenburg County, correct?

22  A.   That's correct.

23  Q.   In fact, Mecklenburg County was the highest level at

24  11.63 in the base case, correct?

25  A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  Q.   And in fact, this air dispersion modeling upon which you

2  relied projects that 87 of North Carolina's 100 counties will

3  have annual average $PM_{2.5}$ concentrations below 10 micrograms

4  in the year 2013 even if TVA emits at the high levels

5  projected by Dr. Staudt in his base case, correct?

6  A.   That appears to be correct.

7  Q.   And these deltas which are no greater than

8  0.31 micrograms per cubic meter, they are of a magnitude

9  that's within the range of normal variation and monitoring

10  instrument uncertainty, correct?

11  A.   The reason why we conduct atmospheric modeling is to be

12  able to determine these deltas between alternative control

13  scenarios; and I think as Mr. Chinkin attested to, at times

14  the modeling capability can be in advance of the monitoring

15  capability.

16  Q.   But in fact, these deltas which are no greater than

17  0.31 micrograms per cubic meter are a magnitude that is within

18  the range of the normal variation and monitoring instrument

19  uncertainty, correct?

20       MR. GOODSTEIN:  Objection, Your Honor.  Asked and

21  answered.

22       THE COURT:  I'll let him answer.

23  A.   I'm not familiar with the different aspects of monitoring

24  uncertainty.  There's multiple types of instruments that

25  measure $PM_{2.5}$ that have different degrees of measurement

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   error.

2   Q.   If you could open the small notebook that I handed you,

3   please, to Tab D.  Is Tab D an article you wrote entitled,

4   Using CALPUFF, C-A-L-P-U-F-F, to Evaluate the Impacts of Power

5   Plant Emissions in Illinois Model Sensitivity and

6   Implications?

7   A.   Yes, it is.

8   Q.   And your Harvard colleague, Dr. Spengler, was a coauthor

9   of this article as well.

10  A.   That's correct.

11  Q.   If you would turn to Page 1073, please.

12  A.   Okay.

13  Q.   Did you write this in the left-hand column, the beginning

14  of the last paragraph?  Did you write:  "An additional

15  limitation is related to the difficulty of validating the

16  model outputs.  For our analysis, population weighted annual

17  average concentration increments were on the order of

18  0.3 micrograms per cubic meter.  Although impacts were as high

19  as 0.6 micrograms per cubic meter close to the facilities and

20  daily concentration variability at specific monitors might

21  imply a larger effect on selected days, the magnitude is

22  within the range of normal variation and monitoring instrument

23  uncertainty."

24  A.   I see that quote.  I think the -- what this quote is

25  trying to articulate is that when we apply atmospheric

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  dispersion models, there are different means of validating the

2  outputs and that monitoring data, you know, cannot be used to

3  directly validate these hypothetical scenarios and the outputs

4  from these models, which is why we rely on other means of

5  validation which I believe Messrs. Wheeler and Chinkin had

6  attested to, the methods for validating the instruments -- I

7  mean, the model.

8  Q.   But it is true, sir, isn't it, that 0.3 to 0.6 micrograms

9  per cubic meter is within the range of normal variation and

10  monitoring instrument uncertainty?

11  A.   At least for the instrumentation available circa 2002.

12  Technology always does change.

13  Q.   Thank you, sir.  Now, the deltas that were -- are in

14  North Carolina, they were primarily composed of sulfate,

15  correct?

16  A.   That's correct.

17  Q.   And the nitrate component was a very small component,

18  correct?

19  A.   That's correct.

20  Q.   And in fact, there are a number of counties in North

21  Carolina where the modeling shows that when TVA reduced its

22  nitrogen oxide emissions, nitrate levels actually went up;

23  isn't that correct?

24  A.   I'd have to look at the outputs, but that is likely the

25  case because of the joint emissions of sulfur dioxide and

1 nitrogen oxide. It wouldn't be the case only from nitrogen

2 oxide emissions in isolation. It's related to the complex

3 secondary chemistry for sulfate and nitrate formations, but we

4 certainly have documented that in other studies that $SO_2$

5 reductions can free up ambient ammonium to react with nitrates

6 so you can reduce $SO_2$ emissions, reduce sulfate, but then

7 increase nitrate by small amounts.

8 Q.   But most of the mortality benefits that you calculated

9 would occur in North Carolina are related to the specific

10 particle sulfate rather than nitrate, correct?

11 A.   That's correct.

12 Q.   And sulfates are attributable to the specific pollutant

13 sulfur dioxide, correct?

14 A.   That's correct.

15 Q.   I want to discuss the methodology you used to turn these

16 $PM_{2.5}$ deltas into your calculation of premature mortalities

17 avoided, but first I want to make sure I understand what you

18 mean by the term premature mortality.

19      Is premature mortality a reduction in life expectancy as

20 a result of an exposure?

21 A.   That's correct. We know that the risk of death for

22 people is 100 percent eventually. We're all going to die. So

23 it's a matter of the degree of prematurity that would be

24 exhibited due to an exposure.

25 Q.   And when you talk about the degree of prematurity, you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1    mean the loss of somewhere on the order of one to three years

2    of life expectancy, correct?

3    A.    That's what the cohort studies have found on average

4    would occur.

5    Q.    Now, to calculate the number of premature mortalities

6    avoided, you used what you call a concentration response

7    function, correct?

8    A.    Correct.

9    Q.    And that's basically a formula, correct?

10   A.    Correct.

11   Q.    And the formula is that for every 1 microgram decrease in

12   the annual average air concentration of $PM_{2.5}$, there will be a

13   1 percent decrease in mortality, correct?

14   A.    Correct.

15   Q.    And to arrive at your estimate of premature mortalities

16   avoided, you simply multiply the population in each county by

17   the baseline mortality rate for that county by the delta in

18   concentrations by 1 percent to get the county mortality

19   figure, correct?

20   A.    That's correct.

21   Q.    I want to do an example of this calculation based on

22   Charlotte, North Carolina -- or actually, Mecklenburg County.

23         This is TVA Exhibit 384.

24         MR. GOODSTEIN:  Your Honor, would it be possible to

25   get a copy of this to put in front of the witness?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Oh, it's in your book, sir, by the way, at 384 as well.

2  A.   Okay.  I've got it on the screen.

3  Q.   We didn't mean to make your head spin there.

4       Now, from the documentation that you -- underlying

5  documentation that you provided, it indicated that you used a

6  population greater than 29 for Charlotte -- or excuse me -- my

7  old home.  I keep calling it that -- Mecklenburg County of

8  388,524, correct?

9  A.   I don't remember all the individual numbers, but that

10 looks correct.

11 Q.   All right.  And the baseline mortality rate of .0101?

12 A.   Again, I'll take it at face value.

13 Q.   And then the delta that was on the Exhibit 371, .17,

14 correct?

15 A.   Correct.

16 Q.   And then the 1 percent translates just to a .01, correct?

17 A.   Correct.

18 Q.   And when you multiply those through, you come up with

19 6-2/3 premature mortalities in Mecklenburg County, correct?

20 A.   Correct.

21 Q.   If the overall $PM_{2.5}$ level is 11.63, your methodology

22 indicates that during the year a little over 456 people in

23 Charlotte will suffer premature mortalities from breathing

24 $PM_{2.5}$, correct?

25 A.   That's not a calculation that I would personally do, but

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  that -- if you do that calculation, that would be correct.

2  Q.   Okay.  So in other words, your calculation is that

3  pollution -- excess pollution from TVA will cause 6-2/3

4  premature mortalities in Mecklenburg County and pollution from

5  other sources in and out of North Carolina will cause another

6  450 premature mortalities, correct?

7           MR. GOODSTEIN:  Objection, Your Honor.

8  Mischaracterizes the testimony.

9           THE COURT:  Let the witness answer it.

10  A.   In the calculation you left out nonanthropogenic

11  background and so this presumes that if you removed all

12  sources, there would be 0 for $PM_{2.5}$ which is not correct.  So

13  you would have to subtract out nonanthropogenic background to

14  get the attributable portion.

15  Q.   Thank you for the correction.  So what it means is that

16  your calculation is that 6-2/3 people in Mecklenburg County

17  will suffer premature mortalities from pollution alleged to be

18  excessive and attributable to TVA while about 450 other people

19  will suffer premature mortalities from the pollution that

20  comes from all other places, correct?

21  A.   Again, without accounting for background, that wouldn't

22  be an appropriate calculation.

23  Q.   And that means that throughout the year -- excuse me,

24  throughout the state, when this calculation is replicated

25  across all 100 counties, that means that thousands and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  thousands of people are dying each year in North Carolina from

2  breathing $PM_{2.5}$ at levels well below the standard; is that

3  correct?

4  A.   That is correct.

5  Q.   And you understand that the methodology you used to

6  calculate that TVA is responsible for 98 premature

7  mortalities, you're aware that that methodology, if it's used

8  on modeling output of Duke Energy and Progress Energy's North

9  Carolina plants, it shows that they are causing on the order

10 of 300 to 500 premature mortalities each year, correct?

11 A.   I'm not sure if that's correct or not.

12 Q.   You're not sure about that?

13 A.   I'd have to look at the calculations.

14 Q.   Do you recall being provided with that calculation at

15 your deposition?

16 A.   I don't recall offhand if those calculations were current

17 emissions or future projected emissions, and what the other

18 assumptions were in the calculations.

19 Q.   I believe they were 2002 zero-out calculations.

20 A.   Okay.

21 Q.   And do you recall being provided with those calculations

22 and being asked if they follow the methodology, same

23 methodology that you used?

24 A.   I do recall.

25 Q.   And you are aware that when that methodology was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  employed, it indicated 300 to 500 premature mortalities per

2  year from the Duke and Progress plants?

3  A.   Again, I don't recall the specific numbers, but I'll take

4  it at face value.

5  Q.   Thank you.  Now, this health impact assessment you

6  performed in this case is by no means the first one you've

7  ever performed, is it?

8  A.   That's correct.

9  Q.   In 1999 you published a health impact assessment for

10  Boston, correct?

11  A.   Correct, for one power plant in Boston.

12  Q.   And you and Dr. -- your colleague at Harvard,

13  Dr. Spengler, both worked on that assessment, correct?

14  A.   That's correct.

15  Q.   And in that paper, you used a concentration response

16  coefficient of 0.4 percent, correct?

17  A.   I believe that's what we used for our base calculation,

18  and we had some sensitivity calculations as well.

19  Q.   In 2002 you and Dr. Spengler published a health impact

20  assessment about Massachusetts, correct?

21  A.   That's correct.

22  Q.   And in that paper you used a mortality concentration

23  response coefficient of approximately 0.5 percent, correct?

24  A.   That's correct.

25  Q.   Also in 2002 you and Dr. Spengler published a paper about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  power plants near Washington, D.C., correct?

2  A.   That's correct.

3  Q.   And in that paper examining the health impacts of power

4  plants around Washington, D.C., you used a coefficient of

5  about 0.4 percent across the general population, didn't you?

6  A.   Well, that I'd have to look at the paper.  I mean, that

7  specific paper was one in which we were looking at

8  stratification across different levels of educational

9  attainment, so that required using a different model and

10  within our base calculation we used one function and we used a

11  set of functions stratified by educational attainment.

12       I think it's also important to recognize that the

13  scientific literature evolves over time and it would certainly

14  not be prudent to develop -- to apply functions in 2008 that

15  were developed in 1997.

16       So in each of these publications in the peer-reviewed

17  literature, we re-examine the literature as a whole.  In our

18  1999 paper, you know, which involved work a couple years prior

19  initially.  This was only shortly after the first couple of

20  cohort studies had been published and prior to the Health

21  Effects Institute's re-analyses of those studies.  So there

22  was less evidence available and less mechanistic evidence

23  available about the health effects of $PM_{2.5}$.

24       New evidence arrived prior to our 2002 papers that led us

25  to utilize different functions from the health effects since

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 re-analysis. There have been further publications that have

2 come down the line.

3      So in each case we re-examine the evidence, consider the

4 weight of the evidence and arrive at a separate function.  So

5 the fact that the functions have varied over time is simply an

6 indication of the changing science and our utilization of that

7 science.

8 Q.  Well, I'm going to catch up to the present in a few

9 minutes.

10 A.  Okay.

11 Q.  In the Washington, D.C. paper, you actually did two

12 things.  You both used conventional assumptions and then

13 considered available evidence for differential effects on

14 susceptible subpopulations, correct?

15 A.  That's correct.

16 Q.  And you used three different coefficients for the -- what

17 you called the susceptible subpopulation, .81 percent with

18 people less than a high school education, .44 percent for

19 people with a high school education, and essentially zero for

20 people with greater than high school education, correct?

21 A.  Actually, my numbers are slightly different, but it

22 was --

23 Q.  Well, what are they?

24 A.  8.5 percent for less than high school education, 4.5 with

25 high school education, and not statistically significant but

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1    .3 percent for those with more than high school education.

2    Q.   And those were all for 10 microgram changes, correct?

3    A.   That's correct.

4    Q.   To make them apples to apples with the numbers you're

5    using here, you would call them .8, .4 and 0, correct?

6    A.   Correct.

7    Q.   And these different coefficients for subpopulations

8    translated to an overall coefficient of about .4 percent

9    across the general population, correct?

10   A.   That's correct.  Again, it's so we could use a value that

11   was commensurate with the stratified calculations so we had an

12   apples to apples calculation in the paper.

13   Q.   Still in 2002, you and Dr. Spengler and others published

14   a paper about Illinois, correct?

15   A.   That's correct.

16   Q.   And the purpose of that Illinois paper was to determine

17   the influence of key atmospheric modeling assumptions on

18   health based conclusions, correct?

19   A.   That's correct.

20   Q.   And as part of your analysis in that paper, you applied a

21   concentration response function for premature mortality,

22   correct?

23   A.   That's correct.

24   Q.   And the concentration response function for premature

25   mortality that you and Dr. Spengler used in the 2002 paper

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   about Illinois was 0.5 percent, correct?

2   A.   I believe that's correct.  I'm looking for the dimension

3   here.

4        Yeah, that paper was largely focused on atmospheric

5   modeling.  This was a side calculation in the discussion

6   section.

7   Q.   Using 0.5 percent?

8   A.   I'm looking for -- I presume that's correct.

9   Q.   I believe it might be on Page 1069.

10  A.   Thank you, I found that.

11  Q.   I'm sorry, I missed your answer.  Did you confirm that

12  you used 0.5 percent?

13  A.   Yes, I did.

14  Q.   I'm sorry, I didn't hear you.

15       In 2003 you and Dr. Spengler and others published a paper

16  about Georgia, correct?

17  A.   That's correct.

18  Q.   And that Georgia paper examined emissions from seven

19  power plants located near Atlanta, Georgia.

20  A.   That's correct.

21  Q.   And as part of your Georgia analysis, you did an

22  illustrative evaluation of the approximate magnitude of health

23  impacts associated with these seven Georgia power plants using

24  a coefficient of 0.6 percent, correct?

25  A.   That's correct.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   In 2005 you and Dr. Spengler prepared a report evaluating

2  public health implications relating to a Wisconsin power

3  plant, correct?

4  A.   That's correct.

5  Q.   And in the Wisconsin power plant analysis, you used a

6  coefficient of 0.5 percent, correct?

7  A.   That is correct.

8  Q.   In 2007, a study -- in May 2007 a study was published

9  that you authored entitled Quantifying the Efficiency and

10 Equity Implications of Power Plant Air Pollution Control

11 Strategies in the United States, correct?

12 A.   Correct.

13 Q.   And you submitted that article for publication in

14 September 2006?

15 A.   That's correct.  The analyses, however, were conducted in

16 the summer of 2005 and in the winter of that year.

17 Q.   And it was accepted for publication in January of 2007.

18 A.   That's correct.

19 Q.   And actually published in May 2007.

20 A.   That's correct.

21 Q.   And in this 2007 article, you used a concentration

22 response function coefficient of 0.6 percent, correct?

23 A.   That's correct.  Since this involved fairly complex

24 simulation modeling -- you know, as the new scientific

25 evidence in 2005 and 2006 unfolded, it was computationally

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1 infeasible to rerun the models, so the outputs that we

2 generated were based on that work in the summer of 2005 and

3 really completed in that winter.

4 Q.   To summarize the concentration response function and

5 coefficients you've used in your past work, the 1999 Boston

6 study was .4 percent; the 2002 Massachusetts study was

7 .5 percent; the 2002 Washington, D.C. study was .4 percent;

8 the 2002 Illinois study was .5 percent; 2003 Georgia study was

9 .6 percent; 2005 Wisconsin study was .5 percent; and the 2007

10 national study was .6 percent, correct?

11 A.   This is commensurate with the range of central estimates

12 that have been reported within the American Cancer Society

13 study which the authors report generally between .4 and

14 .6 percent.

15 Q.   And before this case, you had never conducted a risk

16 analysis calculating premature mortalities associated with

17 $PM_{2.5}$ exposure using a coefficient higher than .6 percent,

18 correct?

19 A.   Correct.

20 Q.   And the central tendency of the coefficients you have

21 used in your past studies is about .5 percent, correct?

22 A.   That's correct.

23 Q.   And in your opinion, a concentration response coefficient

24 of .5 percent for a $PM_{2.5}$ premature mortality calculation is

25 not an unreasonable or implausible one to use, is it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  A.    It's within the range of plausible values, I think.  As

2  many at EPA and elsewhere had done, we had relied to date on

3  the American Cancer Society's study.  I think EPA and others

4  recognize that this was a much larger study than the Harvard

5  Six Cities study and that provided it with many advantages.

6       There was growing recognition starting with the

7  publication by Jared in 2005 that the method for exposure

8  assignment in the American Cancer Society study may have

9  contributed to some exposure misclassification, basically

10 using one monitor to represent a fairly large geographic area;

11 and in these kind of studies, that type of misclassification

12 tends to bias your estimates downward.

13      I think there was also a growing recognition both from

14 the stratified analyses on education, a nice paper by O'Neil

15 and colleagues in 2003, that the socioeconomic status effect

16 was real and important.

17      And between those two effects, I think there was growing

18 recognition in the scientific community, as well as within

19 myself and Dr. Spengler's opinions that the values from the

20 American Cancer Society study, the .4 to .6 values were likely

21 systematically underestimated.  And I think that is reflected

22 in the expert elicitation outputs in the value that we used in

23 this report; and in fact, in -- I believe I've got four or

24 five papers that are submitted for publication now going

25 forward that are using this 1 percent or in some cases higher

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  function.

2      So I think the scientific understanding about these

3  effects has evolved over time.  I think there was actually an

4  inflection point in '05 and '06 when people started to

5  recognize some of the downward biases of the American Cancer

6  Society study.

7  Q.   So in health impact assessments published from 1999

8  through 2007, you always used a coefficient on average of

9  about .5 percent, correct?

10  A.   Yes -- or I would call it analyses prepared between 1997

11  and 2005.

12  Q.   But here you used 1 percent, correct?

13  A.   Right.

14  Q.   And using 1 percent instead of .5 percent doubles the

15  number of premature mortalities you calculated, correct?

16  A.   That's correct.

17  Q.   And the primary basis of this choice of a 1 percent

18  coefficient was that you derived it from a so-called expert

19  elicitation study funded by EPA, correct?

20  A.   It was that 1 percent was corroborated by the expert

21  elicitation study; but also, as I indicated, by our own

22  reading of the literature, by the growing understanding about

23  the effects of exposure misclassification within the ACS

24  study, as well as the educational attainment effect.

25  Q.   If you'd turn to your deposition transcript, please.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  It's Exhibit Number 368.

2  A.   My colleague, Mr. Woodall, asked you at your deposition,

3  "You used a 1 percent function" -- this is -- I'm sorry, I'm

4  on page 44.

5       Page 44, line 6, you were asked:  "You used a 1 percent

6  function in this report.  Why did you use a different function

7  in this report than the one that was used in the earlier

8  reports?"

9       And to begin your answer, you said, "The primary basis

10  was an expert elicitation study that came out in the fall of

11  2006."  Correct?

12  A.   That is what I stated there.  Subsequent to the

13  deposition I did go back and look through sort of the sequence

14  of report preparation and realized that these things actually

15  happened in parallel.  We had certainly begun determining the

16  appropriate concentration response function and had come up

17  with our 1 percent value prior to the publication of that

18  study in the fall of 2006.  We were obviously aware that the

19  study had been ongoing for a period of time and had heard of

20  some of the results and so I don't remember all the time

21  sequences involved.  You know, that was clearly an important

22  corroboratory basis and something that we looked at carefully.

23       I think as I also said on Page 45 of the deposition is

24  that this also led us to reread the literature and recalibrate

25  our thoughts on that literature.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  Q.  And after you gave your deposition, you read it, didn't

2  you?

3  A.  My deposition?

4  Q.  You read the transcript, didn't you?

5  A.  Yes, I did.

6  Q.  And you made a number of changes to it, didn't you?

7  A.  Yes, I did.

8  Q.  And then you signed it, didn't you?

9  A.  Yes, I did.

10  Q.  And you didn't change that testimony, did you?

11  A.  I suspect I did not.

12  Q.  Would you like to review your changes to find out?

13  A.  No, that's all right.

14  Q.  Thank you.  Now, the way you derived your 1 percent

15  coefficient from the so-called expert elicitation was to take

16  a simple average of the medians of each of the 12 estimates

17  given in that study, correct?

18  A.  That's correct.

19  Q.  I'd like you to look at TVA Exhibit 374.

20       What is Exhibit 374?

21  A.  That is a cover page that was appended on to the expert

22  elicitation report produced by Industrial Economics that I

23  referred to earlier.

24  Q.  And does it not say -- is this put out by EPA itself?

25  A.  Yes, it was.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1   Q.   And does it not say, "This expert elicitation report was
2   prepared in support of the characterization of uncertainty in
3   EPA's benefits analyses associated with reductions in exposure
4   to particulate matter pollution.  As recommended by the
5   National Academy of Sciences, EPA is using expert judgment as
6   part of an effort to better describe the uncertainties
7   inherent in any benefits analysis.  This report and its
8   findings are intended solely for this purpose."
9        Is that what it says?
10  A.   Yes.  There's also, if you read in the executive summary
11  of that same report, this is on Page 4 of 109.  The report
12  says, Expert elicitation uses carefully structured interviews
13  to elicit from each expert his best estimate of the true value
14  for an outcome or variable interest as well as his uncertainty
15  about that true value," and goes forward from there.
16       I can't speculate on EPA's intent on the cover page other
17  than that, as the experts all indicated, health effects down
18  to 7 micrograms per cubic meter.  This, you know, certainly
19  would be problematic for the NAAQS setting process.  EPA has
20  used the expert judgment outputs, including their central
21  estimates, in their regulatory impact analyses conducted since
22  that time looking at new source performance standards for --
23  I'm blanking on the source sector, but it was their regulatory
24  impact analysis done in March of this year as well as in --
25  some of their other regulatory impact analyses of the last

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  couple years.

2      So EPA has used these values directly, including the

3  central values for regulatory impact analysis and my -- I

4  can't read their mind, but I expect that this was overlaid on

5  their report related to concerns about the NAAQS.

6  Q.   Although we can't read the EPA's mind, we can read EPA's

7  words and EPA's words were that this so-called expert

8  elicitation was intended to better describe the uncertainties

9  inherent in any benefit analysis, and the report and its

10 findings are intended solely for that purpose, correct?

11 A.   Yes.  And the quotation that I read was also from that

12 EPA report.

13 Q.   And in the body of the report itself, it states that "the

14 purpose of this project is to provide a more complete

15 characterization, both qualitative and quantitative, of the

16 uncertainties associated with the relationship between

17 reductions in ambient $PM_{2.5}$ and mortality," correct?

18 A.   That's correct.  And you know, part of characterizing the

19 uncertainty distribution for each expert involves certainly

20 their upper and lower bound values, their 5th and 95th

21 percentiles, but a key component of that is also the center of

22 that distribution.  So it's meant to capture the degree of

23 uncertainty within the expert arena about a lot of these

24 questions as well as areas of consensus and lack of

25 uncertainty.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1    Q.    There is a methodology for combining a number of studies
2    together called a meta-analysis, correct?  M-e-t-a-analysis.
3    A.    That's correct.
4    Q.    A meta-analysis is a systematic and quantitative
5    synthesis of the epdemiological evidence from a number of
6    published studies, correct?
7    A.    That's correct.
8    Q.    I want to read you a few sentences from the Reference
9    Manual on Scientific Evidence put out by the Federal Judicial
10   Center, the chapter on epidemiology, and ask if you agree with
11   this.
12         "Meta-analysis is a method of pooling study results to
13   arrive at a single figure to represent the totality of the
14   studies reviewed.  It is a way of systematizing the
15   time-honored approach of reviewing literature which is
16   characteristic of science and placing it in a standardized
17   framework with quantitative methods for estimating risk.  In a
18   meta-analysis, studies are given different weights in
19   proportion to the sizes of their study populations and other
20   characteristics."
21         Is that an accurate description of what a meta-analysis
22   is?
23   A.    Yes, it is.
24   Q.    To select the concentration response function coefficient
25   of 1 percent that you used here, you did not conduct a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  meta-analysis, did you?

2  A.    Well, there's a couple levels of response here.  I mean,

3  one is we conducted that precise form of meta-analysis for all

4  other health outcomes and all other -- I mean, for ozone, for

5  all outcomes and for the morbidity outcomes for PM.

6  Q.    And just to be clear, I was not asking about the other

7  ones.  I was asking about the $PM_{2.5}$ coefficient of 1 percent.

8  Did you conduct a meta-analysis to arrive at that figure?

9  A.    But the point is that these meta-analytic techniques are

10  meant when one can pool the evidence across independent

11  samples with a large sample size that can then be used to

12  synthesize the evidence.  So for, you know, for example,

13  cardiovascular hospital admissions, there were, I believe, 51

14  studies so that was amenable to this sort of assessment.  For

15  PM mortality there were many publications that stemmed from

16  two key cohorts.  These were not independent observations and

17  a meta-analysis text would say that it is inappropriate to

18  just simply statistically pool independent observations.

19       Moreover, if one considers the expert elicitation

20  distributions as, you know, potential key inputs to this

21  process, the expert elicitation report itself explicitly

22  stated that statistically combining expert opinions as opposed

23  to independent publications is not well justified by, you

24  know, common practice within expert elicitation.  And that's

25  why EPA, when it's been utilizing expert elicitation outputs

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  in its regulatory impact analyses, has not formally done
2  pooling meta-analyses of those studies.
3      And so we felt that given the nature of the evidence,
4  given the nature of the publications and the expert
5  elicitation, that simply throwing them into an assessment
6  without a more rigorous consideration of what was entailed in
7  each each of those estimates would not have been appropriate.
8  Q.   I may have stayed up too late reading epdemiological
9  studies and I'm not phrasing my questions well, I suppose.  I
10  meant to ask you, sir, did you or did you not conduct a
11  meta-analysis to arrive at the figure of 1 percent to use as
12  the concentration response function coefficient for your $PM_{2.5}$
13  premature mortality calculation?
14  A.   I mentioned earlier that there were two levels of my
15  response.  The second level is that meta-analysis takes many
16  forms and statistically pooling studies through inverse
17  variance weighting is one form of meta-analysis.  Another
18  involves reading and synthesizing the evidence and coming to a
19  determination of the pooled understanding without such a
20  formal approach.  EPA in its regulatory impact analysis
21  describes its approach as meta-analytic, but does not do this
22  form of statistical pooling across the PM cohort studies for
23  similar reasons.
24      So, you know, similar to how there are different levels
25  of uncertainty analysis I described earlier, there are

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  different forms of meta-analysis.  So I would consider what we
2  did as a meta-analysis even if not an inverse variance
3  weighted meta-analysis.
4  Q.  You agreed earlier that a meta-analysis is a systematic
5  and quantitative synthesis of the epdemiological evidence from
6  a number of published studies, didn't you?
7  A.  Yes, I did.
8  Q.  You did not conduct a systematic and quantitative
9  synthesis of the epdemiological evidence from a number of
10  published studies in order to arrive at the 1 percent figure,
11  did you?
12  A.  We did a systematic review of the literature and we did a
13  quantitative assessment.  So I would say that, yes, we did do
14  that form of meta-analysis as described.  We did not do
15  inverse variance weighting or some of the other techniques
16  that I've applied in previous publications just given the
17  nature of the evidence, the number of studies and the methods
18  that were appropriate under the circumstances.
19  Q.  And you agreed with me a moment ago that in a
20  meta-analysis, studies are given different weights in
21  proportion to the sizes of their study populations and other
22  characteristics.  Did you do an analysis in which you gave
23  different weights to the different studies in proportion to
24  the sizes of their study population and other characteristics?
25  A.  Well, this was in fact the reason why in our earlier

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  publications we had given very large weight to the American

2  Cancer Society study outputs because it's a much larger cohort

3  than the Harvard Six Cities study.  We also needed to take

4  into consideration some of these potential biases and issues

5  that do not lend themselves to, again, simply doing these

6  quantitative weights and ignoring other attributes of the

7  studies.

8      So, you know, the formalized weighting approach inherent

9  in inverse variance weighted meta-analysis we did not do for

10  this one endpoint on one pollutant, but it was not justified

11  under the circumstances.

12  Q.   Would it be fair to say you did a meta-analysis light?

13  A.   I'd say it would be fair to say that I did what is

14  appropriate given the scientific evidence available.

15  Q.   But you did not do a formal meta-analysis that involved

16  any sort of statistical analysis, did you?

17  A.   I think, as many others have concluded, that sort of a

18  blind pooling of studies in this context is inappropriate, and

19  that's why I'm not aware of any publications of regulatory

20  impact analysis where for PM cohort mortality such a pooling

21  has been done.  I think it's not -- not a well justified

22  approach.

23      I would add parenthetically that had we done that

24  calculation and selected, you know, a representative study

25  from the American Cancer Society cohort and a representative

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  study from the Six Cities cohort, we would have arrived at a
2  value greater than 1 percent.  But we didn't feel that that
3  was the most appropriate means for doing this calculation and
4  representing the totality of scientific evidence.
5  Q.   You think you would have arrived at a value greater than
6  1 percent if you had done the calculation you didn't do?
7  A.   Yes, I would have.  I think one can -- I mean, I've done
8  these sorts of meta-analyses many times over the last 12
9  years.  I think if you just look at the confidence intervals
10 described within the different cohort studies, they are
11 roughly of comparable magnitude.  So, you know, I could do the
12 calculation if I had a spreadsheet in front of me, but
13 eyeballing the confidence intervals and looking at the central
14 estimates, I think it's pretty clear that one would arrive at
15 a value higher than 1 percent.
16 Q.   No where in your report did you describe the methodology
17 by which you came up with the 1 percent figure as a
18 meta-analysis, did you?
19 A.   I'm not aware of the language that I used, but I'd say,
20 you know, within health impact assessments, constructing
21 concentration response functions involves meta-analyses.  It's
22 an inherent part of the process.
23 Q.   EPA periodically reexamines the National Ambient Air
24 Quality Standards, correct?
25 A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  Q.   And in 2006, EPA completed its review of the $PM_{2.5}$
2  National Ambient Air Quality Standard, correct?

3  A.   Correct.

4  Q.   And for the annual standard, EPA decided to keep it where
5  it already was, at 15 micrograms per cubic meter, correct?

6  A.   Correct.

7  Q.   And that was where it had been set back in 1997, correct?

8  A.   That's correct.

9  Q.   And in 1997, EPA was provided with a quantitative risk
10 assessment, the kind of risk assessment you have performed
11 here, as part of a standard setting process, correct?

12 A.   That's correct.

13 Q.   But in 1997, EPA considered it to be too limited to serve
14 as a quantitative basis for decisions on the standard level,
15 correct?

16 A.   That's correct.  EPA uses those tools in regulatory
17 impact analyses, but it's not a primary basis for NAAQS.

18 Q.   Regular impact analyses occur after the standard has
19 already been set, correct.

20 A.   Well, that occurs in separate and in other settings.  For
21 the Clean Air Interstate Rule, for example, that occurred --
22 that analysis was prior to the setting of the $PM_{2.5}$ standard,
23 but in parallel to the needs to reduce $PM_{2.5}$ concentrations.

24 Q.   And in this most recent round of setting the 2.5 ambient
25 air quality standard, another quantitative risk assessment,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  the kind of risk assessment you performed here, was presented

2  to EPA, correct?

3  A.   Correct.

4  Q.   And the EPA administrator determined that this

5  quantitative risk assessment did not provide a reliable basis

6  to determine what specific quantitative revisions to the

7  standards would be appropriate, correct?

8  A.   That's correct.

9  Q.   What the specific words that the EPA administrator used

10 were that the risk assessment did not provide a reliable

11 basis, correct?

12 A.   I'll take that at face value there.

13 Q.   I want to ask you some questions now about uncertainties.

14 Any health impact assessment of the sort you performed in this

15 case will contain uncertainties, correct?

16 A.   That's correct.

17 Q.   Although you chose 1 percent as your coefficient here,

18 there is uncertainty associated with that coefficient, isn't

19 there?

20 A.   That's correct.  And that was described in our report.

21 Q.   There are clearly numerous plausible estimates of

22 mortality concentration response functions based on reported

23 confidence intervals, alternative statistical models within

24 studies, use of different studies, and alternative assumptions

25 about particle constituent toxicity, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   That's correct.

2   Q.   There is also uncertainty about the shape of the

3   concentration response function, whether it is linear or

4   non-linear, correct?

5   A.   That's correct.

6   Q.   A threshold -- you discussed earlier issues about a

7   threshold.  A threshold is a concentration level below which

8   it is expected that effects are not observed, correct?

9   A.   That's correct.

10  Q.   In your opinion -- excuse me.  It's your opinion that the

11  available evidence does not support or refute the existence of

12  a threshold for chronic effects for $PM_{2.5}$, correct?

13  A.   That's correct.

14  Q.   Thus from the available evidence, one cannot rule out the

15  possibility that there is a threshold exposure level for $PM_{2.5}$

16  below which exposure does not cause serious health effects

17  such as premature mortality, correct?

18  A.   Correct.  One cannot rule out the existence of that

19  threshold at levels that we have never observed within the

20  cohort studies.  At levels at which we have empirical

21  evidence, I think we can quite clearly state that no threshold

22  does exist.

23       So as mentioned previously, studies like the Six Cities

24  follow-up in 2008 demonstrated effects down to 7 micrograms

25  per cubic meter.  Whether there are effects down below 7,

1  there is no empirical evidence to support or refute a

2  threshold.  I think as I described it, it does seem

3  implausible that that lowest level that had been observed in

4  the Six Cities study would coincidentally be precisely the

5  value at which this curve which was a straight line from 30 or

6  40 down to 7 would abruptly and immediately change.

7      So I would think the best available scientific

8  information would indicate that the curve continues on in its

9  form as observed and would be the most reasonable assumption.

10  Although, given a lack of empirical data below 7, I think one

11  could not rule out non-linearities.

12  Q.  If you could turn back to Exhibit 368 in your book which

13  is your deposition transcript.

14  A.  Uh-huh.

15  Q.  And it will be Page 73.

16      Were you asked, sir, "Question:  It's your opinion that

17  the available evidence does not support or refute the

18  existence of a threshold for chronic effects for $PM_{2.5}$; is

19  that correct?"

20      And you answered, "That's correct," didn't you?

21  A.  That's correct.

22  Q.  Now, as I understand it, epdemiological evidence forms

23  the centerpiece of the concentration response function which

24  you used to calculate premature mortalities which you contend

25  result from exposure to $PM_{2.5}$, correct?

1   A.   That's correct.

2   Q.   Epidemiology is a science that is used to examine the

3   pattern of disease in human populations, correct?

4   A.   That's correct.

5   Q.   Epidemiologic studies evaluate the relationship between

6   health outcomes and ambient concentrations as recorded by

7   central site monitors, correct?

8   A.   Not all epidemiologic studies are structured that way,

9   but many of the ones on which we relied are structured that

10   way.

11   Q.   And an epidemiologic study may show an association

12   between exposure to an agent and some health outcome like, for

13   instance, an association between higher $PM_{2.5}$ concentrations

14   in the area and higher mortality rates, correct?

15   A.   That's correct.

16   Q.   But an association -- but an association is not

17   equivalent to causation, is it?

18   A.   It is not.  And I would -- I would say one single

19   epidemiologic study in isolation without any other evidence

20   should not be viewed as evidence for causation; but a large

21   body of epidemiologic studies consistent over time, locations

22   and methods with other corroborating evidence can then be

23   viewed as evidence for causation.

24   Q.   But an association itself is not equivalent to causation,

25   is it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   That's correct.

2   Q.   And an association identified in an epidemiologic study

3   may or may not be causal, correct?

4   A.   Correct.

5   Q.   To arrive at a conclusion of causation, you need to rely

6   on both epidemiological evidence and toxicological evidence,

7   correct?

8   A.   That's correct.

9   Q.   And you do not hold yourself out to be an expert in

10  toxicology, do you?

11  A.   No, I don't.

12  Q.   Nor do you have any training in medicine or biology in

13  connection with assessing the biological mechanisms of health

14  effects, do you?

15  A.   No, I do not.

16  Q.   And you have acknowledged in your public writings that

17  the assumption that mortality associations shown in the

18  epdemiological studies reflect a causal relationship for $PM_{2.5}$

19  is a substantial uncertainty, correct?

20  A.   That's correct.  I would say that I suspect that was from

21  one of my either 1999 or 2002 papers.  I would say that as the

22  scientific evidence has grown substantially in the intervening

23  years, my opinion on that question would change.

24       And I think, you know, if you look at our 1999 paper, we

25  consider the time series evidence as our primary central

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  estimate because there had not been sufficient corroboratory

2  studies of the cohort evidence.  As the cohort evidence has

3  grown and the biological plausibility evidence has grown, I

4  think I have gotten much better confidence in the causal

5  association as well as our understanding of the magnitude of

6  the relationship.

7       I think that's also reflected in the expert elicitation

8  study where the experts were asked the probability of

9  causality given the totality of epidemiologic and toxicologic

10  evidence, and I believe 10 of the 12 experts expressed causal

11  probabilities over 90 percent, some on the order of 95 to

12  99 percent.  You'll never get an academic to say that anything

13  is 100 percent certain.  But, you know, there's strong belief

14  within the scientific community that this is a very well

15  documented causal relationship.

16  Q.   In October 2006, the EPA administrator determined that he

17  was not prepared to make the assumption that associations

18  between mortality and $PM_{2.5}$ are causally related at levels as

19  low as the projected 2013 North Carolina ambient

20  concentrations at issue in this lawsuit, correct?

21  A.   That's correct.

22  Q.   Fine particulate matter, $PM_{2.5}$, is composed of many

23  different kinds of substances, correct?

24  A.   Correct.

25  Q.   Sulfate and nitrate are two of the components of $PM_{2.5}$,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  but there are many others as well, correct?

2  A.   That's correct.

3  Q.   And the different components of PM2.5 are not all equally

4  toxic, are they?

5  A.   It seems unlikely they would all be equally toxic.

6  Q.   And we do not have definitive information about the

7  relative toxicity of the different particle constituents of

8  $PM_{2.5}$, do we?

9  A.   No, we do not.  No constituents have been either

10 exonerated or specifically implicated.

11 Q.   Thus there remains uncertainty about the quantitative

12 relative toxicity of the key constituents of $PM_{2.5}$, correct?

13 A.   That's correct.

14 Q.   In addition to uncertainties in your health impact

15 analysis, there are uncertainties in what I call information

16 upstream of your analysis.  For example, as we discussed a few

17 minutes ago, you were relying on Dr. Staudt's emissions

18 estimates, correct?

19 A.   Correct.

20 Q.   And if Dr. Staudt's projections of the amount of TVA's

21 expected 2013 sulfur dioxide emissions are in error by, say,

22 100,000 or 200,000 tons, that would have an effect on your

23 analysis, wouldn't it?

24 A.   It would.  It would certainly influence the temporal

25 distribution of the benefits.  If controls were put in place

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  earlier than when we had modeled, those benefits would start

2  accruing prior to 2013 and the magnitude of benefits, you

3  know, additional to that after 2013 would be smaller.

4         MR. LANCASTER:  May I approach the map, Your Honor?

5         THE COURT:  Yes.

6  Q.    You're here.  If the evidence shows, sir, that

7  Dr. Staudt's emissions projections are substantially

8  overstated, particularly overstated at TVA's Johnsonville,

9  Bull Run and Kingston plants in eastern North Carolina, that

10 would have an effect on the calculations you made, wouldn't

11 it?

12 A.    Yes, it would.

13 Q.    Thank you, sir.

14        In your view, the two epdemiological studies that give

15 the primary evidence for the mortality effects are the

16 American Cancer Society study and the Harvard Six Cities

17 study, correct?

18 A.    That's correct.  For $PM_{2.5}$.

19 Q.    Thank you.  The Harvard Six Cities study, as its name

20 suggests, involved six communities, correct?

21 A.    Correct.

22 Q.    What were they?

23 A.    Oh, I'll have to recall.  Portage, Wisconsin;

24 Kingston/Harriman, Tennessee; Watertown, Massachusetts --

25 which were the others?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Watertown, Massachusetts; Portage, Wisconsin;

2  Steubenville, Ohio --

3  A.   Steubenville.

4  Q.   -- Topeka, Kansas; Harriman, Tennessee; and South St.

5  Louis, correct?

6  A.   Yes, that's correct.

7  Q.   I happen to live near Harriman, Tennessee, and I cannot

8  see why it is described as a, quote, unquote, city, but it is

9  included in the Harvard Six Cities study, correct?

10 A.   Right.  Portage, Wisconsin, is not a terribly large city

11 either, but every one is included.

12 Q.   The primary limitations of the Harvard Six Cities study

13 were the small number of subjects from a small number of study

14 areas, correct?

15 A.   Correct.

16 Q.   And the six communities in the Harvard Six Cities study

17 clearly cannot represent all the distributions of all the

18 populations in the United States, can they?

19 A.   No, but I think it has the advantage of having a very

20 systematic selection process for cohort members that were

21 meant to be representative of those locales and those locales

22 were selected to be representative of broader geographic

23 areas.  So, you know, in comparison to the ACS study, there

24 was a very explicit and careful attempt to get populations

25 that were meant to be more representative of the United

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   States.

2   Q.   But the concern about the -- pardon me.  The concern

3   about the Six Cities study is its lack of representativeness,

4   correct?

5   A.   Yes.

6   Q.   Now, the American Cancer Society study, it actually

7   showed that there's only a small and insignificant association

8   between $PM_{2.5}$ exposure and mortality for people with more than

9   a high school education, correct?

10  A.   That's correct.

11  Q.   So is that telling us that the best thing to do to

12  protect ourselves from air pollution is stay in school?

13  A.   I think what it says, along with many other studies

14  looking at other risk factors, smoking, anything across the

15  board, is that socioeconomic status matters and other

16  vulnerability attributes matter.  Clearly walking across the

17  stage and getting your high school diploma doesn't immediately

18  confer you with magical protection from air pollution.  But

19  what this is is an indication of those of lower socioeconomic

20  status, for a variety of susceptibility and possibly exposure

21  related reasons, would be at greater risk from air pollution.

22  Q.   And I wouldn't have thought that my college degree was

23  going to protect me from air pollution, but is the Harvard Six

24  Cities study showing that all of the people in the study who

25  have college degrees or who have greater than high school

1  education, that they simply are not statistically associated,

2  there's no rise in death rates for rises in pollution levels

3  of $PM_{2.5}$?

4  A.   I believe that's correct as well.  I think both the Six

5  Cities and the ACS studies show that socioeconomic gradient

6  with highest effects in those with the lowest level of

7  education.

8  Q.   Neither the ACS study nor the Harvard Six Cities study

9  show a significant positive association between ozone and

10  mortality, correct?

11  A.   Publications to date indicate that, that's correct.

12  Q.   In other words, neither the ASC study nor the Harvard Six

13  Cities study supports the argument that ozone causes

14  mortality, do they?

15  A.   They do not contain evidence that would show that

16  long-term exposure to ozone contributes to mortality

17  increments.

18       The time series literature, which is quite large, shows

19  that ozone exposure, daily excursions of ozone exposure are

20  associated with increases in mortality.

21       And, you know, one of the issues certainly present in the

22  Harvard Six Cities study is that there was a relatively small

23  gradient of ozone exposure across the different communities.

24  I think as the modelers previously indicated, ozone can travel

25  a fairly large distance.  And, you know, if one lacks an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 exposure gradient in a cohort study, there's no ability to

2 discern effects even if those effects were to exist.

3     I think the American Cancer Society study has a bit more

4 heterogeneity. Some of the more recent findings from the

5 extended following are showing significant effects on ozone

6 long-term mortality. But, you know, that evidence is not

7 really, you know, as substantially out there in the world yet.

8 We relied solely on the time series literature.

9 Q. You relied on the ACS study and the Harvard Six Cities

10 Study to support your opinion that mortality is caused by

11 $PM_{2.5}$ exposure, correct?

12 A. That's correct.

13 Q. But then you relied on different studies to support your

14 opinion that ozone exposure causes mortality, correct?

15 A. Time series and cohort studies contain potential

16 overlapping effects. The effects in the cohort studies are

17 generally much larger because it can include the effects of

18 long-term exposure. So for PM there's very strong evidence

19 from time series studies of mortality effects, but we were

20 worried about double counting so we left out the time series

21 effects for PM and solely relied on the cohort evidence.

22     So, you know, it's, because of the degree of overlap,

23 inappropriate to include both and so that's why with ozone we

24 only relied on the time series estimates. With PM there's

25 both time series and cohort estimates and we solely relied on

Case 1:06-cv-00020-LHT   Document 200   Filed 06/15/09   Page 119 of 151

JONATHAN LEVY - CROSS

1 the cohort so we didn't overstate the effects.

2 Q.   So you relied on different studies for the ozone

3 mortality, correct?

4 A.   That's correct.

5 Q.   And the studies that you relied on for your $PM_{2.5}$

6 mortality calculations, they don't support a causal -- any

7 sort of causal connection between ozone and mortality,

8 correct?

9 A.   Well, that's an overstatement.  I think they don't have

10 the evidence available to discern such an effect, and air

11 pollution can cause effects both due to acute changes in

12 exposure and due to chronic exposure and it's not an either/or

13 proposition.  So even if there were not evidence of long-term

14 effects of ozone exposure on mortality, there can still be

15 evidence of short-term effects of exposure on mortality.

16 Q.   You're familiar with what is known as the Lipfert,

17 L-i-p-f-e-r-t, Veterans Administration study, correct?

18 A.   Correct.

19 Q.   It was a cohort study of 50,000 U.S. veterans, correct?

20 A.   Correct.

21 Q.   And the Lipfert VA study showed no significant

22 association between particulate matter and mortality for any

23 of the various measures used for particulate matter, correct?

24 A.   That's not correct.  It depends on the publication.  As

25 indicated in that table by Pope and Dockery, one of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Lipfert publications showed an effect between PM and mortality

2    on the order of 1.5 percent increase in deaths per microgram

3    per cubic meter increase, but also contained a large number of

4    sensitivity calculations.  So -- but in their -- certainly in

5    their first view, which was a preliminary look at the cohort,

6    no effect was observed.  In their follow-up analysis, an

7    effect was observed, but in other statistical models that

8    effect was blunted.

9    Q.   You're familiar with the Enstrom, E-n-s-t-r-o-m, study of

10   50,000 older Californians, aren't you?

11   A.   Yes.

12   Q.   For the nearly 20 year period from 1983 to 2002, the

13   Enstrom study showed no association between particulate matter

14   exposure and mortality, correct?

15   A.   That's correct.  I think I and many others had

16   methodological concerns about the Enstrom study and I think

17   that is reflected in some peer-reviewed publications reflected

18   in the California Air Resources Board's summary of PM

19   concentration response function evidence as well as EPA's

20   evaluation of this literature.

21   Q.   But to be clear, I was correct in stating that the

22   Enstrom study showed no association between particulate matter

23   exposure and mortality, correct?

24   A.   That's correct.  Again, with some large methodological

25   concerns.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.    The ACS study, American Cancer Society, in the extended

2    version of that study, the long-term average $PM_{2.5}$

3    concentrations across the cities in the studies was about

4    17.7 micrograms per cubic meter, correct?

5    A.    I believe that was the average across all cities and all

6    dates.

7    Q.    In the Harvard Six Cities study, the long-term average

8    $PM_{2.5}$ concentration across the cities in the studies is about

9    18 micrograms per cubic meter, correct?

10   A.    I think it depends on which follow-on period you're

11   looking at.  I think in at least one of the earlier Six Cities

12   publications, that was the average across cities and dates.

13   Q.    And in terms of $PM_{2.5}$ levels, you acknowledge, do you

14   not, that more uncertainty exists at the lower end of the

15   $PM_{2.5}$ concentration ranges, correct?

16   A.    That's certainly the case, I think.  You know, the fact

17   that the average values were 17 or 18 obviously implies that

18   roughly half of the population were exposed to levels below

19   that and effects were exhibited below those levels.  So I

20   think we need to look at the range of concentrations in the

21   studies to formulate our opinions about the functions and

22   thresholds, not simply at the average.

23   Q.    But more uncertainty exists at the lower end of the

24   concentration ranges, correct?

25   A.    That's correct.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1  Q.   You're familiar with the National Ambient Air Quality

2  Standard for $PM_{2.5}$ that we discussed a few minutes ago,

3  correct?

4  A.   Yes.

5  Q.   Federal law requires EPA to set a National Ambient Air

6  Quality Standard at a level which in the judgment of the EPA

7  administrator is requisite to protect the public health with

8  an adequate margin of safety, correct?

9  A.   That's correct.

10  Q.   In October 2007, EPA finalized its review of the $PM_{2.5}$

11  National Ambient Air Quality Standards, correct?

12  A.   Correct.

13  Q.   And EPA retained the standard at 15 micrograms per cubic

14  meter, correct?

15  A.   That's correct.

16  Q.   And it did so after reviewing what you referred to as the

17  voluminous 2000-page long criteria document, correct?

18  A.   That's correct.  Although CASAC, the Clean Air Science

19  Advisory Committee, as well as EPA staff had recommended that

20  given the scientific evidence, the standard be lower.  The

21  administrator chose not to follow that guidance.

22  Q.   I had a feeling you'd bring up CASAC.  CASAC's

23  recommendation was that the standard should be set at 13 or 14

24  instead of 15, correct?

25  A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1    Q.    And CASAC informed EPA, "The uncertainties would increase

2    rapidly below an annual level of 13 micrograms per cubic

3    meter," correct?

4    A.    That was their statement, yes.

5    Q.    And all of the counties in North Carolina where you

6    predict premature mortalities to occur because of exposures to

7    $PM_{2.5}$, all hundred counties are projected to have $PM_{2.5}$ levels

8    below 13 micrograms per cubic meter in 2013, correct?

9    A.    That's correct.

10   Q.    In fact, they're all projected to be below 12, aren't

11   they?

12   A.    That's correct.

13   Q.    In fact, 87 of the 100 counties are projected to be below

14   10, correct?

15   A.    That's correct.

16   Q.    So there are a number of sources of uncertainty

17   surrounding your premature mortality opinion in this case,

18   correct?

19   A.    Yes.  As acknowledged, there are clear uncertainties and

20   our estimates represent the best estimates given the available

21   science.

22   Q.    And you consider that in a peer-reviewed journal

23   publication, it would be very important to give quantitative

24   uncertainty bounds or sensitivity calculations, correct?

25   A.    That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.    And here, to do a formal quantitative assessment of

2    uncertainties would require propagation of uncertainties

3    through all the stages of the analysis, correct?

4    A.    Yes.  It depends also, in part, on what level of

5    uncertainty analysis one wishes to conduct.  And I think I

6    alluded to this morning that WHO described different levels of

7    uncertainty analysis for what they would call a Tier III

8    uncertainty analysis which is formal quantitative propagation

9    using Monte Carlo analysis.  The only appropriate way to do it

10   would be to consider uncertainties in each part of the

11   assessment and then to formally combine them rather than in

12   single components of the assessment.

13       I think for other levels of uncertainty analysis, I think

14   for other of the tiers that the WHO had laid out, different

15   forms of quantitative or qualitative uncertainty analysis are

16   justified.

17   Q.    If you would turn back to your deposition which is

18   Exhibit 368.  And I'm on Page 112.

19       Are you with me yet, Dr. Levy?

20   A.    Yes, I am.

21   Q.    On line 8 you were asked -- excuse me, on line 5 you were

22   asked, "Why didn't you include an opinion about the extent of

23   the uncertainty of your numbers in your report?"

24       And your answer was, "We were asked to give an opinion on

25   the most credible estimate of the benefits of emission control

1    so that was the opinion that we had offered.

2         "Question:  Do you consider it important in evaluating

3    that estimate to present the uncertainty that is associated

4    with the estimate?

5         "Answer:  I would consider it in a peer-reviewed journal

6    publication very important to give quantitative uncertainty

7    bounds or sensitivity calculations which, as you can see, we

8    offered up in our previous assessments.  In this case that was

9    not a question that was asked and we presented a qualitative

10   description of the fact that estimates could be larger or

11   smaller since to do a formal quantitative assessment would

12   require propagations of uncertainty through all the stages of

13   the analysis which was beyond the scope of what was within our

14   assessment."

15        Was that your testimony, sir?

16   A.   That was.

17   Q.   And here you have not done a quantitative uncertainty

18   bounds or sensitivity calculations that would be very

19   important to do in a peer-reviewed journal publication,

20   correct?

21   A.   Well, in a peer-reviewed journal publication, part of

22   what we're seeking to do in propagating and then essentially

23   segmenting out uncertainty is to make recommendations for

24   future research directions, and that is something that has

25   been emphasized in a number of our previous publications.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JONATHAN LEVY - CROSS

1    This is a very different context in which we were asked
2    to render our best judgment of what the impacts would be and
3    the benefits would be of reducing the excess emissions from
4    the TVA facilities.  You know, we did describe for PM
5    mortalities the uncertainties and gave the explicit
6    quantitative implications within a boundary calculation to
7    demonstrate some of the possible uncertainties.
8        And I think as, you know, the WHO has emphasized and
9    multiple National Resource Council committees have emphasized,
10   you know, uncertainty analysis at the level that is done
11   within the peer-reviewed literature is not always called for
12   in a decision context.  That just because computers can very
13   readily crank out these complicated uncertainty propagations
14   doesn't mean that helps people make decisions; and that the
15   degree of uncertainty characterization, the level of it and
16   the nature of the information depends on the context of the
17   decision.  And I think that was articulated first probably in
18   the 1994 National Research Council report in the Blue Book and
19   then described by the WHO and many others.
20   Q.   Sir, in this particular case regarding the opinions that
21   you've given in this lawsuit, you did not give quantitative
22   uncertainty bounds or sensitivity calculations of the type
23   that you would consider to be very important to give in a
24   peer-reviewed journal publication; is that correct?
25   A.   That is correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1     MR. LANCASTER:  Your Honor, I'd like to move into

2   evidence Defendant's Exhibits 371, 377, 378, 384, and 374.

3   Sorry about getting out of order there.

4     MR. GOODSTEIN:  Your Honor, these calculations

5   apparently have been put together by counsel for TVA and I'm

6   not sure there's an adequate foundation for these calculations

7   that have been put together by counsel.  Obviously not a

8   qualified expert in this case.

9     MR. LANCASTER:  I believe Dr. Levy confirmed the

10  foundation as we went over them, sir.

11    THE COURT:  All right.  I'll overrule the

12  objections.  I'll let in 371, 377, 378, 384 and 374.

13    (Defendant's Exhibits Numbers 371, 374, 377, 378 and

14  384 were received into evidence.)

15    MR. LANCASTER:  Thank you, Your Honor.  And I have

16  no further questions.

17    MR. GOODSTEIN:  Thank you, Your Honor.  Just some

18  brief --

19    THE COURT:  Redirect.

20    MR. BERNSTEIN:  Brief redirect, Your Honor.

21    THE COURT:  All right.  You may proceed.

22                  REDIRECT EXAMINATION

23  BY MR. GOODSTEIN:

24  Q.   Dr. Levy, you were asked about projections for future

25  ambient $PM_{2.5}$ concentrations in counties in North Carolina.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.    Yes.

2  Q.    The current projections for air quality in the future,

3  would you expect those projections to be based on

4  implementation of the Clean Air Interstate Rule?

5  A.    I would expect that that would be the case given that

6  when the modeling was conducted, it was presumed that CAIR

7  would be promulgated.

8  Q.    So with the vacating of the Clean Air Interstate Rule,

9  those projections are going to have to be revisited for the

10  parts of the country that were forecasting improvements

11  resulting from that rule.

12  A.    That's correct.

13         MR. LANCASTER:  Objection, Your Honor.  This

14  gentleman's expertise is in environmental risk assessment and

15  public health, not in projecting emissions or -- that's it.

16         MR. GOODSTEIN:  I'm just following up on the line of

17  questioning of counsel to this witness, Your Honor.

18         THE COURT:  Overruled.

19  BY MR. GOODSTEIN:

20  Q.    And Dr. Levy, do you use toxicological as well as

21  epdemiological literature in your work?

22  A.    I do, yes.  I think part of being a risk assessor

23  involves evaluating all different streams of evidence as well

24  as relying on other expert panels and folks who do have

25  toxicology degrees to sift through that evidence and determine

1  the plausibility of that evidence.

2  Q.   And does the testimony of Dr. Peden, his medical

3  testimony in this case and his reports, support your

4  conclusions regarding biological plausibility of the health

5  endpoints that you used?

6  A.   Yes, it does.

7  Q.   And can you please tell us about the recent ozone study

8  that was issued by the National Academy and what it indicated

9  regarding current mortality estimates associated with ozone.

10  A.   It indicated -- it was a lengthy report, but I think one

11  of the core conclusions from my perspective is it indicated

12  that impacts from ozone would be anticipated including at

13  levels below the National Ambient Air Quality Standards and

14  that therefore the concentration response functions that had

15  been developed by myself and others would be applicable for

16  health impact assessments.

17         MR. GOODSTEIN:  Thank you, Your Honor.  We have no

18  further questions of Dr. Levy.

19         MR. LANCASTER:  No recross.

20         THE COURT:  All right.  That will conclude your

21  testimony, then, Dr. Levy.  You may be excused.

22         (Witness stepped down.)

23         THE COURT:  All right.  Call your next witness.

24         MR. GOODSTEIN:  Thank you, Your Honor.  North

25  Carolina calls Dr. Leland Deck.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

LELAND DECK - DIRECT

1                    LELAND BENSON DECK,

2   being first duly sworn, was examined and testified as follows:

3              MR. GOODSTEIN:  Your Honor, if I may approach, we

4   have a set of exhibits in a binder for Dr. Deck and for the

5   court.

6              THE COURT:  Yes.

7              (The document was tendered to the court.)

8                    DIRECT EXAMINATION

9   BY MR. GOODSTEIN:

10  Q.   Good afternoon, Dr. Deck.  Can you state your full name

11  for the record, please.

12  A.   Leland Benson Deck.

13  Q.   And what is your current position, Dr. Deck?

14  A.   I am a managing economist with Stratus Consulting,

15  Incorporated.

16  Q.   And I want to refer you to Plaintiff's Exhibit 434 for

17  identification.  And is that a copy of your CV?

18  A.   Yes, that is a copy of my resume as I included in my

19  expert witness report circa 2006.

20  Q.   What is your current responsibilities and duties as an

21  economist -- managing economist at Stratus Consulting?

22  A.   I manage and conduct economic analyses, environmental

23  risk assessment analyses for clients that Stratus Consulting

24  has.  The majority of the work I have been doing is -- has

25  been on behalf of EPA, on behalf of various state and local

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    and regional air quality planning organizations, foreign

2    governments also on air quality planning work.

3    Q.    What is your area of expertise?

4    A.    I -- my expertise is in economic benefit cost analysis,

5    specifically in the application of benefit analysis for air

6    quality policy analysis purposes.  That includes the

7    estimation, quantification and valuation of health effects,

8    nonhealth effects, et cetera, that will come from improving

9    air quality, mainly ozone particulate matter, visibility

10   related issues to that.

11   Q.    And how many years have you been involved in that work?

12   A.    I entered the field in 1981 when I joined the State of

13   Maryland Department of Natural Resources Power Plant Siting

14   Program.  Subsequent to that I completed my Ph.D in

15   Environmental Economics and joined USEPA in 1987.  And have

16   been consistently employed explicitly in air pollution benefit

17   evaluation issues since then.

18   Q.    And what has your role been in this case?

19   A.    I was approached by the state to estimate the economic

20   valuation of the human health effects associated with

21   reductions of the excess emissions from the TVA power plants

22   and to compare the economic valuation benefits with the

23   economic costs that the state had also prepared for that.

24   Q.    And can you summarize your educational background which

25   is listed on Page 1 of your CV, Plaintiff's Exhibit 431, for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    us.

2    A.    Yes.  I have a Bachelor of Science in Geology from

3    Rensselaer Polytechnic Institute, and both a Master's and a

4    Ph.D in Economics from the University of Maryland.

5    Q.    And can you summarize your work experience for us, your

6    professional experience, which is listed in your CV on Pages 1

7    through 4.

8    A.    Yes.  Starting with the State of Maryland, I was working

9    with the state on their periodic report on the environmental

10   and economic impacts of siting new fossil fuel-fired power

11   plants within the state of Maryland.

12        Beginning with the USEPA, I was working on a series of

13   individual regulations, doing economic analysis of those

14   regulations.  While with EPA, those included the setting of

15   the $SO_2$ ambient standards in 1988, 1989.  Those were actually

16   promulgated.  Some individual emission source rules and

17   research on methods of doing economic valuation of air quality

18   impacts.  Those included visibility valuation impacts and

19   valuing mortality.

20        When I left OAQPS as my employer and went into the

21   consulting world, my primary client at that point was still

22   EPA, as well as some other state and local and NGO

23   organizations.  And while there, I did the quantitative

24   economic valuation, in some cases the risk assessment, of a

25   wide variety of air pollution regulations, including the 1997

1    PM NAAQS and the ozone NAAQS at approximately the same time.

2    Did the economic benefit assessment and the risk assessment

3    for two major EPA reports to Congress, known as Section 812

4    reports, referring to a particular section of the 812

5    requiring those reports.  Those are comprehensive benefit cost

6    analyses of the Clean Air Act.  The initial report looked at

7    what the country got out of the first 20 years of the Clean

8    Air Act, 1970-1990.  The second report looked at what is the

9    country currently and soon to get out of the Clean Air Act,

10   all of its sections, based on the on-the-books and on-the-way

11   kind of actions.

12       I am currently still working on the next round of the 812

13   analysis which is continuing that line of comprehensive

14   benefit cost analysis.

15       During that period of time as a consultant for EPA, I did

16   economic risk and benefit analysis for a variety of major

17   regulations, including the NOx SIP Call, the CAIR rule, the

18   Section 126 Interstate Power Plant rule, the NAAQS themselves,

19   various mobile source emission rules, autos, trucks, a variety

20   of things.

21       I also worked for as clients various other organizations.

22   I had done for EPA the risk assessment and economic valuation

23   for a proposed piece of legislation that predated CAIR.  The

24   administration called it the Clear Skies Act.  On behalf of

25   the EPA, I did the legislative analysis similar to a

1   regulatory analysis, but it was for proposed legislation of

2   that.  I was also contacted and asked to do a very similar

3   analysis using the same methods of various alternative bills

4   that were introduced on Capitol Hill at that time so we could

5   do an apples to apples comparison, not only the administration

6   proposal, but one of Senator Carper's proposals, Senator

7   Moynihan's proposal.  There was a series of Senate bills that

8   was Senate proposed bills that people wanted apples to apples

9   analysis of those.

10  Q.   So it's fair to say you've done quite a bit of economic

11  analysis of air pollution control programs?

12  A.   That is what I specialize in, yes.

13  Q.   And when you got your master's and Ph.D in economics,

14  that included focus on environmental economics and valuation

15  of environmental effects.

16  A.   Very much.  My Ph.D in particular is on one of the

17  important methods used in valuing statistical life.  It was a

18  statistical efficiency of the Hedonic Method, and very much

19  working on those valuation issues.  In fact, my dissertation

20  adviser serves on many of the peer review boards that I face.

21  I am very tired of the same professor scoring my work.  She's

22  been doing this for 30 years, but it's the field we were

23  studying at Maryland and that I continue to work in.

24  Q.   And so you continued to do that work as a senior

25  economist with USEPA?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    With EPA and then with Abt Associates and now with

2    Stratus Consulting.

3    Q.    Can you tell us about your development, your role in the

4    development of the BenMAP program for EPA.  Tell us what that

5    is and what your role was in the development of that.

6    A.    BenMAP is an acronym.  It stands for the air quality

7    Benefits Mapping and Analysis Program.

8          I was a principal investigator in developing that model.

9    That was a -- there was a predecessor model known as the

10   Criteria Air Pollution Modeling System.  CAPMS or BenMAP have

11   been used by EPA as the primary tool for their health and

12   economic benefit analysis of air quality rules since

13   approximately 1995.  The only difference between the two

14   models, the algorithm, the basic model which I was the lead

15   developer of in CAPMS is the very same algorithm and model

16   used in BenMAP.

17         EPA decided after the NOx SIP Call that they wanted to

18   make this model available throughout the world, and they asked

19   us to make it a stable -- stable model.  It would be run on

20   any Windows application anywhere in the world.  Make it usable

21   for the United States, but also anywhere in the world by being

22   able to incorporate population data, air quality data, all of

23   the different moving parts you need to do an air quality

24   analysis.

25         EPA now has that model as a publicly downloadable model.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    They support its use, encourage its use.  They offer seminars

2    periodically on how to use it.  EPA has sent teams out around

3    the world to train various individuals on -- you know, anyone

4    that wants.

5        It is a very powerful model.  It is designed to be as

6    user friendly as possible.  That, perhaps, is in the eye of

7    the beholder exactly how user friendly it is.  It's got a lot

8    of different capabilities on handling air quality and

9    population and such to use all of the various permutations and

10   aspects of it.  In total it is not thought of as wildly user

11   friendly, but each piece along the way isn't that bad.

12   Q.   Is the approach incorporated in BenMAP for estimating

13   benefits associated with pollution control programs, is that

14   similar to the approach that North Carolina has used in this

15   case?

16   A.   Yes, it is.  The overall paradigm that Dr. Levy described

17   is of applying health risk assessments and exposures, and

18   population baseline incidents is precisely what BenMAP does.

19   There are many different computer frameworks that can do

20   exactly the same basic kind of thing.  The work that Dr. Levy

21   described he did is exactly the approach BenMAP takes in

22   combining the various sources.

23       BenMAP makes it easy for a user by having already in it a

24   detailed population base of the U.S. and population forecast

25   and incidents rates and a long library of concentration

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   response functions that a user can pick and choose as they

2   wish.  But it's very much the same explicit method.  In fact,

3   many, many of the same materials, the Woods and Poole

4   population forecast.  I mean, it's very similar.

5   Q.   Did SAMI use BenMAP for its health analysis?

6   A.   I was involved with the SAMI process and -- which was a

7   multi-stakeholder process.  The USEPA asked me as part of

8   their activity in SAMI to take the SAMI air quality modeling

9   analyses that had been done and use the then current version

10  of BenMAP.  May have been CAPMS.  It's right at that

11  particular transition in time.  And the EPA -- EPA's choice of

12  concentration response functions, which I believe was ones

13  used for the NOx SIP Call which had just preceded that.  Exact

14  details of which functions are always changing from time to

15  time.  And I did the analysis of the main SAMI scenarios that

16  had been -- had undergone, if you will, the full-blown

17  analysis going through the air quality.  And so EPA submitted

18  into the SAMI process and is very much part of the SAMI record

19  the EPA methods estimation of the health effects and the

20  economic valuation of those health effects.

21       BenMAP and CAPMS do the two sides.  They both quantify

22  health effects and apply economic valuation to those

23  quantified health effects.

24  Q.   And does BenMAP, the way it works, seek the central

25  tendency?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    A.    BenMAP can be used in many ways, but yes, that is a

2    primary purpose of it.  You can use a specific concentration

3    response function, either from the library that is included or

4    you may add your own, which is a big advantage when a new

5    piece of research comes out, what we sometimes call the study

6    of the month comes out, you can immediately put that new

7    result in and use those results.  It does produce the central

8    tendency estimates or using the mean value of those

9    distributions, of that parameter, the risk coefficient

10   parameter.  It can also do a wide variety of uncertainty

11   analyses, meta-analytic type analyses in a number of ways.

12        As I said, it's a powerful program with a lot of

13   different uses.  In all cases, the central tendency or mean

14   value is a very featured output of it that's very -- the

15   output is easy to find because in many cases that's what the

16   user is interested in.

17   Q.    And BenMAP has been published and peer reviewed by the

18   National Academy?

19   A.    It has been throughout its development step by step.  It

20   was peer reviewed by EPA Science Advisory Board.  So the

21   methods that go into it in any number of different aspects,

22   concentration response, exposure, handling of the air quality

23   data, population forecast, each of those steps was reviewed by

24   EPA Science Advisory Board over the course of time, so it was

25   a periodic review.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    The -- in 2002, if I remember right, the NRC published a
2    book Reviewing EPA's Benefit Cost Analysis.  And in that they
3    did four case studies of particular regulations, the PMX and
4    NOx SIP call, one of the mobile source rules -- the fourth one
5    escapes me at the moment, where BenMAP was used as the tool.
6    It was my analysis that EPA used in that so at that point it
7    was reviewed by the NRC.
8        The NRC also just completed, Dr. Levy alluded to it
9    earlier, about the -- in their review of modeling estimating
10   ozone risks, they included a review of EPA's methods for
11   applied risk assessment for ozone, which again, is BenMAP --
12   is using BenMAP as EPA used in the analysis in the national
13   risk assessment and the regulatory impact analysis that they
14   used for the 2008 ozone NAAQS resetting.
15   Q.   Have you done economic analysis of air pollution controls
16   on coal-fired power plants previously?
17   A.   Yes, indeed.  Much of my work throughout has included
18   power plants.  Many of the individual papers and studies in my
19   CV are -- some of them are explicitly coal studies or
20   coal-fired power plant studies.  Others, such as the NAAQS,
21   are studies of regional control plans which control power
22   plants and others.  So there's a range of single plant
23   analyses, collections of plants.  The SAMI study, kind of a
24   region wide study of power plants.  My study for the Great
25   Lakes Air Directors Consortium, which is a regional planning

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  organization of five states surrounding the Great Lakes, was

2  of their power plant control options.

3      There -- actually for the EPA did a -- involved when

4  I was an employee there of a major study of one single power

5  plant in Arizona that's owned and operated by the Salt Lake --

6  by the Salt River Valley Project that owned a generating

7  station that became a well-known power plant control --

8  control study.  I was fortunate to receive a Gold Medal from

9  EPA for my role in that benefit cost analysis of that power

10 plant regulation.  Lots of power plants.

11 Q.   All right.  And your publications are listed at Pages 4

12 to 8 of your CV?

13 A.   Yes, they do.  And those include articles in books,

14 chapters in books, published articles on both methods and

15 applications of the methods of doing this.  And a number of

16 reports done for the government as a contractor or where the

17 government has incorporated in part or wholesale my analyses

18 in their -- in their technical support documents for any of a

19 number of rules, many of which I've mentioned here today.

20 There is also, again, reports for other states, locals, NGO's

21 as well.

22      As this resume is moderately dated in 2006 and I continue

23 to earn a living doing this, there are more projects that I

24 have going on.  A major one I did since the time of this was

25 for the South Coast Air Quality Management District, which is

1   the greater Los Angeles metropolitan area.  I did the health

2   assessment and economic valuation of their future control

3   plans for ozone and PM.  Very similar styled analysis to what

4   we're talking about here.  They ran their quality modeling and

5   they did that analysis.  That analysis is closely tied to the

6   CARB report that Dr. Levy mentioned earlier today.  CARB is an

7   obviously connected regulatory agency to the South Coast.

8   They were very involved in the South Coast methods development

9   as South Coast was in the CARB plan development.  It's not

10  real surprising that South Coast's report last year and CARB's

11  report this year use essentially the same selections of

12  valuation techniques, of concentration response functions as I

13  used in the South Coast.

14  Q.   And you're a member of some professional associations in

15  the field of economic analysis and you're also peer reviewer

16  on a number of publications?

17  A.   Yes, I am.  I'm a member of the American Economics

18  Association, Association of Environmental Resource Economics

19  and Waste Management Association, the Society for Risk

20  Assessment.

21      I routinely do peer reviews for all of the journals out

22  of those four organizations.  Several of them have multiple

23  journals.  I continue to do peer review for the Review of

24  Economics and Statistics where my dissertation got several

25  publications in.  And I was also a peer reviewer for a

1 National Research Council recent book on risk assessment

2 methods.  I was a peer reviewer for that.

3          MR. GOODSTEIN:  Your Honor, we tender Dr. Deck as an

4 expert in economic analysis of air pollution controls.

5          MR. LANCASTER:  And we've reached a stipulation on

6 that, Your Honor.

7          THE COURT:  All right.  Let the record show that the

8 court so holds.

9 BY MR. GOODSTEIN:

10 Q.   Dr. Deck, have you prepared some expert disclosure

11 reports in this case?

12 A.   Yes, I have.  And there have been three reports:  My

13 original expert report, a supplemental expert report and a

14 letter report.

15 Q.   And are they identified at the back of your notebook as

16 Plaintiff's Exhibit 477, 478 and 479?

17 A.   Yes, they are.

18          MR. GOODSTEIN:  Your Honor, at this time we offer

19 477, 478 and 479 into evidence.

20          MR. LANCASTER:  Our only objection are to the

21 portions which value health impacts in the 33 state areas

22 instead of North Carolina.

23          THE COURT:  All right.  Show the objection

24 overruled.  And the court, as has previously been indicated,

25 will review the -- include the surrounding areas, but be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  concerned about the states named.

2         MR. LANCASTER:  Thank you, Your Honor.

3  Q.  Dr. Deck, were you able to estimate the value of the

4  health benefits associated with the emissions reductions on

5  TVA power plants sought by North Carolina in this case?

6  A.  Yes, I was.

7  Q.  And what was your overall conclusion?

8  A.  Using the -- valuing the estimated health effects that

9  Dr. Levy testified to few minutes ago and using the standard

10 current peer-reviewed valuation techniques, I estimated that

11 the aggregate benefits for using the 2000 population are about

12 $9-1/2 billion total; and using the 2013 population, nothing

13 else changes, same air quality, just updating the population

14 which is larger as Dr. Levy did, comes to $10.9 billion.  That

15 is for the single year 2013 air quality emission reductions.

16 Q.  And it's your conclusion that you would expect those

17 types of benefits to accrue for each year that the emissions

18 are reduced from TVA power plants as requested by North

19 Carolina in this case?

20 A.  Yes, I would.  And in fact, going forward in time beyond

21 2013 as the population throughout the region increases, the

22 health effects would increase along with the population and

23 hence the economic valuation of those health effects would

24 also increase year by year merely tracking along with the

25 increasing population.

LELAND DECK - DIRECT

1  Q.   Now, are these values comparable to the economic impact

2  of TVA's emissions today?

3  A.   Yes, they are.  As we previously heard testimony earlier

4  in the week, that the excess emissions from TVA's plants

5  are -- in 2013 are comparable to the 20 -- to the current

6  excess emissions in, say, 2006 and the health effects would be

7  comparable then to those excess emissions; and finally, the

8  valuations would be comparable to 2006, the aggregate value in

9  2006 would be comparable to what I estimated in 2013.

10 Q.   And did you also compare these benefits that you've

11 estimated to the cost of the emissions controls and the

12 emissions reductions sought by North Carolina in this case on

13 a yearly basis?

14 A.   Yes, I did.  I used the -- I took the cost estimates,

15 actually three different cost estimates that the state

16 provided me from Dr. Staudt.  And because those cost estimates

17 included both a capital component, the upfront investment cost

18 to install all the equipment, and the operating and

19 maintenance costs, the annual flow, I had, using standard

20 economic techniques, to convert those into an annualized

21 basis.  So it's effectively one year total costs of operating

22 the plants -- the control equipment, so I could compare that

23 with the one year benefits to put it on an apples to apples

24 comparison.

25 Q.   And what was your overall conclusion regarding the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  benefit cost ratio associated with the emissions reductions

2  from TVA power plants sought by North Carolina in this case?

3  A.   Using a single cost estimate just for simplicity here and

4  not get lost in numbers, where the $4.2 billion cost --

5  investment cost, that comes out to $638 million annualized

6  costs.  Comparing that to the benefits throughout the region

7  of $9-1/2 billion versus $638 million costs, it's

8  approximately a 15 to 1 ratio.  Benefits were 15 times the

9  overall -- 15 times the costs.

10      Looking at just the benefits in North Carolina, using the

11  health effects from just North Carolina that Dr. Levy

12  presented, that benefit cost ratio comes out to be 1.05.  So

13  the benefits in North Carolina alone covered the costs.

14      And there's certainly information for each -- each state

15  and you can run all the permutations about, you know, what the

16  benefit cost ratios would be, including any combination of

17  states that you're interested in.  I do present benefits by

18  state throughout allowing you to do it any way you want to.

19  Q.   All right.  And what method did you use to calculate the

20  monetary value of the benefits to North Carolina in the region

21  of the emission reductions for TVA plants sought by North

22  Carolina?

23  A.   The overall approach is called a damage function

24  approach.  We've been using this -- Dr. Levy was using this

25  also.  You look at the benefits piece by piece for each health

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  endpoint.  And in concept you would go on and then look at

2  each category of nonhealth effects.  And so piece by piece and

3  then you add up the sums.  That's called a damage function

4  approach.

5      So for each of the health endpoints that Dr. Levy

6  estimated, I used a valuation technique that comes down --

7  that's really what's called a unit value.  A value for each of

8  those hospital admissions, for each of those premature

9  mortalities, school absence, and just for each and every one

10  of those health effects there is a method and -- that comes up

11  with a unit value for each of those health effects.

12      Then at the end it becomes sort of simple multiplication

13  of a value for health effect times the number of health

14  effects is the aggregate value of that health effect and then

15  you sum across the health effects.

16  Q.  Did you prepare a summary of the unit values that you

17  used for each of the health effects that you monetized?

18  A.  Yes, I did.

19  Q.  And can I refer you, please, to Plaintiff's Exhibit 383

20  for identification.

21  A.  Yes, that is --

22  Q.  Can you identify that for us, please.

23  A.  Yes.  This is a table that this information appears in a

24  table in my expert report.  These are the unit values for each

25  of the health effects that Dr. Levy testified to previously.

1  Q.   And can you describe what this summary shows.

2  A.   Yes, indeed.  There's a lot going on here.  There's a

3  separate story, if you will, separate method for each of

4  the -- each of the line items.  Clearly the mortality one is

5  perhaps the most important.  It dominates the aggregate

6  benefits.

7       What an economist -- so these are showing the initial

8  point is a 5-1/2 -- $5.5 million number used for adults and

9  infants.  I'll probably be talking about this value a good bit

10 and I want to point out that the $5-1/2 million is measured in

11 1990 incomes and 1999 prices.  It can get confusing as we

12 adjust for -- as income changes and the inflation goes on, but

13 for -- as we see here, going from the column with 5-1/2

14 million, just adjusting it for the inflation that's going on

15 between then and 2006 as well as real income growth, not just

16 prices going up, but real income growth, that $5-1/2 million

17 base price, if you will, base value, goes to $7.25 million.

18      The income -- the price adjustment is very

19 straightforward.  It's using the consumer price index such as

20 social security uses to adjust -- I mean, it's a very commonly

21 used inflation.

22      As real income goes up, though, as human beings our

23 demand for things we want goes up.  As we become wealthier as

24 a nation in real terms, we want more healthcare.  We want more

25 education.  We're willing to pay more for protection against

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  risks.  So there is an established method where as income goes

2  up, values or demand goes up.  Not on a one-to-one basis.

3  Income goes up 1 percent; demand goes up at a slower rate, but

4  it does go up.  Combination of those two get us to

5  $7.25 million as a value of statistical life.  That is what's

6  used for both infant and adult premature mortality.

7      There is a wrinkle on the adult premature mortality.  The

8  air pollution from a single year is modeled to cause premature

9  mortality.  EPA has developed an explicit assumption that

10  although the one year's emission reductions cause premature

11  mortalities, they don't all occur in exactly that year.  The

12  majority of them, say half of them occur within a one year

13  period, but then the rest kind of stretch out over a period of

14  time.  Most in one year, I think it's 3/4 or 80 percent total

15  within the first five years and then a long tail still

16  associated with that one year emission reduction.

17      To an economist, events still coming on at different

18  points in time, we are an impatient species.  We would rather

19  have things now than later, so those mortalities that are

20  manifesting themselves 20 years after are worth -- our

21  willingness to pay for them is slightly less than it is up

22  front.  Therefore, that is called the lag structure of adult

23  premature mortality stretching out over 20 years ends up with

24  a net effect of the unit values for adult premature mortality

25  of 6.5, 6.6 million dollars only because of that PM lag

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   effect.

2   Q.   All right.   And you used the EPA unit values for these

3   various health inputs?

4   A.   Yes, indeed.   What an economist would like to value in

5   general -- this is not a value of a life as is often used in

6   certain courtroom situations.   In a common courtroom situation

7   you're talking about after someone has died, talking about the

8   damages, perhaps an economic value for that particular

9   individual.   That's an after-the-fact valuation.

10      We are talking here about before-the-fact risk

11  reductions, ex-ante reductions.   There is a large body of

12  economic research that has gone on in that.   There are

13  literally hundreds of studies of what the value of the risk

14  reduction is.   That's the real underlying question here.   What

15  are people willing to pay to reduce the risk of dying.

16      The $5-1/2 million really comes out of the consensus of

17  all of the literature is that for a small change in risk of

18  mortality, for a small one in -- let's say a one in a million

19  reduction in the risk, economic research has found the central

20  estimate is people will pay about $5-1/2 for that.   There

21  is -- and if a million people are exposed to that -- or enjoy

22  that opportunity, a million people with a one in a million

23  risk, that's one statistical life, and that million people

24  would have each offered to pay or would have paid $5-1/2 and

25  now it comes up to $5-1/2 million for the one statistical

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   life.

2       EPA actually now follows OMB guidance on what the value

3   of statistical life to use is.  That guidance is a range of

4   1 million to 10 million dollars.  That's OMB's 2003 guidance.

5   $5-1/2 million is the central -- it's the midpoint of that 1

6   to 10 million dollar range.

7       There's a lot of peer reviews going on since then, but,

8   yes, this is OMB's guidance as EPA applies it and the rest is

9   just a unit -- you know, the 2006 prices in incomes

10  adjustments off of that -- off that current government

11  guidance.

12  Q.   And you discussed the lag structure associated with adult

13  premature mortality.

14          THE COURT:  I think we'll stop now for lunch, Dr.

15  Deck.  We'll come back and take up at that point.  2:30.

16          (Lunch recess at 1:17 p.m.)

17  UNITED STATES DISTRICT COURT

18  WESTERN DISTRICT OF NORTH CAROLINA

19  <u>CERTIFICATE OF REPORTER</u>

20          I certify that the foregoing transcript is a true

21  and correct transcript from the record of proceedings in the

22  above-entitled matter.

23          Dated this 18th day of July, 2008.

24                          s/Cheryl A. Nuccio
                            Cheryl A. Nuccio, RMR-CRR
25                          Official Court Reporter


        Cheryl A. Nuccio, RMR-CRR (704)350-7494