UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | |
| ex rel. Roy Cooper, | ) | |
| Attorney General, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:06-CV-20 |
| | ) | |
| vs. | ) | VOLUME 7B |
| | ) | (Pages 1712-1808) |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 22nd, 2008

APPEARANCES:

On Behalf of the Plaintiff:

>       JAMES C. GULICK, Senior Deputy Attorney General
>       MARC BERNSTEIN, Special Deputy Attorney General
>       North Carolina Department of Justice
>       114 West Edenton Street
>       Raleigh, North Carolina
>
>       MICHAEL D. GOODSTEIN, Esquire
>       ANNE E. LYNCH, Esquire
>       Resolution Law Group, P.C.
>       5335 Wisconsin Avenue NW, Suite 360
>       Washington, DC

On Behalf of the Defendant:

>       FRANK H. LANCASTER, Senior Attorney
>       HARRIET A. COOPER, Assistant General Counsel
>       THOMAS F. FINE, Assistant General Counsel
>       MARIA V. GILLEN, Assistant General Counsel
>       Tennessee Valley Authority
>       400 West Summit Hill Drive
>       Knoxville, Tennessee

>        Cheryl A. Nuccio, RMR-CRR, Official Court Reporter

1    <u>I N D E X</u>

2                                                            <u>PAGE</u>

3    <u>PLAINTIFF'S WITNESSES</u>

4    <u>SUSAN TIERNEY</u>
          Cross Examination by Ms. Gillen...............    1714
5
     <u>LYNN MINGES</u>
6         Direct Examination by Mr. Gulick..............    1736
          Cross Examination by Ms. Gillen...............    1745
7
     <u>WHITENER HARRIS PREVOST</u>
8         Direct Examination by Mr. Gulick..............    1755

9    <u>WILLIAM ROSS</u>
          Direct Examination by Mr. Gulick..............    1771
10        Cross Examination by Ms. Cooper...............    1780
          Redirect Examination by Mr. Gulick...........    1803
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

1           I N D E X   O F   E X H I B I T S

2

3                                            OFFERED  RECEIVED

4    PLAINTIFF'S EXHIBITS

5    No. 244.................................    1771      1771
     No. 247-249.............................    1771      1771
6    No. 249A................................    1771      1771
     No. 250-251.............................    1771      1771
7    No. 253.................................    1771      1771
     No. 285.................................    1754      1755
8    No. 443-453.............................    1807      1807

9

10   DEFENDANT'S EXHIBITS

11   No. 24-25...............................    1784      1784
     No. 27..................................    1784      1784
12   No. 30..................................    1784      1784
     No. 33..................................    1784      1784
13   No. 40..................................    1799      1799
     No. 48..................................    1790      1790
14   No. 51..................................    1790      1790
     No. 54..................................    1794      1794
15   No. 55-56...............................    1803      1803
     No. 66..................................    1801      1801
16   No. 72..................................    1794      1794
     No. 475-76..............................    1754      1754
17   No. 479-81..............................    1754      1754
     No. 500.................................    1754      1754
18   No. 502.................................    1754      1754

19

20

21

22

23

24

25

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  <u>TUESDAY AFTERNOON, JULY 22, 2008</u>

2         THE COURT:  All right.  We're ready to proceed with

3  cross examination.  Mr. Fine.

4         MR. FINE:  Yes, Your Honor.  Thank you.

5                       <u>SUSAN TIERNEY</u>

6                     CROSS EXAMINATION

7  BY MR. FINE:

8  Q.   Good afternoon, Dr. Tierney.

9  A.   Good afternoon.

10 Q.   At some point, Dr. Tierney, I need to have a conversation

11 with you off the record about moving from art history to

12 regional planning, but we'll leave that for another day.

13 A.   I think everyone will be happy if you do.

14 Q.   Let's keep everybody happy.

15        I would note that, however, amongst your other

16 accomplishments, I did not note that you were trained as an

17 accountant.

18 A.   You are correct.  I am not trained as an accountant.  I

19 have been familiar with many accounting documents.  I am not

20 an accountant.

21 Q.   So obviously, you would not be a certified public

22 accountant.

23 A.   Not in any jurisdiction I know.

24 Q.   All right, ma'am.  Thank you.

25        Let's take a moment to discuss something that

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 4 of 97

SUSAN TIERNEY - CROSS

1  Mr. Goodstein covered in your direct testimony concerning the
2  TVA debt ceiling.  I think everyone agrees and, of course,
3  it's clear in the statute that that's a $30 billion debt
4  ceiling, correct?
5  A.    Yes.
6  Q.    And that is set by Section 15(d) of the TVA Act.
7  A.    I will trust that representation.  I don't have it
8  committed to memory.
9  Q.    But you did -- have read the TVA Act, if I recall your
10 testimony.
11 A.    Yes.
12 Q.    And you would recall that one of the provisions of
13 Section 15(d) of the TVA act gives some authority to the
14 Secretary of the Treasury over TVA's debt issuances.
15 A.    Yes, I do recall that.
16 Q.    And in fact, the Secretary of the Treasury is allowed
17 to -- has to give his or her approval as to the time of
18 issuance and the maximum rates of interest to be borne by the
19 bonds.
20 A.    It has been some time since I read it, but I trust that
21 you just read that from the statute.
22 Q.    So in effect, in order for TVA to issue a bond, it has to
23 do so with the approval of the Secretary of the Treasury.
24 A.    Understood.
25 Q.    And I think as, at least at one point in time, a member

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    of the -- the executive of the Department of Energy, you would

2    agree with me that the Department of the Treasury and the

3    Secretary of the Treasury would listen to the Office of

4    Management and Budget.

5    A.    Yes.

6    Q.    So --

7    A.    Depends upon the topic, of course.

8    Q.    At least they'd have to pay close attention.

9    A.    Agreed.

10   Q.    All right.  And so the Office of Management and Budget's

11   views on what amounts of debt or debt-like obligations are to

12   be included under the TVA debt ceiling, that would be of

13   substantial weight to the Secretary of the Treasury, would it

14   not?

15   A.    I can't tell you that because I have not served in the

16   secretary's office in the treasury so I don't know what kind

17   of weight he would afford to OMB on that matter, as opposed to

18   accorded to TVA.

19   Q.    But if you'll just track me along for a moment.

20        And if the Secretary of the Treasury pays close attention

21   to the Office of Management and Budget on that, on that topic,

22   then OMB's views as to what should be included within the TVA

23   debt ceiling could have a substantial practical effect on

24   TVA's ability to issue bond and indebtedness?

25   A.    Is this a hypothetical?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Yes.

2  A.   Okay, yes.

3  Q.   So you would -- just so that it's clear in the record, we

4  have a lot of yeses running around there.  If my hypothetical

5  stands the test, then in your view, the OMB's views on the

6  sums to be included within the debt ceiling would have a

7  practical impact on TVA's ability to issue a bond.

8  A.   I think you said could originally and -- in the first

9  question.  In other words, that if OMB were to have that point

10 of view, it could have that weight on the secretary's opinion.

11 So in that hypothetical I agreed with that.

12 Q.   All right, ma'am.  Thank you.

13      Dr. Tierney, do you still have the notebook that counsel

14 for plaintiff provided you with your exhibits in it?

15 A.   Yes.

16 Q.   If I could direct your attention for a moment to

17 Plaintiff's Exhibit 405.

18 A.   Yes.

19 Q.   There are a couple of questions I have regarding

20 Plaintiff's Exhibit 405.

21      Now, if I understood your testimony, this, if you will,

22 projection was based on Dr. Staudt's initial estimate of

23 $3 billion.

24 A.   Yes, Exhibit 405 is based on 3 billion.

25 Q.   And this is not one of the exhibits that you redid to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  reflect the TVA estimate of 5 billion.

2  A.    I did redo it as an input to the Exhibit 400 because I

3  had to have those numbers to have calculated the rate impact

4  that appears in Exhibit 400.

5  Q.    So it is -- in effect, that redo is incorporated in

6  Plaintiff's Exhibit 400.

7  A.    Yes, it is.

8  Q.    But you did not independently run out a separate exhibit

9  along the lines of Plaintiff's Exhibit 405 for the $5 billion

10  estimate.

11  A.    Actually, I can't say that I didn't do that.  As I say, I

12  would be surprised that I didn't actually see what it looked

13  like.  But I had to have had the numbers in order to do 400.

14  Q.    But that's certainly not one of the exhibits you

15  presented to us today.

16  A.    That's correct.

17  Q.    All right.  And at the time that Dr. Staudt gave you his

18  $3 billion estimate, I would be correct in stating that he did

19  not tell you that his $3 billion estimate was actually a

20  number in a range of numbers.

21  A.    To the best of my recollection, there was some discussion

22  of range, but the result of that was he said that I should

23  rely on $3 billion for the purposes of analyzing both a

24  funding and rate impact.

25  Q.    And just so that it's clear in the record, if I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  understood your testimony, you relied on Dr. Staudt for the

2  projected capital costs of North Carolina's requested

3  controls.

4  A.    Yes, for the initial estimate and then I relied on TVA

5  for the subsequent estimate of 5 billion and its implications

6  for financing and impacts.

7  Q.    And also, you relied on Dr. Staudt for the estimate of

8  the operating costs for -- associated with North Carolina's

9  proposed remedy.

10  A.    Yes.

11  Q.    So would it be fair to say that you did not do your own

12  analysis of the costs, the capital costs and operating costs?

13  A.    I did not independently estimate the O and M costs nor

14  capital costs.

15  Q.    Just coming back to Plaintiff's Exhibit 405, the question

16  I've got is if -- you start with a calculation, if you will,

17  with the caldendar year 2008, correct?

18  A.    Yes.

19  Q.    And unless I badly missed my guess, we're about already

20  more than halfway through 2008.  I think you would agree with

21  me, wouldn't you?

22  A.    Yes.  I guess we're a couple days past halfway through.

23  Q.    And that would have some impact on not just the

24  calculation you have in Plaintiff's Exhibit 405, but in some

25  of your other exhibits as well.  We're no longer talking about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

SUSAN TIERNEY - CROSS

1  a five-year period; we're actually talking about a
2  four-and-a-half-year period.
3  A.    Yes.  There are a lot of ways in which there are, what I
4  will call in the end, not material changes in my exhibits.
5  And by that I mean they don't -- the changes in rate levels
6  for TVA, the changes in TVA's cost of capital which has gone
7  down, as well as a shorter period for construction of the
8  project.  There are a number of ways in which there are minor
9  changes which at the end of the day would not change the
10 overall implications of my opinion that the proposed
11 construction program for pollution control is both feasible
12 and reasonable.
13 Q.    From a financial standpoint.
14 A.    From a financial standpoint, yes.
15 Q.    And just so that's clear, we're not talking about the --
16 whether these additional controls can be actually constructed
17 and put into operation within a four-and-a-half-year time
18 window.
19 A.    I'm not testifying on those issues.
20 Q.    Great.  Thank you.  One other question I have in
21 relationship to Plaintiff's Exhibit 405, Dr. Tierney.  Please
22 correct me if I misremember this.  But I believe that you said
23 that you relied on Dr. Staudt for a 30-year useful life for
24 the pollution control equipment.
25 A.    I think I said that, yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Okay.

2  A.   Did I misremember that?  But I think so.

3  Q.   Well, that's what I recall, Dr. Tierney, and I'm sure the

4  record will reflect.

5       Dr. Tierney, based on your experience, isn't there an

6  issue with a 30-year useful life for a piece of pollution

7  control equipment on a plant, adding that to a plant which may

8  itself no longer have a 30-year useful life?

9  A.   Again, is this a hypothetical?

10 Q.   Yes.

11 A.   I don't know -- as a general proposition, if you're

12 adding plant on to something that shuts down before the useful

13 life of the add on, yes, then you would have some salvage

14 value or some other thing at the end of the period where there

15 is some undepreciated life for the plant that were added.

16      So that's a very general, hypothetical proposition that

17 I'm saying.  I don't know anything about the extension of life

18 of the plants that we have here.  This was based on

19 Dr. Staudt's assumption to use in that regard.  And I know

20 that there are multiple things that are done for life

21 extension or shortening of life that might actually affect the

22 overall investment dollars, the number of scrubbers or

23 anything else that would be put on.

24 Q.   I think I understood what you just said, but let me --

25 let me test that out with your assistance.  So that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  recognize there is a possibility that you could put on a piece
2  of pollution control equipment on a plant and the plant on
3  which that pollution control equipment is retired at some
4  point before the -- Dr. Staudt's 30-year useful life of the
5  pollution control equipment would have actually run.
6  A.   Yes, I think that is potentially possible, just as I
7  think it is potentially possible that the pollution control
8  equipment could actually have a longer life depending upon the
9  underlying life of the power plant.  And since I don't know
10  what the underlying life of the power plant, it could be
11  shorter or longer, either one.
12  Q.   Thank you, ma'am.
13       You had some testimony concerning what -- a topic near
14  and dear to us as the Tennessee Valley Authority, the TVA
15  fence.
16  A.   Yes, I know that's near and dear to TVA.
17  Q.   It's a part of our life and ever since the self-financing
18  amendment was passed in the '50s.
19       I think, though, I think I heard some of your experience
20  with utilities other than the Tennessee Valley Authority creep
21  into some of your answers.  You referred to the service area
22  provided -- that TVA serves with electric power as a franchise
23  area.  And I'd be correct in saying it really isn't a
24  franchise, is it?
25  A.   I think I used that with a small "F" franchise when I was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  setting out how I was using the term.  I didn't say that this
2  was a legal, chartered franchise because states vary all over
3  the sun around what a franchise literally means for utilities.
4  So I used it conceptually to describe a service territory
5  footprint, and in that concept I believe it would be
6  appropriate to call that a franchise.
7  Q.   But you did not mean to use the term franchise as any
8  form of a guaranteed service area for the Tennessee Valley
9  Authority.
10 A.   No, nor would I use that phrase as a guarantee in a
11 service territory of a local Duke Power where an industrial
12 customer could self-generate.  There is a franchise, there is
13 a service territory, and it is not a guarantee, but there is
14 certain enormous protections for sales of electricity for
15 whatever the utility service is for the franchisee or the
16 utility.
17 Q.   And so in this instance, while we're talking about TVA
18 service area, it's not a 100 percent -- let me back up and try
19 that again.
20       The combination of the fence as provided in the TVA Act
21 with the anti-cherry picking amendment from the Federal Power
22 Act is not a 100 percent guarantee of TVA's service territory,
23 is it?
24 A.   It is not a 100 percent guarantee.  It is a very strong
25 bar added to a very strong economic impediment.  And as I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   described in my report, were a distribution utility to decide

2   that it wanted to buy from someone else and exercise what

3   you're talking about, which is it is not protected a hundred

4   percent, the Tennessee Valley Authority is not protected a

5   hundred percent, that local distributor would have to either

6   bill transmission at a cost and compare that cost of billing

7   transmission and getting out of TVA against the TVA service

8   price, or be on the border and get some connection from

9   outside at a cost.

10      So there are a lot of economic impediments that are added

11  to these legal anti-cherry picking and fence provisions that

12  provide very strong protections that TVA describes to its

13  investors about its service territory.

14  Q.   Well, of course, the anti-cherry picking amendment, as I

15  believe you've already testified to, basically allows TVA to

16  deny an outside power source transmission facilities into the

17  current TVA service area.

18  A.   That's my understanding, right.

19  Q.   Let's focus for a moment, if you will, on the borders of

20  the TVA service area.  And I would be correct in stating that

21  TVA has some fairly large customers located on the borders of

22  the service area, am I not?

23  A.   I have not studied the exact population of the towns of

24  the distribution utilities along the border.

25  Q.   Well, you would agree with me, would you not, that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Memphis, Tennessee, is a large city?
2  A.   Yes, Memphis, Tennessee, is one of those that left and
3  came back.
4  Q.   And because of its location on the border, theoretically
5  could leave again.
6  A.   It could leave again in theory.  And in practice, it
7  built its own power plant.  It turned it off and came back.
8  So yes, in theory it could.
9  Q.   Actually, just for the sake of the accuracy of the
10  record, that is the TVA's Allen plant.
11       And in the same light, Chattanooga, Tennessee, is on the
12  border of the TVA service area, is it not?
13  A.   Yes.
14  Q.   So in theory, Chattanooga, Tennessee, could leave TVA's
15  service.
16  A.   Yes, it could in theory do that.
17  Q.   And I think you would also agree with me, based on your
18  study of the TVA public submissions, that if this -- that
19  some -- that there are different terms of contract that govern
20  the TVA distributors, correct?
21  A.   That's right.  There are some that are five, some that
22  are ten, and I think maybe even something longer than that.
23  Q.   And you would agree with me that looking at the
24  five-year-term contracts, that that represents distributors
25  representing over 50 percent of TVA's operating revenues.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   I would agree that potentially that's the case when you

2   take all of TVA's distributors into account, those inside the

3   core area as well as those on the borders.  So I still think

4   that that represents a group that is not likely to move in

5   light of the economic impediments that I described previously.

6   Q.   Dr. Tierney, if I could ask you to look at Plaintiff's

7   Exhibit 410.  It's towards the front of your book.  The

8   numbers, of course, are not in numerical order.  They are in

9   the order that you were examined about them.

10  A.   I have it.

11  Q.   All right.  And I believe that this is a -- the TVA form

12  10-K filed with the Securities and Exchange Commission for the

13  period of time ending September 30th of 2007.

14  A.   Yes.

15  Q.   And if I remember my terminology correctly, this is an

16  annual report that TVA is required to file with the Securities

17  and Exchange Commission.

18  A.   It's a new annual report that TVA is required to file at

19  the SEC.

20  Q.   That -- as you say, that's a new statutory requirement,

21  or relatively new.

22  A.   Yes.

23  Q.   And if I'm correct, in looking at the first page of this

24  document, you obtained this document or North Carolina

25  obtained this document from the EDGAR Online service, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

SUSAN TIERNEY - CROSS

1   A.   I read that as well.

2   Q.   And EDGAR is the service that's available for, I guess,

3   general public access to reports, public reports that are

4   filed with the Securities and Exchange Commission.

5   A.   As a general proposition, yes.

6   Q.   And that TVA's reports are available on EDGAR.

7   A.   Yes.  Well, actually, that was a very broad question.

8   I'm aware that this report is available on EDGAR.  There are

9   many reports of the TVA that are not on EDGAR.

10  Q.   I -- you are quite correct to point that out to me and I

11  apologize for the overbreadth of the question.  Let me focus

12  on the TVA reports.  Particularly there's the 10-K which we've

13  been talking about.  There is also a 10-Q, is there not?

14  A.   Yes.

15  Q.   And in fact, that is a quarterly report.

16  A.   Yes.  These are all relatively recent reports that don't

17  go back very far in history.  In other words, they've only

18  been filed, if I recall, for maybe a year and a half.

19  Q.   But TVA is also required to file 10-Qs.

20  A.   Yes, that's correct.

21  Q.   And those 10-Qs would themselves be publicly available

22  through the EDGAR system, correct?

23  A.   Yes.

24  Q.   And you've had occasion to view the 10-Q that TVA filed

25  for the quarter ending March 31st of 2008?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

SUSAN TIERNEY - CROSS

1    A.    I don't recall.  I may have, I don't recall.

2    Q.    Would you recall that in the 10-Q that TVA filed for

3    March 31st of 2008, that the TVA's statutory debt, is how TVA

4    views it, both long-term and short-term was some $23 billion?

5    A.    I don't recall that that's the case.  Do you have the

6    document?  I mean, you don't have to pull it up, but I don't

7    recall that that's the case.

8    Q.    But you have no reason to disagree with that number, do

9    you?

10   A.    I recently tried to see what the statutory debt looked

11   like.  It looks around that and it looks like it's a mixture

12   of different long-term and short-term debt than I assumed in

13   my study.  Lower short-term debt, slightly higher long-term

14   debt.

15   Q.    All right.

16   A.    In the early years.  In other words, right now.

17   Q.    And in terms of the total of the debt plus the debt like

18   obligations that you were talking about in your direct

19   examination, you'd have no basis to disagree with saying that

20   that number as of March 31st was some $25 billion?

21   A.    That I don't recall seeing.

22   Q.    Let's turn, if we can, to the Plaintiff's Exhibits 397

23   and 398.  And you'll have to give me a moment because I'm

24   playing fumble finger here.

25          Do you have those in front of you, ma'am?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.  Yes, I do.

2  Q.  And as my parents used to tell me with financial

3  documents, to look at the fine print.

4  A.  Yes.

5  Q.  And you see the fine print at the bottom of your chart.

6  Would you please read that language for us.  It says "Note."

7  A.  Yes.  This is explaining --

8  Q.  Just read the language.

9  A.  Just read it.  "Note" --

10  Q.  -- for the moment.

11  A.  "This exhibit does not reflect possible future debt other

12  than estimates of costs associated with the proposed remedy

13  and the assumed level of short-term discount notes going

14  forward."

15  Q.  And as I believe is clear from your report, what that

16  means is that this chart does not include the other capital

17  needs that TVA will have going forward with its power system;

18  is that correct?

19  A.  That's correct.  And I described that, that I would

20  expect that TVA will enter into new -- refinancing, new

21  infrastructure investment, and a variety of other things in

22  order to satisfy its obligations to serve customers; and I

23  would expect those things to happen in a way that TVA has

24  consistently managed its financial portfolio under its

25  statutory requirements.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Just so that it's clear in the record, we're talking

2  about such things as new generation capacity.

3  A.   That's what I described earlier, included that, yes.

4  Q.   And transmission system expansion and improvements.

5  A.   Yes, it does include that, as well as pollution control

6  equipment, all of which are required for reliable service.

7  Q.   And existing plant maintenance.

8  A.   Yes, that's correct.

9  Q.   And debt refinancing.

10  A.   That's correct.  I assumed all of those when I reached

11  the conclusion that TVA would be able to manage capably its

12  entire requirements for reliable cost -- low cost electricity

13  to its consumers consistent with all required obligations that

14  are imposed on the utility.

15  Q.   But those additional capital needs are -- you'll agree

16  with me that those additional capital needs are not reflected

17  on this chart showing the, what you call the head room between

18  the debt amounts listed here and the maximum amount of

19  statutory debt.

20  A.   That's right, they're not included on this because TVA

21  will have to decide exactly the profile it will use to manage

22  its debt, its expenditures for operating the system, its

23  obligations for making new investment for power plants and

24  transmission and live within 30 billion and set rates to cover

25  costs.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.    And you provided the same information in response to

2    similar questions to Plaintiff's Exhibit 398, correct?

3    A.    Yes.

4    Q.    Dr. Tierney, you'll acknowledge that you do not know what

5    the North Carolina General Assembly concern considered in

6    terms of rate impacts when it considered the Clean Smokestacks

7    Act.

8    A.    I was asked about this previously and at the time I did

9    not know, but I understand that the general assembly was

10   concerned about rate impacts when it considered the Clean

11   Smokestacks Act.

12   Q.    And you will agree that the TVA Act itself requires that

13   TVA fix its rates as low as feasible?

14   A.    Absolutely.  I had the word feasible in mind when I

15   concluded as I did that the proposed pollution control program

16   was feasible financially and reasonable.

17   Q.    Let me direct your attention to Plaintiff's Exhibit 399

18   and Plaintiff's Exhibit 400.

19   A.    Yes.

20   Q.    And working backwards, let's look at Plaintiff's Exhibit

21   400 first of all.

22         I don't recall hearing you say what the percentage of the

23   rate increase would be that's maximum in Plaintiff's Exhibit

24   400.  I think you set out a dollar amount for a typical

25   consumer.  What was the percentage of rate increase that was

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 21 of 97

1 at the maximum in Plaintiff's Exhibit 400?

2 A.    Based on my analysis which compared 2013 to 2005, I

3 estimated that it would be a 5.6 percent increase.  And again,

4 I indicated that since then, since 2005, in other words, TVA's

5 rate has actually gone up and therefore, in fact, it will be a

6 lower increase were this program to be ordered by the court

7 and implemented at these costs.

8 Q.    Of course, Plaintiff's Exhibit 399 reflects it as if it

9 was under Dr. Staudt's $3 billion estimate, correct?

10 A.    Yes.

11 Q.    And Plaintiff's Exhibit 400 is if you accepted TVA's

12 estimate of $5 billion, correct?

13 A.    Yes.  Excuse me, yes.

14 Q.    But I'm correct in saying that even under Plaintiff's

15 Exhibit 399, you were projecting that the additional controls

16 requested by North Carolina in this case would require a rate

17 increase.

18 A.    Oh, no, I did not say that.  What I said was were one to

19 look at an incremental impact, there could be an incremental

20 impact of this amount.  The reason I distinguish that position

21 and a rate increase is only the board can decide what rate

22 increase to do.  They may decide to have a very different

23 pattern of expenditures than I've assumed here.  There could

24 be a rate decrease, all else equal, that will keep rates

25 level.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      So if you're saying what -- that -- what I'm explaining

2  is this is an incremental impact.  It does not tell you that

3  there is a rate increase.

4  Q.   Dr. Tierney, just to look at the heading on Plaintiff's

5  Exhibit 399, it reads, Estimated Impact of the Proposed Remedy

6  on TVA rates, correct?

7  A.   Yes.

8  Q.   And this shows an increase in TVA rates, does it not?

9  A.   All else equal, relative to the 2005 TVA rate, there

10  would be an increase on the order of magnitude that I

11  described.  But in fact, the expectation about whether there

12  is or is not an actual rate increase will be a matter of an

13  enormous number of decisions of how the board and management

14  were to decide how to implement this program and actually

15  implement it.  So I'm looking at the incremental impact

16  relative to 2005.

17  Q.   Dr. Tierney, I believe you have your expert reports there

18  with you, again, in part of your binder.

19  A.   Yes.

20  Q.   And I direct your attention to what's been introduced

21  into evidence as Plaintiff's Exhibit 481.

22  A.   Yes.

23  Q.   And if you could look at Page 8 of Plaintiff's Exhibit

24  481.

25      Are you with me on page 8?

1   A.   Yes, I am.

2   Q.   And I'm looking at paragraph (g).  Are you with me there?

3   A.   Yes, I am.

4   Q.   And isn't it true that you said in your report,

5   "Presumably, therefore, if the proposed remedy is imposed on

6   TVA and TVA complies with the court order by, among other

7   things, financing necessary capital improvements and operating

8   expenditures, then TVA will need to raise rates to cover the

9   cost of the pollution reduction measures, of the money

10  borrowed to pay for it and of the annual expenses needed to

11  operate the measures."

12  A.   Yes.

13  Q.   Do you recall that you said that in your report?

14  A.   I do, but I'm not drawing a distinction between this

15  language which says all else equal, if nothing else happens,

16  then you would raise rates.  But TVA will actually decide how

17  to do that as it goes forward.  If TVA were about to do a rate

18  decrease as TVA has done at times, it might mean that TVA kept

19  rates flat.

20       So I'm simply saying that there will be a cost impact to

21  TVA.  I'm not doubting that fact.  Whether there is literally

22  a rate increase at the time is what I'm saying is we won't

23  know that.

24  Q.   Dr. Tierney, I don't mean to be argumentative, but your

25  report says what it says, does it not?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

LYNN MINGES - DIRECT

1   A.   Yes, it does.

2           MR. FINE:  Thank you, ma'am.  That's all the

3   questions I have.

4           MR. GOODSTEIN:  No redirect, Your Honor.

5           THE COURT:  All right.  Dr. Tierney, thank you.

6   This will complete your testimony and you are excused.

7           THE WITNESS:  Thank you.

8           (Witness stepped down.)

9           THE COURT:  All right.  Call your next witness.

10          MR. GULICK:  Your Honor, with the court's

11  permission, I'll question the next three witnesses from here.

12          THE COURT:  All right, sir.

13          MR. GULICK:  The state calls as its next witness

14  Lynn Minges.

15                      LYNN DAVIS MINGES,

16  being first duly sworn, was examined and testified as follows:

17                      DIRECT EXAMINATION

18  BY MR. GULICK:

19  Q.   Good afternoon.

20  A.   Good afternoon.

21  Q.   Please state your full name.

22  A.   Lynn Davis Minges.

23  Q.   Ms. Minges, what is your current employment?

24  A.   I'm employed with the State of North Carolina, the North

25  Carolina Department of Commerce, and I serve as Executive

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Director of the North Carolina Division of Tourism, Film and

2  Sports Development.

3  Q.    How long have you been an employee of the Division of

4  Tourism?

5  A.    Sixteen -- almost 16 years.  Fifteen years.  I was first

6  employed there in 1993 within the Department of Commerce.  I

7  served in another position and then returned to the division.

8  So I've been there, of the entire time, all but two years.

9  Q.    And how long have you been Director of the Division of

10  Tourism?

11  A.    For nine years.

12  Q.    What are your responsibilities as Executive Director of

13  North Carolina's Division of Tourism?

14  A.    Well, we promote the state primarily as a travel

15  destination, as a venue for sporting events and as a film

16  location, film making location.  Those are our primary

17  responsibilities.  I oversee a staff of around 80 employees, a

18  budget of around $13 million.  We oversee several facilities

19  around the state, but primarily we're a marketing organization

20  and we work with strategic partners around the state to

21  differentiate North Carolina in a very competitive marketplace

22  to draw visitation to the state of North Carolina.

23  Q.    Has North Carolina conducted research on why vacationers

24  or visitors would visit North Carolina?

25  A.    We have.  We expend public dollars, a fair amount of

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 26 of 97

1 those, primarily in marketing activities.  And as a

2 responsible part of any marketing investment that we make, we

3 do a fair amount of advertising.

4      On an annual basis we do economic impact analysis.  We do

5 demographic profiles of travelers coming into the state.  In

6 addition to that, on many occasions we've done conversion

7 studies to find out about visitors who choose to travel to

8 North Carolina:  What motivates them to travel.  We've done

9 attitude and awareness studies.  We do focus groups.

10      Just in the last two months we did a phone survey of

11 travel intentions for the summer relative to spending habits,

12 the change in the economy, gas prices.  So we do those on a

13 very regular basis.  We have two focus groups scheduled coming

14 up in the next couple of months.  It's an ongoing part of what

15 we do.

16 Q.   And what does North Carolina's research show about why

17 vacationers choose to vacation in North Carolina?

18 A.   Overwhelmingly every research study I've ever seen that's

19 been done for the division, and during the time that I've been

20 there, cites North Carolina's natural scenic beauty as a key

21 attribute for the decision to travel to North Carolina.

22 Q.   How has North Carolina used that information in marketing

23 the state?

24 A.   Well, I think when you're charged with marketing, you

25 first of all have to determine what it is that differentiates

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  you, makes you unique and different from the competitive set.

2  I mean, visitors can choose to travel to South Carolina,

3  Virginia, Georgia or Tennessee or other destinations.

4      And we know from our research that visitors who come to

5  North Carolina come and are motivated by the natural scenic

6  beauty of our state.  They come to rest and relax.  They

7  certainly engage in lots and lots of activities in the state.

8  But the motivating factor is the beauty, the natural scenic

9  beauty that's found in abundance within our state.

10     We boast the highest mountain peaks on the east coast.

11  There's no other state on the east coast that can claim that.

12  We have over 300 miles of barrier islands that are very unique

13  and pristine.  And we have the great fortune of having the

14  fact that in this state, most of -- much of our land is

15  preserved by natural forests -- by national forests, by

16  national parks.  The most visited national parks in America

17  are here in our state.  And the national seashore.

18     So those great attributes really differentiate us from

19  our competitive set and have been a key driver in our

20  positioning and marketing of our state over these past 16

21  years.

22  Q.  Do you refer to this as being sort of a brand for the

23  state?

24  A.  It definitely is.  A brand is really a value proposition.

25  It is the promise that one makes in marketing and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  communicating messages to consumers.  It's what folks
2  generally understand and appreciate about a consumer product
3  or good or service or destination.
4        When one goes to Disney World, they expect, you know,
5  quality -- high quality family entertainment.
6        When they come to North Carolina, they expect natural
7  scenic beauty.  They expect to be able to rest and relax in a
8  setting of natural scenic beauty.  That's our promise to
9  consumers and has been for many, many years.
10  Q.  Does the state expend money promoting that brand, if you
11  will?
12  A.  Millions of dollars a year.  Nearly every dollar that's
13  allocated to our division is directed at marketing activities.
14  This past year, for example, we spent $3 million just on paid
15  consumer advertising.  We also participate in a number of
16  trade shows, consumer shows.  Another activity is public
17  relations activities to help to communicate that brand
18  message.
19        So millions of dollars over many, many years.
20  Q.  I'd like to draw your attention to what's been marked as
21  Plaintiff's Exhibit 285, Ms. Minges.  It will appear on your
22  screen.
23        And I'd like to ask you --
24        MR. GULICK:  Your Honor, this will be in Plaintiff's
25  Exhibit Notebook Number 6.  It's the very first exhibit.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      THE COURT:  All right.  I have it.

2  Q.   Ms. Minges, can you tell -- do you know what this exhibit

3  is?

4  A.   Yes, I do.  That is an image or that is the cover shot of

5  the official 2007 North Carolina Travel Guide.  It was

6  produced by my -- the organization that I work for, the

7  Division of Tourism.  We produce 700,000 copies of that and

8  distribute it in North Carolina and in other places.

9  Q.   We're not going to march through this document, but I'm

10 wondering if you can tell me if the cover of this document

11 reflects what you've been talking about already today?

12 A.   It does.  I would suggest that -- if you see -- if you

13 note the cover of this guide, we rotate generally the images

14 on the cover of the travel guide from the mountains to the

15 Piedmont region of the state and to the coast of the state.

16 So the 2007 guide depicts -- you see a mountain vista here.

17 This is actually Lake Junaluska here in the mountain region of

18 North Carolina.  The year after that, 2008, the current guide,

19 that you don't see here, depicts a coastal image.  But always

20 it is an image of natural scenic beauty.  It really is

21 consistent with our overall brand messaging and really what

22 sells and motivates consumers to travel to our state.

23 Q.   Does North Carolina change the brand for different types

24 of advertising for tourism?

25 A.   No.  We're pretty consistent with that messaging.  It's

1 much like you hear politicians say, staying on message. If

2 you say the same thing and you say it the same way over a long

3 period of time, you build up what they call brand equity or

4 what we call brand equity. Over many, many years of time

5 we've been extremely successful in reinforcing what consumers

6 say they find in North Carolina. They tell us time and time

7 again that they come here, they experience rest and relaxation

8 in a setting of natural scenic beauty. It differentiates us

9 from our competitive set. So we've been very successful at

10 marketing against that.

11        A brand is built by firsthand experiences so when most

12 consumers come and they see this natural scenic beauty, that

13 is reinforced. It is built, as I said, on firsthand

14 experiences. It's built on reputation: What one person might

15 tell another. And it's also built on messages that we, as the

16 marketing agents of this great state, put into the marketplace

17 deliberately. We communicate over and over again that brand

18 message through our advertising, through our public relations

19 strategies and through the images. The hundreds and thousands

20 of images that we take each year of beautiful vistas like this

21 across this great state.

22 Q.   Isn't this brand similar to what other states do?

23 A.   It's very, very different. You will not find an image

24 like this for other states. Other states, obviously, have

25 beautiful places, but they market themselves in different

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  ways.

2       We own this brand position.  Third-party researchers have

3  told us this time and time again.  When we've done research,

4  when third-party organizations have done research and they've

5  asked consumers, we own this brand position.  North Carolina

6  is the state to visit to rest and relax in a setting of

7  natural scenic beauty.  There is no other state on the east

8  coast that can say that.

9  Q.   Is tourism a -- how big a business in North Carolina is

10  tourism?

11  A.   Visitors coming into the state of North Carolina pump

12  about $16.5 billion into our state's economy.  They generate

13  about $1.3 billion in state and local tax revenues.  And

14  directly support jobs for our state citizens to the tune of

15  about 200,000, 190,000 last year.

16  Q.   How does that compare with other states?

17  A.   Well, we are the seventh most visited state in America.

18  We, in terms of economic impact, don't rank that high, and I

19  don't know the exact number.  I would say around ten.  We are

20  around 10 or 12.  But in terms of the actual number of

21  visitors who come to our state, we're seventh.  So we lead our

22  competitive set, with the exception of Florida.

23  Q.   Ms. Minges, how does air pollution affect, if it does

24  affect, North Carolina's brand?

25  A.   Well, as I explained earlier, we make a promise to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  consumers that we communicate with every day.  We communicate,

2  you know, through our web site, through advertising with

3  millions and millions and millions of consumers.  And we tell

4  them time and time again, and I have for 16 years, that North

5  Carolina is the state where you can come and rest and relax in

6  a setting of natural scenic beauty.  We're true to that.

7      And we expect that when we make that promise to

8  consumers, when they come to our mountain region or to our

9  coast, for that matter, but when they come to our state, they

10  will have that experience that we promised them.

11      And I think, as I've said before, that being true to that

12  promise is of paramount importance.  So when air pollution

13  diminishes the guarantee and the promise that we make to those

14  consumers, the fact that they may come here and not be able to

15  see these beautiful mountains or beautiful vistas, that the

16  air quality may be unhealthy and that they may not have a

17  natural scenic beauty experience, that threatens our

18  credibility, our integrity, our character.  It goes to the

19  very heart and soul of who we are and what we are as a

20  destination.

21      I drove up the mountain late yesterday and it was a very

22  hazy day here in the mountains.  It's not like the images that

23  we portray and we communicate to visitors.  If you go on our

24  web site, visitnc.com, 7 million consumers went there last

25  year to plan travel.  The images they see on that site are

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  inconsistent with the image I saw when I drove up the mountain

2  yesterday.  And as a person of character and integrity, that

3  concerns me.  It goes to the very heart and soul of the

4  promise and commitment we make to the consumers we communicate

5  with on an ongoing basis.

6           MR. GULICK:  Thank you.  I have no further

7  questions.

8           MS. GILLEN:  I have just a few questions, Your

9  Honor.

10          THE COURT:  All right.  You may proceed, Ms. Gillen.

11                    CROSS EXAMINATION

12  BY MS. GILLEN:

13  Q.   Good afternoon, Ms. Minges.  If you would be so kind as

14  to take from that cart to your left TVA's Exhibit Book 22.

15  A.   Yes.

16  Q.   Thank you.  We may -- we may refer to some of the

17  exhibits in there.

18  A.   Okay.

19  Q.   You testified at a public hearing on the proposed

20  response to North Carolina's Section 126 Petition.

21  A.   Uh-huh.

22  Q.   And at that hearing you testified that North Carolina's

23  travel industry has experienced unprecedented growth since

24  1995, correct?

25  A.   Correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.    And if you turn to, in that binder, Defendant's Exhibit

2  475.

3  A.    Yes.

4  Q.    Do you recognize that?

5  A.    I do.

6  Q.    What is it?

7  A.    It is the Economic Impact of Tourism on North Carolina's

8  Economy.  Again, it's a study I referenced earlier.  Fast

9  facts that show the impact of tourism and it's broken down.

10  This is from our web site.  It's part of the research we do

11  annually.

12  Q.    What year is this for?

13  A.    This is for 2006, the one I see first.  Two years ago, I

14  think.

15  Q.    And that shows that North Carolina visitor expenditures

16  increased from $9 billion in 1995 to almost 15-1/2 billion in

17  2006.

18  A.    I can barely see this.

19  Q.    I think that's in the text, actually.

20  A.    It's in the text.  15.4 -- I don't think it was that high

21  that year.  Would have been from 14-- excuse me.

22        What did you say again?

23  Q.    Well, we'll just -- we'll just read the first one.

24  A.    Yeah.

25  Q.    In 2006 domestic travelers spent $15.4 billion across the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   state --

2   A.   That's correct.

3   Q.   -- which was an 8.3 percent increase over 2005.

4   A.   Correct.

5   Q.   Okay.  And just looking at that bar graph --

6   A.   Yes.

7   Q.   -- it's a pretty steady upward climb since 1995.

8   A.   Yes.

9   Q.   And also on this sheet in 2006, North Carolina ranked

10  sixth in in-person trip volume.

11  A.   Yes.

12  Q.   And that was, in fact, up two places from North

13  Carolina's ranking just the two years before in 2004.

14  A.   That's correct.  We're seventh now.  Anyway, we've

15  enjoyed a strong economy, the benefits of that.

16  Q.   And your office issued a press release announcing that

17  visitors to North Carolina spent a record, I think as you just

18  testified, $16-1/2 billion in 2007.

19  A.   That's correct.  Average daily rates in our state were up

20  7 percent, gas prices are up, and that certainly helps despite

21  the fact we have a decrease in visitation.

22  Q.   So you're happy about the gas prices.

23  A.   Well, we're happy that they're spending money.  We're

24  just getting less visitors.  We really are concerned with the

25  economy that with less visitors and spending down, we're going

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  to see a real impact this year.

2  Q.  And if you'd turn to Defendant's -- what's been marked

3  for identification Defendant's Exhibit 479 which is the next

4  exhibit.

5      Is that the press release that I just referred to?

6  A.  Yes.

7  Q.  And I -- this says that the 16.5 billion in 2007 was an

8  increase of 7.2 percent from 2006.

9  A.  Correct.  Consistent with an increase in room rates and

10 gas rates.

11 Q.  Okay.  And that previous record in -- the previous figure

12 in 2006 was -- had already set a record of 15.4.

13 A.  Correct.  Good economy.

14 Q.  And it also says as of 2007, since the start of 2001,

15 visitor expenditures in North Carolina have increased

16 36.9 percent, from 12 billion to 16-1/2 billion.

17 A.  Correct.  Again, our brand is very credible and

18 believable.

19 Q.  And you're actually quoted in this release as saying, "We

20 are pleased that visitors continue to enjoy traveling to and

21 within our state and that they are spending record amounts of

22 money in each of North Carolina's 100 counties," right?

23 A.  Correct, they are.

24 Q.  And this release references an announcement made by

25 Governor Easley.  Have you seen that release from Governor

Cheryl A. Nuccio, RMR-CRR (704)350-7494

 1  Easley's office?

 2  A.   Is that the same one here?

 3  Q.   It's actually the next exhibit.

 4  A.   Is it tab --

 5  Q.   Marked as Defendant's Exhibit Number 476.  Oh, I'm sorry.

 6       What's been marked as Defendant's Trial Exhibit 476.  I

 7  believe it's tabbed.

 8  A.   Yes.

 9  Q.   Are you familiar with that release?

10  A.   Yes.

11  Q.   And this release, press release from the governor's

12  office confirms the facts and figures that were in the tourism

13  department's press release.

14  A.   Correct.

15  Q.   And that would be a 7.2 percent increase in visitor

16  spending from the previous year.

17  A.   Uh-huh.

18  Q.   16.5 billion in visitor spending in 2007, 190,000 North

19  Carolinians employed --

20       MR. GULICK:  Objection to the form of the question.

21  Q.   This says that there were 190,000 North Carolinians

22  employed in the travel and tourism industry.

23  A.   That's correct.

24  Q.   And that since 2001, there was a 36.9 percent increase in

25  visitor spending.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   Spending, uh-huh.

2  Q.   And this release was done on March 17th of this year,

3  correct?

4  A.   They were both done on the same day, I believe, or maybe

5  one day and the next for different audiences, but it's the

6  same essential information, the same release.

7  Q.   Did you give a speech at the 2006 Rural Partners Forum?

8  A.   I did.

9  Q.   If you would turn to what's been marked for

10 identification as Defendant's Exhibit 502.

11 A.   Yes.

12 Q.   Is this a copy of that speech?

13 A.   It appears to be.

14 Q.   Okay.  And if you look at the second paragraph on the

15 first page of that Defendant's Exhibit 502.

16 A.   Uh-huh.

17 Q.   I think your -- in your speech you said, And so as I -- I

18 think as we go forward, we will continue to see great success

19 in the tourism arena.

20 A.   Yes.

21 Q.   Was that your speech?

22 A.   Uh-huh.

23 Q.   One area I don't know if you talked about, but -- is

24 North Carolina's wine industry.

25 A.   Yes.

1  Q.   And that's an important part of the state's economy; is

2  it not?

3  A.   It is.

4  Q.   And since the year 2000, the number of wineries has

5  tripled.

6  A.   It has.

7  Q.   And the wine industry in North Carolina contributes

8  $813 million annually; is that right?

9  A.   Yes.  Again, research done by my division, uh-huh.

10  Q.   And if you would turn in your book to what's been marked

11  as Defendant's Exhibit 481.  We tried to keep those notebooks

12  small, I'm sorry.  Take your time.

13  A.   Yes.

14  Q.   Have you seen this before?

15  A.   Yes.

16  Q.   And this press release, which was issued in January 2007,

17  says that the wine industry provides $813 million a year.

18  A.   Correct.

19  Q.   And if you would, too -- I'm sorry, just turn to what has

20  been marked as Defendant's Exhibit 480, the one right before

21  that.

22  A.   Uh-huh.

23  Q.   Are you familiar with this press release?

24  A.   I am.

25  Q.   And does this again confirm the numbers of impact from

1  the wine industry in North Carolina?

2  A.   Yes, uh-huh.

3  Q.   I'm assuming that as part of your job, one of your

4  responsibilities is to keep on top of press clippings about

5  North Carolina.

6  A.   Yes.

7  Q.   Do you cover the Wall Street Journal in those press

8  clippings?

9  A.   Someone in my office I'm sure does, yes, and alerts me.

10  Q.   Well, if you'll turn to what's been marked for

11  identification as Defendant's Exhibit 500.

12  A.   Yes.

13  Q.   Have you seen this before?

14  A.   I have.

15  Q.   You have.  And what is -- this is -- just to clarify the

16  record, this is an excerpt from the Wall Street Journal on

17  Tuesday, February 12th, 2008, page --

18  A.   Wait.  500?  I don't have a tab 500, do I?

19      Excuse me, I'm on the wrong one, I'm sorry.

20  Q.   Oh, okay.

21  A.   I've got it.  I'm not familiar with this one.

22  Q.   Oh, you're not familiar with this.  Well, this is a

23  clipping from the Wall Street Journal, Tuesday, February 12th,

24  2008.  And it was a study as to which states people were

25  moving to.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.    Right.  Relocations.

2   Q.    Relocation studies.  You're familiar with those.

3   A.    We don't -- we're not involved in those in our office at

4   all.  We're not involved in relocations.  It's not part of

5   my...

6   Q.    If you'll look at the chart sort of in the middle of the

7   text.  It says that the top five destination states, lists

8   them there, and the first one is North Carolina.

9   A.    Those are for people who choose to move here, yeah.  And

10  we don't -- we don't monitor that.

11  Q.    Would that surprise you, that figure?

12  A.    No.  It's a great state to live in.  I love living here.

13  Q.    And you had said in the hearing that I mentioned at the

14  beginning on the 126 Petition "that the state is well

15  positioned to continue its climb among the nation's most

16  popular visitor destinations."  Is that true?

17  A.    We have tremendous product in this state.  We have

18  wonderful natural scenic beauty, rich assets that we've been

19  given, natural assets that we've been given.  We, through the

20  years, I think, have been very responsible stewards of this

21  land, and there's a strong appreciation for the natural assets

22  that we have in the state.  We position those very well, I

23  think, in our marketing and advertising.  It's very important

24  to us here in North Carolina.

25        We have strong partnerships.  Some of those you've heard

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  from.  Folks from the Biltmore Estate, from Chimney Rock Park,

2  thousands and thousands of businesses that are partners of

3  ours -- with us in marketing the state as a premier travel

4  destination.

5      A lot of positive things going on in this state.  We work

6  very hard.  We have a brand that works and resonates with

7  consumers.  As long as it continues to be credible.  My

8  concern at this point is that when that becomes no longer

9  credible, when the stories about pollution and degradation of

10 views in western North Carolina become public, it threatens

11 the very heart and soul, the essence of who we are as a travel

12 destination and the work I've done for 16 years.

13 Q.  The statistics that we've looked at up until today are

14 proving that you're doing a pretty good job marketing North

15 Carolina.

16 A.  Thank you.

17      MS. GILLEN:  Thank you.  I have no further

18 questions, but I would like to move a couple of exhibits into

19 evidence, Your Honor.  TVA would like to move Defendant's

20 Exhibits 475, 479, 476, 502, 481, 480 and 500 into evidence.

21      THE COURT:  Let those be admitted.

22      (Defendant's Exhibits Numbers 475, 476, 479, 480,

23 481, 500 and 502 were received into evidence.)

24      MR. GULICK:  Your Honor, I have no redirect except I

25 forgot to move Plaintiff's Exhibit 285 into evidence and we

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   wish to do so now.

2            THE COURT:  All right.  Thank you.  Let it be

3   admitted.

4            (Plaintiff's Exhibit Number 285 was received into

5   evidence.)

6            THE COURT:  Thank you.  That will complete your

7   testimony and you are excused.

8            THE WITNESS:  Thank you.

9            (Witness stepped down.)

10           MR. GULICK:  Your Honor, we next call to the stand

11  Mr. Harris Prevost.

12                   WHITENER HARRIS PREVOST, JR.,

13  being first duly sworn, was examined and testified as follows:

14           MR. GULICK:  Your Honor, before we begin, there's

15  one exhibit that I'm going to ask Mr. Prevost about that I

16  would like to give you a courtesy copy of.  It's already been

17  premarked.

18           THE COURT:  All right.  And what's the exhibit

19  number?

20           MR. GULICK:  It's Exhibit Number 251.

21           THE COURT:  All right.  We're looking for it, but if

22  you will bring that up, that will be fine.

23           (The document was tendered to the court.)

24           THE COURT:  All right, Mr. Gulick.  Thank you.

25                   DIRECT EXAMINATION

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  BY MR. GULICK:

2  Q.   Good afternoon.  Would you please state your full name.

3  A.   Whitener Harris Prevost, Jr.  I go by Harris.

4  Q.   Mr. Prevost, where do you live?

5  A.   I live between Boone and Linville.

6  Q.   In Watauga County?

7  A.   Yes.

8  Q.   Where are you employed?

9  A.   Grandfather Mountain.

10 Q.   How long have you -- what is your position at Grandfather

11 Mountain?

12 A.   Vice president.

13 Q.   How long have you worked for Grandfather Mountain?

14 A.   A little over 30 years.

15 Q.   What position did you start at -- start with when you

16 started at Grandfather Mountain?

17 A.   I started doing advertising and promotions.

18 Q.   And did a time come when you became, in effect, general

19 manager?

20 A.   Yes, around 1991, 1990.  Right in there.

21 Q.   And at that time what were your responsibilities from

22 that point forward?

23 A.   I worked for Hugh Morton and he was president of

24 Grandfather Mountain, and he was interested in a lot of causes

25 to benefit the state of North Carolina, and so he pretty much

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   left running the mountain to me.

2   Q.   And you retained that role until what year?

3   A.   About 2006.

4   Q.   And at that time, did one of his sons, Crae Morton, take

5   over that function?

6   A.   His grandson.

7   Q.   Grandson, excuse me.

8   Q.   And so what is your role now?

9   A.   The grandson is more interested in day-to-day affairs and

10  so my role has kind of flip-flopped.  I'm more involved in the

11  things that Mr. Morton was involved in.  A lot of civic

12  things.

13  Q.   Could you explain what Grandfather Mountain is.

14  A.   It's about a 5,000 acre scenic travel attraction.  Four

15  thousand acres has been permanently preserved in the nature

16  conservancy and so the other thousand is -- operates kind of

17  like a privately owned national park.

18  Q.   Has it been designated as an international biosphere

19  preserve?

20  A.   It has.  It's the only privately owned one in the world

21  to my knowledge.

22  Q.   Do any rare species live at Grandfather Mountain?

23  A.   They do.

24  Q.   Does Grandfather Mountain have a museum or set of

25  museums?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   We have a nature museum.

2  Q.   I'm going to -- how high is the highest peak of

3  Grandfather Mountain?

4  A.   5,946 feet.  Did say 64, but a recent survey dropped

5  18 feet.

6  Q.   I'd like to show you, and it will appear on your screen,

7  Mr. Prevost, what's been marked as Plaintiff's Exhibit 244 and

8  ask if you can tell us what this -- what this shows.

9  A.   It's Mile High Swinging Bridge.

10  Q.   Is this on Grandfather Mountain?

11  A.   It is.  It goes to the Linville Peak.

12  Q.   And is this one of the attractions at Grandfather

13  Mountain?

14  A.   It is.  That -- about 30 percent of the people that come

15  to Grandfather Mountain come for the bridge.

16  Q.   What is the primary reason that people come to

17  Grandfather Mountain?

18  A.   Scenery.  It's closer to 40 percent.  We also in our

19  surveys have a category called just the mountain experience,

20  which, if it's not just scenery, they can say that category.

21  That would include scenery, ruggedness of the mountain, the

22  altitude, sense of altitude.  We get about 20 percent that say

23  that.

24       MR. GULICK:  Gary, if you could back off the

25  photograph a little bit.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   In the distance we see a -- do we see a peak in the -- or

2  a ridge in the far distance in this photograph, Mr. Prevost?

3  A.   If you look over to the right of the swinging bridge at

4  the highest point over Linville Peak and look on out, that's

5  Mt. Mitchell and the Black Mountain Range.

6  Q.   How far away is that from Grandfather Mountain?

7  A.   About 30 miles as the crow flies.

8  Q.   Does this photograph accurately depict the swinging

9  bridge at the top of Mt. Mitchell -- Mt. -- Grandfather

10 Mountain, excuse me.

11 A.   Yes, it does.

12 Q.   How many visitors came to Grandfather Mountain in the

13 last year?

14 A.   We had 266,000 paid customers last year.  '07.

15 Q.   I'd like to show you what's -- now what's been marked as

16 Plaintiff's Exhibit 251 and ask if you can identify that?

17 A.   This is a little guidebook that we give to our guests.

18 The purpose of it is to help them appreciate what they see on

19 the mountain.

20      The reason we created this is we know that most of our

21 business comes from repeat business and word of mouth

22 referrals, and so as part of our marketing we want people to

23 have a better experience and really understand what they see

24 so that we have future customers.

25 Q.   And does this --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    MR. GULICK:  I'd like to go to the next page, Gary.
2    One more, I'm sorry.
3  Q.  What does -- what we're looking at right now, can you
4  tell us what we're looking at here.
5  A.  We -- people are always asking us what -- what they see
6  when they're on top.  What's this mountain?  What's that
7  mountain?  How far away is it?  How high is it?
8    So we contracted with someone who can figure that out and
9  to draw it and to put it in our guidebook so that when people
10 are up on top of the mountain and if it's a clear day, they
11 can identify what they're looking at.
12 Q.  Now, have you yourself seen some of the things -- seen
13 the mountains that are featured in this view, if you will?
14 A.  I haven't seen Mt. Sterling, but I've seen everything
15 else.
16 Q.  Mt. Sterling --
17 A.  Yes.
18 Q.  -- is the one you have not seen?
19 A.  Pardon?
20 Q.  Mt. Sterling is the one you have not seen?
21 A.  That's in the Great Smoky Mountains.
22 Q.  But were you saying you'd seen the other mountain peaks?
23 A.  Yes.
24 Q.  Have you seen -- I think I saw the city of Charlotte was
25 mentioned on here.  Have you seen the city of Charlotte from

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   the top of Grandfather Mountain?

2   A.   Yes, I have, with binoculars.

3   Q.   With binoculars.

4   A.   Some people can see it unassisted, but I can't.

5   Q.   I'd like to show you what's now been marked as

6   Plaintiff's Exhibit 250.  Do you know what this is,

7   Mr. Prevost?

8   A.   That's the skyline of Charlotte.

9   Q.   And from what vantage point is that skyline seen?

10  A.   Pardon.

11  Q.   From where?

12  A.   That's taken from up on top of Grandfather Mountain where

13  the Mile High Swinging Bridge is.

14  Q.   Is that a scene that you've seen yourself through

15  binoculars as you've said?

16  A.   Yes, I have.

17  Q.   Is the city of Charlotte always visible from the top of

18  Grandfather Mountain?

19  A.   No, it's a very rare occurrence.

20  Q.   Does air pollution have any effect on the experience that

21  one can have at Grandfather Mountain?

22  A.   Well, the number one reason people come is the scenery.

23  And our customers are mostly from the Charlotte, Raleigh,

24  Greensboro, Winston-Salem area and so they drive two to three

25  hours or more, and most of them are here to see the scenery.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    And so if they can't see as much as they should, it does

2    affect the quality of their visit.

3    Q.    And does air pollution have any effect on what they can

4    see?

5    A.    It does.  There is a haze that -- we've had some very

6    pretty days, very clear days where you just can't see.  You

7    just see a kind of a gray, sort of like a gray screen between

8    you and what you're trying to look at.

9    Q.    It can be that way from the top of Grandfather Mountain?

10   A.    (No response.)

11   Q.    It can be that way from the top of Grandfather Mountain?

12   A.    Oh, definitely.

13        I'm deaf in one ear so sometimes you have to repeat what

14   you say.

15   Q.    Okay.  I'll try to speak more clearly.  I'm sorry.

16   A.    That's okay.

17   Q.    I'd like to show you what's now been marked as

18   Plaintiff's Exhibit 249 and ask you if you know what this is?

19   A.    This is a Hugh Morton photo from about two-thirds of the

20   way up the mountain in an area called Cliffside, and this is

21   Linville Bluff.  This is after a rain when we had clouds in

22   the valley.  It's one of Mr. Morton's favorite topics to

23   shoot.

24   Q.    Is this -- is that the scene that you're -- is that the

25   photograph you're talking about?

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 51 of 97

1   A.   It is.

2   Q.   Have you seen it look like that?

3   A.   I have.

4   Q.   And is the top of Mt. Mitchell -- or I notice there are

5   clouds in this scene.  Was this a hazy day?

6   A.   It was after a rain.  So I wouldn't -- it's a cloudy day.

7   Q.   Are clouds the same as haze?

8   A.   No.

9   Q.   How are they different?

10  A.   Clouds are pretty much defined and haze is pervasive.

11  It's everywhere.  Pretty days where there's no clouds, you can

12  have a haze.  Again, it's kind of like a screen that you're

13  looking through, a gray screen.

14  Q.   In this particular scene -- I take it you know what this

15  scene is.  You know what this photograph is depicting.

16  A.   Yes, I do.

17  Q.   And is that how it looks on a day with the kind of

18  weather that is shown there?

19  A.   It's not all the time.  After a rain, a lot of times it

20  will be clouds in the valley and you see the mountain peaks

21  sticking up out of the clouds.  So that's -- doesn't happen

22  after every rain, but sometimes.

23  Q.   Is it possible so see any part of Mt. Mitchell?

24  A.   It's in the very top, little left of center.  That's

25  Mitchell and the Black Mountain Range.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   I think you already said that's 30 miles away.

2  A.   Yes.

3  Q.   Even though some of it is obscured by clouds.

4  A.   Yes.

5  Q.   I'm going to show you now what's been marked as

6  Plaintiff's Exhibit --

7        MR. GULICK:  Your Honor, there may have been a

8  mismarking of that exhibit.  Plaintiff's Exhibit 247.

9        I apologize, Your Honor.  There seems to have been a

10  bit of a difficulty with the -- some slight mismarking, Your

11  Honor, on the exhibits.

12  Q.   I'd like to show you what's been marked as Plaintiff's

13  Exhibit 248.

14        MR. GULICK:  Your Honor, we -- I apologize.  I'm

15  going to have to call this 249A.  It may appear as 249 in the

16  book, and I apologize for the -- one of these exhibits has

17  been double marked.

18        THE COURT:  All right.  My Exhibit 249 is going to

19  become 249...

20        MR. GULICK:  249A.

21        THE COURT:  249A.  All right.

22  Q.   Mr. Prevost, I'd like to ask you if you can identify what

23  this -- what is shown on this exhibit which is 249A.

24  A.   That's basically the same photo but from a little

25  different angle.  Little lower elevation.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.  And what's -- is it basically the same view?

2  A.  Yes.

3  Q.  And what's different about this one, 249A, from the 249

4  that we were just looking at?

5  A.  Okay.  On the screen we still have the same one.  And if

6  you look above the guy on Linville Bluffs at the first little

7  mountain top, it's called Banner Hill.  That's just before the

8  town of Newland.  It's five miles away.  And you can barely

9  make it out on this large photo up here.  And even harder to

10  see, you can just see a faint outline of the mountain, is Big

11  Bald which is maybe 12 to 15 miles away.  But it's the

12  mountain above Banner Hill in the photo on the TV monitor.

13      And the ridge closest to Linville Bluffs is Point

14  Sublime, and that's where U.S. 221 goes up to to Grandfather

15  Mountain.  It's about a mile away.  At the very top point is

16  one of Mr. Morton's favorite places to take pictures of

17  Grandfather Mountain, and it's behind the trees in this big

18  picture.  But it's one mile away.  It overlooks the MacRae

19  Meadows where the Highland Games takes place.

20  Q.  So is this 249A that we're looking at right here which is

21  now on the screen, is that it, is that what you're looking at

22  on your screen there?

23  A.  That's what I'm looking at.

24  Q.  Have you seen -- is this a day with haze?

25  A.  I saw this last week.  We had a real pretty week weather

1  wise.  Wasn't a cloud in the sky.  This is what it looked

2  like.

3  Q.   I'd like to now show you what's been marked as

4  Plaintiff's Exhibit 247.  I'm going to ask you, Mr. Prevost,

5  if you recognize what Plaintiff's Exhibit 247 is?

6  A.   Its Linville Gorge and Table Rock.  It's taken from a

7  place close to Wiseman's View.  Not Wiseman's View, but a

8  place close to it.

9  Q.   Is this a scene that you yourself have seen?

10 A.   I have not been at this place, but I've been at Wiseman's

11 View.

12 Q.   Have you seen this basic view before?

13 A.   Yes.

14 Q.   And you said you can see Table -- and you're looking into

15 the gorge?

16 A.   Yes, that's the gorge.

17 Q.   And which one is Table Rock?

18 A.   It's the rock formation a little right of center.  Looks

19 like a table.

20 Q.   Have you seen this on other occasions when you can't see

21 Table Rock?

22 A.   Yes, that's true.

23 Q.   I'm sorry?

24 A.   Yes.

25 Q.   And were those -- were those just cloudy days?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   Sometimes cloudy days when clouds are low.  Usually
2   because of the haze.
3   Q.   I'd like to show you what's been marked as Plaintiff's
4   Exhibit 248 and ask you what is shown in -- do you know what
5   this is?
6   A.   It's basically the same photo, same location.
7   Q.   What's the difference here between this -- between 248
8   and 247?
9   A.   A lot of features of the other side of the gorge, the
10  mountain on the other side you can't see, and then Table
11  Rock's disappeared.
12  Q.   Have you seen Linville Gorge under conditions that look
13  like this?
14  A.   Not from in it, but I have seen it.
15  Q.   Now, is this -- were these photographs that were taken by
16  Hugh Morton?
17  A.   Yes.
18  Q.   And are the photographs that we've seen of clear and hazy
19  days, do these accurately depict what haze looks like to you?
20  A.   Yes, it does.  That's what it looks like, unfortunately.
21  Q.   How often is the -- are the views from Grandfather
22  Mountain obscured by haze?
23  A.   I can't give you an exact number.  Most of the time it
24  would be in the summer which is also when our peak visitation
25  is.  In the winter it's -- we have less haze.  Maybe a third

1  of the days.  That's a guess.

2  Q.   Can you tell us the -- do you know what kind of impacts

3  having a hazy day such as those we've seen in these

4  photographs has on the visitor experience to Grandfather

5  Mountain?

6  A.   When I'm up on the mountain, if it's a busy day, we will

7  have some parking issues where we have to park people in a

8  satellite parking place.  People on top tend to just really

9  look and just take in the view and just sit there for a long

10  time.

11  Q.   Is this on clear days?

12  A.   Pardon?

13  Q.   Is this -- on what kind of days is that?

14  A.   That will be on a pretty day.

15  Q.   Days --

16  A.   When they can see -- when they can see the total view.

17  And they just stay up there, just look at it and look at it

18  and soak it in, is the word I say.  It's not -- look at it is

19  not the right word.  It's almost like a spiritual experience.

20  It really -- it means a lot to them.

21       And then if they can't see, they're not up there that

22  long.

23  Q.   Does it detract from their experience to have hazy days

24  like the ones shown in these photographs?

25  A.   In my opinion it does.  You don't see as much.  And what

1    you do see, you can barely make out the outline of a mountain

2    peak.  One of the things about the mountains versus the

3    flatlands -- no offense flatlanders -- you look out and

4    there's a sameness to the view, but in the mountains you see

5    peaks after peaks unfolding and there's a lot of character and

6    beauty to that.  And so that's taken away when the haze

7    obscures it.

8    Q.    I'd like to show you, Mr. Prevost, what's been marked as

9    Plaintiff's Exhibit 253.  And what I'd like you to tell us, is

10   this a photograph you've seen before?

11   A.    Yes.

12   Q.    And do you know what this white substance on the trees

13   is?

14   A.    It's rime ice.

15   Q.    Now, do you ever see rime ice on trees at Grandfather

16   Mountain?

17   A.    We do.  It's really spectacular to see it.  When it -- it

18   occurs when we have low cloud cover and the temperature is

19   below freezing, the moisture from the -- within the cloud

20   freezes on the trees.  It's not snow.  That's where it comes

21   from.

22   Q.    So it just comes off of clouds.  Just condenses off of

23   clouds on to trees.

24   A.    Correct.

25   Q.    And during the period in which you were manager or were

Case 1:06-cv-00020-LHT  Document 202  Filed 06/15/09  Page 58 of 97

1  acting as the general manager of Grandfather Mountain, did
2  Grandfather Mountain have a practice of testing the rime ice?
3  A.   We did.  On occasion we would chip off samples.
4  Actually, we got it off of the steel beams, support beams that
5  hold up the swinging bridge.  And the container that we used
6  to collect the rime ice would be the same one that chipped it
7  off.  And we would -- anything that was touching the steel
8  support beam we wouldn't include.  Or anything on the ground
9  we would not include.  Or anything touching the tree we would
10  not include.  Just what -- the purest sample we could get.
11  Q.   And over a period of -- when did -- about when did that
12  practice start of testing the rime ice?
13  A.   1993.
14  Q.   And that was while you were acting as general manager?
15  A.   Correct.
16  Q.   And over what period of time has that practice continued?
17  A.   It's still going.  The last records I've seen were in
18  '07.
19  Q.   So you do it when there is rime ice that you can chip
20  off, I take it.
21  A.   Right.  It's -- there's no set schedule.
22  Q.   And what range of readings -- do you know what range of
23  readings that you've got -- what are -- what kind of testing
24  do you do with rime ice?
25  A.   The rime ice is put in the container and kept until it's

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 59 of 97

1  melted and then some type of device measures the pH factor.

2  And the reading is -- ranges from 2.6 to 4.65.  The -- in '07

3  we had a sudden jump in the numbers.  Most of our numbers are

4  in the 3s and we had a jump up into the 4s last year for some

5  reason.  But 2.6 is the lowest.

6        MR. GULICK:  Your Honor, at this time I would like

7  to move into evidence Exhibit 250 which is the pamphlet,

8  Exhibits what have now been marked 249 and 249A which are the

9  two photographs from the top of Grandfather Mountain, 244,

10  247, 248, 251 and 253.

11        THE COURT:  All right.  Let them be admitted.

12        (Plaintiff's Exhibits Numbers 244, 247, 248, 249,

13  249A, 250, 251 and 253 were received into evidence.)

14        MR. GULICK:  I have no further questions at this

15  time.

16        MS. GILLEN:  TVA has no questions, Your Honor.

17        THE COURT:  All right.  Thank you.  And that will

18  complete your testimony and you're excused, Mr. Prevost.

19        (Witness stepped down.)

20        MR. GULICK:  Your Honor, we'll now call as our next

21  and final witness Mr. William Ross, Secretary of the

22  Department of Environment and Natural Resources.

23        THE COURT:  All right, sir.

24              WILLIAM GOLEY ROSS, JR.,

25  being first duly sworn, was examined and testified as follows:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1                    DIRECT EXAMINATION

2    BY MR. GULICK:

3    Q.    Would you please state your full name.

4    A.    My name is William Goley Ross, Jr.

5    Q.    Where do you live?

6    A.    I live in Chapel Hill, North Carolina.

7    Q.    How are you currently employed?

8    A.    I'm the Secretary of the Department of Environment and

9    Natural Resources here in North Carolina.

10   Q.    How long have you been Secretary of the Department of

11   Environment and Natural Resources?

12   A.    I was appointed in 2001, January.

13   Q.    As Secretary of the Department, what are your principal

14   responsibilities?

15   A.    The principal responsibilities of the department and of

16   the secretary are to conserve and protect the natural

17   resources of our state and to maintain an environment of high

18   quality for the health -- both protecting the resources and

19   maintaining that high quality environment for the health,

20   well-being and benefit of all the citizens of our state.

21         And our department is organized into four different areas

22   that also relate to those responsibilities.  Environmental

23   protection divisions such as the Division of Air Quality.  You

24   heard from Brock Nicholson of that division earlier.  The

25   natural resource management divisions, such as the Division of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Parks and Recreation.  Then we have some great environmental

2  education programs such as the Museum of Natural Sciences in

3  Raleigh.  And then we have a number of administrative agencies

4  that support the work of the others.

5  Q.  Secretary Ross, where did you receive your higher

6  education?

7  A.  I went to college at Davidson College near Charlotte and

8  to law school at the University of Virginia.  Graduated from

9  Davidson in 1969 and law school in 1972.

10  Q.  Has your career, including your law practice, involved

11  environmental matters and natural resources?

12  A.  It has.  I've worked in the environmental law,

13  environmental protection and natural resource field for more

14  than 35 years, now.  I practiced law with a focus on

15  environmental law.  And then outside my law practice, I was

16  active in parks, recreation, open space, greenway programs in

17  various places around the state.

18  Q.  Secretary Ross, are you familiar with the harms to North

19  Carolina that can come from air pollution?

20  A.  I am generally, and also more specifically related to the

21  harms that can come from the emissions of coal-fired power

22  plants.

23  Q.  Are those concerns -- are those harms -- excuse me.

24     Can you categorize in a general way what those harms are.

25  A.  Yes.  You can relate them back to the department's

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 62 of 97

1   mission in a pretty direct way.  There are harms to natural

2   resources and there are -- or threats of harms.  Harms or

3   threats of harms to people, to health, their welfare, their

4   well-being, their benefits.

5   Q.   Are those harms of concern to the State of North

6   Carolina?

7   A.   Those harms are of great concern to our state.  The --

8   and that concern, I think, is reflected in a number of the

9   statutes that our program administers, but it -- even at a

10  more basic level in the constitutional provision, state

11  constitutional provision that deals with the environment and

12  natural resources.

13           MR. GULICK:  Your Honor, if I might, I have a copy

14  of the constitutional provision that he's referring to.  And

15  if I may approach --

16           THE COURT:  Yes.

17           MR. GULICK:  -- the clerk, I can hand up a copy.

18           THE COURT:  All right, sir, you may do so.

19           (The document was tendered to the court.)

20           MR. GULICK:  May I approach the witness, Your Honor?

21           THE COURT:  Yes.

22           MR. GULICK:  Your Honor, we've marked this as

23  Exhibit 490.

24  BY MR. GULICK:

25  Q.   Secretary Ross, is this the constitutional provision that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  you were referring to in your testimony?

2  A.   It is, Article XIV, Section 5, entitled Conservation of

3  Natural Resources.  And it reflects both the mission of the

4  department and the concerns that the State of North Carolina

5  has about emissions from coal-fired power plants and about

6  those of TVA in particular.

7  Q.   Can you explain what those concerns are in reference to

8  this provision.

9  A.   Yes.  Let me just focus on a couple of the phrases and

10  provisions here in the first paragraph.

11      It's the "policy of the State to conserve and protect its

12  lands and waters."

13      And the next phrase to me is particularly important, "for

14  the benefit of all its citizenry."

15      It's the proper function of the state and "its political

16  subdivisions to acquire and preserve park, recreational, and

17  scenic areas, to control and limit the pollution of our air

18  and water" -- leave out that next phrase -- "and in every

19  other appropriate way to preserve as part of the common

20  heritage of this State its forests, wetlands, estuaries,

21  beaches, historical sites, openlands, and places of beauty."

22      And it seems to me reflected in that paragraph are the

23  concerns the state has about the harms that come from

24  emissions from coal-fired power plants and that inform the

25  mission of our department.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM ROSS - DIRECT

1     Part of the concerns we have relate to the common
2  heritage that this provision refers to.  That the state has an
3  interest in seeing its forests and lands and waters preserved.
4  The idea of the common heritage is that we're leaving
5  something for the generations that come after that will
6  support -- that will be in good shape, that will support
7  healthy lives and that will promote the economic vitality of
8  the region and the state as a whole.
9     And so whether you're looking at the impact potential and
10 the actual impacts of emissions on the natural resources from
11 acid rain or reduced vistas, scenic vistas or ozone, or
12 whether you're worried about the impacts on people from ozone
13 and fine particle pollution, the interests of the state and
14 concerns that we have are reflected in this paragraph.
15 Q.   Secretary Ross, are you familiar -- were you secretary at
16 the time that the Clean Smokestacks Act was enacted?
17 A.   I was.  I was -- if I -- I might -- one more statement
18 I'd like to make with respect to this paragraph before we talk
19 about that is that when you look at this first paragraph and
20 you look at this region, you think about the park and
21 recreational and scenic areas that are so important to the
22 region and the state, the national ones that we've heard
23 talked about, Blue Ridge Parkway, Great Smoky Mountains
24 National Park, the state parks like Mt. Mitchell, privately
25 owned areas like Grandfather Mountain, and you think about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  recreational opportunities like the Mountains To Sea Trail
2  that goes from Clingman's Dome all the way to the coast, these
3  are all resources that are at risk from the emissions from
4  coal-fired power plants.
5  Q.   Mr. Secretary, are you familiar with the concerns that
6  led to the passage of the Clean Smokestacks Act?
7  A.   I am.  It seemed to me that two threads or two kinds of
8  concerns came together to set the stage and drive the
9  enactment of that statute.  One was a concern about the
10 impacts on human health of emissions from coal-fired power
11 plants, the asthma related, cardiovascular related impacts,
12 and a perception in the 2001 time frame that something needed
13 to be done to reduce the emissions from coal-fired power
14 plants in North Carolina and in other -- and outside North
15 Carolina.
16      And at the same time, there merged with that the
17 conclusions and recommendations of a ten-year study that we've
18 heard about, the SAMI study, the Southern Appalachian
19 Mountains Initiative, which looked at the impact of emissions
20 on Class I areas in the mountain -- in the Southern
21 Appalachian Mountains.
22      The -- and the SAMI study, what it brought to the
23 discussion was an understanding that these emissions were
24 having impacts on these important natural resources in the
25 Southern Appalachian region, this eight state area, and an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  understanding about what needed to be done to address those

2  emissions.  The basic SAMI conclusion was that a state could

3  do the most to clean up its air quality by cleaning up at

4  home, but that it couldn't do that -- but even if it did that,

5  it would still need reductions from surrounding states and

6  from outside the SAMI region to achieve the kinds of

7  reductions that were needed.

8       And so those two things came together and informed, in my

9  view, the legislative debate and made it possible for the bill

10 to be debated in 2001 and passed in 2002.

11 Q.   And does the Clean Smokestacks Act, in your view, reflect

12 both of those concerns?

13 A.   It does indeed.  It reflects the fact that significant

14 reduction of emissions from North Carolina's coal-fired power

15 plants will have benefits both in terms of human health and in

16 terms of impacts on human health and welfare and on natural

17 resources.

18 Q.   You indicated that North Carolina can't do that alone.

19 A.   That's correct, and the law contained a provision that

20 directed the state to seek comparable reductions on a

21 comparable schedule from other sources of emissions.

22 Q.   And was that reflective of one of the findings of SAMI?

23 A.   It was, but I paraphrased those earlier.  But again, get

24 the most -- a state could get the most benefit from cleaning

25 up its emissions at home, but then would need to look to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  surrounding states and other regions to achieve the emissions

2  reductions that were needed.

3  Q.   And that was true of North Carolina?

4  A.   It was.

5  Q.   Is it true --

6  A.   And then -- and that's what -- it was true of North

7  Carolina and that's what the Clean Smokestacks Act set our

8  state on the course of doing.  But it was also true of the

9  other states that were involved in the eight state SAMI

10 region.

11 Q.   So it was true of Tennessee?

12 A.   True.

13 Q.   And Alabama?

14 A.   True.

15 Q.   And Kentucky?

16 A.   True.

17 Q.   Secretary Ross, is it fair and reasonable for the State

18 of North Carolina to expect for TVA to reduce its emissions

19 the way that the state is requiring of Duke and Progress?

20 A.   It is.  It is and it's crucial for those reductions to

21 occur if our state is to safeguard human health, if we are --

22 and public health, if we are to protect our natural resources

23 and if we're to maintain and promote the economic vitality of

24 this region and this state.

25        MR. GULICK:  I have no further questions, Your

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Honor.

2          THE COURT:  All right.  Cross examination.

3          MS. COOPER:  Your Honor, before I start, I'd like to

4  approach and bring a notebook with some documents I'd like to

5  talk to Secretary Ross about.  These are all contained in our

6  other exhibit books, but it will be easier to use this one, I

7  think.

8          May I approach the witness?

9          THE COURT:  Yes, Ms. Cooper.  You may proceed.

10                     CROSS EXAMINATION

11  BY MS. COOPER:

12  Q.  Secretary Ross, you have been the Secretary of the

13  Department of Environment and Natural Resources, which I may

14  call DENR; is that appropriate?

15  A.  Yes, ma'am.

16  Q.  Since -- you've been the secretary since January 2001;

17  isn't that right?

18  A.  That's correct.

19  Q.  Now, as secretary of DENR, you have supervisory

20  responsibility over all of DENR, correct?

21  A.  That's correct.

22  Q.  Including over the Division of Air Quality; isn't that

23  right?

24  A.  Correct.

25  Q.  You have worked with Sheila Holman, the Chief of the

Case 1:06-cv-00020-LHT  Document 202  Filed 06/15/09  Page 69 of 97

1  Planning Section of the Division of Air Quality; is that

2  right?

3  A.    Yes.

4  Q.    Do you agree that Ms. Holman does a good job?

5  A.    Yes.

6  Q.    Do you agree that she is knowledgeable about air quality

7  in North Carolina?

8  A.    I found that she is.

9  Q.    And is it true that you have confidence in the work of

10 the Division of Air Quality?

11 A.    I do.

12 Q.    All right, sir.  Now, DENR prepares an annual report

13 about the implementation of the Clean Smokestacks Act during

14 the preceding year, doesn't it?

15 A.    Yes.

16 Q.    And those reports are submitted to the North Carolina

17 Environmental Review Commission and the Joint Legislative

18 Utility Review Commission, correct?

19 A.    That's correct.

20 Q.    And they're submitted at the end of May, around June 1st

21 every year.

22 A.    That's correct.

23 Q.    And they're submitted jointly over the signatures of the

24 Chairman of the Utilities Commission and the Secretary of

25 DENR; is that correct?

Case 1:06-cv-00020-LHT   Document 202   Filed 06/15/09   Page 70 of 97

1  A.   That's correct.

2  Q.   And that's you, correct?

3  A.   That's correct.

4  Q.   Now, you would agree that the reports you submit are

5  accurate, would you not?

6  A.   We try to make them accurate.  We work hard to do that.

7  Q.   All right.

8          MS. COOPER:  Now, I apologize, Your Honor, for the

9  necessity of this, but plaintiffs have lodged an objection to

10  the -- at least in their writings in the formal objections

11  that they've served, to the authenticity of these Clean

12  Smokestacks Act reports.  So I'm going to have to ask Mr. Ross

13  to take a look at the exhibit, what's marked in that book as

14  Defendant's Exhibit 24.

15          THE COURT:  All right.

16          THE WITNESS:  I have that.

17  Q.   And sir, can you tell me --

18          MR. GULICK:  Your Honor, just for the record, we

19  object -- we wanted a foundation laid.  I don't think we

20  objected to the authenticity.

21          MS. COOPER:  Actually, you did, sir.  You have an

22  evidentiary -- lack of -- lack of foundation required by

23  Rule 901 which goes to authenticity.  If you're willing to

24  stipulate to the authenticity of the Smokestacks Act reports

25  that you produced to us plus the one that's already in

Case 1:06-cv-00020-LHT  Document 202  Filed 06/15/09  Page 71 of 97

1    evidence, I'll be glad to just offer them.

2          MR. GULICK:  Your Honor, I don't see any necessity

3    in -- we would stipulate that these are authentic copies of

4    documents.  We had preserved a general objection to a number

5    of documents as to what foundation they had.  But these are

6    authentic copies and we'll stipulate them.

7          MS. COOPER:  Thank you.

8          THE COURT:  So you'll stipulate, then, that --

9          MR. GULICK:  I'm referring to the reports.

10         THE COURT:  -- Defendant's Exhibit Number 24 --

11         MS. COOPER:  And let me add to that, Your Honor, 25

12   which is the 2004 report, 27 which is the 2005 report, 30

13   which is the 2006 report, and 33 which is the 2007 report.

14   For the record, the 2008 report has already been admitted as

15   Plaintiff's Exhibit 10.

16         THE COURT:  All right.  24 is 2000...

17         MS. COOPER:  Three.

18         THE COURT:  Three.  27 is 2005?

19         MS. COOPER:  25 is 2004, I believe.

20         THE COURT:  25...

21         MS. COOPER:  Is 2005.  No, I'm sorry.  Let me go

22   back a minute.  24 is 2003, 25 is 2004.

23         THE COURT:  All right.  And 33 --

24         MS. COOPER:  33 is 2007.

25         THE COURT:  And these are all stipulated as being

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  accurate copies of the reports?

2          MS. COOPER:  And may I add to that, Your Honor,

3  Exhibit 27 which is the 2005 report and Exhibit 30 which is

4  the 2006 report.

5          MR. GULICK:  We stipulate the authenticity of those

6  implementation reports under the Clean Smokestacks Act, Your

7  Honor.

8          MS. COOPER:  And we move their admission, Your

9  Honor.

10          THE COURT:  All right.  Now, have I got all of them?

11  24, 25, 33, 27 and 30.

12          MS. COOPER:  Yes, Your Honor.

13          THE COURT:  All right.  Let those be admitted.

14          (Defendant's Exhibits Numbers 24, 25, 27, 30 and 33

15  were received into evidence.)

16          MS. COOPER:  Thank you, Your Honor.

17  BY MS. COOPER:

18  Q.   Now, Secretary Ross, would you turn to Exhibit Number 48

19  in your book.

20  A.   I have that.

21  Q.   All right, sir.  And can you identify that document for

22  us.

23  A.   Yes.  It's a letter I sent to John Shipp of TVA back in

24  September of 2002.

25  Q.   All right.  And when you sent this letter, you believed

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  it to be accurate; is that right?

2  A.   Yes.

3  Q.   Now, would you turn your attention to the first paragraph

4  of the letter.

5  A.   Okay.

6  Q.   Would you read that to us, please.

7  A.   "I want to thank you for the valuable information on

8  TVA's emissions control plans, an accomplishment you recently

9  provided us in our meeting in Asheville.  It's apparent that

10 TVA has accomplished a lot.  When the planned reductions are

11 made, both Tennessee and North Carolina should benefit further

12 from these efforts."

13 Q.   All right.  Do you recall what the valuable information

14 was that TVA provided about its emission control plans and

15 accomplishments?

16 A.   I don't recall the specifics.  At a meeting in Asheville

17 I sat down with John Shipp, and there were some folks from our

18 Division of Air Quality and perhaps some other TVA folks.  The

19 purpose of the meeting was to have Mr. Shipp describe what

20 was -- what TVA was doing with respect to reducing its

21 emissions from coal-fired power plants.

22      And so this letter was a follow-up to that meeting

23 thanking Mr. Shipp for the discussion, setting out in the

24 second paragraph the legislative directive that we were

25 operating under, and requesting in the third paragraph more

1  detailed information about TVA's emissions reduction plan in

2  order that we might be able to make a judgment about whether

3  TVA's plan offered comparable reductions on a comparable

4  schedule, that phrase from the Clean Smokestacks Act.

5  Q.    And in the final paragraph, you say, "Congratulations to

6  TVA for commencing such an important effort that is so crucial

7  to the citizens of our two states," correct?

8  A.    That's correct.

9  Q.    Now, if you would turn back to Exhibit 24 which is the

10 2003 Smokestacks Act report.  I don't believe the pagination

11 is legible, but there is a number on the right-hand corner

12 that's NC, a lot of zeros and 9.  Do you see that?

13 A.    Yes.

14 Q.    And if you go down to the third bullet, there appears to

15 be a discussion of the meeting that you were just talking

16 about.  Would you read that to us, please.

17 A.    "A meeting was held between DENR/DAQ and the TVA and the

18 Tennessee Air Program officials in August 2002 to discuss

19 actions planned by TVA that would be comparable to the Clean

20 Smokestacks Act.  TVA presented their plans to add five

21 additional $SO_2$ scrubbers to power plants primarily in the

22 eastern portion of the TVA system.  These new scrubbers should

23 benefit North Carolina most.  TVA plans to complete

24 installation of the new facilities by 2010, and the first

25 plant, Paradise, will be installed by 2006.  Regarding NOx

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM ROSS - CROSS

1  control, TVA is on schedule to have the first eight of its

2  selective catalytic reduction systems in place.  TVA plans to

3  add 25 boiler units controlled by 2005 at a cost of

4  1.3 billion which will reduce ozone season NOx by 75 percent."

5  Q.   Secretary Ross, does that refresh your recollection about

6  the valuable information that TVA provided during the meeting?

7  A.   Well, it seems consistent with what the answer I gave you

8  earlier which was we asked what their plans were regarding

9  emissions reductions and made the request of the additional

10  information, so these two seem consistent to me.

11  Q.   Thank you, sir.

12       Now, if you don't mind, would you turn to the document

13  that has been marked Exhibit 51.

14  A.   Okay.  I have that.

15  Q.   All right.  And can you identify this document for us.

16  A.   This is a letter from John Shipp to me dated February 11,

17  2003.

18  Q.   All right.  And do you remember receiving this document?

19  A.   Well, I see a note in the upper right-hand corner that's

20  in my handwriting, "File DAQ Clean Smokestacks."  And I don't

21  specifically remember receiving it, but I must have.

22  Q.   All right.  Would you read the first paragraph to us.

23  A.   "This is a follow-up to our January 23, 2003, meeting

24  with Brock Nicholson and Sheila Holman of your Division of Air

25  Quality and in response to your letter of September 25, 2002,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  concerning our emission control plans and accomplishments.

2  TVA appreciates the opportunity to learn of your data needs

3  and will assist in your efforts to accurately represent TVA

4  sources in your air quality modeling studies."

5  Q.   Thank you, sir.  So at that time DENR was planning to do

6  some air quality monitoring studies; is that right?

7  A.   I don't remember specifically.  This letter suggests

8  that.  And I know that from the earlier letter, we were

9  requesting additional information from TVA.  So I don't have

10  specific memory of what modeling exactly was planned at that

11  time.

12  Q.   All right, sir.  Are you aware that DENR has not done any

13  modeling that has been presented to this court in support of

14  North Carolina in this case?

15  A.   I'm not aware of what modeling the Division of Air

16  Quality has done on this particular -- on this matter.  I'm

17  not aware of that.

18  Q.   Okay, sir.  Now, this February 11th, 2003, letter that's

19  been marked as Exhibit 51 states that TVA planned to install

20  additional NOx reduction systems at 25 units at a cost of

21  $1.3 billion which would have -- which would lower ozone

22  season NOx emissions by 75 percent, correct?

23  A.   I'm sorry?

24  Q.   I'm actually reading from the second paragraph.

25  A.   Okay.

1 Q. And it says that TVA plans to install additional NOx

2 reduction systems at 25 units at a cost of $1.3 billion which

3 would lower ozone season NOx emissions by 75 percent, correct?

4 A. So which paragraph?

5 Q. The second one, sir.

6 A. And this is Exhibit 51?

7 Q. Yes, sir.

8 A. And that's the last sentence in the paragraph?

9 Q. Well, it says, "For our NOx reduction program we have

10 completed the first four SCR systems and another four SCRs

11 will be operational this coming ozone season. These systems

12 are part of our announced plan to install NOx reduction

13 systems to further control NOx from 25 units. All these

14 controls will be installed by 2005 at a cost estimated at

15 1.3 billion, helping TVA to lower its ozone season NOx

16 emissions by 75 percent."

17 A. Okay. I see that, yes.

18 Q. All right, sir. And it also says, if you look at the

19 third paragraph, that "we have recently signed a $1.5 billion

20 contract for an additional five FGD scrubbers to further

21 control $SO_2$ emissions." And then it goes on and says that

22 when those scrubbers are installed, TVA's $SO_2$ emissions would

23 be reduced by 85 percent, correct?

24 A. That's what it says.

25 Q. All right, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1      MS. COOPER:  Your Honor, we offer Exhibits 48 and 51

2  into evidence.

3      THE COURT:  Let those be admitted.

4      (Defendant's Exhibits Numbers 48 and 51 were

5  received into evidence.)

6  BY MS. COOPER:

7  Q.  Now, sir, will you turn to what has been marked as

8  Exhibit 54 in your book.

9  A.  Okay.

10  Q.  And is that your handwriting at the top of the document?

11  A.  It is.

12  Q.  All right, sir.  Can you identify this document for us.

13  A.  It's a letter that TVA president and chief operating

14  officer sent to the Region 4 Administrator Jimmy Palmer on

15  November 9, 2004.

16  Q.  All right.  And you obviously received a copy of this

17  letter, correct?

18  A.  I don't remember it, but I put this note on it so I did.

19  Q.  Now, this letter says that TVA began -- I'm looking now

20  at the last paragraph of the first page and going on to the

21  first paragraph of the second page.

22      "To further improve local and regional air quality and

23  comply with the NOx SIP Call rule, TVA began installing SCRs

24  on 25 coal-fired units at seven plants in 1999.  Eighteen

25  systems have now been completed."  And then there's a list of

Case 1:06-cv-00020-LHT  Document 202  Filed 06/15/09  Page 79 of 97

1  plants.

2      And then it says, "Colbert unit 4 has similar advanced

3  NOx reduction technology.  By 2005 two additional SCRs will be

4  completed on Kingston units 5 and 6, with the final unit

5  receiving an SCR by ozone season 2006."  And then it goes on

6  to talk about --

7          MR. GULICK:  Your Honor, is she going to ask a

8  question about this?

9          MS. COOPER:  Yes, I am.

10 Q.   "As a result, this ozone season TVA should show a

11 70 percent reduction in NOx emissions from 1995 levels."

12      Now, this letter, which was dated November 2004, says

13 that TVA had 18 SCRs and that three more would be completed by

14 the end of ozone season -- or by ozone season 2006.  Do you

15 know whether that's been done?

16 A.   No.  When -- part of the note is cut off, but when I

17 received information about what TVA was doing, what I would

18 have done and what I believe I did with this letter is send it

19 to the Division of Air Quality to evaluate it.

20 Q.   So that you don't -- as you sit here, you don't really

21 know what TVA was doing to control NOx or $SO_2$.

22 A.   I don't know specifically.  I know that when information,

23 as I said, came from TVA, I would send it to the Division of

24 Air Quality for them to evaluate in terms of whether TVA was

25 making those comparable reductions on a comparable schedule to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    the one we had.

2    Q.   All right.  Let me direct your attention to the

3    penultimate paragraph of the letter on the second page which

4    says, "TVA is committed to doing its part to assist Valley

5    States to continue the improvement in air quality.  While

6    current plans may change in response to future events, such as

7    the administration's Clean Air Interstate Rule, we are

8    confident that emissions on TVA's system will continue to be

9    reduced and are committed to this effort."

10        Now, at the time of this letter, TVA said that it was

11   committed to making reductions even before CAIR was

12   implemented.  Didn't it say that?

13   A.   That's what this paragraph says.

14   Q.   All right, sir.

15   A.   I don't remember CAIR's calendar exactly, but that's what

16   this says.

17        And as I say, our effort always was to take the

18   information that TVA provided and to try to determine whether

19   the actions TVA was taking met the standard of the state law

20   that we were operating under.

21   Q.   All right, sir.  Are you familiar with the Clean Air Act

22   Section 126 Petition filed by North Carolina with EPA in 2004?

23   A.   In a general way, yes.

24   Q.   All right.  Would you turn to Exhibit 72 in your book.

25   A.   Okay.  I have that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Q.   All right.  And turn to page 23, to the fourth paragraph

2    beginning "The TVA."  Do you see that?

3    A.   Yes.

4    Q.   All right.  "The TVA has embarked on a plan to effect

5    sizable reductions of emissions of $SO_2$ and NOx from some of

6    its coal-fired facilities primarily in Tennessee.  TVA plans

7    to reduce $SO_2$ emissions by approximately 45 percent from 1998

8    levels by 2007.  And over the same period, it intends to

9    reduce annual NOx emissions also by 45 percent.  From 1993, a

10   recent peak emissions year for $SO_2$, TVA plans to reduce $SO_2$

11   emissions 66 percent by 2007.  TVA's NOx emissions peaked in

12   1995.  The projected 2000 levels represent a 58 percent

13   reduction from that year.  These cuts are, while very positive

14   steps, not the same levels of reductions that North Carolina

15   is requiring of its own sources."

16        Then it goes on to say, "The State is pleased that TVA

17   has attacked this problem and is moving forward.  Even so,

18   TVA's plan is voluntary and addresses only a part of the

19   problem."  Then it goes on and talks about other states.

20        Now, as far as you're concerned, that was an accurate

21   statement in 2004, wasn't it?

22   A.   As far as I know, as far as I'm concerned it was.  It

23   reflects, again, the process that we were going through of

24   trying to get the best information we could from TVA and about

25   TVA and then measuring that against the standard in the Clean

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Smokestacks Act.  We were hopeful that TVA's claims that its

2    reductions were comparable on a comparable schedule would

3    prove out.

4    Q.   So in 19 -- I'm sorry, in 2004, according to this

5    petition that North Carolina filed, TVA was planning to make

6    sizable reductions in emissions which were very positive steps

7    and the state was pleased, correct?

8    A.   Well, the document says what it says here.  That's part

9    of what it says.

10   Q.   All right.  Well, about 18 months later, not even that

11   much, North Carolina brought this lawsuit claiming that TVA

12   was a public nuisance.  Now, TVA didn't suddenly abandon its

13   emission control program, did it?

14   A.   I don't know the answer to that question.

15   Q.   All right, sir.

16        MS. COOPER:  Your Honor, I'd like to offer Exhibits

17   54 and 72 into evidence.

18        THE COURT:  Let those be admitted.

19        (Defendant's Exhibits Numbers 54 and 72 were

20   received into evidence.)

21   Q.   Now, Mr. Ross, you're aware that your counterpart agency

22   in Tennessee, the Tennessee Department of Environment and

23   Conservation, issues operating permits to TVA's coal-fired

24   plants in Tennessee, are you not?

25   A.   Could you repeat that question, please, ma'am.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.    Yes.  You are aware that your counterpart agency in

2  Tennessee, the Tennessee Department of Environment and

3  Conservation, issues operating permits to TVA's coal-fired

4  plants in Tennessee, correct?

5  A.    Yes.

6  Q.    And you are also aware that those operating permits set

7  limits on the emissions of sulfur dioxide by each plant; is

8  that not true?

9  A.    I assume that's true.  I haven't looked at those permits,

10 but I assume it's true.

11 Q.    Now, isn't it also true that North Carolina could object

12 to those permits if it chose to?

13 A.    I believe that's correct.  I haven't looked at those --

14 I'm not immediately familiar with those rules, but I believe

15 that's correct.

16 Q.    And North Carolina could object to the permits on grounds

17 that the permit allows too much sulfur dioxide to be emitted;

18 isn't that right?

19 A.    Yes.

20 Q.    North Carolina has never done that, has it?

21 A.    As far as I know, no.

22 Q.    All right.  And if I asked you the same questions about

23 Kentucky and the Air Regulatory Agency there and TVA's plants

24 in that state, would your answers be the same?

25 A.    It would.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And would your answers be the same as well for Alabama

2  and TVA's plants in that state?

3  A.   Yes.

4  Q.   Thank you, sir.

5       Now, I'd like you to turn to the 2008 Clean Smokestacks

6  Act report which has been previously admitted as Plaintiff's

7  Exhibit 10.

8  A.   If I could add one other thing to my answer.  Your

9  question was did we send some sort of request to the agency in

10  Tennessee or one of the other states you mentioned requesting

11  a lower sulfur dioxide or other pollutant emission rate; is

12  that --

13  Q.   Well, the question really had to do with the process.

14  A.   And so in that meeting in 2002, the Shipp letter

15  reflected a meeting not just with TVA officials, but also with

16  State of Tennessee officials talking about the -- TVA's

17  emissions reductions plans, but also the section of the Clean

18  Smokestacks Act that called for comparable reductions on

19  comparable schedules.  So --

20  Q.   That's the letter that's been marked as -- it's been

21  admitted as Exhibit 48.

22  A.   Yes, and that letter doesn't refer to Tennessee agency

23  officials, but it seems to me the other document you showed me

24  did, the Clean Smokestacks Act report that referred to that

25  meeting.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Yes, sir.  And this letter is the one that said

2  congratulations to TVA after the meeting.

3  A.   Among other things.

4  Q.   Yes, thank you.

5       If you would turn now to -- I was trying to get through

6  this, but Plaintiff's Exhibit 10.  It's also TVA's Exhibit

7  marked 36 that's in your book.  It is the 2008 Smokestacks

8  report.

9  A.   I have that.

10 Q.   All right.  And if you would turn to page 16.  And the

11 penultimate paragraph, the last sentence, reports that TVA has

12 recently announced that its board of directors had approved

13 the expenditure of more than 600 million to install NOx and

14 $SO_2$ controls on its John Sevier plant, which is the closest

15 facility to North Carolina, by 2012.  Do you see that?

16 A.   I do.

17 Q.   Do you believe that it is an accurate statement?

18 A.   I believe it's an accurate statement.

19 Q.   All right.  Now, if you would turn to Section 5 of this

20 report which begins on page 17 and concludes on page 18.

21 A.   Say that again, please.

22 Q.   Section 5 of the report --

23 A.   Okay.

24 Q.   -- which refers to Section 11 of the act found at the

25 bottom of 17 and also goes on to 18.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1        Do you have that, sir?

2    A.    I do have it, yes.

3    Q.    All right.  Now, this section of your report provides

4    information about Section 11 of the Clean Smokestacks Act,

5    does it not?

6    A.    Yes.

7    Q.    And isn't it true that under Section 11, the

8    Environmental Management Commission was required to study and

9    report on the desirability and feasibility of obtaining

10   additional NOx and $SO_2$ reductions from Duke and Progress

11   units?

12   A.    Correct.

13   Q.    And Section 11 also required the commission to report

14   annually beginning on or about September 1, 2005, correct?

15   A.    Correct.

16   Q.    The commission didn't meet that requirement, did it?

17   A.    No.

18   Q.    In fact, the legislature amended the Clean Smokestacks

19   Act and changed the requirement to begin on September 1, 2007,

20   didn't it?

21   A.    Yes.

22   Q.    Do you agree that the Smokestacks Act could be amended in

23   the future?

24   A.    It could be, yes.

25   Q.    All right.  Now, has there been any Section 11 report

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  submitted?

2  A.   I believe that the commission has submitted two reports.

3  Q.   All right.  Would you turn to what has been marked as

4  Defendant's Exhibit 40 in your book.

5  A.   Okay.

6  Q.   And are those the two reports that you referred to, the

7  reports submitted under Section 11?

8  A.   Yes.

9  Q.   Thank you, sir.

10        MS. COOPER:  Your Honor, I offer Exhibit 40 into

11  evidence.

12        THE COURT:  Let it be admitted.

13        MS. COOPER:  Thank you.

14        (Defendant's Exhibit Number 40 was received into

15  evidence.)

16  Q.   Turning now to what has been marked as Defendant's

17  Exhibit 66.  Can you identify that for us?

18  A.   Let me look at it just a minute here.

19  Q.   All right.

20        (Pause.)

21  A.   This is a letter from Roy Cooper dated August 9, 2002, to

22  Attorney General Paul Summers of Tennessee.

23  Q.   And you're listed as someone who received a copy,

24  correct?

25  A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   All right.  And if I may summarize this letter, it

2  essentially is asking the attorney general of Tennessee to

3  encourage adoption of a law in Tennessee similar to the Clean

4  Smokestacks Act; is that correct?

5  A.   Let me refer to it -- or review it just one more minute.

6  Q.   All right.

7       (Pause.)

8  A.   That's correct.  It, in addition, says in that last

9  sentence on the first page that "we encourage our neighbors to

10 pursue similar efforts.  The quality of our air depends on all

11 of us and North Carolinians do not want the benefits created

12 by this new law to be lost because of emissions from other

13 states.  We will look at all the options available to us to

14 ensure that that does not happen."

15 Q.   All right, sir.  And now, would you take a look at what's

16 been marked as Exhibit 67 which appears to be a letter back

17 from Paul Summers, Attorney General of Tennessee, to Roy

18 Cooper, Attorney General of Tennessee -- I'm sorry, North

19 Carolina dated September 20, 2002.  Are you -- do you recall

20 this document, sir?

21 A.   Let me review it for just a minute.

22 Q.   Sure.

23      (Pause.)

24 A.   I don't remember this letter specifically.  I may have

25 seen it back then, but I don't remember it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Well, would it have been routine for you to have received

2  an incoming response when you saw the outgoing letter?

3  A.   It would have been routine, but sometimes those things

4  don't happen.  And I don't see myself listed as a copied

5  recipient on it so I'm sorry, I don't remember.

6  Q.   Thank you, sir.

7        MS. COOPER:  Your Honor, I'd like to offer 66 into

8  evidence.

9        THE COURT:  Let it be admitted.

10        (Defendant's Exhibit Number 66 was received into

11  evidence.)

12  Q.   Secretary Ross, are you familiar with North Carolina's

13  notice of intent to sue TVA for NSR violations?

14  A.   I don't remember that document.

15  Q.   I'm afraid it's not in the book so we're going to have to

16  put it over here.

17        Now, that's the first page of the letter.

18  A.   Yes, ma'am, I can't -- my eyes are bad and the type is

19  small.  I can't read it on this -- there is a sign that says

20  it's auto focusing.

21  Q.   Does that help?

22  A.   That's a little better.

23  Q.   And let me know when you're ready for me to turn the

24  page.

25  A.   Okay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1           MS. COOPER:  That is not in your book, Your Honor.

2    Q.   And here's the second page.

3    A.   If you can leave -- there we go.

4           MS. COOPER:  It is, however, in Book 4 of the TVA

5    exhibits.

6           THE COURT:  Yes, I am looking at it now.  Thank you.

7           THE WITNESS:  Okay, I read that page.

8    Q.   All right.

9    A.   And read that one -- or hadn't read it, but I see what it

10   is.

11   Q.   You probably don't want to read this one.

12   A.   It's upside down.

13   Q.   The question I wanted to ask you is whether that

14   refreshed your recollection?

15   A.   I do believe I saw this when it was -- when it went out.

16   Q.   All right, sir.  Did you see TVA's response to the

17   letter?  It's Defendant's Exhibit 56 also in Book 4.  I note

18   for the record that you are listed as a CC on it.

19   A.   That's 66?

20   Q.   56, I'm sorry.

21   A.   I don't appear to have 56 in this.

22          MS. COOPER:  I'm sorry.  May I approach the witness?

23   A.   I quickly scanned this letter.  Would you like me to read

24   it?

25   Q.   I'm sorry, sir?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   I quickly scanned the letter.  Would you like me to read

2  it more carefully?

3  Q.   Well, first I'd like you to tell me whether you can

4  recall receiving it.

5  A.   I do remember receiving it.

6  Q.   All right, sir.  And would it be fair to conclude -- to

7  say that after North Carolina sent TVA this notice that it was

8  going to sue it for NSR violations, that it never did in fact

9  do that?

10  A.   I think that's correct.  The lawsuit that was filed was

11  based on nuisance ultimately.

12  Q.   Thank you, sir.

13       MS. COOPER:  Your Honor, I offer Exhibits 55 and 56

14  into evidence.

15       THE COURT:  Let those be admitted.

16       (Defendant's Exhibits Numbers 55 and 56 were

17  received into evidence.)

18       MS. COOPER:  Your Honor, I have no further

19  questions.

20       THE COURT:  Any redirect?

21       MR. GULICK:  Just a little bit, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. GULICK:

24  Q.   Secretary Ross...

25  A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM ROSS - REDIRECT

1  Q.   Is it your -- pardon me.  Is it your recollection that --
2  from your perspective, that the state received all of the
3  information that it wanted to find out if the reductions that
4  TVA was making were comparable to those being -- that were
5  being made under the Clean Smokestacks Act?
6  A.   My recollection is that we didn't receive what we needed
7  in order to make that determination.
8  Q.   I'd like to draw your attention back to one of the
9  exhibits that we put in front of you.  Bear with me a moment.
10 It's the 126 Petition which is Defendant's Exhibit Number 72
11 in the binder you were given.
12 A.   Okay.  I have that.
13 Q.   You found it?
14 A.   I do, yeah, I have it.
15          MR. GULICK:  Your Honor?
16          THE COURT:  Yes.
17 Q.   What is the date on this petition?
18 A.   The date is March 18, 2004.
19 Q.   And I'd like, if you would, Secretary Ross, go into Bates
20 stamped number page 147620.  Do you see that in the bottom
21 right-hand corner?
22 A.   Okay.  I have that page.
23 Q.   Going up to the body of the first paragraph, do you see
24 the sentence that begins, "As demonstrated and discussed more
25 fully below?"

Cheryl A. Nuccio, RMR-CRR (704)350-7494

WILLIAM ROSS - REDIRECT

1  A.   Yes.

2  Q.   Could you read that sentence.

3  A.   "As demonstrated and discussed more fully below, the

4  State is entitled to relief from certain emissions of sulfur

5  dioxide and oxides of nitrogen from large Electric Generating

6  Units in the states of Alabama, Georgia, Illinois, Indiana,

7  Kentucky, Michigan, Ohio, Pennsylvania, South Carolina,

8  Tennessee, Virginia and West Virginia."

9  Q.   Does this suggest to you, Secretary Ross, that the state

10 was not, in fact, satisfied with the reductions that TVA had

11 made or promised to make?

12 A.   Yes, it does suggest that.

13 Q.   Secretary Ross, with regard to the Clean Smokestacks Act,

14 have the requirements of the act that require a reduction of

15 emissions by Duke Energy and Progress Energy on a schedule

16 that ends in 2013, have those requirements been relaxed by

17 statute or otherwise?

18 A.   They have not been relaxed in any respect, and both

19 utilities are meeting their deadlines and on schedule to

20 achieve those caps that have yet to arrive, 2009, 2013.

21 Q.   Do you believe it is likely that legislation to relax

22 those would be likely to pass?

23 A.   I believe it's totally unlikely.

24      MR. GULICK:  I have no further questions, Your

25 Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    THE COURT:  Further cross?

2    MS. COOPER:  I have nothing further, Your Honor.

3    THE COURT:  All right.  Thank you, Secretary Ross.

4  That completes your examination and you may be excused.

5    THE WITNESS:  Thank you, Your Honor.

6    (Witness stepped down.)

7    THE COURT:  Any further evidence for the state?

8    MR. GULICK:  Your Honor, we have no more witnesses.

9  We would at this time, however, like to offer into evidence

10  our discovery designations.  They're contained in Binder

11  Number 9, Exhibits 443 to 5 -- 453 -- let me repeat that.  443

12  to 44 -- to 453, and also our counter-designations which were

13  filed June 16, 2008.

14    THE COURT:  Wait just a moment and let me --

15    MR. GULICK:  Pardon me, Your Honor.

16    THE COURT:  -- catch up with you here.

17    All right.  Let those be admitted.

18    MR. LANCASTER:  Your Honor, I would note those are

19  without objection with two points to note.  First, 445 through

20  453 were filed by the plaintiff under seal and should remain

21  that way.  They contain information designated as confidential

22  pursuant to the Protective Order.  And TVA submitted counter

23  designations of additional portions of the deposition

24  transcripts which under Rule 106 ought in fairness to be

25  considered with these designations and would ask that those

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  counter-designations be considered as well.

2        THE COURT:  All right.  445 and 453 are ordered

3  under sealed -- under seal until, and if, further court order.

4  And counter-designations of the same materials.

5        MR. LANCASTER:  Yes, sir.

6        THE COURT:  Likewise under seal.

7        All right.  With those qualifications, let those be

8  admitted.

9        MR. GULICK:  Thank you, Your Honor.

10        MR. LANCASTER:  Thank you, sir.

11        (Plaintiff's Exhibits Numbers 443 through 453 were

12  received into evidence.)

13        MR. GULICK:  We also have, and I don't know if I was

14  getting ahead of you.  We have counter-designations that were

15  filed on June 16, 2008, and we would also ask that those be

16  admitted into evidence.

17        THE COURT:  All right.  Let those be admitted.

18        (Plaintiff's counter-designations were received into

19  evidence.)

20        MR. GULICK:  With their admission, Your Honor, the

21  state rests.

22        THE COURT:  All right.  I see no reason to hurry

23  about starting.

24        MR. LANCASTER:  We'd appreciate starting in the

25  morning to tell the other side of the story, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Tell the rest of the story.

2          All right.  We will recess until tomorrow morning at

3  9 o'clock, at which time we will begin with defense evidence

4  and proceed accordingly.

5          (Evening recess at 5:35 p.m.)

6  UNITED STATES DISTRICT COURT

7  WESTERN DISTRICT OF NORTH CAROLINA

8  CERTIFICATE OF REPORTER

9

10

11          I certify that the foregoing transcript is a true

12  and correct transcript from the record of proceedings in the

13  above-entitled matter.

14

15          Dated this 22nd day of July, 2008.

16

17

18                         s/Cheryl A. Nuccio
                           Cheryl A. Nuccio, RMR-CRR
19                         Official Court Reporter

20

21

22

23

24

25


                  Cheryl A. Nuccio, RMR-CRR (704)350-7494