UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA    )
ex rel. Roy Cooper, Attorney )
General,                   )
                           )
          Plaintiff,       )   No. 1:06-CV-20
                           )
     vs.                   )   **VOLUME 1A**
                           )
TENNESSEE VALLEY AUTHORITY, )   [Page 1-135]
                           )
          Defendant.       )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 14th, 2008

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

    JAMES C. GULICK, Senior Deputy Attorney General
    MARC BERNSTEIN, Special Deputy Attorney General
    North Carolina Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina

    MICHAEL D. GOODSTEIN, Esquire
    ANNE E. LYNCH, Esquire
    Resolution Law Group, P.C.
    5335 Wisconsin Avenue NW, Suite 360
    Washington, DC

On Behalf of the Defendant:

    FRANK H. LANCASTER, Senior Attorney
    HARRIET A. COOPER, Assistant General Counsel
    THOMAS F. FINE, Assistant General Counsel
    MARIA V. GILLEN, Assistant General Counsel
    Tennessee Valley Authority
    400 West Summit Hill Drive
    Knoxville, Tennessee

    Karen H. Miller, RMR-CRR, Official Court Reporter

**I N D E X**

**GOVERNMENT WITNESSES:**                                    PAGE


BROCK NICHOLSON
    Direct Examination By Mr. Gulick              33
    Cross Examination By Ms. Cooper              119


**PLAINTIFF'S EXHIBITS**

**NUMBER**                                            **ADMITTED**

    1,2,3                                          87
    5A                                             95
    5,6,7                                         102
    10                                            111
    11,13                                         118

KAREN H. MILLER, RMR-CRR   (828) 771-7217

P R O C E E D I N G S

**THE COURT:**  We now call the case of the State of North Carolina vs. Tennessee Valley Authority.

Is defendant ready to proceed?

**MR. GULICK:**  We are, Your Honor.

**THE COURT:**  And the Tennessee Valley Authority?

**MR. LANCASTER:**  We are, Your Honor.

**THE COURT:**  All right.  I will recognize the plaintiff, State of North Carolina, counsel for a 30-minute opening statement.  Not to exceed 30 minutes, that is.  So you may proceed.

**MR. GULICK:**  Thank you, Your Honor.  May it please the Court.

It is a fair and reasonable demand on the part of the sovereign that the air over its territory should not be polluted, that the forests on its mountains should not be destroyed or threatened by the act of persons beyond its control.  These are the words of the United States Supreme Court, Your Honor, and this is the relief that the State of North Carolina seeks from Tennessee Valley Authority in this case.

Judge Thornburg, my name is Jim Gulick, and with me at counsel table are my co-counsel, Mike Goodstein, Anne Lynch and Mr. Marc Bernstein standing over here.  Together, we are here to represent the State of North Carolina in this

1    matter.

2         Common law public nuisance claims have existed for

3    centuries, and they provide a significant legal remedy for

4    the significant interference of public rights.

5         As the Supreme Court of the United States

6    recognized, air pollution is, quote, one of the most

7    notorious types of public nuisance in modern experience,

8    close quote.

9         In this case, we are proceeding under the laws of

10   the States of Kentucky, Tennessee and Alabama, which are the

11   states where the plants that emit the pollutants in question

12   that are owned by Tennessee Valley Authority exist.  That's

13   where the pollution is emitted, but the harms from that

14   pollution come to the state of North Carolina here in the

15   mountains and elsewhere in the state.

16        Each of these states has found under its law that

17   air pollution can be actionable under the law of nuisance in

18   that state.  Your Honor is already familiar with that law.

19   Injunctive relief is an appropriate remedy for the abatement

20   of a public nuisance.

21        Our proof will show, Your Honor, that the emissions

22   from Tennessee Valley Authority harm the public health and

23   environment of the state of North Carolina as well as

24   throughout the region.  In particular, our proof will show

25   that their emissions cause premature death, cardiovascular

1 and respiratory disease, exacerbated asthma, and other

2 similar disease.

3        In addition, TVA's emissions have harmed and

4 continue to harm the environment of the state, degrading

5 visibility, especially the beautiful mountains of western

6 North Carolina, damaging the forests and streams with acid

7 deposition and causing damage from ozone.  All of these

8 injuries are unreasonable interference with public rights in

9 the state of North Carolina.

10        TVA's emissions are also unreasonable, Your Honor,

11 because there is available to TVA reasonable approved and

12 feasible controls by which -- that they can install on their

13 plants to control their pollution to a very large degree.

14        In 2002, at the urging of its own citizens, some of

15 whom you will hear from in this case, the State of North

16 Carolina enacted the Clean Smokestacks Act.

17        The Clean Smokestacks Act requires the two large

18 public utilities in this state, which are privately owned,

19 investor-held utilities, Duke Power and Progress Energy, to

20 install pollution controls on their coal-fired facilities in

21 the state, reducing from 1998 levels by approximately 75

22 percent the pollution which was coming from those plants, and

23 they needed to be controlled.  In addition, the control of

24 sulfur dioxide emissions and oxides of nitrogen, two

25 principal pollutants that are emitted, also will result in a

significant co-benefit of reducing mercury emissions from
these plant.

North Carolina has monitored the progress of the
installation of pollution controls from Duke and Progress
Energy and they are on track to complete the progress that
they have to make to complete those controls according to the
timetable set forth in the Clean Smokestacks Act.

You will hear they have met their 2007 cap under
that act for annual emissions of oxides of nitrogen, or Nox,
as it's called, and the sulfur dioxide emissions in
anticipation of the 2009 interim cap.  And you will hear they
are indeed on schedule to meet the 2013 cap, which is the
ultimate cap provided in that act.

While North Carolina recognized the importance of
controlling the emissions from its own large utilities, it
also recognized that it was important, Your Honor, that it
needed to have pollution control from similar facilities
outside the state whose emissions of pollution are coming
into the state of North Carolina and also degrading its air
quality.  Among those is Tennessee Valley Authority.

For a ten-year period starting in 1992, Your Honor,
the State of North Carolina and seven other states, and
numerous utilities and industry and environmental groups and
the federal government, joined in a process called the
Southern Appalachian Mountain Initiative, known as SAMI for

short.  It was one of the participants.  Indeed, it was one
of the contractors.  The purpose of that was to try to find
out what was harming the visibility in the mountains, what
was causing the acidification of soils and streams and
otherwise damaging the flora of these mountains, in
particular, Class 1 areas in North Carolina, Great Smoky
Mountain National Park, Shining Rock Wilderness, Linville
Gorge and Joyce-Kilmer National Forest, as well as several
others outside the state.

          Among SAMI's many lessons was that each state would
be the biggest beneficiary of its own reductions, and,
indeed, before the final ink was dry on the final SAMI report
in 2002, North Carolina had enacted the Clean Smokestacks
Act, putting into effect significant pollution controls on
the privately held utilities Duke and Progress Energy.

          But SAMI also found, and I quote:  Annual average
sulfate particle mass at the Great Smoky Mountain National
Park on the Tennessee/North Carolina border and at
Joyce-Kilmer, Slickrock, Shining Rock and Linville Gorge
Wilderness Areas in western North Carolina are most
influenced by sulfur dioxide reductions in Tennessee.  You
will hear testimony that, by far, the largest contributor --
72 percent of the sulfur dioxide emissions in 2002 were from
Tennessee Valley Authority.

          In addition, SAMI found that there were

1  contributions of pollution from other places as well,

2  including Alabama and Kentucky, states in which TVA also has

3  facilities.  As I said, TVA participated in SAMI; TVA helped

4  develop that evidence; and TVA is aware of the findings that

5  were made.

6          TVA will state that it is planning to install

7  controls.  But a plan, Your Honor, is not a legal

8  requirement.  It is not a commitment.  And plans change.  As

9  the head of TVA's fossil-power generating system, Joseph

10 Bynum, said in his deposition in this case, quote:  The plan

11 is not cast in concrete.  You put a long-range plan into

12 place, you know that you're not going to do that particular

13 plan.  Right now, it's almost a certainty.  That's the one

14 thing you know, is it will not work out that way.  Close

15 quote.

16          Your Honor, TVA's plans can and do change.  But one

17 way to assure that, in fact, they install controls is for

18 this Court to require it on a schedule in a similar way the

19 State of North Carolina is requiring Duke and Progress Energy

20 by statute to put pollution controls in their facilities.

21          TVA operates 59 electrical generating units at 11

22 coal-fired power plants, Your Honor, that are shown on this

23 map.  All these plants emit sulfur dioxide and oxides of

24 nitrogen and all of them contribute to the air quality

25 problems in North Carolina and throughout the region.

1          North Carolina's engineering expert, Mr. Jim

2    Staudt, will testify about the control technologies that TVA

3    installed in its facilities and that they can put on at

4    reasonable time and at reasonable cost by the year 2013 and

5    to bring their, TVA's, emissions down to 140,064 tons of

6    sulfur dioxide and 60,310 tons of nitrogen oxide by the year

7    2013.  These caps are comparable to those required by the

8    State of North Carolina from Duke and Progress combined.

9          While the state has been progressing, Tennessee

10   Valley Authority has been working on some scrubbers on a

11   couple of plants in eastern Tennessee.  And that's good.

12   That is part of the relief that the State of North Carolina

13   would like.  Earlier this year in 2008, they announced a

14   scrubber and SCRs to control oxides of nitrogen on their

15   facility at John Sevier, another plant close to the state.

16   To ensure, however, that these are completed and operated

17   continually, it is necessary to have relief from this Court.

18   But good as these controls are, Your Honor, they're not

19   enough to abate all of the nuisance and the harm that's

20   coming from TVA's facilities.  So we need further help from

21   the Court in assuring the level of controls that is

22   reasonable.

23         Our expert Sue Tierney will testify that the cost

24   of these controls is easily affordable by TVA and that it can

25   do so with only minimal impact on rates.  So financial

1  considerations of the ability of TVA to fund this is not a

2  question.

3       TVA will argue that there are not enough

4  boilermakers or other personnel who are capable of putting

5  and installing these controls, but our expert Jim Staudt will

6  explain to you how it is that, in fact, there will be enough

7  available to install the controls in a timely manner by 2013.

8       Your Honor, our experts in air dispersion modeling,

9  Lyle Chinkin and Neil Wheeler, modeled an entire year worth

10  of emissions with and without the controls that North

11  Carolina seeks in this case to show what difference it would

12  make if those controls were installed.  Their air dispersion

13  modeling shows the impacts from TVA's facilities, how sulfur

14  dioxide, on the map, the exhibit you see before you, is

15  emitted from these facilities, how it forms sulfate, the same

16  sulfate that causes haze and fine particulate matter, is

17  formed in the atmosphere, and where it travels, to North

18  Carolina and to other states throughout the region.

19       Your Honor, they have used the best possible

20  modeling, the most up-to-date modeling.  Indeed, it's the

21  same computer model for simulating that is used by TVA's

22  experts in this case, and they use the same emissions

23  inventory, which you'll learn more about during the testimony

24  of this case.

25       Dr. David Peden, head of The Center For

1  Environmental Medicine, Asthma, and Lung Biology, who works
2  in research as to the effects of air pollution on human
3  health, will testify to you and show the clear relationship
4  between exposure to fine particulates and the occurrence of
5  adverse cardiovascular effects on human beings, including
6  myocardial infarction, arrhythmia, stroke, and premature
7  death from sudden cardiac death.  In addition, it causes
8  lesser cardiovascular disease, as well, as a result of
9  hospitalization.  Exposure to fine particulates also causes
10 chronic bronchitis and other respiratory disease.
11         Exposure to ozone, Dr. Peden will tell you, causes
12 exacerbation of asthma in many asthma patients, requiring
13 emergency room visits, requiring missed school, missed work,
14 and disruption in their lives.  Ozone can also affect
15 otherwise healthy people, causing a rapid decrease in the
16 ability to breathe, especially among athletes and others,
17 such as children who are exercising heavily.  Chronic
18 exposure -- Dr. Peden will tell you, Your Honor, chronic
19 exposure can actually affect lung development in children.
20         Dr. Donald Russell, a local asthma specialist, will
21 tell you about the impact that air pollution has had on his
22 patients, how he must advise them to stay indoors and avoid
23 going outside or exercising or going to school or going to
24 work to protect themselves from the effects of air pollution.
25         Our public health experts, Your Honor, will show

1   you the quantified effect of these exacerbations and

2   causation of disease.  You have before you their calculation,

3   using 2000 population figures, of the premature deaths that

4   will be avoided each year with the installation of these

5   controls.

6           Your Honor, TVA's experts will question whether or

7   not it's possible to quantify this.  Their experts,

8   Drs. Anderson and Moolgavkar, will testify for industry in

9   similar cases such as this, but theirs is the minority view,

10  as you will hear, and does not represent the majority view of

11  scientists knowledgeable in this area.

12          You will hear from individual citizens, such as

13  Will Harlan, an endurance runner, five-time champion running

14  to the top of Mount Mitchell, who, running on the Appalachian

15  Trail of the Great Smoky Mountain National Park, found

16  himself unable to breathe because of the pain of breathing on

17  a high ozone day.  Others will have similar experience.

18          Dr. Leland Deck, our economic specialist, will

19  quantify for you the effects, the value, the cost, if you

20  will, of the benefit -- the value of the benefit of reducing

21  the disease that was otherwise quantified by our health

22  experts Levy and Spengler, and they will show you the very

23  substantial benefits which outweigh the costs to the

24  Tennessee Valley Authority of installing these controls.

25          Even if Your Honor were only to consider the

benefits in North Carolina, the benefits outweigh the cost to
TVA.  However, we believe that the correct result, Your
Honor, is that you should -- if, indeed, you find that there
is public nuisance, that you should consider all the benefits
of abating the nuisance, not just the injury to plaintiff.

Your Honor, you will hear from local citizens and
business owners about the great value of good visibility in
the mountains.  You will hear from visibility expert, John
Molenar, about how much increased visibility there will be as
a result of the pollution controls that will be installed.
You will hear a valuation of that that was done, prior to
this case, for the Blue Ridge Parkway, a unit of the national
park system, about the great value that visitors to the Blue
Ridge Parkway place on improved visibility.

You will hear from U.S. Forest Service air
resources specialist, Mr. Bill Jackson, who is also a plant
pathologist.  He will describe for you the harm that ozone
and acid deposition are causing in the national forests and
wilderness areas in this state, including Shining Rock and
Linville Gorge.  He will testify that many of the
high-altitude forests and streams are seriously impacted by
acid deposition, especially sulfate depositions from sulfur
dioxide emissions, and that they will not begin to recover
until that acid deposition is stopped.  Linville Gorge, you
will hear, is in particular danger.

 1          He will testify that the federal acid rain

 2    amendments were not enough to protect the Class 1 areas in

 3    the Southern Appalachians and that much more reduction is

 4    needed, especially from utilities, such as Duke, such as

 5    Progress, and such as TVA.

 6          He will tell you that TVA's emissions are part of

 7    the problem, especially in the Southern Appalachians, and

 8    that deep reductions in these emissions must be part of the

 9    solution if these national treasures are to be protected.

10          Ecology expert Dr. Charles Driscoll will testify

11    about the acidic deposition that alters soils, stresses

12    forest vegetation, acidifies lakes and streams and harms fish

13    and aquatic life.  He will testify about the improvements in

14    acid deposition that will occur if you grant the relief that

15    we request, and that will include an 11 percent reduction in

16    sulfate deposition at Great Smoky Mountain National Park and

17    an 8.4 percent annual reduction at Mount Mitchell.

18          Secretary Bill Ross of the Department of

19    Environment and Natural Resources will testify as to the

20    importance of this relief, of protecting the air quality of

21    the State of North Carolina.

22          All these benefits are in addition to the

23    quantified benefits for health that you will hear testified

24    about.

25          Your Honor, TVA will argue to you that this case is

about Duke and Progress; they will argue to you that this
case is about pig farms or that it's about paper plants. But
this case is about TVA's emissions. They will argue to you
that the federal law, the Clean Air Act, is sufficient to
protect North Carolina. Unfortunately, Your Honor, it has
not been. Indeed, only last Friday, the U.S. District Court
of Appeals in the District of Columbia vacated the Clean Air
Interstate Rule of the EPA. There were many petitioners in
that case, Your Honor, almost all of them industries, who
believe that the value of their allowances could be used,
rather, to delay the installation of pollution controls as
being unfairly devalued, and similar arguments, or that they
shouldn't be included.

          North Carolina, in contrast, argued that the CAIR
needed to be strengthened. North Carolina believed that EPA
had allowed this rule to extend the time in which pollution
controls needed to be installed way into the future, not in
time to help deal with the issues of health and the damage to
the environment, and, in particular, it was concerned that
the use of these allowances would allow plants upwind of
North Carolina to buy credits rather than make pollution
reductions.

          The Court agreed with both of these arguments and
it said, for example, quote: Under CAIR, sources in Alabama
which contribute to nonattainment of the fine particulate

1  ambient air standard in Davidson County, North Carolina,

2  would not need to reduce their emissions at all.  North

3  Carolina asked that this matter be sent back to EPA to be

4  corrected and specifically asked the Court, both in its

5  briefs and in oral argument, not to vacate the rule.  But the

6  Court also agreed with many of industries' arguments and

7  determined that it was so flawed that it had to be vacated.

8  It noted the dilemma and said, the petitioners disagree about

9  the proper remedy, with positions ranging from Minnesota

10 Power's demand that we vacate CAIR with respect to Minnesota,

11 to North Carolina's request that we vacate only the

12 compliance supplement pool of allowances but remand most of

13 CAIR for EPA to make changes to the compliance date, to set

14 the seven included states and the training program.

15 Unfortunately, the Court chose to vacate the rule.

16         Once again, Your Honor, the Clean Air Act has not

17 been sufficient to protect the state, and so we turn again,

18 as we have in this case, to the ancient common law remedy of

19 the public nuisance.  Your Honor has already ruled and the

20 Fourth Circuit Court of Appeals has held that we are not

21 prevented by the Clean Air Act; we are not preempted from

22 bringing this claim.  This latest decision only reinforces

23 the wisdom of Congress of preserving such claims.

24         Your Honor, TVA will tout its experience, but it

25 will not tell you of the many instances in which it has

1   resisted even the EPA's efforts to get pollution controls in
2   its facilities and that it has installed controls, generally,
3   when it was under legal pressure to do so in settlement of
4   lawsuits.  Tennessee, Alabama, and Kentucky have long
5   recognized, Your Honor, that injunction is an appropriate
6   remedy for abating a public nuisance, that you should
7   consider the whole harm and all the benefits in weighing that
8   matter.  North Carolina's evidence will show to you that the
9   benefits to the public of relieving them of this harm
10  substantially outweigh the harms.

11          Your Honor, it is a fair and reasonable demand on
12  the part of the State of North Carolina that the air of its
13  territory should not be polluted, that its mountains should
14  not be destroyed or threatened by the acts of TVA and
15  Tennessee, Alabama and Kentucky.  North Carolina's proof will
16  show that it is entitled to relief, and in this case, Your
17  Honor, North Carolina needs the help of the Federal District
18  Court in western North Carolina.

19          Thank you.

20          **THE COURT:**  All right.  Thank you.  And I turn to
21  the TVA.

22          **MR. LANCASTER:**  Good morning, Your Honor.  My name
23  is Frank Lancaster.  I'm a lawyer at TVA's Office of General
24  Counsel in Knoxville, Tennessee.  With me are three other
25  lawyers from TVA's Office of General Counsel:  Maria Gillen,

1  Tom Fine, and Harriet Cooper.  Together, the four of us will

2  present the evidence to this Court that will show that the

3  Tennessee Valley Authority is not a public nuisance.

4         The Tennessee Valley Authority is a federal

5  government agency that provides reliable, affordable

6  electricity to nearly 9 million people living in the

7  Tennessee Valley region, and that covers seven states.  To do

8  that, the TVA operates a system of electric power generating

9  facilities.  Includes nuclear power plants, combustion

10 turbine facilities, hydroelectric dams, the largest

11 wind-generating facility in the Southeast, and eleven

12 coal-fired power plants.

13        The evidence will show that half the electricity in

14 this country is made from coal-fired power plants using

15 America's most abundant fuel that we can obtain right here at

16 home.  The evidence will show that all of those coal-fired

17 power plants, all of TVA's, all the plants in North Carolina,

18 emit some amount of pollution, sulfur dioxide, nitrogen

19 dioxide, and mercury included.

20        The three states in which the power plants are

21 located, Kentucky, Alabama, and Tennessee, are well aware of

22 TVA's power plants.  They know all about them.  They've

23 issued them all permits authorizing them to operate their

24 power plants and setting limits on the amount of pollution.

25 We brought those permits with us.  They are very detailed,

1    Your Honor.

2           I apologize for how many exhibit notebooks we have

3    placed in your hands, Your Honor, but these permits are so

4    detailed that they fill two of them.  And these permits tell

5    the TVA how it can operate its plants in great detail.

6           The allegation is made in this lawsuit that these

7    permits can just be laid aside and TVA's operations ought to

8    be found to be unreasonable, despite the fact that they are

9    taking place in the way that the State of Alabama, the State

10   of Tennessee, and the State of Kentucky have authorized.

11          The evidence will tell a different story, however,

12   Your Honor.  The evidence will show that TVA has made

13   substantial and successful efforts to reduce its emissions

14   and leads the nation in many categories of pollution

15   reduction efforts.

16          There are three pollutants at issue in this case,

17   and I'd would like to talk about them one at a time.  The

18   first -- and as the Court hears the evidence, the Court will

19   learn probably the most important pollutant at issue here is

20   sulfur dioxide, and it's also called SO2 short.  Sulfur

21   dioxide in the atmosphere can turn into what is called fine

22   particles, fine particulate matter, and it also has the label

23   PM2.5 to designate its size.

24          There is a pollution control for sulfur dioxide

25   called scrubber.  A scrubber is a huge device.  It's often

1  bigger than the power plant itself.  It costs hundreds of

2  millions of dollars to build.  It's like building a chemical

3  plant next to your power plant.  The evidence will show that

4  seven of TVA's largest power generating units already have

5  these scrubbers that cost them hundreds of millions of

6  dollars, and that an eighth is about to start up in a couple

7  of months, Your Honor.

8          TVA's scrubber program goes back to the 1970s.  And

9  it was not in response to settling lawsuits.  The evidence

10  will not show TVA has reduced its pollution across the years

11  in settlement of lawsuits.  The evidence will show that TVA

12  has been reducing pollution for years, and that at the time

13  this lawsuit was filed, TVA was starting up its seventh

14  scrubber at the same time that the first scrubber in the

15  state of North Carolina was coming on line, nearly 30 years

16  behind TVA's lead.

17          The evidence will show that in this country a third

18  of the generating capacity is equipped with scrubbers, and

19  the evidence will show that a third of TVA's generating

20  capacity is equipped with scrubbers, right on line with the

21  average.

22          In addition to installing these giant scrubbers,

23  another way to reduce pollution emissions is to switch to

24  lower sulfur coal, switch from burning one kind of coal to

25  burning another kind of coal that has less sulfur in it to

1   start with.  The evidence will show that TVA has undergone a

2   number of these fuel switches to reduce its emissions of

3   sulfur dioxide by switching to lower sulfur coal.  As a

4   result of its activities, TVA has been steadily reducing its

5   sulfur dioxide emissions year after year after year.  TVA put

6   giant scrubbers on its Cumberland plant in middle Tennessee

7   in the mid 1990s in response to the acid rain provisions of

8   the Clean Air Act.

9          Mr. Gulick mentioned that utilities like to buy

10  pollution allowances to delay their installation of controls.

11  That's what happened in North Carolina.  That's what the

12  North Carolina utilities did.  But TVA responded to the Clean

13  Air Act by installing a scrubber, and since the mid 1990s has

14  reduced its emissions of sulfur dioxide from 900,000 tons

15  down to 374,000 tons last year.  The evidence will show that

16  TVA expects and intends to continue to reduce its emissions

17  with scrubbers that are under construction right now.

18         Not only has TVA put on pollution controls on its

19  plants and made fuel switches, TVA has shown results, results

20  in the form of emission rates.  Emission rates tell one what

21  effect one gets, how much pollution do you make to make one

22  unit of electricity, how many tons of sulfur dioxide do you

23  put out to make a gigawatt hour of electricity, and then

24  measures that tradeoff.

25         The evidence will show that as a result of all its

1  pollution reduction efforts, TVA's emissions rates for sulfur

2  dioxide are far superior to those of the power plants in

3  North Carolina.  Over the last three years TVA has made a lot

4  more electricity than Duke Energy and Progress Energy have

5  made here in North Carolina and have made a lot less

6  pollution in the process.  The North Carolina power plants

7  have emission rates 25 to 40 percent higher for sulfur

8  dioxide that TVA's power plants.  So the TVA will show it has

9  made substantial and successful efforts to reduce its sulfur

10  dioxide emissions.

11         The second kind of pollution at issue in this

12  lawsuit is nitrogen oxide.  And like everything you're going

13  to hear in this lawsuit, Your Honor, it also has a shorthand.

14  NOx.  NOx is associated with ozone.  The NOx emissions

15  combine with other sources to make ozone during the time of

16  year when it's warm and sunny, and that's why ozone season --

17  May to September, is known as ozone season.

18         Like scrubbers, there's a huge pollution control

19  device for NOx, and it's called an SCR.  That's short for

20  selective catalytic reduction.  They're not quite as big as a

21  scrubber, maybe two-thirds the size of a scrubber, two thirds

22  the cost, but they're still almost as big as the power plant

23  itself.  21 of TVA's 59 units are already equipped with these

24  huge SCRs at a cost of a billion dollars.  This includes

25  TVA's Bull Run plant in eastern Tennessee; this includes

1   TVA's Kingston plant, all nine units, in eastern Tennessee.

2   These 21 TVA units that are already equipped with these giant

3   SCRs to control NOx, that's 60 percent of TVA's generating

4   capacity.  The evidence from the plaintiff itself will show

5   that one-third of the generating capacity in this country is

6   equipped with SCRs.  TVA, at 60 percent, is already nearly

7   twice the national average.

8           There are other ways to reduce NOx emissions as

9   well.  There are what are called combustion controls, like

10  low-NOx burners; there are selective non-catalytic reduction,

11  SNCR; and there is low-NOx coal.  The evidence will show that

12  TVA uses these methods at all of its plants.  The 21 have

13  SCRs, and all the other ones have NOx controls as well.

14          Now, these NOx reduction measures are working, too.

15  It's true that North Carolina's utilities have better

16  year-round, full-year emission rates for NOx than TVA's

17  plants do, but the evidence will show that summertime, ozone

18  season, May to September, is the important time to reduce NOx

19  emissions, and the evidence will show that during that time

20  of the year TVA's rates are essentially equivalent to those

21  of North Carolina's utilities, Duke Energy and Progress

22  Energy, and that if the Court just looks at TVA's Tennessee

23  plants, TVA's performance is better.

24          The third kind of pollution at issue in this case

25  is mercury, and the evidence will show that the best

1    currently known way of reducing mercury emissions is to

2    operate a giant SCR and a giant scrubber together, and they

3    produce what are called co-benefit reductions in mercury.

4    The evidence will show that seven of TVA's plants, all seven

5    with scrubbers, already have SCRs as well, and are producing

6    these co-benefit mercury reductions.

7            In contrast to TVA's approach of study reductions

8    year by year, the evidence will show that power plants in

9    North Carolina have taken a different approach.  For example,

10   the evidence will show that since the mid 1990s North

11   Carolina power plants did not reduce their sulfur dioxide

12   emissions at all, not an ounce, until last year.  A full

13   decade.

14           Mr. Gulick made reference to a study called

15   Southern Appalachian Mountain Initiative, SAMI.  TVA did

16   participate in that.  TVA did a lot of work on that study.

17   And what that study is is -- and TVA has actually made the

18   reductions that that study called for.  That study was based

19   on 1990s data.  Since that time, TVA has made the reductions

20   that SAMI indicated would be helpful to the mountains.

21   During that time, North Carolina's utilities haven't made

22   reductions.  That's changing.  That's changing because of the

23   North Carolina Clean Smokestacks Act that was passed in 2002,

24   which is a very good law, and it's requiring Duke Energy and

25   Progress Energy to bring their emissions down by 2013 to

1    lower levels, their emissions of sulfur dioxide and NOx.

2            The plaintiff's apparent theory here is that if its

3    utilities reduce their emissions, yet TVA fails to continue

4    with its long trend of reducing its own emissions, North

5    Carolina will not get the benefit of its actions in reducing

6    emissions because TVA's pollution will come in from the west.

7    But the evidence isn't going to show that.

8            In support of its case, the plaintiffs will call an

9    expert witness named Dr. Staudt, and Dr. Staudt has estimated

10   that, absent an injunction from this Court, in the year 2013,

11   TVA will have 450,000 tons of sulfur dioxide emissions on its

12   system.  That's almost exactly the number TVA had in 2006.

13           So the plaintiff's case hinges on the Court

14   accepting Dr. Staudt's testimony that TVA will just stop dead

15   in its tracks and cease its long history of making emission

16   reductions and make no more for the six years to 2013.  But

17   the evidence will show that TVA has already made some of the

18   emissions reductions that the plaintiff's case says won't be

19   made.  Last year, TVA's sulfur dioxide emissions were already

20   down to 374,000 tons, 75,000 tons below the level that

21   Dr. Staudt projects.

22           May I walk to the map, Your Honor?

23           **THE COURT:**  Yes.

24           **MR. LANCASTER:**  There are more on the way, Your

25   Honor.

1          TVA's Bull Run plant is in eastern Tennessee.  It's
2    one of the closest plants to North Carolina of all of TVA's.
3    A scrubber, a giant $300 million building next to the plant,
4    is under construction.  Ron Nash, the man at TVA in charge of
5    that construction, will explain to the Court that it's
6    essentially finished.  It's starting up this fall.  There
7    isn't any question about it.  And it will reduce TVA's
8    emissions from that plant another 30,000 below the level that
9    Dr. Staudt projected.

10          TVA has a plant called Kingston in eastern
11    Tennessee.  It has a scrubber under construction as well --
12    actually, two scrubber units - to scrub all nine units at the
13    plant.  It's over 60 percent complete right now, Your Honor.
14    It's expected to be on line in less than two years, and it
15    will reduce the emissions from TVA's plant, that plant, by
16    approximately 50,000 tons compared to what plaintiff's
17    witness Dr. Staudt will testify.

18          Another plant that's closest to North Carolina is
19    the John Sevier plant, way up in the corner of northeastern
20    Tennessee.  The evidence will show that TVA is kicking off a
21    project right now to install a scrubber at the John Sevier
22    plant and that that be in place before the year 2013, and
23    that that will reduce the emissions from that plant on the
24    order of 30,000 tons-per-year below what plaintiff's case
25    hinges on the Court finding will take place in the year 2013.

1          All three of these eastern Tennessee plants, the

2     ones closest to North Carolina, when these projects are in

3     place will have scrubbers on every single unit, will have

4     SCRs for NOx control on every single unit, and then the

5     combination of those two will have the mercury co-benefit

6     reductions, all three of those plants nearest to North

7     Carolina, at a cost to TVA of approximately one and a half

8     billion dollars.

9          In addition to that, there are many other projects

10    ongoing.  The Court will learn that the Johnsonville plant,

11    way over in western Tennessee, is undergoing a fuel switch

12    that will lower its emissions to the tune of

13    40,000 tons-per-year.  And the Court will learn that

14    plaintiff's expert Dr. Staudt made a mistake about TVA's

15    Paradise plant and overestimated its emissions by 14,000 tons

16    a year.

17          Your Honor, TVA's employee Mike Scott, who has been

18    in charge of emissions planning at TVA for ten years and

19    under whose watch TVA's emissions dropped over 500,000 tons

20    of sulfur dioxide and over 300,000 tons of NOx, he will

21    testify that Dr. Staudt's estimate is on the order of 200,000

22    tons high.  And what that means, Your Honor, is that every

23    witness that follows Dr. Staudt to this witness stand and

24    bases opinions about premature mortalities, about impacts on

25    the forests, about things like that, every one of those

1  witnesses will be relying on testimony from Dr. Staudt about

2  the amount of emissions that's going to take place that will

3  not be supported by the evidence.

4       Your Honor, the plaintiff's case hinges, Your

5  Honor, then, on the idea that TVA will just reverse course

6  and stop reducing its emissions, but our last witness in our

7  case, Your Honor, will be the CEO and president of Tennessee

8  Valley Authority, Tom Kilgore.  He will come and take the

9  witness stand and he will tell the Court about TVA's

10 commitment to continue reducing its emissions into the

11 future, just as it has been doing all along.

12      Not only will the evidence show that TVA, Tennessee

13 Valley Authority, has had successful efforts to reduce its

14 emissions and will continue to do so, the evidence will show

15 that the State of North Carolina is not suffering significant

16 harm to its air quality.

17      There is an important thing the Court needs to know

18 about, and it's called air quality standards.  Those are set

19 by both the Environmental Protection Agency, the United

20 States EPA, and by the State of North Carolina, and what they

21 are is levels of air pollution that define the difference

22 between good air quality and bad air quality.  The evidence

23 will show that the State of North Carolina is meeting these

24 standards just about everywhere in the state and that a few

25 places in the state that are not meeting the standards are

1    expected to meet them soon.

2         The most important one of these standards in this

3    case is the PM2.5.  That's the fine particle annual standard.

4    And it is set at 15 micrograms per cubic meter.  The evidence

5    will show from the North Carolina Division of Air Quality

6    witnesses that they set that standard at a level that is

7    designed and intended to provide protection of public health

8    in North Carolina, and that if that standard were not good

9    enough, then it would be lowered; it would be lowered to a

10   level that would provide protection for the public health.

11        The evidence from plaintiff's own computer modeling

12   will show that the entire state of North Carolina is expected

13   to be below that standard of 15 in the year 2013, the year

14   that we're focusing on.

15        Even assuming the high levels of emissions that

16   Dr. Staudt projected, without any -- even if TVA didn't

17   continue with its course of reducing emissions, the whole

18   state is supposed to be below that level of 15, in fact, well

19   below it.  The entire state is projected by plaintiff's

20   modeling to be below 12, and, in fact, 87 of North Carolina's

21   100 counties are projected to be below ten micrograms, over a

22   third below the level of the standards set by the State of

23   North Carolina itself to protect air quality.

24        And there will be a lot of evidence, Your Honor,

25   that air quality in the state is good.  Just last year the

North Carolina Department of Environment and Natural

Resources proclaimed 2007 to be a banner year for the

environment in North Carolina.

So we don't expect the evidence to show significant

harm to air quality in North Carolina.  But if the Court

concludes otherwise, the evidence will not show that TVA is

the cause of it.  The parties both have done extensive

computer modeling of emissions, and what that modeling shows

is that TVA's emissions, they contribute a very small portion

of the pollution in North Carolina, small compared to the

amount contributed by North Carolina's power plants, small

compared to the amount contributed by other pollution sources

in North Carolina, and small compared to the amount that

North Carolina sends to her neighbors.  And so what that

evidence will show, Your Honor, is that TVA is only a small

portion of the -- and that's TVA's whole system of the air

pollution in North Carolina.  When you look at particular

plants or state groupings of plants, that's even smaller.

None of the evidence will show, for instance, that TVA's two

Kentucky plants in far western Kentucky have an adverse

impact in North Carolina.  In fact, the testimony from North

Carolina Division of Air Quality officials will be that the

impacts come from the southwest and that TVA's plants far to

the northwest aren't as likely to have impacts in North

Carolina.

1        I mentioned earlier that there are some counties in
2   North Carolina not meeting the particulate matter standard.
3   Catawba County was one of those, over by Hickory.  The
4   evidence will show that right next to Catawba County is a
5   power plant called the Marshall plant, which was emitting
6   100,000 tons a year of sulfur dioxide by itself until it
7   installed its scrubbers just recently, and that as soon as
8   its scrubbers were installed, the State of North Carolina
9   found that Catawba County was no longer failing to meet the
10  air quality standard.

11       The evidence will show that the State of North
12  Carolina tasked one of its scientists to examine certain high
13  readings on pollution monitors to determine what states
14  contributed to them, and the evidence will show that after he
15  did something called back-trajectory modeling, he concluded,
16  quote, North Carolina is the major culprit, unquote.

17       The evidence will show that that's not surprising
18  because everyone agrees that pollution from nearby has more
19  of an impact than pollution from further away.  Pollution
20  from North Carolina power plants has more of an impact in
21  North Carolina than pollution from TVA's far-away plants in
22  Memphis or Kentucky.

23       In conclusion, Your Honor, there is inevitably
24  going to be a lot of technical evidence in this case, but
25  what that evidence is going to show is that TVA provides a

1  vital commodity, reliable affordable power to 9 million

2  people; that TVA has responded to federal pollution reduction

3  requirements by making early and continuous reductions; that

4  TVA has spent billions of dollars making those pollution

5  reductions; that TVA's emission rates are as good as and in

6  some cases better than those of other utilities; that TVA

7  will continue with its program to install pollution controls,

8  and particularly at the three eastern Tennessee plants that

9  are closest to North Carolina.

10        The evidence will show that North Carolina's air

11 quality is good and not a danger to the people of North

12 Carolina, that TVA's emissions make up such a small part of

13 it that the best way for North Carolina's air quality to get

14 even better is for North Carolina to continue to making

15 reductions right here at home, just like TVA is continuing to

16 do, not by pointing the finger at TVA.

17        Thank you, Your Honor.

18        **THE COURT:**  All right.  Thank you.

19        Then we are ready to proceed with evidence, so call

20 your --

21        **MR. GULICK:**  We're ready to call our first witness,

22 Your Honor.

23        **THE COURT:**  Yes.

24        **MR. GULICK:**  Mr. Brock Nicholson.

25        **MR. LANCASTER:**  Your Honor, may I ask a question

1  before the testimony starts?

2        **THE COURT:**  Sure.

3        **MR. LANCASTER:**  We had filed a number of motions in

4  limine that had not been acted on.  Should we assume that we

5  should simply raise those matters at the time they arise

6  during the testimony?

7        **THE COURT:**  Right.  I felt that it wasn't necessary

8  to rule on motions in limine prior to the trial.  They can be

9  handled as well or better when the witness takes the stand.

10  And you gentlemen will have ample opportunity to present your

11  witness and to lay your foundation for determination by the

12  Court that we're dealing with an expert, and then I'll hear

13  cross-examination --

14        **MR. LANCASTER:**  Thank you, Your Honor.  I just

15  wanted clarity on that.

16        **THE COURT:**  All right.  Come around and be sworn.

17                  **BROCK NICHOLSON,**

18  **being duly sworn, was examined and testified as follows:**

19                 **DIRECT EXAMINATION**

20  **BY MR. GULICK:**

21  **Q.**  Would you state your full name, please.

22  **A.**  Brock McFall Nicholson.

23  **Q.**  Where do you live, Mr. Nicholson?

24  **A.**  Live in Clayton, North Carolina.

25  **Q.**  What is your higher educational background?

1 **A.** Bachelors degree in mechanical engineering.

2 **Q.** Are you a professional engineer?

3 **A.** I am, registered in the State of North Carolina.

4 **Q.** Would you please state your employment background,

5 starting from the time that you graduated from NC State

6 University.

7 **A.** I graduated in 1966, and then, for the following year, I

8 remained at the university as a research engineer in the

9 Department of Biological and Agricultural Engineering.

10 And then I went on active duty with the U.S. Army. That

11 lasted for four years. And during that time I was in the

12 Corps of Engineers. But then I flew in the Army and spent a

13 year in Vietnam, and then came back and was a flight test

14 engineer with the Army for the last year on active duty.

15 **Q.** When you left the Army, where did you then work?

16 **A.** I came to work for the air quality program in North

17 Carolina in August of 1971.

18 **Q.** And how long did you stay -- when you were there, what

19 were you doing in that capacity?

20 **A.** I was doing engineering work and then helped develop the

21 permit program in 1972 for the State, and then I remained

22 until the fall of '72, which at that time I was the called

23 the chief engineer in the organization at that time. Then I

24 accepted an appointment as a commissioned officer in the

25 United States Public Health Service.

1  Q.   What year was that?  What year did you accept --

2  A.   In the fall of 1978.

3  Q.   And then -- and how long did you work for the Public

4  Health Service and what were you doing?

5  A.   I was detailed from the U.S. Public Health Service to

6  the United States Environmental Protection Agency, the Office

7  of Air Quality Planning and Standards.  That's the national

8  headquarters office for the air program in EPA.

9       I was there until 1992, when I was detailed again back

10 to the State of North Carolina Air Quality Program, and I was

11 in that detail for three and a half years, and at that time

12 retired from the Public Health Service and remained on with

13 the state.

14 Q.   You continued on with the state, did you say?

15 A.   I did.

16 Q.   Are you still employed by the State of North Carolina

17 Division of Air Quality?

18 A.   I am.

19 Q.   What is your current position in the Division of Air

20 Quality?

21 A.   I'm the deputy director of the division, state Division

22 of Air Quality.

23 Q.   In your work area, in this history, what did you focus

24 on; what has been your principal area of concentration?

25 A.   Principally, it's been on the planning side of the

1  house, from the first state agency, developing rules and

2  program for permitting, and also at USEPA, where I was head

3  of the Ozone Policy Section within the Office of Air Quality

4  Planning and Standards, and then, upon return to the state

5  program, I was chief of the Air Quality Planning Section

6  until assuming the role of deputy director in 2003.

7  **Q.**   In your position, do you work with air quality modeling?

8  **A.**   I work with it in the sense of overall supervision of

9  that process, not as a hands-on technical detail, but

10  certainly in the role of how and when to apply modeling and

11  to understand the results of modeling.

12  **Q.**   Does that also include understanding the inputs in

13  modeling?

14  **A.**   That is correct, the inputs and so forth.

15  **Q.**   What are your main responsibilities as deputy director

16  of the division?

17  **A.**   Well as deputy, certainly support and assist the

18  director of the division in all aspects of the program, but

19  with a focus on the planning side of the house at the

20  regulation development, legislation development, and planning

21  programs.

22  **Q.**   How long have you been deputy director?

23  **A.**   Since 2002.

24  **Q.**   Are you familiar with something known as the Southern

25  Appalachian Mountains Initiative?

1  **A.**  I am.

2  **Q.**  Is that known as SAMI, S-A-M-I, for short?

3  **A.**  It is.

4  **Q.**  Was the State of North Carolina involved in SAMI?

5  **A.**  Very much so.

6  **Q.**  Were you personally involved in it?

7  **A.**  I was personally involved.

8  **Q.**  Pardon me.

9      I'll get the hang of this microphone in a moment.

10     What was your role -- when did you begin your

11  involvement of SAMI?

12  **A.**  In late 1992.

13  **Q.**  And how long did SAMI -- did SAMI's process end at some

14  time?

15  **A.**  In 2002.  It was essentially a ten-year program.

16  **Q.**  Were you involved throughout that entire period?

17  **A.**  I was.

18  **Q.**  What was your role or roles in the SAMI process while

19  you were involved with it?

20  **A.**  I was the co-chair of the policy committee, helping

21  guide the direction of SAMI and how it was to be conducted.

22  **Q.**  Were there other groups in addition to the policy work

23  group?

24  **A.**  There were.  There was a technical work group and then a

25  public advisory group.

1  **Q.**  Did SAMI issue a final report?

2  **A.**  It did.

3  **Q.**  Were you involved in the development of that final

4  report?

5  **A.**  I was, in an oversight and supervisory sense.

6  **Q.**  I'd like to show you Plaintiff's Exhibit No. 1 and ask

7  if you can identify what that is.

8  **A.**  That is the cover on the final report issued in August

9  of 2002.

10  **Q.**  And I'd like to also show you -- was there an executive

11  summary that was also published at the same time.

12  **A.**  There was.

13  **Q.**  Like to show you Plaintiff's Exhibit No. 2 and ask

14  you --

15  **A.**  And that is the executive summary.

16  **Q.**  It's also called a final report summary.

17  **A.**  Correct.  Dated August, 2002.

18  **Q.**  I'd like to direct your attention to Exhibit 1, page 2,

19  and ask if you can -- what is this page?  Tell us about it.

20  **A.**  On this page it lists the governing body that guided the

21  SAMI work and a number of organizations that were involved in

22  it.

23      Under the governing body, the eight states that were the

24  leaders in the project are listed here.

25  **Q.**  Now, do we see a large amount -- a list of the governing

1    body on the monitor?

2    **A.**    Yes.

3    **Q.**    And who -- what did the governing body largely consist

4    of?

5    **A.**    These were secretaries, or in some cases labeled as

6    directors or commissioners, of the departments in the various

7    eight states that guided the conduct of the SAMI project.

8    **Q.**    And did that include the North Carolina Department of

9    National Resources?

10   **A.**    It did.

11   **Q.**    Environment and Natural Resources.

12        Did it also include -- were there others involved other

13   than representatives of these eight states?

14   **A.**    There were.  This was -- the voting members of the

15   governing body were the eight-state commissioners or

16   secretaries, but we did have ex-officio members on governing

17   body, as you can see listed, the USEPA Region 3, USEPA Region

18   4, superintendent of the Blue Ridge Parkway, U.S. Forest

19   supervisor for the southeast region, the Southern Company

20   principal scientist, and the Environmental Defense air

21   quality specialist, and these were on the governing body as

22   principal advisers, if you would, to the voting members of

23   the governing body.

24   **Q.**    Does this page also talk about who the participants are

25   or identify them?

1    A.    It does.  There's an extensive list of those entities

2    that were participants in the SAMI project through the years,

3    including power companies, environmental groups, academia,

4    and other industry, and public -- members of the public.

5    Q.    Was the Tennessee Valley Authority one of the

6    organizations that participated?

7    A.    It is listed and they did participate throughout the

8    course of the project.

9    Q.    Is that shown over in the right-hand column?

10   A.    It is.  It's highlighted.

11   Q.    Like to direct your attention to Exhibit 1, page 3.  And

12   ask you what this shows at the bottom.

13   A.    This lists the numerous contracts involved in the

14   project.  Most of the technical work was actually done under

15   contract with specialists, contractors involved, and this

16   lists the numerous contractors.

17   Q.    Was the Tennessee Valley Authority one of those

18   contractors?

19   A.    They were.

20   Q.    Mr. Nicholson, could you tell us why SAMI was created?

21   A.    SAMI was created because of a concern about the

22   deteriorating air quality values in the Southern

23   Appalachians.  It had been noted in the early '90s that

24   visibility was degrading, acidification of the terrain and

25   streams was occurring and there was ozone damage to

1  vegetation; and at the same time, there were a number of

2  permit applications being made and there was concern by the

3  permitting authorities that these permits may cause adverse

4  effects in the Southern Appalachians and it was felt that

5  there needed to be a cooperative study to understand what

6  impacts there would be from these sources and, perhaps, what

7  could be done in terms of emissions reductions and what

8  impact those reductions would have on air quality related

9  values in the region because of the mounting concerns at that

10  time.

11  Q.   Did the semi-final report have a mission statement?

12  A.   It did.

13  Q.   I'd like to direct your attention to Exhibit 1, page 10,

14  in the middle left that's now shown on your screen; and is

15  that a mission statement there?

16  A.   Yes.

17        MR. GULICK:  Gary, I believe it's on the left-hand

18  side.

19        MS. COOPER:  Your Honor, we'd like to object on

20  grounds of hearsay.

21        MR. GULICK:  Your Honor, we have an authenticated

22  copy of this report from the State of North Carolina.  It

23  documents a long history of study that was done by the State

24  of North Carolina in conjunction with other states and many

25  others.  The document is authenticated by the document which

1  North Carolina participated.  It is an official public record

2  of the State of North Carolina, among others.

3             **THE COURT:**  All right.  Give me a minute.

4        **MR. GULICK:**  Mr. Brock Nicholson is well qualified

5  to testify about this, and the report will be -- I also

6  believe that the Tennessee Valley Authority did not note an

7  objection.

8             **MS. COOPER:**  To the contrary, Your Honor; we did

9  object on grounds of hearsay.

10            **MR. GULICK:**  Our mistake.  Sorry.

11            **THE COURT:**  I'm sorry.  I'm having trouble hearing.

12            **MS. COOPER:**  Your Honor, I just wanted to note, in

13  response to what Mr. Gulick said, that TVA did, in fact,

14  object to this.

15            **MR. GULICK:**  I stand corrected, Your Honor.  We

16  just discovered that.  So I was mistaken that they had not

17  objected.

18            Nonetheless, Your Honor, this is an extremely

19  relevant document, it is a public record, and we believe that

20  it should be --

21            **THE COURT:**  I am looking for the page here.  You're

22  on --

23            **MR. GULICK:**  Excuse me, Your Honor.  I'm on page --

24  Your Honor, I apologize.  Because of the electronic

25  documents, it has page numbers that are different.  It's

1  actually page 1.1 of the Chapter 1 if you're looking at the

2  hard copy.  I apologize.

3         THE COURT:  You're on page 1.1 in my notebook?

4         MR. GULICK:  Of Exhibit 1.

5         THE COURT:  I'm in Exhibit 1.

6         Okay.  I see it.

7         MR. GULICK:  Your Honor, I apologize.  We have this

8  electronic document, and the electronic document's page

9  number is not always the same as the document page number.  I

10  will try to, as I'm proceeding ahead, to give you both page

11  numbers at the same time.

12         THE COURT:  Yes.  I have it.

13         MR. GULICK:  That's the reason for the different

14  page number, Your Honor.  I'll try to give you both.

15         THE COURT:  I'm on -- I'm with you now as to your

16  exhibit.  Now, let me take a look at it right here.

17         MS. COOPER:  Your Honor, I'd like to note that SAMI

18  itself is not the State of North Carolina.  It's, as he says,

19  a voluntary organization of a number of states, and there

20  were many, many, many participants.  It's hard to understand

21  how it could be an official public record of the State of

22  North Carolina.

23         THE COURT:  It does include the State of North

24  Carolina, if I'm reading it correctly, and includes this

25  mountain area here in western North Carolina.

1    Show the objection overruled.  Give the defendant

2  an exception.

3    All right.

4  **BY MR. GULICK:**

5  **Q.**  Mr. Nicholson, I believe I was trying to direct your

6  attention to the mission statement.  Can you tell us what it

7  is?

8  **A.**  Well, in essence, what it says is that these eight

9  states and the other members of the project will come

10  together in a cooperative way and identify and make

11  recommendations on reasonable measures to address the

12  existing and any future adverse effects from human-induced

13  air pollution on air quality related values in the Southern

14  Appalachians, and particularly focus on the Class 1 areas

15  across that whole region, and then considering both the

16  environmental and socioeconomic implications of these

17  recommendations.

18  **Q.**  On the same page, is the map of the SAMI area of concern

19  identified?

20  **A.**  Yes, it is.

21  **Q.**  And is that now on the screen in front of you?

22  **A.**  Yes.  And in this map, it shows the eight states that

23  cooperatively participated in a voluntary way in SAMI, and it

24  also shows the particular highlighted or colored region of

25  the Southern Appalachians and the locations and identity of

1  the Class 1 areas of which we focused our attention.

2  **Q.**   Are any of those -- these Class 1 areas, are these the

3  ones that are identified by dark black print?

4  **A.**   They are.  And the associated dot indicates the Great

5  Smokies or Shenandoah Valley area, the colored area.

6  **Q.**   Are any of those Class 1 areas located in whole or in

7  part in North Carolina?

8  **A.**   There are.  There are four in western North Carolina:

9  Linville Gorge, Shining Rock, Joyce-Kilmer-Slickrock, as well

10  as the Great Smoky Mountains National Park.

11  **Q.**   How much of the Great Smoky Mountain National Park is

12  located in North Carolina?

13  **A.**   A little more than -- approximately a little more than

14  half of the park area is in North Carolina.

15  **Q.**   You mention air quality-related values.  What were the

16  air quality-related values that SAMI was addressing?

17  **A.**   There were several, particularly visibility impairment

18  or ability to see, and acidification of streams and land, as

19  well as the effects on forest land from ozone exposure.

20  **Q.**   Was SAMI addressing human health concerns?

21  **A.**   Not directly.  It was really based on what we call

22  welfare-related values, those associated with those air

23  quality-related values.

24  **Q.**   Will you tell the Court what a Class 1 area -- using

25  that term, what is a Class 1 area?

**A.**   Class 1 areas are those areas that are felt to be

particularly in need of protection.  They're generally

pristine areas, and by definition of the Clean Air Act, I

believe it would be the amendments of 1977, identified as

national parks of a certain size and greater, I believe 5 or

6,000 acres of forest land, or wilderness areas of a certain

size and greater.

**Q.**   I'd like you now to explain the background process --

pardon me.  I'm getting too close -- the background process

that SAMI used, and I'd like to direct your attention to

Exhibit 2, page 5.

             **MR. GULICK:**  If you could show that on the screen.

             This is the, Your Honor, the smaller, the second

report summary.  And if you will go to page -- it actually is

page 5 of the executive summary, Your Honor.  Those pages are

the same as on your electronic document.

             **THE COURT:**  All right.  On page 5.

**BY MR. GULICK:**

**Q.**   Page 5 of the final summary, would it help you to

explain the process by which SAMI is using in an overview

way?

**A.**   Okay.  In a very overview, it's a body of integrated

assessment where we look at each of these air quality-related

values or the effects of them in one analysis, if you would,

and in that analysis, we are looking at ozone and the

1　formation of ozone, which is formed from, as you heard

2　earlier, nitrogen oxides, or NOx, plus what we call volatile

3　organic compounds, and ozone is formed.  But then for the

4　acid deposition, effects on streams and soils, it's sulfur

5　dioxide, plus nitrogen oxide, again, and water equals various

6　acids, sulfuric acid and nitric acid.  And then fine

7　particles, which is associated with visibility impairment,

8　and, again, sulfates and nitrates, again coming from sulfur

9　dioxide and nitrogen oxides and ammonia and organic -- and

10　soil dust.

11　　　　And those are done in an integrated way, where we

12　employed, for one of the first times, what's called a one

13　atmospheric model, where we conceptually take emissions from

14　the various sources as a starting point and employ through a

15　computer model which accounts for meteorology, chemistry, as

16　well as the emissions, and then that model will predict a

17　result in a downwind area, and then the output from that

18　model can go into what we call effects models, so you can

19　really understand the change in the forests or trees that

20　would be affected by the ozone or the acidification of

21　streams or soil and, in fact, also visibility impairment.

22　　　　Or if we're going to change the inventory in the

23　model -- which is part of the technique, is to vary the

24　inventory once the model is established, then you can see the

25　benefit of certain control strategies and improving those

1   concerns, if you would, improving visibility, reducing

2   acidification or improvements to the forest.

3   **Q.**   You mentioned something about emissions inventory.

4   Would you tell the Court a little bit about what's entailed

5   and what are you looking at in emissions inventory?

6   **A.**   Emissions inventory is kind of the starting point for

7   any of these kinds of analyses.  It's the fundamental

8   foundation of understanding.  In other words, given the

9   pollutants that I talked about are crucial in the analysis,

10  we need to understand what sources emit these pollutants and

11  where those sources are and in what quantities.  So we

12  compile what we call a base inventory to fundamentally

13  understand what the emissions are out there.

14       And I might note here that some of the emissions I

15  mentioned are secondarily formed in the atmosphere into

16  sulfates or nitrates or ozone, but they stem from the

17  precursor pollutants of sulfur dioxide or nitrogen oxides

18  that I had mentioned earlier.

19       So with that inventory, we can then build the process of

20  understanding the model and then relate different strategies

21  to that base inventory.

22  **Q.**   In a general way, tell us a little bit about what the

23  strategies are you're talking about.

24  **A.**   Strategies are fundamentally taking the base inventory

25  to a future year by growth factors, growth and emissions due

1  to population increase or vehicle miles traveled or vehicle

2  use increases associated with the population increase, or

3  demand of electricity from a power plant, for example, and

4  then when you have that future year inventory, you can look

5  at strategies by reducing the future year inventory by

6  various amounts.

7      And we had two techniques that we employed in SAMI.  One

8  was to do it in a sensitivity context where it may not be

9  particularly associated with actual control put on equipment,

10  but the percentage change of inventory, to understand how the

11  atmosphere and the system will respond to a particular

12  strategy.  And I believe we'll explain that a little more

13  later.

14      But then other are specific strategies where we go in

15  and look at what's reasonable from a cost standpoint.  And

16  one of the concepts we employed at SAMI is to stress the

17  system in the sense of a moderate strategy or a mild strategy

18  in terms of emissions reduction in the future, all the way

19  out to a fairly significant reduction to sort of stress the

20  system and understand what the benefits would be across that

21  spectrum of different strategies on, for example, forest

22  health or acidification or visibility improvement.

23  **Q.**   Did SAMI study the cost of control?

24  **A.**   It did.  As part of the analysis, there was an

25  assessment of cost.  And this is important because, in

1   defining our strategies, one of our future strategies, to

2   look at source category by source category, was to pick those

3   strategies that would be maybe less of a cost consideration

4   to a more extreme strategy, where we would need to understand

5   economic impacts of such a strategy in conjunction with

6   looking at the benefits of that strategy.

7   **Q.**    Did SAMI undertake any socioeconomic assessment?

8   **A.**    It did.  In SAMI, we wanted to understand what the

9   public felt like they -- what value they associated with

10  these improvements, and two particular -- well, there are

11  several areas we looked at.  One was the value of what we

12  call residential visibility, if you would.  In other words, a

13  resident of this region, for example, what would they value

14  in dollars in terms of -- or what would they be willing to

15  pay, I guess is another way of saying it, for visibility

16  improvement associated with our range of strategies.

17       Now, another one was recreational visibility

18  improvement, where a visitor to our area, a tourist, values

19  the ability to see a vista from, for example, the Blue Ridge

20  Parkway or one of our Class 1 areas, what value do they

21  associate with that, and there was, through a process of

22  meetings and interviews with the public, they established a

23  range of values for these strategies, what they would be

24  willing to pay.

25  **Q.**    Let's return to the subject of the inventory.  And I'd

1  like  to direct your attention to Exhibit 1.

2           **MR. GULICK:**  It's the electronic page 19.  If

3  you'll bear with me, Your Honor, I will give you the page

4  number -- or docket number.  I believe that's page 26 -- 2.6,

5  Your Honor, in Exhibit 1.

6           **THE COURT:**  Okay.

7  **BY MR. GULICK:**

8  **Q.**   Mr. Nicholson, could you just, in a general way, tell us

9  what this page has on it, what this table is.

10  **A.**   This is a summary table of the emissions inventory.  And

11  on one axis we have, going down the side, various pollutants.

12  It's grouped by pollutants that we talked about earlier.

13  Volatile organic compounds, for example, has been highlighted

14  here.  And then further down the left side it's divided by

15  type of source.

16      It's important when talking about strategies to identify

17  types of sources, and also they're handled perhaps

18  differently in the air quality models.

19  **Q.**   Briefly, what are the sources, different types of

20  sources?

21  **A.**   The types of sources -- and it's a fairly standard way

22  of dividing it in these type of analyses.  We have utility

23  sources, which are important from an nitrogen oxide/sulfur

24  dioxide standpoint because they tend to have taller stacks;

25  and we have industrial point sources, meaning they're

1  combustion sources, depending on the pollutant; and it may be

2  other types of sources, generally characterized as industrial

3  boilers or industrial processes, but not electric generating

4  units.

5      And then in the transportation sector, we have highway

6  vehicles, highway mobile, and then non-road, and those are

7  generally calculated through specialized emissions inventory

8  models that are produced primarily by USEPA where we can

9  calculate emissions associated with highway vehicles, trucks

10  and cars and so forth, as well as off-road equipment, be it

11  construction or agricultural.

12  **Q.**  Is that what "non-road" means?

13  **A.**  That's what "non-road" means.

14      And then "area source" generally means any other source

15  that doesn't have a particular identifiable emission point or

16  stack to it.  Area sources might be homes, emissions from

17  homes or other commercial institutions and facilities that

18  also emit.

19      So we have a sense of the total emissions inventory by

20  pollutants across these various sectors, and we feel like

21  we've covered the complete emissions inventory for man-made

22  emissions in the region.  And this is a summary for all eight

23  states.  And then it's a rate across, from left to right, by

24  years that we project out to the future and by strategies.

25  **Q.**  And in the various figures under these, in these columns

1 below the years, when you talk about the strategies, is this

2 where you have A1, A2, B1, B2?  Is that the strategies?

3 **A.**    That's the way we identified the spectrum or range of

4 strategies that were analyzed in the process, A strategies

5 generally being what we figure either it's already on the

6 books in terms of regulatory programs for these categories or

7 very certain that it will be on the books.  Perhaps an

8 example for A2 is that it included the Federal Tailpipe

9 Program, that's typically called Tier 2, Tailpipe Program

10 adopted by USEPA, as well as the NOx SIP Call, NOx

11 regulations for utilities and other major stationary sources.

12 **Q.**    You said those were included in what's called the --

13 **A.**    In the A2.  A2.  We sort of had a shorthand for A1 and

14 A2.  A1 is on the books, in other words, already definitely

15 set in regulation or statute, and then A2 is on the way.

16 It's A1 plus some other expected regulations that are very

17 high degree of certainty that they will be applied.  And an

18 example here when we did this in the early -- number of years

19 ago was, again, the Federal Tailpipe Program for automobiles,

20 and the NOx SIP limitations for power plants and other large

21 combustion sources.

22 **Q.**    NOx is oxygen nitride; is that correct?

23 **A.**    Nitrogen oxide --

24 **Q.**    Nitrogen oxide.  Is that right?

25 **A.**    Correct.

1  Q.   And SIP.  Explain what SIP is.

2  A.   SIP, State Implementation Plan.

3       We do use a lot of acronyms.

4  Q.   Now, when you talked about these A strategies, if you

5  will, what are the -- there's B1, B2 and B3.  What are those?

6  A.   Well, as I briefly mentioned earlier, as part of the

7  process, we wanted to understand the relative benefit in

8  terms of improvements in air quality-related values by

9  applying strategies to the sources, and strategies, of

10 course, reduce emissions fundamentally.  That's the variable

11 that we're changing.  And this table just sort of summarizes

12 how the emissions for the sectors from each of the various

13 pollutants change as we go from sort of a mild strategy, B1,

14 out to a more stringent strategy, B3.  And then we did that

15 for each of two future years, and those years are 2010 and

16 2040, as our future projection years that we wanted to

17 understand the benefits of.

18 Q.   Now, with respect to the various pollutants involved,

19 are electric generating utilities particularly connected, if

20 you will, or related to emission of particular pollutants?

21 A.   They are.  Nitrogen oxide emissions, especially, are

22 significant emission from combustion sources, and it comes

23 from two sources, one, atmospheric nitrogen in the combustion

24 process, and the other one, coal, especially, does have

25 inherent in it some nitrogen content.  So you'd have NOx

1  produced when you combust the coal.

2      And then SO2 is another significant emission point from

3  coal-fired utility boilers because of the sulfur content in

4  the fuel, so you would have sulfur dioxide emitted.

5  **Q.**   I'd like to direct your attention to the panel on this

6  page, at the bottom of the page, dealing with sulfur dioxide

7  emissions.

8          **MR. GULICK:**  And if you could highlight that, Gary.

9  If you could highlight the panel dealing with sulfur dioxide

10  emissions and bring that up so we can look at that more

11  closely.

12  **BY MR. GULICK:**

13  **Q.**   You had indicated that utilities emit the sulfur

14  dioxide.  Could you explain a little bit about the various

15  sectors and how much of sulfur dioxide they emit?

16  **A.**   Well, as you can see here, given the quantity of fuel

17  burned in the utilities sector, as summarized in this table,

18  we're looking at over -- these are thousands of tons per

19  year, so we're talking about 4.7 million tons per year in the

20  base consideration without a control strategy applied for the

21  utilities sector, versus under a million tons for the total

22  of the industrial sector in all eight states, that being

23  under 700,000.

24      By contrast, the highway mobile is only 33,000 tons and

25  non-road, 121, and area source totaling less than

1    500,000 tons, for a total of 6 million.  So we're talking

2    about 4.7 out of 6 million tons of sulfur dioxide utilities

3    sector.

4    **Q.**    Now, as I'm looking at this, could you sort of explain

5    what's happening with sulfur dioxide and the various

6    strategies that you were talking about?

7    **A.**    Okay.  As we -- as I mentioned earlier, particularly in

8    the A2 strategy, it does also contain the NOx SIP call in

9    that strategy.  So we do see a reduction -- well, that's NOx.

10   But we do see reductions in SO2, primarily the Title IV, the

11   acid rain provisions of the Clean Air Act, and certainly --

12   **Q.**    Is that the third column from the left?

13   **A.**    Yes, it is.

14   **Q.**    Okay.

15   **A.**    And when we get into the B strategies, we do apply

16   additional controls, but it certainly may reflect our best

17   estimate of other controls that have been put on in terms of

18   scrubbers or other techniques that were applied or would be

19   applied in this time frame.

20   **Q.**    In looking at the B strategies in comparison to the A2

21   strategy, which is now highlighted on your screen, could you

22   explain what's going on here and what the strategies actually

23   are reflecting with respect to utilities and also the other

24   sectors?

25   **A.**    Well, certainly, by 2010, in the utility sector, we're

1  reflecting a greater and greater degree of control across the

2  B strategies, as you can see a considerable degree of control

3  when we get to B3 by 2010.  And then, as you can see in the

4  highway mobile, for example, that's gone down considerably

5  due to the Federal Highway Tailpipe Program and low-sulfur

6  fuel standard for gasoline, primarily, and certainly see that

7  it reduces.  There is actually a subsequent table that will

8  actually list the strategies we employed in the -- in

9  constructing these inventories.

10 **Q.**  How does the reduction strategy for utilities compare to

11 that for industrial sources?

12 **A.**  Well, it is considerably more stringent.  I think once

13 we understood the cost of control in these strategies, we

14 realized that it was much more cost effective to reduce the

15 utility emissions in these strategies than the industrial

16 point emissions.  And this summary table of total tons across

17 the eight states does reflect that realization, and we went

18 through a process to determine those strategies through

19 sector work groups.  In other words, we had representatives

20 from each of the industry sectors to participate in the

21 process of determining what would make sense from a strategy

22 selection, candidate strategy selection process.

23 **Q.**  Is there a SAMI graph somewhere that shows the relative

24 costs that you just talked about?

25 **A.**  There is.

1  Q.   I'd like to direct your attention to Exhibit 1,

2  electronic page 122, figure 7.8.

3       **MR. GULICK:**   And, Your Honor, if you go to page

4  7.11, Chapter 7.  It's also going to be showing on your

5  screen.  It's figure 7.8 on that page.

6  **BY MR. GULICK:**

7  Q.   Can you tell us what's shown on Figure 7.8?

8  A.   What we have in this figure illustrated graphically is

9  the cost-per-ton, which is a parameter that's quite often

10 used, sometimes referred to cost effectiveness of a strategy.

11 So it's in dollars-per-ton of pollutant removed.  And we have

12 it illustrated for the B1, B2, B3 strategies, and it compares

13 the dollars-per-ton cost for each of the emissions inventory

14 sectors that we saw on the last chart that's sort of an

15 orange color, the relative cost effectiveness of applying the

16 B1, B2, B3 strategy in 2010 to that sector.  And we're

17 talking about somewhere on the order of a thousand or little

18 bit more, in B1, dollars-per-ton; B2, perhaps a little less

19 than a thousand; then more than a thousand --

20 Q.   That's for what sector?

21 A.   That's for the utility sector.  And then in each of the

22 sets across here, we can compare that to the blue column, for

23 example, the industrial sector, and here we can see that

24 we're at 6 or more thousand dollars-per-ton of SO2 removed in

25 2010 by that strategy, a little bit less per ton in the B2

1  and B3.  And these are all as compared to the "On the Way,"

2  A2 strategy.

3      So it's a way of understanding incrementally what it

4  would cost to apply that level of control to each of the

5  categories as we go across the spectrum of strategies under

6  consideration.

7      So one might observe that instead of about a thousand

8  dollars per ton, we're talking about six times more higher

9  cost to remove a ton of SO2 from an industrial boiler under

10 the B1 strategy than it would be for utilities.

11 **Q.**  On that same page, in the top left-hand corner, did SAMI

12 provide a written explanation of this graph?

13 **A.**  Yes.

14 **Q.**  It's now being shown on your screen at the top left-hand

15 corner.

16 **A.**  And here we sort of summarize in text form that the cost

17 per ton of SO2 removed in the industrial sector is five to

18 six times greater than in the utility sector.

19     Industrial sector costs are higher than utility due to

20 negative economies of scale involved with smaller industrial

21 boilers, and I think also, not stated here, but retrofit

22 technology is on the wide range of configurations for that

23 category.

24     But when we had the utility boiler with considerably

25 more emissions, we do have the advantage, and the SAMI study

1  observed this, that it's much more cost effective on a scale

2  basis to reduce those emissions on a dollars-per-ton basis.

3  **Q.**   So going back to the question of your strategies, is

4  there -- what's the relationship of this to the strategies

5  that you developed for the utilities versus the industrial

6  sector?

7  **A.**   Well, again, when we went through the process, the

8  sector-by-sector work groups, to lay out the spectrum of

9  strategies, cost did play a factor in assigning or

10  identifying mechanical strategy to test in the project, and

11  these -- this was inherent in that selection of the

12  strategies that are unique to each of the source categories.

13  **Q.**   Let's turn now to the question of modeling.  Back when

14  you were talking about modeling, you talked about geographic

15  sensitivities.  Would you explain again what that entails or

16  what was involved with that?

17  **A.**   We have -- in the eight SAMI state region, we wanted to

18  understand, given it's a pretty broad region, the benefits or

19  effects of controlling emissions of sulfur dioxide and

20  nitrogen oxides selectively in various portions of that

21  region, and we chose state-by-state reductions to be made and

22  then understand what the relative benefits of that reduction

23  is in one state, on that state and all of the other states.

24      So we did that across a series of days that were

25  modeled.  I briefly mentioned meteorological inputs in the

1  model.  Of course, meteorology, wind and temperature and

2  various conditions affect the results through the air quality

3  model, so we actually did this for a whole series of

4  different meteorological days in the model.

5  **Q.**   I'd like to draw your attention now to Plaintiff's

6  Exhibit 3 and ask you if you can identify what this is.

7  **A.**   This is a plot depicting the results of our -- or one of

8  the days that we model in the geographic sensitivity

9  analysis.

10  **Q.**   And you indicated there were a series of these?

11  **A.**   There were.  There were a number of different days.  We

12  wanted to understand the effects of different weather systems

13  or meteorological days on the results.

14  **Q.**   And are these plots that were actually performed by SAMI

15  that was -- are these the ones that were performed?

16  **A.**   It is.  This is one of the plots.

17  **Q.**   And this exhibit consists actually of 28 pages.  I would

18  like to direct your attention to the very last one, which is

19  page -- electronic page 28.

20        **MR. GULICK:**  Your Honor, if you're looking at the

21  hard copy, it should be the very last page.

22  **BY MR. GULICK:**

23  **Q.**   And looking at this page, Mr. Nicholson, could you tell

24  us, first of all, in a general way what this page is showing?

25  **A.**   This is a plot -- these are plots.  We call them

1   difference plots.  And the way we conduct the sensitivity

2   analysis I mentioned, state by state, is to make a reduction

3   in the emissions inventory.

4       Again, the way we do the studies is the variable in the

5   whole process is the emissions inventory.  So with a

6   10 percent reduction in the sulfur dioxide emissions on a

7   state-by-state basis, we can then see the resulting change in

8   sulfate.  Again, sulfate is a product secondarily formed in

9   the atmosphere in what would end up as an impact in an area.

10      So, very briefly, the left column center is the

11  beginning situation on that day of air quality, and, from

12  that, we make the 10 percent change.

13  Q.   Is that what's highlighted now on the screen in front of

14  you?

15  A.   Correct.

16  Q.   And the large --

17  A.   And, again, I should emphasize, this was for 2010.  It's

18  one of our prediction.  It's called "On the Way" here.

19  Really, it's the A2 strategy, as we explained earlier.  So it

20  doesn't have any of the subsequent more stringent reductions

21  in it, but it was figured as kind of a standard baseline from

22  which we make changes.

23  Q.   Now, on this -- on that one -- if you could put that one

24  back up.  It has a table on the -- excuse me.  There is a --

25  on the left, very left-hand side, there is a list of numbers

1  and color-coded chart.

2  **A.**    Right.

3  **Q.**    And could you explain what that is?

4  **A.**    It's a scale in micrograms per cubic meter that one

5  would associate the color with.

6  **Q.**    And just briefly, what is the -- what do those colors

7  signify?

8  **A.**    Well, it gives a change in values associated with

9  modeling on that day of "On the Way," and from blue, you can

10  see we're talking about perhaps a blue range of 5 up to 20 in

11  terms of the red, that strategy impact on the area.

12  **Q.**    Now, is that the change, or was this one the --

13  **A.**    Absolutely.  This is what we predict on that day.

14  Excuse me.

15  **Q.**    Okay.

16  **A.**    What it'll show state by state is really the change from

17  this base condition.

18  **Q.**    Let's look at -- there is a panel there that says "NC"

19  over it, which is on the middle right-hand side.

20          **MR. GULICK:**  Again, if you could enlarge that so we

21  could see it better.

22  **Q.**    What does this panel show?

23  **A.**    When we apply the ten percent change in sulfur dioxide

24  emissions in North Carolina, we see the resulting change from

25  the base condition.  And we'll see, also, a scale that

1  relates to the degree of that change, again in micrograms per

2  cubic meter.  And what's important here is the relative

3  change.  If we made no change, everything would be great on

4  this plot.  Since we did a ten percent change in the state,

5  and only in North Carolina in this case, we can see the

6  spatial relative change or benefit of that sulfur dioxide,

7  10 percent sulfur dioxide change, and, of course, here we can

8  observe that the greatest benefit is to almost the whole

9  State of North Carolina, with certainly some downwind benefit

10 to the northeast, being Virginia and Delaware, Maryland and

11 New Jersey in this case, with some small benefit in South

12 Carolina, and a little bit of spillover perhaps in portions

13 of Tennessee.

14      On this particular -- maybe I should reemphasize this is

15 just one meteorological day in many days that we modeled.

16 **Q.**  And could you look now at the panel -- there is a panel

17 there for Tennessee right to the left of that.

18          **MR. GULICK:**  Could you enlarge that, Gary?

19          **THE WITNESS:**  And, similarly, we reduced the

20 emissions in Tennessee but held them constant in all the

21 other states.  Maybe that's a key point to mention here.

22          And in this one, we, likewise, show the spatial

23 extent of the benefit of that reduction.

24          Again, these are sensitivity analyses.  And we can

25 see here that the reduction in Tennessee benefits both

1 Tennessee and considerable part of North Carolina, western

2 North Carolina, and then northwest Georgia and extending into

3 much of Alabama, as well as up to the northeast in Virginia.

4 Q.   And could we now look at the panel in the top left-hand

5 corner, which shows reductions in the state of Kentucky.

6        MR. GULICK:  If you'll highlight, please.

7        THE WITNESS:  And again, the reduction only in

8 Kentucky in this case.  A ten percent reduction in state SO2

9 gives considerable benefit beyond Kentucky, into North

10 Carolina, Tennessee, Alabama, little bit of Georgia and

11 considerable part of Virginia.  But, again, an appreciable

12 amount within the state in which the reduction is made, that

13 being Kentucky.

14 Q.   And now I'd like to focus your attention to the bottom

15 left-hand corner, to Alabama.

16 A.   Well, in a similar process, we're seeing the reduction

17 in Alabama benefiting Alabama to the greatest extent, but,

18 also, it's that benefit or relative reduction of the fairly

19 mild 10 percent reduction extending into North Carolina and

20 across South Carolina and Georgia, as well as Mississippi and

21 part of even Florida in this case.

22 Q.   I'd now like to direct your attention to Exhibit 3,

23 page -- it's electronic page 14.

24        MR. GULICK:  Your Honor, these documents don't have

25 page numbers, but it will be shown on the screen and it may

1  be easier to see there.

2          **THE COURT:** All right.

3          **MR. GULICK:** It's for the SO2. It's got a date on

4  it of May 15, 1993.

5          Once again, if you would look at the -- at North

6  Carolina and highlight the state of North Carolina on the

7  screen here so we can see, more enlarged, what the benefit

8  is.

9          Again, if you're looking at the hard copy, Your

10 Honor, it would be May -- what did I say -- May 15, 1993.

11         We now have enlarged on the screen the panel from

12 North Carolina on that date.

13         **THE COURT:** Okay.

14         **THE WITNESS:** This is a, of course, late spring

15 day, and we did have a range of the sensitivity analyses run

16 for, as I said, various meteorological days in the modeling.

17 And, clearly, here again, North Carolina benefits the most

18 from its reductions in North Carolina, but there is also

19 spillover benefits to other states, including South Carolina

20 and Virginia in this case.

21 **BY MR. GULICK:**

22 **Q.**   And now, if we look at the panel next to that for

23 Tennessee and enlarge that one as well.

24         That's now shown enlarged on the screen.

25 **A.**   So when we reduce the emissions only in Tennessee in

1   this sensitivity analysis, we see we benefit to a great

2   extent much of Tennessee as well as perhaps half of North

3   Carolina, South Carolina, and Georgia in this case, and most

4   of far western Virginia, and certainly a little bit of

5   Kentucky, so, again, a considerable spillover benefit of this

6   reduction in Tennessee.

7   **Q.**   And now let's look at the panel for Kentucky.

8   **A.**   And likewise, on this same meteorological day, the

9   reduction in Kentucky benefits to a pretty good extent its

10  own state, but also North Carolina and Tennessee, South

11  Carolina and Georgia.  And in West Virginia and Virginia

12  here, we're getting some lessening of the resulting sulfates

13  predicted.

14  **Q.**   And again, on the same meteorological day, Alabama.

15  **A.**   I think this one for Alabama illustrates what we have

16  observed here, is that we get much, if not most, of the

17  benefit in the state in which the reductions occur, but it

18  certainly benefits in this case to Tennessee, Georgia, over

19  quite a range, and a little bit of South Carolina, and I

20  believe I faintly see a little bit of benefit in western

21  North Carolina there, a little bit of a yellow speck.

22          **MR. GULICK:**  And now I'd like to go to Exhibit 3,

23  page 6.

24          And, Your Honor, if you're looking at the hard

25  copy, this has a date of July 19, 1995, and it's now shown on

1  the screen.

2          Once again, I'd like to draw your attention to the

3  panel for North Carolina.

4  **A.**   For this July day, we see a sulfate reduction resulting

5  from the SO2 reduction from the emission sources in North

6  Carolina particularly benefiting North Carolina, but also a

7  considerable part of South Carolina and a little bit of

8  Virginia.

9          Again, I might emphasize, while we're seeing a variation

10 here, we do have different wind conditions, different

11 meteorological conditions as we go across different days, and

12 actually across different sources, states, on a given day.

13 **Q.**   And now Tennessee, in the middle of the page.

14 **A.**   Well, considering the winds on that day, it looks like

15 we have just a very little bit of benefit in Tennessee, even

16 though that's where the reductions occurred, but considerable

17 benefits in portions of North Carolina, South Carolina and

18 Georgia on that meteorological day.

19 **Q.**   And now if we look at Kentucky.

20 **A.**   It doesn't appear that we show any benefit within the

21 state of reduction in this particular case for Kentucky, but

22 considerable benefit in North Carolina, with some

23 considerable benefit in South Carolina and Virginia, and some

24 smaller degree of benefit in Georgia.

25 **Q.**   I'd like now to go to Exhibit 3, page 2.  This is the

1   last one I think I'll ask you to look at.  This is for

2   July 12, 1995.  And then scale down and enlarge it there.

3        Would you look at North Carolina and, again, observe

4   what is shown on this meteorological day.

5   **A.**   This day in July, we see most of the benefit gained by

6   reducing sulfur dioxide in North Carolina occurring in North

7   Carolina, with considerable benefit across North and South

8   Carolina, a little bit of southeastern Virginia and a little

9   bit of Georgia.

10  **Q.**   Now, you indicated before, and I'll just mention again,

11  these are a 10 percent reduction of statewide sulfur dioxide?

12  **A.**   That's correct.

13  **Q.**   And so is this viewed as a -- in a relative sense, was

14  this viewed as a small or large reduction?

15  **A.**   Well, I think it depends on the state and the nature of

16  a reduction and strategy, but it could be viewed as a

17  relatively small reduction when we talk about a major part of

18  an inventory being reduced, say, more than 50 percent or up

19  to 90-some percent.  This is only a 10 percent reduction in

20  the inventory.

21       It is a reduction of the total inventory for the state,

22  but as we recall from the table 2.2, the vast majority of the

23  inventory would come from utility boilers, with a

24  considerably lesser degree industrial, and the rest of the

25  categories is fairly minor.

1  Q.   Let's now look at Tennessee in this case.  Let's see

2  that enlarged.

3  A.   On this day, Tennessee benefits to a great extent from

4  the reductions in Tennessee, but so does western North

5  Carolina, considerable amount of Kentucky, Alabama, Georgia

6  and South Carolina, and a little bit of Virginia also

7  benefits from that also, given the wind patterns and so forth

8  on that day.

9  Q.   And can we look at Kentucky in the top left-hand corner

10  and enlarge that.

11  A.   I think, likewise, Kentucky benefits to a great extent

12  from their own reduction on that day, but considerable

13  benefit shown in North Carolina, Tennessee, South Carolina,

14  Georgia and Virginia and West Virginia.  And even Ohio in

15  this case and a little bit of Indiana would benefit

16  considerably.

17  Q.   Thank you.

18      Now, was one of these figures or charts actually

19  included, or a set of them, included in the final report?

20  A.   It was.  And the whole set was made part of the record,

21  recorded in the various appendices.

22  Q.   So this set that we've been looking at were included as

23  part of the record?

24  A.   Yeah.  Correct.

25  Q.   I now want to draw your attention back to Exhibit 1,

1    which is the final report itself, and I want to go to -- I'd

2    like to draw your attention to Figure 3.11 on page 53.

3             MR. GULICK:  Which, Your Honor, is Chapter 3, page

4    3.18, of the hard document.  But that's now also shown on

5    your screen.  Page 3.18 of the printed document.

6             THE COURT:  And we're back to Exhibit 1?

7             MR. GULICK:  Yes, Your Honor.

8             THE COURT:  All right.

9    BY MR. GULICK:

10   Q.   And I'd like to draw your attention, Mr. Nicholson, to

11   the figure at the top -- figure at the top, which is Figure

12   3.11, and I'd like you to first just sort of orient us a

13   little bit to this to explain what this table or figure

14   shows.

15   A.   This figure is a, if you would, a summary plot of a lot

16   of what we just looked at in terms of sensitivity plots, but

17   it's arranged such that the episode days by -- the modelers

18   took this and, if you would, composited it in an annual sense

19   to represent the various meteorological days to represent a

20   whole year.

21        So it's arranged by a Class 1 area within the SAMI

22   region across the bottom, as you can see, going from Alabama,

23   West Virginia, with our North Carolina Class 1 areas in the

24   middle.

25   Q.   So that's the list on the bottom that's sort of

1    horizontal -- that's sort of vertical.

2  **A.**    That's correct.  And we call it a stack bar chart, in

3    that the contributions on an annual basis to this 10 percent

4    sensitivity analysis are assigned based on the results of the

5    modeling in the stack, in the order that are seen on the

6    right-hand side, with a different color for each state's

7    contribution to the benefit seen at the various Class 1

8    areas.

9  **Q.**    So you have -- on the right-hand side, you have a key,

10   if you will, that lists the states, and each of them has a

11   color associated with it?  Is that what's going on here?

12 **A.**    That's correct.

13 **Q.**    And are the eight SAMI states indicated by their

14   initials, if you will?

15 **A.**    They are, in various colors, starting at the bottom with

16   Alabama, going up to West Virginia.

17 **Q.**    Now, what's above that?  We see some things that are

18   not --

19 **A.**    What's above that, we also did sensitivities for

20   regions, SAMI as a whole as well as outside regions, and just

21   a very brief explanation.  It's the central states outside of

22   the region.

23 **Q.**    That's CN?

24 **A.**    CN.  And midwest states, MW; northeast states, NE.

25   Florida and Mississippi are in the southeast but were not

1  part of SAMI, so we wanted to understand what benefit we

2  might gain by reductions if they were done in those two

3  states.  And then "other."

4  **Q.**  And then what do the bars you've indicated -- what do

5  the bars represent?

6  **A.**  The bar heights for each color represent -- and I think

7  this is the most important part of this plot -- is the

8  relative benefit of one state to the others in improvement or

9  reduction in sulfate aerosols in each of the Class 1 areas.

10  **Q.**  I'd like to focus your attention now to the -- there are

11  four bars.  Starting from the third from the left, which is

12  Joyce-Kilmer NC; and then we have four bars, Lookout,

13  Tennessee.  Do you know where that is located?

14  **A.**  Yes.

15  **Q.**  And where is it located?

16  **A.**  That's on the -- well, it's in the Smokies, but it's on

17  the western edge of the Smokies.

18  **Q.**  And then we have -- and when you say "Smokies," do you

19  mean --

20  **A.**  In the Great Smokies, but on the Tennessee side.

21  **Q.**  You mean the Great Smoky Mountains National Park?

22  **A.**  Correct.

23  **Q.**  And then you have Shining Rock; is that right?

24  **A.**  Shining Rock, and then Linville Gorge.

25          **MR. GULICK:**  Gary, if you'd highlight that on the

1  screen there.

2          Not Shining Rock.  Expand those four on the screen

3  so it's a little easier to see them.  And also the table of

4  the states.  Make it a little easier to follow what's going

5  on here.

6  **BY MR. GULICK:**

7  **Q.**   So tell us a little bit about what these show.

8  **A.**   Again, what they show is kind of the summation on an

9  annual basis of the sensitivity -- individual sensitivity

10 plot, some of which we looked at earlier.  And, for example,

11 what we're seeing here at Joyce-Kilmer is the relative

12 benefit, starting at the bottom of the bar, of the reductions

13 in Alabama and then Georgia.

14 **Q.**   And Alabama is what color?

15 **A.**   It's a blue color on the screen here, Alabama being a

16 maroon color, and Kentucky is sort of a cream.

17 **Q.**   I'm sorry.  Did you say Alabama was a maroon color?

18 **A.**   Georgia is a maroon color.  Excuse me.  I'm sorry.

19 Alabama is the blue color.

20     Kentucky is above -- they're taken in order of the

21 legend on the right-hand side as you go up the bar, and these

22 indicate the relative benefits of the reductions in those

23 various states as it benefits these Class 1 areas.

24     So perhaps reading this -- and Tennessee would be the

25 fifth -- sixth one up above South Carolina, being the darker

1  maroon, if you would.  Tennessee is kind of the peach color.

2  I guess we tried to make it orange, but it didn't quite come

3  out that way.

4      But you can see it is the largest, in a relative sense,

5  contributor to the benefit in that Joyce-Kilmer, whereas

6  Alabama appears to be the second largest benefit to that

7  area, and Georgia would be, I think, about the next largest,

8  with Virginia -- No.  Well, another state at the top or group

9  would be --

10 Q.   The dark blue, maybe, could that be the central states?

11 A.   I think that is the central states.

12      So it gives us a sense of the relative benefit of

13 reductions through the sensitivity analysis, reductions in a

14 particular state, to our Class 1 areas here, as well as all

15 of them across the SAMI region.

16 Q.   And looking at this bar chart, looking at these four

17 here, did SAMI draw a conclusion with respect to the impacts

18 on these four Class 1 areas?

19 A.   I think the most significant conclusion that SAMI drew

20 was that we, as we look at the various Class 1 areas, that we

21 get a significant benefit within the state in which we make

22 reductions, but we also get a very significant benefit from

23 reductions in other states, and depending on the Class 1

24 area, that varies a little bit.

25      These particular ones are that -- for our Class 1 areas

1  in North Carolina, we get the greatest benefit from

2  reductions in Tennessee, as you can see from the height of

3  the peach-colored segments in each of the four areas.

4       As we see, Shining Rock and Linville Gorge, North

5  Carolina, does also, with its reductions, benefit a

6  considerable amount to Linville Gorge and Shining Rock, a

7  lesser degree to the others, but still less than the benefit

8  shown in the Tennessee reductions.

9  **Q.**  Are there benefits shown in this bar from reductions in

10 Alabama and Kentucky?

11 **A.**  I was just going to say, we see what I would say is an

12 appreciable benefit also in both Alabama and an increasing

13 benefit in Kentucky, the sort of cream-colored or

14 yellow-colored bar or segment, by the reductions in Kentucky

15 on Shining Rock and Linville, especially, but also an

16 appreciable amount in the Great Smokies and at Joyce-Kilmer.

17 **Q.**  Now, on the -- did SAMI actually represent what it found

18 about this in words?

19 **A.**  Yes.

20 **Q.**  Like to draw your attention to the preceding page, and

21 I'd like to direct your attention to the middle paragraph on

22 the left in the first few lines of that.  This would be the

23 preceding page in the written document.

24      What does it say there?

25 **A.**  Well, in words, it says I think what we've observed from

1  the summary bar chart, is that annual average sulfate

2  particle mass at the Great Smoky Mountains National Park on

3  the Tennessee/North Carolina border and at Joyce-Kilmer,

4  Slickrock and Shining Rock and Linville Gorge Wilderness

5  Areas in western North Carolina are most influenced by sulfur

6  dioxide reductions in Tennessee.

7  **Q.**   And the next sentence?

8  **A.**   But sulfur dioxide emissions in Georgia, Alabama, and

9  North Carolina, the central and midwest regions beyond SAMI,

10  also influence sulfate fine particle mass at these sites.

11  **Q.**   Thank you.

12      Do you know what the biggest source of sulfur dioxide

13  emissions in Tennessee is?

14  **A.**   TVA.

15  **Q.**   Do you know what percentage total Tennessee emissions

16  TVA's constituted in 1970 -- excuse me -- in the year 2002?

17  **A.**   I understand 72 percent of the state's total SO2

18  emissions.

19        **MS. COOPER:**  Going to object, Your Honor.  There's

20  no foundation for his answer.

21        **THE COURT:**  Overruled.

22  **BY MR. GULICK:**

23  **Q.**   Now, in talking about all of the sensitivity analyses

24  that we've been looking at --

25        **THE COURT:**  I think we will -- since you're

1  starting another area, we'll take our midmorning, 15-minute

2  recess, and after the recess, come back to the stand,

3  Mr. Nicholson.

4           Take a 15-minute recess, Marshal.

5           **(Recess.)**

6           **THE COURT:**  All right, Mr. Gulick.

7           **MR. GULICK:**  Thank you, Your Honor.

8  **BY MR. GULICK:**

9  **Q.**   Mr. Nicholson, you were indicating that, in looking at

10  the graphs, looking at the reduction in sulfur dioxide, that

11  produces a benefit in that state or some other state, does

12  that say anything about the source of where those emissions

13  are coming from?

14  **A.**   It certainly suggests that it does indicate that the

15  source where a -- particularly in a relative sense, you would

16  certainly get the biggest benefit.  For example, from

17  reductions in Tennessee to western North Carolina, when you

18  make those reductions and you see the biggest benefit in the

19  downwind area, or a Class 1 area, it certainly suggests the

20  importance of those reductions, and consistent with the

21  meteorological conditions, we're seeing those benefits.

22  **Q.**   Now, you've indicated that there was a consensus

23  process.  Was there a consensus process about the selection

24  of the days that were being evaluated?

25  **A.**   There was.  In fact, SAMI, if I didn't emphasize that

1  early on, was really a voluntary effort to look at this, and

2  it was consensus by all parties, and we were very deliberate

3  in making sure that we did get a consensus on all aspects of

4  it, including emissions inventory.

5      I may have mentioned it in these workgroups that were

6  formed by sector.  And, of course, that might be one reason

7  it took so many years to do it, because it was a consensus

8  process; it wasn't driven by specific federal or state

9  regulatory requirement to do this.  It very much was a

10  consensus process, and we labored at length at times to make

11  sure we got that and make sure the data was accurate and

12  correct and acceptable to all the parties.

13  Q.   Do you know whether TVA has coal-fired power plants in

14  Alabama?

15  A.   They do.

16  Q.   And do they?

17  A.   They do.

18  Q.   And do you know if TVA has coal-fired power plants in

19  Kentucky?

20  A.   They do.  Two that I'm aware of.

21  Q.   And did the various sensitivity analyses that you've

22  been talking about earlier this morning before the break, did

23  SAMI reach some principal conclusions from -- broad

24  conclusions from these initial reductions in individual

25  states?

1   A.   We did.  I think very significant conclusions were

2   reached.  Particularly, when a state makes a reduction, it

3   gets the greatest benefit of that reduction in that state, in

4   other words, in the state in which the reductions occur,

5   which became very significant to us later on in North

6   Carolina.  But, also, I think it's clear that in almost every

7   case in our observations, we saw benefits in states, or in

8   other states, from benefits in a given state.

9   Q.   From -- you said from benefits in a particular state?

10  A.   Well, benefits in the sense that it reduced sulfate

11  levels in the downwind or receiving state.

12  Q.   And did those two conclusions drive any of SAMI's final

13  recommendations?

14  A.   I believe it did.

15  Q.   In particular, what?  What was that?

16  A.   Well, I think the most significant one that it drove was

17  the conclusion that sulfur dioxide emissions reductions are

18  very important, if not the most important emissions reduction

19  strategy one could employ to improve visibility, particularly

20  since sulfate is a primary pollutant that degrades

21  visibility.

22  Q.   Touching briefly on visibility, when we're talking about

23  visibility in regard to SAMI, what are we talking about?

24  A.   We're really talking about the ability to see an object

25  at some distance, both identifying the shape or outline or

1  contrast or color of that object against the background, and
2  that's the concept of visibility.
3  Q.  You had said that SAMI did a socioeconomic assessment to
4  the visibility.
5  A.  SAMI did.
6  Q.  I'm sorry.  SAMI did; is that right?
7  A.  SAMI did, yes.
8  Q.  I'd like to draw your attention to Exhibit 1, page 128.
9  That's the electronic page.
10          MR. GULICK:  And it's page 8.1, Your Honor, in the
11  Exhibit 1, the hard copy.  We've got it highlighted on the
12  screen.
13  BY MR. GULICK:
14  Q.  And if you could direct your attention to -- there's a
15  paragraph called "Visibility," with that heading, on the
16  right-hand side.
17          MR. GULICK:  I'll wait until Your Honor finds that
18  page.  It's now highlighted on the screen as well.  The hard
19  copy page is 8.1, Your Honor.
20          THE COURT:  Okay.
21  BY MR. GULICK:
22  Q.  And Mr. Nicholson, there's -- in the right hand column,
23  there's a paragraph that has a heading called "Visibility."
24  Could you just tell us what SAMI is talking about here?
25  A.  As a value to the people assigned to improve visibility,

1  and they recognized that that's a value that they want to

2  see, and they, in fact, can assign a willingness-to-pay

3  figure to improvements in visibility, and it's characterized

4  in two ways; one for the local people that live in an area

5  where they value visibility and it's called residential

6  visibility; and then recreational visibility for individuals

7  that, perhaps, want to go to a place to observe a vista or

8  realize that they can see, in other words, have a good

9  visibility in an area, that there is a value assigned to

10  that.

11  **Q.**   Did Sally -- excuse me -- did SAMI engage a contractor

12  to do an economic analysis of that value on visibility?

13  **A.**   They did.

14  **Q.**   And did the -- did SAMI publish in this document the

15  results of that economic evaluation?

16  **A.**   Yes, SAMI did.

17  **Q.**   Like to direct your attention to electronic page 133,

18  which, I believe, Your Honor, is 5 pages forward, 8.6 in the

19  hard copy, Your Honor.

20          **THE COURT:**  All right.

21  **BY MR. GULICK:**

22  **Q.**   And Mr. Nicholson, if you're on this page, there are

23  three tables here.  Could you explain what these tables are

24  about?

25          Why don't you start with the one on the bottom, which is

1  table 8.6, which is now enlarged on the screen.

2  **A.**  This table summarizes the results of that assessment

3  that was made by the contractor in the interviews and in the

4  meetings they had.  And this one deals with what I referred

5  to earlier as residential visibility.  In other words, what

6  the locals, if you would, would assign a value once it was

7  described to them for each of the strategies in the two

8  timeframes.  And I think the most significant part is it

9  ranges from $224 million for the strategy in 2010, going from

10 the base or what's "On the Way" strategy we talked about

11 earlier, to the first of the additional strategies being one.

12 And then when we go from A2, which again is our base in 2040,

13 they would assign a value of $1.46 billion to that

14 improvement in visibility that they would realize.

15 **Q.**  Now, that figure you just mentioned was associated with

16 the change in strategy from "On the Way" to B3?

17 **A.**  B3 in 2040.

18 **Q.**  B3 is --

19 **A.**  Is the most stringent of the ones that we tested in the

20 analysis.

21 **Q.**  And what was the range for that change in the -- in

22 2010?

23 **A.**  It's right at a billion dollars or a little bit more.

24 **Q.**  Now, this is the residential visibility benefit?

25 **A.**  That's correct.

1   Q.   Now, let's leave that table and look at the table at the

2   top of the page, which is table 8.4.  What does this table

3   show?

4   A.   Well, in like manner, it reflects the summary of the

5   analysis for the value of improving visibility in a

6   recreational context, and that would be for individuals that

7   would go somewhere to observe a vista or a scenic view and

8   the value to them in being able to see that, in other words,

9   it having improved visibility.

10       And in 2010, as you can see, the range from, in the SAMI

11  eight-state region, of $155 million to maybe a national

12  context of almost $800 million, but maybe something less than

13  a national perspective of 640 million.

14  Q.   And which strategy changed?

15  A.   That's the -- again, to the first level of the strategy

16  beyond what's our base strategy.  Interesting observation is

17  that nationally, for our region, the Southern Appalachians,

18  there's a pretty good value, the recreational value, to

19  improve visibility, essentially $800 million for that

20  first-level strategy in 2010.

21       And, likewise, when we go from the A2 to the third

22  level, a more stringent strategy, B3, we're talking about a

23  two-and-a-half-billion-dollar benefit from a national

24  perspective, you know, of citizenry that's maybe not a

25  resident of the region, their view of the value of being able

1  to see a vista, and you can see how within the eight-state

2  region, it's about 500, a little bit less than 500 million in

3  some of the other regions, but not on the national level;

4  it's still a large number, $2 billion.

5      And then, similarly, in the year 2040, going from the

6  base to the first level of additional strategy, you can see

7  the numbers range nationally from about 1 and a half billion

8  on B1 to -- B3 going to over or nearly $3 billion in value,

9  and then somewhat less for the sub regions of the eight SAMI

10 states and the sub national regions of the non SAMI regions.

11 **Q.**  Let's go to the table 8.5, I guess, which is in the

12 middle of the page.

13     Could you explain what's going on in this table?

14 **A.**  Well, here it's actually broken down by Class 1 areas

15 for each of the two future strategy design years of 2010 and

16 2040, and then again broken down for the first extended

17 strategies, B1 and B3; that is, the improvement from the base

18 to the B1 strategy and improvement from the base A2 to A3 in

19 each of the two strategies, and we can get a sense of the

20 value people assign to the improvement.

21     And I guess a really impressive point of this is to

22 illustrate the value people place on visibility improvements

23 in the Great Smoky Mountains and the Shenandoah National

24 Park, and to a lesser degree in the other Class 1 areas.

25 **Q.**  Thank you.

1    Did North Carolina support SAMI by -- in a monetary way?

2  **A.**    We did.  We contributed to the effort over the years,

3  $50,000 per year from the state air program, as did a number

4  of other states, and then there was also support from the

5  USEPA to SAMI in varying amounts over the years for this

6  analysis.

7  **Q.**    Did SAMI -- excuse me, did the State of North Carolina

8  provide personnel labor, if you will, in performance -- in

9  the SAMI process?

10 **A.**    We did, certainly a considerable amount of time.  I put

11 in a pretty good share of my time over the years, as did

12 other staff in the division.

13 **Q.**    Do you recall the Tennessee Valley Authority ever

14 dissenting from the -- or disagreeing with the final

15 conclusions of SAMI?

16 **A.**    I don't recall that they did dissent.  We were fairly

17 careful at trying to get a consensus among all of the parties

18 and, as I recall, at the very last meeting here in Asheville,

19 where the governing body, the commissioners and the

20 secretaries, were here, it was a concerted effort to go

21 around the group of seven states and also others who had

22 participated to get the consensus.

23 **Q.**    I'm going to come back to SAMI with another witness, but

24 at this time I would like to ask that Exhibit 1, the SAMI

25 Final Report, Exhibit 2, the SAMI Report Summary, and Exhibit

1    3, the geographic sensitivities, be admitted into evidence.

2          **THE COURT:**  Let those be admitted.

3          **MS. COOPER:**  Your Honor, I'd like to object to the

4    admission of Exhibit 3.

5          **THE COURT:**  Show the objection by TVA.

6          **MS. COOPER:**  Yes, as to the admission of Exhibit 3.

7          **THE COURT:**  That objection just goes to Exhibit 3?

8          **MS. COOPER:**  Just to Exhibit 3.

9          **THE COURT:**  All right.

10         **MS. COOPER:**  And, Your Honor, we think that the --

11   that exhibit is hearsay.

12         **MR. GULICK:**  Your Honor, I think Mr. Nicholson

13   testified that that was part of the official record of SAMI.

14         **THE COURT:**  Yes.  I've ruled on the objection.

15         **(Plaintiff's Exhibits Nos. 1, 2 and 3 received.)**

16         **THE COURT:**  Any further questions for this witness?

17         **MR. GULICK:**  Yes, sir.

18         **THE COURT:**  All right.

19   **BY MR. GULICK:**

20   **Q.**   Mr. Nicholson, are you familiar with North Carolina's

21   Clean Smokestacks Act?

22   **A.**   I am.

23   **Q.**   I'd like to draw your attention to Exhibit 5.

24         **MR. GULICK:**  Your Honor, we discovered, and we've

25   drawn this to the attention of the Tennessee Valley

```
 1   Authority, that a statute -- the statute copy of part of the
 2   act was mistakenly included when it was our intention to
 3   include the session law, which is more meaningful for this
 4   discussion.  Session law was actually produced as a document
 5   to TVA early in this litigation.  I would like to substitute
 6   that.  I have hard copy substitutes for this exhibit, if a
 7   may approach the bench.
 8           May I approach the bench?  I have copies for the
 9   Court and also --
10           THE COURT:  Let me have a copy then.  You may
11   approach.
12   BY MR. GULICK:
13   Q.   Mr. Nicholson, if you'll now look at the screen.  Do you
14   recognize this?
15   A.   I do.  It's the Clean Smokestacks Act as it was
16   presented in the bill, in the legislative bill.
17   Q.   Is this, in fact, Session Law 2002-4?
18   A.   Yes.
19   Q.   When was this act actually enacted?
20   A.   In June of 2002.
21   Q.   How did you become familiar with it?
22   A.   I became familiar by working on the act from early 2001,
23   January 2001, with the various parties that were working on
24   this bill.
25   Q.   How did you first come to be involved in it?
```

1   A.   I attended what was, I think, the first meeting the

2   department was involved in, with the key legislative sponsors

3   of this bill and the utilities and environmental community to

4   address the substance of the bill.

5   Q.   And were you invited to that meeting?

6   A.   I was.

7   Q.   And at that time, you were employed by the Division of

8   Air Quality?

9   A.   I was.

10  Q.   And what took place at that meeting?

11  A.   As I recall, what took place there was an understanding

12  among the various parties of what the bill would do, the

13  reductions and the cap and so forth, and the understanding

14  that this would be reductions in North Carolina; and there

15  was some discussion, of course, of cost recovery at that time

16  in then that version of the bill.

17       But, fundamentally, it laid out the requirements of the

18  cap, SO2, the NOx requirements, and there was some discussion

19  of what had previously been proposed on mercury and CO2, and

20  at that time it was agreed upon by all of the parties that we

21  would not have a mercury cap or a CO2 goal, but that by a

22  date certain, three years hence, we, the department, the

23  division, would report on recommendations on those two

24  aspects of the multi-pollutant program, with recommendations

25  for the legislature on what to do regarding mercury and CO2.

1  Q.   Talk a little bit about the caps and what was discussed

2  and what was agreed.

3  A.   What was discussed and agreed upon was that SO2

4  emissions, for example, would be reduced in a phased

5  approach, a two-phase approach, from approximately 500,000

6  tons to 130,000 tons from that point in time, with an interim

7  phase for SO2 in 2009, where emissions would be cut by 50

8  percent, actually, in North Carolina and then, again, another

9  approximately 50 percent down to 130,000 tons for the year

10 starting January 1st, 2013.

11      In addition, for NOx, we would go from approximately

12 245,000 tons at that time down to 56,000 tons ultimately,

13 starting for the year 2009, with an interim phase at 60,000

14 tons for the year 2007.

15 Q.   Who are the entities whose emissions were going to be

16 subject to this act?

17 A.   These were our two investor-owned utilities, Progress

18 Energy and Duke Energy, and it was subject for all of the

19 power plants in -- coal-fired plants in North Carolina.

20      Another key feature that was agreed upon at that time

21 was this would be a hard cap in North Carolina.  In other

22 words, into the future, any growth due to new facilities and

23 so forth would have to be within this cap.  In other words,

24 it could not exceed it.

25 Q.   Now, was any particular modeling done to determine what

1  the benefits would be of this cap?

2  **A.**   Not specifically for settlement of those caps, but we

3  carried into that meeting, I think, considerable experience

4  from SAMI, for example, that the levels that we were talking

5  about, basically a 78 -- 77-78 percent reduction in NOx and

6  73 percent reduction, actual reduction, in North Carolina for

7  SO2 was a very significant reduction, but a very reasonable

8  one that made sense from a cost-effectiveness standpoint.

9  And given that the parties agreed to do this and accept the

10 requirement that we would look at mercury and CO2 later, we

11 didn't feel like we needed to do modeling specifically to

12 argue that that was the right level.

13 **Q.**   Now, were the terms that you've been describing

14 ultimately enacted in the law as we now have sitting here in

15 front of us in Exhibit 5?

16 **A.**   They were.

17 **Q.**   And in which section of the act are those set forth?

18 **A.**   In Section 1.

19 **Q.**   In Section 1?

20 **A.**   Section 1, yes, sir.

21 **Q.**   And that begins on page 1 of Exhibit 5 which we have in

22 front of us?

23 **A.**   It does.

24 **Q.**   Now, here in this act, it talks about investor-owned

25 public utility.  What is it talking about there?

1  A.   As a practical matter, it's our two major utilities in

2  North Carolina, which, of course, produce the vast majority

3  of the power in the state.

4  Q.   And does this section provide that each of them has a

5  separate cap?

6  A.   It does.  In fact, we had some discussion on combined

7  cap, and, actually, at the suggestion of the utilities, they

8  would rather accept a company -- separate cap for each

9  company system, and that was acceptable to all the parties.

10 Q.   And was that --

11 A.   That's where we ended up.

12 Q.   And that's what was eventually enacted, that Duke Power

13 had a cap for NOx and SO2 --

14 A.   That's right.

15 Q.   -- and, likewise, Progress Energy had a cap for NOx --

16 A.   That's correct.

17 Q.   -- emissions and also SO2?

18      And was this phased approach that you described, was

19 that carried forward into the actual enactment?

20 A.   It was.  And that was something that we insisted on

21 having so that there could be a clear demonstration that

22 progress was being made in the interim in a fairly short time

23 for each of the pollutants as opposed to waiting until the

24 end of the compliance period to see whether or not progress

25 was actually made in producing emissions.

1  Q.   You have a board and easel right there.  If you could

2  make a little chart of the years and the caps for each of

3  these two companies.

4  A.   I need something to write with, I guess.  Oh, this one

5  here.  Okay.  I'm sorry.

6  Q.   Please write it big enough so the Judge can see it.

7  A.   I'll just do Duke Energy and Progress Energy, best way

8  to scale this thing, but let me put '07, '09 and 13 up here

9  for the years.

10           THE COURT:  Can defense counsel see it?  I can see

11  it.  That's fine.

12           THE WITNESS:  I don't know if I remember the

13  numbers correctly.

14  BY MR. GULICK:

15  Q.   Would you like a copy of the act?

16  A.   Let me see if I can get it without.

17       For Progress Energy, let's divide between SO2 and NOx.

18  This is the most easy way to understand it.  I'll put SO2

19  only for 2013, since the phase in for NOx is 2007 and 2009.

20  SO2 is 2009 and 2013.

21       Let's see.  The total between the two companies in 2007,

22  I think as I may have indicated, was 60,000 tons.  I mean,

23  excuse me, of NOx.  Of NOx.

24       So it's 35,000 in '07 for Duke; and for Progress Energy,

25  it's 25,000 tons for NOx in 2007.

1    Now, might observe that for Progress Energy, that was

2 their final compliance, 25,000 tons, and it was for 2007.

3 Duke had a further requirement for NOx to go to 31,000 tons

4 of NOx, and Progress stayed at 25,000 tons in 2009 and

5 thereafter.  So, really, that 25 is from then on that they're

6 capped for their system for NOx.

7    For SO2 -- maybe I'll back up a little bit.  In 2013,

8 Duke Energy's cap is 80,000 tons of SO2 for 2013, and

9 Progress Energy's cap is 50,000 tons from their whole system,

10 and so those are each individual system's requirements.

11    For 2009 in SO2, if I'm remembering correctly, it was

12 150,000 tons for SO2 from Duke and I believe a hundred -- for

13 Progress Energy, 100,000 tons, for a total interim phase of

14 250, hence the half of the 500,000 nominal level that they

15 had been operating at.

16    At the time Clean Smokestacks Act started, they would go

17 down to 250,000 in the interim, or first day for compliance

18 with SO2, and 60,000 for NOx.

19    I shouldn't have put an SO2 by '07.  NOx's period is '07

20 and '09; SO2 is '09 and 13 for the two phases.

21        **THE COURT:**  And how do you number this exhibit now?

22        **MR. GULICK:**  Pardon me?

23        **THE COURT:**  How do you number this exhibit?  We

24 need that in the record.

25        **MR. GULICK:**  I think it's going to have to be

1  Exhibit 5A, Your Honor.

2          **THE COURT:**  All right.  Let the record reflect the

3  admission of that Exhibit as 5A.

4          **(Plaintiff's Exhibit No. 5A received.)**

5  **Q.**   Now, going back to the act, are these, you indicated --

6  are all of these caps set forth in Section 1 of this act?

7  **A.**   They are, yes.

8          **MR. GULICK:**  Could you bring the act up?  This is

9  Exhibit 5.

10 **BY MR. GULICK:**

11 **Q.**   And I'd like to draw your attention now to subsection F,

12 which is on page 2, I believe, of Exhibit 5.

13      Are you familiar with subsection F?

14 **A.**   I am.

15 **Q.**   Just tell us in your own words, what's now up on the

16 screen, tell us what this subsection does.

17 **A.**   It puts into the statute a provision that was discussed

18 in our early discussions on this, and we felt that, and I

19 think every party agreed, that it was important for each of

20 the companies to make their own best business decisions on

21 how we would comply with the caps.  So they can certainly

22 determine how they will achieve these, but the caps

23 themselves become a hard obligation, including the interim

24 phase caps for each of the companies.

25 **Q.**   What does the last sentence of this subsection mean?

1   A.   And it says that this subsection shall not be construed

2   to limit the authority of the commission to impose specific

3   limitations on the emissions of oxides of nitrogen and sulfur

4   dioxide from an individual coal-fired generating unit owned

5   or operated by an investor-owned public utility.

6        And this was put in for the purposes of ensuring that if

7   we had air quality issues associated with an individual plant

8   or facility and it needed to be specifically regulated in

9   some manner to assure we've met those air quality goals, that

10  we had the authority to do that.

11  Q.   Now, in the federal government's Clean Air Acid Rain

12  Program, or Title IV, can companies acquire allowances by

13  buying them or receiving them rather than actually making

14  emission reductions?

15  A.   They may, or they could have, and, in fact, did, and I

16  might add that one of the reasons, besides SAMI, that we

17  realized we needed this Clean Smokestacks Act was that our

18  utilities, quite frankly, had pretty excessive emissions.

19  Q.   When you say "our utilities," you mean what?

20  A.   Progress Energy and Duke Energy.  And that they -- these

21  emissions needed to be reduced significantly, as certainly

22  SAMI told us we should do that, and our realization that they

23  had not put sufficient controls on these utilities.  They, in

24  fact, had a record of acquiring compliance allowances to

25  comply with the Title IV provisions under acid rain.

1  Q.   Is it possible under Clean Smokestacks Act to meet these

2  caps by acquiring allowances?

3  A.   No, it is not.  We specifically said no allowances

4  acquired could substitute for real reductions in the state.

5  In other words, we would not allow any kind of on-paper

6  reductions by use of these allowances.

7  Q.   Let me draw your attention to provision subsection (i),

8  which is on the bottom of page 2 that we have in front of us

9  and carries over to the next page on this Exhibit 5.

10      Are you familiar with this section?

11 A.   I am.

12 Q.   Subsection.  What is this about, this subsection (i)?

13 A.   Well, somewhat like the provision I just talked about,

14 where paper credits couldn't be used to meet the requirements

15 of the Clean Smokestacks Act itself if by virtue of putting

16 on controls, one of our two utilities, Duke or Progress,

17 might go beyond -- in putting on controls, go beyond the

18 federal requirement, for example, and create a credit.

19      Any credits created by complying with the Clean

20 Smokestacks Act would need to be turned over to the State,

21 and this would be done by agreement with the governor that

22 they would do that.

23      Part of the reasoning, of course, is -- or two primary

24 reasons:  One, there was concern, one, that the companies,

25 because rate payers were going to pay for these controls, the

1  companies really didn't own the credits in the first place so

2  it's not their place to sell them; but perhaps more

3  importantly, there was concern that after paying for the

4  controls in North Carolina to get a benefit in North

5  Carolina, we didn't want credit sold to an upwind state that,

6  in turn, might avoid control by use of these credits and we

7  would dilute the benefit that we receive in North Carolina

8  from our reductions.

9       So that was a very explicit concern in the legislation

10  when this feature was put into effect.

11  **Q.**  Do you know whether or not such an agreement was entered

12  into by the governor with each of these two companies,

13  Progress Energy and Duke Energy?

14  **A.**  I do, and they were.

15  **Q.**  Like to draw your attention to Plaintiff's Exhibits 6

16  and 7.  Plaintiff's Exhibit 6, actually.

17       Excuse me.  Let's look at Plaintiff's Exhibit 6 first.

18       And what is -- do you know what this document is?

19  **A.**  This is a copy of the agreement entered into with Duke

20  Energy.

21  **Q.**  By the?

22  **A.**  With the state, the governor.

23  **Q.**  And is this the agreement that you were talking about?

24  **A.**  It is.

25  **Q.**  And when was this agreement executed?

1  A.    At about the time that the legislation was signed.

2  Q.    I direct your attention to the next page, page 2 of

3  exhibit -- I guess it actually would be page three.  I'm

4  mistaken.  Page 3.

5        It says the execution of this particular contract?

6  A.    It does, on the 19th of June, 2002.

7  Q.    And let's look at Exhibit 7.  And Plaintiff's Exhibit 7

8  is what?

9  A.    This is the similar agreement entered into with Carolina

10 Power & Light company, now known as Progress Energy.

11 Q.    This is essentially the same agreement with Progress

12 Energy as the State had with Duke as well?

13 A.    It is.

14 Q.    And -- all right.  Thank you.

15       Are the NOx emission caps that you've been describing,

16 the Clean Smokestacks Act, are they voluntary caps?

17 A.    No.  These are enforceable caps.

18 Q.    And does the act provide a mechanism for enforcement?

19 A.    It does.  It provides for both civil and criminal

20 penalties for failing to meet the requirements on the

21 schedule.

22 Q.    And are those set forth in Plaintiff's Exhibit 5?

23 A.    They are.

24 Q.    Let's go back to Exhibit 5, and I'd like to draw your

25 attention to Section 10 of this session law and --

1      **MR. GULICK:**  Gary, I apologize.  Going to have to

2  go forward.  There you are.  Section 10.

3          I'm not sure there's a page number on the actual

4  physical document, Your Honor.

5          **THE COURT:**  Okay.

6  **BY MR. GULICK:**

7  **Q.**    What does -- are you familiar with Section 10?

8  **A.**    I am.

9  **Q.**    What does Section 10 provide?

10  **A.**    It provides -- states the intent of the general assembly

11  in enacting its legislation, that the State should take all

12  available resources and means, including negotiation and

13  participation in various activities, multistate agreements,

14  et cetera, and petitions, including Section 126 of the

15  federal Clean Air Act, and litigation to induce other states

16  and entities, including Tennessee Valley Authority, to

17  achieve reductions in emissions of oxides of nitrogen and

18  sulfur dioxide comparable to those required by the Clean

19  Smokestacks Act as enacted by Section 1 of this act on a

20  comparable schedule.

21  **Q.**    Thank you.

22          Let me ask you, how does the State of North Carolina

23  know that Duke and Progress are complying with this act?

24  **A.**    Well, a specific provision in the statute, in the act,

25  required that they report annually on their current plans and

1   progress to date in meeting that; and the other means we have

2   for understanding that is these emissions are recorded

3   through continuous emissions monitors, so we can understand

4   their progress; and, of course, we make visits.

5   **Q.**   I'd now like to draw your attention to Section 12 of the

6   Clean Smokestacks Act, Exhibit 5 again.

7        And in your own words, what does Section 12 involve, if

8   you're familiar -- are you familiar with Section 12?

9   **A.**   Yes.

10  **Q.**   Just tell us, in your own words, what this is about.

11  **A.**   Well, in this provision, it requires the Division of Air

12  Quality of the Department of Environmental Resources to look

13  at the issue of mercury from coal-fired power plants, and

14  then, as I indicated earlier, we would make recommendations

15  three years hence, in this case, September 2005, but we would

16  do an annual report starting in September, 2003,

17  recommendations on what we should do regarding regulation of

18  mercury from each --

19  **Q.**   Looking at the first sentence of this section, could you

20  tell us what that is talking about?

21  **A.**   Part of our -- what it's addressing is the co-benefits

22  of mercury reduction that I believe TVA talked about earlier,

23  and we realized that there will be considerable co-benefits

24  through the installation of scrubbers.  These are flue gas

25  desulfurization units for the control of SO2, also the

1  benefits in terms of SO2 reductions.  Realizing that, that's

2  the factor into our recommendations on mercury controls.

3  **Q.**   Now, you indicated that you were involved with SAMI --

4  excuse me, in the -- prior to the enactment of the Clean

5  Smokestacks Act, you were involved in some discussions.  Did

6  you ever have occasion to use any of the SAMI work product

7  during your involvement with the Clean Smokestacks Act?

8  **A.**   I did.

9  **Q.**   And what was that?

10 **A.**   Primarily, that's utilizing the same geographic

11 sensitivity plots that we looked at earlier to discuss with

12 the legislators during the enactment of this, to explain the

13 benefits that enactment of such a program would have to the

14 citizens of North Carolina across the whole state, not just

15 necessarily the western portion of the state, and that, as it

16 turns out, was a very important consideration, in my

17 understanding, influence on the passage of the act.

18 **Q.**   And when you're talking about the geographic

19 sensitivities, does that include the documents that

20 constituted Plaintiff's Exhibit 3?

21 **A.**   That's correct.

22       **MR. GULICK:**  Your Honor, I'd like to move the

23 admission of Plaintiff's Exhibits 5, 6 and 7 at this time.

24       **THE COURT:**  Let those be admitted.

25       **(Plaintiff's Exhibit Nos. 5, 6 & 7 received.)**

1    Q.   Mr. Nicholson, are Duke and Progress, in fact, on track

2    to meet the caps set forth in the Clean Smokestacks Act?

3    A.   The division and the department believe they are.

4    Q.   And you indicated that there are reports that are --

5    A.   There are requirements for each of the two utilities,

6    Duke and Progress, to report annually, by April 1st of each

7    year, and then the department, in conjunction with the State

8    Utilities Commission, then, in turn, issues a report with

9    conclusions regarding their progress to the general assembly,

10   and those are required by June 1st of each year.

11   Q.   Have those, in fact, been completed each year since, I

12   guess -- what was the first one?  2003?

13   A.   2003 would be the first.  And they have been completed

14   each year, and both utilities have met their obligation each

15   April 1st in reporting.

16   Q.   I'd like to draw your attention to what has been marked

17   as Plaintiff's Exhibit 10.

18        Do you know what this document is?

19   A.   This is a cover sheet on this year's most recent report

20   that the department and -- the division and department put

21   together in conjunction with the Utilities Commission to

22   submit to the legislature on the progress of implementing the

23   Clean Smokestacks Act.

24   Q.   Were you involved in the preparation of this report?

25   A.   I was.

1  Q.    I want to draw your attention to Exhibit 10.

2          MR. GULICK:  This is electronic page 14.  We'll

3  have to see what -- it's page 12 of the hard copy, Your

4  Honor.

5          THE COURT:  Okay.

6  BY MR. GULICK:

7  Q.    And I want to draw your attention to the -- I guess it's

8  number 9 at the bottom.  I'm not sure if those are paragraphs

9  or not.

10      What does this paragraph 9 at the bottom talk about?

11 A.    Paragraph 9 addresses one of the specific items

12 contained in the Clean Smokestacks Act that requires each of

13 the two utilities to report annually in this report the tons

14 of oxides of nitrogen and sulfur dioxide, SO2, emitted during

15 the previous calendar year from their generating units.

16          MR. GULICK:  Now, I'd like to draw your attention

17 to the following page, which is hard copy page 13, Your

18 Honor.  It's electronic copy page 14.  15, excuse me.  Hard

19 copy is page 13, Your Honor.

20 BY MR. GULICK:

21 Q.    And what's shown here as a response from Progress

22 Energy?

23 A.    It's a summary of the emissions over the last calendar

24 year from Progress Energy, and it reflects that they have

25 reduced NOx emissions, NOx, by 59 percent and 25 percent SO2

1    since 2002.

2        The total calendar year 2007 emissions from the

3    affected, which it means all of the Progress Energy plants,

4    for NOx total is 24,383.

5        As I indicated earlier, they have met their 25,000-ton

6    cap by reaching this level in 2007, 2007 being the first year

7    for NOx, the NOx cap for the first phase.  SO2 is 147,242

8    tons.  Again, at this point in time, they're, of course, on

9    their way to their 100,000-ton ultimate cap here.

10   Q.   And the paragraph right below --

11   A.   First phase cap.  Excuse me.  I misstated that.

12   Q.   The paragraph right below that discusses what you've

13   just been talking about?

14   A.   Yes.

15   Q.   And it sets forth, again, what the SO2 emissions caps

16   are for 2009 and 2013 for Progress Energy?

17   A.   That's correct.  100,000 tons for 2009 and 50,000 for

18   Progress in 2013.  And this represents -- is a reduced amount

19   from generally a level of about 200,000 tons when the Clean

20   Smokestacks was enacted.

21   Q.   Let's consider the Duke Energy response, which is

22   further down this page.  The next one, actually.

23   A.   Well, in like manner, Duke has met their 2007 cap for

24   the year, being under 35,000 tons, that being just a little

25   over 33,000.  And they have a further requirement to go to

1    31,000 tons in the second phase.  Fairly short distance

2    there.  But SO2 is at 223,000 tons for calendar year 2007.

3    Again, their next goal for -- first phase requirement on SO2

4    is 150,000 tons in 2009 and then down to 80,000 for the year

5    of 2013 and thereafter.

6    **Q.**    I'd like now to draw your attention to page -- to

7    exhibit -- this exhibit, page 23, same Exhibit.

8              **MR. GULICK:**  It's page 21 of the hard document,

9    Your Honor.

10             **THE COURT:**  Okay.

11   **BY MR. GULICK:**

12   **Q.**    Did the Department of Environment and Natural Resources,

13   Division of Air Quality, review the data that had been

14   provided by Duke Energy and Progress Energy?

15   **A.**    We did.

16   **Q.**    And did you -- what conclusions did you draw?

17   **A.**    We concluded that, given the evidence presented both by

18   the companies and our observations on the ground and

19   measurements of emissions by the continuous emissions

20   monitors, that they are on the track to meet the requirement

21   and, in our opinion, will meet the deadlines.

22   **Q.**    And you indicated they had met the 2007 deadline.

23   **A.**    For NOx, that's correct.

24   **Q.**    Or cap.

25   **A.**    Cap.

1  Q.   And does this first -- this second paragraph here

2  discuss Progress Energy?  What is it basically talking about

3  here?

4  A.   Again, it relates emissions from Progress Energy and

5  relates it to the numbers of scrubbers or -- first scrubbers

6  here and then, I believe, NOx units put on in their system to

7  achieve these levels.

8  Q.   Now, it indicates in this report, in the middle it says,

9  two more Roxboro units are to begin operation in 2008.

10 A.   Right.

11 Q.   And Mayo unit in --

12 A.   In 2009.

13 Q.   -- in 2009?

14 A.   No.  This is the status as of April 1st of this year.

15 Q.   Has that status changed at all since then?

16 A.   It has.  I can relate it to --

17 Q.   How is that?

18 A.   I can relate it to both companies together, if that

19 would be useful, for July.

20 Q.   All right.

21 A.   As we understand it, we're now at 11 scrubbers

22 operational in -- between the two systems, Progress and Duke

23 Energy, and while this isn't necessarily the end statistic we

24 want to use, it's a handy way of understanding progress in a

25 program like this, that brings them to about 54 percent of

1  their total generating capacity is now scrubbed.

2  **Q.**  Could you identify the units?  Let's talk about

3  Progress.

4  **A.**  Okay.  When Progress Energy -- trying to find it on the

5  page here.  We know that the first two units went on here in

6  Asheville as far as scrubbers.  And Roxboro, I believe we

7  have two scrubbers on -- available for the whole year, 2007,

8  and two more that are available for part of the year, and

9  there would be a total of four at that location.

10 **Q.**  Did you say 2007?

11 **A.**  I should have, yeah.

12 **Q.**  And --

13 **A.**  That's just for Progress.

14 **Q.**  All right.  And with respect to Duke?

15 **A.**  In Duke, we have scrubbers on Belews Creek, two units

16 presently, and Marshall, and I believe at -- let's see.

17 **Q.**  So how many of the Roxboro units are currently

18 operational?

19 **A.**  I'm sorry?

20 **Q.**  How many of the Roxboro units are currently operational?

21 **A.**  I believe at least two, if not the third one at this

22 point in time.  I'm trying to find it on here.

23 **Q.**  I was going to refresh your memory.  One of them had --

24 there's been a change from since the April report date.

25 **A.**  I think we have an additional unit on in Roxboro since

1   the April status report.

2           **MS. COOPER:**  Objection; lack of foundation.

3           **THE COURT:**  Just a minute.

4   BY MR. GULICK:

5   **Q.**   You indicate that there is an additional unit coming

6   on -- or has come on?

7   **A.**   Well, the report on April 1st says two more Roxboro

8   units are to begin operation in 2008 and the Mayo unit in

9   2009.  I believe, from my memory, we have one more Roxboro

10  unit on now, if I'm not mistaken.

11  **Q.**   And that occurred since --

12  **A.**   I believe so.

13  **Q.**   -- since the April date?

14  **A.**   Yeah.

15  **Q.**   And with respect to Belews Creek, Duke unit, or Duke

16  facility?

17  **A.**   My understanding is that both of those units are on now.

18  **Q.**   That they're both operational?

19  **A.**   That's my understanding.

20  **Q.**   Now, I'd like to draw your attention to the final

21  paragraph of the conclusions, which is on the next page,

22  whatever is the -- in summary.

23          **MR. GULICK:**  No.  Back one page.  The bottom of

24  page 22 of the hard copy.

25

BY MR. GULICK:

Q.   Did the -- did the commission, the Utilities Commission
and DENR make any conclusions with respect to the progress
that had been made by Progress Energy and Duke Energy towards
meeting their caps?

A.   They did.

Q.   And what were those conclusions?

A.   The conclusion is that the actions taken to date by the
two companies appear to be in accordance with the -- are in
accordance with the provisions and appear to allow them to
meet their schedules and caps as contained in the Clean
Smokestacks Act.

Q.   I'd like to refresh your memory, if I could, with a
report with respect to operational dates.  And I want to show
you what's now on the screen in front of you and ask you if
you -- if this refreshes your recollection with regard to
what's in the report.

A.   It indicates that Belews Creek --

Q.   Does it refresh your recollection?

A.   Yes.

Q.   And having refreshed your recollection, what is your
recollection now?

A.   Well, that both units at Belews Creek are online.

Q.   And the unit two came online when?

A.   I think the end of May or so timeframe is what it was

1  scheduled for, and it's my understanding it's on line now.

2  **Q.**  Are Duke and Progress required to report the operational

3  dates to the State of North Carolina?

4  **A.**  I believe that various provisions in their permits would

5  indicate that, when they should be coming on line and so

6  forth.  And, of course, they start reporting emissions

7  relative to the control device.

8  **Q.**  And the next one.

9      You now have on the screen in front of you another

10  document.  Does this refresh your recollection with regard to

11  this Progress Energy report with regard to Roxboro?

12  **A.**  Right.  It refreshed my memory in the sense that Roxboro

13  unit 2, and now 3, are on, and unit 1 is scheduled in

14  December to come on.

15  **Q.**  In other words, so a second unit actually came on in

16  May?

17  **A.**  Correct.

18  **Q.**  Roxboro unit 3.

19          **MR. GULICK:**  Thank you.  Your Honor, I'd like to

20  move the introduction of Exhibit 10, which is the June 1,

21  2008, report of the implementation of the Clean Smokestacks

22  Act.

23          **THE COURT:**  Let that be admitted.

24          **(Plaintiff's Exhibit No. 10 received.)**

25

1  BY MR. GULICK:

2  Q.   Mr. Nicholson, I would like to draw your attention to

3  Plaintiff's Exhibit 13.

4         MR. GULICK:  Excuse me.  Exhibit 11.  It would be

5  Exhibit 11.  I apologize, Your Honor.  Plaintiff's Exhibit

6  11.

7         THE COURT:  All right.  I have it.

8  BY MR. GULICK:

9  Q.   And, Mr. Nicholson, do you know what this document is?

10 A.   I'm familiar with it.

11 Q.   What is it?

12 A.   This is a technical support document, or a portion of

13 it, from USEPA for the CAIR rule, the Clear Air Interstate

14 Rule.

15 Q.   And in the general matter, as a generate matter, just as

16 an overview, what does this document actually show?

17 A.   It shows the results --

18         MS. COOPER:  Objection; hearsay.

19         THE COURT:  Overruled.  Let me hear an answer.

20 Q.   Mr. Nicholson, what -- as an overview, what does this

21 document show?

22 A.   This reflects the results of EPA's air quality modeling

23 to support their Clean Air Interstate Rule.

24 Q.   And what is the function of the Clean Air Interstate

25 Rule?

1   A.   It was to reduce emissions of sulfur dioxide and NOx in

2   a number of eastern states in the U.S. as a multistate, main

3   multi-pollutants tool for the utility industry and other

4   large sources.

5   Q.   And what was the basis for making requirement

6   reductions?

7   A.   I think the EPA viewed that there was a requirement to

8   make these reductions over a broad eastern U.S. to allow

9   states, in fact, to obtain the ambient standards.

10  Q.   So this was in connection with a significant

11  contribution to nonattainment?

12  A.   Yes.

13  Q.   And so what does this -- with respect to that, what does

14  this -- you indicated it reflects the air quality modeling.

15          MR. GULICK:  Well, let's go to the -- let's go to

16  the next page of this document.

17          I guess we can go forward one more.  Page 4.  This

18  is page 4 of this document.

19          And, Your Honor, at the bottom of the page -- I

20  think we need to look at the bottom of the page, if you can

21  find it.  At the bottom of the page you'll see, Your Honor, a

22  Bates stamp, which is NC244714.

23          THE COURT:  Okay.

24  BY MR. GULICK:

25  Q.   And what I would like to draw your attention to here,

1  Mr. Nicholson, are the parts of this chart that relate to

2  downwind nonattainment counties and they're identified for

3  North Carolina.

4      If you look at the left-hand side, you see state, North

5  Carolina, Catawba and Davidson Counties; is that correct?

6  **A.**   That's correct.

7          **MR. GULICK:**  And Gary, if you could highlight those

8  rows and then the list of upwind states and the caption at

9  the top and bring those forward so it makes the chart easier

10 to read.  And highlight those and enlarge them on the screen.

11         Your Honor, we have these highlighted on the

12 screen.  It may make it a little easier to see.

13 **BY MR. GULICK:**

14 **Q.**   With respect to this, what does -- Mr. Nicholson, do you

15 understand what this chart represents?

16 **A.**   It is a summary chart of the results of some modeling

17 that the USEPA did to understand the impacts of various

18 upwind states as listed in the major body of the table in the

19 columns to the right of the left two columns.

20     And these are -- this is a result of what we call zero

21 outruns.  These are micrograms per cubic meter impacts from

22 those states.  For example, Alabama has an impact of .28,

23 impact on Catawba County or Hickory, if you would.  In North

24 Carolina --

25 **Q.**   And .28 means what?

1  A.   Impact of micrograms per cubic meter.  And, likewise,

2  for Davidson County, Alabama has an impact of .23.

3       And just looking across at some we were looking at

4  earlier, Kentucky would be .29 impact on Catawba and .21

5  respectively on Davidson County, or Lexington.

6  Q.   Now, I see we have the shorthand "AL" for Alabama and

7  "FL" for Florida and so on.  Were there other states, upwind

8  states, or is this the sum total?

9  A.   I don't know.  There were more subsequent pages.

10            MR. GULICK:  Could you go forward two pages, Gary?

11  Forward.  It's going to be hard to ...

12  BY MR. GULICK:

13  Q.   Actually, Mr. Nicholson, are you -- do we have a

14  prepared --

15       I'd like to draw your attention to Plaintiff's Exhibit

16  13 and ask you -- let's look at that now.  Do you recognize

17  what this document is?

18  A.   I do.  It is a summary, a table, to summarize the

19  impacts from all the states that have an impact on both

20  Catawba and Davidson County in North Carolina from the

21  analysis summary that we just saw.

22  Q.   And so this collects, on one page, information with

23  respect to Catawba and Davidson Counties and the states?

24  A.   It does.

25  Q.   And the source states?

1  A.   It does, yes.

2  Q.   And have you personally verified the accuracy of this --

3  A.   I have, and, for example --

4  Q.   -- with respect to the document --

5  A.   I have.

6  Q.   -- Plaintiff's Exhibit 11?

7  A.   I have.

8  Q.   And tell us what this Exhibit 13 shows.

9  A.   Well, again, like we noted earlier in the big table,

10 Alabama's contribution to Hickory/Catawba County is

11 .28-micrograms per cubic meter, and Davidson is .23; and then

12 we can go down to other states and see contributions of

13 Kentucky, .29 and .21 respectively, and point out North

14 Carolina's own contribution to our two counties is .92 and

15 1.21 in this case and --

16 Q.   Does Tennessee have a contribution?

17 A.   Tennessee.  Yes, they do, of .62 and .3 respectively.

18 Contributions to our North Carolina PM2.5 non-attained areas.

19 Q.   With respect to Catawba County, what is the relationship

20 here in part of the -- if you can tell, from the contribution

21 from Tennessee, to Catawba County's PM and North Carolina's

22 contribution?

23 A.   The observation is that North Carolina, on this table,

24 is the single largest contributor to Catawba County's air

25 quality issue there in terms of PM fine.  Tennessee

1  contributes considerably more than many other states, maybe

2  not the most compared to North Carolina, but it's a

3  significant contributor.

4  Q.   When you look at the bottom of this, with respect to

5  Catawba County, is there any other state other than North

6  Carolina that has -- how does Tennessee's compare to the

7  other states?  Is there any one that's as large as that?

8  A.   Ohio is just a small amount larger, at .63 contribution,

9  and Georgia is a little less than North Carolina and

10  Tennessee, at .56.  And as we indicated earlier, Alabama is

11  .28.

12  Q.   When we look down at the bottom, there are some totals,

13  out-of-state and in-state.  Do you have any conclusions that

14  can be drawn about what those numbers are?

15  A.   I think the first conclusion one has, while North

16  Carolina's impact is at .92, the largest single state, all of

17  the out-of-state impacts are very much larger than that.  In

18  fact, North Carolina's impact appears to be less than 20

19  percent of the total impact from other states on the air

20  quality -- PM air quality issue in Hickory.

21  Q.   When you say Hickory, you mean?

22  A.   Catawba County.

23  Q.   And the figure is a little different for Davidson?

24  A.   It is.

25  Q.   Is your conclusion basically the same?

1  A.    Yeah, it's basically the same.  It's not quite the same

2  multiple, but we can see a 1.21 compared to a, roughly, five

3  and a half micrograms-per-cubic-meter impact.  So we're

4  talking about 25, 25 percent-plus impact from North Carolina,

5  and the majority being from out of state.

6  Q.    And I think you already observed the contributions from

7  Kentucky and Alabama.

8  A.    Kentucky is, again, in the same order of magnitude as

9  Alabama, at .29 and .21 micrograms.

10  Q.    And that's for Catawba County?

11  A.    For the two areas, Catawba and Davidson Counties.

12  Q.    And when was the -- when was the evaluation -- when was

13  EPA's evaluation dated; do you recall?

14  A.    I'm not sure I recall that right now.

15  Q.    Let's go back to Plaintiff's Exhibit 11.

16  A.    March of 2005.

17  Q.    And -- all right.

18      MR. GULICK:  I'd like to move the admission of

19  Plaintiff's Exhibit 11 and Exhibit 13 into evidence.

20      THE COURT:  Let those be admitted.

21      (Plaintiff's Exhibit Nos. 11 & 13 received.)

22      MR. GULICK:  Your Honor, that's all we have on

23  direct examination of this witness.  And, of course, I'll

24  have to reserve, if necessary, the redirect, if necessary.

25      THE COURT:  All right.  You may proceed.

1    MS. COOPER:  All right, Your Honor.

2    CROSS EXAMINATION

3    BY MS. COOPER:

4    Q.   Now, you've testified about your role in and your

5    understanding with respect to the Clean Smokestacks Act,

6    correct?

7    A.   Correct.

8    Q.   And you said that your first involvement was in

9    approximately January of 2001; is that correct?

10   A.   That's correct.

11   Q.   And at that time, you were involved in a meeting with

12   some legislators; is that correct?

13   A.   That's correct, the two primary sponsors of the

14   legislation.

15   Q.   And there were also representatives of Duke and Progress

16   there?

17   A.   They were.

18   Q.   And some representatives of an environmental

19   organization?

20   A.   That's correct.

21   Q.   Now, at the meeting, isn't it true that Duke and

22   Progress reached a fairly quick agreement with the

23   environmental representatives about the level of caps on

24   emissions to be used?

25        MR. GULICK:  Objection.  If you know.

1        **THE COURT:**  Overruled.

2        **THE WITNESS:**  There was agreement at that meeting.

3    It happened in the meeting, if that's the definition of

4    quick.

5    **BY MS. COOPER:**

6    **Q.**   Well, do you remember your deposition in April of 2007

7    in this case?

8    **A.**   Yes.

9    **Q.**   Do you have it there in front of you?

10   **A.**   I do not.

11       **(Pause in the proceedings.)**

12   **Q.**   Can you see that?

13   **A.**   I don't have anything on my screen, no.

14       Okay.

15   **Q.**   Now do you have it?

16   **A.**   It was a quick flight.

17       **THE COURT:**  Now it's on.

18   **BY MS. COOPER:**

19   **Q.**   Can you take a look at page 33, line 21?

20   **A.**   Cannot actually see the line.  Oh, okay.  I do.

21   **Q.**   I'm sorry.  You believe that -- page 74, line 13.

22       **MR. GULICK:**  I'm sorry, what page are you on?

23       **MS. COOPER:**  Can you get that?

24       **MS. GUILLEN:**  I can't show you the line numbers.

25   Just a second.

1  BY MS. COOPER:

2  Q.   Did you not say -- were you not asked at your deposition

3  on line 14:

4       "So in other words, Duke and Progress negotiated the cap

5  amounts that were required of them?"

6       And you said:

7       "Answer:  Came to an agreement on it, yes."

8  A.   Yes.

9  Q.   And then:  "Negotiated those amounts?"

10      And you said:  "Well, there was not extensive discussion

11 at the meeting.  They were proposed, and the environmental

12 community said, We're happy with that, and the two utility

13 companies said, Okay, we'll take that."

14      Is that correct?

15 A.   That's correct.

16      And as I said earlier, our feeling was that

17 understanding these levels that were agreeable to both the

18 companies and environmental community did represent

19 significant reductions and would be very helpful to our

20 future strategies for ozone and PM fine and help visibility.

21 So we said that looks right to us.

22 Q.   Well, your role in this meeting was apparently to offer

23 advice; is that correct?

24 A.   I would say offer advice and interact as appropriate,

25 from representing the division and the department.

1  Q.   And you offered the advice at this meeting that the caps
2  were appropriate?
3  A.   I believe I did.
4  Q.   And you offered that advice because Duke and Progress
5  had a history of buying emission allowances rather than
6  reducing emissions; isn't that right?
7  A.   I think a lot of these considerations factored in,
8  certainly, our SAMI experience on the benefits we would get
9  from such reductions, the fact that both of these companies,
10 both of these companies, had excessive emissions without any
11 controls on SO2.
12      They did have considerable controls for NOx due to the
13 NOx SIP call, but that it was certainly in the ballpark of
14 what we would expect as a reasonable set of controls and it
15 seemed like the right level for us at the time.  And I think
16 77 percent reduction in NOx, 73 percent in SO2, does
17 represent a significant reduction.  We went from zero
18 scrubbers to what initially were 23 but now look like 20
19 scrubbers in the system and will meet these caps.
20 Q.   Well, Mr. Nicholson, your exhibit, which, by the way is
21 TVA -- your deposition in April of '07, is TVA Exhibit 145 in
22 book No. 7.
23 A.   I don't see it here.
24 Q.   And if you'll take a look at page 79.
25      "Question" --

1   A.   I'm sorry.  I don't have it.

2   Q.   It's over there on --

3        MS. GUILLEN:  It's up on the screen.

4        THE WITNESS:  Which book?

5   BY MS. COOPER:

6   Q.   Book 7.  It's also on the screen.

7   A.   Okay.  I see it now.

8   Q.   Page 79.

9        "Question:  Why did you think your reduction amounts

10  were appropriate?

11       "Answer:  Well, they were pretty significant.  I mean,

12  the reality is, in North Carolina, we did have zero

13  scrubbers.  These utilities had a history under Title IV of

14  buying credits.  So we had not yet gotten any reductions in

15  North Carolina, and we thought that was a very important

16  objective in North Carolina to get that."

17       Do you remember being asked that question and giving

18  that answer?

19  A.   It looks very familiar, and I think I'd say the same

20  thing today as I pretty much just said, is that, for SO2, we

21  were not getting any reductions in North Carolina and that

22  was a key feature of the agreement, was these would be

23  reductions by controls in North Carolina, no use of credits

24  anymore, and that level of reduction seemed very appropriate

25  and consistent with what we would -- you know, would see

1  benefits as we saw in SAMI.

2  **Q.**   But at the time that the Smokestacks Act was passed,

3  there were no scrubbers on any North Carolina utility; isn't

4  that right?

5  **A.**   That is correct.

6  **Q.**   All right.  Now, the Division of Air Quality didn't do

7  any air quality modeling itself to decide whether the levels

8  of emission caps were appropriate, did it?

9  **A.**   We did not.  And I think I explained why we felt that

10  wasn't necessary.

11  **Q.**   So as far as you know, the cap amounts were not set on

12  the basis of avoiding quantified health benefits or health

13  impacts?

14  **A.**   What we did know, though, with these significant

15  reductions, and we had agreement.  To get them capped in

16  North Carolina -- I keep wanting to emphasize that -- was

17  very important to us.  These were very significant

18  reductions.  And we did have the provision, as we noted

19  earlier in the bill, that if we have specific air quality

20  issues to deal with in a local area, we have the authority

21  right in the act to require further controls on specific

22  units to be --

23  **Q.**   I don't think that quite answers my question, Mr.

24  Nicholson.

25       The question was:  The cap amount set in the Smokestacks

1  Act were not set on the basis of quantified health benefits?

2  **A.**   We did not do a specific analysis to analyze those, but

3  at the same time, we knew that was a very significant

4  progress forward in reducing emissions and it was a key to

5  air quality management strategy to get those emission

6  reductions down.

7  **Q.**   The Smokestacks Act, I think you've mentioned, it's a

8  schedule for compliance.  Isn't that right?  A schedule by

9  Duke and Progress for compliance?

10  **A.**   There are schedules built into the act, yes.

11  **Q.**   And basically, the schedule for Duke and Progress to

12  come into full compliance with the caps was about ten and a

13  half years; isn't that right?

14  **A.**   Well, they have to be in for the full year, if you're

15  talking about the second phase of SO2 for the full year of

16  2013.  So that implies they have to be with their controls in

17  place prior to that date.

18  **Q.**   Well, the act was passed in 2002; isn't that right?

19  **A.**   Correct.

20  **Q.**   And they have to be compliant at the beginning -- the

21  end of 2012, beginning of 2013?

22  **A.**   Correct.

23  **Q.**   That's ten years plus, correct?

24  **A.**   Correct.

25  **Q.**   Now, at the January 20, 2001, meeting that you said you

1  attended, Duke and Progress and the environmental

2  representatives agreed on the schedule that was later

3  enacted; isn't that right?

4  **A.**   That's correct.

5  **Q.**   And you offered some advice about the schedule for Duke

6  and Progress; isn't that right?

7  **A.**   I did offer advice in that I insisted that there be an

8  interim compliance date so that we would very clearly show

9  that there was actual progress, and that's how the first

10 phase got put in place.

11 **Q.**   And you thought the schedule that the Smokestacks Act

12 provided for Duke and Progress was a reasonable one; isn't

13 that right?

14 **A.**   I thought it was reasonable at that point in time, given

15 the uncertainties of the ability to comply, yes.

16 **Q.**   Now, when you decided that the cap amounts were

17 appropriate, you didn't do any analysis of the costs of

18 complying with the cap, did you?

19 **A.**   I did not.

20 **Q.**   But --

21 **A.**   But, I might add, we did understand that the utilities

22 had also done some work on cost, and that knowledge was

23 presented and seemed reasonable to the parties.

24 **Q.**   Now, in 2001, there was a smokestacks bill that passed

25 the North Carolina Senate but not the House, isn't that

1  right?

2  **A.**    Correct.

3  **Q.**    The reason it got hung up in the House was concern over

4  cost; isn't that true?

5  **A.**    The first version of the bill that you're referring to

6  did have a provision in there that there would be some rate

7  adjustments for the cost of the facilities; that is correct.

8  **Q.**    And at the time, it was estimated that there would be a

9  rate adjustment of approximately 1 to 3 percent increase over

10 the cost --

11 **A.**    That's my recollection and understanding, yes.

12 **Q.**    And the breakthrough, the legislative breakthrough was

13 that there was a way to pass the law without requiring a rate

14 increase; isn't that true?

15 **A.**    That is correct.  And that came in the second-year

16 version of the bill.

17 **Q.**    And the -- ultimately, the law was passed with a

18 five-year rate freeze, not a rate increase; isn't that right?

19 **A.**    That is correct.

20 **Q.**    Now, isn't it true that there are nine coal-burning

21 electricity generating plants in North Carolina that are not

22 covered by the Smokestacks Act?

23 **A.**    There -- well, the Smokestacks Act covers the major

24 investor-owned utilities.  There are some smaller co-gen

25 facilities in North Carolina.

1  Q.   Isn't it true that these plants that are not covered by

2  the Smokestacks Act emit about 20,000 tons of sulfur dioxide

3  annually?

4  A.   I don't have that figure in front of me or in mind.

5  Q.   Well, let's turn to page 87 of your deposition.  If

6  you'll take a look at line 21 on page 87 and going through to

7  page 88.

8       "Question:  Are you telling me that there was no

9  consideration given to including these power plants in the

10  caps being imposed by the Clean Smokestacks Act?"

11 A.   Right.

12 Q.   "Answer:  That's correct.  We're talking 20,000 tons as

13 compared directly, 500,000, so these additional 20,000 tons

14 would deem to be a negligible amount."

15      Does that refresh your recollection?

16 A.   It does, and I would say -- again today, I would say the

17 same thing.  Just because they're not included in the Clean

18 Smokestacks Act, we would not have written off this as an

19 issue that might need to be addressed in a particular air

20 quality plan.

21      But, again, we had the opportunity to deal with 500,000

22 tons in a program that was agreeable and we were going to get

23 a very major reduction, so that seemed like an appropriate

24 opportunity to take to deal with the major source, and we

25 aren't giving up the authority or the ability to deal with

1  those others in any way.

2  **Q.**  Well, let me ask you about one of those others.  The

3  Blue Ridge Paper Products company.

4  **A.**  Okay.

5  **Q.**  That's one of those emitters that's not under the

6  Smokestacks Act; isn't that right?

7  **A.**  That is correct.

8  **Q.**  And that company operates a number of old coal-fire

9  boilers in Canton, North Carolina; isn't that right?

10  **A.**  That is correct.

11  **Q.**  And that's right here in the mountains of western North

12  Carolina, isn't it?

13  **A.**  Correct.

14  **Q.**  And they've been emitting in the vicinity of 800,000

15  tons of --

16  **A.**  No.

17  **Q.**  -- sulfur dioxide -- I'm sorry, 8,000 tons of sulfur

18  dioxide annually for a number of years; isn't that correct?

19  **A.**  I believe it's in that ballpark.

20  **Q.**  In fact, didn't did the Division of Air Quality issue

21  the plant an operating permit in December of '07, expressly

22  allowing them to emit 8200-plus tons of SO2 annually?

23  **A.**  I cannot recall exactly the date of issuance of a

24  permit, but they're operating under permits presently, yes.

25  **Q.**  Do you recall the amount of SO2 that they're allowed --

1  **A.**   I do not expressly recall that, but I think you're in

2  the ballpark.

3  **Q.**   All right.  Now, are you aware of any complaints that

4  the Division of Air Quality has received about emissions from

5  Blue Ridge Paper Products?

6  **A.**   There have been complaints over the years.  Yes, I'm

7  aware.

8  **Q.**   And do you recall a complaint from David Northcutt?

9  **A.**   The name sounds familiar, but I cannot place a specific

10 complaint.

11 **Q.**   Well, if you could turn to what has been marked as

12 Defendant's Exhibit 82.

13      Could you get it from your book over there?  It's book

14 5.

15 **A.**   Okay.

16         **MR. GULICK:**  Did you say Exhibit 82?

17         **MS. COOPER:**  82.

18 **BY MS. COOPER:**

19 **Q.**   I'd like you to take a look at that.  First of all, can

20 you tell me what the letter is that's been marked as Exhibit

21 82?

22 **A.**   This is a letter from our regional supervisor here in

23 the Asheville regional office, Paul Mueller, to Mrs. Esther

24 Clark in the office of Senator Elizabeth Dole in Raleigh.

25 **Q.**   Would you take a look through that letter?

1      Do you remember seeing this letter before?

2   **A.**   I do not remember seeing this letter.

3   **Q.**   Would you take a look through it and see if that

4   refreshes your recollection at all about the complaint by Mr.

5   Northcutt.

6   **A.**   Okay.

7   **Q.**   Does that refresh your recollection at all?

8   **A.**   I do recall that -- being aware of a complaint by an

9   individual about particles falling on a car.  I guess I'm not

10  specifically familiar with this letter, but generally --

11  **Q.**   Do you recall his complaint about his --

12  **A.**   In a -- sort of remotely, I do.

13  **Q.**   Do you recall that he also complained about the

14  potential effects of air emissions on his health?

15  **A.**   I think I recall that.

16  **Q.**   And do you also recall that the Division of Air Quality

17  responded to his concern by telling him that the -- all

18  National Ambient Air Quality Standards and State standards

19  were met in Canton and Haywood County?

20  **A.**   I see that in the letter.

21  **Q.**   So is it fair to say that, at least in responding to

22  this individual's fears about his health, the division

23  considered it appropriate to say we're meeting federal state

24  ambient air quality standards which are designed to protect

25  public health?

**A.**    Let me mention that -- what I recall and what I see in
this letter reflects a report, an investigation of a
complaint of a nearby neighbor who apparently experienced
some material falling on his car, and I believe I recall that
he lives very close to the mill, and we certainly investigate
these kinds of situations and others routinely.

And as it was noted in the letter, it was reported back
to him that they were in compliance with permit conditions
and standards at this time and that -- I believe we said that
we invited him to again contact us if he experienced other
upset conditions, thinking this was an upset condition at the
mill.

**Q.**    I don't think you exactly answered my question, Mr.
Nicholson.

The question has specifically to do with his fears about
his health and the response of the Division of Air Quality,
that the area was in attainment -- it determined that the
areas meet all National Ambient Air Quality Standards
established to protect human health.

**A.**    We say that in the letter, and certainly we have issues
of complaints and concerns about health, not always verified
by tests that, in fact, there is a health -- in fact, a major
health problem there by, say, an unbiased party.

I'm not saying that he didn't have a serious and real
problem there, but I don't think this shows, quite frankly,

1  that -- or proves that there is an ambient air quality

2  violation there, in fact, at all.

3     So I think this is just an example of a complaint that

4  we occasionally get about an upset condition, it sounds like,

5  for something that's fallen out onto his car.  Whether or not

6  that constitutes an actual health problem, I don't think

7  we've been shown that, or we haven't concluded that.

8  Q.  But you did conclude that it was appropriate to respond

9  to the fear of a health concern by saying ambient air quality

10  standards were met?

11  A.  We did.

12  Q.  And those ambient air quality standards are set at a

13  national level which is designed to protect -- designed to

14  protect human health with an adequate margin of safety; isn't

15  that correct?

16  A.  That is the original desire in the Clean Air Act, that

17  they be set at that level.  I think what we've learned in

18  recent years with the latest standards for PM and ozone is

19  that, in fact, they are not likely set at that because they

20  have discovered there is no level of which there is an

21  adequate margin of safety that's readily --

22  Q.  Let me ask you -- sorry for interrupting, but let me ask

23  you this question.  Does North Carolina also set statewide

24  ambient air quality standards?

25  A.  We have traditionally followed the federal standards in

1  setting them in our rules; that is correct.

2  **Q.**   I believe you just indicated that you think there may be

3  some question about whether those standards are sufficiently

4  protective.  Is that true?

5  **A.**   I think that's what the recent science and understanding

6  is, in fact, serious question, as to whether the

7  administrator under the federal Clean Air Act is, in fact,

8  setting them at the proper level.

9      We understand that there's some frustration on the

10  administrator's part, he must set a standard -- certain

11  requirements for states to be submitted to EPA; however,

12  whether or not that's actually set at the right level or

13  there is a level they could even set it at, that's, I think,

14  a growing concern here.

15  **Q.**   Well, doesn't North Carolina have the authority to set

16  ambient air quality standards below the national levels if it

17  feels the national levels aren't sufficiently protective of

18  human health?

19  **A.**   I believe we do have the authority, but whether that's

20  the right policy decision to make is a different question.

21  **Q.**   So you haven't done --

22  **A.**   We have not --

23  **Q.**   You haven't set standards lower in light of these --

24  **A.**   Not recently, that's right.

25  **Q.**   So currently the North Carolina standards are the same

1  as the federal standards; isn't that correct?

2  **A.**   I think that's correct.

3  **Q.**   If you believe that the federal and North Carolina

4  standards are not adequate to protect human health, wouldn't

5  you have an obligation to lower them?

6  **A.**   Well, that would be, I think, a major policy call.

7  Whether or not we have an obligation, I'm not sure about

8  that.

9      The issue of setting a standard brings up a number of

10  policy questions that's lower than the federal standard.  One

11  that comes to mind and we've thought about a little bit is if

12  we in North Carolina set a lower standard but none of our

13  neighboring states do and they design their strategies to

14  meet the higher standard, then we'll never get any additional

15  benefit of emissions reductions that they would put in their

16  strategies to help North Carolina.  And there are other

17  implications about doing that.

18      I think one policy position to take is that we

19  concentrate our resources on emissions reductions knowing

20  that we'll get continued benefit from those and not

21  necessarily design it to a lower ambient standard.

22          **THE COURT:**  All right.  We're going to quit for

23  lunch on that point.  We'll start back at 2:15.

24          Take a recess until 2:15.

25          (Lunch recess.)

1

2

3  UNITED STATES DISTRICT COURT

4  WESTERN DISTRICT OF NORTH CAROLINA

5  CERTIFICATE OF REPORTER

6

7          I certify that the foregoing transcript is a true

8  and correct transcript from the record of proceedings in the

9  above-entitled matter.

10          Dated this 15th day of July, 2008.

11

12                              S/ Karen H. Miller

13                              _____
                                Karen H. Miller, RMR-CRR
                                Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25