<pre>
 1                   UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                       ASHEVILLE DIVISION

 3
   STATE OF NORTH CAROLINA      )
 4 ex rel. Roy Cooper, Attorney )
   General,                     )
 5             Plaintiff,       )      No. 1:06-CV-20
                                )
 6      vs.                     )        VOLUME 6A
                                )
 7 TENNESSEE VALLEY AUTHORITY,  )     (Page 1285-1426)
                                )
 8             Defendant.       )
   _____)
 9
                 TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE LACY H. THORNBURG
               UNITED STATES DISTRICT COURT JUDGE
11                      JULY 21, 2008

12 APPEARANCES:

13 On Behalf of the Plaintiff:

14      JAMES C. GULICK, Senior Deputy Attorney General
        MARC BERNSTEIN, Special Deputy Attorney General
15      North Carolina Department of Justice
        114 West Edenton Street
16      Raleigh, North Carolina

17      MICHAEL D. GOODSTEIN, Esquire
        ANNE E. LYNCH, Esquire
18      Resolution Law Group, P.C.
        5335 Wisconsin Avenue NW, Suite 360
19      Washington, DC

20 On Behalf of the Defendant:

21      FRANK H. LANCASTER, Senior Attorney
        HARRIET A. COOPER, Assistant General Counsel
22      THOMAS F. FINE, Assistant General Counsel
        MARIA V. GILLEN, Assistant General Counsel
23      Tennessee Valley Authority
        400 West Summit Hill Drive
24      Knoxville, Tennessee

25       Karen H. Miller, RMR-CRR, Official Court Reporter
</pre>

```
 1                     I N D E X
 2  PLAINTIFF  WITNESSES:                        PAGE
 3  TODD MORSE
 4     Direct Examination Mr. Gulick            1287
       Cross Examination By Ms. Gillen          1307
 5
 6  WILLIAM CECIL
 7     Direct Examination Mr. Gulick            1310
 8
    ERIC PLAKANIS
 9
       Direct Examination By Mr. Gulick         1335
10     Cross Examination By Ms. Cooper          1342
11
    DONALD BARGER
12
       Direct Examination Mr. Gulick            1345
13
14  JOHN MOLENAR
15     Direct Examination Ms. Goodstein         1365
16  PLAINTIFF'S EXHIBITS
17     NUMBER                               ADMITTED
18     255-260                                  1334
       262                                      1334
19     264, 265                                 1295
       270, 271                                 1296
20     272, 273                                 1302
       288-295                                  1393
21     296-298                                  1410
       300, 301                                 1410
22     302                                      1393
       303                                      1398
23     431                                      1367
       472                                      1376
24     473, 473A                                1376
       488                                      1365
25
```

1                    P R O C E E D I N G S

2           THE COURT:  Is the State ready to proceed,

3  Mr. Gulick?

4           MR. GULICK:  Yes, Your Honor.

5           THE COURT:  And the TVA?

6           MS. GILLEN:  We are, Your Honor.

7           MR. GULICK:  Good morning, Your Honor.  Jim Gulick

8  for the State.

9           Our next witness is Todd Morse.

10          THE COURT:  All right, sir.

11                       TODD MORSE,

12  being duly sworn, was examined and testified as follows:

13                    DIRECT EXAMINATION

14          MR. GULICK:  Your Honor, may I approach the witness

15  to just show him how to use the screen?

16          THE COURT:  Yes, that would be fine.

17  BY MR. GULICK:

18  Q.   Please state your full name.

19  A.   It's Todd Baker Morse.

20  Q.   Where do you live, Mr. Morse?

21  A.   I live in south Buncombe County.

22  Q.   And how long have you lived there?

23  A.   In my current residence, about ten years.

24  Q.   How long have you lived in Buncombe County?

25  A.   I've lived in Buncombe County for ten years.  I've lived

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 3 of 142

1   in western North Carolina about 21, 22 years.

2   Q.    And what is your current occupation?

3   A.    Current occupation is president of Chimney Rock Company.

4   Q.    Until the last few years, had you been the president and

5   general manager of the Chimney Rock Park?

6   A.    Yes, that's correct.

7        My family owned Chimney Rock Park for 105 years, from

8   1902 to 2007.  We sold it to the State of North Carolina

9   in -- and we finalized the sale in May of 2007.

10  Q.    And if you could, could you just give us a little bit of

11  the history of the park?  Was it operated as a park for that

12  period of time?

13  A.    Well, the brief history is that my great-great uncle,

14  Dr. Lucius G.  Morse, was a physician who was practicing

15  medicine in Chicago.  He contracted tuberculosis and ended up

16  moving to North Carolina for the air quality, basically.

17       At that time, around just after the turn of the 20th

18  Century, there were a lot of clinics, sanitaria, set up for

19  tuberculosis sufferers in this area, and he came here

20  specifically for that purpose, to recuperate.  And he used to

21  ride down through the Chimney Rock area for recreation, and

22  paid the family that owned it, back in 1902, 25 cents to ride

23  out to Chimney Rock.  He fell in love with it, bought the

24  original 64 acres back in 1902, and then, over time, added

25  about a thousand acres.

1      It had been open to the public prior to our operating

2 it, and we operated it, as I said, for about 105 years as a

3 scenic attraction, a natural scenic attraction.

4 **Q.**   And did you -- how much of that did you sell to the

5 state in 2007?

6 **A.**   We sold the entire thousand acres to the state.  We

7 basically sold all of the assets and the business to the

8 State of North Carolina for inclusion of what is now Chimney

9 Rock State Park.

10 **Q.**   During the time in the last few years that you were the

11 operator of Chimney Rock State Park, approximately how many

12 visitors came to the park each year?

13 **A.**   The average was in the neighborhood of a quarter

14 million, 250,000.

15 **Q.**   Did Chimney Rock visitors come from all over the

16 country, or were they local, or both?

17 **A.**   It was both.  Lot of North and South Carolina residents

18 came.  But we had a lot of international visitation, as well

19 as visitation from across the country as well.

20 **Q.**   What kinds of activities can visitors do when they're at

21 Chimney Rock State Park?  Or Chimney Rock Park.

22 **A.**   Well, the portion that is open to the public is still

23 what was known as Chimney Rock Park, and, basically, there's

24 a 315-foot rock monolith called Chimney Rock, and so visitors

25 can take in the wonderful scenic views from the top of that;

1   and we've got interesting rock formations, a number of hiking

2   trails, and a 404-foot waterfall that was featured in the

3   "Last of the Mohicans."

4   **Q.** And about approximately how many -- what length of

5   trails or how many miles of trails are there?

6   **A.** We've got, I think it's just over five miles of trails.

7   **Q.** Like to bring up Exhibit 265. And go to page 3, if you

8   would.

9       Ask you first, Mr. Morse, if you can identify what this

10  document is.

11  **A.** This is the trail map that is used down at Chimney Rock

12  Park to help people orient themselves when they come for a

13  visit. This is generally the piece of literature they're

14  handed at the gate. You can also pick it up in other places.

15  But, primarily, we use it as a handout at the gate to show

16  people all around the park.

17          **MR. GULICK:** If we could go to page 3 of this

18  document and just sort of focus in a little bit on the map

19  itself, Gary, on the screen. Just if you could enlarge that.

20          Your Honor, I believe it may be easier to see it on

21  the screen than on the hard exhibit.

22  **BY MR. GULICK:**

23  **Q.** I was wondering if you could, Mr. Morse, just sort of

24  point out the various features here on this map.

25      This is the map you were talking about?

1  **A.**   Yes, that's correct.

2      I'll circle the main feature.  Let's see if I can do

3  this.  Okay.  That is Chimney Rock, and, as I mentioned,

4  that's really the namesake for the park.  That's the primary

5  rock formation that we have, where 100 percent of our

6  visitors will come and visit.

7      As you'll see, the items marked in what looks like black

8  on this screen, up here and here, are two of our trails that

9  go to the top of the falls, and then, down below, is the

10  trail that goes to the bottom of our falls, which is, of

11  course, over here on the right-hand side of the screen.

12      And basically, when you're hiking the trail,

13  particularly on the upper trails, it's full of incredible

14  scenic views up and down the valley, looking back up toward

15  Little Pisgah, going toward Asheville and all the way down

16  towards Lake Lure and out on the Piedmont plateau below us.

17  **Q.**   And what place on this map was shown in the movie "Last

18  of the Mohicans" that you mentioned?

19  **A.**   Let me see if I can figure out how to clear this.  There

20  we go.  I got it.

21  **Q.**   Got it?

22  **A.**   I think.  Oops.  I've got to go back.  Is there a clear

23  all?

24  **Q.**   It's on the bottom right.

25  **A.**   Okay.  During the "Last of the Mohicans," there was

1  footage that was shot at Groundhog Slide, which was one of

2  the last fight scenes, second to the last fight scene, along

3  the cliff trail; and then the final scene was shot at the top

4  of the 404-foot waterfall.  There was a view just before they

5  actually entered Chimney Rock that was taken across the

6  valley showing the mountain and primarily showing the

7  waterfall in the background.

8  **Q.**   I'd like to show you what's been marked as Exhibit 264.

9  And it will show up on the screen.

10       **MR. GULICK:**  Your Honor, we've provided you a --

11  Your Honor, we've provided you a courtesy copy of the actual

12  document, I believe your clerk is handing you.

13       **THE COURT:**  Yes, sir.

14  **BY MR. GULICK:**

15  **Q.**   Mr. Morse, what is this document?

16  **A.**   This had been a book that we had produced in conjunction

17  with a local photographer, Scott Graham, to depict a lot of

18  the scenes in the park.  And it was really a souvenir book

19  that was produced a number of years ago.

20  **Q.**   And on the cover of this document, what are we looking

21  at?

22  **A.**   You're basically looking at a view from the stair tower

23  just to the west of Chimney Rock that goes from around the

24  opera box area to the Devil's Head area on the trails, and

25  looking across Chimney Rock, which is the obvious rock

 1  formation in the lower part of the picture, and then across

 2  that to the Piedmont plateau, including Lake Lure just off in

 3  the distance.

 4  **Q.**   And I'd like to go into this document to page 6.

 5        **MR. GULICK:**  Your Honor, if you look at the

 6  courtesy copy, the pages are tabbed with little markers, the

 7  ones that we're going to go to.

 8  **BY MR. GULICK:**

 9  **Q.**   And Mr. Morse, what are we looking now at on the screen?

10  **A.**   What looks like, on a very clear day, you're getting a

11  picture of Chimney Rock taken from the parking lot area just

12  below Chimney Rock, which is what most visitors would come up

13  to and park at during a visit to the park.

14  **Q.**   Now let's go to page 12 of the electronic copy.  And

15  what are we looking at in this picture?

16  **A.**   That is our 404-foot Hickory Nut Falls.

17  **Q.**   Is that the highest fall in the park?

18  **A.**   Yes, it is.  It's one of the highest falls in the

19  eastern United States, actually.

20  **Q.**   Now I'd like to direct your attention to page 12.

21        Oh, excuse me, page 18.

22        What are we looking at in this picture on the screen?

23  **A.**   That's a picture of one of the rock formations that

24  we've got in the park called the Devil's Head, and it sort of

25  resembles a devil's head by profile.  It was formed over many

1  years of erosion and weathering and so forth, and it's a rock

2  that sits out on the edge of one of our cliff faces.

3  **Q.**   And what is the valley or gorge that we're looking up?

4  **A.**   You're basically looking up what we refer to as Hickory

5  Nut Gorge.  And Hickory Nut Gorge is the area that's made up

6  of the towns from Gerton through Bat Cave, Chimney Rock, and

7  all the way to Lake Lure.  It's a natural gorge that was

8  carved by what we call the Rocky Broad River over many, many

9  years.  It's a very steep gorge with rock-faced walls on

10  either side of it.

11  **Q.**   And is there a mountain in the distance partly obscured

12  by the Devil's Head itself?

13  **A.**   Yeah.  That would be -- the one immediately behind the

14  Devil's Head would be Little Pisgah, which would be the

15  mountain I referred to earlier that is -- I believe if you

16  stand on top of Little Pisgah, that would offer you a view

17  looking back toward Asheville.  So it's the highest peak in

18  that immediate area.

19         **MR. GULICK:**  Your Honor, I'd like to ask that this

20  Exhibit 264 and the one preceding be admitted into evidence

21  for illustrative purposes.

22         **MS. GILLEN:**  No objection, Your Honor.

23         **MR. GULICK:**  And the other was 265.

24         **THE COURT:**  Let it be admitted.  That would be 264

25  and 265.

1            **(Plaintiff's Exhibits 264 and 265 received.)**

2  **BY MR. GULICK:**

3  **Q.**   I'd like now to look at Exhibit 270.  And Mr. Morse,

4  what are -- what is this?

5  **A.**   That's a view of what we call the Rock Pile, another

6  rock formation in the park.  And this was taken not too long

7  before sunset.  I think this photo gives you an idea of some

8  of the sweeping vistas and panoramas that we have in the

9  park.  This would be looking, I guess, northwest, and it was

10  taken from an observation -- another observation point, rock

11  formation, called Pulpit Rock, looking back north to

12  northwest, back up the valley.

13  **Q.**   Now I'd like to show you what's been marked for

14  identification as Plaintiff's Exhibit 271 and ask you if you

15  can identify this.

16  **A.**   That, of course, is Chimney Rock, the top of Chimney

17  Rock.

18  **Q.**   And is this the same photograph that was actually used

19  on the cover of the brochure?

20  **A.**   It was on -- I believe on the cover of our brochure, not

21  on the book that we saw earlier, because that was taken

22  during fall color.

23  **Q.**   So this is another time of year?

24  **A.**   Yeah.  This is during probably the spring or summer.

25  **Q.**   And there appears to be a tree on the top of this.  Is

1  that right?

2  **A.**    That's correct.  It's a pine that has been there for

3  many, many years, and it's very interesting that it just

4  grows out of the rock.  One of the other things that is

5  interesting about that tree is that we refer to it as a flag

6  tree because -- and I was going to point out on the slide of

7  the Rock Pile the same thing, because I happened to notice

8  another flag tree on that drawing -- or on that photograph as

9  well.

10      And the reason why it's referred to as a flag tree is it

11  shapes itself over time in the direction of the prevailing

12  winds.  And it's kind of hard to tell from this photograph,

13  unfortunately, but if you were on top of Chimney Rock, it's

14  very obvious and apparent which direction the tree is shaped,

15  and it basically is leaning from the west to the east.  It is

16  pointing toward the east.  Our prevailing wind direction

17  comes up the valley from the west to the east.

18          **MR. GULICK:**  Your Honor, I move that Exhibits 270

19  and 271 be admitted into evidence for illustrative purposes.

20          **MS. GILLEN:**  No objection, Your Honor.

21          **THE COURT:**  All right.  Let those be admitted.

22          **(Plaintiff's Exhibits 270 and 271 received.)**

23  BY MR. GULICK:

24  **Q.**   I'd like now to -- Mr. Morse, did Chimney Rock Park

25  produce a video of a 360-degree view from Pulpit Rock?

**A.**   Yes, we did.  We have a number of pictures that are

viewed through an IPIX viewer.  One is of at the top of

Chimney Rock that we've used on our website to give people a

better idea of what their experience would be like. I can't

recall, but I think it's in the virtual tour part of our

website.

Again, there are a number of places in the park where it

gives people -- and on our website -- where it gives people

the opportunity to get more of a sense.  It's kind of hard

sometimes to capture the awesomeness of the scenic beauty

that we've got down there, and I think this IPIX give you a

much better perspective of what's around on top of Chimney

Rock and a couple other places in the park.

**MR. GULICK:**  Your Honor, with the Court's

permission, we would like to show the two very brief

360-degree views.  We have the videos.  With the Court's

permission.

**THE COURT:**  All right.

**BY MR. GULICK:**

**Q.**   Now, I'd like to look first at the -- this is -- if you

can identify what this one is.  And we'll rotate it and stop

at various places.  If you can identify what we're seeing,

Mr. Morse.

**A.**   Okay.  This would have been where we would have set the

IPIX tripod on Pulpit Rock, which is a rock formation.  You

 1  see Chimney Rock up here.  Right over here.  And where you

 2  would -- where this person would have been standing, you get

 3  the same image you do on that rock formation I refer to as

 4  Pulpit Rock.

 5      **MR. GULICK:**  Now could you rotate it, Gary, to the

 6  left?

 7      **THE WITNESS:**  Now you're starting to see the view

 8  across Lake Lure, down right below where the icon is.  And

 9  out -- and that's a view looking directly east.  And, again,

10  there is Lake Lure right there.

11      And then you're starting to look at the beautiful

12  rocks, rock cliffs that we've got across from us, one being

13  that mountain just below where I just touched, Rumbling Bald,

14  and another one being just there under the icon called Round

15  Top.  But you get a sense of the incredible views that we've

16  got all around this area.

17      That's looking -- starting to look pretty much

18  directly north at this point.  And then you'll see looking

19  back up the valley.  At this particular viewpoint, you won't

20  be able to see all the way back up the valley.  If you were

21  able to get past this pine tree over here, or whatever that

22  is, you would be looking back up, directly up the valley to

23  the west.

24      And, of course, over here on the left-hand side of

25  the image is the rock cliffs within Chimney Rock.  On the top

 1  of that is our upper trail, the Skyline trail, and just at

 2  the base of that would be the trail, which would be one way

 3  you would access the rock formation you see down below you.

 4          But this looks like it was taken on a relatively

 5  clear day.

 6          **MR. GULICK:**  Thank you.

 7          Gary, could we go to Exhibit 273?

 8          Your Honor, what we just looked at is Exhibit 272,

 9  and we're about to look at -- this is -- this, Your Honor, is

10  marked for identification as 273.

11  **BY MR. GULICK:**

12  **Q.**  Mr. Morse, what is this?

13  **A.**  This is a view from the top of Chimney Rock.  And,

14  again, the tripod was set on top of the chimney itself, and

15  this is the view that we believe 100 percent of our visitors

16  will experience while they're there, unless they have severe

17  fear of heights, because you do have to climb up about 44

18  steps to get to this area.  So let's say 99.9 percent of our

19  visitors go to that.

20      Again, you're looking at -- this is as a little aside --

21  a plaque that commemorates our family's history with the

22  park.  You'll see again Lake Lure out there in the distance.

23  So off to this area, you're looking directly east.  The IPIX

24  does distort things a little bit because it's a bit of a

25  fisheye lens, so it looks a little bit more tilted than it

1  actually is.  But, again, you're looking at, where the arrow

2  is, out in the direction of Lake Lure, which is east,

3  directly east.

4  **Q.**   Do you know how far you can see in that direction when

5  it's clear, as it appears to be in this picture?

6  **A.**   On a very clear day, you can see to King's Mountain and

7  just a little bit beyond that.  And that's why, over many

8  years, we used to -- in my early years of involvement with

9  the park, when I started in 1986, we featured the 75-mile

10 view prominently as part of our brochure because on many

11 clear days you could see 75 miles, on the clearest days.

12 **Q.**   Does that remain the case?

13 **A.**   We have, over the last number of years -- of course, I

14 can't remember exactly when it was withdrawn -- but we have

15 deemphasized the views from the top of Chimney Rock, and we

16 do talk about the views in our website, but they are much

17 less prominent than they used to be.

18     Frankly, there were a number of factors in deemphasizing

19 those views, but one of the primary ones for me was that we

20 were having many more days, in my experience of my 21 and a

21 half years directly involved with the park, that visibility

22 was greatly limited, and, in fact, on some of the worst days

23 of summer haze, about where I have the arrow, at the end of

24 Lake Lure would have been about as far as you could see,

25 which I've not measured it exactly, but my estimate would be

1  in the neighborhood of 5 to 7 miles from the top of Chimney

2  Rock to that point.

3       And so we did deemphasize the 75-mile views because we

4  didn't want our visitors to come and be disappointed if they

5  couldn't experience the 75-mile views.

6  Q.   In your experience, are they disappointed if it's hazy?

7  A.   Well, I think so.  My experience has been that.  We had

8  done a number of marketing research pieces over the years to

9  try to get a sense of why our visitors are coming to the

10 park, and every time we have done those marketing research

11 pieces, the number one reason that they say they're coming is

12 the views and mountain scenery.  And I also believe that the

13 City of Asheville, Buncombe County tourism folks that have

14 done research in this area, it's the same reason that people

15 are coming to western North Carolina, for the scenic views.

16 Q.   As a businessman, did you use and rely on market tourism

17 at that time?

18 A.   Oh, absolutely.  We are a very marketing research driven

19 organization.  We definitely listen to our visitors and try

20 to understand what they want and try to give them what they

21 want.  We, over the years, have done quite a number of

22 marketing research pieces.

23 Q.   In this particular case --

24          MR. GULICK:  Gary, can you rotate -- this is one of

25 those 360-degree views.  Rotate to the right.

1      **THE WITNESS:**  There's a better picture of our flag

2  tree, and I think you can see -- I don't know how to draw it

3  on here, but you can see about where the arrow is that that

4  was the tree that I was referring to, the pine, and you see

5  how it leans.  And, again, with a bit of distortion of the

6  fisheye lens in the way that it moves across, it's hard to

7  tell exactly what direction, but you can see that it is

8  leaning, and I think if you were on top of Chimney Rock, it's

9  very clear to see that it is leaning toward the east.

10      **MR. GULICK:**  Can we now rotate a little bit further

11  to the right, Gary?

12      **THE WITNESS:**  This is looking back toward our

13  Skyline gift shop and elevator.  It's a little bit hidden

14  right behind the tree.  Of course, this is the rest of

15  Chimney Rock Mountain, looking back and away from Lake Lure,

16  down toward where the stairs are leading off Chimney Rock.

17  And then there's the view looking back up the valley.

18      **MR. GULICK:**  Thank you.

19      Your Honor, like to move the introduction, the

20  admission of the two film clips, Exhibits 272 and 273, for

21  illustrative purposes.

22      **MS. GILLEN:**  No objection, Your Honor.

23      **THE COURT:**  All right.  Let those be admitted.

24      **(Plaintiff's Exhibits 272 and 273 received.)**

25

1  BY MR. GULICK:

2  Q.   Now, I think you've already indicated these were filmed

3  on relatively clear days.

4  A.   That's correct.

5  Q.   Mr. Morse, to what degree has -- are most of the days,

6  in your experience, as clear as the ones that are shown in

7  this film clip -- in these film clips?

8  A.   In my experience, the days, primarily in the summer,

9  once we get into June, July, August, are not nearly this

10  clear.  In fact, you know, I know a number of times where

11  I've gone up to the chimney and barely been able to see to

12  the end of Lake Lure, as I indicated a few minutes ago.

13  Q.   Based upon your 20 years of experience, or 21 years of

14  experience, do you believe that it affects the quality of the

15  experience that your visitors have?

16  A.   I believe it does, because I think that we have -- as a

17  business, we have a lot of what may be available for free in

18  western North Carolina, but one of the things that's really

19  our business premise was that in Chimney Rock Park you could

20  see all that's special about western North Carolina in one

21  place, and if you take away one of those things that's

22  special about western North Carolina, I would believe that

23  our visitors would not have as good of an experience.  You're

24  taking away one of the main selling points that we've got for

25  people to be there.

1  **Q.**   Now, do you have an understanding about, in just a

2  general manner, about what's causing that haze?  Not who, but

3  what.

4  **A.**   Well, I would say yes, from the standpoint that I read

5  the newspaper.  I try to keep myself informed.  I'm involved

6  with --

7        **MS. GILLEN:**  Your Honor, we object to this

8  testimony.  Mr. Morse is a fact witness.

9        **THE COURT:**  Sustained.

10 **BY MR. GULICK:**

11 **Q.**   Mr. Morse, is the haze that you see the same as clouds?

12 **A.**   No, it's not; it's very different.  Clouds are -- you

13 know, come in different forms and sizes and shapes and so

14 forth, but I think the haze that we see is more just evenly

15 spread and it's not distinctive, as clouds are.

16 **Q.**   Is air pollution a concern -- was air pollution of

17 concern to you as an owner of Chimney Rock Park?

18 **A.**   Yes, it was, I think for several reasons.  One was, as

19 I've already mentioned about the view, the impact on the view

20 with haze, being our number one reason why people are coming

21 to the park and that impacting that.

22      I think, and I'm reminded this morning that there was a

23 mention of ozone, high ozone levels, a code orange, I

24 believe, this morning when I opened up the paper.  And we're

25 about hiking and getting outdoors, and our trails, one thing

1  I should have mentioned is we rate them as moderate to

2  strenuous.  And so the article that I read this morning

3  specifically talked about limiting outdoor activity in the

4  afternoon, and, you know, when you hear "code orange," you're

5  not thinking about going hiking.

6       And I think the other issue is the publicity.  We are

7  very much, as I mentioned, marketing research driven.  We're

8  also very much word-of-mouth driven.  That still shows up as

9  our number one form of advertising, and experiences that

10 people have at Chimney Rock help drive whether other people

11 come as well.  And I think when you see code orange days

12 showing up or when you see record ozone days in the Smokies

13 in the newspaper, that's not really the kind of publicity

14 that is beneficial to the tourism industry and helping people

15 want to make a choice to come to visit Asheville.

16      A lot of those things we do -- we put a lot of money

17 into marketing to try to get people to come visit Chimney

18 Rock, and that kind of negative publicity about the air

19 quality in this area definitely can't be helping our business

20 here at Chimney Rock or anywhere in western North Carolina.

21 **Q.**  As a business person, or even in your personal capacity,

22 have you taken any actions to deal with the fact of air

23 pollution?

24 **A.**  Yes, I have.  I got involved with a group called the

25 Clean Air Community Trust in Buncombe County when it was

1  first formed.  It was a group of Buncombe County and

2  Asheville City folks that had gotten together that formed

3  this organization.  It's all about educating the public,

4  coming up with programs around air quality, around energy

5  conservation.  We do a lot of, I think, interesting and

6  innovative things to try to help our young people in this

7  area learn more about air quality issues in this area as

8  well.

9       I also -- and I can't recall the date, but I was

10  involved with the grassroots group that was put together that

11  helped create the Clean Smokestacks legislation a number of

12  years ago.  I was asked to serve on a committee of business

13  people and environmentalists and other folks that were very

14  concerned about the air quality, and, again, were the ones

15  who ultimately drafted the Clean Smokestacks legislation.  As

16  part of that, I was asked to go to Raleigh to speak on the

17  legislature steps as a representative of the tourism industry

18  to help introduce the bill.

19  **Q.**  Did you do that?

20  **A.**  I did, along with a medical professional and some of the

21  legislators that were sponsoring the bill.  And I got

22  involved with it because I knew it was an important first

23  step for the State of North Carolina to clean up its air, and

24  I spent some time lobbying some of our legislators to try to

25  get the bill passed, and was very delighted that it did,

1  through a lot of people's hard work.

2  **Q.**   Does air pollution have a more personal impact on you

3  and your family?

4  **A.**   Yes, it does.  I'm a runner.  I'm training for the New

5  York City marathon this year, which is a little scary.  It's

6  only my second.  But I like to run, and, obviously, to a

7  long-distance runner, air quality is pretty important

8  personally.

9       And my wife has, unfortunately, in the last, I think it

10  was six to eight years, developed asthma from living in this

11  area -- as she's lived in this area.

12       And I've got two children, and I'd like for them to grow

13  up in an area where the air is clean to breathe.  And again,

14  that was the reason why my family came here in the first

15  place, my great-great uncle recuperating from tuberculosis.

16  This was an area known for its air quality a long time ago.

17            **MR. GULICK:**  I have no further questions.

18            **MS. GILLEN:**  Just a few, Your Honor.

19                     **CROSS EXAMINATION**

20  **BY MS. GILLEN:**

21  **Q.**   Good morning, Mr. Morse.

22  **A.**   Morning.

23  **Q.**   I don't know if you need it, but if you do, we're kind

24  of doing the low-tech version of the exhibits, so it's

25  Plaintiff's Exhibit book 5 that will have exhibits, if you

1  need them.

2  **A.**    Okay.

3  **Q.**    I know you said you deemphasized the 75-mile views from

4  Chimney Rock.  But they're still contained on your website,

5  right?

6  **A.**    They are.  That's correct.

7  **Q.**    And the 75-mile views was also featured in the press

8  release about the sale of the park to the State of North

9  Carolina?

10 **A.**    I'd have to see that.  I'm not aware of that.  But I

11 know there -- that was a very crazy time, when we were

12 selling, so I can't recall.  I'd have to see that.

13 **Q.**    Well, if you want to take a look, it is in that book No.

14 5, North Carolina exhibit book.

15         **MR. GULICK:**  Your Honor, may I assist him in

16 finding that?

17         **THE COURT:**  All right.

18         **THE WITNESS:**  Could I ask for clarification?  What

19 was the origin of that press release?

20         **MS. GILLEN:**  It was a June 28, 2007, press release.

21         **THE WITNESS:**  Was it -- I guess my question was,

22 was it issued by the State of North Carolina or by Chimney

23 Rock management?

24         **MS. GILLEN:**  It's in the media room of the Chimney

25 Rock Park website, I believe.  We'll look at it in a minute.

1          **MR. GULICK:**  274?

2          **MS. GILLEN:**  Exhibit 274.

3    **BY MS. GILLEN:**

4    **Q.**   And if you look on page -- page 1 shows you where it's

5    from, and then page 2, under the heading "Chimney Rock

6    Park" -- let's see.

7    **A.**   Oh, I see.  I see where it is, on page 2.  This would

8    have been -- yes, I acknowledge that that is in there.

9          Again, my comments were really that, from a brochure

10   standpoint, it was featured on the front of the brochure,

11   which means it was featured very prominently as a reason why

12   people would want to come there.  It is still -- on a clear

13   day, we do have 75-mile views.  That is still correct.

14   **Q.**   And do you offer free admission to children under six?

15   **A.**   Yes.

16   **Q.**   I have a vested interest in this.  I have a

17   five-year-old, so just checking.

18         And you have reduced admission to children between the

19   ages of six and 15?

20   **A.**   Yes, that's correct.

21   **Q.**   And I think you just testified earlier that you welcome

22   about a quarter of a million visitors each year to the park?

23   **A.**   Yes.  In and around that area, yes.

24   **Q.**   Great.  Hopefully, it'll be a quarter of a million and

25   one soon.

1      Thank you very much.

2  A.    Thank you.

3          MS. GILLEN:  No further questions, Your Honor.

4          MR. GULICK:  No redirect, Your Honor.

5          THE COURT:  All right.  Did you say --

6          MR. GULICK:  I have no further questions.

7          THE COURT:  All right, then, Mr. Morse, that will

8  complete your testimony and you are excused.

9          THE WITNESS:  Thank you.

10          MR. GULICK:  Your Honor, our next witness is

11  Mr. William Cecil.

12                    WILLIAM CECIL,

13  being duly sworn, was examined and testified as follows:

14                   DIRECT EXAMINATION

15          MR. GULICK:  Your Honor, may I approach the witness

16  and show him how to use the screen?

17          THE COURT:  Yes.

18          (Pause.)

19  BY MR. GULICK:

20  Q.    Mr. Cecil, you can eliminate those marks on your screen

21  by touching the lower right-hand corner.

22  A.    Okay.  Is that all I need to know?

23  Q.    That's all you need to know, except you can mark, if you

24  want to, by touching the screen with your fingernail, and you

25  can draw a circle or just touch it and put an arrow.

1  **A.**   Okay.  Thank you.

2  **Q.**   Would you please state your full name.

3  **A.**   William Amherst Vanderbilt Cecil, Jr.

4  **Q.**   Where do you live, Mr. Cecil?

5  **A.**   I live here in Asheville on Biltmore Estate.

6  **Q.**   And where do you work?

7  **A.**   I work for Biltmore Estate.  I'm the president and CEO

8  of the Biltmore Company.

9  **Q.**   What are your responsibilities as president and CEO of

10 Biltmore Company?

11 **A.**   Well, we operate four primary entities under the name of

12 the Biltmore Company, and I'm responsible for all of them.

13      They are the Biltmore House and Gardens; Biltmore Estate

14 Wine Company; The Inn On Biltmore Estate; and what we refer

15 to as Biltmore For Your Home.  It's a reproductions program

16 that's sold in places like Belk's and Lowe's.

17 **Q.**   Let's talk a little bit about the Biltmore House.  Could

18 you tell us a little bit about what the Biltmore House is.

19 **A.**   Well, Biltmore House is a big house -- it's a big house

20 that was built by George Vanderbilt back in 1890 to 1895, and

21 it was built as a private residence for the Vanderbilts as a

22 way for them to have an oasis, and also as a way to showcase

23 a model farm in western North Carolina.  That was part of his

24 vision, was to have an area in western North Carolina, or

25 somewhere in the country anyway, that would be a model farm,

1  for the United States to be able to see that sustainable

2  agriculture was a better model than slash-and-burn

3  agriculture, which was fairly typical at that time.

4  **Q.**   What was your relationship to him?

5  **A.**   He's my great grandfather.

6  **Q.**   At one time, do you know how much property he owned in

7  this area?

8  **A.**   Well, nowadays -- they changed the number back and forth

9  from 128,000 to 124,000 acres, so I'd have to assume -- I was

10 always told it was 128,000 acres, that he owned all the way

11 from where Biltmore House is to Mount Pisgah.

12 **Q.**   That's the family history?

13 **A.**   Yeah, that's the family history.

14 **Q.**   And how much of that land is still part of the estate

15 today?

16 **A.**   Approximately 8,000 acres.

17 **Q.**   And Mount Pisgah is now part of the national forest?

18 **A.**   Yes, sir.  Mount Pisgah is part of the Pisgah National

19 Forest.  His widow, Mrs. Vanderbilt, sold the land to form --

20 I believe it was 87,000 acres -- the nucleus of the Pisgah

21 National Forest.

22 **Q.**   Now, with respect to the building itself, would you tell

23 us a little bit about the house itself.

24 **A.**   Well, it's about 180,000 square feet.  It's the largest

25 privately-owned residence in the United States.  We get about

1  1,100,000 visitors a year, is our gate count.  Our actual

2  ticket sales are about a little less than that, a million 54,

3  56,000 is what we're forecasting this year.  The difference

4  between the gate count and the forecast is the number of

5  12-month pass-holders that we have that are repeat visitors.

6  We count them separately.

7       The house is filled with furnishings from the Vanderbilt

8  era.  It's basically been frozen in time to about 1914, when

9  he passed away.  We try to create this -- I don't know quite

10 how to say it -- a quasi time travel experience, where you

11 can get away from your daily grind and come up to Asheville

12 and relax and just have a nice time in a perception of a

13 world that was kinder, gentler, you know, no fax machines,

14 cell phones, PDAs, stuff like that.

15 **Q.**  Do you conduct -- as a businessman do you conduct -- do

16 you look at market research to see why people come to this

17 area?

18 **A.**  Yes, I do.  I look at research from all kinds of sources

19 and also commission my own research with our guests all the

20 time.

21 **Q.**  And based upon that research, do you know what the

22 primary reasons are that people come to the Asheville area

23 and to the Biltmore?

24 **A.**  We find that the primary reason is the scenic beauty of

25 our area, mountain vistas, views, just the general prettiness

 1  of the area.

 2      We also find that this oasis, this sense of get away and

 3  escape, is huge.  We find that the there is also a sense of

 4  safety here in Asheville that people like, and they come up

 5  for the feeling of being safe.

 6  **Q.**  Does tourism play a large part of the economic

 7  well-being of this community?

 8  **A.**  Yes, it does.

 9  **Q.**  I'd like to show you what's been marked as Plaintiff's

10  Exhibit 262.  It will appear on your screen.

11      And just look at the cover of this, and I'm going to ask

12  you if you are familiar with this document.

13  **A.**  Yeah.  It's one of the surveys that the Chamber of

14  Commerce does.

15  **Q.**  Are you a member of the Chamber of Commerce?

16  **A.**  Yeah, I'm a member of the Chamber of Commerce and have

17  been on their board of directors for many years.  In fact,

18  this past July ended my year as chairman of the Asheville

19  Area Chamber of Commerce.

20          **MR. GULICK:**  Gary, I'd like to direct our attention

21  to page 18 of this survey.

22  **BY MR. GULICK:**

23  **Q.**  And are you familiar with this particular page,

24  Mr. Cecil?

25  **A.**  Yes, I am.

1  **Q.**   Would you just sort of tell us what you learned from

2  this?

3  **A.**   Well, consistently, mountain scenery and scenic views

4  are very important to the reasons people visit here.  Also,

5  just to see Biltmore.  And I think the relaxing is part of

6  that oasis experience that I mentioned just a moment ago.

7  **Q.**   Now, the Biltmore Company is a company.  How many

8  employees do you have?

9  **A.**   It varies seasonably, but right now probably around

10  1800.  We have a little bit less in the early season, and it

11  grows more, up to about almost 1900 by the time Christmas is

12  upon us.  And we start off with festival of flowers in April,

13  and it probably starts about 1700, and we build through

14  there.

15      Our lowest season would be during the winter.  We'll

16  have 11 or 1200, being January, February and half of March.

17  **Q.**   Let me show you what's been marked as Plaintiff's

18  Exhibit 260 and ask you if you can identify this document.

19  **A.**   Yeah.  That's a front view of the Biltmore House, and it

20  looks like it's on our guidebook.  It shows the very front of

21  the house, the main architectural features, and it's taken

22  from about halfway up an area that we refer to as the ramp in

23  front of the house.

24      **MR. GULICK:**  Your Honor, we've provided you a

25  courtesy copy of this document, which is a book.

 1          THE COURT:  I don't seem to have that.

 2          MR. GULICK:  Padron me, Your Honor.  I'm about to

 3  provide you with a courtesy copy of the book.  I apologize.

 4          THE COURT:  All right.

 5          MR. GULICK:  May I approach the clerk?

 6          THE COURT:  Yes, please.

 7  BY MR. GULICK:

 8  Q.   You had indicated this is the front cover of a book that

 9  you published.

10  A.   Yeah.  We call this our guidebook.  It's one of our

11  primary retail items.  I don't know how much detail you want

12  me to go into, but it's designed around three of our primary

13  guests, and they refer to them as strollers, streakers and

14  studiers, and there's a little bit of each in there.  If

15  you're in a hurry, you can read the picture and byline; if

16  you want a little more information, you can read the first

17  paragraph; and if you're just absolutely fascinated by each

18  and every artifact, it's in the back, and you can reference

19  the rooms and the artifacts.

20       It's been a very successful piece for us over the years.

21  Q.   Thank you.  We're going to take just a brief tour of

22  this.

23  A.   Okay.

24  Q.   I'd like to go to the page -- electronic page 9 of this

25  document.

1          **MR. GULICK:**  And if Your Honor is looking in the

2    hard copy, it is the page facing 9 in the hard copy.

3          **THE COURT:**  Yes, I have that.

4    **BY MR. GULICK:**

5    **Q.**  And could you just tell us, Mr. Cecil, what we're

6    looking at in this particular picture.

7    **A.**  That's a picture of the fireplaces in the tapestry

8    gallery on the first floor of the Biltmore House.  Oh, and

9    also, that's a picture of George Vanderbilt on the left

10   there, lower left-hand corner.

11   **Q.**  And you indicated, on the walls, you said this was a

12   tapestry gallery.  Would you indicate where the tapestries

13   are?

14   **A.**  Well, that's one right there; and there is one to the

15   right of the fireplace you see in the upper right-hand

16   corner; and there's one to the far left of the fireplace.

17   You see there's three along that gallery.

18   **Q.**  Now I'd like to go to page 30, electronically, which is

19   page 29 of the hard copy, and ask you if you can identify

20   what that is.

21   **A.**  Yeah.  This is the main banquet hall in Biltmore House.

22   It's the centerpiece of the house where the Vanderbilts held

23   their large banquets.  The table seats about 66 people.  And

24   the three fireplaces at the end are shown operating.  We

25   actually now have natural gas that operates the fireplaces so

1  that we can provide a consistent experience for our guests.

2       We actually took a page out of Disney's book, and we

3  used to have -- the fireplaces were wood-operated, obviously,

4  and they would be beautiful and burn down, and beautiful and

5  burn down, and so we put in natural gas fireplaces so that

6  they would be consistent for each guest as they came through,

7  providing them with a good solid experience.

8       It's a huge room.  It's about 70 feet to the ceiling,

9  and we put a 35-foot Christmas tree in there, consistent with

10  what the Vanderbilts did at Christmas.

11  Q.  Like to go down to Exhibit 260, which is page 37.

12  A.  Okay.  That's another view of the tapestry gallery, this

13  time facing toward the library.  The previous view was facing

14  toward the concourse at the entrance to the Biltmore -- or

15  the entrance to the main floor.  This is the same view but

16  reverse angle, facing in the other direction.

17       Also, it's showing a tapestry there on the right and

18  that really elaborate fireplace design over the mantel of

19  that fireplace.  The curators explained to me that that's a

20  type of a tattooing, where you take non-water soluble inks

21  and put them into the limestone and create that.

22       Apparently, according to the National Trust For Historic

23  Preservation, that's an incredible example of that particular

24  technique.  And we have -- I was going to say "recently," but

25  it's not so recently now.  We restored it in the late 1970s,

1  early 1980s to its original look and feel.

2      Apparently, the difference between really nice and not

3  so nice is the subtle changes in hue across the deer and the

4  other animals that are shown there.  Most of them would be

5  all one color rather than fading from one color to the next.

6  **Q.**   Is most of the stone work in the house itself limestone?

7  **A.**   Yes, it is.  Well, it's a facing.  There is brick

8  underneath, and then the facing all throughout the house,

9  inside and out, is limestone; where it's not wood, anyway.

10  **Q.**   In addition to the house, are there grounds as part of

11  the estate?

12  **A.**   Yeah.  The formal gardens are about 475 acres, and that

13  would include the three-mile approach road, which has a

14  ribbon of fine landscaping following the road up to the

15  house.  And then we have a formal garden, what they call an

16  English Walled Garden, which is where we put the tulips and

17  the roses and the seasonal planting beds.  But we also have a

18  about 175-acre azalea garden with 100 different varieties of

19  native azaleas in there that were collected by a man named

20  Chauncey Beadle back during and after the Vanderbilt era.

21  And then there is a couple other gardens that are associated

22  with the formal garden.  One we refer to as The Ramble and

23  one we call The Italian Garden.

24  **Q.**   Thank you.  Are guests permitted or invited to walk

25  about the grounds?

1  **A.**   Yes.  Guests are actually very much encouraged to walk

2  about the grounds.  Back in the '80s we found that only about

3  40 percent of our guests during the summer season -- not

4  spring, but summer season actually got out of their vehicle.

5  Most of them just walked from their vehicle -- rode through

6  the gardens in their vehicle.  And now we get about 85 to

7  86 percent of our guests actually put their foot down in the

8  gardens.  And that's a huge thing for us.  We really think

9  that if you're going to experience this like the Vanderbilts

10 did, you should enjoy the entire estate, not just the lavish

11 furnishings inside Biltmore House.

12 **Q.**   Like to draw your attention to the same exhibit, but

13 this time at page 95.

14     What is depicted in this picture, Mr. Cecil?

15 **A.**   That's one of our woodland trails.  We have various

16 degrees of trails, and this one is a woodland trail with the

17 mulch that we put down as wood chips, and then a nice scene

18 passing over a bridge down in one of our gardens.  Looks to

19 me like that's going to be in the azalea garden, but I'm not

20 positive.

21 **Q.**   Now I'd like to draw your attention to page 97 of the

22 same document.  And can you tell us, Mr. Cecil, what we're

23 looking at here.

24 **A.**   Yes.  That's a view of our vineyards.  The oak tree in

25 the sort of upper middle right-hand side is the vinyard

1  section that we refer to as Oak Knoll, based on that tree.

2       You're looking at Cabernet Sauvignon at Oak Knoll and

3  Chardonnay grapes in the foreground.  I believe we are,

4  anyway.  We could be just a little bit to the left of where

5  the Chardonnay is.  Oh, there's about 100 acres, in that

6  area.  The vineyards -- It's actually about, right now at

7  about 93.7 acres of vineyards the way the wine master counts

8  it, but it's actually about 300 acres of cultivated land.

9  They just don't count anything except for the vines and three

10 feet around the vines, and they add it all up.

11 **Q.**  Mr. Cecil, do you, as president and CEO of Biltmore,

12 have concerns about air quality?

13 **A.**  Yes, I do.

14 **Q.**  Would you briefly tell us what those concerns are?  And

15 then you can go back through them and discuss them a little

16 more.

17 **A.**  Okay.  Well, I primarily -- I was trying to think about

18 this over the weekend.  And my concern is when we can't see

19 Mount Pisgah from Biltmore.  See, Pisgah was a part of the

20 historic view shed, and if we can't see that, we get an awful

21 lot of discussion, and complaints, really, from our guests,

22 saying why can't I see the mountains, and that scenic vista

23 is the main thing that we look at.

24 **Q.**  Was the house situated in a particular way, with an eye

25 towards the view of Mount Pisgah?

1   **A.**   Yes.  It's said, according to the family story anyway,

2   that George Vanderbilt's bedroom was located in such a way

3   that he could look over all of his property that he owned

4   from the windows that were in his bedroom, and that Frederick

5   Law Olmstead, landscape architect, and Richard Morris Hunt

6   specifically oriented these views to focus out toward Mount

7   Pisgah.

8        Now, I know that that's not exactly true because if you

9   look out the far right window, you see west Asheville, and he

10  never owned west Asheville.  So I think they probably kept

11  those curtains drawn.

12  **Q.**   But does the back of the house, or the front of the

13  house, if you will, actually face towards Mount Pisgah?

14  **A.**   Well, the back of the house -- well, the south terrace

15  faces the best view of Mount Pisgah, which is off of the

16  library.  And if you go out off the library terrace where --

17  apparently, the library would have been something very

18  special for his guests at that time.  Nobody would have had

19  access to 20,000 volumes of books, except at a university,

20  back in the 1890s, and it would have been very special.

21       And they spent a lot of time in that tapestry gallery

22  that you showed earlier.  There is a loge up there that looks

23  out and you can see Mount Pisgah off in the distance; and

24  then the south terrace and the library terrace, you could see

25  Mount Pisgah.  Apparently, the guests spent quite a bit of

1  time there enjoying that.  It was specifically located to

2  create that oasis, a time to recharge for his friends and

3  family.

4  **Q.**   And you indicated that -- how does air quality affect

5  that experience?

6  **A.**   Well, when there's haze and you can't see Mount Pisgah,

7  and people are either on the rooftop tour, which kind of --

8  the rooftop tour has a little bit of a fear factor in it

9  because you go up a little narrow stairwell and then you open

10  up to a guardrail with the whole world out there behind you,

11  and when you can't see that, they comment about the views and

12  the vistas and how they're disappointed that they couldn't

13  see as well as they had hoped.

14  **Q.**   Do you have -- as president and CEO of the Biltmore, do

15  you have other concerns about air quality?

16  **A.**   Yes.  When we get an ozone alert day, we take

17  precautions with our employees very specifically.

18      Several years ago there was something in this area

19  called nonattainment, and we were threatened with

20  nonattainment from EPA or some organization.  I'm pretty sure

21  it was EPA.  And we took a step to form an Early Action

22  compact, and they told us what we could do locally to reduce

23  the effects if you had one of these alert days.  And so we

24  incorporated those steps in our employee training -- what we

25  call BEST training, Biltmore Estate Staff Training -- and we

1  incorporated some of them.  They're common sense.  But we

2  fuel vehicles early in the morning or late in the day, not in

3  the middle of the day.  We also have people hopefully not go

4  out to lunch.  You know, if they can bring their own lunch

5  with them, they do.  We also have enough flexibility in our

6  schedules that we'll delay or postpone mowing and we'll delay

7  and postpone any kind of farming, agricultural work that we

8  can, whether it be tilling or plowing or just any kind of

9  work with big, heavy tractors, and weedeaters and leaf

10 blowers to the best of our ability.  We can delay a lot of

11 that work.  It won't hurt one or two days to stop that.

12 **Q.**  And the purpose of this is what?

13 **A.**  Well, the purpose is to be responsible local corporate

14 citizens and try and reduce the intensity of one of these

15 alert days that comes up from time to time.

16      Now, the other things we do is, also, we have specific

17 things to look out for our employees who are outside,

18 particularly outdoor staff.  We give them more frequent

19 breaks.  And also -- and this I just really discovered

20 recently -- we have a lot of elderly drivers in our shuttle

21 bus programs, and those drivers need extra breaks during

22 these ozone alert days, at least according to the supervisors

23 in those departments.  They regularly schedule about

24 30 percent more breaks during these days.

25 **Q.**  As president and CEO of Biltmore, do you have concern

1   about air pollution with respect to the health of your

2   employees and guests?

3   **A.**   Yes, I do.  We monitor our employees and keep an eye on

4   our guests.  And when I say "keep an eye on our guests," we

5   have a lot of stairs inside Biltmore House, and we also have

6   a pretty long walk from the gardens back to the parking,

7   where you were parked.  About three years ago, however, we

8   started shuttling anybody who wants a shuttle back from the

9   gardens to the parking lot, so back to the front of the

10  house, and then the parking lot shuttle picks them up there.

11  So that has greatly reduced the strain on our guests as they

12  walk back to the parking lot.

13  **Q.**   There are elevators in the Biltmore?

14  **A.**   Yeah.  We have two elevators.  One is licensed as a

15  service-only elevator and has to be operated by somebody.

16  It's actually the oldest operating Otis elevator in the

17  country.  It's kind of cool.

18  **Q.**   Did that get more use in that area?

19  **A.**   No, I don't think so.  We get an awful lot of use in

20  that for strollers and wheelchairs and generally older guests

21  who can't particularly handle the stairs going down.  It's

22  knee injuries and stuff that we see most use of the

23  elevators.

24  **Q.**   Do you, as president and CEO of Biltmore, have other

25  concerns about air pollution that you haven't described?

1  **A.**   Yeah.  We have an awful lot of horses in our trail ride

2  program, and carriage horses or draft horses in our programs,

3  and in the past we've had a couple that really had breathing

4  difficulties and we had to take them out of service,

5  particularly the draft horses.  But for a long time we had

6  this one horse, who is now retired, and we just immediately

7  took him out of service.  He would make this horrible

8  wheezing sound on certain really hot, you know, hazy days.

9  And so we'd take him out of service.  But we watch the staff

10  and the guests as well, but in that case the horse does most

11  of the work.

12  **Q.**   I'd like to show you what's been marked as Plaintiff's

13  Exhibit 255.  And just tell us a little bit about what this

14  shows.

15  **A.**   Okay.  That's the front view of the Biltmore House

16  again, and it shows the distant mountains in the background.

17  Also, it shows just the whole view of the house, and that's

18  taken on a very pretty day.

19  **Q.**   Like to ask you now, do you have any concerns about the

20  affect of air pollution on the property itself?

21  **A.**   Yes, I do.  The curatorial staff spends a great deal of

22  money -- I like to say it's a great deal of energy, but it's

23  the same thing.  And they have -- or I have, I guess -- we

24  have commissioned studies of various things on the house, and

25  we find that the copper gutters and the copper roof lines,

1  particularly the metal, have been affected by what they

2  describe as acid rain.

3  **Q.**   And could you point out for us -- are those visible on

4  this photograph?

5  **A.**   Yes, they are.  Some of the worst areas actually aren't

6  terribly visible, but I can point out where I'm talking

7  about.

8       The ridge line right there is one of the areas, and then

9  this ridge line across here is also affected.

10  **Q.**   Okay.  If you could clear your -- oh, there you are.

11       What is the copper -- is that the green?

12  **A.**   Yeah, that's the green part above the slate roof.

13  That's copper.  The green in and of itself isn't a bad thing.

14  But here is a place you can actually see -- if you can show

15  it.  Right there is a valley.  I just pointed out a valley.

16  It's where the roof lines come together and form a V.  That's

17  where we find that we get the most damage in the form of

18  pitting, and we, since the 1980s, really about '85, '86, our

19  director of house operations, Rick King, has coined a phrase

20  that he likes to call beaver chipping, in that we keep

21  working at it year after year after year, and we put about 25

22  to $30,000 a year into replacing those copper gutters so as

23  to never get water inside Biltmore House.  One of our biggest

24  fears is that all of us will not outlive the slate roof.

25  None of us want to be in charge when the slate roof has to be

1  replaced.  And so we're all hoping to do just every bit we

2  can to not have to do that, and keeping the water out of the

3  house is number one there.

4  **Q.**  Back up and look at the whole again.

5      You had indicated earlier that the stone facing on the

6  house is made of limestone?

7  **A.**  Um-hum.  Yes.  We do find where water does touch the

8  house that we'll have some -- I don't know if the right word

9  is etching.  It's more discoloration.  You'll have a very

10 white and a very dark area as the water runs off the house.

11 **Q.**  And do you have -- do you have a curatorial staff to

12 assist you in the operation of the house and the estate?

13 **A.**  Oh, yes, sir.

14 **Q.**  And what is the cause of that etching that you

15 described?

16      **MS. GILLEN:**  Objection, Your Honor.  This is a fact

17 witness.

18      **THE COURT:**  Overruled.  You may answer.

19      **THE WITNESS:**  Excuse me?

20      **THE COURT:**  You may answer.

21      **THE WITNESS:**  Oh.  They tell us that it's the acid

22 rain.

23 **BY MR. GULICK:**

24 **Q.**  I'd like to show you what's been marked as Plaintiff's

25 Exhibit 256 and just ask you, is this one of the horse

1  carriage trails and the horses that you were talking about?

2  **A.**   Yes.   This is actually a special event that we did where

3  we invited the U.S. -- Carolina Carriage Association as part

4  of the U.S. Carriage Association, to a special event.   This

5  isn't one of our typical trails.   This is one of our guest

6  roads down to the lagoon, showing the west side of the

7  Biltmore House.

8       But this is not typical with what we do with our guests

9  when we charge them for carriage rides.   We find that they

10 like the smaller private carriages.   We used to do these big

11 kind of wagon rides with 10 or 15 people, and it wasn't

12 unusual to have them pay for the entire wagon ride just so

13 one family could go or boyfriend and girlfriend could go on a

14 romantic kind of time-travel experience.

15 **Q.**   And I'd like to look at page 2 of Exhibit 257.

16 **A.**   Is there a way to remove my marks on there?

17 **Q.**   Yes.   Bottom right-hand corner.

18 **A.**   Bottom right.   There we go.   Thanks.

19      That's a picture at the lagoon, sort of a similar

20 picture from where the carriages were, just in a different

21 angle.   That's actually very close to where a movie was

22 filmed with -- what was it called -- "Being There," with

23 Peter Sellers, and he walked out into the water pretty close

24 to there at the end of the movie.

25 **Q.**   And does this appear to be a fall day?

1  **A.**   Yes, it does.  And a very pretty fall day.

2       The only time this picture gets even prettier is when

3  there is no wind at all and you can see the complete

4  reflection of Biltmore House in the lake, and that's what

5  they were going for with that movie, and they were very

6  successful in catching that.  This picture doesn't quite

7  catch it as well.

8  **Q.**   Now I'd like to show you Plaintiff's Exhibit 259 and ask

9  if you can identify it.

10 **A.**   That's a picture of -- appears to be a picture of the

11 loge off the south of Biltmore House, or southeast part of

12 Biltmore House.  That's the area that's like a porch that's

13 off of the tapestry gallery.

14      A lot of our guests go out there, and we offer them

15 chairs that are quite comfortable that are not part of our

16 artifacts.  We used to let people sit in all the old chairs,

17 and after a million people a year sit in them, they don't

18 hold up so well, so we regularly replace new chairs and we

19 allow people to take a break from their tour on the loge and

20 enjoy these kind of views.  This is a very pretty fall day

21 and a little bit closer to peak color than we see in the

22 previous picture.

23 **Q.**   And in this picture, what are the mountains we're seeing

24 in the background?

25 **A.**   Well, we're seeing the range to the south.  If that

1   pillar wasn't quite right in the way, we'd probably be seeing

2   Mount Pisgah, which is, I believe, pretty close behind that

3   pillar, but I'd have to go out there to be sure about that.

4   It could be -- no, I'm pretty sure it's behind that pillar.

5   **Q.**   And this is a very clear day.  Is that always visible

6   from the loge?

7   **A.**   No.  Mount Pisgah is not always visible, and that's when

8   we get concerned and we also see the complaints that I

9   mentioned from the guests who take our rooftop tour and

10  behind-the-scenes tour because that includes the upper areas

11  of the house where they can see the longest distances.

12  **Q.**   How bad can the haze be?

13  **A.**   Well, I mean, some days if you look from the loge and

14  you look toward the farmer's market, which is about two and a

15  half, three miles away, there's days when you can barely see

16  the farmer's market at the intersection of I-40 and I-26.

17  That's the ones when we get really kind of concerned.  And

18  those kind of days when you can barely see the farmer's

19  market is the days when we see a lot more complaints from our

20  guests.

21  **Q.**   How far away is Mount Pisgah, roughly?

22  **A.**   I'm told it's 17 miles as the crow flies, which is a

23  straight line from the house.

24  **Q.**   Like to show you Plaintiff's Exhibit 258 and ask you if

25  you can identify it.

1  **A.**   This is a picture from the library terrace, which is

2  just adjacent to the south terrace, in between the south

3  terrace and the loge.  It's a right off the back side of the

4  house, very close to where we just saw, but without the

5  pillars in it, also in fall colors and on a pretty day.

6      This area is an area we refer to as the Deer Park,

7  especially if you move the picture just a little bit to the

8  right.  And you can barely see the lagoon, which is where you

9  saw the picture from that water back up toward the back side

10  of the house.  Barely see it.  Right about in that area,

11  right there.  And you see deer in the afternoon come out

12  there.  And a lot of our guests from the cities, from

13  Atlanta, Raleigh, Charlotte, they get very excited when they

14  see white tail deer and wild turkey in this field.  And you

15  can see them on a fairly regular basis.

16  **Q.**   As a result of your concerns about air pollution, have

17  you, as president and CEO of the Biltmore Company, taken any

18  steps to take action with regard to air pollution?

19  **A.**   Yes, I have.  As a board member of the Chamber of

20  Commerce, several years ago, when we were trying to get the

21  Clean Smokestacks bill passed, I got the Chamber of Commerce

22  to pass a resolution, just in general, supporting clean air

23  and air quality.  I actually received a phone call later from

24  the U.S. Chamber of Commerce explaining to me that I

25  shouldn't have done that, but we did because we felt it was

1    important.  And the resolution was passed during that whole

2    process leading up to the Clean Smokestacks bill.

3        I also worked with the Environmental Defense Fund -- I

4    believe they're now called Environmental Defense -- at the

5    request of my mother, who was a very strong proponent for

6    nature conservancy and environmental defense and all of this.

7    And I went to Washington and testified on behalf of western

8    North Carolina for something that the EPA referred to as

9    BART --

10   Q.   Best Available Retrofit Technologies?

11   A.   Best Available Retrofit Technologies.

12   Q.   And about when was that?  As best you can remember.

13   A.   That was -- it was after 2001, because I worked with

14   Congressman Taylor to help present his general accounting

15   office report in May of 2001 that talked about kind of a

16   snapshot of air quality at that time, and I was the moderator

17   over at Diana Wortham theater when that was presented to the

18   public in his district, and it was after that, because the

19   BART testimony went -- I included that information in the

20   packet of information that I gave as a leave-behind in

21   Washington.  But it was in that time frame, 2001 or 2.

22   Q.   Mr. Cecil, does air quality in this area still need

23   improving?

24   A.   Well, recently, I might have answered that question a

25   little differently, but this very hot air that we've had in

1  early June -- we've had quite a few days in early June where

2  we had real significant problems with haze, and in the past

3  week or so we've had another few days where we've had some

4  really significant problems with haze.

5      As I was talking to my family about this opportunity to

6  be here in court today, I was, you know, sitting on the back

7  porch of our house, and you could see the farmer's market,

8  but it was really hazy.  You could not see Mount Pisgah

9  yesterday evening.  And we were talking about that.  You

10  know, I think it could always be improved, and it's very

11  important to us.

12          **MR. GULICK:**  Thank you.  I have no further

13  questions, Your Honor.

14          **MS. GILLEN:**  Thank you, Your Honor.

15          **MR. GULICK:**  I apologize, Your Honor, I need to

16  move into evidence for illustrative purposes several exhibits

17  that we looked at, and these include Exhibits 255, 256, 257,

18  258, 259, 260, 261 -- excuse me -- correction.  Not 261.

19  262.  And I'd like to move those into evidence for

20  illustrative purposes, Your Honor.

21          **THE COURT:**  All right.  Let those be admitted.

22          **(Plaintiff's Exhibits 255 through 260, and 262**

23      **received.)**.

24          **MS. GILLEN:**  Your Honor, we have no questions for

25  Mr. Cecil.  Thank you.

```
 1              THE COURT:  Thank you.  That will complete your
 2    testimony, and you are excused, Mr. Cecil.
 3              THE WITNESS:  Okay.  Thank you.
 4              MR. GULICK:  Your Honor, the next witness the State
 5    would call is Mr. Eric Plakanis.
 6                          ERIC PLAKANIS,
 7    being duly sworn, was examined and testified as follows:
 8                       DIRECT EXAMINATION
 9    BY MR. GULICK:
10    Q.    Good morning.
11    A.    Morning.
12    Q.    Please state your full name, Mr. Plakanis.
13    A.    Eric Scott Plakanis.
14    Q.    Plakanis.  Excuse me.  I've been mispronouncing your
15    name since I met you.
16    A.    Very common.
17    Q.    Where do you live, Mr. Plakanis?
18    A.    Outside of Gatlinburg, Tennessee.
19    Q.    And how long have you lived there?
20    A.    For about ten years.
21    Q.    What is your occupation, Mr. Plakanis?
22    A.    I'm a trail guide and owner of a guide service in the
23    Great Smoky Mountains National Park called A Walk In The
24    Woods.
25    Q.    And tell us a little bit about the Walk In The Woods,
```

1  what it is.

2  **A.**   Well, we offer a wide range of services to help people

3  enjoy the Great Smoky Mountains National Park.  Primarily, we

4  lead interpretive walks, everything from very short walks to

5  day hikes and multiple-night backpacking trips; but we also

6  provide support services to other hikers and backpackers,

7  like offering shuttle service and equipment rental.

8  **Q.**   And is this the only thing in your profession?

9  **A.**   No.

10  **Q.**   What did you -- what used to be your profession?

11  **A.**   For a period of time, I was a financial accountant --

12  financial controller at a video post-production house in

13  Atlanta, for about ten years.

14  **Q.**   And what brought you to this change in profession, if

15  you will?

16  **A.**   Well, my wife and I have always loved the outdoors, and

17  we wanted to do something that felt a little more meaningful

18  with our lives, and sharing and introducing people to the

19  wonders of the natural world felt a lot more important than

20  what we were doing.

21  **Q.**   In running your business, Mr. Plakanis, does air

22  pollution affect your business?

23  **A.**   Yes.

24          **MS. COOPER:**  Your Honor, I'm going to object to

25  that.  It's an opinion by a fact witness.

1        **MR. GULICK:**  Your Honor, I'm not asking his

2   opinion.  I'm asking if it affects his business.  Seems to me

3   he's entitled to answer that question.

4        **THE COURT:**  The objection is overruled.  You may

5   answer.

6        **THE WITNESS:**  Yes.

7   **BY MR. GULICK:**

8   **Q.**   Could you tell us the way or ways in which it affects

9   your business.

10  **A.**   Let's see.  In many different ways.  One very direct way

11  is that on days like today, where we have an air quality

12  alert in the Great Smoky Mountains National Park, we cannot

13  bring our clients into the upper elevations or do strenuous

14  programs.

15       So, like, on Friday, where we had a trip scheduled to go

16  to the top of Mount LeConte and back down, we had to cancel

17  that and try to reschedule it.

18       In addition, it just makes our job a lot harder.  On a

19  great visibility day, no matter what we're doing, our clients

20  love it.  When visibility is poor, we have to work a lot

21  harder to try to awaken the enthusiasm that is naturally

22  there on a great visibility day.

23  **Q.**   Had you personally ever had an experience relating to

24  health as a result of air pollution?

25  **A.**   I did.

Q.    Would you tell us about that experience?

A.    In May of 2000, I was guiding a backpacking trip in the eastern part of the Great Smoky Mountains National Park, and on the second day, we were going from Walnut Bottoms, at about 3,000 feet, up to Mount Sterling, which is a little under 6,000.  And after an hour or two into the hike, I lost my breath.  We were going uphill, so that's not an uncommon thing.  So I took a little break to recover.  But then, once I started hiking again, I didn't get another hundred yards before I lost my breath again.  And this time we took a five-minute break, dropped our packs, sat down for a little while.  And then when we started again, I didn't get a hundred yards until I lost my breath.  It was very difficult for me to get air.  And at that point I was getting very nervous because I was responsible for the people backpacking with me.

      And that situation just continued to deteriorate.  And we took a long lunch break, you know, sat down for an hour.  And even after that, immediately after we started going again, the problem continued.  And once we finally limped into camp, even that night, it continued until sometime during the evening.  It was like something changed and all of a sudden I could breathe again, and I was able to continue the rest of the trip without incident.

Q.    Did you learn what the air quality was on that day?

1    A.    Yeah.   We weren't that aware of the air quality issues

2    back then.   When I came off the trail, there were articles in

3    the local newspaper talking about how high the ozone levels

4    were during my trip, and that's really when we became very

5    aware of the ozone situation.

6    Q.    Is that affecting how you handle your customers and what

7    kinds of trips you take them on when there are ozone alerts?

8    A.    It certainly does.   Now, you know, every morning we

9    print out a report that not only has the weather forecast; it

10   has information about the visibility and air quality.

11         And, you know, this weekend has been a tough one for us

12   because of the very poor air quality.   Every group that we

13   met, we had to discuss those implications with them and how

14   it may affect them.   And like you mentioned, we had to

15   reroute some trips.

16   Q.    Do you give tours in both the Tennessee and North

17   Carolina parts of the park?

18   A.    Yes, sir.

19   Q.    Have you actually had -- I think you indicated that your

20   customers were disappointed if they didn't have good views.

21   Is that your experience?

22   A.    Absolutely.   You know, we do some trips over and over

23   again, and we'll take them to some great vista points, places

24   like Charlie's Bunion, Rocky Top, Mount Cammerer, and on good

25   visibility days, you can just see the excitement, the

1   enthusiasm.  On those days, it will be hard to get them to

2   leave, to go on to continue the trip.  But on poor visibility

3   days, people get there, you know, step on Charlie's Bunion,

4   look around, and it's like, okay, fine, I'm ready to go now.

5       In fact, we sort of changed the pacing of our trip based

6   on the visibility because we'll know people want to spend

7   more time at those vistas on good visibility days.

8   **Q.**   Have you ever seen or experienced, if you will, any kind

9   of monetary effect as a result of that?

10  **A.**   Certainly.  We also run backpacking trips on the

11  Applachian Trail for REI adventures, and I get to do

12  approximately two of those a month.  And last year it just

13  happened that there was sort of a little experiment set up,

14  because our primary route starts from Newfound Gap and covers

15  the east side of the Applachian Trail, but there were two

16  trips early on that had to do the other side of the park, and

17  those were the two we had there.

18      With those REI trips, the clients get a questionnaire to

19  rate the quality of their experience and the quality of their

20  guides, and on both of those trips, we received the highest

21  scores, sevens, all the way down the line.  The difference

22  was, on the first trip, the visibility was very good; on the

23  second trip the visibility was poor.  And on the first trip,

24  we were tipped over $600.  The second trip was more -- was

25  less than $200.

1    And so there is just a situation where we both did the

2  identical trail, same shelters, everything, less than a month

3  apart; the main difference was that intangible, because both

4  those trips, each client was very happy with the service,

5  very happy with the trip, and the only big difference was

6  that visibility.

7  **Q.**   Now, you live in Tennessee; is that correct?

8  **A.**   Correct.

9  **Q.**   Do you have concerns about air quality in Tennessee?

10 **A.**   I have great concerns.  You know, my wife and I have

11 built this business and, for us, it's our dream job.  We are

12 making a living doing what we absolutely love.  But each year

13 we have to make a decision if we want to do this another

14 year.  Because we're guinea pigs.  We are guinea pigs on what

15 happens when you spend a lot of time in a high-ozone

16 condition exerting yourself.

17 **Q.**   Have you ever had occasion when the visibility in the

18 park has been really great?

19 **A.**   Yes.  A few years ago our park was impacted by two

20 hurricanes, and as the second one was coming in, as a

21 precautionary measure, the park closed a bunch of roads and

22 all their campgrounds.  But that second hurricane sort of

23 petered out, it didn't affect us that badly, and we had

24 already canceled all our work, so I was off.  And when it

25 went through, the sky cleared and I took that opportunity to

1  hop in the car and go up to Clingman's Dome, and it was

2  spectacular.  The sky was a -- just a deep shade of blue and

3  as far as you could see in the sea of mountains surrounding

4  us, the mountains were crisp and green.  It really was a

5  spiritual experience.  I'd never experienced that before.

6        **MR. GULICK:**  Thank you.  I have no further

7  questions.

8        **THE COURT:**  Questions?

9        **MS. COOPER:**  Your Honor, I just have a few

10 questions.

11       **THE COURT:**  Yes.  Fine.  Go ahead.

12                        **CROSS EXAMINATION**

13 **BY MS. COOPER:**

14 **Q.**   Mr. Plakanis, you're a member of the National Parks

15 Conservation Association; is that correct?

16 **A.**   Correct.

17 **Q.**   And that's an advocacy group for environmental causes;

18 is that a fair statement?

19 **A.**   I think so, yes.

20 **Q.**   Now, in connection with a lawsuit that the National

21 Parks brought against TVA, you submitted an affidavit.  Do

22 you recall that?

23 **A.**   Yes.

24 **Q.**   And that affidavit was in September of 2001; is that

25 correct?

 1  **A.**   That I wouldn't know.

 2  **Q.**   But it was a number of years ago?

 3  **A.**   Number of years ago, correct.

 4  **Q.**   Now, in your affidavit, I represent to you, you said

 5  that you had been operating your business for two and a half

 6  years at that time.  And so that would be consistent with

 7  2001; is that true?

 8  **A.**   We started business in 1998.

 9          **MR. GULICK:**  Your Honor, I wonder -- excuse me.

10  Your Honor, I wonder if he might be shown a copy of what he's

11  being asked about, if it's a document that he signed.

12          **THE COURT:**  Yes.  You do not have a copy?

13          **MR. GULICK:**  We do not have a copy.

14          **THE COURT:**  All right.  Let's see if we can furnish

15  him one.

16  **BY MS. COOPER:**

17  **Q.**   All right.  Is that your signature, sir, on the bottom?

18  **A.**   Not yet.

19  **Q.**   On the bottom of the page?

20          Is that your signature, sir, on the bottom of the page?

21  **A.**   Yes, it is.

22  **Q.**   And it's dated, January 4, 2001; is that correct?

23  **A.**   Yes.

24  **Q.**   All right.  Now, if you take a look at the top of the

25  page, it says:  "We are seriously considering moving" --

1   "considering the possibility of moving our business to

2   another location."  Is that correct?

3   **A.**   That is correct.

4   **Q.**   And that was because, in 2001, you were concerned about

5   the air pollution.

6   **A.**   Correct.  The effects of the air pollution on us and our

7   daughter, correct.

8   **Q.**   But now it's 2008 and you're still there, correct?

9   **A.**   That is correct.

10  **Q.**   Now, in 2007, is it true that your business accommodated

11  some 22,000 people, or perhaps slightly more?

12  **A.**   I think what that means is up till 2007.

13  **Q.**   Cumulative.

14  **A.**   Cumulatively, that's correct.

15  **Q.**   And by 2008, the number was up to 27,000 people; is that

16  correct?

17  **A.**   That is probably correct.  It's in the ballpark.

18          **MS. COOPER:**  Thank you very much.

19          I have no further questions, Your Honor.

20          **THE COURT:**  All right.

21          **MR. GULICK:**  No redirect, Your Honor.

22          **THE COURT:**  All right.  Thank you, sir, and that

23  will complete your testimony and you may be excused.

24          **THE WITNESS:**  Thank you.

25          **MR. GULICK:**  Your Honor, we next call to the

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 60 of 142

1  witness stand Mr. Don Barger.

2          THE COURT:  All right.

3                      DONALD BARGER,

4  being duly sworn, was examined and testified as follows:

5                   DIRECT EXAMINATION

6          MR. GULICK:  Your Honor, if I might be allowed to

7  approach this witness and show him how to use the screen?

8          THE COURT:  All right, sir.

9          THE WITNESS:  Thank you.  I'm a dummy with this.

10         MR. GULICK:  You can draw on the screen.  If you

11 see something you want to point out, you can point it out

12 like that, just touch it.  And then to clear one of the last

13 things, touch there.  To clear them all, you touch there.

14         THE WITNESS:  Good.  Thank you very much.

15 BY MR. GULICK:

16 Q.   Could you please state your full name?

17 A.   My name is Donald Paul Barger.

18 Q.   Where do you live, Mr. Barger?

19 A.   I live in Norris, Tennessee.

20 Q.   And is that near a larger city?

21 A.   Yes.  It's about 20 miles outside of Knoxville.

22 Q.   And in what direction?

23 A.   North of Knoxville.

24 Q.   How long have you lived there?

25 A.   I've lived there since 1992.

1  Q.   What is your occupation, Mr. Barger?

2  A.   I am the Southeast Regional Director of the National

3  Parks Conservation Association.

4  Q.   Tell us what the National Parks Conservation Association

5  is, please.

6  A.   Yeah.  The National Park's Conservation Association, or

7  NPCA, was created in 1919, three years after the creation of

8  the National Park Service.  It is an advocacy organization.

9  Our mission is to preserve and enhance America's national

10 parks for present and future generations.  We do advocacy

11 specifically aimed at mobilizing public support for the

12 protection of our national parks.

13 Q.   Within the scope of the region that you are responsible

14 for for the association, what are some of the major national

15 parks that come to mind?

16 A.   Well, certainly, the Great Smoky Mountains National

17 Park.  There are, in the southeast region, about 50 or so

18 units of the National Park System that fall under our sort of

19 area of jurisdiction, within the Southeast Regional Office.

20 It's everything from Hot Springs National Park to Mammoth

21 Cave National Park to -- actually, about 60 percent of the

22 units of the National Park System are historic sites.  So as

23 well as national parks, there are a lot of historic parks,

24 battlefields, and other units managed by the National Park

25 Service.

Q.   Are there any Class I areas, as that's defined under the Clean Air Act, within your jurisdiction, if you will?

A.   Yes, there are.  There are two Class I areas in my region that are managed by the National Park Service. They're Great Smoky Mountains National Park and Mammoth Cave National Park.

Q.   Where is Mammoth Cave National Park?

A.   It's in western Kentucky.

Q.   And to your knowledge, is the Applachian National Scenic Trail a unit of the National Park Service?

A.   Yes, it is.

Q.   Tell us a little bit about what the National Park Service is.

A.   Well, three years before the creation of NPCA, in 1916, Congress created and President Woodrow Wilson signed the Organic Act of the National Park System.  It was the first of its kind in the world.  It's essentially our nation's first commitment to sustainability, the first time that we ever said that some areas were so special they needed to last forever and they needed to belong to everybody.

     The mission statement that Congress put into the Organic Act for the National Park Service is to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the

1    enjoyment of future generations.

2    **Q.**   And what is the relationship, if any, between the

3    National Parks Conservation Association and the National Park

4    Service?

5    **A.**   There is no formal affiliation between -- we are a

6    non-governmental organization.

7    **Q.**   When you say "we," you mean?

8    **A.**   NPCA is a non-governmental organization.

9        Several years ago I took a reporter hiking in the

10   Smokies, and he kind of put a moniker on us that stuck.  He

11   said that NPCA was the Park Service's chief advocate and

12   critic.  As a public advocate, our role is to advocate for

13   the preservation and protection of the parks and not the

14   National Park Service.

15       So, you know, our job is to try to determine what issues

16   are affecting the national parks, you know, and help

17   determine their long-term viability to be protected and

18   unimpaired for future generations and to advocate for those

19   measures of protection.

20   **Q.**   So was his description accurate?

21   **A.**   I would say so.

22   **Q.**   I'd like to show you what has been marked -- in fact,

23   it's already been admitted -- as Plaintiff's Exhibit 174.

24          **MR. GULICK:**  Your Honor, I believe this particular

25   document has already been admitted into evidence.

1    THE COURT:  All right.

2    MR. GULICK:  Your Honor, actually, this particular

3  document is rather faint on this screen, and I'd like to --

4  Your Honor, you may find that it's in the -- there is a --

5  you received a book from Lyle Chinkin.  It was a Lyle Chinkin

6  binder.  And there's probably a better copy of it available

7  there to see than is on the screen.

8    THE COURT:  All right.  Thank you.

9    MR. GULICK:  Sometimes this technology fails us,

10  Your Honor, and I wonder if I might approach the witness and

11  give him a better copy of this as well.

12    THE COURT:  All right.

13    MR. GULICK:  May I approach the witness, Your

14  Honor?

15    THE COURT:  Yes.

16  BY MR. GULICK:

17  Q.   Before we look at this document, Mr. Barger, I was

18  wondering if you could just briefly outline for us what

19  concerns you may have.

20    MR. GULICK:  At least put it up on the screen so he

21  can illustrate what he's talking about, looking at the

22  document itself.

23  BY MR. GULICK:

24  Q.   I'll ask you, what concerns does the National Parks

25  Conservation Association have, if any, with regard to air

1  quality in the national parks?

2  **A.**    Well, you know, I began my job in 1992, so I've been

3  doing this for 16 years, and very shortly after coming into

4  the job and beginning to explore, I learned that air

5  pollution was one of the most dramatic problems affecting

6  Great Smoky Mountains National Park and, in fact, a lot of

7  the other parks in the region.  Of the 391 units of the

8  National Park System, 150 of those are in areas that are

9  designated as nonattainment for one or more pollutants.  So

10 park visitors are obviously being exposed to high levels of

11 pollution in lots of places throughout the system.

12     In particular, with Great Smoky Mountains National Park

13 and Mammoth Cave National Park, since they are Class I areas

14 in my region, I began to look at what the impacts were and

15 what the levels of protection are supposed to be of those

16 parks.

17     Three of the principal issues that are of great concern

18 to NPCA are visibility, ozone, and acid deposition, among

19 others.

20 **Q.**    Now, this Exhibit 174 that you have before you is a --

21 is this a document of the National Park Service itself?

22 **A.**    Yes.

23 **Q.**    Are you familiar with this document?

24 **A.**    Yes, I am.

25 **Q.**    Does it address the issues that you've just talked

1  about?

2  **A.**   I believe so, yes.  Yes, it does.

3  **Q.**   Could you just point out in this document where those

4  things are discussed?  Just take them one at a time, if you

5  would.

6  **A.**   All right.  Down at the -- well, at the bottom of the

7  first column on the first page, shrinking views and particle

8  pollution.  This is essentially the visibility aspect of

9  this.  I think it's -- from our perspective, it's notable

10  that when Congress created the National Park System, the

11  first thing that they said in its purpose is to conserve the

12  scenery.  That was the number one mandate from Congress in

13  creating the National Park System.

14       **MS. COOPER:**  Your Honor, at this point I would like

15  to interpose an objection to the cumulative nature of this.

16  This particular exhibit has been testified to by both

17  Mr. Chinkin and Mr. Sommerville, and it's only a few pages

18  long.  I think this is cumulative testimony.

19       **MR. GULICK:**  I don't believe Mr. -- Your Honor, I

20  don't believe that Mr. Sommerville talked about it.  However,

21  Mr. Chinkin is not a member of the National Parks

22  Conservation Association, and this is an association that is,

23  as you've heard already, is devoted to addressing issues in

24  the national parks.  And his testimony is not going to be

25  very long, so I believe --

1        **THE COURT:**  Well, if you have something new to add,

2   that will be fine.  Otherwise, let's move along rather

3   quickly.

4        **MR. GULICK:**  We'll do that, Your Honor.

5   **BY MR. GULICK:**

6   **Q.**   Would you just touch on a few points as to each of those

7   concerns?  Then we'll go to the next --

8   **A.**   All right.  Well, during my lifetime, visibility in the

9   Southern Appalachians has decreased 40 percent in the winter

10  and 80 percent in the summer, and the National Park Service

11  has done a survey which indicates that the number one reason

12  people come to the parks is to see the scenic views.  So from

13  the standpoint of visitor experience, again, the Organic Act

14  of the Park Service, specifically, is the central mission

15  that my organization is also concerned about protecting.  The

16  annual average visibility in the Smokies right now is

17  33 miles and it should be 113.  That's natural visibility.

18  So that particle pollution that produces the haze --

19        **MS. COOPER:**  Your Honor, I'm going to object to

20  this testimony.  There's lack of foundation, and also, it's

21  cumulative.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  Okay.  Continue?

24        **MR. GULICK:**  Yes.

25        **THE COURT:**  Yes, you may proceed.

 1          THE WITNESS:  Thank you, Your Honor.

 2          The principal constituent of the particulate

 3   matter -- I'm sure you've probably had testimony about the

 4   health effects on that that I won't go into -- is sulfates.

 5   Sulfates are responsible for over 80 percent of the

 6   visibility impairment in the parks, and three quarters of

 7   those sulfates come from coal-fired plants.

 8          THE COURT:  I believe I'll sustain the objection

 9   now as to the last answer there --

10          MR. GULICK:  Thank you, Your Honor.

11          THE COURT:  -- since that isn't an area in which an

12   average layman can testify.

13          MR. GULICK:  Thank you, Your Honor.

14   BY MR. GULICK:

15   Q.   I want to draw your attention, if you will, to

16   Plaintiff's Exhibit 276.

17          MR. GULICK:  Your Honor, this is a document that's

18   already been received into evidence.  However, I'm going to

19   draw Mr. Barger's attention to a matter that was not

20   addressed in the testimony of any other witness.

21          THE COURT:  All right.

22   BY MR. GULICK:

23   Q.   I'd like to draw your attention, Mr. Barger, to page --

24          MR. GULICK:  It's Bates stamped No. 2358, Your

25   Honor.  It's also page 24 of the electronic copy that is now

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 69 of 142

1 appearing on your screen.

2 **BY MR. GULICK:**

3 **Q.**   In particular, Mr. Barger, I want to draw your attention

4 to the bar chart at the top of this document.

5         **MS. COOPER:**  Your Honor, I have to object to this.

6 We saw this bar chart at some length in the testimony of

7 Mr. Sommerville.

8         **MR. GULICK:**  Your Honor, I'm going to ask him about

9 something that was not addressed by Mr. Sommerville with

10 respect to this bar chart.

11        **THE COURT:**  Objection overruled.  Go ahead.

12 **BY MR. GULICK:**

13 **Q.**   You indicated before that Mammoth Cave was one of the

14 Class I areas in Kentucky that was of concern to your

15 association?

16 **A.**   Yes, that's correct.

17 **Q.**   Is there any manner touching upon Mammoth Cave,

18 Kentucky, that is addressed in this bar chart?

19 **A.**   Yes, absolutely.  The light extinction.  It's over at

20 the far left of the chart, being the highest light

21 extinction.  In fact, the resource we've seen, it is, in

22 fact, the haziest of the Class I national parks that are

23 managed by the National Park Service, meaning it has the

24 highest level of particle pollution.

25 **Q.**   And that's what this bar chart shows?

1  A.   Yes, it does.

2  Q.   Let me ask you a question, since I've never been there,

3  Mr. Barger.  Mammoth Cave sounds like a cave.  Is visibility

4  actually of concern?

5  A.   Mammoth Cave is a cave.  It's also 52,000 acres of

6  surface, and the Park Service determined that at least

7  60 percent, or the majority of people who visit Mammoth never

8  go underground.  There are 70 miles of trails.  There are

9  scenic overlooks of the Green River.  Most of the users of

10 the park, in fact, use the surface, and they have one of the

11 National Park Service visibility cameras at an overlook of

12 the Green River.

13 Q.   Thank you.

14     Mr. Barger, to your knowledge, are there TVA coal-fired

15 power plants in Kentucky?

16 A.   Yes.

17 Q.   And there are coal-fired plants in western Tennessee --

18 A.   Yes.

19 Q.   -- that belong to TVA?

20 A.   Yes, there are.

21 Q.   I'd like to draw your attention, Mr. Barger, to

22 Plaintiff's Exhibit 146.  It's already been received in

23 evidence.  And, specifically, Mr. Barger, I was wondering if

24 you could identify for us where on this particular

25 document -- if you can identify on this document --

1    MR. GULICK:  Your Honor, have you found that

2  exhibit?

3    THE COURT:  Yes.

4  BY MR. GULICK:

5  Q.  If you could identify on the screen, Mr. Barger, the

6  location of Mammoth Cave.

7  A.  Approximately.  It would be in western Kentucky, right

8  kind of south of that (indicating).

9  Q.  Where you've marked it on the screen?

10  A.  Just a minute.  I'll try it again.  It's going a little

11  bit north of where I'm trying to poke, but let me see if I

12  can -- okay.  That's pretty close.  (Indicating.)

13  Q.  So the arrow is pointed to where it actually is?

14  A.  Yeah, the arrow -- the tip of the arrow.  It may be a

15  little bit north of there.  Right in that area.

16  Q.  That's the location of the Mammoth Cave?

17  A.  Yes.

18  Q.  I believe -- thank you.

19    I'd like to now draw your attention to Plaintiff's

20  Exhibit 148.  And, specifically, there's a second page,

21  closeup of this document.  And that's --

22    MR. GULICK:  Your Honor, have you found that?

23    THE COURT:  Yes.

24  BY MR. GULICK:

25  Q.  Mr. Barger, where do you live?  Can you show us where

1  you live?

2  **A.**   If I can get this to do it.  I'm in the lower right-hand

3  corner of that, in the upper end of Anderson County.  Right

4  in the edge of that black box is the city of Norris.

5  **Q.**   And that's where your home is?

6  **A.**   That's my home.

7  **Q.**   Could you show us on this particular map -- I apologize.

8  Can you show us on this map again the location of Mammoth

9  Cave?

10  **A.**   Well, I'm going -- it's going to be approximate, but

11  it's -- you come out of Nashville and go up, so it would be

12  right up here.  That's a little bit north of -- yes,

13  somewhere up in -- it's probably a little further, but it's

14  difficult for me to get this precisely, but up in western

15  Kentucky.

16  **Q.**   And is the area in which you live a nonattainment

17  county?

18  **A.**   Yes.  It's in -- it's nonattainment for ozone and

19  particulate matter.

20  **Q.**   And does that affect your personal life?

21  **A.**   Yes, it does.  The city of Norris is actually a

22  wonderful place to live.  It was built by the Tennessee

23  Valley Authority in the 1930s.  It was a planned community.

24  And the plan still works in community life.  And one of the

25  things that TVA did was set aside the Norris watershed, which

1  is our source of water, and it's also a recreational area

2  that all of the residents of Norris use regularly and very

3  much appreciate.

4  **Q.**   And does it -- but does air pollution affect your life

5  there?

6  **A.**   Well, absolutely.  I mean, today, we are again in

7  exceedance for both ozone and particulate matter.  Yesterday

8  evening, it was difficult even to get out.  I had two

9  separate people comment to me, one person with asthma who

10 said she had been using her inhaler all day, and another

11 person, perfectly healthy, said the air just felt thick.  And

12 on those kinds of days, it's very difficult to get out and

13 enjoy the outdoors.  That is the sort of nature and basis for

14 the area.

15 **Q.**   Do you use trails in the area that you live?

16 **A.**   Yes, I do.  In addition to the Norris watershed, I hike

17 extensively in the Great Smoky Mountains National Park, along

18 sections of the Applachian Trail, the Big South Fork River

19 and Recreational Area.

20 **Q.**   Let's show you what's been marked as Plaintiff's Exhibit

21 149.  And can you again show us where it is that you live?

22 **A.**   Yeah.  Up here in the very tip of Anderson County, where

23 you see the green, that's probably Norris Dam, or Norris Dam

24 State Park, and that's very close to the city of Norris.

25 **Q.**   Now, you just indicated that you hike on the Applachian

1  Trail.

2  **A.**   Yes.

3  **Q.**   What portions of the Applachian Trail have you hiked on?

4  **A.**   I've done about two-thirds of the Applachian Trail, from

5  Mount Rogers, Virginia, to its southern terminus in Georgia.

6  **Q.**   Could you just sort of indicate those points on the

7  screen?

8  **A.**   Yes.  Mount Rogers, Virginia, is right there, and then

9  the southern terminus of the Applachian Trail is here.

10 **Q.**   Most of that length is where?

11 **A.**   It runs along the Tennessee/North Carolina border for a

12 long ways, and then goes into Tennessee on its northern trek,

13 up to Damascus, Virginia, across North Carolina, and into

14 Georgia on its southern end.

15 **Q.**   Finally, if you could take a look at Plaintiff's Exhibit

16 No. 156.

17      Now, again, I'd like to ask you if you can identify

18 where on this map that you live.

19 **A.**   Right there (indicating).

20 **Q.**   Do you know whether or not the county in which you live

21 has been in nonattainment for ozone?

22 **A.**   Yes, it has.

23 **Q.**   And do you hike in the area of your town?

24 **A.**   Yes.  That's -- the Norris watershed is essentially

25 attached to downtown.  I can walk out of my driveway and walk

1   about a quarter of a mile and I'm in the Norris watershed.

2   **Q.**   As a result of air pollution, have you had to -- has

3   that affected your walking schedule outside?

4   **A.**   It does.  At the valley level, the ozone levels are much

5   worse in the afternoon, which is different than the mechanism

6   in the mountains.  So, you know, you try to get exercise of

7   that nature early in the day if possible during the summer

8   months.  Sometimes that's not possible.

9   **Q.**   When you came into the courtroom, you handed me a

10  document, and I'm going to ask you some questions about that;

11  but I only have one copy of this so I'm going to show it to

12  counsel for TVA, and then I'm going to have to put it up on

13  this machine, which I've never done.

14  **A.**   Okay.

15          **MR. GULICK:**  Your Honor, this is a document that

16  was just handed me by the witness when he came in and I only

17  have one copy.  I'll allow counsel for the defendant to view

18  it before I show it to Your Honor.

19          **THE COURT:**  All right.  If you can put it up so we

20  can all view it at the same time, and then provide counsel a

21  copy --

22          **MR. GULICK:**  We will do that, Your Honor.

23          **THE COURT:**  -- so they will have it to work with.

24          **MR. GULICK:**  May I go to the overhead viewer?

25

1  **BY MR. GULICK:**

2  **Q.**   What I'm showing you, is this the document that you

3  handed to me when you came in the courtroom this morning?

4  **A.**   Yes, it is.

5  **Q.**   And can you tell us what this document is and how it --

6  when it came into your possession and how it came into your

7  possession?

8  **A.**   It's a copy of an e-mail.  I'm on a distribution list

9  for Great Smoky Mountains National Park for air quality

10 alerts, and this is an alert that the National Park Service

11 has issued to its employees, and also to partners and other

12 people that they think may be in the park, of both an ozone

13 and particle pollution advisory.  This was for yesterday.  I

14 checked the website this morning and we're in violation of

15 the particle pollution again, so I'm assuming there may be

16 another one today.  The day before, they had a similar one,

17 but it was just for ozone.

18      And what it basically says is they are encouraging their

19 staff to refrain from strenuous or prolonged physical outdoor

20 activities, don't do anything outside where you'd have to

21 breathe hard.

22 **Q.**   And this indicates that it's from Jim Renfro.  Do you

23 know who Jim Renfro is?

24 **A.**   Yes, I do.  He's the Air Resource Specialist for Great

25 Smoky Mountains National Park.

1          **MR. GULICK:**  Your Honor, I've put an exhibit

2    sticker on this which marks it as Plaintiff's Exhibit 488.

3          **THE COURT:**  488?  All right.

4          **MR. GULICK:**  488, Your Honor.  Thank you.

5          Your Honor, at the next break we will make copies

6    of this document for the Court and for defendant's counsel.

7          **THE COURT:**  All right.

8    **BY MR. GULICK:**

9    **Q.**  Mr. Barger, you indicated that you started with the

10   National Parks Conservation Association in 1992, I believe

11   you said.

12   **A.**  That's correct.

13   **Q.**  Were you involved with the effort known as Southern

14   Appalachian Mountain Initiative?

15   **A.**  Yeah, SAMI.  Yes, I was.  I represented NPCA in the SAMI

16   process for the ten years of its existence.

17   **Q.**  And did you do that as a representative of the National

18   Parks Conservation Association?

19   **A.**  That's correct.

20   **Q.**  Mr. Barger, you were telling me the other day about this

21   being a consensus process.

22   **A.**  Yes, the SAMI process.

23   **Q.**  I'm wondering if you could describe for the Court

24   briefly your view about that as a consensus process.

25   **A.**  Yeah.  I guess "agonizing" is the first word I would

1  use.  It was both its strength and its weakness in many ways.

2  Being a consensus process of states, federal agencies,

3  utilities, tourism, conservation organizations, the

4  likelihood that we would come to a consensus of action at the

5  end of the process was pretty slim.

6        On the strength side, I think, from my view, what was

7  really important about the process was the ongoing consensus

8  that had to happen at every step of the way.  As we were

9  going through the examination of the material that was

10  presented to us, there was an opportunity at every step from

11  a consensus standpoint.  Every fact, every data set, every

12  computer model, every assumption that went into every

13  computer model, at every point, all the participants had an

14  opportunity to say, I've got something better, you know, this

15  is not the best, so that, at each step, as we moved forward,

16  we were sure that everyone felt like that was the best

17  information moving into the integrated assessment which

18  produced the information that's in the SAMI document.

19  **Q.**   And that included -- that consensus process included

20  your association organization?

21  **A.**   Yes, it.

22  **Q.**   And it included the State of North Carolina?

23  **A.**   Yes, it did.

24  **Q.**   And it included the Tennessee Valley Authority?

25  **A.**   Yes, it did.

1   **Q.**   From the perspective of the National Parks Conservation

2   Association, Mr. Barger, is the air in Tennessee and Kentucky

3   and North Carolina as free of pollution as it needs to be?

4   **A.**   No, it's not.  The National Park Service has -- I was

5   actually here in court on the first day of this trial, and

6   Mr. Jackson from the Forest Service talked about sulfate

7   deposition in the national forest.  I can't remember which

8   one.  But he said that, I remember it being kilograms per

9   hector per year, meaning relatively like pounds per acre per

10  year, and needed to be around 3 to 5.  In Great Smoky

11  Mountains National Park, they're looking at about 4.5 --

12  between 4 and 5 as being what they call a target load and

13  where we really began to see recovery of the systems; and

14  nitrogen deposition in the park currently is at 33 kilograms

15  per hector per year, so that would be about an 85 percent

16  reduction in nitrogen deposition that would be needed.

17      So what that tells me is that we've really got a long

18  way to go.

19           **MR. GULICK:**  Thank you.  No further questions.

20           **MS. COOPER:**  We have no questions, Your Honor.

21           **THE COURT:**  All right.  That will complete your

22  testimony, and you may be excused.

23           **THE WITNESS:**  Thank you, Your Honor.

24           **MR. GULICK:**  Thank you, Your Honor.

25           **THE COURT:**  All right.  I think this is a good

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 80 of 142

1  point to take our midmorning break.  So we'll take a

2  15-minute break.

3          **(Recess.)**

4          **THE COURT:**  All right.  Call your next witness.

5          **MR. GULICK:**  Your Honor, I forgot to move into

6  evidence the one new document, Exhibit 488, which is the

7  e-mail Mr. Barger testified about which I showed from the

8  projector.

9          **THE COURT:**  All right.  Let that be admitted.  488.

10          **(Plaintiff's Exhibit 488 received.)**

11          **MR. GOODSTEIN:**  North Carolina's next witness, Your

12  Honor, is John Molenar.

13          **THE COURT:**  All right.

14                    **JOHN MOLENAR,**

15  **being duly sworn, was examined and testified as follows:**

16                    **DIRECT EXAMINATION**

17          **MS. GOODSTEIN:**  If I may approach, Your Honor.  We

18  have a set of Mr. Molenar's exhibits for the Court.

19          **THE COURT:**  All right, sir.

20  **BY MR. GOODSTEIN:**

21  **Q.**   Good morning, Mr. Molenar.  Can you state your full name

22  for the record, please?

23  **A.**   John Victor Molenar.

24  **Q.**   And how are you currently employed, Mr. Molenar?

25  **A.**   I work for Air Resource Specialists, Inc., an

1  environmental consulting firm located in Fort Collins,

2  Colorado.

3  **Q.**  What does Air Resource Specialists do?

4  **A.**  We do all phases of atmospheric monitoring and modeling

5  for federal agencies, state agencies and private industry.

6  **Q.**  And what are your responsibilities there?

7  **A.**  I'm vice president of the company.  My major

8  responsibilities are in the field of atmospheric visibility.

9  Primary responsibilities are in the form of research and

10  development for visibility and atmospheric optical

11  measurements, modeling, data interpretation.

12  **Q.**  And how are you involved in this case?

13  **A.**  I was hired by North Carolina Department of Justice to

14  review results of the Sonoma Technology modeling for

15  additional controls on TVA coal-fired power plants for

16  visibility effects.

17  **Q.**  And were you asked to generate some images that show the

18  effects and improvements from the emissions reductions sought

19  by North Carolina in this case?

20  **A.**  Yes.  STI, in their report, used the software packages I

21  developed to generate imagery.  North Carolina asked me to

22  generate images for other Class I areas in the region.

23  **Q.**  And what is your area of expertise, Mr. Molenar?

24  **A.**  I have a master's degree in atmospheric physics.  My

25  major research field is in visibility and atmospheric optical

1  measurements.

2  **Q.**   The first exhibit in your folder should be Plaintiff's

3  Exhibit 431 for identification.  Will you take a look at

4  that, please.

5       Is this a copy of your CV?

6  **A.**   Yes, it is.

7  **Q.**   So your education is summarized on page 2 of Plaintiff's

8  Exhibit 431.

9  **A.**   Yes.

10  **Q.**   We offer 431 into evidence at this time, Your Honor.

11            **THE COURT:**  Let it be admitted.

12            **(Plaintiff's Exhibit 431 received.)**

13  **BY MR. GOODSTEIN:**

14  **Q.**   Can you describe for us, Mr. Molenar, a summary of your

15  educational experience, what you studied, and then summarize

16  your professional experience for us?

17  **A.**   Yes.  In 1973, when I went to school at Northern Arizona

18  University, I got involved in some of the early research in

19  visibility and atmospheric optical measurements.

20       When I graduated from there, I went to the University of

21  Reno (inaudible)...

22  **Q.**   Can if you could slow down a little bit, Mr. Molenar?

23  **A.**   University of Reno, Desert Research Institute, where I

24  got my master's degree in atmospheric physics.

25       After that, I was hired by the John Muir Institute,

1  which is a non-profit organization which funneled research

2  grants from university professors working in the field of

3  environmental sciences.  In that capacity there, with the

4  Visibility Research Center in Las Vegas, Nevada, we conducted

5  the first perception studies for the National Park Service

6  and also began to develop a computer imaging code to

7  visualize air quality.  In 1982, we moved to Fort Collins,

8  Colorado, the Visibility Research Center did.

9       I started my own business in 1983, Air Resource

10  Specialists, Inc., which we bid on a contract with the

11  National Park Service to do their optical imaging.  Since

12  that time, we've expanded out do all the ambient air quality

13  ozone monitoring for the National Park Service.  We also do

14  work for the U.S. Forest Service and  other departments of

15  the federal government, the states of Colorado, Nevada,

16  Arizona and Wyoming.  We also work with private industry, and

17  we do atmospheric modeling, monitoring, research data

18  interpretation.

19       We've also been involved in the Grand Canyon Visibility

20  Transport Commission, which was the first regional planning

21  organization which was formed in the mid 1990s, came up with

22  the first recommendations to EPA for the Regional Haze Rule.

23  I was personally involved on a number of the technical

24  committees and also a member of the Public Advisory

25  Committee, which is the committee that came to consensus on

1  their final report.

2      Since then, the regional planning organizations have

3  been formed in the United States.  Those are groups of states

4  which have to address visibility impacts, and they've also

5  expanded that out to address other ambient air quality

6  impacts.

7      I, personally, and my company has, worked with all the

8  regional planning organizations:  SAMI, VISTAS, RAP, the

9  Northeastern Regional  Planning Organization, the Central

10 Regional Planning Organization, called CENRAP, and the

11 Midwest Region, called MRAP.  I continued working with

12 National Park Service and had those contracts for 26 years.

13     I belong to a number of professional organizations:  Air

14 and Waste Management Association; Society for Photographic --

15 can't remember -- excuse me -- the Society for Imaging

16 Science and Technology; International Society of Optical

17 Engineering.

18 **Q.**  Can you describe for us, Mr. Molenar, the visibility

19 monitoring program that your firm and yourself operate for

20 the National Park Service?

21 **A.**  Yes.  The national program has got three phases.  One of

22 them is called aerosol monitoring, which is operated by the

23 University of California-Davis.  The other two are what we

24 call optical monitoring and C monitoring, or photographic

25 monitoring.  My company runs and operates the optical

1  monitoring and C-monitoring programs for National Park

2  Service and U.S. Forest Service.  That is a nationwide

3  program making measurements in national parks and wilderness

4  areas.

5  Q.   Can you describe for us how those monitoring stations

6  work, what they're comprised of, and how they record

7  visibility effects?

8  A.   Yes.  The C-monitoring originally started with 35

9  millimeter cameras, which were phased out to digital cameras.

10  Those are scenic vistas areas and in a number of Class I

11  areas.  Currently, there are over 100 cameras in operation.

12  That data, the old data, was on 35 millimeter slides that we

13  have and stored in archive, and we have over a million slides

14  from Class I areas across the United States.

15       We have digital cameras, which take pictures every 15

16  minutes.  Those images are archived or uploaded to websites

17  for each of the areas that have one.  National Park Service

18  operates 20 some and U.S. Forest Service operates about 50, I

19  think, and a number of the regional planning organizations

20  operate their own.

21  Q.   And does your firm do the monitoring of visibility at

22  the Great Smoky Mountains National Park?

23  A.   Yes, we do.  We operate the Look Rock visibility site

24  for the National Park Service, Great Smoky Mountains.

25       The additional monitoring, besides the C-monitoring, is

1  the optical monitoring, and that is specialized

2  instrumentation that measures how clear the atmosphere is,

3  and measures what's called the scattering coefficient with an

4   instrument called nephelometer.  And those operate in Class

5  I areas throughout the United States and also urban areas.

6  **Q.**   And can you describe for us the database of photographs

7  that your firm maintains for the National Park Service and

8  other Federal Land Managers?

9  **A.**   Yes.  The original database began in early the 1980s

10  with 35-millimeter slides.  Those were phased out

11  approximately 1998 to 2000 and we went to digital cameras.

12      The early slides have all been archived and stored in a

13  secure area in Fort Collins, Colorado.  On those slides -- we

14  have examined all those slides and created what we call a

15  frequency distribution of visibility in Class I areas.  Those

16  have been digitized and are available on the National Park

17  Service website.  Also we've done that for the U.S. Forest

18  Service.

19      Since then, we've operated digital cameras which take

20  much more frequent images and are easier to archive and

21  store.

22  **Q.**   And you can show the improvements to visibility that

23  will result at certain locations based on various air

24  dispersion model changes and emissions in the region?

25  **A.**   Yes.  For the last 25 years or so, we've been

1  developing -- I have been developing what we call visual air

2  quality simulation packages.  The concept of visibility is

3  relatively complex and difficult to just present to lay

4  people and decision makers, all these numbers we talk about,

5  and so we decided to, since visibility is a visual

6  experience, to develop software packages that allow us to

7  visualize changes in air quality due to various changes and

8  concentrations of atmospheric aerosols and gases.  And that's

9  what I used to generate the images which will be seen.

10 Q.   Has this become a regular, generally accepted approach

11 to looking at changes in visual air quality resulting from

12 potential air pollution control programs?

13 A.   Yes, it has.  The full modeling package is quite complex

14 and difficult to use, so what was -- what I wrote and

15 developed in 1995 was a package called WinHaze.  WinHaze is

16 an easy to use desktop application which synthesizes all

17 these various models and allows relatively untrained users to

18 generate imagery with inputs of various types of aerosols or

19 gases to see what the effect would be.

20     These packages have been developed under contracts with

21 the National Park Service, and we have used these packages

22 in -- well, all the regional planning organizations have used

23 this particular computer imaging model to generate imagery

24 for all their Class I areas under their advising and control.

25 Okay.

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 88 of 142

1    **Q.**   Can you give us some examples of the regional planning

2    organizations that have used your WinHaze program to generate

3    images of visibility changes resulting from potential air

4    quality programs?

5    **A.**   Yes.   The Grand Canyon Visible Transport Commission

6    began this, but it really initiated with SAMI in the late

7    1990s.   The SAMI report contains images of the Great Smoky

8    Mountains.   VISTAS currently has on their website the

9    archived images created with WinHaze showing the baseline

10   2000 to 2004 air quality and the projected improvement in

11   2018.   Those images are available for the public to download

12   and review.   Those are created with WinHaze, specifically for

13   VISTAS.

14   **Q.**   Has the methodology underlying WinHaze been peer

15   reviewed and published?

16   **A.**   The basic algorithms have been published in two papers I

17   was an author with, and also about four or five other papers

18   where we researched and looked at basic algorithms and the

19   concept behind generating visual air quality using visual air

20   transfer models.

21   **Q.**   Can you show us on your CV, on page two, where these

22   publications are that you are an author on that documented

23   the methodology underlying WinHaze?   I think it might be --

24   **A.**   Next page.

25   **Q.**   Page three, I'm sorry.   Page 3 of Plaintiff's Exhibit

1  431.

2  **A.**    These publications here would be -- this one right here

3  was the first paper we published.  We published another paper

4  in 1994, which is this one right here.  Those are two papers

5  I've been an author on, with the photographic simulation

6  techniques.

7      There are other references, I believe, in my submitted

8  documents which have been published by Cal Tech, California

9  Institute of Technology, Los Alamos Laboratories, where we

10 originally developed these packages.

11 **Q.**    Okay.  And what are some of the projects that you worked

12 on in the field of atmospheric optics and visibility?  Maybe

13 just give us a summary of the types of projects that you

14 worked on.

15 **A.**    The major ones have been with the National Park Service

16 and the IMPROVE program.  The IMPROVE program is the

17 inter-agency monitoring of protected visual environments.  It

18 is a national program that monitors all Class I areas in the

19 United States.  We are the optical monitoring contractor to

20 that program, and have been since IMPROVE started in 1988.

21     In addition to that, we have operated -- we operate the

22 State of the Wyoming's visibility monitoring network, the

23 State of Arizona's visibility monitoring network.  We operate

24 now -- just recently, the State of Colorado has, through

25 their county system, implemented visibility monitoring

1  networks.

2      We also worked with the Electric Power Research

3  Institute, Shell Oil and EnCana Oil and Gas exploration on

4  their development of well and gas properties in western

5  United States.

6  **Q.**   In addition to the several publications that we just

7  spoke about, do you have other publications in the field of

8  atmospheric physics, and are they listed in your CV?

9  **A.**   Yes.  There are several publications and reports and

10 presentations at conferences.

11 **Q.**   What do you do to keep up in your field?

12 **A.**   Well, I'm currently an active researcher in development

13 of the computer imaging software and maintaining that, and

14 data analysis interpretation.  Work closely with the IMPROVE

15 program and all these other agencies we work with in

16 developing new monitoring technology and data interpretation

17 techniques.

18        **MR. GOODSTEIN:**  At this point, Your Honor, we

19 tender Mr. Molenar as an expert in air pollution effects on

20 visibility.

21        **THE COURT:**  Let the record show that the Court so

22 holds.

23 **BY MR. GOODSTEIN:**

24 **Q.**   Mr. Molenar, have you authored a number of reports in

25 this matter, expert reports?

1      They should be at the back of your binder.

2   **A.**   Yes, sir, I have.   Yes.

3   **Q.**   All right.   So I want to direct your attention to

4   Plaintiff's Exhibit 472, 473, and 473A, and take a minute to

5   identify those and let us know if those are true and correct

6   copies of your expert disclosure reports in this case.

7   **A.**   Yes, they are.

8          **MR. GOODSTEIN:**  Your Honor, we offer 472, 473 and

9   473A into evidence.

10          **THE COURT:**  Let those be admitted.

11          **(Plaintiff's Exhibits 472, 473 and 473A**

12      **received.)**

13  **BY MR. GOODSTEIN:**

14  **Q.**   Mr. Molenar, so have you reached come conclusions on

15  improvements to visual air quality that would result from TVA

16  reducing their emissions as requested by North Carolina in

17  this case?

18  **A.**   Yes, I have.

19  **Q.**   And can you give us a summary of those conclusions,

20  please?

21  **A.**   Yes.  When I reviewed the results of STI's modeling and

22  the frequency of occurrence of changes in visibility and the

23  maximum changes modeled in each Class I one area, I concluded

24  that these were quite dramatic and quite significant

25  frequencies of occurrence in changes in visibility with those

1  additional controls.

2  **Q.**  And you looked specifically at some of the Class I areas

3  in the region?

4  **A.**  Yes.  That would be Great Smoky Mountains, Shining Rock,

5  Linville Gorge, Joyce-Kilmer Slickrock, and also Shenandoah

6  National Park, which is a bit farther downwind.

7  **Q.**  What are Class I areas?

8  **A.**  Class I areas were mandated in the 1977 Clean Air Act

9  amendments.  They are national parks greater than 5,000 acres

10  and U.S. wilderness areas greater than 6,000 acres, I

11  believe.

12      In 1977, there was 165 identified; 163 of them became

13  Class I areas.  Two decided that they were not -- visibility

14  was not important.  And those are mandatory.

15      Since then, tribes and states can designate additional

16  areas as Class I areas.  Those areas receive the maximum

17  protection under the Clean Air Act, specifically to remedy

18  any existing visibility impairment and to maintain the very

19  good visibility on the cleanest days.

20  **Q.**  Before we look at your results, Mr. Molenar, we wanted

21  to just get an overview of how regional haze and visibility

22  impairment occurs.

23      **MR. GOODSTEIN:**  And with the Court's permission,

24  Your Honor, if I could have Mr. Molenar approach the easel.

25      Plaintiff's Exhibit 288 is on the easel.  It should

1    also be in your book behind that number tab.  And I think

2    that would help Mr. Molenar explain the basic processes of

3    visibility impairment.

4              **THE COURT:**  You may step down.

5              **THE WITNESS:**  Thank you.

6              **MR. GOODSTEIN:**  Thank you, Your Honor.

7              **THE WITNESS:**  Visibility is an interesting optical

8    phenomenon.  Of all the atmospheric air pollution effects,

9    it's the one we are most intimate with as people living on

10   this planet.

11             Every morning when we wake up, we see various

12   vistas, and if we live in an area with multiple mountain

13   ridges, we can make instantaneous judgments about the air

14   quality.  It's really the only air pollution indicator that

15   we have intimate knowledge of.

16             So when we sit up there -- what this schematic is

17   is a very simplified version of what we see when we're out

18   there.  We're an observer standing somewhere, either at our

19   home or on a mountain looking out at a scenic vista, and if

20   we're lucky, we have a number of distant targets out there

21   that we can make judgments on.

22             What happens is air pollution, in the form of

23   gases, like SO2, are emitted from industrial facilities and

24   coal-fired generating plants, or there are nitrogen oxides

25   emitted from automobiles, or we have organics emitted from

 1  wildfires and other industrial processes.  Those all get

 2  transported downwind, and those gases convert into what we

 3  call secondary aerosols.

 4          Primary aerosols are also emitted from industrial

 5  facilities and wind-blown dust.  But in the eastern United

 6  States, sulfates are the biggest contributor to our

 7  visibility impairment.

 8          As that mass of pollution gets transported, it ends

 9  up impacting our scenic view.  What we have out here is some

10  distant target that we're looking at that has color contrast,

11  various lighting characteristics.  That image gets

12  transmitted through the atmosphere, and as it gets

13  transmitted through the atmosphere, that image-forming light

14  gets removed from the atmosphere by either being scattered

15  out, redirected in different directions, or absorbed by

16  absorbing particles.  Absorbing particles are not a great

17  concern in the eastern United States.  In the western United

18  States they are.

19          The other thing that happens is that the air

20  itself, between the observer and the target, is illuminated.

21  It gets illuminated by the sun; it gets illuminated by light

22  reflecting off the ground; it gets illuminated by light

23  interacting with clouds.  And that interacts with these

24  aerosol particles and it gets redirected into your eye.

25  That's a veiling illumination we call path radiance.

1          I think the easiest way to explain that is if

2    you're driving at night and it's a fog, you put on your high

3    beams, you lose your visibility because that light gets

4    re-scattered into your eyes.  And so visibility is just two

5    effects.  It's a removal of light from a target and the light

6    scattered into your eyes by the atmosphere itself.

7          And what we do in visualization is we run

8    atmosphere radiated transfer models which follow the light

9    photons and generate the effects of the air pollution.  It's

10   a very brief description.

11   **Q.**   Thank you, Mr. Molenar.

12        You have a figure in your report which is now marked

13   Plaintiff's Exhibit 289 for identification, and could you

14   identify that and explain to us what it shows?

15   **A.**   Yes.  This is a schematic of some of that process I was

16   discussing there.

17        SO2 is emitted by combustion of fossil fuels that have

18   sulfur in them.  Coal is the biggest contributor of sulfur

19   dioxide emissions.  Sulfur dioxide is an invisible gas.  When

20   it gets into the atmosphere, it reacts and converts into a

21   particle, usually an ammonium sulfate particle, and as the

22   particles grow, they get to a size they can interact with

23   light.

24        Sulfur dioxide also has an additional factor, and it's

25   called hydroscopic.  It is hydroscopic.  It has an affinity

1   for water.  So water vapor below 100 percent humidity

2   condenses out of the atmosphere, becomes a liquid ammonium

3   particle, and that particle gets bigger and it has a larger

4   effect on the scattering of the visibility degradation.  It

5   condensates -- condensation.  This is unlike wind-blown dust

6   and most organics, which are not hydroscopic, so the water

7   vapor has no effect on them.

8   **Q.**   Did you have a figure in your report that showed what

9   you just described?

10  **A.**   Yes.  The next exhibit.

11  **Q.**   Okay.  So referring you to Plaintiff's Exhibit 295 for

12  identification, should be the next one in the binder, can

13  you -- is this the figure from your report that you're

14  referring to?

15  **A.**   Yes, it is.

16  **Q.**   Can you explain to us what it shows, please?

17  **A.**   Yes.  This is a scene of Shining Rock Wilderness looking

18  at Mount Pisgah.  I used the visual air quality simulation

19  techniques that we've developed to show the effects of the

20  same concentration of aerosol mass in the atmosphere.  Three

21  of the scenes have sulfur ammonium sulfate and one scene has

22  fine soils, so the same amount -- if you were to measure the

23  amount of aerosols in the atmosphere, you'd get the same

24  number.

25      The upper right, or the A diagram, is 20 micrograms per

1  cubic meter of ammonia sulfate at 50 percent pH -- relative

2  humidity, excuse me -- and the visual range is 27 miles.

3      B is that same amount of ammonium sulfate, but relative

4  humidity goes to 75 percent instead of 50. The visual range

5  goes to 16 miles.

6      And the number C is the same amount of micrograms per

7  cubic meter of ammonium sulfate but at 95 percent relative

8  humidity -- which is probably close to this morning,

9  actually -- a visual range of about ten miles.

10     I must point out this is not fog. This is not fog.

11  This is water vapor in the atmosphere condensing out on

12  hydroscopic material. If instead of ammonium sulfate you had

13  a non-hydroscopic material, such as wind-blown dust, and you

14  had the same amount of mass -- and that's what you have in

15  image D -- this fine soil, at 95 percent humidity, has a

16  visual range of 81 miles.

17     This shows the exceptional effect of ammonium sulfate on

18  visibility degradation, which is one of the reasons it is

19  such an important issue in the United States, in fact, all of

20  the world.

21  **Q.** And what does this tell you about sulfur dioxide

22  emissions from power plants like the power plants run by TVA?

23  **A.** It is well known and well accepted that SO2 emissions

24  are the greatest cause of visibility degradation in the

25  eastern United States, as has been stated by the SAMI reports

1  and VISTA reports, EPA reports, U.S. Forest Service and

2  National Park Service monitoring.

3  **Q.**   And do you have a figure in your report that shows that?

4  **A.**   Yes.

5  **Q.**   I want to show you Plaintiff's Exhibit 294 for

6  identification.  Is that a figure out of your report?

7  **A.**   Yes, it is.  I took it from a report by ABT Associates,

8  I believe, in 2000.

9       What this is is the source categories for SO2 from

10  electrical generation in the United States, where 88 percent

11  of the SO2 emitted in the United States comes from burning of

12  coal, with other minor electrical generating, oil, gas, and

13  other emitting the rest of the SO2, sulfur dioxide.

14  **Q.**   And is this your understanding, in your experience?

15  **A.**   Yes.

16  **Q.**   And as part of your analysis, did you reconstruct

17  aerosol extinction at a number of Class I areas --

18  **A.**   Yes.

19  **Q.**   -- in the southeast region?

20  **A.**   Yes, I did.

21  **Q.**   I want to refer you to Plaintiff's Exhibit 290 for

22  identification.  Can you explain to us -- I know you have

23  several of these figures.  Can you explain to us what you did

24  to develop these figures and what they show?

25  **A.**   Yes.

Case 1:06-cv-00020-LHT  Document 213  Filed 06/22/09  Page 99 of 142

1  Q.  So let's start with this one, this first one.

2  A.  This data is taken directly from the IMPROVE database,

3  which is maintained by Colorado State University.  It's

4  online.

5      What you do is, the IMPROVE program makes aerosol

6  measurements and speciates those measurements by chemical

7  analysis and then calculates the effective extinction for

8  each type of species, and then it stratifies those into the

9  whole year in various categories.

10     This particular category is the 20 percent worst days in

11 2004 at Shining Rock Wilderness Area.  The 20 percent worst

12 days are an important category for visibility because they

13 are mentioned in the Regional Haze Rule as the days which

14 will be cleaned up to natural background by 2063.

15     So what they do is calculate the effect of extinction by

16 species, and then you sum up that total extinction and

17 visibility degradation and you apportion it.  And this shows

18 by the measured data by the national IMPROVE program that

19 sulfates are responsible for over 80 percent of the

20 extinction of visibility degradation by aerosols in Shining

21 Rock, with the other constituents, sea salt, coarse mass,

22 which is wind-blown dust, fine soil, light absorbing carbon,

23 which is LAC, organics, which are various kinds of organic

24 emissions, and nitrates, which are ammonium nitrate, making

25 up the remainder.

1  **Q.**   Okay.  What does this tell you about the source of

2  visibility impairment at the Class I areas in this region?

3       Let's first start with Shining Rock.

4  **A.**   Well, sulfates are the major dominant contributor for

5  visibility degradation, and sulfates come directly from SO2

6  emissions, and SO2 emissions are primarily from electrical

7  generating facilities, and that is primarily due to

8  coal-fired electrical generating facilities in the eastern

9  United States.

10 **Q.**   Like the ones operated by TVA --

11 **A.**   Yes.

12 **Q.**   -- in Tennessee, Kentucky and Alabama?

13 **A.**   Yes.

14 **Q.**   Let's take a look at your second aerosol extinction

15 summary in Plaintiff's Exhibit 291 for identification.  And

16 can you explain to us what you summarize here and what it

17 shows.

18 **A.**   Yes.  This is from Linville Gorge Wilderness Area.  It

19 is, again, part of the national IMPROVE monitoring program.

20 This is the data for the 20 percent worst visibility days of

21 2004.  And this shows that sulfates are over 85 percent of

22 the aerosol extinction on the worst days.

23 **Q.**   And have you had an opportunity to look at this data

24 since 2004?

25 **A.**   Yes.  The 2005 data and 2006 data are out.  They weren't

Case 1:06-cv-00020-LHT   Document 213   Filed 06/22/09   Page 101 of 142

1  as easily accessible in these kind of pie charts, but it is

2  the same similar thing, over 85 percent -- 80 to 85 percent

3  of sulfates on the worst days.

4  **Q.**   Let's look at Plaintiff's Exhibit 292 for

5  identification.  And can you explain to us what this shows?

6  **A.**   Similar plot.  This is done for Great Smoky Mountains

7  National Park in Tennessee.  Again, over 85 percent is due to

8  sulfate on the 20 percent worst days due to extinction.

9  **Q.**   And so what does this tell you about visibility

10 impairment in the Great Smoky Mountains National Park in

11 Tennessee?

12 **A.**   Similar picture as we've seen with Linville Gorge and

13 Shining Rock, the whole Appalachian region is affected

14 primarily by sulfate, ammonium sulfate in the atmosphere

15 causing the vast majority of visibility degradation on the

16 worst days.

17 **Q.**   Let's take a look at Plaintiff's Exhibit 293 for

18 identification.

19        **MS. GILLEN:**  Your Honor, TVA would object to

20 Exhibit 293 based on Your Honor's previous ruling about

21 impacts in states like Virginia, where Shenandoah National

22 Park is located.

23        **THE COURT:**  All right.  Overruled.

24        **MR. GOODSTEIN:**  Thank you, Your Honor.

25

1  BY MR. GOODSTEIN:

2  Q.   Can you explain to us, Mr. Molenar, what this one shows?

3  A.   Yes.  This is data similar  to the IMPROVE monitoring

4  program at Shenandoah National Park.  It shows that the

5  sulfate, again, ammonium sulfate, again, is the primary cause

6  of aerosol extinction, primary cause of visibility

7  degradation in a wide region in the eastern United States.

8  Q.   And does this data from Shenandoah National Park confirm

9  the traceability of the sources of visibility impairment that

10 you've seen at the other Class I areas that you've shown us

11 in the last few figures?  Is it the same type of

12 relationships between sulfates and visibility impairment?

13 A.   Yes.  Sulfates are the primary cause of visibility

14 impairment in the eastern United States due to SO2 emissions.

15 Q.   All right.  Mr. Molenar, we have a series of summary

16 tables that were contained in your report and generated by

17 STI.  And we don't have to go through these results in

18 detail, but I just want you to identify them for the record

19 as data that you considered and relied on in reaching your

20 conclusions.

21     So maybe you could just look at each one and explain to

22 us how you considered them and relied on them in reaching

23 your conclusions.

24     So let's start with Plaintiff's Exhibit 162.

25 A.   Yes.  This is data directly from the STI report.  This

1   is their model improvement of the 20 percent worst days in

2   2013 with additional controls.  And they define it as

3   perceptible visibility improvement, which is defined as a

4   one-deciview change.

5   Q.   Can you tell us what a one-deciview change means?

6   A.   Yes.  The perception of visibility degradation is not a

7   linear extinction in the amount of aerosols that are put in

8   the atmosphere.  So the deciview metric was developed to try

9   to linearize changes in extinction to a perceptible

10  increment.

11      The best example of this I could give you would be if

12  you have a very highly polluted day, and we have 100 units of

13  extinction, and we change that by two, that would be a two

14  percent change, it would probably be imperceptible.  However,

15  on a very clean day, we only had 12 units of distinction and

16  we changed it by 2, that would be almost a 20 percent change

17  in extinction, which would be highly perceptible.

18      The same amount of change of aerosol in the atmosphere

19  has a greater effect on cleaner days than on hazy days.  That

20  was the concept of deciviews.  It's a way of creating a

21  metric which is linear with perceptibility.

22      So the determination has been that approximately a

23  10 percent change in extinction, which is one deciview, is a

24  perceptible increment.

25  Q.   And has a one-deciview change been generally accepted as

1  the change that would result in a perceptible visibility

2  improvement by the population?

3  **A.**   There has been a lot of research and discussion on

4  deciview changes.  The concept behind this was developed out

5  of studies started in the late 1970s all through the mid '80s

6  run by National Park Service, trying to determine how people

7  perceive changes in air quality.

8      Those studies surveyed over 2000 people in three

9  national parks using projected images, people looking outside

10  their windows, making measurements of the scene, and it was

11  determined that approximately a 10 percent change in

12  extinction is perceptible to these visitors in the parks.

13      Over a series of years, that was turned into this

14  concept of deciview.  It was put into the Clean Air Regional

15  Haze Rule in 1999, where the EPA stated that a one-deciview

16  change was perceptible.  It was used -- it is used by what's

17  called FLAG, which is Federal Land Managers Air Quality

18  Group.  It is a group that has developed models to look at

19  siting of new facilities near Class I areas.  They have

20  determined -- and they use a half a deciview -- or excuse

21  me -- a half a deciview or  a 5 percent change in extinction,

22  as a cause for concern, where they would look up the

23  emissions from a particular plant and say, what can we do to

24  improve it.  They use one deciview as a definite flag that

25  they would question the permitting of that facility.

1    The EPA has reiterated this concept in the 2005 BART,

2    Best Available Retrofit Technology, final ruling in 2005,

3    where they stated that, again, a half a deciview contributes

4    to visibility degradation and one deciview causes visibility

5    degradation when emissions come from any particular facility.

6    **Q.**   Mr. Molenar, as an expert in impacts of air pollution on

7    visibility, based on your experience, how would you

8    describe -- how would you characterize these visibility

9    changes that you have data regarding for improvements in air

10   quality, visual air quality, resulting from additional

11   emissions reductions sought by North Carolina from TVA plants

12   in this case?

13   **A.**   When I first saw these, when they were first submitted

14   to me, I was actually quite stunned that they were this

15   large.  The national goal is to, over a 60-year period, to

16   clean up the haziest days in this country.

17       Having worked with the regional planning organizations

18   and looked at other facilities all throughout the United

19   States, to see additional controls resulting in 18 to 20 days

20   of perceptible improvement on the 20 percent haziest days was

21   quite a large number.  So I was quite amazed, actually.

22   **Q.**   And did you take a look at this data in terms of

23   deciview changes as well?

24   **A.**   Yes.

25   **Q.**   And you have a table in your report to show that.

1  A.    Yes.

2  Q.    And that is Plaintiff's Exhibit 302 for identification?

3  A.    Yes.  What this is was the maximum change model for

4  2002 by STI with additional controls.  Each specific day is

5  noted from the base 2013, and if you had additional controls

6  on the TVA, their model predicts up to a seven-deciview

7  change in Shining Rock and a two-deciview change at a Class I

8  as far as away as Shenandoah National Park.  These are the

9  maximum changes.  These are also the changes that I used to

10 generate images from.

11 Q.    Based on your experience, would you expect similar types

12 of improvement at other Class I areas around the region?

13 A.    You would expect improvements at other Class I areas,

14 the nearest Class I areas, which would be areas like Mammoth

15 Cave National Park, which is already highly improved, and, in

16 fact, had the worst visibility air quality of all national

17 park facilities that we monitor.

18     You would also expect improvement in areas outside these

19 Class I regions that are contiguous to that area.

20 Q.    And what do these changes in deciviews that you have

21 estimated resulting from the additional emissions reductions

22 sought by North Carolina of TVA in this case -- how would you

23 describe, based on your experience, these deciview changes?

24 A.    The maximum deciview changes are quite large.  These are

25 from four to seven in the nearby Class I areas.  That is a 40

1  to 70 percent change in extinction.

2  **Q.**   And how would you describe the frequency of these

3  improvements based on the number of days?

4  **A.**   On the haziest days, we're talking about approximately a

5  one-in-four to one-in-three day improvement, which is 25 to

6  30 percent of the time there would be perceptible change in

7  the worst days in the Class I areas.  I believe there is

8  another table that talks about the changes all year round,

9  not just on the worst days.  There are perceptible changes on

10  days other than the 20 percent worst days, too.

11  **Q.**   Okay.  And is that Plaintiff's Exhibit 161 for

12  identification?

13  **A.**   Yes.

14  **Q.**   And so can you explain to us what you concluded from

15  these results based on your experience as an air quality

16  atmospheric physics expert?

17  **A.**   Having 40 days a year perceptible change in visibility

18  due to any kind of emission controls is a significant event.

19  I've been involved with analyses and source apportionment for

20  a number of studies on power plants, throughout the western

21  United States, specifically, and many times in some of these

22  studies we've seen very little improvement with anticipated

23  controls.  With this particular control strategy on the TVA

24  plants to get 40 days a year -- 40 plus days a year over such

25  a wide region is significant.

1  **Q.**   And referring your attention to Plaintiff's Exhibit 160

2  for identification, can you explain the significance of these

3  results in your conclusions?

4  **A.**   Oh, yeah.  We can you use the term "deciview" to do

5  perceptible changes.  However, for most people, the concept

6  of visual range, how far you can see, is a little bit more

7  intuitive.  And so this data comes again from the STI report,

8  and it talks about the change in visual range, or how far you

9  could see a large dark objects with these kind of

10  improvements.  So you see changes in visual range anywhere

11  from 20 to 100 percent, doubling the visual range at Shining

12  Rock on the maximum improved days.

13          **MR. GOODSTEIN:**  Your Honor, we'd like to offer the

14  exhibits we've covered so far with Mr. Molenar into evidence,

15  and I believe they're Plaintiff's Exhibit 288, 289, 295, 294,

16  290, 291, 292, 293, and 302.  We offer these into evidence at

17  this time.

18          **THE COURT:**  All right.  Let those be admitted.

19          **MR. GOODSTEIN:**  Thank you, Your Honor.

20          **(Plaintiff's Exhibits 288 through 295, and 302**

21      **received.)**

22          **MR. GOODSTEIN:**  Thank you, Your Honor.

23  **BY MR. GOODSTEIN:**

24  **Q.**   What is the significance of visible range?  Can you

25  describe that for us, Mr. Molenar?

1  **A.**   Oh, yeah.  Visible range actually has a well-defined

2  meaning in terms of meteorologic or air quality visibility.

3  It's how far you can see a large black target on the horizon.

4  And if you assume that if you have a two percent contrast or

5  that target makes it two percent darker than the background,

6  you would detect that target.

7      In the eastern United States, visual range has real good

8  physical meaning because you have enough targets out there

9  which are beyond the visual range, so that if you change

10 visual range from 10 miles to 20 miles, you'll see a new

11 mountain that will just all of a sudden appear.

12     In the western United States, visible range has a little

13 bit less meaning because the visual range is something  a

14 little over 150 miles, and there is nothing that far away

15 that you can see.

16 **Q.**   So based on your experience, these visual range

17 improvements that we just went over that will result from

18 these emissions reductions at TVA plants sought by North

19 Carolina, what do you conclude about those changes in visual

20 range?

21 **A.**   Well, the maximum cleanup days, if you went from 10-mile

22 visual range to 20-mile visual range, all the mountains that

23 were between the 10 to 20 would be visible.  Those particular

24 targets would now be visible to the observer.

25     As was discussed earlier today, sometimes Mount Pisgah

1  cannot be seen from the Biltmore Estate.  Mount Pisgah, I

2  believe they said, is 17 miles away.  So if the visual range

3  is 10 miles, you can't see Mount Pisgah.  If the visual range

4  is 20 miles, you can see Mount Pisgah.  That's the kind of

5  effect it has.

6  Q.   Mr. Molenar, were you involved in the SAMI process?

7  A.   Yes.  We provided support for data analysis

8  interpretation.  We developed some software products for them

9  to generate graphs and data analysis for the final SAMI

10  report, yes.

11  Q.   Were these relationships that you just described for us

12  between sulfur dioxide emissions from coal-fired power plants

13  like TVA's and visibility impairment known to the

14  participants in the SAMI process?

15  A.   Yes.

16  Q.   And based on your experience, how many -- approximately

17  how many years has that been common knowledge in your field,

18  that relationship?

19  A.   Since I started in the field in early 1970s, it was

20  known that sulfates were the primary cause of visibility

21  degradation in the eastern United States.

22       It has been studied, verified, restudied, looked at,

23  source apportioned.  The dominant cause of visibility in

24  eastern United States is sulfate pollution.

25  Q.   And do you know whether TVA participated in SAMI?

1  **A.**   Yes, they were a participant.

2  **Q.**   Turn your attention, Mr. Molenar, to Plaintiff's Exhibit

3  303 for identification.  And it should be a figure out of one

4  of your supplemental reports.  Can you identify it?

5  **A.**   Yes.  Excuse me.  The yellow squares are the Class I

6  areas modeled by STI.  These are separate areas:  Look Rock,

7  Great Smoky Mountains, Joyce-Kilmer Slickrock, Shining Rock,

8  and Linville Gorge Wilderness Areas, those areas where

9  specific improvements were modeled.

10       Since regional haze is a regional issue, the haze does

11  not end at the boundaries of Class I areas, what I did was

12  made a calculated estimate of days in North Carolina, which

13  is the red shaded areas, that would also experience 40 or

14  more days of perceptible improvement with additional

15  controls.  This region would extend into Tennessee and into

16  surrounding other states, but on this particular graphic, I

17  only focused on North Carolina.  So the areas in between

18  these class ones areas would also have similar improvements

19  in visibility.

20  **Q.**   All right.  And you mentioned that you stopped the

21  shading on this particular figure at the border, but would

22  you expect similar improvements to visual air quality with

23  the emissions reductions sought by North Carolina extending

24  into the state of Tennessee?

25  **A.**   Yes.

1  Q.   And you also have some points of interest indicated in

2  blue circles.

3  A.   Blue circles are current state parks in North Carolina,

4  which, even though they do not have Class I protection status

5  from the federal government, are areas of recreation.  I

6  think we had some testimony from Chimney Rock -- the ex-owner

7  of Chimney Rock that visibility is very important at his

8  particular facility, and it would be in this area that would

9  experience 40 or more days of improved visibilty --

10 perceptible improved visibility.

11 Q.   And this area includes Mount Mitchell?

12 A.   Mount Mitchell, yes.

13 Q.   And it includes Gorges State Park?

14 A.   It would be, yes.

15      Gorges?  Is that how you pronounce it?  Yes.

16 Q.   As well as the Class I receptor areas that you

17 identified for us?

18 A.   Yes.

19 Q.   And you would expect it to extend to the Look Rock area

20 as well, in Tennessee?

21 A.   Yes.  Look Rock was one of the model receptor sites that

22 had 40 plus days of perceptible improvement.  So they would

23 extend around that region to some extent and there would be

24 similar improvements.

25 Q.   And this would include the Asheville area?

1  A.   Yes.  Definitely.

2          MR. GOODSTEIN:  Your Honor, we offer Plaintiff's

3  303 into evidence.

4          THE COURT:  Let it be admitted.

5          (Plaintiff's Exhibit 303 received.).

6  BY MR. GOODSTEIN:

7  Q.   Mr. Molenar, we want to move into your results using the

8  WinHaze model.  And maybe you could just give us a little

9  overview into how you prepared these photo simulations and

10  explain to us what they show as we move through the series.

11  A.   Sure.  I'll give you first a brief overview of the

12  modeling process.

13      Unlike Hollywood, we do not recreate the scene from

14  scratch.  We have searched the photographic database from the

15  various national visibility monitoring programs to find the

16  cleanest slide we could find for all the Class I areas.

17      As was mentioned earlier, even the most hazed out parts

18  of the United States get clean.  A few years ago when the

19  hurricanes came through, I happened to have been in the area

20  at the same time, and visibility was dramatically improved.

21      So for every Class I area in the United States where

22  we've had cameras, we have a base image of a very, very clean

23  day, very near Rayleigh conditions.  Rayleigh means no

24  atmospheric aerosol.  That becomes the base image from which

25  we generate all of our images.  That image is digitized,

1 turned into an electronic file, and calibrated to generate a

2 base radiance field, which we then use in radiative transfer

3 models to model the effects, as on this diagram up here, to

4 generate a new image under different atmospheric aerosol

5 loadings, air pollution loadings.

6      From that, then, you could model a base image at some

7 particular level of aerosols in the atmosphere, change that

8 level of aerosols in the atmosphere, and visualize the

9 improvement with an image, not just a number like two

10 deciviews or five deciviews or a 10-mile visual range.

11      Visibility is not just how far you can see; it's how

12 well you can see.  It's color contrast, detail of the scene,

13 and it's all the sharpness that you pick out on cleaner days.

14 **Q.**   So you used -- as your base photographs for the

15 simulations you did in this case, you used photographs from

16 the database that you maintain for the National Park Service?

17 **A.**   And the Forest Service, yes.

18 **Q.**   And Forest Service.

19 **A.**   Yes.  The cleanest images have been put into WinHaze as

20 base images for anybody's use.

21 **Q.**   And then you also used the CMAQ air quality modeling

22 output that you obtained from Sonoma Technologies?

23 **A.**   Yes.  The WinHaze model, what you input into it is

24 aerosol concentrations or extinction.  You generate that with

25 other modeling exercises.

1     And so what I took was the base images modeled by Sonoma

2   Technologies, the base aerosol extinction, and their improved

3   aerosol extinction on the worst days, and created images for

4   the 2013 base image and then 2013 with additional controls.

5   **Q.**   Let's go -- let's take a look at Plaintiff's Exhibit 296

6   for identification.  And each of these exhibits coming up

7   contain a series of photographs.

8     Can you explain to us for this one what each photograph

9   in the series from Plaintiff's Exhibit 296 for identification

10  shows?

11  **A.**   Yes.  This is a view of the Shining Rock Wilderness

12  toward Mount Pisgah.  This is the 2013 base image without

13  controls on the TVA power plants with 22.5-mile visual range.

14  I'd have to look back to find the exact deciview, though.  I

15  can't remember off the top of my head.

16    Then the next image, B, is that same scene modeled with

17  additional controls on the TVA coal-fired power plants with a

18  visual range of 45.6 miles.

19    If we flip back and forth between those two images, you

20  can see the improvements, projected improvements modeled.

21  And what you see is the far distant horizon becomes much more

22  distinct, the sky becomes bluer, and the foreground images

23  become less murky, less hazed out, which is what you see when

24  you improve visibility.  It's not just how far you can see;

25  it's how well you can see details of nearby features which

1   are closer than the visual range.

2   **Q.**   What you see on your screen right now, Mr. Molenar, are

3   those two photos side by side?

4   **A.**   Those are two photos side by side, yes.

5   **Q.**   The one on the right is the one with the emissions

6   reductions sought by North Carolina on TVA plants?

7   **A.**   Yes.

8   **Q.**   And what do you see -- based on your experience, what do

9   you see is the difference?

10  **A.**   These are the kinds of improvements that -- this is the

11  goal of the Regional Haze Rule.  These are the kind of

12  improvements that are dramatic and significant to anybody who

13  visits a visitor center or visibility site in Class I areas.

14      Again, we've heard earlier testimony today about the

15  importance of visibility to visitors to national parks,

16  wilderness areas, state parks, and facilities such as the

17  Biltmore Estate.  It is the primary reason that -- one of the

18  primary reasons people go to these remote areas, is to have

19  clear air.

20  **Q.**   Can you see an additional mountain range in the figure

21  on the right?

22  **A.**   The farthest mountain range is very indistinct on the

23  22.5-mile visual range and is quite distinct on the 45-mile

24  visual range.  That's because that mountain range is right

25  near the visual range, and so, depending on your visual

1   acuity, it will either not be there or, if you clean it up,

2   it will be there.

3   **Q.**   And what is the improvement in visual range that you

4   estimated on this series at the Mount Pisgah vista?

5   **A.**   It was at 12.1 -- excuse me.  22.1.  It's almost

6   doubled.

7   **Q.**   So it goes from 22.5 miles to 45.6 miles?

8   **A.**   To 45.6 miles, yes.

9   **Q.**   Moving on to 296C.

10          **MR. GOODSTEIN:**  These are labeled in the upper

11  left-hand corner, Your Honor, if that's helpful.

12          **THE COURT:**  All right.

13  **BY MR. GOODSTEIN:**

14  **Q.**   What does this simulation show, Mr. Molenar?

15  **A.**   What it is is WinHaze has the ability to split images.

16  You can actually create two images and then take your split

17  and put it wherever you want on the scene.

18      What you have here is the base case, no control on the

19  left, 22.5-mile visual range, and the model improvement with

20  controls on the TVA coal-fired power plants.  These kind of

21  images, these are similar to the images which VISTAS has

22  created and are on their website, where they've looked at the

23  base 2018 -- excuse me -- the base 20 percent worst days in

24  2000 and 2004 and their projected improvements in 2018 for

25  meeting regional haze goals.

1  Q.    So the improvement is on the right, with the additional

2  controls on TVA power plants.

3       And what about the next one, 296?

4  A.    296 is just the reverse, so that you have the base case,

5  no controls on the right, the case where you have additional

6  controls on the left.

7  Q.    And how would you describe the differences based on your

8  experience?  What do you see here?

9  A.    Again, what you see is the far distant mountain range

10  becomes much more distinct.  The sky color itself becomes

11  bluer as you decrease the amount of pollution in the

12  atmosphere.  That is one of the not discussed -- it's not

13  discussed on a regulatory case about the color of the sky,

14  but it is one of the benefits when you reduce air pollution,

15  is that the sky becomes bluer.  Only to the horizon does it

16  become that murky white.  The details on the nearby features

17  are also sharper.  You start seeing detailed color contrast

18  on those features which are closer to visual range, but not

19  just murked out by an opaque veil.  You see the trees and the

20  shadows.

21       That's what happens when you reduce air pollution, in

22  terms of visibility.

23  Q.    Let's go on to the next series you prepared,

24  Mr. Molenar.  This should be Plaintiff's Exhibit 297 for

25  identification.

1  A.   This is another view at Shining Rock.  A number of the

2  Class I areas have multiple cameras.  This particular one

3  operated by the Forest Service has two cameras.  This is a

4  view towards Cold Mountain from Shining Rock.  This is the

5  base case, with 22.5-mile visibility without controls.

6  Q.   Mr. Molenar, could you do us a favor and clear your

7  screen.  If you'd press "Clear All."

8       Thank you very much.

9       And is this a similar series for this Cold Mountain

10 vista in North Carolina?

11 A.   Yes.  It's the same as with the other previous, Shining

12 Rock vista.

13 Q.   So can you please take us through this series and

14 explain what it shows.

15 A.   Again, this is the day that will show the greatest

16 improvement from STI modeling.  This is their base case

17 without additional controls, 22.5 miles.  This is the Cold

18 Mountain vista.

19      The next image, B, would be the improvement to

20 45.6 miles, with additional controls on the TVA coal-fired

21 power plants, their model improvement.

22      The next one would be the split image, with the base

23 case on the left, the improvement on the right.  And the

24 final one would be a split image, with the base case on the

25 right and the model improvement on the left.

1   **Q.**   How would you describe what these show, based on your

2   experience?

3   **A.**   Again, similar improvements as with the other image.

4   Sky gets bluer; horizon lines get sharper; detail on the

5   foreground becomes more distinct; shadows become darker.

6   They're not so light because of the path radiance by the

7   scattered radiation from the aerosols in the atmosphere.

8   **Q.**   Let's take a look at Plaintiff's 298 for identification.

9   Can you explain to us what this series shows?

10  **A.**   Similar to the previous ones, this is, again, the model

11  of the worst day and model of the day with the greatest

12  improvement.   This is Linville Gorge Wilderness, again, the

13  camera operated by the U.S. Forest Service.

14       This is their base case day, 19.7-mile visual range.

15  The next slide shows the improvement with additional

16  controls, 34.2 miles visual range.   This is a case where on

17  the base case the far distant horizon is very, very close to

18  the visual range so it's very indistinct and very whited out.

19  The improvement, then, you don't have as many nearby features

20  to the extent it's a distant panorama.

21       The next two images are the split images again, with the

22  no control scenario on the left, additional control scenario

23  on the right.   The final one is no control scenario on the

24  right, additional controls on the coal-fired power plants on

25  the left.

1    Again, sky gets bluer; distant terrain features become

2   sharper; intermediate terrain features lose the milky-white

3   haze; close in features, shadows become darker, contrast

4   improves.

5   **Q.**   How would you describe the changes in the visible range

6   of the showing on this simulation for Linville Gorge with the

7   additional controls on TVA's coal-fired power plants?

8   **A.**   Well, almost 15-mile change in visible range.  That's

9   70 percent range.  Not quite as big as Shining Rock, but

10  they're still very, very large.

11  **Q.**   And let's look at Plaintiff's Exhibit 300 for

12  identification.  Can you explain to us what that series

13  shows?

14  **A.**   Yes.  This is actually a very old image of the Great

15  Smoky Mountains.  This is one of the first images put in

16  WinHaze.  This is the worst case model -- day of most

17  improvements, the base case of no controls of 15.5 miles

18  visual range.

19      The next image is the image with the additional controls

20  on TVA's coal-fired power plants.  The visual range increases

21  from 15.5 to 26.2.  Again, what you have is a change in --

22  the next one then is the no controls on the left, controls on

23  the right.  And the final one is just swapped; no controls on

24  the right, controls on the left.

25      Again, similar changes.  Sky color changes; horizon gets

1 bluer as you go higher up in the sky.  The horizon itself

2 isn't as white.  The distant terrain features are darker,

3 more contrast.  The close terrain features, the shadows

4 become darker.  Overall visibility is great improvement.

5 **Q.**    This is a view from Great Smoky Mountains National Park

6 in Tennessee; is that right?

7 **A.**    Yes, it is.

8 **Q.**    And would you expect similar types of improvements to

9 occur in that area around this particular viewpoint?

10 **A.**    Oh, yes.  Yes.  This is just one -- how can I say this?

11 There's not enough money to put out cameras to look at all

12 the different visibility places in all the national parks and

13 wilderness areas.  So when the camera systems were first

14 installed, typically, they went to an overview that people

15 went to and tried to pick something that was significant for

16 the park.

17    But you could go to any of these Class I areas and find

18 similar views with different kind of distant features that

19 you could see from hiking trails even more dramatic, but it's

20 just harder to keep your equipment there.

21    And the next -- the next picture will show a problem

22 with that.

23 **Q.**    Okay.  So based -- one more question on this one.  Based

24 on your experience, you would expect to see similar types of

25 improvements along the mountains in the Tennessee side of the

1  Smokies as you've modeled on Plaintiff's Exhibit 300D.

2  **A.**   Yes.

3  **Q.**   All right.  Now let's go on to Plaintiff's Exhibit 301

4  for identification.  And can you explain --

5  **A.**   Yes.  This is a view in Shenandoah National Park.

6  Actually, this is one of the prettier views in the park.

7  It's called Dicky's Ridge.  It is an area where we had a

8  camera for only six months because it got vandalized twice,

9  so we could never do it anymore.

10        Luckily, we happened to have a camera there one fall

11  when a very clear cold front came through so we could get a

12  base image.  This has some long, long range views out there.

13  This is the day with the most improvement.  This would be the

14  base case with no controls on the TVA plants, 24.9 miles.

15        Then the next image would be with controls on TVA

16  plants.  Now, this site has a smaller change in visual range

17  and maximum change in visibility.  It is also, I believe, a

18  couple, 200 miles plus downwind from the power plants, which

19  shows that improvements, not as dramatic as at the nearby

20  Class I areas, still occur over a wide range over the region,

21  as far out as Shenandoah National Park.

22  **Q.**   What does this tell you about the current impacts of

23  emissions from TVA coal-fired power plants on visual air

24  quality in the region?

25  **A.**   It's a regional issue.  Regional haze is a large mass of

1  polluted air which is impacted by all emissions in that area.

2  But emissions from any industrial facility can have

3  long-range effects downwind, up to 2 to 300 miles downwind.

4  **Q.**   And with the additional emissions reductions sought by

5  North Carolina in this case, would you expect to see

6  improvements in visual air quality in North Carolina?

7  **A.**   Yes.  North Carolina, Tennessee, farther out downwind, I

8  would expect to see those, yes.

9  **Q.**   How about Kentucky and Alabama?

10  **A.**   When the wind blew in that direction, yes.  When

11  emissions from the plants were transported into those

12  regions, you would see improvement if their emissions were

13  reduced.

14  **Q.**   So if the sulfur dioxide emissions from TVA power plants

15  and the resulting sulfates were blowing in the directions of

16  areas in each of the states where the plants are located, you

17  would expect to see similar types of visual air quality

18  impairment as we've seen in your simulations?

19  **A.**   Yes.

20  **Q.**   So the reduction in sulfur dioxide emissions sought by

21  North Carolina of TVA in this case is going to have a

22  positive effect on visual air quality in the states where

23  TVA's plant are located?

24  **A.**   I would expect that, yes.

25  **Q.**   As well as North Carolina and other states in the

1  region?

2  **A.**    Yes.

3          **MR. GOODSTEIN:**  Your Honor, we offer 296, 297 and

4  298, 300 and 301 into evidence.

5          **THE COURT:**  Let those be admitted.

6          **(Plaintiff's Exhibits 296, 297, 298, 300 and 301**

7      **received.)**

8  BY MR. GOODSTEIN:

9  **Q.**    So, Mr. Molenar, in summary, what did you conclude about

10  the improvements in visual air quality that will result if

11  TVA were to reduce its emissions as requested by North

12  Carolina in this case?

13  **A.**    Reviewing the results of STI's modeling and creating

14  these images, and using my experience in the field, the

15  maximum improvements are quite dramatic and the frequency

16  occurrence of perceptible changes in visual air quality would

17  be significant throughout the region.

18  **Q.**    And that includes the states where TVA's plants are

19  located.

20  **A.**    Yes.  Besides the receptors -- I believe, besides the

21  receptor's model, there would be a wide region experiencing

22  perceptible improvement in visibility on significant number

23  of days.

24  **Q.**    And that includes North Carolina?

25  **A.**    That includes North Carolina, yes.

1  Q.   Now, have you had an opportunity to review the expert

2  disclosure report submitted by Dr. Ivar Tombach on behalf of

3  TVA?

4  A.   Yes.

5  Q.   And do you recall Dr. Tombach's comments on your use of

6  a one-deciview change as an appropriate unit for perceivable

7  improvement in visual air quality?

8  A.   Yes.

9  Q.   Did those comments cause you to change your conclusions?

10 A.   No.  I've seen Dr. Tombach's comments before.  I've

11 worked with Dr. Ron Henry, who did much of the work that

12 Dr. Tombach's comments were based on, in the past.  I have

13 had discussions with both of them on this.

14      My position still is that a one-deciview change is

15 perceptible to a significant portion of the population.  It

16 has also been EPA's position and the Federal Land

17 Management's position that that is the case.

18 Q.   And can you tell us the process that Federal Land

19 Managers went through to adopt the one-deciview change as

20 their measure of perceivable improvement?  Can you just

21 summarize for us the process?

22 A.   Yes.  When the Clean Air Act was amended in 1977 and

23 made visibility a national goal, there was no real knowledge

24 of how people perceived visibility.  How do people actually

25 experience changes in air quality when you're looking out in

1  the field?

2      National Park Service initiated, in 1979, a perception

3  study at Canyonlands National Park.  It was based on work

4  done by a number of psychophysicists, actually, for the

5  American Petroleum Institute, looking at scenic beauty in

6  national parks and wilderness areas.

7      We presented to observers a series of slides with

8  changing visibility and had them rate those slides.  From

9  those slides, we made measurements of what the people were

10  actually seeing with an instrument called a radiometer of the

11  stimulus on the scene.

12      Besides looking at those particular images, they also

13  then looked outside at the same scene, frame by window frame,

14  and made judgments of a three-dimensional scene, which we

15  took pictures of and then funneled back into this survey.

16      At Canyonlands National Park, we had over 700 people we

17  surveyed and we tried to determine how people rate changes in

18  visibility and what measurement we could make to tie those

19  ratings to, and those measurements basically used a

20  measurement called contrast, how dark this mountain was

21  against the sky.  We looked at confounding effects of clouds,

22  time of day, snow on the mountains, all these different

23  issues, which confound a person's judgment of visibility.

24      What was interesting was all those confounding effects

25  changed the perceived scenic beauty but not the perceived

 1  visibility.  If you held the time of day constant or you hold

 2  the clouds constant or you held snow on the mountain constant

 3  and changed the air quality, they rated changes in air

 4  quality the same.  The rating scale was a one-to-ten

 5  judgment.  So a scene with lots of snow and clouds might

 6  start out as a base rating of eight and go down to a base

 7  rating of four as your change in air quality got worse.  A

 8  scene without clouds might start at a base rate of five and

 9  go down to one, but the rate of change with air quality was

10  the same.  We were pretty amazed at that.

11      We continued the studies in 1980 in Mesa Verde National

12  Park and Grand Canyon National Park, where we used, again,

13  similar projected slides, on-site scenes.  We also

14  incorporated photographic prints, incorporated split screens,

15  incorporated multiple different ways of testing human

16  response.

17      After that, we then spent two or three years in a

18  laboratory, where we were generating computer images, looking

19  at various changes in air quality generated by computer

20  imaging.  We also looked at plumes, looked at hazes.  We

21  actually also worked with the Department of Defense on

22  detectability of plumes from jet aircraft for pilots.  This

23  was a period from 1979 to about 1986.

24      A number of studies were done.  A few thousand people

25  were interviewed.  Those coalesced around this concept of a

1  10 percent change in extinction being detectable to most

2  people when the scenic vista that you were looking at had a

3  sensitive scenic element.

4     It turned out that when people look out at a scene, if

5  they know the scene reasonably well, they've been trained or

6  they lived there or go there regularly, they key in on these

7  specific scenic elements which have the maximum rate of

8  change in air quality, and so they can accurately and

9  reliably deduce changes in air quality.  That idea of a

10  10 percent change in extinction in view was not a linear

11  aerosol concentration, so the concept then was to linearize

12  it with this term called deciview, which is similar to the

13  way you linearize sounds per decibels.  So that one-decibel

14  change is perceptible for sounds; a one-deciview change is

15  perceptible in visibility.  It does not mean 100 percent of

16  the people will detect that change; it means a significant

17  probability that people will detect that change.

18     We've actually -- there are people that have argued,

19  researchers, that a half a deciview or a 5 percent change is

20  detectable by a significant fraction of the sensitive people

21  in the population.  So that's why a half a deciview is

22  considered a low concern when a new facility is being

23  permitted that it might cause -- it contributes to visibility

24  degradation, but if a new facility causes a one-deciview

25  change, it causes visibility degradation.

Case 1:06-cv-00020-LHT   Document 213   Filed 06/22/09   Page 130 of 142

1     So the converse is true, too.  If you put controls on a

2 facility and it results in that one-deciview change, those

3 controls will result in perceptible changes in visibility.

4     So this was based on number of years of research study,

5 thinking, looking at psychophysical models.

6 **Q.**   And has it been uniformly adopted, the one-deciview

7 change, as the increment of perceivable improvement?  Has

8 that been uniformly adopted by Federal Land Managers?

9 **A.**   Federal Land Managers.  EPA adopted, in 1999, the

10 Regional  Haze Rule, and reiterated its position and stance

11 in the 2005 BART rule that a one-deciview change is

12 perceptible.

13 **Q.**   And the studies you just described that that's based on,

14 approximately how many participants were involved in those

15 studies?

16 **A.**   The three major studies, over 2,000 -- over 2500

17 combined laboratory studies.  Probably another hundred.  But

18 the major studies were based on the first three surveys done

19 in '79 and 1980 and 2000.

20 **Q.**   So thousands of participants?

21 **A.**   Yes.

22 **Q.**   Can you describe the studies that Dr. Tombach is relying

23 on in his comments about your use of a one-deciview change as

24 an appropriate increment of perceivable improvement in your

25 work for this case?

1  **A.**   Yes.  When deciview was first published, I believe, in

2  1994, Pitchford and Malm published a document, in 1994, which

3  first presented deciview in its finalized form.

4       Right after that, there were a number of reviews of

5  that -- Dr. Tombach actually wrote one, too -- discussing was

6  it proper to -- was one deciview truly the perceptible

7  increment.

8       At that point Dr. Ron Henry was funded by the Electric

9  Power Research Institute to do a number of studies of how

10 people perceive visual air quality also.  He tried to bring

11 into -- he tried to employ standard techniques used in what

12 we call colorimetry, which is the measure of colors by

13 laboratories, which has been developed over the last 50 years

14 for industrial processes, so that when you manufacture a red

15 cup, all your red cups look the same to people.  And there's

16 a very well thought out long process for doing laboratory

17 analysis of color.

18      Well, Dr. Henry developed an instrument called -- a

19 series of instruments called a VICAR, three different ones,

20 for a period of four to five years.  It uses a laboratory

21 concept of using an instrument in one eye and viewing a scene

22 with your other eye and trying to generate color matching.

23      His first study was with two people, his final study was

24 with eight people, and he concluded that human perception of

25 colors is confounded by a lot of issues.  One of them is the

1  transparency of the atmosphere; the other one is color

2  matching itself, using this particular instrument.  And his

3  conclusion was -- final conclusion was that there is a more

4  probability of detection by the public, general public, of a

5  one-deciview change.  His final paper resulted in about a 16

6  to 35 percent probability of detection.  He considered that

7  to be insignificant.

8       Those studies were also submitted to the EPA in the

9  2005 BART ruling.  EPA acknowledged those studies and still

10 said they stood by their position that a one-deciview change

11 is perceptible in Class I areas.

12 **Q.**   And how many participants were involved in Dr. Henry's

13 studies --

14 **A.**   Ten.

15 **Q.**   -- that Dr. Tombach is relying on in this case?

16 **A.**   Total of ten.

17 **Q.**   And who were those people?

18 **A.**   His first one was -- well, himself.  Dr. Henry was

19 involved in developing the instrumentation.  He had two

20 graduate students in his first one, and he had several other

21 people in the last one.  And he tried to pick what we would

22 call naive observers, nine graduate students, to look at his

23 changes, using his instrumentation.

24 **Q.**   So we're talking about the subjects of a study, and the

25 total subjects in the Dr. Henry studies that Dr. Tombach were

1  relying on were approximately 11?

2  **A.**    Ten.

3  **Q.**    And how many subjects were in the studies that the

4  Federal Land Managers have relied on to uniformly adopt the

5  one-deciview increment as the increment for perceivable

6  improvement?

7  **A.**    Over 2,000.

8  **Q.**    You also, Mr. Molenar, recall comments about your work

9  in this case that were contained in Dr. Tombach's report,

10  about the use of pictures --

11  **A.**    Yes.

12  **Q.**    -- to visualize model changes in visual air quality

13  resulting from the reductions in emissions that North

14  Carolina is seeking from TVA in this case.

15  **A.**    Yes.

16  **Q.**    You remember those comments?

17  **A.**    Yes.

18  **Q.**    Did those cause you to change your presentation and your

19  report in any way?

20  **A.**    No.

21  **Q.**    Can you explain to us why that didn't cause you to

22  change your presentation?

23  **A.**    Yes.  I'll try to be brief.

24         There is no doubt that a two-dimensional image, a

25  photographic print or a transparency displayed or a movie

1    does not match reality.  You do not have the

2    three-dimensional effect there.  However, the photographic

3    industry has gone to great lengths to create processes to

4    generate imagery that, while not measured exactly if you were

5    on site, reproduces a response in human beings that is

6    similar to what you see when you're on site.

7         We used transparencies, projected transparencies, and

8    computer images on screens to interpret people's response to

9    visibility.  We also tied those to on-site, looking out the

10   window of a three-dimensional scene and found that they were

11   very similar.

12        So the use of photographic prints to show changes in

13   visual air quality, we believe -- I believe, personally --

14   are to be used quite accurately; that we, as human beings,

15   having had the experience of looking at prints, know how to

16   interpret photographic images.  It is not exactly what I

17   would see out there, but it is what I would see if I took a

18   picture of it and was reviewing it back at the house.  So

19   changes are perceptible similarly.

20        The modeling that we've done has been tested in terms

21   of -- the radiative transfer modeling has been tested in a

22   number of studies which shows that our ability to project

23   colors in the atmosphere are quite good.  There has been a

24   few studies done looking at the on-site measurements versus

25   our photographic measurements run through this model.  Two

1  major ones.  One was in a Dallas/Fort Worth -- a study in

2  Dallas/Fort Worth looking at brown clouds there due to what

3  they thought were caused by power plants, looking at

4  perceptible changes.  It's in the report which Dr. Tombach

5  was editor of and principal investigator of.

6      In that particular case, I created images of

7  Dallas/Forth Worth that Dr. Ron Henry made measurements from,

8  and the results between on-site measurements and the imagery

9  was done quite well, and in that report they state that

10 photographic imagery, while having limitations, is still the

11 best way of doing it.

12     There was a second study done by Ron Henry, images of

13 Grand Canyon for the Project Mohave.  Those results were not

14 as good, and Dr. Henry and I had a lot of communication about

15 those results, about why they weren't as good.  The results

16 of that particular study was just done by Dr. Henry looking

17 at the images.  And that's in a report that's been sent to

18 Project Mohave.  It's a report that's not widely available.

19 I've got a copy of it and a few other people have.

20     But, in general, my experience is, after all these years

21 of doing this, is that people can accurately judge changes in

22 imagery as well as they can in the real world.

23 **Q.**  Okay.  SAMI used pictures and photographs?

24 **A.**  Yes.  SAMI report has images, actually, of the Great

25 Smoky Mountains in their executive summary.  VISTAS is using

1  it currently.  They have used WinHaze to generate, again, the

2  current conditions and their projected improvements in 2018.

3  Those images are available on the VISTAS website to the

4  public, and it's used -- it's been used in perception

5  studies.  It's been used in cost-benefit analysis studies by

6  the National Park Service, EPA.  Electric Power Research

7  Institute has used the computer imagery to generate images to

8  look at perception work, cost-benefit work, to look at

9  projected improvements in the future from the Regional Haze

10  Rule.  It's used on people's desktops just to play games with

11  it and see what would happen with it.

12  **Q.**  And Dr. Anne Smith, who is an economist who we're going

13  to hear some testimony from, apparently, on behalf of TVA,

14  has she used this approach in some of her work?

15  **A.**  Yes.  Dr. Smith, a few years ago, examined a

16  cost-benefit analysis, a willingness-to-pay analysis, for

17  what people would pay for changes in visibility.  It was

18  originally done by National Park Service in the early '90s

19  with real 35-millimeter slides.

20      The problem with real 35 millimeter slides is you can't

21  control accurately the changes.  You can only show whatever

22  you took pictures of.  I created a series of slides of

23  Shenandoah National Park using WinHaze, that she used in her

24  analysis of people's willingness to pay for changes in

25  visibility.

1    Also done this for, again, SO2 reductions in Cincinnati.

2   It was used by the State of Arizona to set their visibility

3   standards in Phoenix, Arizona, created imagery of the city

4   under various air quality levels, and then they surveyed the

5   public and said at what level is visibility unacceptable, and

6   they set their visibility standard based on that survey.

7   **Q.**   What about the use of split images, as you showed us in

8   your testimony?  Is that a generally-accepted approach?

9   **A.**   It's been used by a lot of people.  There are arguments

10  about split imagery.  Split imagery -- the eye-brain system

11  we've developed we look at edges.  See edges really well.

12  There's lots of reasons for that.  One, you want to step off

13  a cliff, you want to see edges.  When you split an image,

14  you're not changing the stimulus on the two images; you're

15  just putting them side by side with that long, straight line

16  and so you see the line better, but the two stimuli on either

17  side are not changing.  It does not modify the stimulus; it

18  allows the change in the stimulus to be seen a little easier.

19    In fact, WinHaze, when you split an image, brings up a

20  warning saying, if you split the image under very low levels

21  of change, you can enhance the perception of that change.  On

22  a large level of change, it has very little effect at all.

23  **Q.**   Is that a factor in this case?

24  **A.**   The images I show, those were enlarged changes.  They

25  had no effect.

1  **Q.**  And does the Park Service use split images to show

2  visual air quality changes?

3  **A.**   Yes.  The Park Service uses split images; EPA uses split

4  images; regional planning organizations have used split

5  images.  The EPA, the cover image on their 1996 National Air

6  Quality Report is a split image of the Great Smoky Mountains.

7  Actually, it's the same image as in the exhibits here.

8  **Q.**  So the use of pictures, split images and WinHaze to

9  model changes in visual air quality resulting from additional

10  air pollution controls, this was used in SAMI?

11  **A.**   Yes.

12  **Q.**  And it was used in VISTAS?

13  **A.**   Yes.

14  **Q.**  And TVA's involved with VISTAS as well as SAMI?

15  **A.**   Yes.

16  **Q.**  And has Dr. Tombach himself used these kinds of

17  photographic representation techniques to show air quality

18  changes?

19  **A.**   I believe he has.  He has a copy of WinHaze.  He is --

20  I've discussed it with him, his use of it.  I've never

21  actually been at a presentation where he's used it.  I have

22  to say that.

23  **Q.**  And just for clarification, the base photographs that

24  you used in your simulations, those are not natural

25  background; is that right?

1  **A.**    The base photographs in --

2  **Q.**    That you used in your study in this case.

3  **A.**    Yes.  Yes, that's not natural ground.

4  **Q.**    That is not natural background.

5        Can you explain the difference for us, please?

6  **A.**    Yeah.  The base images here are typically somewhere

7  around 15 to 20-mile visual range.  What would be considered

8  natural background on the east is a visibility of about 110

9  to 115-mile visible range, much cleaner than the base we use

10 here.

11 **Q.**    So the first photographs that we saw in each of your

12 series, those are not natural background photos?

13 **A.**    No.  Those are -- what STI did was model every day in

14 2002.  Every day but one, actually.  Missed December 31st.

15 They modeled what would be under the current emissions

16 scenarios.  And so they modeled every day, and then they

17 removed the emissions from TVA with additional controls and

18 then remodeled the day, and modeled the change on an

19 every-day period, and so that maximum changes occurred on the

20 haziest days, not on natural background days.

21        **MR. GOODSTEIN:**  Can I have a moment, Your Honor?  I

22 think we can pass the witness.  I just want to check with my

23 co-counsel for a minute.

24        **THE COURT:**  All right.

25        **(Pause in the proceedings.)**

1  BY MR. GOODSTEIN:

2  Q.   Mr. Molenar, if that analysis that you presented was --

3  if you looked at the scenario with controls and compared that

4  to natural background, how would that -- how would that

5  affect the change that is shown?

6  A.    If you were to --

7  Q.   Would it be a larger change or a smaller change?

8  A.   It would be larger and more frequent.  If you took the

9  model, decreasing in extinction for every day of 2002

10 projected by Sonoma Technology, instead of comparing it to

11 the visibility on that day, compared it to what we call

12 natural background, which is what the Regional Haze Rule

13 says, instead of 40-plus days per year of one-deciview

14 change, you'd have over 100-plus days per year of

15 one-deciview change, with the maximum changes being over 20

16 deciviews.

17 Q.   But what your analysis did was look at a base case

18 projected by Sonoma Technology --

19 A.    Right.

20 Q.   -- and compared that to the case with additional

21 controls, consistent with what is sought by North Carolina on

22 TVA plants, and then you showed us the difference --

23 A.    Yes.

24 Q.   -- between those two?

25 A.    Yes.

Case 1:06-cv-00020-LHT   Document 213   Filed 06/22/09   Page 141 of 142

1        **MR. GOODSTEIN:**  No further questions at this time,

2   Your Honor.

3        **THE COURT:**  All right.  We will take our noon

4   recess, and ask you to be back with us at 2:15.

5            **(Recess.)**

6                        * * * * * *

7                    **[END OF VOLUME 6A]**

8

9

10

11

12   UNITED STATES DISTRICT COURT

13   WESTERN DISTRICT OF NORTH CAROLINA

14   CERTIFICATE OF REPORTER

15

16        I certify that the foregoing transcript is a

17   true and correct transcript from the record of proceedings

18   in the above-entitled matter.

19            Dated this 22nd day of July, 2008.

20

21                            S/ Karen H. Miller

22                            _____
                             Karen H. Miller, RMR-CRR
                             Official Court Reporter
23

24

25