UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA      )
ex rel. Roy Cooper, Attorney )
General,                     )
          Plaintiff,         )      No. 1:06-CV-20
                             )
     vs.                     )      **VOLUME 7A**
                             **)**
TENNESSEE VALLEY AUTHORITY,  )      [1571-1711]
                             )
          Defendant.         )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 22, 2008

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

    JAMES C. GULICK, Senior Deputy Attorney General
    MARC BERNSTEIN, Special Deputy Attorney General
    North Carolina Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina

    MICHAEL D. GOODSTEIN, Esquire
    ANNE E. LYNCH, Esquire
    Resolution Law Group, P.C.
    5335 Wisconsin Avenue NW, Suite 360
    Washington, DC

On Behalf of the Defendant:

    FRANK H. LANCASTER, Senior Attorney
    HARRIET A. COOPER, Assistant General Counsel
    THOMAS F. FINE, Assistant General Counsel
    MARIA V. GILLEN, Assistant General Counsel
    Tennessee Valley Authority
    400 West Summit Hill Drive
    Knoxville, Tennessee

    KAREN H. MILLER, RMR-CRR  (828) 771-7217

# I N D E X

**PLAINTIFF  WITNESSES:**                              **PAGE**


BRUCE BUCKHEIT

   Direct Examination By Mr. Goodstein        1578
   Cross Examination By Ms. Gillen            1621
   Redirect Examination By Mr. Goodstein      1632


SUSAN TIERNEY

   Direct Examination Mr. Goodstein           1634

**PLAINTIFF'S EXHIBITS**

   **NUMBER**                                 **ADMITTED**

   377                                        1603
   378-382                                    1620
   391-394                                    1671
   397-400                                    1698
   401                                        1671
   403                                        1671
   404                                        1671
   405,406                                    1698
   415                                        1678
   421-423                                    1678
   435                                        1671
   436                                        1620
   458A                                       1620
   481, 482                                   1637

**DEFENDANT'S EXHIBITS:**

   **NUMBER**                                 **ADMITTED**

   518                                        1631

PROCEEDINGS

1          **THE COURT:**  All right.  Call your next witness.

Mr. Goodstein.

          **MR. GOODSTEIN:**  Thank you, Your Honor.  North

Carolina calls Bruce Buckheit.

          **MS. GILLEN:**  Your Honor TVA has a pending motion in

limine seeking to preclude Mr. Buckheit from testifying,

which I can summarize for you now if you wish.

          **MR. GOODSTEIN:**  Your Honor, our understanding of

their motion is that it's directed to Mr. Buckheit's expert

testimony.  And Mr. Buckheit is a fact witness as well --

          **MS. GILLEN:**  Actually --

          **MR. GOODSTEIN:**  -- and he's been designated as a

fact witness by North Carolina in its initial Rule 26

disclosure in this case.  So that's been disclosed to TVA for

a number of years.  Mr. Buckheit is --

          **MS. GILLEN:**  Excuse me.

          **MR. GOODSTEIN:**  -- is going to be testifying from

his personal knowledge, Your Honor.  He was an Air

Enforcement Director at the USEPA from 1996 until 2003, and,

during that time period, TVA was investigated by the USEPA

for violations of the Clean Air Act, and Mr. Buckheit was

personally and directly involved in that investigation.

          The investigation resulted in findings from USEPA

that TVA had violated the Clean Air Act at its plants in

1  Kentucky, Alabama and Tennessee, by a number of the units

2  that are implicated in this case, Your Honor, and what the

3  testimony will show is that some of the emissions, at least

4  some of the emissions that North Carolina is complaining

5  about and concerned about in this case are, in fact, unlawful

6  emissions under the Clean Air Act, and that testimony is

7  going to be based on Mr. Buckheit's personal knowledge.

8        So it's reliable.  It's directly relevant to this

9  case.  It's certainly relevant to North Carolina's claim of

10  nuisance, since some of the emissions that are part of the

11  nuisance have been caused by unlawful emissions, and it's

12  certainly relevant to TVA's defense that they're

13  substantially in compliance with law.

14        So what I'd suggest, Your Honor, is that we proceed

15  with Mr. Buckheit's testimony and take it as far as we can on

16  a factual basis, and then we can take up the objection on the

17  expert portion of it.

18        Mr. Buckheit is an expert.  He is an expert on

19  implementation of Clean Air Act.  He was not only a director

20  of the Air Enforcement Division of the EPA, but he's also

21  currently on a state air quality control board and he is an

22  expert on the implementation of the Clean Air Act, and he's

23  going to address some of the issues that have been raised in

24  TVA's expert reports, in particular, Dr. Andersen's expert

25  report.

         Dr. Anderson is also a former official of EPA.

1 She's going to be testifying for TVA regarding the

2 implications of the National Ambient Air Quality Standards

3 program.  Mr. Buckheit is prepared to provide some testimony

4 on that also, based on his experience and training.

5          **THE COURT:**  Was he on your list that you gave --

6          **MR. GOODSTEIN:**  Yes, sir.

7          **THE COURT:**  -- to TVA?  So they've had it all the

8 time?

9          **MR. GOODSTEIN:**  Yes.  As I said, he was identified

10 as a fact witness from day one in our Rule 26 disclosures,

11 and then when the expert reports were exchanged, we provided

12 an expert disclosure by Mr. Buckheit.

13          **THE COURT:**  And when was that?

14          **MR. GOODSTEIN:**  That was within 30 days of when we

15 received the TVA expert reports.  So it's an appropriate

16 rebuttal expert disclosure under the rules and under your

17 order, Your Honor, as we talked about the other day.  And

18 they had some time in deposition with Mr. Buckheit as a

19 designee of North Carolina.  He was certainly available to be

20 deposed fully on his expert disclosure report.  And it's been

21 very clear since we issued that disclosure that we would be

22 tendering him as an expert witness as well as a fact witness.

23          **THE COURT:**  All right.

24          **MS. GILLEN:**  Your Honor, if I may.  Thank you.

First of all, our motion is not about disclosure, a disclosure objection. The issue with Mr. Buckheit's testimony is he is an attorney, so that causes two issues. The area that he may be qualified to testify on is an area that the Court needs no help with, the law. And his area of expertise is the law. And so, therefore, he is not a toxicologist; he cannot testify to the standards of NAAQS, et cetera.

As to the first issue, what Mr. Goodstein characterizes as fact, factual testimony, I believe Mr. Buckheit is seeking to testify about alledged violations of the Clean Air Act that resulted from an investigation Mr. Buckheit led as the director of EPA's Air Enforcement Division, and that investigation and the Environment Appeals Board proceeding were assessed by the Eleventh Circuit in a case captioned *TVA v. Whitman*, which is recorded at 336 F.3d 1236.

The Eleventh Circuit exhaustively examined all the ways that that proceeding lacked the hallmarks of due process and summed up their findings by saying that the administrative compliance order that the EPA had issued to TVA is legally inconsequential and did not constitute final agency action. The Eleventh Circuit, therefore, did not assert jurisdiction and said the EPA must prove the existence of a CAA, Clean Air Act, violation in district court, and,

1  until then, TVA is free to ignore the administrative

2  compliance order without risking the imposition of penalties

3  for non-compliance with its terms.

4          The EPA never did prove those allegations in

5  District Court.  Mr. Buckheit seeks to come into this Court

6  and catalog those allegations and present them as fact, and

7  they are not.

8          Moreover, I believe Mr. Buckheit disclosed in his

9  report he's being paid $250 an hour, which seems somewhat

10 inconsistent with characterizing him as a fact witness.

11         As to the second issue, Mr. Buckheit opining on

12 areas outside of the law, he's a lawyer; he's not a

13 toxicologist.  He worked in EPA enforcement, not in policy

14 making.  He may have conferred with policy makers, but he,

15 himself, was not.  And so we would simply say that his

16 testimony is completely improper.

17         **MR. GOODSTEIN:**  Your Honor, we can lay a proper

18 foundation for it.  Mr. Buckheit has a law degree.  He also

19 has two degrees in physics.

20         Thank you, Your Honor.

21         **THE COURT:**  All right.  I'll let him at least start

22 his testimony, and I'll rule as we go along as to the

23 objections that are made.

24         **MR. GOODSTEIN:**  Thank you, Your Honor.

25         **MS. GILLEN:**  Thank you, Your Honor.

1        **MR. GOODSTEIN:**  If I may approach, Your Honor, I

2   have a binder for Mr. Buckheit's exhibits for the Court.  It

3   also has a certified copy of the administrative order, one of

4   Mr. Buckheit's exhibits, in the inside cover.

5             Mr. Buckheit, can you step down so you can be

6   sworn, please?

7                         **BRUCE BUCKHEIT,**

8   **being duly sworn, was examined and testified as follows:**

9                       **DIRECT EXAMINATION**

10  **BY MR. GOODSTEIN:**

11  **Q.**   Good morning, Mr. Buckheit.  Can you state your full

12  name for the record, please.

13  **A.**   Bruce Charles Buckheit.

14  **Q.**   And how are you currently employed, Mr. Buckheit?

15  **A.**   Well, I like to say I'm mostly retired, but I do some

16  independent consulting for a variety of clients.

17  **Q.**   And you retired from the position of director of the Air

18  Enforcement Division of the US Environmental Protection

19  Agency?

20  **A.**   I did.

21  **Q.**   And you were in that position from 1996 until 2003?

22  **A.**   1997.

23  **Q.**   1996 [sic].  I'm sorry.  1996 until 2003.

24        I'm going to show you the first exhibit in order in your

25  binder, Mr. Buckheit.  Should be Plaintiff's Exhibit 436.

1  And is that a copy of your CV?

2  **A.**   It is.

3  **Q.**   And you have described there your environmental

4  consulting practice and your membership -- or your position

5  as a member at the Virginia Air Pollution Control Group?

6  **A.**   That's correct.

7  **Q.**   Can you first give us an overview of your current

8  environmental consulting.

9  **A.**   Yes.  My environmental consulting opportunities include

10  assignments for both industry, states, and occasionally

11  environmental groups, but primarily industry, states and

12  state groups.  They've ranged in variety of interesting

13  opportunities.

14     One project that I recently engaged in was for a company

15  that develops marketing opportunities or business

16  opportunities for large corporations, and it was at the

17  request of a Fortune 100 company to look at market

18  opportunities for that company to engage in $CO_2$ gas

19  separation business opportunities.  The company brought

20  together a multidisciplinary team to look at that issue for

21  it, and my role on the team was, among other things, to look

22  at what regulatory drivers or limitations there might be on

23  the companies thinking to join -- this is a global warming

24  issue -- to look at whether there would be market opportunity

25  for the company to get into the separating $CO_2$ gases from

1   other gases for purposes of sequestration.

2       I have drafted testimony for state agencies respecting

3   preserving state's rights in CO2 legislation that might be

4   pending.

5       I have an agent project that I just finished, again for

6   the association -- the National Association of Clean Air

7   Agencies is the professional association of the managers of

8   Clean Air Programs at the state and local levels, and they

9   retained me to help them put together a model permit to use

10  for industrial boilers under the EPA's Air Toxics Program.

11  Because of some court development, the states now have to do

12  this job, and they retained me to help them figure out how to

13  do it; and that involved a lot of data gathering and data

14  crunching about what the current capacities and current

15  emissions of industrial boilers across the country were,

16  sub-categorizing it into what technologies might be available

17  to reduce those emissions, and then applying the tests that

18  Congress and the regulations set out to develop, what the

19  permit limits should be and what technologies might be

20  available to meet those permit limits.  This is for

21  industrial, not for EGUs or electric generating units.  And

22  that project just finished in June.

23      I had a large project right after Katrina with respect

24  to solid waste management issues, how and where solid waste

25  from the Katrina cleanup should properly be managed.

 1      Those are some of the types of projects that I've been

 2 involved with in my consulting activities.

 3      As a member of the Virginia Air Pollution Control

 4 Board -- that board is a statutory board under the Virginia

 5 laws.  The governor appoints -- it was originally five; now

 6 it's seven members.  Each member is required by the statute

 7 to be an expert in air pollution matters.  They're not all

 8 lawyers, by any stretch.  One is a professor of environmental

 9 policy.  The other is an engineer by training.  So you have

10 to have expertise in air pollution matters, but it's not a

11 legal board.

12      The board has the direct authority in Virginia to

13 implement Virginia air laws, and we delegate to the Virginia

14 DEQ the day-to-day management of it.  But when our

15 significant matters come up, the board can and often does

16 reserve those matters unto itself.  The board -- we adopt

17 supervisions.  We adopt the rules that Virginia needs to

18 adopt under federal law.  They come to us to be approved and

19 entered.  We set policy.  I'm working right now on a

20 five-year plan for Virginia, where it's going to take itself

21 over the next five years.

22      And we have engaged in permitting activities.  Most

23 notably, over the last year and a half, we had a large

24 controversial matter respecting the power plant that's just

25 south of Reagan National Airport, some very complex issues.

1       And then, just a few weeks ago, we were down in Wise

2   County where we -- the board took testimony and made

3   determinations as to what the appropriate emission

4   limitations should be for the new Dominion Power Plant in

5   Virginia City in western Virginia.  So we were the permitting

6   authority for that.  I spent several weeks researching what

7   might be comparable units in the country, identified one in

8   Puerto Rico and one in Pennsylvania, with the basis of the

9   study being the emissions limitations on this new power

10  plant.

11  **Q.**   And you are appointed to the Virginia Air Pollution

12  Control Board for a four-year term by the governor, Governor

13  Kaine?

14  **A.**   That's correct.  And that position also requires

15  confirmation by the Virginia General Assembly.

16  **Q.**   Looking at your CV, Mr. Buckheit, can you summarize your

17  educational background for us, please.

18  **A.**   I have a bachelor's and master's degree in physics, and

19  then I turned to the dark side and went to law school.

20  **Q.**   Um-hum.

21  **A.**   And graduated from William and Mary in 1974.

22  **Q.**   And you were employed by the federal government in the

23  administration and enforcement of federal laws related to

24  environment and safety, from approximately 1974 until 2003?

25  **A.**   That's correct.  December, 2003.

Q.   Can you summarize your experience there?

A.   My first ten years in the federal government, I was in the Office of Chief Counsel for the National Highway Traffic and Safety Administration.  And the Chief Counsel's office has four branches, if you will, and I, during my career, rotated through each of them.

     While in the General Law Division, I was assigned responsibility for assuring compliance by the National Highway Traffic and Safety Administration, or NHTSA, with environmental laws.  And there came a point where the administrator was pursuing a regulation that would require air bags in cars, and I noted that that action would likely require preparation of a environmental impact statement.  And since NHTSA is a small agency, I was tasked by the administrator to author the environmental impact statement for air bags.

     This involved testing, since what's in an air bag is sodium azide -- it's rocket fuel -- which, when combusted, forms nitrogen and NaOH, both of which are harmless.  But sodium azide itself is mutagenic, carcinogenic, and there were concerns of what would happen if cars were shredded at the end of their useful lives, and so we ran a number of tests where we actually shredded vehicles and took measurements -- this was at my direction -- and I ultimately wrote the environmental impact statement for air bags.

1    I also spent several years in the rule-making section,

2  where I drafted auto safety rules applied to cars and trucks

3  and buses, working with the engineers.  Most of my time was

4  spent in the litigation section, where we pursued violations

5  of federal motor vehicle safety standards and safety defect

6  findings by the agency and enforced those findings.

7       Again, NHTSA is a small shop and there were

8  opportunities for me to use both sides of my education early

9  on.  There was a famous defect case involving the Pinto, Ford

10  Pinto automobile, which was highly controversial and well

11  publicized.  At about the same time as that matter was

12  proceeding, a General Motors vehicle had been tested by our

13  engineers and, in a rear-end crash test, leaked, and that

14  would have been extremely controversial with General Motors

15  since Ford was undergoing the same highly publicized problem.

16  And so I was -- General Motors challenged the agency's

17  testing, and I was cast to go out to California for several

18  months at the test site, review our test procedures, see if

19  they were accurate, and I identified that there were some

20  inaccuracies.  We corrected the design of the test equipment,

21  re-ran the tests, and General Motors acknowledged that the

22  testing was quite defensible and then went ahead and recalled

23  the vehicle.

24       So my career at NHTSA was sort of a mix of law and

25  technical issues.  And after ten years there, I was recruited

1    to come on with the Justice Department.  They were expanding

2    the old Pollution Control Division into the Environmental

3    Enforcement Section.  And I worked there for a number of

4    years, initially, as counsel, and then as senior counsel in

5    the Environmental Enforcement Section.

6         There, in 1984, I litigated my first research review

7    case.  I say -- I prosecuted by myself -- and did a number of

8    solid waste cases, a number of superfund cases, Clean Water

9    Act cases and Clean Air Act cases, including cases involving

10   steel mills, automobiles, almost any industrial sector you

11   can think of.

12        In '96, I was again recruited to apply for the job of

13   director of the Air Enforcement Division at the EPA.

14   Q.   And I'm going to refer you to Plaintiff's 458A.  And can

15   you identify that?  It should be the next one in order in the

16   book.

17        Is this a description of the Air Enforcement Division

18   Director position that you assumed in 1996?

19   A.   Yes.  This looks like EPA's current web page that

20   describes the job for the public.  Adam Kushner is the fellow

21   who succeeded me as Air Enforcement Director.

22   Q.   So how would you describe the job, Mr. Buckheit?

23   A.   Well, the position is in senior executive service.  It's

24   a policy and management job.  The shop is comprised of

25   engineers, scientists, and lawyers who work to establish

1  policy but also get involved in the direct investigation and

2  enforcement of what's called nationally significant cases.

3      Most enforcement investigation is conducted at the

4  regional level with regional engineers and regional counsel.

5  Cases are either pursued administratively in the regions or

6  they're referred to the Justice Department for prosecution.

7      What our shop does is it sets policy and seeks to

8  establish consistency and work with states, again to set

9  policy and establish consistency.

10      I noticed in one of the reports some discussion of the

11  credible evidence rule.  That rule was prepared at our shop.

12  And that is the bulk of the work that we do on the stationary

13  source side.

14      On the mobile source side -- that's cars and trucks and

15  buses -- there is no delegation to the regions or states and

16  so our attorneys and engineers do the investigations directly

17  and either pursue the cases themselves or work with the

18  Justice Department to pursue the cases.  Many of those cases

19  are small matters involving gas stations that don't convert

20  from winter fuel to summer fuel on time and things like that.

21  And so we have a field office out in Denver and a presence in

22  Ann Arbor, as well as our headquarters staff.

23      With respect to nationally significant cases, however,

24  that's where, you know, the office will step in and directly

25  supervise and manage something if it's really a major, major

1    matter.

2    **Q.**    So what were your duties and responsibilities as Air

3    Enforcement Director at USEPA?

4    **A.**    Well, I think I've pretty much described it.  It's to

5    set policy, to manage the shop, to interact with senior

6    officials at EPA and the Justice Department and at the

7    states, again, to develop policies that are used to

8    consistently enforce the Clean Air Act across the country.

9         As an example, I think one of my biggest accomplishments

10   at EPA was to change the model of how investigations are

11   conducted or how the agency directs its resources.  For many

12   years, you had what was called inspection base model, where

13   someone would go out and do an inspection, write up a report,

14   and then whatever happened, happened.  And as a workload

15   management tool, regions were graded, if you will, on how

16   many inspections they did.  And so that, over time, led to

17   what we call drive-by inspections, where if you're going to

18   be measured by how many inspections you do, maybe the best

19   way to get your numbers up is to do a number of inspections

20   on matters that don't -- aren't really significant.  And so

21   you might identify what we call ankle-biting violations.  And

22   there was always some level of complaint from industry over

23   that practice, and I had thought it was not a wise use of our

24   resources, so I worked to change how EPA accounted for its

25   resources, and that was basically to give regions credit

1  within our management system for investigations as opposed to

2  simple inspections.  And in this way, one would encourage

3  regions to invest more heavily in matters that might take a

4  longer time to develop the case, but the case would be more

5  significant.  And so that's the kind of policy work that I

6  was involved in.

7  **Q.**   When you were Air Enforcement Director from 1996 until

8  2003, were you involved in investigations of New Source

9  Review violations?

10 **A.**   Yes.  One of the --

11 **Q.**   Can you tell us what that is first, and then explain how

12 you were involved.

13 **A.**   New Source Review was one of the several clean air

14 programs that, in its initial form, calls for a review, an

15 environmental review of new sources.  If you want to build a

16 new power plant, such as the one that we just permitted in

17 Virginia, you need to come in and the agency will conduct an

18 environmental review.  As part of that, the agency will look

19 at what is, quote, best available control technology, which,

20 in shorthand, is just model pollution controls, and before

21 you can commence construction, you must get a permit.  If

22 you're in an area where the health standards are being met,

23 an attainment area, that's called a PSD permit.  If it's a

24 nonattainment area, it's called a nonattainment New Source

25 Review Permit.

1    In the '70s, late '70s, Congress adapted that

2 requirement, changed that requirement, so that existing

3 sources which had previously been grandfathered would have to

4 undergo New Source Review if they modified the plant in such

5 a way that emissions were increased.

6    I did my first New Source Review case, as I mentioned,

7 in 1984, but late in my DOJ career, EPA had stumbled over an

8 industry-wide problem with the wood products industry where

9 it had across-the-board violations, and I led the DOJ team,

10 working with EPA, to resolve the first of those, which was

11 the Louisiana Pacific case.  The agency then serially, one

12 after the other addressed those issues with respect to the

13 other companies in the industry, and that was a process that

14 took almost ten years to work through the industry.  And this

15 is sort of important because it affected both my thinking and

16 the agency's thinking as to how to proceed on a policy level

17 where there's detected industry-wide problems.  We discovered

18 at one point, I think in the late '90s, an industry-wide

19 problem with respect to heavy duty diesel engines -- and I'm

20 straying from NSR, but I'll come back -- where each of the

21 manufacturers, each of the makers and manufacturers of heavy

22 duty diesels had incorporated different software in the

23 engine control computers that basically turn off the

24 pollution control system when they were on the highway and

25 turned it back on when the system sensed it was being tested

1    for emissions.  And we engaged in an industry-wide settlement

2    there and found that that was successful because each of the

3    companies knew that their competitors were at the same time

4    forced to change how they did business and comply with the

5    law.

6         So, from that experience, we learned that if you have an

7    industry-wide problem, it's better to approach it

8    industry-wide to try to resolve it rather than one at a time,

9    and that guided our thinking as we proceeded with subsequent

10   issues.

11        We learned at one point in time that there were

12   widespread violations of New Source Review requirements in

13   three industry sectors.

14        One sector was the refinery sector.  And there, our very

15   sophisticated investigative techniques included hiring a

16   college kid to go through back issues of the "Oil & Gas

17   Journal," where the industry basically touted its large

18   expansions of existing refineries.

19        What was happening at the time was the number of

20   refineries was shrinking as the mom and pop, smaller

21   refineries, were gobbled up by the larger refineries, and

22   capacity at the remaining refineries expanded.  So the

23   overall refinement capacity in the country stayed the same,

24   but you only had half as many refineries.  To us, as

25   enforcers of these New Source Review rules, that suggested

Case 1:06-cv-00020-LHT  Document 214  Filed 06/22/09  Page 20 of 141

1  that there had to be capacity expansions going on at the

2  existing plants, and so we embarked on, industry-wide, to

3  start negotiations, you know, with each of the companies, but

4  on a parallel basis, to try to resolve those issues.  And, in

5  large part, we were successful in doing that.

6      We discovered similar issues in the pulp and paper

7  industry and in the coal-fired power plant industry.  With

8  respect to the coal-fired power plants --

9          **MS. GILLEN:**  Your Honor, I think we are starting to

10  get into a territory where TVA would object to this as

11  improper legal testimony, and I believe Mr. Buckheit is

12  starting to characterize EPA's enforcement position carried

13  out in litigation that is still proceeding and issues that

14  are still undecided in the courts of law across the country.

15          **MR. GOODSTEIN:**  Your Honor, I think this objection

16  has been overruled.

17          **THE COURT:**  It has, and is now overruled, yes.

18          **MR. GOODSTEIN:**  Thank you, Your Honor.

19          **THE WITNESS:**  With respect to the coal-fired power

20  plants, or EGUs, electric generating units, we read, in the

21  newspaper actually, that one part of EPA was commenting on

22  deregulation proposals in the environmental impact statement

23  associated with deregulating the generating industry, that

24  deregulation might lead to increased use of coal-fired power

25  plants, particularly in the west.  And again, if you're

1  enforcing the New Source Review rules, that's sort of a

2  cautionary flag.  We thought at the time that we would really

3  get into compliance assistance and that we would warn the

4  industry that if they expand their operations by way of

5  physical changes that increase emissions, that they should be

6  careful to go through the permitting process.  But as we

7  started looking into it, we found that, over two decades, the

8  industry had been modifying and making physical changes to

9  their plants in a way that increased annual emissions and

10 should have gone through the permit process and should have

11 put on modern controls.

12        We started out with an initial group of ten or

13 twelve companies that we looked at:  American Electric Power,

14 Synergy, TVA, and others.  The investigations proceeded by

15 having our inspectors, either regional or headquarters folks,

16 go into the plants and obtain records.  They are obtained

17 records that, for us, indicated what I would call probable

18 cause, although it's not a legal requirement, more a common

19 sense requirement.

20        We have authority at EPA to issue what's called 114

21 letters.  These are mandatory information-gathering documents

22 that are issued under Section 114 of the Clean Air Act.  But

23 we don't issue those, because they can have a fair amount of

24 work associated with it and have a burden on the respondent.

25 We don't issue those unless we have some real reason to think

1   that there may be a problem there.

2           And so after our initial gathering of information

3   from the plants and we thought we had reason to go further,

4   we issued a series of 114 letters to each of the companies

5   that we were looking at.

6           And I remember going to Knoxville with my staff, my

7   regional staff, to sit down and talk through these issues

8   with TVA, as we did with each of the other companies, to

9   indicate to them that we would be sending a 114 request, to

10  let us know if there was some way of rephrasing it, that if

11  we inadvertently write our request in a way that greatly

12  magnifies the burden, of course we would work with them,

13  et cetera.  But we talked through the issues that we thought

14  we were seeing and identified them, and that we would be

15  proceeding with a formal investigation.

16  **Q.**   Can you tell us what it means for a plant to be

17  grandfathered under the Clean Air Act?

18  **A.**   Yeah.  In the early days of the Clean Air Act, it was a

19  fundamental compromise that Congress looked at, and that was

20  that new sources should put on the best controls as they're

21  being built.  And so we have two programs, one, the New

22  Source Review program, but also the New Source Performance

23  Standards program that drive in that direction.

24          Originally, it was thought that existing sources would

25  be phased out over time, so why bother, why spend the money.

1  So they were called grandfathered.  They were excepted from

2  the New Source requirements.  But then, after a few years,

3  Congress realized this wasn't working and in 1977 amended the

4  statute to require that existing sources be treated as new

5  sources if those folks were modified.  Congress could have

6  picked a dollar trigger or an age or some other trigger to

7  say when a modification could occur, but Congress accepted

8  EPA's arguments that what the Clean Air Act should care about

9  is emissions, not dollars, not age, and so the trigger was if

10 there was a physical change or change in method of operation

11 that resulted in an increase in emissions, then, prior to

12 doing such a project, you are required to get a permit and

13 put on modern controls.

14 Q.   So could you tell us what a life extension project is,

15 based on this experience in the coal-fired power plant

16 investigation under NSR?

17 A.   Well, originally, most companies -- this is as we

18 learned in our investigation.  Most utilities had it in mind

19 that there would be transition to solar and nuclear power

20 facilities, that electricity would be too cheap to meter.

21 That was sort of the popular thinking at the time.  And so

22 they didn't worry about maintaining sort of in perpetuity

23 their coal-fired fleet because they didn't think they'd need

24 their coal-fired fleets anymore.  And in the '40s and '50s --

25 well, I'd say the '40s, prior to air pollution laws, it was

1   common for coal-fired power plants to have a useful life of

2   30 years and then the plant would be scrapped because newer

3   designs would be more efficient.

4       Two things happened.  One is we had Three Mile Island

5   and the other is we have the advent of air pollution laws

6   that require costly controls.  And so the dynamic changed in

7   the industry.

8       When they realized that they weren't going to be

9   building a substantial fleet of new nuclear plants, the

10  companies generally, TVA included, looked back at their

11  existing fleet of coal-fired power plants and asked

12  themselves:  What do we have to do to be able to supply power

13  to this country given that we're not going to be building new

14  nuclear plants?  What do we have to do?  Building new plants

15  is expensive and we have to put those pesky pollution

16  controls on them.  What can we do to extend the life of our

17  existing units past the nominal 30-year design cycle.

18      And so we saw Duke and, also, TVA had a very specific

19  life-extension program, and these would be projects that, at

20  least EPA believed, were not routine.  They would be -- it

21  would involve taking out substantial large components of the

22  boiler and replacing them in one piece.  So instead of the

23  week-by-week or seasonal maintenance where -- I guess maybe I

24  should back up.

25      I know, Your Honor, you've heard this, but a boiler in

1  the earliest days was just simply a pot of water that you

2  boiled to make steam.  That was inefficient and tended to

3  explode.  And so these days boilers are miles of pipe filled

4  with water, and we heat the pipe, and that then heats the

5  water to generate the steam.  And you have several bundles of

6  these pipes with water walls around the side.  Then you have

7  other bundles that serve basically the purpose of either

8  increasing the temperature of the steam or things called

9  economizers.  You're trying to recover the heat that would be

10  most energy efficient.

11      And, basically, we were looking at projects that were

12  significant capital projects but weren't the types of things

13  that you'd do on an ongoing basis, maybe once in a lifetime

14  in a plant, if ever.  We replaced the whole box, all of the

15  them, instead of, on a weekend, patching and welding pipes

16  that might be leaking.

17      And so those are the kinds of things that different

18  companies engaged in in long-term planning, significant

19  capital expenditures to extend out the life of these plants,

20  now that they were operating in a nuclear-free world.

21  **Q.**   So the New Source Review requirements were triggered by

22  a major modification that increased emissions substantially.

23  What is the requirement for that unit?

24  **A.**   The requirement is, before you do such a project, you

25  get a permit, and the permit does require best available

1  control technology.

2  **Q.**    What does that mean?

3  **A.**    Well, best available control technology is a

4  determination made by a permitting agency.  In practical

5  terms, for EGUs, it would mean FGDs for $SO_2$.  There would be

6  some argument about whether in 1980 it would be SCR or some

7  other NOx control device.  But as time progressed, certainly

8  into the '90s, that SCR technology became more and more

9  accepted as BACT.

10  **Q.**    Can you describe for us your involvement in the NSR

11  investigation of TVA when you were director of the Air

12  Enforcement Division?

13  **A.**    Yes.  As you can imagine, this matter was highly

14  sensitive within EPA.  This was extremely controversial.  It

15  was briefed, certainly, to the Assistant Administrator for

16  Enforcement, the Assistant Administrator for Air, General

17  Counsel to the Administrator, to the Assistant Attorney

18  General at the Justice Department -- I think to the Attorney

19  General of the Justice Department, but by the EPA, just short

20  of the DOJ.

21      We could not afford to be wrong.  If we were going to go

22  out and make these public accusations, we had to be correct.

23  And so it would be my natural inclination to do this, but,

24  also, my management insisted that I be directly and

25  personally involved in looking at these issues.  Again, we

1  had to be right.

2      And so I visited with our attorneys, DOJ attorneys, our

3  engineers, frequently.  They would bring to me the evidence,

4  the calculations and the arguments, and I would review it

5  personally and then brief my management on the status of

6  where we're at.

7      I personally reviewed a number of TVA documents.  One of

8  our principal sources of information about whether a project

9  should be assumed to have an emissions increase was TVA's

10  procurement documents, their internal documents.  We

11  recognized that, as with any large organization, if you want

12  to obtain 20 or $40 million in capital in your budget to do a

13  project that you would have to justify it.

14      So we looked at EPA -- TVA's internal justifications.

15  What was TVA telling their management was the purpose and

16  effect of these projects?  And I personally reviewed a number

17  of those documents.

18  **Q.**  And can you describe for us what the investigation that

19  you were personally involved in at TVA showed with regard to

20  the TVA system?

21          **MS. GILLEN:**  Your Honor, I believe we're getting

22  into some hearsay.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  What I personally saw and personally

25  reviewed was evidence that showed a number of projects

1  conducted by TVA for the express purpose of reducing what we

2  call forced outages.  These are outages where there is

3  demand, but your system breaks and so you have to go off line

4  and you can't service your demand.  If you reduce those

5  incidents of forced outages, you increase your utilization

6  during the year, and your annual emissions, necessarily.  And

7  I personally reviewed and noted a number of instances where

8  TVA had conducted projects, quite significant projects, in

9  fact, some of them most significant projects we saw in the

10 course of our investigation across the industry, that I felt,

11 as did others in EPA and the Justice Department, constituted

12 violations of the Clean Air Act.

13 **Q.**   And what year was this?

14 **A.**   Our investigations commenced in -- I believe this is

15 industry-wide -- in February of 1997, and I think we were in

16 a position of making our findings in early 2000.

17 **Q.**   And to your knowledge, have these violations that were

18 determined by EPA's investigation, had they been resolved;

19 had they been addressed by TVA?

20 **A.**   No, they had not.

21 **Q.**   And you were involved in some interactions with TVA

22 during that time period, during the investigation?

23 **A.**   Yes.  We very much hoped that EPA would -- we hoped to

24 be able to settle this matter with TVA.  We hoped that, as a

25 federal agency, TVA would step up and be basically a leader.

1    **MS. GILLEN:** Your Honor, I'd like to object to

2  this, too. As he did in his expert report, I think

3  Mr. Buckheit is going to begin to reveal the content of

4  confidential settlement negotiations with TVA and perhaps

5  other utilities, and we object to that.

6    **MR. GOODSTEIN:** Your Honor, that was not my

7  question. My question was, as part of the investigation, was

8  Mr. Buckheit, personally involved in the meetings with TVA to

9  deal with the Section 114 information request issued by EPA,

10  and was he involved in receipt of documents and interviewing

11  of TVA employees during that investigation.

12    **THE WITNESS:** I'm sorry. Yes, I was.

13    **THE COURT:** All right. I'll let him answer that

14  question.

15    **MR. GOODSTEIN:** Thank you, Your Honor.

16    **THE WITNESS:** Yes, I was.

17  **BY MR. GOODSTEIN:**

18  **Q.** Can you describe for us your involvement in those

19  activities?

20  **A.** I reviewed the 114 requests before they went out to

21  ensure that they were consistent with those being submitted

22  to others and to make sure that they were not unnecessarily

23  burdensome.

24    I again, as I mentioned, went to Knoxville prior to that

25  to visit with TVA folks to discuss our investigation, talking

1  about what we would be seeking, and, thereafter, I interacted

2  with my staff and regional staff who were reviewing the

3  responses provided by TVA.

4  **Q.**   And was there an administrative order and request for

5  information issued during that time period by USEPA Region 4?

6  **A.**   I'm sort of puzzled because there were a number of them.

7  So, yes.

8  **Q.**   Let me show you Plaintiff's Exhibit 377 for

9  identification.  Can you identify that document?

10          **MS. GILLEN:**  Your Honor, I'm cognizant of your

11 ruling, but TVA has an objection to this administrative

12 compliance order, and this is the -- this and many others

13 were found to be without legal consequence by the United

14 States Court of Appeals for the Eleventh Circuit in *TVA v.*

15 *Whitman*.

16          **THE COURT:**  Yes, but they're not my circuit.

17          **MS. GILLEN:**  I understand that, Your Honor.  I just

18 wanted to note the objection to this exhibit for the record.

19          **THE COURT:**  All right.

20          **THE WITNESS:**  I'm familiar with this document.

21 **BY MR. GOODSTEIN:**

22 **Q.**   Can you explain to us what it is.  Can you identify it

23 for us and explain what it shows.

24 **A.**   Well, this is the fourth amended order.  There were a

25 series of orders issued by Region 4 in coordination with my

1  office and myself that represented our findings at the

2  conclusion, at that point in our investigation.

3      The reason there were a series of amended orders was

4  basically to extend the compliance date of the order.  Under

5  the act, we're only allowed -- EPA orders have a one-year

6  life and cannot be renewed, so this was by consent of TVA to

7  extend the compliance dates to allow discussions to occur.

8  **Q.**   And what did this order require of TVA?

9  **A.**   Well, as we go through it, the order required several

10 things.  One, it required them to obtain permits and put on

11 controls, and it required them to do an audit of other units

12 within their system other than those where we had

13 specifically identified violations.

14     TVA had advised us that in the course of transferring a

15 number of their records from paper to electronic storage, or

16 microfiche storage -- I don't recall which -- they were

17 unable to locate a substantial portion of the records

18 relating to a number of their plants, and so the audit

19 provision was an effort to direct a more in-depth search for

20 those documents.  We felt that while we had information

21 sufficient to identify the violations that we did, we had not

22 received enough information to fully characterize TVA's

23 system.

24 **Q.**   And did it contain an additional request for information

25 and an audit provision?

1  **A.**   Yes.  I think I just discussed the audit provision.

2  **Q.**   Okay.  So it also contained an additional request for

3  information.

4  **A.**   It says it on the title.  I'll have to look through it.

5  **Q.**   Okay.  And it required TVA to pursue permits for the

6  subject units?

7  **A.**   Yes.

8         **MR. GOODSTEIN:**  Your Honor, at this time we offer

9  Plaintiff's Exhibit 377 into evidence, and we have provided a

10 certified copy to the Court and a copy of the certification

11 to counsel, which we obtained from EPA Region 4.

12         **THE COURT:**  All right.  Let it be admitted.

13         **(Plaintiff's Exhibit 377 received.)**

14 **BY MR. GOODSTEIN:**

15 **Q.**   Mr. Buckheit, could you describe for us what happened

16 after this order was issued and TVA received it?

17 **A.**   There were a number of discussions at both staff level

18 and the administrator, the TVA board, and in the end the

19 matter wasn't resolved amicably.

20     And the Clean Air Act provides that, in response to,

21 when an administrative order is issued, the respondent has an

22 opportunity to confer with the regional administrator.

23 Again, this was obviously a nationally significant issue, and

24 so the administrator directed that the order be reviewed in

25 detail by the Environmental Appeals Board.  The regional

1  administrator granted an opportunity, of course, to confer

2  with TVA administrator, and proceeded, in our view,

3  represented.

4       The agency has a number of administrative law judges who

5  hear day-to-day administrative enforcement matters, and it

6  also has a -- then, I think it was three-member.  It might be

7  four or five members now -- Environmental Appeals Board that

8  sort of served as an appellate review for the ALJ processes.

9       In addition, the EAB is the direct, sort of, court of

10  appeals within the EPA administrative system.  It receives

11  direct challenges to New Source Review permits issued by the

12  regions.  And with that instruction, the EAB acts as the

13  administrator.  So this is -- the EAB decision is the

14  administrator speaking.

15       The EAB charged one of the administrative law judges to

16  conduct an evidentiary hearing and gather information, but

17  not make findings, and then the EAB issued it's own lengthy

18  detailed view of the allegations.  A number of the alleged

19  violations in the amended order were knocked out by the EAB

20  for one reason or another, but, in the end, the EAB

21  determined, as basically EPA's view, that a number of major

22  and minor NSR violations had occurred.

23  Q.   I'm going to show you what's been marked as Plaintiff's

24  Exhibits 378 and 379 for identification.  And can you

25  identify those and explain what they show?

1   **A.**   The two tables that are shown are excerpts from the EAB

2   decision.  Except for the title.  The tables appear as part

3   of the text in the decision.  And they are reflective of the

4   determinations of the Environmental  Appeals Board as to --

5   in 378, it's the violations of the NSR rules with respect to

6   the noted pollutants that were determined by the EAB.  Thus,

7   you see at Allen Unit 3, the EAB decided that violations of

8   the New Source Review rules had occurred with respect to both

9   NOx and SO2.

10  **Q.**   All right.

11  **A.**   379 is violations of what's called minor New Resource

12  Review rules.  These are state rules that operate sort of at

13  a level below the major NSR rules.  They are violations of

14  the Clean Air Act, but, in my mind, they're not as

15  significant as the ones on the prior exhibit.

16  **Q.**   Can you explain for us why you viewed the violations on

17  Plaintiff's Exhibit 378 as significant?

18  **A.**   They're more significant in my view because of the

19  consequences that flow.  Minor NSR rules are state rules that

20  either are used to regulate minor sources, small sources of

21  air pollution, or sort of as a gatekeeper.

22       In many states, the major New Source Review threshold,

23  for instance, for SO2, if a project has an increase of

24  40-tons a year, then it's subject.  The minor New Source

25  Review rule would apply to a project that had any emission

1  increase, and it serves as a gatekeeper so the state can

2  check to see -- review the calculations of emissions of the

3  company in terms of whether, in fact, the modification is

4  causing a major increase.

5  **Q.**    Okay.  So let's look at Plaintiff's Exhibit 378.

6       Can you tell us why these violations of Clean Air Act

7  New Source Review provisions confirmed by the USEPA and

8  Environmental Appeals Board are significant to you based on

9  your experience?

10 **A.**    They're significant, I guess, for two reasons.  One, the

11 New Source Review provisions are among the most significant

12 provisions in the act in terms of what they require a company

13 to do.  And this is part of our focus.

14      If you look at a violation of, for instance, a permit

15 limit and you determine that a company is exceeding the

16 permit limit by 10 percent 10 percent of the time, that might

17 be, in many folks' minds, a significant matter, and in some

18 circumstances it might be.  However, that would result in a

19 one percent increase in emissions; a 10 percent increase

20 10 percent of the time.  With a New Source Review violation,

21 you're basically exceeding the appropriate limits by a factor

22 of 9 all the time.  So you have a 900 percent increase.

23      So New Source Review violations generally are considered

24 by the agency and by me as very significant violations.

25      In addition, this is -- TVA is one of the largest

1  systems in the country.  At the time we were looking at this,

2  they were either first or second for SO2/NOx emissions in the

3  country.  They were first in one and second in the other, and

4  AEP was the other leader in the category.

5      These are some very large units that emit very large

6  quantities of air pollution, and some of the modifications

7  that we saw were extremely significant where the threshold is

8  40 tons a year.  I think one of these, the modification

9  itself led to an increase in emissions of 20,000 tons a year.

10 So these are very significant violations.

11 **Q.**   And what time period did these violations occur?

12 **A.**   The ones identified here, I believe it says from the mid

13 '80s, early '80s to the early '90s.

14 **Q.**   And were they considered continuing violations by USEPA?

15      **MS. GILLEN:**  Objection, Your Honor.  This, too, is

16 also a legal issue that is ongoing in many courts, and

17 specifically with regard to TVA's plans that are addressed

18 here, as has been decided by courts of appeals in TVA's

19 favor.

20      **THE COURT:**  Overruled.

21      **THE WITNESS:**  The EPA considered these to be

22 continuing violations because, while the obligation to get a

23 permit, pre-construction permit, could be argued to be a

24 one-day obligation with a maximum of $5.7 thousand, what the

25 permit requires is to put on controls and to meet limits

1  thereafter, forever thereafter.  EPA's view is that these

2  violations continue until today.

3  Q.   So what's the implication of the emissions from these

4  units that were determined to be in violation of the New

5  Source Review provisions of the Clean Air Act, effective when

6  they were modified a number of years ago?

7  A.   To give a long-ish answer, we had -- I mentioned the

8  heavy-duty diesel matters.  At one point during that

9  investigation, we calculated the illegal emissions from that

10  activity industry-wide to be a million tons over the useful

11  life of those trucks, which would be 20 years or so.  And we

12  were stunned.

13      Most air pollution enforcement matters, you know, if you

14  have a few hundred tons or a few thousand tons, it's a big

15  deal.  The wood products industry that I mentioned earlier,

16  the excess emissions were in the range of several thousand

17  tons.  Here, this utility alone has over a million tons of

18  what I would call excess, illegal emissions resulting just

19  from the identified violations set aside what I would assume

20  come out of an audit.  So I would say this is one of the most

21  significant set of violations I've ever seen.

22  Q.   And if TVA had complied with the New Source Review

23  provisions of the Clean Air Act and went through the

24  permitting at the time they did these major modifications,

25  they would have been required to put on additional controls?

1  Is that your testimony?

2  **A.**   Yes, it is.

3  **Q.**   And additional controls on NOx for the NOx violations?

4  **A.**   Yes.

5  **Q.**   And additional violation -- I'm sorry.  And additional

6  controls on the sulfur dioxide, for the sulfur dioxide

7  violations?

8  **A.**   Yes.

9  **Q.**   And how would those controls that were required by the

10 Clean Air Act at the time these modifications were made

11 compare to the controls, additional controls, that North

12 Carolina is seeking in this case on these units?

13 **A.**   I'd say they're comparable.  However, I would also say

14 that, for instance, SO2 -- FGDs have been around since the

15 early '70s, but their performance has greatly improved over

16 time.  So if TVA had put on SO2 controls, for instance, in

17 1986, you'd be in the 90s, 90 percent removal rate, where

18 today one would expect to see upper 90s from a new FGD.  But

19 they're in the same, you know, range.

20      You would -- I would have expected, in the '80s, that an

21 FGD would have gotten 90 percent reduction from TVA's

22 emissions.  With SCRs, it is more of an argument as to what

23 the control device would have been in the early '80s, but,

24 again, I think by the '90s, certainly, EPA would have

25 asserted that SCRs would be BACT in those days.  In the early

1  days we're probably looking at 80 percent removal and now

2  we're looking at 90 percent removal.  But, again, it would

3  have been a significant emission reduction.  Even before SCR,

4  there were other techniques, such as over-firing air, that

5  would have had a substantial emission reduction, however, not

6  as great as an SCR would provide.

7  Q.  Have you done an estimate of the unlawful emissions that

8  have been emitted from TVA's units summarized on Plaintiff's

9  Exhibit 378 that were determined by the USEPA to be out of

10  compliance with the Clean Air Act NSR requirements?

11       MS. GILLEN:  Your Honor, I just lodge a continuing

12  objection to characterizing them as unlawful.

13       THE COURT:  All right.  Let the objection be shown

14  in the record and overruled by the Court.

15       MR. GOODSTEIN:  Thank you, Your Honor.

16       THE WITNESS:  381 is not exactly as you

17  characterized it, Mr. Goodstein.

18       Exhibit 381 is a calculation of what the excess

19  emissions are, I would say, using today's BACT numbers as

20  opposed to what might have occurred historically.  These

21  numbers, I think, are numbers that would have occurred if EPA

22  and TVA had resolved the matter some years ago, in 2001, but

23  they probably -- some of these numbers are already aggressive

24  in terms of what NOx reductions, for instance, would have

25  been required in 1986.

1  **Q.**   So can you identify Plaintiff's Exhibit 381 and explain

2  to us what it shows.

3  **A.**   What 381 shows is a number of -- there are several

4  columns.  Some of them are simple data supplied by EPA -- by

5  TVA to the EPA information system or from TVA's submissions

6  in this case.  Dr. Staudt prepared this at my request.

7       They show in the different columns, one is what is the

8  NOx emissions reported by TVA for the class identified by the

9  EAB decision as violations of the NSR for NOx.  And that's

10  the third column of numbers, the first column of real data.

11  80,292 tons of NOx were emitted in the year 2006 by the

12  listed facilities.  And that's the information provided to

13  the government by TVA.

14       The heat input, again, is -- I'm not sure exactly what

15  it's derived from, but I assume it's arrived from the DOE

16  data.  The .07 assumed NOx rate is what Dr. Staudt assumes as

17  a representative NOx emission rate if you would put on

18  controls for NOx today.  I would say, in my opinion, that's a

19  reasonable limit.

20       It's a simple mathematical calculation to multiply the

21  heat input in mmBtu by the NOx rate of pounds per BTU, and

22  convert that to tons per year.  And so we see that if TVA

23  were to install today's NOx controls, their NOx emissions,

24  leaving everything else the same, would drop from 80,293 tons

25  to 13,362 tons for these units, which is a reduction of some

1    60 to 70,000 tons a year.

2    **Q.**   What's the last column over on the right?

3    **A.**   Last column on the right is taking information from

4    Mr. Park's declaration as to what permit limit was supplied

5    to these particular units.  And there you see the sum total

6    is 131,511 tons.

7    **Q.**   What does that tell you when you compare that to the

8    actual emissions for 2006 for these units?

9    **A.**   Well, for some of the units, acid rain program limits

10   apply.  So some of those units, the permit limits are

11   constrained for TVA, but for many of the units, the permit

12   limits in no way constrained TVA's operation.

13       For instance, if you to look at Bull Run, their

14   emissions are 8,300 tons and their limit is 14,000 tons.

15   **Q.**   Okay.  Let's take a look at Plaintiff's Exhibit 382 for

16   identification, and can you identify that and explain to us

17   what it shows.

18   **A.**   This is pretty much the same information but with

19   respect to SO2 emissions and the plants identified in the EAB

20   decision as violations of NSR with respect to SO2.

21       And here we see that the reported annual emissions from

22   the named facilities is 76,000 tons, 76,173 tons, and if

23   those facilities were installed with sulfur control devices

24   at today's reasonable levels, that 76,000 tons would drop to

25   11,300 tons.

1  **Q.**  All right.  And what does this show about the permit

2  limits for sulfur dioxide for these units that were

3  determined by the EAB to be out of compliance with the Clean

4  Air Act?

5  **A.**  The Title IV program does have facility-specific limits

6  for NOx, but it doesn't have similar limits for SO2.  So here

7  you see that TVA's permit limits are relics of the early

8  1970s and they in no way constrained TVA's operations.

9  **Q.**  And was the audit, the system-wide audit, for NSR

10  violations that was requested by USEPA Region 4 in the

11  administrative order that we've just looked at, to your

12  knowledge, was that audit ever completed?

13  **A.**  To my knowledge, no.

14  **Q.**  And what does that tell you, based on your experience

15  with this investigation of TVA?

16  **A.**  Well, two or three things here.

17      One, the laws of physics apply to all of TVA's plants.

18  Most of these plants -- many of these plants were built in

19  the '40s and '50s.  One can expect that these large

20  components will wear at essentially the same rate.

21      Two, we saw in Mr. Park's materials that TVA had

22  expended -- had capital expenditures for a number of years

23  for pollution control projects in response to the 1970's era

24  lawsuits against TVA.  But then, for a long period of ten

25  years or more, no capital expenditures are reported.  And the

1   reason that this is significant is one can modify -- you can

2   modify your plant and make a physical change, including

3   replacing these big boxes, as long as your emissions don't go

4   up.  And so one way to manage the process is to time your

5   large capital projects with installation of pollution control

6   devices.

7        And so one might wonder, you know, is there a violation

8   here.  If pollution control projects are being installed at

9   the same time or during a time frame, you'd have to at least

10  think that, well, there may not be violations because there

11  are emission investments going on.

12            MS. GILLEN:  Your Honor, I'd like to interpose an

13  objection to this testimony.  It's clearly speculative.

14  Mr. Buckheit is speculating as to what TVA has or has not

15  done.  I don't think he knows.

16            THE COURT:  I'll sustain that objection.

17            MR. GOODSTEIN:  Thank you, Your Honor.

18  BY MR. GOODSTEIN:

19  Q.   Mr. Buckheit, I'd like to show you what's been

20  identified as Plaintiff's Exhibit 380 and ask you if you can

21  identify that document and tell us what it shows.

22  A.   380 is the same information as in the earlier two sets

23  of calculations but looking at TVA's entire system, not just

24  the units where we had specifically identified violations.

25  Q.   And what does it show?

1  **A.**    If I can get to the fine print.

2       The system-wide emissions from TVA, all of TVA's units

3  in 2006, 452,791 tons of SO2.  If BACT levels or controls

4  were employed at each of those units, those emissions would

5  drop by approximately 345,000 tons to something -- to 78,508

6  tons per year.

7       Similarly, TVA's NOx emissions in 2006 were

8  197,843 tons; and if today's level of NOx controls were

9  applied to each of the units in TVA's system, emissions would

10  drop from that 197,000 tons to 36,637 tons.

11  **Q.**    So what's the significance of these summaries, based on

12  your experience with investigations of TVA?

13  **A.**    Well, if TVA had violation rates across its system that

14  were similar to other systems that we looked at, then one

15  might expect that the, quotes, unlawful, close quotes,

16  emissions, for instance, of SO2 would be in the range of

17  350,000 tons a year.  Excuse me.  300,000 tons a year.  The

18  net is 350.  And if we assume 70 or 80 percent of

19  350,000 tons a year, we would be at 300,000 tons a year.

20       Similarly, if we look at NOx, the reduction for all

21  units applying BACT is 100 -- looks like 160,000 tons.  If we

22  apply a 70 or 80 percent estimate of violations that were

23  similar to what we found at other systems to that number, we

24  would get something like 130,000 tons per year over a 15-year

25  period with BACT for however long these continue.

1  **Q.**  Mr. Buckheit, you were retained by North Carolina in

2  this case to look at some of the expert reports disclosed by

3  TVA and to reach some conclusions about that?

4  **A.**  Yes.

5  **Q.**  Can you give us an overview of what conclusions you

6  provided in your expert disclosure report in this case?

7  **A.**  There were four areas --

8          **MS. GILLEN:**  Your Honor, I'd like to re-up our

9  objection.  Mr. Buckheit is an attorney and he has been

10 listed on North Carolina's expert stipulations and

11 qualifications as his area of expertise being Clean Air Act

12 implementation, including TVA's history of non-compliance of

13 air pollution requirements, which I do not believe

14 encompasses the setting of NAAQS, the efficacy of NAAQS.

15         Mr. Buckheit is not a toxicologist or an

16 epidemiologist.  He is an attorney who was charged with

17 enforcement of policies set by other people at the EPA.

18         **MR. GOODSTEIN:**  Your Honor --

19         **THE COURT:**  Let me hear from you on that,

20 Mr. Goodstein.

21         **MR. GOODSTEIN:**  Thank you, Your Honor.

22         We've laid some foundation for this.  We've looked

23 at the description of Mr. Buckheit's job at the EPA.  He

24 described it as a policy job.  It's described in the

25 description, current description of position of Air

1  Enforcement Director as a policy job.

2          We also heard testimony from Mr. Buckheit about his

3  experience on the Virginia Air Quality Control Board,

4  implementing the Clean Air Act and administering the Clean

5  Air Act, including the NAAQS.

6          There is testimony that is going to be proffered by

7  TVA on this, Your Honor, and that includes a former EPA

8  official, Dr. Anderson, and she is going to testify about her

9  knowledge and experience with the National Ambient Standards

10  under the Clean Air Act, and her background and experience

11  with it is very similar to the background and experience that

12  Mr. Buckheit brings to it.

13          Dr. Anderson has a pedigree in toxicology.

14  Mr. Buckheit has a pedigree in physics.  He also has a law

15  degree.  But, Your Honor, just because he has a law degree

16  doesn't mean all the conclusions he reaches in the area of

17  Clean Air Act implementation and administration is a legal

18  conclusion.  He is offering the same type of opinion that

19  Dr. Anderson is offering.  And North Carolina should be

20  entitled to have an expert on implementation of the NAAQS who

21  has got experience both at the federal level, implementing

22  it, and at the state level, the same way TVA has an expert on

23  implementation of the NAAQS, who was also a former official

24  at EPA.

25          **MS. GILLEN:**  Your Honor, if I may.  First of all,

1  I'd like to comment that this testimony is cumulative, and

2  North Carolina has already brought on Dr. Levy, who has

3  testified.

4            Second of all, Mr. Buckheit's experience at the EPA

5  is in a different world from Dr. Andersen's experience at

6  EPA.  Dr. Anderson was responsible for setting the standards,

7  the air quality standards that we're talking about that are

8  reflected in the NAAQS, and she's led hundreds of risk

9  assessments in order to set those standards.  So their

10  experience and their qualifications are worlds apart.

11            **MR. GOODSTEIN:**  Your Honor, we can lay some further

12  foundation on Mr. Buckheit's experience under the NAAQS

13  program.  It's explained to some extent in his CV and in his

14  description of the position, the Director of Air Enforcement

15  Division, 458A.  But we can also lay some further foundation

16  with him to follow up on the description of his experience at

17  the Virginia Air Quality Control Board, which, as

18  Mr. Buckheit testified earlier, is the authority in the

19  Commonwealth of Virginia that sets air quality standards in

20  that state.  So he's got experience with both --

21            **THE COURT:**  I have no problem with his testimony

22  and his opinion in compliance with his duties and

23  responsibilities in these various positions, that they

24  weren't in compliance.

25            I do have a problem here, for example, with this,

1  what you you're proposing, summary opinion, 17,000 fatalities

2  per year from excess emissions.  Those are things that your

3  experts have already talked about, and I don't think

4  Mr. Buckheit proposes to have expert knowledge in that area

5  as a part of his expert report that you're putting together

6  here.

7        **MR. GOODSTEIN:**  Well, Your Honor, we are just going

8  to ask Mr. Buckheit some questions about the National Ambient

9  Air Quality Standards program, as I described.

10        **THE COURT:**  I think that I'm going to sustain the

11  objection at this point.  If after hearing TVA's evidence, if

12  I think it might be proper for rebuttal purposes, then I'll

13  let you know.

14        **MR. GOODSTEIN:**  All right.  Thank you, Your Honor.

15        **MS. GILLEN:**  Thank you, Your Honor.

16        **THE COURT:**  Yes.

17        **MR. GOODSTEIN:**  Your Honor, there is also a portion

18  of Mr. Buckheit's disclosure that addressed the opinions of

19  Gordon Park, who is a witness for TVA who is going to testify

20  that, based on his review, TVA is in substantial compliance

21  with the Clean Air Act; and I was planning on asking

22  Mr. Buckheit whether he, upon review of Mr. Park's report,

23  his knowledge of TVA's history of non-compliance with the

24  Clean Air Act, whether he agrees with those opinions, and, if

25  not, why.

 1        So I'm not sure if that's part of your ruling, Your

 2   Honor, or if I can proceed with that line of questioning.

 3        **MS. GILLEN:**  Your Honor, TVA intends to call

 4   Mr. Park in its direct case and, presumably, will be able to

 5   be cross-examined by North Carolina.

 6        **THE COURT:**  Yes.  I will sustain that part of it

 7   also and he may come back later.  At this point I'm

 8   considering it objectionable.

 9        **MR. GOODSTEIN:**  Thank you, Your Honor.

10        If I could have a moment to consult with counsel

11   before I pass the witness.

12        **(Pause in the proceedings.)**

13        **MR. GOODSTEIN:**  Your Honor, at this time we offer

14   Plaintiff's Exhibits 436, 458A, 378, 379, 381, 382, and 380

15   into evidence.

16        **MS. GILLEN:**  Your Honor, TVA just notes for the

17   record its objection to -- let me get the right numbers --

18   377, 378, 379, 381, 382 and 380 as being based on allegations

19   of an administrative compliance order that was deemed to be

20   without legal consequence by the Eleventh Circuit Court of

21   Appeals.

22        **THE COURT:**  Again, the objections are overruled.

23        **MR. GOODSTEIN:**  Thank you, Your Honor.

24        **(Plaintiff's Exhibits 788-382, 436 and 458A**

25      **received.)**

 1      **MR. GOODSTEIN:**  We have no further questions of

 2   Mr. Buckheit at this time, Your Honor.

 3      **THE COURT:**  All right.  Who is going to

 4   cross-examine?

 5                    **CROSS EXAMINATION**

 6   **BY MS. GILLEN:**

 7   **Q.**   Good morning, Mr. Buckheit.

 8   **A.**   Good morning.

 9   **Q.**   If I could ask you before we start, just to save

10   confusion in the middle, if you could pull out TVA's exhibit

11   book No. 23, which is on the rolling cart to your left there.

12      Thank you.

13      I think we've established this but, just for the record,

14   Mr. Buckheit, you are an attorney, correct?

15   **A.**   I am an attorney.

16   **Q.**   And you are not a toxicologist?

17   **A.**   I am not a toxicologist.

18   **Q.**   And you are not an epidemiologist?

19   **A.**   I am not an epidemiologist.

20   **Q.**   You are an attorney.  Correct?

21   **A.**   I am.

22   **Q.**   And as an attorney, you were involved in the development

23   of cases referred to the Department of Justice for

24   prosecution for alleged violations of the New Source Review

25   requirements of the Clean Air Act,  correct?

1    A.    That's correct.

2    Q.    And in your opinion -- and your opinion is that, based

3    on EPA's investigation, it appears that as much as 70 to

4    80 percent of the entire utility industry has been violating

5    New Source Review.

6    A.    I missed a word there.  Could you just say it again?

7    Q.    Sure.  And it's your opinion that, based on EPA's

8    investigation that you spearheaded, as much as 70 to

9    80 percent of the entire utility industry was violating New

10   Source Review; is that correct?

11   A.    Yes.

12   Q.    And one of the cases that you helped develop for

13   prosecution involved Duke Energy, right?

14   A.    That's correct.

15   Q.    And the EPA alleged that certain projects undertaken by

16   Duke Energy at 29 of its units here in North Carolina

17   violated New Resource Review.

18   A.    That's correct.

19   Q.    And I believe you testified that under the Clean Air

20   Act, if such violations are proven, the offending utility

21   must install best available control technology, which is

22   abbreviated as BACT sometimes.

23   A.    That's correct.

24   Q.    And I believe you further testified that BACT for SO2

25   emissions is an FGD or scrubber?

1   A.    For most of it.

2   Q.    And you said, although there's some question, generally,

3   BACT for NOx emissions is an SCR.

4   A.    Today.

5   Q.    And North Carolina was aware of EPA's allegation that

6   Duke had violated New Source Review at 29 of its units,

7   correct?

8   A.    Yes.

9   Q.    And North Carolina has not independently investigated

10  those claims.

11  A.    To my knowledge, they have not.

12  Q.    But in your opinion, your personal opinion, Duke Energy

13  did violate New Source Review at each of these 29 units.

14  A.    That's correct.  And the federal government filed a

15  lawsuit.

16  Q.    And in your opinion, Duke Energy is operating each of

17  these units today, in violation of the Clean Air Act.

18  A.    Yes.

19  Q.    North Carolina has not filed suit against Duke for those

20  alleged New Source Review violations, have they?

21  A.    No, they haven't.

22  Q.    One of those 29 projects occurred at Duke's Buck plant,

23  Unit 5, specifically?

24        I can refer you to an exhibit if you'd like.

25  A.    I don't recall the names of each unit.

Case 1:06-cv-00020-LHT  Document 214  Filed 06/22/09  Page 53 of 141

1   Q.   Let me try to make it easier.  Why don't you turn in

2   your exhibit book 23 to Defendant's Exhibit 517.  And this is

3   an excerpt from a decision of the United States District

4   Court for the Middle District of North Carolina captioned

5   *United States vs. Duke Energy Corporation*.

6         And as I said, it's just an excerpt.  I can provide you

7   with the whole opinion if you'd like.  But I would

8   specifically turn your attention to page 2, which is page 624

9   of the reported decision, and to the footnote No. 2 that

10  appears on that page.

11  A.   I see it.

12  Q.   And does that refresh your recollection that one of the

13  29 projects that EPA accused Duke of being in violation of

14  the New Source Review occurred at Duke's Buck plant Unit 5?

15  A.   I'll accept that we sued Buck Unit 5.

16  Q.   And Duke does not plan to put a scrubber on Buck Unit 5

17  in order to comply with the North Carolina Clean Smokestacks

18  Act, does it?

19  A.   I don't know.

20  Q.   I'd like to show you an excerpt from what has been

21  admitted into evidence as Plaintiff's Exhibit 10.  And we'll

22  put that on the monitor for you.

23         **MS. GILLEN:**  There we go.  Okay.  Great.

24         This is the cover page of Plaintiff's Exhibit 10.

25  If you would please put the next page up.  That's the page we

1   need to look at.  We just need the left-hand columns.

2           There we go.  Great.

3   **BY MS. GILLEN:**

4   **Q.**   I represent to you that this was -- this is the latest,

5   most recent filing under the North Carolina Clean Smokestacks

6   Act, and these are Dukes plans for compliance with the CSA.

7   And if you will look to the facility list on the left, and

8   then on the third column over, it shows the technology that

9   is being planned.

10          And so my question, based on this recent filing, was

11  Duke does not plan to put a scrubber on Buck Unit 5 in order

12  to comply with the Clean Smokestacks Act, does it?

13  **A.**   Well, I've never seen this document before, and I'll

14  just take it for what it says.  It appears to say there's not

15  a listed scrubber for Buck Unit 5.

16  **Q.**   Then referring back to the *United States v. Duke Energy*

17  opinion, another one of the 29 projects that EPA alleged

18  violated New Source Review occurred at Duke's Buck plant Unit

19  4; is that correct?

20  **A.**   That's correct.

21  **Q.**   And looking at Plaintiff's Exhibit 10, which has been

22  admitted into evidence, there is no scrubber planned for Buck

23  Unit 4, is there?

24  **A.**   No.  It looks like they plan to shut Buck Unit 4 down.

25  **Q.**   And a third project of the 29 projects that EPA alleged

1  violated New Source Review occurred at Duke's Dan River Unit

2  3?

3  **A.**  I see that.

4  **Q.**  And looking at Plaintiff's Exhibit 10, there's no

5  scrubber planned for Dan River 3, is there?

6  **A.**  That's what this document would appear to show.

7  **Q.**  And another few of the 29 projects occurred at Duke's

8  River Bend plant, Unit 4, 5, 6 and 7.  Is that correct?

9  **A.**  I'm sorry.  I don't see River Bend 5.

10  **Q.**  You're quite right.  I misspoke.  I have 4 dash 7 on

11  mine.  So let's be clear, 4, 6 and 7.

12  **A.**  That's correct.

13  **Q.**  Okay.  Thank you for correcting me.

14      And if we look at Plaintiff's Exhibit 10, no scrubber is

15  planned for 4, 6 and 7 at Duke's River Bend plant; is that

16  correct?

17  **A.**  I'm sorry.  Would you just repeat that?

18  **Q.**  Sure.  Looking at Plaintiff's Exhibit 10, it appears

19  that no, Duke is not planning to install a scrubber on River

20  Bend Units 4, 6 or 7?

21  **A.**  At whatever date this document is, that was apparently

22  not their plan.

23  **Q.**  Right.  It was June, 2008.

24      And if EPA's ongoing suit against Duke succeeds, Duke

25  will be required to include best available control technology

1  when it's -- in the operating permits of the implicated

2  plans, correct?

3  **A.**   Yes.

4  **Q.**   The North Carolina Clean Smokestacks Act does not

5  require Duke to include such limits in its operating permits,

6  though, does it?

7  **A.**   No.  The North Carolina act is a cap.

8  **Q.**   In addition to Duke Energy, you developed cases against

9  other utilities, I believe you testified, and one of those

10 other utilities was Synergy.  Is that correct?

11 **A.**   That's correct.

12 **Q.**   And under your direction, EPA enforcement sued Synergy

13 for alleged New Source Review violations at several of its

14 electric generating plants in Indiana and Ohio, correct?

15 **A.**   That's correct.

16 **Q.**   And by the time the case was given to the jury, the

17 original allegation that EPA had lodged had been discarded

18 and was down to 14 projects, correct?

19 **A.**   I don't know.

20 **Q.**   Okay.  Let me show you -- just one second, I'll show you

21 something.  I'm showing you now -- zoom out.

22      This is a jury verdict form.  You can see the caption

23 there, *"United States vs. PSI Energy and Cincinnati Gas and*

24 *Electric Company, Better Known As Synergy*," and this is the

25 14 projects that went to a jury.

1    If you could just flash through the pages.  This is page

2  one.  You see two projects there, two for the defendant, one

3  for the plaintiff.  Second page is three for plaintiff.  And

4  the remaining projects are all found for defendant.  There's

5  that court stamp at the top.

6    If you'll trust my math, I will represent to you that

7  the checkmarks add up to 14 total projects, 10 of which were

8  decided in the favor of synergy.

9    Does that appear to about what this court document

10  shows?

11  **A.**   I'll rely on your math.

12  **Q.**   Okay.  New Source Review allegations against TVA's Bull

13  Run plant are still ongoing, aren't they?

14  **A.**   I believe so.

15  **Q.**   And the court that is hearing those allegations has not

16  decided that TVA broke the law in any way, has it?

17  **A.**   I don't think it's rendered a decision, if that's your

18  question.

19  **Q.**   Excuse me?

20  **A.**   Is your question has it rendered a decision?  I don't

21  think so.

22  **Q.**   Correct.  It has not rendered a decision yet, has it?

23  **A.**   No.

24  **Q.**   And you're aware from the testimony that TVA has an SCR

25  in its Bull Run plant and will be starting up a scrubber

1  later this year?

2  **A.**   I don't -- I mean, I'm not going to quarrel with you.   I

3  heard representations that they're planning on starting up an

4  FGD.  As to whether there is an SCR, I'd have to look at a

5  piece of paper, but I'm not going to challenge it.

6  **Q.**   Appreciate that.  And the New Source Review allegations

7  against Unit 5 at TVA's Colbert plant were brought in a suit

8  filed some 20 years after the events at issue, and they were

9  dismissed by the District Court in the Northern District of

10  Alabama, correct?

11  **A.**   I believe so.

12  **Q.**   And that dismissal was affirmed by the Eleventh Circuit?

13  **A.**   Yes.  That was a citizen suit, not a --

14  **Q.**   Right, and that was --

15  **A.**   That was the basis, as I understand it, for dismissal.

16  **Q.**   I'm sorry?

17  **A.**   I think that was the basis for the dismissal, was the

18  status of the plaintiff, not the ongoing violation.

19  **Q.**   Actually, no; it was that they were untimely, untimely

20  brought.

21  **A.**   That -- not to argue with you, but that wouldn't apply

22  to the government.

23  **Q.**   I'm sorry.  I can't understand.

24       Well, for whatever reason, you can testify that the

25  Eleventh Circuit affirmed the dismissal of that case against

1  TVA?

2  **A.**   The document is a better record on that, but it's my

3  general understanding that's what occurred.

4  **Q.**   Okay, great.  And the petition for certiorari that the

5  citizen group brought in that case was denied by the United

6  States Supreme Court, was it not?

7  **A.**   I don't know that.  Either way.

8  **Q.**   Let me show you...

9  **A.**   I see that.

10  **Q.**   Thank you.

11       And in addition to the other cases, you were directly

12  involved as an attorney in the development and prosecution of

13  the EPA enforcement action against TVA, correct?

14  **A.**   Correct.

15  **Q.**   And that prosecution was described by the Eleventh

16  Circuit as lacking the virtues of most agency adjudications,

17  correct?

18  **A.**   The EAB hearing?

19  **Q.**   Yes.

20  **A.**   That's correct.

21  **Q.**   And the Eleventh Circuit found that the basis of EPA's

22  case against TVA was not divulged to TVA until three weeks

23  before the administrative --

24            **THE COURT:**  Can we shorten this by just introducing

25  the Eleventh Circuit opinion and move along?

1    **MS. GILLEN:**  Oh, okay, Your Honor.  Sure.

2         Well, we have as an exhibit Defendant's Exhibit

3    518, which is an excerpt from that decision, which is

4    recorded at 336 F.3d, page 1236.

5         **THE COURT:**  All right.  Let that be admitted.

6                   **(Defendant's Exhibit No. 518 received**

7         **in evidence.)**

8    BY MS. GILLEN:

9    Q.   EPA has never proven the existence of the allegations

10   against TVA in district court, has it?

11   A.   It has not.

12   Q.   In fact, no court anywhere has ever held TVA violated

13   any Clean Air Act New Source Review requirements, has it?

14   A.   That's true.  However, numerous district courts have

15   found similar modifications to be violations of the New

16   Source Review rule, and those courts -- I'm thinking now of

17   the Duke court -- held otherwise have been reversed by the

18   Supreme Court.

19   Q.   But my question --

20   A.   I answered it.  I said I agree.

21   Q.   -- was, no court has ever found TVA has violated the New

22   Source Review?

23   A.   That's correct.

24        **MS. GILLEN:**  Thank you very much, Mr. Buckheit.

25        No further questions, Your Honor.

1          **THE COURT:**  Mr. Goodstein?

2             **REDIRECT EXAMINATION**

3    **BY MR. GOODSTEIN:**

4    **Q.**   Mr. Buckheit, was this case against TVA pursued

5    judicially by the USEPA?

6    **A.**   No.

7    **Q.**   And why not?

8    **A.**   Without getting too deeply into interdepartmental

9    matters, the Justice Department has publicly announced

10   several times that it believes in -- its term -- the unitary

11   executive theory, in which executive branch agencies should

12   not utilize the services of the court system to resolve

13   disputes, and so agencies should not sue agencies.

14   **Q.**   So what you're saying is EPA, through the Justice

15   Department, determined that it couldn't proceed judicially

16   against TVA because of TVA's status?

17   **A.**   I think it's more a policy statement than a legal bar,

18   and, as a policy statement, that's subject to change, but

19   that has been the policy of the Justice Department on this

20   matter.

21   **Q.**   Was there any determination, to your knowledge, by the

22   Justice Department or EPA that the violations determined by

23   EPA were unfounded?

24   **A.**   Absolutely not.  The Justice Department reviewed each of

25   the allegations contained in the EPA administrative order.

1  They were pursuing similar violations elsewhere, and I

2  certainly wanted to assure that we were being consistent in

3  each of the forums that we were proceeding.

4      In addition, shortly after the change of administration,

5  the Cheney Energy Task Force asked a different office within

6  the Department of Justice, the Office of Legal Counsel, to

7  review the theories that were being pursued by the government

8  in these New Source Review matters, and the LLC report was

9  that theories were sound.

10 **Q.**   Does TVA share the unitary executive theory with the

11 Department of Justice?

12 **A.**   On their pleadings, no.

13 **Q.**   In fact, did they sue EPA in this case, *EPA vs. Whitman*,

14 which they just offered into evidence?

15 **A.**   Yes.

16 **Q.**   And did the Court of Appeals there determine that they

17 lacked jurisdiction to review the ACL because it didn't

18 constitute final agency action?

19 **A.**   Yeah, the Court didn't review the substance of the

20 administrative decision.

21       **MR. GOODSTEIN:**  If I could have a moment, Your

22 Honor.

23       **THE WITNESS:**  Excuse me, the EAB order.

24 **BY MR. GOODSTEIN:**

25 **Q.**   Is EPA the agency entrusted by Congress to implement the

 1   Clean Air Act?

 2   **A.**   Yes, it is.

 3          **MR. GOODSTEIN:**  We have no further questions of

 4   Mr. Buckheit, Your Honor.

 5          **THE COURT:**  All right.  Thank you, Mr. Buckheit.

 6   That will complete your testimony.

 7          We'll take a 15-minute midmorning recess.

 8          **(Recess.)**

 9          **THE COURT:**  Mr. Goodstein?

10          **MR. GOODSTEIN:**  Thank you, Your Honor.

11          North Carolina's next witness is Dr. Susan Tierney.

12                        **SUSAN TIERNEY,**

13   **being duly sworn, was examined and testified as follows:**

14                     **DIRECT EXAMINATION**

15          **MR. GOODSTEIN:**  Your Honor, if I may approach, we

16   have a binder for the Court for Dr. Tierney's exhibits.

17          **THE COURT:**  All right.  Thank you.

18          **MR. FINE:**  Before Mr. Goodstein gets started, Your

19   Honor, if I could just indicate to the Court and to counsel

20   that TVA would be willing to stipulate to Dr. Tierney as an

21   expert in utility economics and financial analysis, as

22   denominated in the plaintiff's filing in this case in their

23   qualifications of their experts.

24          **THE COURT:**  All right.  Let the record reflect the

25   stipulation.

1        **MR. GOODSTEIN:**  Thank you, Your Honor.

2    **BY MR. GOODSTEIN:**

3    **Q.**   Can you state your full name for the record,

4    Dr. Tierney?

5    **A.**   My name is Susan Fallows Tierney.

6    **Q.**   And how are you involved in this case, Dr. Tierney?

7    **A.**   I am here testifying on behalf of the State of North

8    Carolina.

9    **Q.**   Okay.  And what were you asked to look at on behalf of

10   North Carolina?

11   **A.**   I was asked to look at whether or not the Tennessee

12   Valley Authority would be capable of undertaking an

13   investment program to put in place pollution control

14   equipment as recommended by the State of North Carolina.

15       I was asked specifically to opine on whether or not the

16   program, as proposed, would be financially feasible and

17   financially reasonable for TVA to undertake.

18   **Q.**   And did you reach any conclusion on those questions?

19   **A.**   Yes, I did.

20   **Q.**   And what was your overall conclusion?

21   **A.**   My overall conclusion was that, indeed, it would be

22   financially feasible and reasonable for the Tennessee Valley

23   Authority to undertake the pollution control equipment

24   program as recommended by the State of North Carolina.

25   **Q.**   And you prepared several disclosure reports in this

1  case, Dr. Tierney?

2  **A.**    I did.

3  **Q.**    They should be at the back of your binder, marked for

4  identification as Plaintiff's Exhibits 481 and 482.

5       Can you take a moment and look at those and see if

6  they're true and accurate copies of your reports, and if so,

7  let us know.

8  **A.**    They look like it to me.

9  **Q.**    Your Honor, at this time we offer Plaintiff's Exhibit

10  481 and 482 into evidence.

11          **MR. FINE:**  Your Honor, we have no objection, but I

12  have a couple questions for counsel, if he would indulge me.

13          When Dr. Tierney submitted her initial expert

14  report, which has been offered for evidence as Plaintiff's

15  Exhibit 481, there was a sort of a supplement to her expert

16  report that contained confidential information, information

17  denominated as confidential by TVA, and my concern is if that

18  portion of her initial report is being tendered as

19  Plaintiff's Exhibit 481.  We would ask that that particular

20  portion be filed under seal under the terms of the protective

21  order which the Court has entered in this case.

22          **THE COURT:**  Yes.  If you will designate that

23  portion of which you want filed under seal, the Court will

24  order that be done in the filing of these reports.

25          **MR. FINE:**  Your Honor, I'm actually seeking some

1   assistance from my worthy opposing counsel because I do not

2   see that document in the materials.  And if I could have a

3   representation, counsel, if that's not part of the rather

4   long document that we're looking at as Plaintiff's 481, I

5   believe that the problem will take care of itself.

6          MR. GOODSTEIN:  I don't believe it's a part of

7   that.

8          THE COURT:  Not a part?

9          MR. GOODSTEIN:  Not a part.

10          MR. FINE:  Then, Your Honor, we're fine and can

11  proceed.

12          THE COURT:  All right.  Let those two reports be

13  admitted.  That's 481 and 482.

14          (Plaintiff's Exhibit 481 and 482 received.)

15  BY MR. GOODSTEIN:

16  Q.   Dr. Tierney, I'm going to refer you back to the first

17  exhibit in your binder, Plaintiff's Exhibit 435 for

18  identification.  Is that a copy of your CV?

19  A.   Yes, it is.  At least as it stood at the time I filed my

20  original report.

21  Q.   Can you give us a summary of the updates that are

22  included on your current CV?

23  A.   Yes.  There are an additional half dozen testimonies.

24      On page 50 of this exhibit -- it's actually not page 50.

25  It's the third page of the exhibit.

1   Q.   Right.  But it was at the end of your report, so it's

2   got those page numbers.  But that's okay.  That's easier to

3   direct us.

4   A.   I just didn't want people to think I was giving you a

5   50-page resume.

6   Q.   We understand.

7   A.   Page 50 shows that I had a number of testimonies since

8   the year 2000.  There are approximately a half dozen other

9   testimonies filed in courts or administrative agencies.

10       Additionally, there are approximately maybe ten reports

11  or articles that I have authored or co-authored, and those

12  would appear to supplement those that are listed on pages 52

13  and 53.

14       And additionally, I have been involved in a number of

15  other industry panels.  Therefore, those would supplement the

16  other professional activities that are listed beginning on

17  page 53.

18  Q.   Okay.  And what is your current position, Dr. Tierney?

19  A.   My current position is managing principal at a

20  consulting firm called Analysis Group, Inc.

21  Q.   And what do you do in that position?

22  A.   I am a full time consultant involved on a number of

23  engagements for public and private clients, principally on

24  matters involving the electric industry and the natural gas

25  industries, but other utility industries as well.

**Q.**   And how long have you been involved in issues related to the electric power markets and utility regulation policy in that sector?

**A.**   For approximately 25 years.

**Q.**   And who are some of your clients in your current practice?

**A.**   I have a wide variety of clients.  On the one hand, I work for utility companies on matters of strategy or matters of rate regulation.  I have worked for large industrial customers as they've tried to figure out a strategy for using a variety of energy sources in a clean and efficient fashion.

I have worked for a number of organizations that are called regional transmission organizations.  They're the grid operators.  And I work with the boards of directors and senior management on a number of strategic issues involving the design of the markets and the market rules, as well as some of the key issues facing those organizations.

I have worked for a number of public organizations, including state governments, on matters such as this.

That gives you a range of the type of client work that I've done on electric and gas industry issues.

**Q.**   And can you summarize for us your educational background and your professional experience?

And I know this is listed on page 49 of your CV, but if you could just give us an overview of your educational

1  background and professional experience, please.

2  **A.**    I have a bachelor's degree from 1973 from a college in

3  California called Scripps College.  After that, I undertook a

4  master's degree and a Ph.D., both in regional planning.

5  Regional planning is an area of -- it's a discipline that

6  involves analyzing public and private sector problems.  My

7  specialty was on infrastructure issues and analyzing issues

8  at the intersection of economics, in some sense engineering,

9  politics, and administration; and, specifically, what I mean

10 is kind of the conduct of developing energy systems,

11 developing transportation systems and water systems.

12      Oh, that's my education.

13      My professional experience.  After receiving my Ph.D., I

14 taught at the University of California for a number of years,

15 and subsequently resigned that in order to practice in my

16 discipline.

17      I went to Massachusetts, where I was involved in a

18 number of government jobs in state government, starting with

19 a position in the state's energy office, where I served as a

20 senior economist involved principally on electric industry

21 issues.

22      After that, I became the director of the State Energy

23 Facilities Siting Council, the organization that is involved

24 and responsible for approving electric and gas utility demand

25 forecasts and plans to supply resources to their consumers,

1  as well as their proposals to construct power lines, gas pipe

2  lines, and power plants.

3      I served in that position a number of years and was

4  appointed by Governor Dukakis to serve as commissioner on the

5  state's public utility commission.  That's the rate-setting

6  agency that approves financings, rates, and a number of other

7  issues involved in the investor-owned utility sector

8  electric, gas, telephone and water utilities.

9      After that service for a number of years, I was

10 appointed by Governor Weld to serve as the Secretary of

11 Environmental Affairs.  I was responsible for natural

12 resource management, as well as pollution control in the

13 Commonwealth of Massachusetts.

14     One of my prime responsibilities was to serve as the

15 chairman of the board of the Massachusetts Water Resources

16 Authority.  The Secretary of Environmental serves -- excuse

17 me.  The Secretary of Environmental Affairs always serves as

18 the chairman of the board of the Massachusetts Water

19 Resources Authority.  That is a public authority, a

20 multibillion-dollar agency charged with providing clean water

21 and sewer services in the eastern half of Massachusetts.

22 It's the agency that was responsible for implementing the

23 court-ordered cleanup of Boston Harbor.  So for three years,

24 I served as the chair of the board for bi-weekly meetings at

25 which we oversaw a multibillion-dollar program to clean up

1   Boston Harbor, as overseen by Federal Judge David Mazzone.

2        From that position, I was appointed Assistant Secretary

3   of Policy at the U.S. Department of Energy, appointed by --

4   nominated by President Clinton and appointed by -- excuse

5   me -- confirmed by the U.S. Senate.  My responsibilities at

6   the Department of Energy were to be involved in matters

7   related to energy policy of the U.S. government.  I was the

8   principal policy adviser to the Secretary of Energy.

9        Additionally, I was involved in strategic planning for

10  the Department of Energy.  At the time, it was approximately

11  a $20 billion organization.  I was responsible for nuclear

12  warheads, clean up of contaminated lands from testing of

13  nuclear warheads, the Advanced Energy Research and

14  Development Program of the United States government, and

15  occasionally some energy policies as well.

16  **Q.**   So --

17  **A.**   I --

18  **Q.**   Oh, I'm sorry.

19  **A.**   That's great.

20  **Q.**   In your work for the Commonwealth of Massachusetts and

21  the U.S. government, have you evaluated the economic

22  feasibility of utility programs?

23  **A.**   Yes.

24  **Q.**   Can you describe that experience for us?

25  **A.**   Yes.  Let me describe most directly two things, both of

which were in Massachusetts.  One of them was the work that I
was involved with as a commissioner of the Department of
Public Utilities.  In Massachusetts, the state has
responsibility to set the rates of the utility companies.  No
rate can be charged by utility companies other than those
that are approved by the state commission.  We approved
demand forecasts, supply plans.  These are large utility
companies providing service in the franchise areas in -- as
established under state law and policy.

     We had authority to review and approve issuances of
security and large debt instruments by the utilities under
our jurisdiction.

     Additionally, as part of responsibility for approving
contracts, approving cost recovery for multimillion-dollar
and, in some cases, hundreds of millions of dollars of
investment in utility power plant and transmission
investment.

     As I mentioned, as Chairman of the Board of the Water
Resources Authority, I was involved in actually setting the
rates for providing water and sewer service in Massachusetts
for the wholesale sale of water and sewer services.  That
organization, in some sense, was akin to the Tennessee Valley
Authority in the sense that it was a publicly-owned
authority; it had responsibility to set its own rates under
the board of directors' responsibility; it issued bonds and

1   other debt instruments; and was responsible for complying

2   with a significant major, multiyear -- actually, I think it

3   was a 15-year court-ordered compliance schedule for cleaning

4   up Boston Harbor.  I believe the overall program that took

5   place in the 1980s and 1990s amounted to approximately

6   $4 billion.  And remember, that was two-decades-ago dollars.

7   **Q.**   After your government service, you were in the

8   consulting business for a number of years, since

9   approximately 1995?

10  **A.**   That's right.

11  **Q.**   Can you describe the areas of your consulting practice,

12  please?

13  **A.**   Yes.  Yes.

14      I think there's three categories of work that I've been

15  involved with over the last 13 years in which I've been a

16  consultant.  I described these a few minutes ago when I said

17  I advise companies on their business, on the environment in

18  which they are conducting their business and operations.  I

19  advise them with regard to likely changes in regulatory

20  policy or market fundamentals, meaning fuel prices and other

21  issues.  Those are engagements where I'm typically advising

22  senior management on matters that involve judgment as well as

23  very large sums of investment dollars for transmission, for

24  environmental compliance, for building power plants,

25  et cetera.

1    Another third or so of my work tends to involve writing

2 studies of policy issues in the electric industry, things

3 like the restructuring of the electric industry, how to

4 integrate market forces into certain parts of the electric

5 and gas industry to discipline prices.  I have recently

6 published a number of those, most recently presented a report

7 that was commissioned by the organization of state officials,

8 state public utility commissioners.  On Sunday, I presented a

9 report to them in which I analyzed how utilities around the

10 country use competitive procurements to figure out where to

11 obtain their next resources for their customers.

12    So that's about another third of my work, and that

13 involves electric and gas industry issues, in particular.

14    And then another third of my work I'd say is where I'm

15 involved as an expert witness on matters involving economics,

16 regulation, financial issues, utility rate-making for

17 electric and gas utilities.  And I have done that in the

18 context of contracts disputes, tax board matters, matters of

19 rate-making before regulatory agencies, and litigation

20 involving some bankruptcy questions, where I have been an

21 expert on electric and natural gas industry matters.

22 **Q.**  You said you testified on behalf of utilities in some of

23 those proceedings.

24 **A.**  Yes, I have.  Among others.

25 **Q.**  All right.  Have you written articles that have been

1  published in the literature in the field of utility economics

2  and financial analysis?

3  **A.**    Yes, I have.

4  **Q.**    And those are summarized in your CV --

5  **A.**    Yes.

6  **Q.**    -- starting at page 52.

7  **A.**    Yes.

8  **Q.**    And can you summarize your publications for us?

9  **A.**    Yes.  I tend to write on issues where there is a

10 question of either how to modify or revise regulatory policy,

11 or legislation in some cases, to accomplish one or another

12 efficiencies in the industry.  So there are a number of

13 issues that I'm involved with where it has to do with

14 regulatory incentives.

15     I write also on issues related to things at the

16 intersection between environmental policy and economic policy

17 affecting the electric and gas industries.

18     I have done work on transmission issues, including

19 issues relating to how to allocate costs for electric

20 transmission among different kinds of customers.

21     I have done work on climate change policy and how it

22 might affect the electric industry.  I have looked at the

23 benefits and costs of different kinds of organizational

24 structures in the electric industry, such as the adoption of

25 independent grid operators.

**Q.**   Okay.  And can you describe some of your professional

activities in the area of utility economics and financial

analysis, please.

**A.**   There are several things that I am involved with

professionally.  I periodically have been appointed to what

are called blue ribbon commissions or other industry

organizations having to do with transmission policy.

I'm a member of the National Commission on Energy

Policy, a bipartisan group that has been appointed, including

CEOs of major electric companies, as well as others,

including myself in academics, to opine on a number of

questions related to improvements in the nation's energy

policy.

I serve on the board of directors of several -- excuse

me.  I have served on the board of directors of several

publicly-traded electric companies.  Actually, I should

rephrase that.  Publicly-traded companies who are involved in

the electric industry.  They're not utilities.  Some are

pollution control manufacturing companies.  One is a power

production company that's called Renergy, and I now serve on

the board of that company.

Additionally, I serve on the board of directors of

several environmental, non-governmental organizations:  The

Energy Foundation; The New England -- The Northeast States

for Coordinated Air Use Management Foundation; I serve on the

 1  advisory counsel to a number of organizations such as the

 2  National Renewable Energy Laboratory, a laboratory of the

 3  U.S. government; the New York Independent System Operators,

 4  on whose is environmental counsel I serve as a member.

 5      In the past, I have served on the board of directors of

 6  the electric industry's research and development consortium

 7  called the Electric Power Research Institute and chaired its

 8  subsidiary organization, which was called the Electricity

 9  Innovations Institute.

10      There are several other things, but that's -- that gives

11  you a flavor.

12  **Q.**  All right.  We see you have a number of honors listed on

13  page 54 of your CV.  Could you please summarize the

14  recognition you've received in your field as listed on your

15  CV?

16  **A.**  Well, I was very proud to have received several awards

17  for my public service in state and federal government by the

18  Cogeneration Engineers Association and the Association of

19  State Energy Officials.  And the "Energy Daily," which is an

20  industry newsletter.

21          **MR. GOODSTEIN:**  At this time, Your Honor, we tender

22  Dr. Tierney as an expert in utility economics and financial

23  analysis.

24          I understand there is a stipulation.

25          **THE COURT:**  Yes.  Let the record show that the

 1  Court so holds.

 2          MR. GOODSTEIN:  Thank you, Your Honor.

 3  BY MR. GOODSTEIN:

 4  Q.  Dr. Tierney, could you please give us an overview of the

 5  methods you used to arrive at the conclusions you told us

 6  about earlier?

 7  A.  Yes.  Upon being asked by the State of North Carolina to

 8  look into the financial and economic challenges that might

 9  face the Tennessee Valley Authority if it were to have an

10  order to adopt a pollution control program, I began to review

11  a number of documents in the public domain which contained

12  financial, economic and operational information for the

13  Tennessee Valley Authority.

14      These are things like the annual reports, the annual

15  information statements.  When it was available, I looked at

16  the filing of the TVA before the Securities and Exchange

17  Commission.  TVA files annually a number of government

18  reports to the Office of Management and Budget and to

19  Congress.  I looked at those.  I looked at a number of

20  reports by other public organizations, such as the general

21  accounting office and congressional offices with regard to

22  the Tennessee Valley Authority.

23      I reviewed those to understand the context for TVA's

24  conditions, and, by that, I mean their financial conditions.

25  Additionally, I reviewed the -- I read the Tennessee Valley

 1  Authority Act and the bond resolutions under which TVA issues

 2  debt instruments that are backed by the rate-making

 3  capabilities and authorities of the Tennessee Valley

 4  Authority.

 5      I reviewed a number of other documents in the public

 6  domain, again, to try to get an understanding of the

 7  constraints under which the board of directors and management

 8  of the organization carry out their obligations to serve

 9  customers under the TVA Act, they're responsibilities to

10  repay bondholders for debt that has been issued; to

11  understand what the rates look like for customers of the TVA;

12  to understand what TVA was identifying as its strategic

13  challenges.

14      So I was reviewing those things in order to provide

15  context for understanding essentially how I would put myself

16  in the shoes of a senior member of TVA management or board

17  having a responsibility to undertake a large new capital

18  program such as proposed by North Carolina.

19      Additionally, I received information from another of

20  North Carolina's witnesses, Dr. James Staudt, with regard to

21  certain assumptions to use for the cost of the program for

22  pollution control.  Dr. Staudt gave me -- I relied on a

23  number of inputs from Dr. Staudt about the size of the total

24  investment that would be involved.

25      Dr. Staudt initially indicated a $3 billion program, and

1    he indicated what assumptions I should use about how TVA

2    would undertake that program over a five-year period from

3    2008 to 2013 -- up to 2013, and using a standard method used

4    in the utility world to analyze how a new expenditure or a

5    new investment would be undertaken, both from a financial

6    investment point of view and then from the point of view of

7    how it would recover the cost of that investment from

8    consumers over time.

9        I developed a point of view about how the dollars would

10   be spread over time associated with a $3 billion initial

11   capital program.  Using a methodology that is very standard

12   in the utility business that is called a "cost-of-service

13   analysis," I determined what it would cost over the years in

14   which this program would be in effect and I analyzed what it

15   would mean for electric consumers in the service area of the

16   Tennessee Valley Authority, and I used very standard methods

17   to go about that, which essentially spread the cost of

18   investment across the consumers.  And I assumed some kind of

19   average approach to doing that.  There are different ways to

20   do that.  But I assumed that every person would pay his or

21   her pro rata share of that investment over time.

22       And with that, I tried to analyze this, again, against

23   the constraints, to understand whether or not I thought that

24   TVA would have the ability to finance in the debt markets

25   $3 billion, given certain constraints under which it

1   operates, which principally includes a $30 billion debt

2   ceiling in law.

3       Additionally, I analyzed that challenge of a $3 billion

4   investment, given TVA's authority and responsibility to set

5   rates, to collect all costs associated with providing for

6   power service in the service area, and I concluded that TVA,

7   indeed, would be able to finance in debt markets the

8   investment in question and then proceed to be able to recover

9   that in rates.

10      I concluded that it would be feasible, therefore,

11  financially for TVA to proceed and undertake with this

12  program, and the rate impacts associated with this

13  investment, I concluded, were also reasonable, and on the

14  order of magnitude that TVA itself has undertaken from year

15  to year, and certainly on the order of magnitude of other

16  utility rate increases that have been managed in the electric

17  industry.

18  **Q.**   Dr. Tierney, did you also look at TVA's capital cost

19  estimate of $5 billion?

20  **A.**   Yes, I did, using the same methodology that I just

21  described.

22  **Q.**   So let's talk now about some of the specific aspects of

23  TVA's organizational and financial structure that you found

24  particularly important for your analysis.

25      Again, I'll refer you to Plaintiff's Exhibit 410 for

1  identification.  It should be the next one after your CV in

2  your binder.  And can you identify this document for us?

3  **A.**   Yes.  This is the so-called Form 10-K, annual report of

4  TVA.  This particular version was the most recent 10-K filing

5  of TVA that's submitted to the Securities and Exchange

6  Commission.  This is filed at the end of 2007 for the period

7  ending at the end of September, 2007.

8  **Q.**   Can you tell us, Dr. Tierney, what structure -- what

9  factors in the organizational financial structure at TVA you

10  found particularly significant in your analysis?

11  **A.**   Yes.  I'm going to ask you to turn to -- I'm going to

12  just describe TVA, if that's all right, in responding to that

13  question and ask you to turn to page -- I don't see a page.

14  It's a map of TVA service territory.

15  **Q.**   So it should be the fourth page of this document.

16  **A.**   That's right.

17  **Q.**   Okay.  We can blow that up on the screen so you can see

18  it a little better.

19  **A.**   Perfect.  So what you see before you in this document is

20  a depiction of the TVA service territory.  This is a

21  footprint often understood as a franchise area of a utility.

22  This is the territory in which TVA is authorized to provide

23  service under the TVA Act, and there are certain aspects of

24  the service territory that are similar and different to other

25  utilities.

1    Let me talk about some of the things that are similar.

2    TVA is a very large, multistate utility, providing generation

3    and transmission service.  There are many other large,

4    multistate, investor-owned utility companies in the

5    neighborhood also operating in the franchise area.

6    This one, as you can see, shows that TVA serves most of

7    Tennessee and a little bit of six other states.  So,

8    predominantly, TVA serves in Tennessee, but it certainly does

9    provide distribution companies in a number of other states as

10   well.

11   When I refer to distribution companies, here is what I

12   have in mind.  TVA provides the production of power and TVA

13   transmits that power and then resells it under contract to

14   distribution entities.  Those are typically publicly-owned

15   utility companies which are local in size.  There are

16   approximately 160, maybe 158 local distribution utilities to

17   which TVA provides electric service at wholesale; and then

18   those distribution utilities provide to what I call the

19   end-use customers, the stores, the hospitals, the homes,

20   et cetera, of the customers in the Tennessee Valley Authority

21   franchise area.

22   TVA operates a mix of power plants that you've heard a

23   lot about, I'm sure.  That it includes coal plants, nuclear

24   plants, hydroelectric facilities, and that makes it very

25   similar to many of the other utilities which are also very

 1  large.  TVA is one of the largest owners of power generation

 2  capacity anywhere in the United States and it operates its

 3  system in inter-connection to utilities across the border.

 4  In other words, the power lines run across the border of TVA

 5  and connect to the systems of neighboring utility companies.

 6      TVA operates under standards that are consistent in the

 7  electric industry and overseen by what is now an independent

 8  reliability organization.

 9      Additionally, TVA, like many of these utility companies,

10  is an organization whose rates reflect the cost to provide

11  utility service.  That means the cost associated with

12  building power plants, operating power plants, buying fuel,

13  hiring people to run the transmission lines and to operate

14  trucks, et cetera, those are all the costs to provide utility

15  service in the service territory.

16      TVA has a board of directors that is appointed by the

17  president, and TVA's board of directors is responsible for

18  assuring that its rates cover its costs.  TVA's bond

19  resolution assures debt holders that -- or debt issuers that

20  TVA will repay the bonds by raising the rates, if necessary,

21  to cover the cost of providing service.

22      TVA sets rates to cover not only investment -- and

23  investment, as I said, includes the hardware at power plants,

24  the turbines that run the generating facilities, but also the

25  pollution control equipment, as well as the fuel to operate

 1    the power plants.  And recently TVA adopted a change in its

 2    rate-making policy because fuel prices are so expensive

 3    lately that TVA was finding that they were running behind in

 4    keeping up with fuel cost changes.  So they adopted a special

 5    provision which is very common in the electric industry in

 6    this part of the country.  It's called a fuel adjustment

 7    clause.  And it allows TVA's board of directors to change its

 8    rates on a quarterly basis, if necessary, to track and absorb

 9    the cost of fuel and pass the cost along to consumers.

10        TVA is a very large, sophisticated organization; has a

11    planning staff, a financial staff, a management which is as

12    sophisticated as many, if not all, of the large utility

13    companies in the United States.  TVA is a little bit

14    different from some of its other large, multistate companies

15    owning, generating and transmission.  TVA does not have

16    shareholders.  It's owned by the U.S. government, as you

17    know, and TVA, therefore, can only raise money by going to

18    the debt markets.  There are no shareholders or private

19    investors, so TVA issues bonds and other things that are

20    called instruments of indebtedness.  That's the nomenclature

21    in the Tennessee Valley Authority Act for issuances of

22    instruments of debt.

23        TVA must operate such that its statutory debt, things

24    that count under the $30 billion cap, never goes above

25    $30 billion at any one time.  And the TVA Act is precise with

1  regard to the types of debt instruments that are and are not

2  covered under that cap.

3  TVA is, like many utilities, subject to a number of

4  state and federal laws, such as pollution control laws; but

5  TVA is not rate-regulated by a state government or by the

6  federal government.  That makes it very different from any of

7  the other investor-owned utility companies in neighboring

8  areas where the rates that are charged are subject to

9  approval by the state regulators or by the federal

10 government.

11 So that's the beginning of some of the features of TVA

12 that describe it as an institution, kind of, in the financial

13 and organizational world.

14 **Q.**  And this Plaintiff's Exhibit 410 for identification,

15 this 12-12-07 Form 10-K, does this also summarize TVA's

16 revenues?

17 **A.**  Yes, it does.

18 **Q.**  And is that shown on the same page as the map of the

19 service area?

20 **A.**  Yes.

21 **MR. GOODSTEIN:**  Maybe we can enlarge that on the

22 screen, please?

23 **BY MR. GOODSTEIN:**

24 **Q.**  And can you summarize the revenues that are shown in the

25 TVA's form 10-K, Dr. Tierney, please?

1   **A.**   Yes.   This shows revenues for three 12-month periods.

2   The last one on the left most column is for 2007 for the

3   period ending September 30th, 2007.   This shows that TVA has

4   operating revenues of approximately $9.2 billion in 2007.

5   That's up from 9.17 billion in 2006, and up from 7.78 billion

6   the previous year, in 2005.

7       This chart also shows the sources of sales and the

8   sources of revenue broken down by types of customers.   These

9   are TVA's customers.

10      TVA sells most of its electricity product, if you will,

11  to municipalities and cooperatives.   Those are the

12  distribution utilities I was referring to a minute ago.   This

13  shows that 7.77 billion of the 9.2 billion in 2007 came from

14  sales to customers of the municipalities and cooperatives.

15  And those are, again, the local electric distribution

16  utilities in the TVA area.

17      TVA also sells electricity to a number of large

18  industrial customers, and those are listed in the second row

19  where it says, Industries Directly Served.   Those are sales

20  amounting to 1.2 billion in 2007.

21      And then TVA sells a small -- a relatively small amount

22  of electricity products to other federal agencies amounting

23  to approximately just over $100 million.

24  **Q.**   And referring you, Dr. Tierney, to the page before this

25  one in the TVA's 10-K.   Does this provide a breakdown of the

1  electricity sales revenues by state?

2  **A.**    Yes, it does.

3  **Q.**    And what does this show?

4  **A.**    So, just to orient you to this, the very bottom row

5  shows operating revenues, and the numbers in this row are

6  identical to the numbers in the bottom row in the previous

7  chart.  So these numbers add up.  Essentially, 2007 shows

8  9.2 billion in operating revenues.  And this shows, if you

9  look under the 2007 column, that TVA sells most of its

10  power -- most of the dollars associated with TVA sales of

11  power come from sales in Tennessee, but it also shows that

12  there are sales of electricity in Alabama, Georgia, Kentucky,

13  Mississippi, North Carolina and Virginia.

14      The sales for reseller are small sales to wholesale

15  entities.  But this is essentially indicating that TVA's

16  sales occur in that footprint or the franchise area that I

17  described previously in the map on page 4 of this exhibit.

18  **Q.**    And can you also tell us what market protections that

19  TVA enjoys for its service area?

20  **A.**    Yes.  Under the Tennessee Valley Authority Act, there is

21  a provision which has come to be called the

22  anti-cherrypicking, act or a fence.  This is a ring around

23  the service territory.  TVA is not permitted to sell outside

24  of that service territory or outside of that fence, and TVA

25  does not have to provide transmission service to some other

1    party who would like to sell electricity inside of the

2    fence -- inside of the TVA fence.

3        So there is one entity that has been exempt that I'm

4    aware of from the anti-cherrypicking provisions, and that's

5    Bristol, Virginia.  Otherwise, the users of electricity

6    within the service territory, in theory, have the option to

7    leave Tennessee Valley Authority's service, but, to do so,

8    they would have to either build their own power plants or

9    they would have to figure out how to get power transmitted

10   over new lines or build their own power lines because TVA is

11   not required to move power within its fence from somebody

12   outside of the fence.

13       So this provides some protections for TVA.  TVA

14   describes these protections in numerous documents when it's

15   describing the strength of the organization, the strength of

16   its ability to sell electricity in the region, its strength

17   of being able to retain customers because of that fence and

18   anti-cherrypicking provision.

19   **Q.**   All right.  I'd like to refer your attention, Dr.

20   Tierney, now to Plaintiff's Exhibit 401 for identification.

21   And can you give us an overview -- well, first, can you

22   identify this as a figure that came out of your report?

23   **A.**   Yes.  It is a figure from my initial report.

24   **Q.**   Okay.  So in reference to Plaintiff's Exhibit 401 for

25   identification, can you tell us about some of the

1  similarities of TVA to these other utilities that operate in

2  the region and what some of the major differences are between

3  TVA and these neighboring electric utility systems?

4  **A.**   Yes.   Exhibit 401 shows TVA in blue dark color, and it

5  indicates a number of circles and words that represent

6  different utility companies in neighboring areas.

7       To the south is the Southern Company.  Southern Company

8  has a number of affiliated subsidiary companies that serve in

9  Georgia, Alabama, Mississippi, to the best of my

10  recollection.  And the Southern Company is, like TVA, a very

11  large, multistate utility company owning nuclear plants,

12  owning coal plants, and serving in a franchise area to the

13  south of the TVA.

14       To the east of the Tennessee Valley Authority is

15  Progress Energy and Duke.  Duke also owns and merged with

16  Synergy, which you see in the right-hand corner, which serves

17  in Ohio.  Those, again, are very large coal-power production

18  utility companies.  They own transmission; they own other

19  power plants; they serve customers in their own franchise

20  areas.  To the north of TVA are the utility companies that

21  are commonly known as Louisville Gas and Electric -- it's

22  shown as LG&E -- and Kentucky Utility.  That's KU.  Those are

23  held by a holding company called E.ON.  E.On is a German

24  utility company and owns the Kentucky Utility.

25       To the west and north of TVA is Amren service territory.

1    Amren is the holding company, holding a number of other

2    subsidiary companies called Amren and various other utility

3    names for those, serving in Missouri and Illinois largely.

4         To the west of TVA and to the southwest are the Entergy

5    System Company.  Entergy Arkansas  and Entergy Mississippi

6    are shown on this particular map, which is Exhibit 401.  The

7    circles represent the approximate stylized service

8    territories.  They're actually much larger than those

9    circles.  The power plants are located around the area of

10   transmission.

11        Each of these companies connects to the TVA.  TVA

12   actually serves, if I recall correctly, as the grid operator,

13   the independent grid operator, for some of the Kentucky

14   utilities.

15        So these are a number of companies.  All of these are

16   investor-owned utility companies.  Their rates charged to

17   retail consumers in the state are subject to rates that are

18   set by the states of North Carolina, South Carolina, Georgia,

19   Alabama, Mississippi, Arkansas.  And so when I named a state,

20   they set the rates for the sales of electricity in those

21   states.

22        So there are circumstances where the utility may

23   actually make an investment, and if the state public utility

24   commission decides that the expenditure was not prudent, the

25   utility may not be able to recover those dollars from

1  consumers.  That is unlike TVA.  TVA, its board sets its own

2  rates and it is mandated to set rates to cover its costs.

3  Q.  And how do TVA's rates compare to that of neighboring

4  other utility systems shown on 401 for identification?

5  A.  Quite favorably.  TVA's rates are relatively low.  They

6  are not the lowest of the companies shown on this list.

7  Kentucky, typically, over the years, has lower rates than

8  TVA, but the rates of the customers in the other states are

9  typically higher.  Generally higher.

10      And I actually have a -- I've prepared a document

11  showing that in my report.

12  Q.  Okay.  So why don't we then look at Plaintiff's Exhibit

13  394 for identification.

14  A.  Perfect.

15  Q.  And that's a summary you prepared, Dr. Tierney?

16  A.  Yes, it is.

17  Q.  And can you explain to us what it shows, please.

18  A.  Yes.  I'll tell you what the bottom line is and then how

19  I created this.

20      Using information that was available in the public

21  domain at the time I prepared my report, I looked at the

22  average electricity rates in each of the states.  I pulled

23  out TVA.  TVA's service territory covers seven states, or

24  portions of seven states, so each of the remaining portion of

25  the other states do not include TVA's sales in those states.

1    So TVA, in 2005, had among the lowest rates of the states in

2    the area surrounding TVA.

3        Now, within Kentucky, the actual rates will vary from

4    one of those electric utility company service territories to

5    another.  Similarly, that would be the case in Mississippi,

6    et cetera.  So these are the averages across the states.  And

7    it shows that, as of 2005, TVA had the second lowest rates.

8        From year to year, the rates may vary slightly with the

9    position shifting one or another, but TVA has consistently

10   had amongst the lowest rates of the states in the vicinity.

11   **Q.**   And you also looked at how TVA's rates compared to the

12   national average?

13   **A.**   Yes.

14   **Q.**   And I'll show you Plaintiff's Exhibit 403 for

15   identification.  Is that your summary of the comparison of

16   TVA and some other state rates to the U.S. average?

17   **A.**   Yes.  This shows the same set of states that was

18   included on the prior exhibit, and it just shows the actual

19   numbers.  And it also shows that, on average, the United

20   States electricity consumer paid 8.14 cents per kilowatt

21   hour.  TVA, in 2005, had retail sales in its service

22   territory of 6.04 cents.

23        Just as a benchmark, there are portions of the country

24   that have rates as high as, I think in this time period, it

25   was probably around 12 or 13 cents per kilowatt hour, and

1    today those are as high as about 18 cents per kilowatt hour.

2    **Q.**    Have you looked at rates in the region since 2005?

3    **A.**    Yes.

4    **Q.**    And what is the picture?  How does TVA compare to the

5    other utilities in the region?

6    **A.**    TVA remains on the relatively low side.  Again, there is

7    year-to-year slight variation.  In terms of the actual

8    average rates, TVA consistently remains low and well below

9    the national average.

10   **Q.**    So, in looking at some of TVA's unique features, did you

11   look at any statements made by financial officers at TVA?

12   **A.**    Yes, I did.

13   **Q.**    I want to show you Plaintiff's Exhibit 393 for

14   identification.  And can you identify this and explain what

15   it shows?

16   **A.**    Yes.  This is a page from a presentation that was made

17   by TVA's financial executive, Mr. Hoskins, to the LaSalle

18   Fixed Income Symposium in January, 2006.  This was a

19   multipage power point presentation that Mr. Hoskins gave to

20   the investment community about TVA and the solidness of its

21   financial situation.

22        And as part of that, TVA's -- Mr. Hoskins described some

23   of the features of TVA by describing that it is advantaged by

24   having one owner, as indicated here; that it is

25   self-financed; and that its rates are set by the board and

1  that, on a statutory basis, TVA is required to cover its

2  costs through the rates charged to consumers, and that those

3  costs include paying back interest and principal on debt

4  borrowed from debt issuers.

5      Additionally, just one other thing to note on this, and

6  that is that TVA's debt instruments are tax exempt for a

7  number of types of things, such as, I think, if I recall

8  correctly, gift tax, inheritance tax, and state and local

9  tax.

10 Q.   Did that same presentation by Mr. Hoskins also summarize

11 the investor advantages that TVA offers?

12 A.   Yes.

13 Q.   And I'll show you Plaintiff's Exhibit 391 for

14 identification.  And can you identify that and explain what

15 it shows, please.

16 A.   Yes.  This is from the same presentation made by

17 Mr. Hoskins to the investment community, and, as you can see,

18 he's describing what TVA views as its own advantages as a

19 place where investors should put their dollars.

20     Mr. Hoskins identifies that TVA's power bonds are rated

21 triple A.  Actually, he does not say -- I apologize -- he

22 doesn't say that they're rated triple A.  He said that they

23 received the highest credit rating, and, in fact, that is

24 triple A from Standard & Poors.  So he identifies their very

25 high quality-credit, credit quality debt instruments.  He

1  identifies the fact that TVA, under its authorities and bond

2  resolutions, must repay the bondholders first with dollars

3  that it receives from the power sales from TVA.  TVA's bonds

4  that are issued are issued for all things related to the

5  power program.  This is the purpose of the issuance, the

6  third bullet on this page.  That means all of the dollars

7  that are raised in debt markets are essentially fungible.

8  They go to support the power program in its many dimensions

9  that include power line investments, power plant investments,

10  including the equipment associated with pollution control.

11  And as I mentioned, he identifies that there are certain tax

12  exemptions associated with the bonds that TVA issues.  And he

13  identifies, and I agree, that these are investor advantages.

14  Q.    I'll show you Plaintiff's Exhibit 392 for identification

15  next.  And is this another slide from Mr. Hoskins'

16  presentation?

17  A.    Yes, it is.

18  Q.    And what does this show?

19  A.    What this shows is the array of possible credit ratings

20  that Standard and Poors, the rating agency, might give to a

21  utility company.

22      So this was 2005, December, 2005.  It showed that there

23  are certain investment-grade credit ratings.  Those are shown

24  on the left-hand side of the chart.  These are things that

25  are appropriate for pension funds and other organizations

1    seeking to have high quality investments.  And on the

2    right-hand side of this chart there are speculative credit

3    ratings.

4         This shows that there are a large number of utility

5    companies that, as of December, 2005, had investment-grade

6    ratings.  Only one of them had the highest rating, a triple A

7    rating.  That is TVA.  And to best of my understanding today,

8    TVA remains the only triple A rated electric utility.  This

9    is ratings not only of TVA, which, as I've mentioned, is a

10   public-owned utility, but this chart also shows the ratings

11   for investor-owned utility companies.  There has been a

12   recent trend in the industry to move utilities downward in

13   their credit ratings.  Mr. Hoskins identifies here that TVA

14   was the highest-rated utility company, and, as I say, that

15   remains the case today in terms of its high quality credit.

16        Let me just mention that one of the implications of a

17   high credit rating is that investors can be assured that they

18   will be repaid.  This shows -- a credit rating depicts the

19   analyst's view about how risky it is that there will be

20   repayment of the debt.  This shows that there is a very sound

21   expectation that the debt issuer will be repaid both

22   principal and interest.  What that means is that it's lower

23   risk.  TVA then can get its money at a lower interest rate

24   than utilities who are on the other side, to the right, in

25   terms of lower credit ratings.  Anyone to the right of TVA on

1  this chart with a lower credit rating will have to borrow

2  money at a higher rate than TVA, all else equal.  All else

3  equal.

4  **Q.**   And you had a figure in your report which showed TVA's

5  comparison of capital cost as compared to other utilities.

6  **A.**   Yes.

7  **Q.**   I'll show you Plaintiff's Exhibit 404 for

8  identification.  And is that your figure?

9  **A.**   Yes.

10  **Q.**   Can you explain to us what it shows?

11  **A.**   Yes.  This chart has a bar representing the cost of

12  capital, or what it takes to pay investors to borrow money,

13  either as debt or as equity.  And each of the companies that

14  are listed on here is one of the companies that was shown on

15  a previous map, the map of the service territories that was

16  on Exhibit 401:  Southern Company, Amren Energy, Progress,

17  Duke, E.ON.  I've also added American Electric Power.

18  American Electric Power serves in a number of the midwest and

19  surrounding states in this area.

20       And what I'm showing on here is, as of the time I did my

21  analysis, which was, if I recall, the fall of 2006, I

22  analyzed the then current cost of capital on a weighted

23  average base for each of these utility companies.

24       Let me just explain what that meant.  For TVA, this is

25  the average interest rate of the debt instruments or the

1    bonds that TVA has issued.  So TVA has issued over

2    $20 billion in bonds; this represents the average cost of

3    capital associated with those bonds as of this period of

4    time.

5         Additionally, for each of the other companies, this

6    represents their weighted cost of capital.  It's their

7    average charge that they have to pay in order to use somebody

8    else's money for investment.  And this reflects two different

9    types of ways in which they get money from investors.  Part

10   of this weighted average cost of capital is from debt, and so

11   it's their actual historical debt and the cost of actually

12   borrowing that money from a variety of parties, including

13   bondholders.  Additionally, it's the average shareholder

14   return that those companies are allowed to charge in their

15   rates under the rates that are set by the utility regulators

16   in their states.  Utility regulators actually set the profit

17   rate that's allowed to be set -- to be included in its rate.

18   So in each of these companies, the average weighted cost of

19   capital represents their access to money for investment

20   purposes and how costly it is.

21        TVA shows here that as of this period of time it was

22   less than 6 cents -- excuse me -- 6 percent interest rate.

23   The weighted average cost of capital of every one of these

24   other utility companies is higher than that.  In fact, it's

25   gone higher than that in recent years for these companies.

1  TVA remains cheap in terms of its -- I said that wrong.  Let

2  me start that sentence over, please.

3       TVA can borrow money more cheaply than other utilities,

4  partly because it doesn't have any equity shareholders, and

5  equity shareholders are riskier because they get repaid after

6  shareholders.  So that's a riskier form of investment.  It

7  costs more to get money from equity shareholders.  Every one

8  of the other companies that are listed on this exhibit has

9  equity in its cost of capital.  But also, because TVA's debt

10 is so highly rated by Standard and Poors and Moody's, it can

11 borrow more cheaply than any of these other companies can, so

12 the combined effect of low cost debt and equity capital means

13 that TVA's cost to borrow money is lower.

14      All else equal, that means TVA could operate and make

15 investments more cheaply than any of these other companies.

16           **MR. GOODSTEIN:**  Your Honor, we'd like to offer

17 Exhibits 435, which is Dr. Tierney's CV; 401, the map of

18 TVA's neighbors; 394, 403, 393, 391, 392 and 404 into

19 evidence at this time.

20           **THE COURT:**  Let those be admitted.

21           **(Plaintiff's Exhibits 391, 392, 393, 394, 401,**

22      **403, 404 and 435 received.)**

23 **BY MR. GOODSTEIN:**

24 **Q.**  Dr. Tierney, are you aware of actions that TVA has taken

25 to reduce its debt, its capital debt?

1   **A.**   Yes.

2   **Q.**   I want to refer your attention to Plaintiff's Exhibit

3   415 for identification.  And is this a presentation to

4   investors that was done by Tom Kilgore, the president and CEO

5   of Tennessee Valley Authority?

6   **A.**   Yes, it is.

7   **Q.**   And referring your attention to page 21 of that

8   document, can you explain to us what this slide shows.

9   **A.**   Yes.  This slide shows that in a period from 1997

10  through 2006, TVA lowered its debt and other financing

11  obligations per unit of capacity of power plants owned by

12  TVA.

13      So TVA took all of the megawatts of power plant capacity

14  of all of its power plants and it compared those megawatts to

15  how much debt and other financing instruments were

16  outstanding in each of those years, and it shows that, over

17  time, the ratio of debt in other financing obligations

18  dropped year to year, as you can see here on the chart, or

19  almost year to year.  There was certainly a downward trend.

20  Then that came as a result of a number of things, but

21  probably most importantly, TVA's initiative to attempt to

22  reduce its debt.

23      TVA, in the early 1990s, had begun to approach its debt

24  ceiling of $30 billion, and TVA was encouraged by a number of

25  parties, including, if I recall correctly, the office of

1   management and budget, as well as potentially, again, as I

2   recall, the general accounting office, to begin to provide

3   more flexibility and security for TVA's management of its

4   finances by reducing its debt below the $30 billion.

5        So TVA has had a strategic objective for a number of

6   years to reduce its overall debt profile, and this shows that

7   TVA has had some substantial progress in accomplishing that

8   result.

9   **Q.**   Now, referring your attention to the next slide in that

10  exhibit, page 22.  Can you explain to us what that one shows?

11  **A.**   Yes.  This is a conceptual schemata, if you will, that

12  identifies a profile of management of debt and other

13  financial obligations from the current time, as of the

14  current time of this presentation by Mr. Kilgore, which was

15  2006-2007, up through approximately a 30-year period.  It

16  indicates that TVA's existing debt is -- shown in that light

17  orange or tan color -- it shows that existing debt was,

18  according to this, above or near $25 billion.  And TVA

19  includes in that number other financing obligations.  Those

20  are things that are above and beyond what the TVA mandate for

21  what debt falls below the $30 billion cap.  TVA includes not

22  only debt, but these other financing obligations as

23  instruments that TVA is attempting to manage and balance

24  against a debt ceiling.  These other financial obligations

25  are things where TVA has a lease-back agreement with a third

 1  party.  They sell somebody a power plant, the power plant

 2  owner leases it back to TVA, and this serves as a way in

 3  which TVA can provide financing for its activities, and,

 4  technically, those other financing obligations don't count

 5  under the $30 billion ceiling.  This shows that when you add

 6  those to the existing debt, there is a profile that shows TVA

 7  will expect to keep its total of those manageable over time

 8  at approximately some number -- this is, as I say, kind of a

 9  schematic.  This appears, by eyeball shot, to be around

10  $27 billion a year.  The existing debt represents debt that

11  is actually outstanding as of the time of the presentation,

12  and the maturities of those borrowings, they taper down over

13  time.

14      So you can see, you know, there was a debt for a 30-year

15  bond.  That 30-year bond would be paid off -- if it was

16  issued in the year 2000, that would be paid off in the year

17  2030.  There are a variety of maturities, and, therefore, at

18  any snapshot point in time, those existing debt instruments

19  taper off.

20      But TVA has indicated in this picture that they will

21  manage and most likely issue new debt, and that's shown in

22  the brighter yellow color.  So as they're tapering down some

23  older debt, they'll refinance and/or take out new debt.  So

24  they'll manage their financial portfolio within this target

25  range that they've identified.

1        **MR. GOODSTEIN:**  And, Your Honor, I see that this

2   copy is not very good.  It didn't get the color of the areas.

3   So you can see it on the monitor, and we'll get a better copy

4   of this and replace it in the record.  Sorry about that, Your

5   Honor.

6        **THE COURT:**  All right.

7   **BY MR. GOODSTEIN:**

8   **Q.**  Dr. Tierney, did you see some information that updates

9   the data that we're looking at here to show that TVA is

10  continuing to service debt at very low costs?

11  **A.**  Yes.

12  **Q.**  Okay.  I'll refer your attention to Plaintiff's Exhibits

13  420, 421, 422 and 423, which is a series of information that

14  you reference in your report.  And maybe we can go through

15  these quickly and you can just explain to us the

16  significance -- first of all, what they are, and the

17  significance of these announcements by TVA for your analysis.

18  **A.**  Sure.  These four exhibits are four press releases

19  issued by TVA at four different periods of time in the last

20  three years, and they represent announcements by TVA of

21  successful bond issuances.  They represent a large dollar

22  quantity and low interest rates.

23      So let me just start with the first one quickly.  On

24  June 15th, 2005, TVA issued 1 billion dollar debt, now, in

25  other words, bonds, that would be for 10 billion -- for

1   billion, and these would be repaid in ten years.  And TVA

2   announces here, you might see in the first paragraph, a

3   couponed rate of 4.375 percent.  That represents the interest

4   rate in effect for this bond.

5       Additionally, what TVA did in this was refinance some

6   other debt that it had borrowed at a much higher rate.  So

7   this is like refinancing your house with a cheaper mortgage

8   rate, when that's possible to do.  TVA was able to do that

9   here and replace some of its more expensive date with cheaper

10  debt.

11      TVA indicates here that -- in a second paragraph,

12  Michael Rescoe, the chief financial officer, says that the

13  success of the transaction is indicative of TVA's ability to

14  match its own financial needs with those investors around the

15  world and to keep on track with its current interest rate

16  forecast.

17      Let me turn your attention to the next one, which is

18  421.  This is was an announcement in March of 2006.  TVA

19  issued another $1 billion for a 50-year bond, and in this TVA

20  announces that it borrowed -- I think this was a record.

21      Yes.  In the first paragraph, this is the largest

22  50-year transaction ever for a U.S. agency or corporate

23  issuer with a lowest coupon rate ever for a 50-year bond.

24      This issuance was -- if you scroll down a minute to the

25  fifth paragraph.  This indicates that TVA's -- that interest

1  in TVA's debt was twice as large as the bond issuance

2  occurred.

3      So there is a paragraph that says "Demand for the bond

4  produced an order book that was more than twice the amount

5  billion-dollar size."  Meaning this was a very attractive

6  bond issuance in the investment community at that time.

7      Please turn your attention to the next exhibit, 422.

8  This was at the first of this year, January 17th, 2008.  TVA

9  issued half a billion dollars in a 40-year power bond.  This

10  had a coupon rate or an interest rate of 4.875 percent

11  interest.

12      The fourth and fifth paragraphs of this announcement

13  indicate that this was the lowest ever coupon rate, or the

14  lowest ever interest rate, for a bond with a 40-year

15  maturity.  The ultra long-term combined with the low coupon

16  rate will allow TVA to extend the average life of its

17  financing portfolio while reducing its overall cost of

18  borrowing.  TVA identifies, once again, that it has the

19  highest bond rating of utilities, showing a triple A rating

20  by Fitch and Standard and Poors.

21      Finally, in Exhibit 423, more recently, in what we

22  already know is a pretty troubled investment climate at the

23  moment, TVA announced on March 6th, 2008, that it had issued

24  another billion dollars in power bond at a coupon rate of 4

25  and a half percent.  TVA said it was able to take advantage

1  of its strong credit rating and move out quickly for

2  favorable market conditions and financed this at very low

3  cost.

4       Together, we've just gone through three and a half

5  billion dollars of bond issuances.  TVA has actually issued

6  more bonds than I've illustrated with these four press

7  releases, and those bonds continue to show that TVA's

8  financial strength and its advantages to investors remain

9  very strong and very attractive, especially compared to many

10  other targets of investment in the utility community today.

11          **MR. GOODSTEIN:**  Your Honor, at this time we offer

12  Plaintiff's Exhibit 415, 420, 421, 422 and 423 into evidence.

13          **THE COURT:**  Let those be admitted.

14          **(Plaintiff's Exhibit 415, 420, 421, 422 and 423**

15      **received.)**

16  BY MR. GOODSTEIN:

17  **Q.**   Dr. Tierney, can you summarize for us the impacts of

18  TVA's low rates and their low cost of capital that you've

19  described on TVA's power system?  What's the effect of those

20  things?

21  **A.**   In simplest terms TVA stands head and shoulders among

22  its colleagues in the electric utility industry as being a

23  very strong, creditworthy entity.  It can attract investments

24  through very low cost debt.  It can undertake its power

25  program at interest rates that are lower than other utility

1  companies in the United States.  It is viewed attractively by

2  investors, and it has the advantages associated with assuring

3  that its rates cover its costs, that bondholders are repaid,

4  that it has a sophisticated financial management.  All of

5  those mean that TVA has the means to carry out a large

6  investment program going forward with confidence.

7  Q.   And what's the significance of TVA's rate-making

8  authority to your analysis?

9  A.   It's very significant to my bottom line, and that is

10 that TVA's ability and responsibility to set its own rates,

11 to cover its costs and to keep costs as low as feasible and

12 to provide reliable electricity service to its consumers

13 means that TVA has the authority, basically, to get the job

14 done.

15     If it is approaching its debt ceiling and it must

16 undertake an investment to keep the lights on, to keep

17 pollution at acceptable levels, for whatever reason that the

18 board determines is appropriate to responsible service, TVA's

19 board has the ability to actually raise rates to make sure

20 that the investment requirements can be undertaken.

21 Q.   All right.  So with that background, Dr. Tierney, that

22 background on your analysis, let's look at your evaluation of

23 the feasibility and reasonableness of TVA financing of the

24 emissions reductions in air emissions from its coal-fired

25 power plants sought by North Carolina in this case.

1    How did you go about looking specifically at the cost of

2   this additional control program and how feasible and

3   reasonable that was financially for TVA?

4   **A.**    I started by thinking about this investment the way that

5   a utility typically would think about it, which is I've got

6   to undertake infrastructure investment; I will borrow either

7   from my cash reserves, from my shareholders -- there are none

8   for TVA -- or my debt holders, to borrow money to fund an

9   investment program.

10       I relied upon Dr. Staudt to tell me how large an

11   investment.  In this case it was $3 billion.  And I

12   eventually looked at a $5 billion estimate by TVA.

13       I thought about how the utility would undertake that.

14   And Dr. Staudt asked me to assume that TVA would spend

15   one-fifth of the investment cost in each of five years.  So

16   from 2008 through 2012, I assumed that one-fifth of

17   $3 billion or one-fifth of $5 billion would be spent, and for

18   the purpose of analyzing the incremental impact of that

19   investment, I assumed that TVA would actually be borrowing

20   money to do that in each of those five years.

21       So for the $3 billion estimate, I assumed TVA would

22   borrow 600 million in each year for five years, as it was

23   planning for, constructing, and installing the pollution

24   control program.

25       At the end of five years TVA, would have borrowed

1  $3 billion.  I assumed that TVA paid off the interest rate on

2  that debt each year, so that at the end of that period of

3  time TVA had a $3 billion, or in the case of the $5 billion

4  investment, a $5 billion investment, and it had a system with

5  the pollution control equipment in place and ready to go into

6  service.

7      In typical utility rate-making, a cost of an investment

8  for a long-lived capital investment program is spread across

9  the life of the investment.  I assumed in this case the life

10  of this investment as given to me by Dr. Staudt.  He gave me

11  a 30-year investment -- excuse me -- an investment life, a

12  capital life for the pollution control equipment, and,

13  therefore, I spread the cost of recovering the cost of this

14  three to five billion dollars across that 30-year period.

15      So what that meant was I was -- I had 3 billion or

16  5 billion that TVA had borrowed, and I had to pay back

17  principal each year and I had to pay interest down each year

18  for the amount that I had borrowed until the full amount of

19  exhausted at the end of 30 years.

20      Finally, I analyzed what it would cost to operate that

21  system, and the cost to operate the system was given to me by

22  Dr. Staudt.  It was a $220 million amount to operate and

23  maintain the system.  And using very standard utility

24  cost-of-service methodology, in essence, I designed a cost

25  recovery profile for paying back the interest and principal

1  on debt over 30 years, as well as paying the operations and

2  maintenance costs over that entire 30-year period as well.

3  **Q.**   So let's look at what your analysis showed, Dr. Tierney.

4  And I'll refer you to Plaintiff's Exhibit 405 for

5  identification.  And can you identify that and explain what

6  it shows, please.

7  **A.**   Yes.  This shows in graphic form what I described in

8  words.  And let me just orient you to what's shown on the

9  chart.  It shows some orange bars on the left-hand side of

10 the chart from 2008 until 2013, and those represent the

11 borrowing costs associated with an annual $600 million of

12 bonding.  In each of those years, those are the interest

13 costs of having borrowed money in each of those years for the

14 construction program.

15      So you'll see the first bar is after the first year.  I

16 borrowed for TVA in my analysis, 600 million, and the

17 interest on that shows that that small little orange bar over

18 on the left-hand side.  In 2009, I've got to pay back one

19 year of interest on 600 million.

20      The second year, 2009, and I apologize, these appear to

21 be slightly off in terms of visually, but by the second year,

22 I would have borrowed 1.2 billion.  That's two years, at 600

23 a year.  And I've got interest to repay.  TVA's interest for

24 repayment of that would show up then in that second bar.  And

25 then, on -- the first five bars shows just repaying interest

1  such that I have been, at the end of that period, once the

2  pollution control program is going into effect, in 2013, I've

3  got 3 billion that I need to pay back.

4      So what you see then from 2013 to the right on this

5  chart, and in the years through 2042, if I'm recalling

6  correctly, you have three cost elements that show up on this

7  chart.  The blue element on the bottom is depreciation cost.

8  Think of that as the cost of wear and tear on the plant, and

9  I'm going to depreciate the plant over 30 years and I'm going

10 to collect an amount in rates associated with recovering

11 investment for 1/30 of the life of the plant.  That allows me

12 to repay 1/30 of my bond's principal.  Then I'm also going to

13 repay the interest cost of having -- still holding the rest

14 of the bond.

15     So this shows, over time, I'm going to pay each year

16 1/30 of the principal on my bond, which, again, in this

17 particular picture is 30 -- 3 billion -- excuse me, not

18 30 billion -- and my interest goes down as I pay off the

19 principal, so the orange wedge declines as I pay off the

20 principal.

21     The third cost element here in the annual amount that's

22 paid is the $220 million in operations and maintenance cost.

23     This shows, therefore, that in 2013, which is the

24 highest cost year for recovering the cost of this program,

25 TVA consumers, in effect, would be paying approximately

1  500 million to pay off the investment and maintain and

2  operate this pollution control program, and the cost goes

3  down over time.

4      So, essentially, this would be TVA's cost horizon, its

5  cost profile that it needs to collect from consumers in

6  rates.

7  **Q.**   Okay.  And so what was your overall conclusion regarding

8  the cost of the additional controls sought by North Carolina

9  and the options available to TVA to finance that cost?

10 **A.**   I determined that this would be a feasible and

11 reasonable level of investment for a number of reasons.

12     While $500 million a year sounds like a lot of money, as

13 it would appear in its highest year just under 500 million in

14 2013 for the $3 billion program, TVA's revenues, as we

15 indicated, are 9.2 billion in 2006, and TVA is of the size

16 that can handle this amount of incremental addition.

17     I note that TVA's most recent rate increase,

18 essentially, was for an amount larger than this.  So TVA

19 raised its rates most recently to recover an incremental

20 amount, unrelated necessarily to what I'm talking about here,

21 for an amount larger than this overall cost impact to TVA.

22     So this was a doable amount for TVA, given its size, its

23 complexity and, most importantly, its ability to raise money

24 in debt markets and its ability to collect that money from

25 consumers through rates.

1  **Q.**   And how do you expect that TVA will absorb the costs of

2  the additional emissions reductions sought by North Carolina?

3  **A.**   Well, if I understand your question right, TVA will

4  manage a portfolio of debt and manage its rate increases to

5  accommodate whatever necessary expenses that it has to run

6  its power program.

7      As I mentioned before, the power program includes

8  whatever it takes to assure reliable service to consumers,

9  keeping the lights on, if you will; it includes investment

10  that TVA has to make in order to add power plants, if demand

11  is growing as TVA expects demand to grow; and that will

12  include, if ordered by this Court, a pollution control

13  remedy.  And TVA will manage debt issuances, repayment plans,

14  refinancings and rate increases to live within its

15  $30 billion cap, retaining sufficient flexibility to keep it

16  financially sound.  It will repay bondholders and it will

17  collect from consumers, and be able to do so, an amount to

18  recover the cost of this investment.  And in my opinion, this

19  is an amount which is consistent with the type of

20  programmatic responsibilities of the organization, consisting

21  in terms of type, size, quantity, and managability.  This is

22  a doable program for an organization the size, complexity and

23  sophistication of TVA.

24  **Q.**   And did you look at the capital costs of the additional

25  controls sought by North Carolina and compare them to TVA's

1  statutory debt ceiling?

2  **A.**   Yes, I did.

3  **Q.**   So let's look at Plaintiff's Exhibit 397 for

4  identification.  And is this one of the figures out of your

5  report, Dr. Tierney?

6  **A.**   Yes, it is.

7  **Q.**   And can you explain to us what it shows?

8  **A.**   Yes.  If you keep in mind that colored picture you had a

9  minute ago from Mr. Kilgore's presentation.

10  **Q.**   Is that Plaintiff's Exhibit 415?

11  **A.**   Yes.  Page 22.

12  **Q.**   Page 22.  All right.

13  **A.**   Where existing debt is shown to taper down consistent

14  with maturities of the bonds.  What I did was look at the

15  actual maturities of the bonds that were held as of the time

16  I issued my report.  And those bonds are shown in the colored

17  bars on this chart.

18      The bottom most colored bar -- a portion of each bar is

19  a dark blue and it represents debt -- long-term debt that are

20  called power bond issuances.  Power bonds have the highest

21  quality in terms of repayment by TVA.  And as you can see

22  here, as of the time I did my report, the maturities during

23  which TVA would have to pay off those existing commitments to

24  bondholders took this tapering-down effect.  That's

25  consistent with what Mr. Kilgore showed on his existing debt

1  in his exhibit.  So this is the actual maturities as they

2  existed at the time of my analysis.

3      Additionally, there were non-power bond debt forms that

4  are very light colored blue that in the years from 2008 -- or

5  is it 2006?  I can't even read it myself.  2006 through 2018,

6  there are some other non-power bonds that need to be repaid.

7  So those are shown in light blue and they taper off, so that

8  by the early 2020s there are no such prior commitments for

9  those kind of bonds.

10      In yellow are things called discount notes.  Those are

11  short-term bonds.  These are bonds where -- excuse me.  These

12  are debt instruments that TVA issues for a period of less

13  than one year and TVA has to repay them back in a one-year

14  period.  In fact, I think it's 270 days.  At any one point in

15  time, TVA typically uses those discount notes in a working

16  capital kind of fashion.  I assumed in here the amount of

17  discount notes that TVA actually had as of the time I did

18  this analysis, which was the end of 2006, and I think that

19  was $2.4 billion in discount notes.  That amount fluctuates

20  from time to time.  It's lower than that right now.  And in

21  fact, if this were to be updated, there was a slight

22  reshaping of this overall blue curve, but it has this overall

23  pattern of tapering off.

24      This represents a snapshot in time of commitments

25  already made by TVA.  These are commitments that are under

1    the statutory debt ceiling of $30 billion.  I did not include

2    under this debt ceiling things like other financing

3    obligations, lease-back agreements that do not qualify under

4    the $30 billion cap.  And I asked myself, if I put the

5    dollars under here associated with borrowing 3 billion or

6    5 billion, in the case of my $5 billion analysis, if I added

7    the borrowing associated with that in each year starting in

8    2008 through 2042, what would that do to take TVA up above

9    its existing commitments?  And, as you can see, it shows that

10   for the first five years there is an incremental increase of

11   $600 million a year in bonding, up to the point at which

12   there is principal held that begins -- that principal starts

13   at 3 billion in 2013, and the principal declines over time,

14   because I assumed these would be 30-year bonds that would be

15   repaid at the end of 30 years.  So this tells me that this is

16   consistent with the type of profile that TVA is capable of

17   and used to managing.

18        The reason I put existing bonds on this is because any

19   point in the future TVA will have to manage its program of

20   new bonds, assuming its prior commitments and, in my

21   analysis, assuming the $3 billion program cost and the

22   borrowings associated with that, and TVA would have to manage

23   subsequent refinancings, new bond issuances and other things

24   to live within its cap, and to the extent that it continues

25   to seek to manage a debt-reduction program, TVA will have to

1  balance raising rates with bond issuances in order to have a

2  sound management profile for its finances going forward.

3  **Q.**   And did you do the same analysis, Dr. Tierney, for the

4  capital cost estimate of $5 billion that was provided by TVA?

5  **A.**   Yes, I did.

6  **Q.**   I'd like to refer you to Plaintiff's Exhibit 398 for

7  identification.  And could you explain to us what this figure

8  shows?

9  **A.**   Yes.  This figure shows the blue, light blue, and yellow

10 colors are identical from the previous chart that we just

11 discussed, which was Exhibit 397.

12      This shows that same existing commitment profile for

13 debt issuances that TVA has done.  It compares it to the

14 $30 billion cap, and in this case I assumed that the

15 borrowing for the pollution control program would be

16 5 billion, to see whether or not it would be a manageable

17 amount of new debt under the $30 billion ceiling.  It left me

18 with the impression that in the highest year this would leave

19 TVA at an amount at less than 25 billion, and, in fact,

20 closer to $23 billion relative to its $30-billion debt

21 ceiling.

22      TVA has indicated through its chief financial officer

23 that it seeks to maintain sufficient room under the cap so

24 that it has flexibility and that they would not go above

25 28 billion.  This provides a cushion that will allow TVA to

1  issue bonds for other purposes and manage its financial

2  profile as needed over the years going forward.

3  **Q.**  And do you expect that TVA will need to finance capital

4  expenditures to a level that, when combined with this capital

5  cost estimate and operation and maintenance costs, would

6  approach the debt ceiling?

7  **A.**  No.  I would expect TVA to do the job that it's been

8  doing in the past decade, to look at the array of

9  responsibilities that it has for providing reliable power at

10  minimum feasible cost and providing all compliance with

11  health safety and other requirements so that TVA balances

12  issuances below the debt ceiling and rate increases in a way

13  that capably balances, providing all of that electricity

14  service, giving the cost to consumers, the legal requirements

15  that are obligated, including a $30-billion debt ceiling and

16  repayment of bonds.  TVA in my opinion will be able to manage

17  this capably and continue to do its job effectively.

18  **Q.**  Did you look at the impact of this kind of expenditure

19  on additional air pollution emissions reductions and its

20  impact on rates and TVA's customers?

21  **A.**  Yes, I did.

22  **Q.**  And can you explain to us what your conclusions were

23  there?

24  **A.**  Yeah.  My conclusion was that the rate increase that

25  would be implied by this investment program that I've just

Case 1:06-cv-00020-LHT  Document 214  Filed 06/22/09  Page 120 of 141

1  been describing would be of a size that would be absorbable

2  by TVA's consumers, and, therefore, that it would be within

3  the ability of TVA's management to exercise its

4  responsibilities to raise rates to cover these costs and that

5  the rates would have a relatively modest impact on consumer

6  prices.

7  Q.   I want to show you Plaintiff's Exhibit 399 for

8  identification and 400 for identification.  Look at these one

9  by one.  And are these figures that were contained in your

10  reports, Dr. Tierney?

11  A.   Yes.

12  Q.   And can you explain to us what they show?

13  A.   Yes.  What I did on this was consistent with how one

14  would look at an incremental impact of a new investment on

15  consumer rates.  And in this case, what I did was I took the

16  average consumer rate in TVA's service territory.  So this

17  was the average cents per kilowatt hour rate.  Previously, we

18  looked at what that rate was in 2005.  That was just around 6

19  cents per kilowatt hour.  That's the unit of sales and

20  electricity.

21       You see that over on the very left axis.  It shows $0.06

22  per kilowatt hours, 6 cents per kilowatt hour.  So that was

23  the historical rates.

24       There is -- then what I did was I tried to analyze how

25  you would spread the cost of the program that we've

1  previously discussed -- and I can't for the life of me find

2  the right chart, which I apologize for.  But, in essence, the

3  chart would show -- it was chart 405, actually, Exhibit 405.

4  **Q.**  All right.

5  **A.**  Exhibit 405 showed, again, the need to recover a dollar

6  amount in each year from consumers.  So what I did was I took

7  that dollar amount, which in the year 2013, in the $3 billion

8  case, was below $500 million, and I spread that across all of

9  the electricity sales expected to occur in TVA's service

10  territory.  So I took the dollar amount in 2013, I divided

11  that by total sales, and that produced a cent per kilowatt

12  hour.  And that is the bar that you see on the year 2013 in

13  Exhibit 399.

14      The smaller bars from 2009 -- 2008 through 2012 show the

15  increase in rates associated with just interest payments for

16  borrowing the money to build the pollution control program.

17  2013 then, I had the full money of the $3 billion, plus

18  interest, plus operations and maintenance, and I had to

19  spread that across all the kilowatt hour sales.  That came

20  out to approximately a quarter of a penny, 2.5 mills.  That's

21  what you see in the bar on 2013.  That's the year of the

22  highest rate impact, and as you can see, it declines and

23  tapers off over time.

24      When you compare a quarter of a penny to a 6-cent

25  average, we're talking about a 4 percent rate increase

1  associated with this pollution control program in its highest
2  rate impact year.
3       Now, I just note, I used as my base in that comparison,
4  in that rate impact comparison, the rate that appeared in
5  2005.  In fact, in 2013, what consumers will feel will be the
6  rate impact of that quarter of a penny on top of the rates as
7  they're being charged in 2013.  All expectations are that
8  that will be higher than 6 cents per kilowatt hour.  In fact,
9  the rates have already gone up above that amount already.  So
10 the rate increase here is higher than one would expect
11 because I'm using a base of comparison of 2005 year rate
12 increases, and a consumer will actually feel a smaller impact
13 in the year -- in 2013.
14      These are not cumulative rate impacts, by the way.
15 These are the rate impacts relative to 2005.  So the rate is
16 going up a tiny bit in 2008, a little bit more in 2009, a
17 little bit more in 2012, such that, by 2013, the total impact
18 is a quarter of a penny.
19      By the way, just one more thing.  In this, I grew the
20 amount of electricity TVA is expecting to sell over time, so
21 that I used that to spread the amount of cost among all the
22 sales.  And as it turns out, I used an assumed growth rate
23 which is lower than what TVA is using for planning purposes
24 today.  I used 1.4 percent increase in sales.  TVA is now
25 planning for 1.9 percent electricity sales.  That would also

1    lower the rate.

2    **Q.**    And did you do a similar analysis for TVA's $5 billion

3    capital cost investment?

4    **A.**    I did.

5    **Q.**    I'll show you Plaintiff's Exhibit 400 now for

6    identification, and can you explain to us what that one

7    shows.

8    **A.**    Yes.   Using the exact same methodology, I spread the

9    $5 billion investment cost, the debt repayment, and the

10   operations and maintenance cost across all of the electricity

11   sales TVA would expect in these years, and in this case, the

12   impact on rates in 2013, which is the highest rate year

13   impact, would be 3.5 mills per kilowatt hour, or a third of a

14   penny rate increase associated with the $5 billion remedy.

15        That works out to be about $4 a month for an average

16   consumer.   Again, that's at the high end range.   At the

17   $3 billion range, it was about $3 per month per consumer.

18   **Q.**    And did your analysis consider the potential fuel cost

19   savings to TVA from the additional pollution controls sought

20   by North Carolina?

21   **A.**    No, it did not.   And I am aware of Dr. Staudt's

22   conclusion or opinion that there will be fuel cost savings

23   associated with running a cheaper fuel, a less expensive coal

24   in the coal plants once the pollution control equipment are

25   in place, and I did not include that benefit, or their

1  countervailing benefit, in my rate analysis.

2  **Q.**   Did you consider how this potential rate increase would

3  affect electricity use by TVA's customers?

4  **A.**   Yes, I did.

5       Electricity use happens to be one of those things that

6  people need a lot, and they tend to use electricity even when

7  there are prices in place -- excuse me -- when there are

8  price increases that occur.

9       Electricity use is relatively insensitive to price

10  increases, and the evidence shows that there are very, very

11  small increases -- excuse me -- decreases in electricity use

12  associated with increases in electricity prices of the order

13  of magnitude I'm describing here.  So I don't expect this to

14  have an appreciable impact on sales of electricity by TVA

15  within its service territory.

16  **Q.**   And is TVA at risk of losing customers to surrounding

17  utilities based on your experience from the additional costs

18  associated with the emissions reductions sought by North

19  Carolina?

20  **A.**   There is not a material risk that TVA faces that is

21  associated with this cost increase, in my opinion.

22  **Q.**   And why is that?

23  **A.**   There are a number of reasons.

24       As I indicated previously, the large share of utilities

25  surrounding TVA have higher rates than TVA, meaning that, if,

1  someone were able to choose where they got their power supply

2  and they were able to choose to buy from TVA, the trend would

3  be to seek to have TVA be a provider rather than have TVA be

4  exposed to having competitors come in.

5      That, of course, assumes that there would be a change in

6  law that removed the fence around TVA.  And while there have

7  been some indications of interest in removing the fence so

8  that TVA's customers are able to have more options to buy

9  electricity from outside and others are allowed to sell into

10 TVA's service territory, those proposals over the years have

11 gone nowhere in Congress, and I don't think that there is a

12 significant threat TVA faces for having its service territory

13 invaded, if you will, by competitors.

14     Were that to occur, I think that TVA would have just as

15 strong chance to be able to convince Congress that it should

16 be able to sell outside of the fence if others can sell

17 inside of the fence.

18     So I think that there are sound economic reasons and

19 very strong political/statutory/legal reasons without opining

20 about it, as if I were a lawyer, which I am not, that lead me

21 to that conclusion.

22 **Q.**   And did you look at the relative sales volumes for TVA

23 and companies in the area with lower rates and companies with

24 higher rates?

25 **A.**   Yes.

1  **Q.**   I'll show you Plaintiff's Exhibit 406 for

2  identification, and can you explain to us what that figure

3  shows.

4  **A.**   Yes.  Let me actually give a little context for the

5  figure.

6       I asked myself what if the law changed, what if the ring

7  or the fence around TVA were removed, how vulnerable would

8  TVA be, so that if it were forced to pay for a 3 to

9  $5 billion program, would it likely find itself disadvantaged

10 from a competitive point of view?

11      So I wanted to see whether it was more likely to be

12 invaded by competitors with lower cost power so that TVA's

13 consumers would go seek supplies from lower cost providers,

14 or whether TVA actually would stand to gain market in a

15 situation where the ring or the fence went down around TVA's

16 boundary and TVA could compete outside, and I found that the

17 amount of demand in the portion of the region with lower

18 prices than TVA is smaller than the market with higher prices

19 than TVA.

20      So were the Congress to change the law such that TVA

21 lost its protection on its franchise, in my opinion, TVA, at

22 worst, would be held harmless and might actually have

23 opportunities to sell more outside, because of its low cost

24 of capital, its relatively cheap rate, its ability to do its

25 job at a -- all else equal, at a lower cost of service than

1  many of the other utilities in the service territory.

2      So this told me that, whereas TVA has identified the

3  risk associated with being invaded, so to speak, by suppliers

4  from Kentucky, which has lower prices, there are higher

5  prices being charged to consumers in Mississippi, Georgia,

6  North Carolina, South Carolina, Arkansas, et cetera, such

7  that TVA would be able to find a market where it would be

8  able to sell its electricity.

9          MR. GOODSTEIN:  Your Honor, at this time we offer

10 Exhibit 405, 397, 398, 399, 400 and 406 into evidence.

11         THE COURT:  All right.  Let those be admitted.

12         (Plaintiff's Exhibits 397, 398, 399, 400 405 and

13     406 received.)

14         MR. GOODSTEIN:  Thank you, Your Honor.

15 BY MR. GOODSTEIN:

16 Q.  Dr. Tierney, did you have a chance to read the expert

17 reports submitted by Mr. Mitchell on behalf of TVA?

18 A.  Yes, I did.

19 Q.  Mr. Mitchell comments that there is some risk to TVA

20 that their service area could be restructured?

21 A.  Yes.

22 Q.  Did you consider that risk in your analysis?

23 A.  Yes, I did.

24 Q.  And what did you conclude?

25 A.  That I don't consider it to be a substantial risk such

1 that my opinion about TVA's ability to finance this program

2 feasibly and reasonably would change.  And partly, it's for

3 the reason I just described, which is that Congress would

4 have to change a law, and if Congress were to change a law,

5 TVA might just as well do well in that legal change as it

6 would do poorly.

7      And I also analyzed what was going on in trends in the

8 electric industry with regard to the increased pressures for

9 competition and what that might mean for TVA.

10 **Q.**   All right.  And what did you conclude there?

11 **A.**   I concluded that I don't think that TVA stands to --

12 stands under significant pressure today for successful

13 pushing for competition within its service territory.

14      The past decade -- actually, the last 15 years, there

15 has been an overall trend in the electric industry toward the

16 introduction of market forces and the increase of

17 competition, and up through about 2001, there was growing

18 interest of states to open up the franchise areas of

19 utilities for competition, and it would have been

20 understandable as of that period of time for TVA to worry

21 about whether or not there would be significant pressure for

22 opening up the TVA service territory.

23      Then a number of things happened after that, including

24 the California electricity crisis in 2001, the Enron

25 bankruptcy, bankruptcy of a number of electric utility

1    companies, as well as power suppliers, and there has been a

2    slowing down of the pressure to open up electricity markets

3    around the country.

4         TVA's own strategic plan, in fact, identifies this

5    change in trends to lessen the pressure for competition,

6    especially in the states around TVA.  And so I don't think

7    that this is a material risk for TVA at present.

8    **Q.**   So referring your attention to Plaintiff's Exhibit 411

9    for identification, Dr. Tierney, and is this a copy of TVA's

10   strategic plan for 2007?

11   **A.**   Yes, it is.

12   **Q.**   And referring you to page 6 of that exhibit, what does

13   TVA have to say in its strategic plan about the status of

14   retail restructuring in the United States?

15   **A.**   Well, let me just show you the text there at first.  The

16   very first sentence says that TVA, in its issuance of its new

17   2007 plan, identifies that there are significant changes

18   since the last time it did its strategic plan, which was

19   2004.  At that time, wholesale competitive market structures

20   were still expanding.

21        Since then, down in the second paragraph, it identifies

22   at the end of the paragraph, the last sentence reads,

23   consequently -- the second to the last sentence.  I'm sorry.

24   "Consequently, wholesale competition is now evolving more

25   slowly and much of the focus is on governing transmission

1    access in bilateral markets."

2        The gist of what that means is that there is less

3    pressure on all transmission providers, like TVA and other

4    companies that own transmission wires, to open them up to let

5    other companies and other parties use their transmission

6    wires.

7        So whereas several years ago TVA might have worried,

8    justifiably, that there could be continued pressure in

9    Congress to remove the fence around TVA so that TVA could be

10   ordered to open up its transmission lines to carry power for

11   other power suppliers so that those other power suppliers

12   could sell it to TVA's distribution companies, this indicates

13   TVA's own view that that's no longer such a threat, and in my

14   opinion, that is very consistent with the trend in the

15   industry.  TVA, I think, is not in a position to worry

16   significantly about this.

17       The bottom of this page just shows a map.

18   **Q.**   Okay.

19   **A.**   And this map shows a snapshot as of 2006, updated by TVA

20   in 2007, indicating where there has been movement amongst the

21   states to open up their electricity franchise areas to

22   competition.

23       You can see up in the northeast, those states have

24   opened up their utility service territory so a retail

25   customer can choose their electricity supplier.  California

1  did that, but they suspended it after the electricity crisis.

2  That's why it's in red.

3     The black states on this map are states where the state

4  actually repealed a law allowing for competition in one form

5  or another in the state.  And, in fact, since this map was

6  done, Ohio has similarly changed its law and, in fact, I

7  would personally paint that state as black on this map

8  because of the new law in Ohio.

9     The green states on this map are states not considering

10  restructuring.  In other words, there's not a lot of pressure

11  in the legislature or regulatory commission to change the

12  rules to allow for more competition.  So that in the area

13  surrounding Tennessee, there is not a lot going on that would

14  create pressure to open up TVA's service territory for more

15  pressure for competition.

16     I think this confirms TVA's view with, which I agree

17  with, which says that TVA is not likely to face increased

18  pressure for competition any time soon.

19  **Q.**  So you wouldn't expect customers to leave the TVA system

20  as a result of additional cost of emissions reductions sought

21  by North Carolina?

22  **A.**  I would not expect a material amount of customers to

23  move off.  I would not say that there would never be a

24  customer that would do that.  In fact, there have been two

25  customers who have left.  One has already come back.  Another

Case 1:06-cv-00020-LHT  Document 214  Filed 06/22/09  Page 132 of 141

1   has -- is coming back this year.  And there are three other

2   customers that have given notice that they may change, but

3   they represent, in total, 0.6 percent of TVA's sales.  So I

4   don't think there is a risk of a material amount of sales

5   loss in TVA's customer service territory associated with

6   competitive pressures.

7   **Q.**   And has TVA's CEO, Tom Kilgore, indicated that TVA

8   expects its sales volume to grow in the coming years?

9   **A.**   Very much so.

10  **Q.**   And this is reflected in Plaintiff's Exhibit 415 on page

11  23?

12  **A.**   Yes.  This shows that TVA's forecast is to continue to

13  increase its sales of electricity.  TVA is planning around

14  this forecast.  That means it's planning its generation

15  expansion consistent with needing to grow its amount of

16  electricity sales at 1.9 percent per year.

17      In my analysis, please recall that I assumed that TVA

18  would grow at about 1.5 percent.  1.4, 1.5 percent a year.

19  TVA itself is expecting to grow faster than I assumed in my

20  analysis, so I had a relatively conservative analysis.  This

21  percentage increase in growth from year to year is higher

22  than the amount of sales that right now is on notice that

23  could leave TVA.  That's 0.6 percent of total sales.  This is

24  1.9 percent, growing each year.

25  **Q.**   And just for clarification, we're talking about total

1 growth here, not just the growth from their coal-fired power

2 system.

3 **A.**    Yes.  That's right.  This is sales to ultimate

4 customers, whether they're distributers or directly served

5 industrial customers.  That's right.

6 **Q.**   And did you consider Mr. Mitchell's comment that

7 debt-like instruments should be counted against the

8 $30 billion debt ceiling that TVA operates under?

9          **MR. FINE:**  Your Honor, I would interpose an

10 objection.  I believe that's misrepresenting Mr. Mitchell's

11 report.  I believe it's a question of whether that has to be

12 prudentially considered, given the position that the office

13 of management and budget has taken historically as to whether

14 those numbers should be counted towards the debt ceiling or

15 not.

16          **MR. GOODSTEIN:**  I'd be happy to rephrase it, Your

17 Honor.

18          **THE COURT:**  Rephrase your question and let me hear

19 it again.

20          **MR. GOODSTEIN:**  Okay.  Thank you, Your Honor.

21 **BY MR. GOODSTEIN:**

22 **Q.**   Dr. Tierney, you're aware of the comments from

23 Mr. Mitchell about your consideration of debt-like

24 instruments in your analysis as opposed to types of debt that

25 are expressly provided for in the act that sets the ceiling

1  on TVA's debt?  You're aware of those comments?

2  **A.**    I am.

3  **Q.**    Did you change your analysis as a result of those

4  comments?

5  **A.**    No, I did not.

6  **Q.**    Can you explain to us why you didn't feel it necessary

7  to change your analysis in light of those comments?

8  **A.**    Yes.  I will try to characterize Mr. Mitchell's position

9  on this.

10      TVA provides information through the president's budget

11  to Congress each year and indicates in that budget, under

12  instruction by the office of management and budget of the

13  U.S. government, that it should include not only the types of

14  debt which are statutory debt, the types of debt that are

15  covered by the $30 billion ceiling, but also other financing

16  obligations, other debt-like instruments.  These are these

17  prepayments and lease-back agreements.  In essence, these are

18  things that TVA has entered into which are commitments to pay

19  somebody else back.

20      Bristol, Virginia, pre-pays TVA for a certain amount of

21  electricity that will be delivered in the future.  It's like

22  debt in some sense, because it is prepaid and TVA has to

23  deliver a product for it.

24      Office of management and budget's position is that those

25  other financing obligations have to be included under a

1  $30-billion debt ceiling.  They are not stated as such in the

2  TVA Act, and I have read TVA documents that make it clear

3  that other financing obligations of that form do not cover --

4  do not count under the $30 billion ceiling in TVA's opinion.

5      Mr. Mitchell said that, in light of OMB's position and

6  the fact that OMB has drafted a bill to submit to Congress,

7  that would count these other forms of debt, which may then

8  crowd the amount of new debt that could come under the

9  $30 billion ceiling, that in light of that bill that's been

10 drafted, that I should have included that also.

11      In my opinion, there are several reasons why I did not,

12 and think it is reasonable not to include other financing

13 obligations under the $30 billion ceiling.  There are many

14 instances where TVA differentiates between statutory debt and

15 other debt.  If OMB's position in a bill that's been drafted

16 but not submitted to Congress is that that would change,

17 Congress hasn't changed the law.  I don't know whether

18 TVA's -- what TVA's position would be before the law.  I

19 don't know whether the law would be passed by Congress.  And

20 I don't know whether Congress would in fact raise the

21 $30 billion ceiling if it were also adding new things that

22 would come under a ceiling.  The $30 billion has actually

23 been in place many, many years, and so one would think, with

24 the time value of money, that that actually might change.

25      So I took today's law, I used that as the template for

1  understanding what should go under the $30 billion, and, as I

2  say, TVA itself uses that approach when it is speaking to

3  bondholders about what it is obligated to pay under the

4  $30 billion ceiling.  So I feel very confident that that's a

5  reasonable approach.

6  **Q.**   And what about Mr. Mitchell's comment that you didn't

7  use a sophisticated enough rate analysis?

8  **A.**   Mr. Mitchell says that when a utility like TVA is

9  actually setting its rates and figuring out how to go about

10  an investment and then spread it across different customer

11  classes, that TVA uses very sophisticated modeling tools to

12  carry that analysis out.  Indeed, TVA would be doing that if

13  it were actually setting rates to recover these costs.

14      In my opinion, the structure of my analysis is identical

15  to the structure of the way TVA does it, and the details are

16  not important for the matters to present to you here.  The

17  simplifying assumptions that I made are consistent and

18  appropriate for the question of whether or not TVA can fund

19  an additional 3 to 5 billion and recover it in rates.  So if

20  and when TVA is actually compelled to do this program, TVA

21  will figure out, using its sophisticated tools and models,

22  the timing of passing the dollars through to consumers in

23  rates, and TVA will use its management acumen, its

24  sophisticated analysis, its political skills and judgment

25  appropriately to decide which types of consumers should have

1 slightly higher than average rate increase, what types of

2 consumers should have a lower than average rate increase

3 associated with the program.  That's what TVA does all the

4 time.  And it wasn't necessary or appropriate for what my

5 analysis says to be -- to go through that analysis.

6     I'm very familiar with the types of tools TVA is

7 describing.  It is entirely appropriate for them to use them

8 in their day-to-day management of their rate setting.  But it

9 is overkill for what is appropriate, in all due respect, to

10 put before the Court, in terms of understanding the order of

11 magnitude of this impact on TVA's financing of the program

12 and its cost impact to consumers.

13 **Q.**  And what about Mr. Mitchell's comment on your use of

14 retail versus wholesale in comparisons?

15 **A.**  Mr. Mitchell suggests that because I do an analysis that

16 looks at what would be the rate impact to a real household or

17 a real industrial customer that I'm understating the impact

18 by looking at that end-user impact.  He says, had I actually

19 looked at the dollar impact on TVA's portion of the rate, the

20 wholesale portion of the rate, it would have been a higher

21 rate impact.  He's right.  It would have.

22     What I mean by that is, when you think about an

23 electricity rate, there's a part of it that's for

24 transmission and power production, and there's a part of it

25 that's associated with covering the cost of the local

1  service, the wires, the local trucks that repair the service,

2  that meter local service.  So the rate is split between those

3  local costs and the wholesale costs.  If I had added the rate

4  increase on TVA's association of the bill, wholesale

5  portion, mathematically, the rate increase would have been

6  higher.  He's absolutely right on that.

7      But from the point of view of putting myself in the

8  shoes of the board of directors of the TVA, what I'm really

9  interested in seeing is whether or not my ultimate consumer

10  base can absorb an impact as it hits their pocketbooks, and

11  that's a fully blended wholesale and retail rate.  So in my

12  opinion, that's the appropriate rate to look at.  I know that

13  TVA uses retail rates when it does rate comparisons as well.

14  **Q.**   And finally, Dr. Tierney, how did you consider

15  Mr. Mitchell's comments about the depreciation time and the

16  shape of the investment curve that you used in your analysis?

17  **A.**   Yes.  Please recall that I indicated I assumed that the

18  pollution control equipment would wear out over a 30-year

19  period, as Dr. Staudt had instructed me to think about it.

20  So I paid for it through a depreciation charge, if you will,

21  that is tied to the life of the asset.  It's a straight-line

22  depreciation.  1/30 of the amount of the investment gets

23  depreciated in each year over 30 years.

24      Mr. Mitchell suggested that it would be more appropriate

25  if I had depreciated it over the life of the number of years

1   of the contract notice period under which consumers could

2   leave TVA's system.  In other words, if a customer, a

3   distribution customer, could give a five-year or ten-year

4   notice period, TVA should pay back all of the debt associated

5   with this pollution control period over that five or ten-year

6   notice period in the contract.  That is completely counter to

7   what TVA's policy is for depreciation.  TVA's policy is to

8   depreciate investment over the life of the asset, and TVA's

9   information statement and SEC statement say that that's TVA's

10  normal policy.

11  **Q.**  So, finally, what is your overall conclusion,

12  Dr. Tierney, after you've completed your analysis and

13  considered the expert reports submitted by Mr. Mitchell with

14  regard to the financial feasibility and reasonableness of the

15  additional pollution controls sought by North Carolina in

16  this case?

17  **A.**  In the end, well, 3 to $5 billion is a large sum of

18  money.  In the end, I concluded, for a utility of the size,

19  sophistication, financing capabilities, rate-making

20  authorities of TVA, that a pollution control program

21  amounting to 3 to $5 billion is financially feasible and

22  financially reasonable.  TVA can undertake this program with

23  a reasonable rate impact on consumers.  It will be able to go

24  to debt markets.  It will be able to raise rates to recover

25  the cost, and it is a relatively small impact on the -- on

1  the overall rates that consumers pay in the Tennessee Valley

2  Authority area.

3        **MR. GOODSTEIN:**  Have no further questions of

4  Dr. Tierney at this time, Your Honor.

5        **THE COURT:**  All right.  We will take our luncheon

6  break and be back at 2:45.

7        **(Recess.)**

8                        [END OF VOLUME 7A]

9                        *  *  *  *  *

10

11

12

UNITED STATES DISTRICT COURT

13 WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

14

15        I certify that the foregoing transcript is a

16 true and correct transcript from the record of proceedings

17 in the above-entitled matter.

18        Dated this 24th day of July, 2008.

19

20                              S/ Karen H. Miller

21                              _____

                               Karen H. Miller, RMR-CRR

22                              Official Court Reporter

23

24

25