UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA       )
ex rel. Roy Cooper, Attorney  )
General,                      )
          Plaintiff,          )     No. 1:06-CV-20
                              )
     vs.                      )     **VOLUME 10A**
                              )
TENNESSEE VALLEY AUTHORITY,    )     [Page 2330-2466]
                              )
          Defendant.          )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 25, 2008

APPEARANCES:

On Behalf of the Plaintiff:

    JAMES C. GULICK, Senior Deputy Attorney General
    MARC BERNSTEIN, Special Deputy Attorney General
    North Carolina Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina

    MICHAEL D. GOODSTEIN, Esquire
    ANNE E. LYNCH, Esquire
    Resolution Law Group, P.C.
    5335 Wisconsin Avenue NW, Suite 360
    Washington, DC

On Behalf of the Defendant:

    FRANK H. LANCASTER, Senior Attorney
    HARRIET A. COOPER, Assistant General Counsel
    THOMAS F. FINE, Assistant General Counsel
    MARIA V. GILLEN, Assistant General Counsel
    Tennessee Valley Authority
    400 West Summit Hill Drive
    Knoxville, Tennessee

          KAREN H. MILLER, RMR-CRR (828) 771-7217

```
1                          I N D E X

2    DEFENSE WITNESSES:                              PAGE

3

4    SURESH MOOLGAVKAR

5        Direct Examination Mr. Lancaster            2332
         Cross Examination By Mr. Gulick             2365
6

7    ELIZABETH ANDERSON

8        Direct Examination Mr. Lancaster            2409
         Cross Examination By Mr. Gulick             2444
9

10

11

12   PLAINTIFF'S EXHIBITS

13       NUMBER                                   ADMITTED

14       493                                         2466

15

16   DEFENDANT'S EXHIBITS:

17       NUMBER                                   ADMITTED

18       342-344                                     2339
         345,346                                     2420
19       364                                         2444
         367                                         2444
20       492                                         2408

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2              **THE COURT:**  All right, Mr. Lancaster.  You may call

3  your next witness.

4              **MR. LANCASTER:**  Thank you, Your Honor.

5              Defendant Tennessee Valley Authority calls

6  Dr. Suresh Moolgavkar.

7              **THE COURT:**  All right.

8                         **SURESH MOOLGAVKAR,**

9  **being duly sworn, was examined and testified as follows:**

10                        **DIRECT EXAMINATION**

11             **MR. LANCASTER:**  I would ask that Dr. Moolgavkar

12  take exhibit book 14 from the shelf next to the witness

13  stand, and the Court may wish to have reference to

14  defendant's book 14.

15             **THE COURT:**  All right, sir.

16  **BY MR. LANCASTER:**

17  **Q.**   Dr. Moolgavkar, could you please state your full name

18  for the record?

19  **A.**   My name is Suresh Moolgavkar.  Would you like me to

20  spell it?

21  **Q.**   Yes, sir.

22  **A.**   First name is Suresh, S, as in Sam, u-r-e-s-h.  The last

23  name is Moolgavkar, M as in Mary, O-O, L as in Lion, G as in

24  George, A as in apple, V as in Victor, K as in King, A as in

25  apple, R.

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 3 of 138

1  Q.   Dr. Moolgavkar, where do you live?

2  A.   I live in the Seattle area, in a suburb of Seattle

3  called Bellevue, Washington.

4  Q.   You have been retained by Tennessee Valley Authority as

5  an expert in this lawsuit?

6  A.   Yes, I have.

7  Q.   And you have authored three reports?

8  A.   Yes, I have.

9  Q.   And are Defendant's Exhibits 342, 343 and 344 copies of

10  those reports?

11  A.   May I take a look at those?

12  Q.   Yes, sir.

13  A.   Yes, they are.

14  Q.   And you are an epidemiologist; is that correct?

15  A.   That is correct.

16  Q.   How long have you worked in the field of epidemiology?

17  A.   For more than 30 years now.

18  Q.   What is your educational background?

19  A.   I got a medical degree from the University of Bombay,

20  completed one year of residency there, and then came to the

21  Johns Hopkins University Medical School as a post-doctorate

22  fellow in pharmacology and biophysics.

23       While at Johns Hopkins, I obtained a Ph.D. in

24  mathematics and got post-doctorate training in epidemiology

25  and biostatistics at the University of Washington.

1    **Q.**    Where are you currently employed?

2    **A.**    I'm currently employed by a consulting company, an

3    international consulting company called Exponent.

4    **Q.**    And until recently, you were employed in an academic

5    setting; is that correct?

6    **A.**    That is correct.  In fact, technically, I'm still a

7    member of the faculty of the University of Washington and of

8    the Fred Hutchinson Cancer Research Center in Seattle.

9    However, I will be retiring from those positions and taking

10   emeritus status as of August 1st of this year.

11   **Q.**    That's next week.

12   **A.**    Next week, yes, sir.

13   **Q.**    And you taught at other places besides the University of

14   Washington; isn't that right?

15   **A.**    Yes.  I have taught at the Johns Hopkins University, at

16   the University of Pennsylvania, at Indiana University in

17   Bloomington, and, then, finally at the University of

18   Washington.

19   **Q.**    And have you been at a visiting scientist at any place?

20   **A.**    Yes.  I've held several visiting scientist positions.

21        I've been a visiting scientist at the International

22   Agency for Research on Cancer in Léon, France.  That is the

23   cancer research organization of the World Health

24   Organization.  I have been a visiting scientist at the

25   Radiation Effects Research Foundation in Hiroshima, which was

1  set up after the Second World War to investigate the effects

2  of ionizing radiation on the populations of Hiroshima and

3  Nagasaki.  I've been a visiting scientist at the German

4  Cancer Research Organization in Heidelberg.  And I have also

5  spent brief periods of time at the Canadian -- equivalent of

6  the Canadian EPA.

7  **Q.**  And you have published a number of articles and papers

8  in your field?

9  **A.**  Yes.  I have over 150 articles in the field of

10 epidemiology, biostatistics and risk analysis.

11 **Q.**  I would like to read briefly from an article that was

12 attached to the expert report of Dr. Peden which has already

13 been admitted in this case.  It's an article published by

14 Dr. Pope and Dr. Dockery in 2006.

15     It indicates:  "Beyond simply recognizing gaps in

16 knowledge, there remains a need for a healthy skepticism

17 regarding what we may think we know about the health effects

18 of particulate matter exposure.  There are important

19 scientific issues that are not fully resolved.  For example,

20 Moolgavkar argues that potential confounding, measurement

21 error, model building and selection, and related issues

22 remain concerns, especially when the estimated risks are

23 small."

24     Are you that Moolgavkar?

25 **A.**  I believe I am.

1  Q.   So your work has been cited in the article relied upon

2  by Dr. Peden?

3  A.   Yes.

4  Q.   And in addition to publishing articles, have you had

5  editorial responsibilities in the field of epidemiology and

6  related disciplines?

7  A.   Yes.  I was one of the editors of a journal called

8  *Genetic Epidemiology* in the 1980s.  I edited several books

9  and monographs in the field of epidemiology and

10  biostatistics.  I'm currently one of the editors of *Risk*

11  *Analysis:  An International Journal*, and also on the

12  editorial board of *Inhalation Toxicology* and of the web-based

13  journal called *Biology Direct*.

14  Q.   Are you a member of any organizations of

15  epidemiologists?

16  A.   Yes, I'm an elected member of the International

17  Epidemiology Society.

18  Q.   Have you sat on any review panels as a consultant on

19  epidemiology?

20  A.   Yes.  I've been on several National Institutes of Health

21  review panels as an expert reviewer for grants and as a site

22  visitor at various cancer centers site visits.

23       I have served as a consultant to the California Air

24  Resources Board.  I've served as an consultant to the USEPA,

25  to the Department of Energy, to the World Health

1  Organization, to the -- I'm also one of the scientific

2  advisers to the European Union effort to estimate the risk

3  from low doses of ionizing radiation.  In fact, I chaired

4  that panel.

5      I've also been a consultant to Health and Welfare

6  Canada.

7  **Q.**  And is Health and Welfare Canada simply a Canadian EPA?

8  **A.**  Yes, it is.

9  **Q.**  In your service to these organizations, have you had

10 experience specific to evaluating the health risks of air

11 pollution, including particulate matter?

12 **A.**  Yes.  In fact, that is my main role as an adviser to the

13 California Air Resources Board.

14     And I forgot to mention that I was also on an HEI --

15 that is Health Effects Institute -- advisory panel that was

16 involved in oversight of reanalysis of the Harvard Six Cities

17 and the ACS-2 studies.

18 **Q.**  And ACS is short for American Cancer Society?

19 **A.**  Yes.  That's one of the largest cohort studies that has

20 been done to look at the risk of exposure to fine PM.

21 **Q.**  And you've testified as an expert on epidemiology

22 before?

23 **A.**  Yes, I have.

24 **Q.**  In court?

25 **A.**  Yes.

Case 1:06-cv-00020-LHT   Document 216   Filed 06/22/09   Page 8 of 138

1   **Q.**    How about other places?

2   **A.**    I'm not sure.  What do you mean by testify?

3   **Q.**    Have you testified before EPA's Clean Air scientific

4   Advisory Committee?

5   **A.**    Yes.  Yes, I have.

6   **Q.**    In this case, have we asked you to address the question

7   about whether the opinions expressed by plaintiff's experts

8   are supported by the current available epidemiological

9   literature on the association between air pollution and human

10  health?

11  **A.**    Yes.

12  **Q.**    And you have formed conclusions on that matter?

13  **A.**    Yes, I have.

14  **Q.**    And are they described fully in your written reports?

15  **A.**    Yes.

16        **MR. LANCASTER:**  Your Honor, we tender

17  Dr. Moolgavkar as an expert in the field of epidemiology,

18  specifically including air pollution epidemiology.

19        **MR. GULICK:**  Your Honor, as I had told

20  Mr. Lancaster before this began, we'd stipulate to

21  Dr. Moolgavkar's expertise as he has just stated.

22        **THE COURT:**  All right.  Let the record reflect the

23  stipulation, and show that the Court holds Dr. Moolgavkar to

24  be an expert in the field as articulated by TVA counsel.

25        **MR. LANCASTER:**  Thank you.

Case 1:06-cv-00020-LHT  Document 276  Filed 06/22/09  Page 9 of 138

1         Thank you, Mr. Gulick.

2         I would also move the admission of Defendant's

3    Exhibits 342, 343 and 344, which are Dr. Moolgavkar's expert

4    reports.

5         **MR. GULICK:** With respect to those, Your Honor, for

6    the record, understanding how Your Honor has ruled on these,

7    we had filed a motion in limine with respect to these, so we

8    would ask that they be excluded in accordance with that

9    motion in limine.

10        But that's for the record. I understand Your Honor

11   has taken these into evidence already.

12        **THE COURT:** Yes. Show the objection overruled.

13        **MR. LANCASTER:** Thank you.

14             **(Defendant's Exhibit No. 342, 343 and**

15        **344 received in evidence.)**

16   **BY MR. LANCASTER:**

17   **Q.**   Now, Dr. Moolgavkar, I'll have to confess that when I

18   began working on this case I could barely pronounce the word

19   "epidemiology," much less know what it was.

20        Would you explain to the Court the basics of what the

21   science of epidemiology is.

22   **A.**   Yes. I'll try to do it as briefly and succinctly as I

23   can.

24        Epidemiology is basically the study of diseases in

25   populations, but mostly, of course, interested in human

1   population, so let me restrict my attention to epidemiology

2   as the study of diseases in human populations.  It is usually

3   defined as the study of the distribution and determinants of

4   diseases in populations.

5        Epidemiology is largely an observational discipline.

6   This means that the kind of randomized trials or randomized

7   experiments that can be done in the laboratory cannot be done

8   in epidemiology because, obviously, it would be unethical to

9   randomize human beings to one exposure or another.  So what

10  you see is basically what you get.  So that is why it is an

11  observational discipline.

12       I do want to make clear that there are occasions when

13  clinical trials or the equivalent of clinical trials can be

14  done in epidemiology, and that is important to keep in mind

15  because that is the only study designed which can eliminate

16  the problem of what is called confounding, which I will

17  explain in just a minute.

18       And so let me explain to you, Your Honor, what I mean by

19  confounding.  Since epidemiology is an observational

20  discipline, and, as I said, you cannot randomly assign human

21  beings to one exposure or another.  So if one wants to study

22  air pollution and the effect of air pollution on human

23  health, then, of course, the most obvious design would be to

24  take groups of human beings and assign one of them randomly,

25  one group randomly, to no exposure and another group to

exposure, obviously, we cannot do such a thing.  So we have to use what we can observe in the population.

Now, as a simple example, we know that levels of air pollution are highly correlated with weather.  So on hot, humid days, for example, when the air is stagnant, air pollution is also high, and if you observe increased mortality on the next day after an episode of high air pollution but also an episode of very high heat and humidity, it is difficult to verify the reason for that mortality.  Is it due to air pollution or is it due to high heat and humidity?  So that is a concrete example of a confounder.

In this case, weather is a confounder of the air pollution effects, and unless you can adequately control for weather, you cannot conclude that air pollution had anything to do with mortality on the next day.

So that is one of the most important jobs of the proper epidemiological analysis, to control for confounding such as that.

So to give a general definition, a confounder is a kind of hidden variable in the investigation of epidemiological studies, which, if not properly and adequately controlled for, can lead to biased conclusions about an association between the exposure of interest and the disease.

So that is one big problem we run into because it's an observational discipline.

1    The other big problem, and that is particularly to air

2  pollution epidemiological -- it occurs in other types of

3  epidemiological studies also, but it's very important in air

4  pollution epidemiology, and that is the proper measurement of

5  exposure.  By that I mean, if you want to look -- study the

6  effect of cigarette smoking on lung cancer, you can go to the

7  subjects and ask them to tell you what their smoking habits

8  are:  How many cigarettes did you smoke?  When did you start

9  smoking?  When did you quit smoking?  So you can get

10  information on the individual level.  However, in air

11  pollution epidemiology, we cannot measure what individuals

12  are exposed to.  All we have are central monitors where

13  readings are taken, and then we assume that everybody who is

14  in the proximity of that monitor would be exposed to the same

15  level of air pollution; although, clearly, individual

16  exposure will depend upon the habits of the individual, how

17  much the individual is outside the home, how much the

18  individual -- how much time the individual spends inside in

19  an air conditioned home or an air conditioned office, and so

20  on.  So the circumstances of exposure for each individual

21  might be quite different, and, yet, we simply assign an

22  exposure that is measured at a central monitor.

23    So these are the two big problems for epidemiology, and

24  specifically for air pollution epidemiology:  Confounding and

25  mismeasured exposure, or exposure that is not well known.

1 And, therefore, air pollution epidemiology is particularly

2 difficult to study.

3      The problem is made even more difficult because the

4 risks that we are trying to eke out in air pollution

5 epidemiology are so small.  The risks of smoking-associated

6 lung cancer are pretty large, and so they are easy to

7 separate -- it's easy to separate the signal from the noise.

8 But in air pollution epidemiology, the risks are pretty

9 small, and so it becomes a very difficult task to eke out the

10 signal and separate it from the noise.  And for that reason,

11 a number of very sophisticated statistical techniques have

12 been devised for the study of air pollution epidemiology.

13      Now, I need to introduce one more concept, Your Honor,

14 and that is the concept of how you measure the association

15 between an exposure of interest and a disease.  And,

16 generally, the measure that we use in epidemiology is called

17 a relative risk.  And the relative risk very simply defined

18 is defined as the ratio of the risk in the exposed population

19 divided by the risk in the unexposed population.  So you're

20 simply looking at the proportionate increase or decrease in

21 risk associated with the exposure.  So if the relative risk

22 is greater than one, then you say that there is a positive

23 association between the risk factor and the disease.  If the

24 relative risk is less than one, you say that there is a

25 negative association between the risk factor and the disease.

1   But having measured the relative risk, you can only conclude

2   that there might be an association between the risk factor

3   and the disease.

4        There is one more step that needs to be taken, and that

5   step is to look at statistical significance of that relative

6   risk.

7        So the question we are really asking here is that, when

8   you do an epidemiological study and you come up with some

9   estimate of relative risk, that is, some estimate between the

10  association of the risk factor and the disease, then the

11  question becomes, could that just be a fluke?  Could that

12  just have a good by-chance?  And the statistical method that

13  is used to test that is the idea of statistical significance.

14       So if the association between the risk factor and the

15  disease is deemed to be statistically significant, then what

16  you are saying is that this association has probably not

17  occurred by chance; it's a real finding.

18       And to give an analogy which is I think particularly

19  timely in this election season, when you take polls and you

20  come up with numbers like 41 percent and 44 percent and say

21  that, well, the difference is within the margin of error,

22  what you're really saying is that the difference is not

23  statistically significant and 41 is not really different from

24  44 percent.

25       So that is the idea.  What is the probability that this

1   finding in an epidemiological study is a good by-chance, and

2   you use statistical significance to get a measure on that

3   question.

4       Now, having said that, even if you find a statistically

5   significant result in one epidemiological study, because of

6   the problems that I've described, mainly those of confounding

7   and error in measurement of exposure, that is not generally

8   sufficient to compute that the exposure might be related to

9   the disease in a causal way.  In order to do that, you need

10  quite a bit more.  You need to do many epidemiological

11  studies in different populations and under different

12  circumstances, and if the results of all these

13  epidemiological studies are pretty consistent and if the

14  associations are pretty strong, then we might decide that the

15  association is causal.  However, if the associations are not

16  really strong, if they're weak, that is, if the risks are

17  very small, then not only do you need a number of consistent

18  epidemiological studies, but we also need to have some

19  biological basis for thinking that the association might be

20  causing it.  So some sort of a biological plausibility needs

21  also to be established before saying that the association is

22  causal.

23      So I think that, very briefly, Your Honor, is a tutorial

24  on epidemiology and the pitfalls of doing observational

25  studies rather than randomize the clinical trials.

1      And I would say that this is not just an academic

2   concern.  This is a real concern.  And the issue of

3   confounding in observational studies has led to some very

4   serious mistakes in the past.  And one of the examples of

5   where a very serious mistake was made, because -- in good

6   faith, because of the issue of confounding to not be

7   addressed adequately, is that the issue of hormone

8   replacement therapy for postmenopausal women.

9      In the 1990s, based on a whole slew of observational

10  studies, epidemiologists were pretty sure that administration

11  of hormone replacement therapy to postmenopausal women was

12  really good for them because it prevented a whole host of

13  conditions, including bone fractures and, quite importantly,

14  cardiovascular disease.  And it all seemed to make biological

15  sense because women have a lower risk of cardiovascular

16  disease than men, and it was hypothesized that it was because

17  of their hormone profiles.  And so there was a whole host of

18  biological reasons also to believe these observational

19  epidemiology studies that giving a postmenopausal -- giving

20  of hormone replacement therapy to postmenopausal women would

21  protect them against heart disease.

22      And, in fact, two professors at Harvard, Graham Colditz

23  and Mile Stanford, wrote an editorial and actually did an

24  analysis of all the population and epidemiology studies and

25  concluded in the 1990s that, in fact, it would be unethical

1  not to give postmenopausal women hormone replacement therapy.

2       Now, in the early 2000s, at the behest of the NIH, a

3  very large clinical study, clinical trial, was undertaken to

4  look at many, many different issues of women's health, and

5  one of the things that they undertook was a proper randomized

6  clinical trial of hormone replacement therapy in

7  postmenopausal women, and at the end of that trial, lo and

8  behold, what did the investigators discover?  They discovered

9  that hormone replacement therapy was not good for women.  Not

10  only did it not provide any protection from heart disease, in

11  fact, it increased to some extent the risk of heart disease.

12  So all these observational epidemiology studies had been

13  wrong for these many years, and the clinical trial was

14  undertaken and the cart was upset.

15      And what is the reason for this?  The reason that has

16  been put forward is confounding by socioeconomic factors, or

17  inadequate control of confounding by socioeconomic factors.

18  Because well-to-do women have access to physicians, they are

19  more likely to take hormone replacement therapy than poor

20  women.  The have access to physicians; they eat a better diet

21  in general; they exercise more than poor women do.  In

22  general, they lead a healthier lifestyle.  And because of

23  that, it turned out that the conclusions of the observational

24  studies was that hormone replacement therapy was good.

25  Actually, the conclusion should have been that women in the

1  upper socioeconomic status had better heart health than poor

2  women.

3      So here is a case of confounding by socioeconomic status

4  which really led to findings that were quite biased and it

5  led to a standard of practice for many years in this country

6  that was probably wrong.

7  **Q.**  So the hormone replacement therapy example is one where

8  the failure to properly address what you called confounding

9  led to some unfortunate results?

10         **MR. GULICK:**  Object to leading.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  Yes.  That is one example.  And I

13  think it's particularly relevant to the air pollution

14  example, because confounding by socioeconomic status is

15  particularly relevant to air pollution because, of course,

16  it's the poor people at the lower end of the socioeconomic

17  status that are also exposed to the greatest amount of air

18  pollution.  And I will come back to this when we talk about

19  the American Cancer Society studies.

20  **BY MR. LANCASTER:**

21  **Q.**  Okay.  Thank you.

22      And this confounding problem is common to all air

23  pollution -- excuse me -- I mean all epidemiological studies,

24  but particularly so for air pollution studies.

25  **A.**  Yes.  It is particularly relevant for air pollution

1  studies because, first of all, the risks that you're trying

2  to detect are extremely small.  So any kind of small

3  confounding could bias the risks.  And, secondly, the

4  confounders are also very complex.

5       So, for example, if you want to look at the risks

6  associated with fine particulate matter, then you have to

7  consider confounding by a whole host of other pollutants.  I

8  mean, you have to consider sulfur dioxide, nitrogen dioxide,

9  ozone, and, in reality, you should also be considering all

10  the pollutants in the environment that are not even routinely

11  measured upon which we have no information; and then, again,

12  this confounding by weather, as I have already said.

13       Lifestyle factors could also confound the association

14  between air pollution and health.  So, for example, cigarette

15  smoking habits need to be taken account of in certain types

16  of studies.

17  Q.    Okay.  Dr. Moolgavkar, are you aware that Dr. Levy has

18  testified to a calculation of the number of premature

19  mortalities that he contends will be avoided if TVA's

20  projected emissions are reduced and, as a result, the PM2.5

21  levels in North Carolina are reduced?

22  A.    Yes, indeed, I'm familiar with those.

23  Q.    What is your opinion about Dr. Levy's calculation?

24  A.    Well, I don't believe that those calculations are based

25  on sound science and I don't think they're defensible.  But

1  before I get into the technical epidemiological and

2  statistical reasons, I think that I would like to make a sort

3  of general statement, and that is statistics is a method or a

4  tool for looking at complex relationships in databases, but

5  this statistical methodology -- but I would say statistics

6  does not trump common sense.  If statistical methodology

7  yields answers that run counter to common sense, then I think

8  it's incumbent upon you to take another look at the

9  statistical analysis that you've done to see whether the

10  numbers you get make any sense of.

11      Now, if you look at the calculations done by Dr. Levy --

12  let me say this.  First of all, if you believe that air

13  pollution is associated in a causal fashion with health

14  effects on human populations, then what you would expect is

15  that on or after high-pollution days you would expect a

16  certain number of people to get sick, either respiratory

17  disease or, what is now generally believed in the air

18  pollution literature, cardiovascular disease.  So you would

19  expect a certain number of people to get sick and be admitted

20  to the hospital and then, for a certain smaller fraction of

21  that number to die because of exposure to air pollution.

22      So when you look at calculations of the number of lives

23  saved and the number of hospital emissions avoided, what you

24  would expect to see is a large number of hospital admissions

25  avoided and a smaller number of deaths avoided.

1    However, if you look at Dr. Levy's calculations here --

2  **Q.**   I don't mean to interrupt you, but Ms. Shea has been

3  good enough to put Plaintiff's Exhibit 231 on the screen,

4  which is Dr. Levy's summary of his calculations for North

5  Carolina.

6  **A.**   Right.  So if you -- Your Honor, if you look at

7  premature mortality, Dr. Levy calculates that 99 cases would

8  be avoided.  So he's basically saying that 99 cases per year

9  are caused by exposure to emissions from TVA.  But if you

10  look at the total number of hospital admissions that would be

11  avoided, that's only 60.  That is much less than the number

12  of deaths that would be avoided.  And so what Dr. Levy's

13  calculations imply is that a lot of people are simply falling

14  dead without ever being admitted into hospital.  And this is

15  something that common sense tells me is highly unlikely.  It

16  is not a result that I can believe.

17    There is another thing here that also sticks out.  In

18  the air pollution literature, the focus currently is on

19  cardiovascular disease, not on respiratory disease.

20  Respiratory disease has been played down.  And most of the

21  deaths that are talked about in the air pollution literature

22  are due to cardiovascular disease, not due to respiratory

23  disease.  And yet, in this table, Dr. Levy has twice as many

24  respiratory hospital admissions as cardiovascular hospital

25  admissions.

1    So, to me, these numbers, just from the common sense

2  point of view, really are difficult to swallow.  I cannot

3  accept these numbers for that reason.

4    Well, then to get into the more epidemiological and

5  statistical reasons, I think we have to look at the generally

6  inconsistent epidemiology literature.  Now, there are two

7  classes of study that have been looked at by Dr. Levy, and

8  the first class of studies is the so-called long-term studies

9  that look at the long-term effects of air pollution on

10  mortality, and the other are the so-called time-series or

11  short-term studies.

12  **Q.**   Go right ahead, sir.

13  **A.**   So let me talk about the long-term studies first because

14  that's where Dr. Levy's calculation of premature mortality

15  comes from, so that is the most important part for PM.

16  Premature mortality associated with fine PM comes from the

17  long-term studies.

18    Now, long-term studies are difficult to do, expensive,

19  so there are few of them.  Half a dozen long-term studies

20  have been done.  Many of them have shown no association

21  between fine PM and mortality.  Examples are studies done by

22  Enstrom in California, the studies done by Lipfert on the

23  Veterans score, and also, the second half of the study done

24  by Laden on the Six Cities score.

25    These studies show no association between fine PM and

1  mortality.

2  **Q.**    Let me stop you right there briefly.

3      Are you saying that the Harvard Six Cities Study that

4  Dr. Levy cited actually shows no association?

5  **A.**    I believe that the extension of the Six Cities Study

6  published by Laden, et al, one interpretation of that study

7  is that during the second period over which they looked at

8  the data, there was no association between fine PM pollution

9  and mortality.

10 **Q.**    Okay.  Go right ahead, sir.

11 **A.**    So these studies, particularly, the Enstrom and Lipfert

12 studies, Dr. Levy completely ignores.  So let's set those

13 aside.  But let's look more critically and carefully at the

14 families of studies that he does consider.

15     He considers some of the studies done -- some of the

16 studies based on the Six Cities data, and he also looks --

17 very important part -- at  the coefficient.  I should say

18 that the coefficient that he uses to derive his estimates of

19 mortality comes from the, basically, from the American Cancer

20 Society study.  So let's look at these two families of the

21 Six Cities Study and the American Cancer Society studies.

22     Now, because of the number of criticisms addressed in

23 the original Six Cities Study gathered up in 1993, the study

24 was reanalyzed under the auspices and funding from the Health

25 Effects Institute in the year 2000, and the reanalysis was

1    conducted by Dr. Krewski of the University of Ottawa.  And

2    here is what they found.

3        What they found was that not only was fine PM associated

4    with mortality, but all the other gases were associated with

5    mortality as well in about the same way, with the single

6    exception of ozone.  So in the Six Cities long-term study,

7    ozone was in no way associated with mortality, but the other

8    gases were, and because there were only six cities in the

9    study, confounding by the gases would not be addressed in

10   this study.  So Krewski, et al, say that it's impossible to

11   tell from the Six Cities Study whether it's fine PM or one of

12   the other gases that is associated with mortality.  Could be

13   any one of them.  You cannot test that hypotheses in this

14   data set.

15       So the Six Cities Study really does not provide very

16   strong evidence that it's fine PM that is associated with

17   mortality.  And, in fact, let me reiterate that, for ozone,

18   which is the other pollutant of interest in this case, the

19   Six Cities Study found absolutely no association between

20   levels of ozone and mortality.

21       Now let's go to the second family of studies, that based

22   on the American Cancer Society cohort, and that is a much

23   more interesting study because it is much larger.  It

24   involved almost half a million individuals.  It was first

25   published by Arden Pope and others in 1995.  It came under

1  for the same kind of criticism as did the Six Cities Study.

2  Namely, they did not take confounders into account.  Even

3  though they could have looked at the gases at the time, they

4  did not.  They simply looked at fine PM and nothing else in

5  their analysis.  So this study was also reanalyzed by

6  Krewski, et al.

7      And by the way, as I said earlier, I was on the

8  scientific advisory panel, external advisory panel for this

9  reanalysis of both the Six Cities and the American Cancer

10 Society studies.

11     So when the American Cancer Society study was reanalyzed

12 by Krewski, et al, here were the main findings.  First, it

13 was fine particulate matter, or specifically sulfate, that

14 was most strongly associated with mortality.  It was, indeed,

15 one of the gases.  And the gas that was associated with

16 mortality was sulfur dioxide.  So when you considered sulfur

17 dioxide in an analysis simultaneously with fine particulate

18 matter, sulfur dioxide was the pollutant that was

19 significantly associated with mortality, and the fine

20 particle signal basically vanished, became highly

21 insignificant.

22     Now, it is generally agreed, there is a consensus that

23 biologically there is no basis to suspect that sulfur dioxide

24 could be causing death.  Therefore, the association of sulfur

25 dioxide with mortality remains unexplained at this time.  We

1    don't know what the reason is.  But we do know that when you

2    consider sulfur dioxide, fine PM is no longer associated with

3    mortality in the ACS, the American Cancer Society, study.

4    That was one finding.

5        The second finding of Krewski, et al was that when you

6    looked at just fine PM, just the fine PM and mortality,

7    without looking at the confounders, which is what Dr. Levy

8    does, that effect of fine PM or the association of fine PM

9    with mortality was restricted to people only with a high

10   school education or less, in other words, to people in the

11   lower socioeconomic strata.  There is no reason to believe

12   that air pollution would differentially kill off people in

13   the lower socioeconomic strata.  And that is another flag

14   that there are certain socioeconomic factors that have not

15   been adequately adjusted in the study.

16       The third fact.  In a statistical analysis, it is

17   important to make allowance for the fact that cities that are

18   close together have highly correlated mortality rates.  So,

19   for example, if you look at Minneapolis and St. Paul,

20   mortality rates are highly correlated in those two cities for

21   reasons that we do not completely understand.  The same thing

22   would be true of Miami/Ft. Lauderdale, for example.

23   Mortality rates would be correlated for reasons that we do

24   not completely understand.  And it's important to take that

25   kind of correlation into account.  And when Krewski, et al,

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 27 of 138

1    did an analysis taking this kind of spatial correlation into

2    account, they found that fine particles and sulfates were no

3    longer significantly associated with mortality.

4         For a fact, when you look at some of the analyses done

5    by Krewski, he found, for example, that in the Six Cities

6    Study, ozone and nitrogen dioxide -- not Six Cities.  Sorry.

7    When you look ACS study -- I'm still talking about the

8    American Cancer Society -- both ozone and nitrogen dioxide

9    were negatively associated with mortality and they were

10   statistically significant.  So what this data were saying,

11   that ozone and nitrogen dioxide have a protective effect on

12   human health, which, of course, is biologically highly

13   implausible and one cannot accept that finding, of course, at

14   face value.  But in view of that finding, it is difficult to

15   take any of the other quantitative estimates given in that

16   study seriously.

17        So if you get findings of this type that are simply

18   counter to biology, how can you take any of the other

19   conclusions of the study seriously, at least in a

20   quantitative sense?

21        Now, in further analyses of the American Cancer Society

22   study, there was another paper that appeared in 2002, in

23   JAMA, *Journal of the American Medical Association,* again by

24   Arden Pope, et al, the person who wrote the first paper in

25   1995, and in that paper he reports in a figure that carbon

1  monoxide is also protective of cardiovascular mortality, that

2  is, it is negatively associated with cardiovascular

3  mortality, and that is statisticallly significant.  Again,

4  that is a finding that is counter to all of biology,

5  particularly in view of the fact that carbon monoxide is a

6  cardiac toxin.  And so that finding is unbelievable.  But I

7  think it is wrong to ignore that finding and simply to accept

8  the finding on fine PM from that study.

9       So, once again, I think the quantitation of the

10  association between fine PM and the mortality in that paper

11  cannot be taken seriously because there are other results.

12  The paper is not entirely consistent with respect to the

13  biology.

14       Then in another paper published in 2004, in *Circulation*,

15  the journal *Circulation*, Pope, et al, looked at both

16  respiratory disease and cardiovascular disease and they found

17  a specifically significant negative association between fine

18  PM and respiratory mortality.  And that again does not make

19  biological sense.

20       So if the papers are not consistent with respect to

21  biology, it is difficult to take the precise quantitation

22  that they offer for the association between fine PM and

23  mortality very seriously.

24       So, for this whole host of reasons, I feel that the

25  precise coefficient that Dr. Levy has used and which is

1  derived mainly from consideration of the American Cancer

2  Society studies, that the precise coefficient that he has

3  used to derive the number of deaths in North Carolina, or

4  anywhere else in the domain in which he has calculated these

5  deaths, is just totally unjustified.  Cannot be done.

6  **Q.**    Thank you, Dr. Moolgavkar.

7       And are there, in addition to the two major families of

8  long-term studies about which you've described some of the

9  issues, those being the Harvard Six Cities Study and the

10  American Cancer, ACS, study that was reanalyzed by

11  Dr. Krewski, K-r-e-w-s-k-i, are there also short-term

12  studies, or what you call time-series studies, that look at

13  pollution even in North Carolina?

14  **A.**    Yes, there are.  In fact, I think the single most

15  important short-term, or time-series, studies of air

16  pollution and mortality are the so-called NMMAPS studies,

17  National Mortality and Morbidity and Air Pollution Study.

18  **Q.**    So that's N-M-M-A-P-S?

19  **A.**    Yes, N-M-M-A-P-S.

20       These studies were funded by the Health Effects

21  Institute, the same institute that funded the Krewski

22  reanalysis, and they were conducted by investigators at Johns

23  Hopkins University and they remain the most comprehensive

24  short-term studies of the association between air pollution

25  and mortality undertaken in the United States.  And here

1  again, the fundamental fact is that they looked at 90 cities

2  across the United States, including some in North Carolina.

3  So that is extremely relevant to the North Carolina

4  situation.  And when they looked at particulate matter, they

5  found no association between particulate matter and mortality

6  in three -- in the three North Carolina cities they looked

7  at.  They looked at three North Carolina cities,

8  Raleigh-Durham, Charlotte and Greensboro, and they found no

9  association with particulate matter and mortality in those

10  three cities.

11      They also looked at two cities with respect to ozone.

12  That is Raleigh-Durham and Charlotte.  For some reason they

13  didn't look at Greensboro for ozone, probably because ozone

14  readings are not available in that city.  But even also for

15  ozone, as for particulate matter, there was no association

16  between ozone and mortality in these two North Carolina

17  cities.

18      Now, let me state one sort of overarching kind of

19  observation here.  Dr. Levy bases his calculations of

20  mortality from the exposure to fine PM on the long-term

21  studies, basically, from the coefficients derived from the

22  American Cancer Society study, but these long-term studies

23  found no association between ozone and mortality, and,

24  therefore, Dr. Levy does not -- he ignores these studies and

25  he goes to the short-term studies to assess the impact of

1  ozone on mortality.  And he does not look at the specific

2  results in North Carolina, but he looks at some overall

3  national result from the NMMAPS studies and does his

4  calculation in that way.  And so he is using the long-term

5  studies for fine PM.  He's using the short-term, time-series

6  studies for ozone because the long-term studies don't show

7  any association with ozone.

8      So the question I have is how can air pollution in the

9  short term increase mortality from ozone and this does not

10  show up in the long-term statistics?  How can you have short

11  term associations between ozone and mortality without that

12  showing up in the long-term studies?

13      So I think there is some sort of a logical disconnect

14  here in the way that Dr. Levy has done his calculations.

15  **Q.**   There has also been testimony, Dr. Moolgavkar, that the

16  particulate matter component at issue here is sulfate.  What

17  is -- and you've made some reference to sulfate in your

18  testimony so far.  Could you briefly summarize the status of

19  the epidemiological literature of the relation between

20  sulfate and mortality?

21  **A.**   Yes.  In fact, I think one of the assumptions made by

22  Dr. Levy in all his calculations is that all fine PM is, if

23  we accept -- if we accept -- that fine PM is causing the

24  association with mortality.  And I've given you a whole host

25  of reasons now to at least question that conclusion for the

1  current ambient levels of fine PM.

2      Another assumption made by Dr. Levy is that all

3  particles are equal in their toxicity.  And there is a fair

4  bit of literature, not a huge amount, but there is a fair bit

5  of literature indicating that all fine particles are not

6  equal in their toxicity.  There are time-series studies done

7  in Atlanta by Lam, et al.  There is the new Lipfert study

8  that also concludes that components of fine particles may

9  have different toxicities.  There are other Canadian studies

10 that by Burnett, et al, that also show components of fine PM

11 mix are important.  And then, finally, there are studies by

12 Dr. Levy's colleagues.  Dr. Laden and others published a

13 study in 2000.  I have a number of concerns about the way

14 that study was done and some of its conclusions.  However, if

15 one accepts their conclusions, they show that particles from

16 vehicular sources are three times -- at least three times as

17 toxic as sulfates emitted from power plants.

18      In a later study by Maynard, et al, that appeared in

19 2007 -- I believe these are also colleagues of Dr. Levy --

20 they also found that, in fact, when you look at particles

21 from power plants and compare them and look at them jointly

22 with particles from vehicular emissions, it turns out that

23 the particles from the power plants are not significantly

24 associated with mortality, whereas the particles from

25 vehicular emissions are.

1    So, again, these studies point to the fact, first of

2 all, that not all particles are equal in their toxicity; and,

3 secondly, even if you look at the few studies that have tried

4 to parse out the source of particles, it is the vehicular

5 emissions that appear to be a lot more toxic.

6 **Q.** What does the inconsistency in the literature you've

7 been describing mean in terms of reaching causal conclusions

8 and quantitative estimates?

9 **A.** Here is what I believe based on all the literature that

10 I have looked at. First of all, I think the literature is

11 inconsistent, and for the same data set, depending upon which

12 model you use for the data, and how you control confounding

13 by weather and co-pollutants and so on, can make a huge

14 difference to the results of the analysis. So the data are

15 pretty sensitive to the method of analysis. So you don't get

16 consistent results.

17    So, based on that, my personal belief is could air

18 pollution and fine particulate matter, in particular, be

19 associated with health effects at the current low levels in

20 the United States? Yes, it could. You can't rule it out.

21 But can you definitively assert that there is a causal

22 connection? I don't believe you can. And neither can you

23 come up with any precise estimate of the dose response

24 coefficient that would allow you to estimate the number of

25 deaths avoided -- that would be avoided if further controls

1  were imposed on TVA.

2  **Q.**    Thank you, sir.

3       Finally, I want you to address one last topic.

4       Dr. Levy testified that he provided no quantitative

5  uncertainty bounds or sensitivity calculations for his

6  premature mortality calculations, although it would be very

7  important to do so to publish the work in a peer review

8  journal.

9       Do you have any opinion about the validity of his

10  failure to do that?

11  **A.**    Well, I think that in any exercise of this type, one has

12  to provide uncertainty estimates, because his estimates are

13  based on a whole chain of models that he has used.  He has

14  estimates of emissions, he has models for air dispersion,

15  models that tell him what the exposure would be in any given

16  area, then he has a model for the dose response that he has

17  derived basically from the American Cancer Society study.

18  Each one of those steps in the process of providing the

19  estimates of the number of deaths averted, each one of those

20  steps is subject to uncertainty and to error, and that

21  uncertainty is extrapolated down the chain.

22       What Dr. Levy should have done in this case is applied a

23  method called Monte Carlo simulation in order to come up with

24  some uncertainty estimates on the numbers that he provided.

25  And, in fact, in previous papers with Dr. Spengler, Dr. Levy

1  has done just that.  He has provided uncertainties.

2  **Q.**   In his published papers?

3  **A.**   In his published papers, yes.

4  **Q.**   In summary, Dr. Moolgavkar, is it your conclusion that

5  the epidemiological studies cited by plaintiff's experts

6  cannot be used to derive scientifically with reliable

7  estimates of alleged health impacts from the TVA power plants

8  under the circumstances of this case?

9  **A.**   I do not believe, in my expert opinion, that these can

10 be used the way they've been used by Drs. Levy and Spengler.

11            **MR. LANCASTER:**  Thank you.

12            Your Honor, no further questions.

13            **THE COURT:**  Mr. Gulick?

14                     **CROSS EXAMINATION**

15 **BY MR. GULICK:**

16 **Q.**   Good morning, Dr. Moolgavkar.

17 **A.**   Good morning.

18 **Q.**   First, Dr. Moolgavkar, you indicated that you had a

19 medical degree from the University of Bombay, but you do not

20 actually practice medicine, do you?

21 **A.**   No, I don't currently practice medicine, and I haven't

22 for many years.  I did take my licensing exams in the United

23 States but never did practice medicine.

24 **Q.**   And you got your medical degree in 1965.

25 **A.**   In 1965.

1   Q.   And then you practiced during your residency?

2   A.   Yes, sir.

3   Q.   And that was the last time you practiced medicine?

4   A.   Correct.

5   Q.   And, so in the last 40 years, you've not practiced

6   medicine?

7   A.   That is correct.

8   Q.   And I believe you indicated that you are not a

9   toxicologist; is that correct?

10  A.   I have done some work in toxicology.  I've published a

11  few papers, but I'm not a toxicologist.

12  Q.   And I believe you testified that you do not do chamber

13  studies; is that correct?

14  A.   I do not do chamber studies.

15  Q.   And it's also true, is it not, that you have never

16  conducted a long-term study in the type of the American

17  Cancer study or the Six Cities Study?

18  A.   There are probably a half a dozen individuals in the

19  world that are involved with an air pollution study of that

20  type.

21  Q.   So the answer is no?

22  A.   No.  The answer is no, I have not been directly involved

23  in a study of that type.

24  Q.   But you yourself have performed a few time-series

25  studies?

1    **A.**    I have done numerous time-series studies, yes.

2    **Q.**    Doctor, I believe you indicated in your testimony that a

3    considerable portion of your career was devoted to studying,

4    in an epidemiological manner, cancer.  Is that correct?

5    **A.**    Well, the main focus of my career over the last 30 years

6    has been cancer epidemiology, but for about the last 10 or 12

7    years, I've also done quite a bit in air pollution

8    epidemiology.

9    **Q.**    I understand.  And if you would turn to your CV,

10   Dr. Moolgavkar, which I believe is found at the end of your

11   first report, which I believe is Defendant's Exhibit 342.

12   **A.**    Yes, I have it.

13   **Q.**    And it's an attachment to your first report, is that

14   correct?

15   **A.**    That's correct.

16   **Q.**    I'd like to direct your attention to page No. 7 of your

17   CV.

18        Have you found that?

19   **A.**    Yes.

20   **Q.**    And I want to direct your attention to item No. 88,

21   which is in the middle of page 7.  Have you located that?

22   **A.**    Yes.

23   **Q.**    And this involved -- this was a letter to the *New*

24   *England Journal of Medicine*, was it not?

25   **A.**    That's correct.

1  Q.   And it addressed the subject of air pollution and
2  mortality?
3  A.   Yes.
4  Q.   And you were, in fact, critical of -- in much the manner
5  you've testified today, were you not, of the association
6  between air pollution and mortality?
7  A.   That was a specific criticism, as I recall, of the
8  Harvard Six Cities Study, the first published version of the
9  Harvard Six Cities Study.
10 Q.   And was that not your first publication in the field of
11 air pollution and mortality?
12 A.   Yes.
13 Q.   Let me draw your attention next to item No. 90 on the
14 same page.
15 A.   Yes.
16 Q.   And this is an article that you published, did you not,
17 along with Mr. Luebeck, Mr. Hall and Elizabeth Anderson; is
18 that correct?
19 A.   Yes.  Dr. Luebeck, Dr. Hall and Dr. Anderson, yes.
20 Q.   My apologies.  You're right.
21      And that's the same Dr. Anderson who is an expert also
22 in this case; is that correct?
23 A.   That's correct.
24 Q.   And I want to -- this was a reanalysis, was it not, of
25 the Steubenville data?

1  A.    Yes.

2  Q.    And is it not, in fact, the case that this -- that there

3  was funding provided for this article by the American Iron

4  and Steel Institute?

5  A.    Yes, that is correct.  All the funding sources should be

6  clearly acknowledged.

7  Q.    And it is on the article; is that correct?

8  A.    I would imagine so, yes.

9  Q.    And I believe your next article that reflects air

10  pollution and mortality is item No. 95, publication No. 95,

11  which begins at the top of page 8 of your deposition.  Is

12  that correct?  Excuse me.  Of your CV.

13  A.    95, yes.

14  Q.    And this one is also authored by you, Drs. Luebeck, Hall

15  and Anderson; is that correct?

16  A.    Correct.

17  Q.    And it's entitled *Air Pollution and Daily Mortality in*

18  *Philadelphia;* is that right?

19  A.    Yes.

20  Q.    Is it not also the case that this article was funded by

21  the American Iron and Steel Institute?

22  A.    It probably was.  Again, that would be clearly

23  acknowledged on the paper.

24          MR. GULICK:  May I approach the witness, Your

25  Honor?

1          THE COURT:  Yes.

2   BY MR. GULICK:

3   Q.   Is this the same article we're talking about?

4   A.   Yes.

5   Q.   And this is Plaintiff's --

6          MR. GULICK:  Your Honor, this is marked as

7   Plaintiff's Exhibit 535 for identification.

8          THE COURT:  All right.

9   BY MR. GULICK:

10  Q.   Dr. Moolgavkar, you indicated this is the article we're

11  talking about, item 95 on your CV?

12  A.   Yes.

13  Q.   Draw your attention to the bottom left-hand corner.

14  There is a series of acknowledgments.  Do you see that?

15  A.   Yes.

16  Q.   And you see where it says, "This research was supported

17  by the American Iron and Steel Institute"?

18  A.   Yes.

19  Q.   I believe your next publication, Dr. Moolgavkar, was

20  item No. 98, which is appears to be a letter by you, Drs.

21  Luebeck, Hall and Anderson, and it appears to be a letter to

22  the editor of *Epidemiology*; is that right?

23  A.   Yes.

24  Q.   And it's "Particulate Air Pollution and Mortality."  Is

25  that right?

1    **A.**    Yes.

2    **Q.**    And then the letter is not sponsored or funded by

3    anyone.

4    **A.**    Probably not.

5    **Q.**    And your next publication, Dr. Moolgavkar, on the

6    subject of air pollution is item No. 99 on page 8.  Is that

7    correct?

8    **A.**    Yes.

9    **Q.**    And this is a critical -- is it not entitled by -- this

10   article is by you and Dr. Luebeck, I believe.

11   **A.**    Yes.

12   **Q.**    And it's entitled, *A Critical Review of the Evidence on*

13   *Particulate Air Pollution and Mortality*, and it's published

14   in *Epidemiology*?

15   **A.**    Yes.

16   **Q.**    And it was published in 1996; is that correct?

17   **A.**    That's correct.

18   **Q.**    And is it not the case that this article -- that this

19   particular article was also supported by the American Iron

20   and Steel Institute?

21   **A.**    It probably was, if it says that on the paper.

22           **MR. GULICK:**    If I could approach the witness,

23   Your Honor?

24           **THE COURT:**  All right, sir.

25

Case 1:06-cv-00020-LHT   Document 216   Filed 06/22/09   Page 42 of 138

1    BY MR. GULICK:

2    Q.   Now, Dr. Moolgavkar, is this Plaintiff's Exhibit 43,

3    which has been marked for identification as Plaintiff's

4    Exhibit -- excuse me -- Plaintiff's Exhibit 543?

5    A.   Yes.

6    Q.   Is this the article that we have just been talking about

7    by you and Dr. Luebeck?

8    A.   Yes.

9    Q.   I'd like to draw your attention once again to the bottom

10   left-hand corner, Dr. Moolgavkar.  Do you see there's some

11   acknowledgments on the bottom left-hand corner of the first

12   page?

13   A.   Yes.

14   Q.   And does it not indicate, among those, "This research

15   was supported by the American Iron and Steel Institute"?

16   A.   Yes.

17   Q.   Dr. Moolgavkar, I believe the next item on this list,

18   that is on your list on your CV that relates to air pollution

19   is item 102, also on page 8.  Am I correct about that?

20   A.   Yes.

21   Q.   And this, again, appears to be an article authored by

22   you, Dr. Luebeck, and Dr. Anderson.  Is that right?

23   A.   Yes.

24   Q.   And it's entitled *Air Pollution and Hospital Admissions*

25   *for Respiratory Causes in Minneapolis St. Paul in Birmingham,*

1   is that right?

2   **A.**    That's correct.

3   **Q.**    And it was published in *Epidemiology* in 1997?

4   **A.**    Yes.

5   **Q.**    And, Dr. Moolgavkar, is it not also the case that this

6   particular article was supported by the American Iron and

7   Steel Institute?

8   **A.**    Well, sir, you can see the acknowledgement there.  I'm

9   not sure.  It's 12 years later, so ...

10          **MR. GULICK:**  Your Honor, may I approach the

11  witness?

12          **THE COURT:**  You certainly may.

13  **BY MR. GULICK:**

14  **Q.**    Dr. Moolgavkar, I've just handed you what's been marked

15  as Plaintiff's Exhibit 538, and I will ask you, is this the

16  article which is listed on your CV as item 102 among your

17  publications?

18  **A.**    Yes.

19  **Q.**    It is?

20  **A.**    Yes.

21  **Q.**    And once again, I'd like to draw your attention to the

22  bottom left-hand corner, Dr. Moolgavkar, and ask if it does

23  not say among the acknowledgements, quote, "This research was

24  supported by the American Iron and Steel Institute," close

25  quote.

1  A.    Yes.

2  Q.    And, Dr. Moolgavkar, I believe the next article on your

3  CV lists that relates to air pollution specifically is item

4  121.  Is that correct?

5  A.    That's correct.

6  Q.    And this was an article that was authored by you and --

7  is it Dr. Hazelton?

8  A.    Yes.  Dr. Hazelton, yes.

9  Q.    And Dr. Luebeck?

10  A.    Yes.

11  Q.    And D. Levy.  Is that David Levy?

12  A.    I forget his first name.  I think he was a graduate

13  student at the University of Washington.  I'm not sure that

14  he received his doctorate by then or not.

15  Q.    And a Dr. Shepherd?

16  A.    Yes.

17  Q.    And this article is entitled *Air Pollution Pollens and*

18  *Admissions for Chronic Respiratory Disease in King County*; is

19  that right?

20  A.    Yes.

21  Q.    Now, this particular article was funded or supported, in

22  part, by EPA; is that correct?

23  A.    Well, supported, as I recollect, entirely by EPA.

24  Q.    Okay.  And then the next item that relates to air

25  pollution is item 122.  Is that correct, Dr. Moolgavkar?

1  A.    Yes.

2  Q.    And this is an article authored by you and Dr. Dewanji?

3  A.    That's correct.

4  Q.    And it's called *A Poisson* -- am I pronouncing that

5  correctly?

6  A.    Yes.

7  Q.    P-o-i-s-s-o-n.  *A Poisson Process Approach of Recurrent*

8  *Event Data With Environmental Covariates*?

9  A.    Correct.

10 Q.    And it was published in *EnvironMetric*; is that correct?

11 A.    Yes.

12 Q.    This article also received funding from EPA; is that

13 right?

14 A.    That's correct.

15 Q.    Now, the next article you have regarding air pollution,

16 Dr. Moolgavkar, is item 123, is that right, also on page 9?

17 A.    Yes.

18 Q.    And this article appears to be by you alone; is that

19 right?

20 A.    Yes.

21 Q.    And it's entitled *Air Pollution and Hospital Admissions*

22 *for Diseases of the Circulatory System in Three U.S.*

23 *Metropolitan Areas.*

24 A.    Yes.

25 Q.    And this particular article was also supported by the

1  American Iron and Steel Institute; is that correct?

2  **A.**   If that's what the acknowledgement says.

3  **Q.**   And so the answer is yes?

4  **A.**   Yes, if that's what the acknowledgement says.

5        **MR. GULICK:**  May I approach the witness, Your

6  Honor?

7        **THE COURT:**  Yes.

8  **BY MR. GULICK:**

9  **Q.**   Excuse me.

10       If you would, would you turn to the last page of this

11  document, Dr. Moolgavkar?

12       And do you see where it says "Acknowledgements" on the

13  last page of the article.

14  **A.**   Yes.

15  **Q.**   And does it not, in fact, say, quote, This work was

16  supported by the American Iron and Steel Institute?

17  **A.**   Yes.

18  **Q.**   And I believe your next publication relating to air

19  pollution is item No. 24.  Is that correct?

20  **A.**   Yes.

21  **Q.**   Now, that's entitled *Air Pollution and Data of Mortality*

22  *in Three U.S. Counties*; is that right?

23  **A.**   Yes.

24  **Q.**   And it was published in *Environmental Health*

25  *Perspectives* --

1  A.   Yes.

2  Q.   -- in 2000?  And is it not the case that this work was

3  supported by the American Iron and Steel Institute?

4  A.   Yes, if that's what the acknowledgement says.

5       MR. GULICK:  May I approach the witness, Your

6  Honor?

7       THE COURT:  Yes.

8  BY MR. GULICK:

9  Q.   And, Dr. Moolgavkar, is this the article that was

10 entitled -- that was marked which is Plaintiff's Exhibit 539?

11 A.   Yes.

12 Q.   Is this the item 124 on your publications in your CV?

13 A.   Yes.

14 Q.   And I would draw your attention to the bottom right-hand

15 corner of Plaintiff's Exhibit 539.  And do you see where it

16 says, quote, This work is supported by the American Iron and

17 Steel Institute?

18 A.   Yes.

19 Q.   And, Dr. Moolgavkar, the next article that relates to

20 air pollution is item number 125?

21 A.   Yes.

22 Q.   Is it by you alone?

23 A.   Yes.

24 Q.   Entitled *Air Pollution in Hospital Admission for Chronic*

25 *Obstructive Pulmonary Disease in Three Metropolitan Counties*?

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 48 of 138

1    **A.**    Three Metropolitan Areas.

2    **Q.**    I'm corrected.  This is published in relation to

3    toxicology?

4    **A.**    Yes.

5    **Q.**    I don't have a copy so I can't ask you about it.

6         After that, is not the next article that you authored

7    for or co-authored on the matter of air pollution item 134?

8    **A.**    Yes.

9    **Q.**    And this is another article that you authored with

10   Dr. Dewanji; is that correct?

11   **A.**    That's correct.

12   **Q.**    This is *Choice Stratification* -- entitled *Choice of*

13   *Stratification in Poisson Process Analysis of Recurrent Event*

14   *Data with Environmental* Covariates?  Is that right?

15   **A.**    Correct.

16   **Q.**    And this was published in 2002, and you received EPA

17   funding for this; is that right?

18   **A.**    Well, it was either funded by EPA or not funded at all.

19   It dealt with some ideas that came up during the previous

20   paper that we talked about that was funded by EPA.  At this

21   point, I'm not sure whether the funding had run out and we

22   just did it on our own time or whether it was funded by the

23   EPA.  The acknowledgements would say that.

24   **Q.**    Now, Dr. Moolgavkar, before we leave the subject of the

25   American Iron and Steel Institute, is it not in fact the case

1  that the American Iron and Steel Institute is an industry

2  group?

3  A.   It is.  I might point out that all these papers

4  supported by that trade group have appeared in good quality

5  peer-reviewed journals.

6  Q.   I understand.  But it is a trade group, is it not?

7  A.   Yes.  Yes, it is.

8  Q.   And is it not an entity group that has a financial

9  interest in whether or not fine particulates are associated

10 with human mortality?

11 A.   I don't know that it has a financial interest in whether

12 or not fine particles are associated with mortality.

13 Q.   Is it an industry that survives, Dr. Moolgavkar, on the

14 use of coal as a fuel?

15 A.   It probably does.  I don't know what they use as fuel.

16 Q.   Is the next article that you have that relates to air

17 pollution item No. 139, Dr. Moolgavkar, also on page ten of

18 your CV?

19 A.   Yes.

20 Q.   And is it entitled *Air Pollution and Daily Mortality in*

21 *Two U.S. Counties*?

22 A.   Yes.

23 Q.   And it was published in *Inhalation and Toxicology* in

24 2003.

25 A.   Yes.

1   Q.    And is it not, in fact, the case that the funding for

2   this particular article was provided by the American

3   Petroleum Institute?

4   A.    It was, if that's what the acknowledgement says.  It's

5   always in the acknowledgements.

6          MR. GULICK:  May I approach the witness, Your

7   Honor?

8          THE COURT:  Yes.

9   BY MR. GULICK:

10  Q.    Dr. Moolgavkar, is this plaintiff's exhibit -- this has

11  been marked as Plaintiff's Exhibit 540 for identification.

12  And I would ask you first, is this the article that we were

13  just discussing, which is item 139, among your publications

14  in your CV?

15  A.    Yes.

16  Q.    And drawing your attention to the bottom of this page,

17  there are some acknowledgements, are there not?

18  A.    Yes.

19  Q.    And among them, does it not say, "Research supported by

20  a contract with American Petroleum Institute-Sciences

21  International, Inc."?

22  A.    Yes.

23  Q.    The American Petroleum Institute is a trade association,

24  is it not?

25  A.    Yes.

1  Q.    Of petroleum companies?

2  A.    Yes.  I guess so.

3  Q.    And is it not in fact the case that that industry would

4  have an interest in whether or not air pollution has any

5  association with daily mortality?

6  A.    I guess they have an interest in regulation of air

7  pollution.

8  Q.    And Sciences International, Inc., is that a company with

9  which expert witness Elizabeth Anderson was connected?

10  A.    Yes.  I believe she was -- she was president of Sciences

11  International.

12  Q.    And the next article on your CV that relates to air

13  pollution was item 140.  Is that right, Dr. Moolgavkar?

14  A.    Yes.

15  Q.    I apologize.  And this one is entitled *Air Pollution and*

16  *Daily Deaths and Hospital Admissions in Los Angeles and Cook*

17  *Counties*.  Is that right?

18  A.    Yes.

19  Q.    And this was an article that was requested by the Health

20  Effects Institute, was it not?

21  A.    That's correct.  About the time that problems were found

22  with the most commonly used statistical software for analysis

23  of these studies, the Health Effects Institute picked out

24  some studies that it considered particularly important on the

25  issue, which in their review included some of the studies

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 52 of 138

1  funded by these trade associations, and asked me to do a

2  reanalysis correcting for the statistical problems, and that

3  is what I did.  And I don't believe there was any funding for

4  that study.

5  Q.  And I'd asked you if it was requested by them.

6  A.  I beg your pardon?

7  Q.  I had asked you if it was requested by the Health

8  Effects Institute.

9  A.  Yes.  It was requested by the Health Effects Institute,

10  yes.  But I might point out that it was a request to

11  reanalyze what they considered important studies, which

12  included the studies that you have just gone through

13  supported by trade groups.

14  Q.  And, Dr. Moolgavkar, the next article among your

15  articles in your CV that relates to air pollution is item

16  149.  Is that right?

17  A.  Yes.

18  Q.  And it was authored by you alone, it appears.

19  A.  Beg your pardon?

20  Q.  You were the only author of this article, weren't you?

21  A.  That's correct, yes.

22  Q.  And is it not entitled *A Review and Critique of the*

23  *EPA'S Rationale for a Fine Particle Standards*?  Is that

24  right?

25  A.  That's right.

1  Q.   And it was published in -- is that *Regulatory*

2  *Toxicology* --

3  A.   Yes.

4  Q.   -- *and Pharmacology?*

5  A.   Yes.

6  Q.   And that was in 2005?

7  A.   Yes.

8  Q.   And I ask you, Dr. Moolgavkar, whether or not this

9  article received support from the American Petroleum

10  Institute.

11  A.   It did.

12  Q.   I believe the next item on your CV that relates to air

13  pollution is No. 156 on your CV?  Is that right?

14  A.   That's correct.

15  Q.   And it was an invited editorial on the Enstrom paper

16  that you referred to earlier in your testimony?

17  A.   Yes, it was.

18  Q.   And being an invited article, there was no funding

19  source?

20  A.   There was no funding for that, no.

21  Q.   And the next item on your list -- the next article on

22  your list that relates to air pollution appears to be some

23  correspondence by you, which is item 159; is that correct?

24  A.   That's correct.

25  Q.   And it appears to be, I guess, correspondence by you to

1   the *Journal of Nature*; is that right?

2   **A.**   Yes.

3   **Q.**   And it's entitled *Pollution Analysis Flawed by*

4   *Statistical Model*; is that right?

5   **A.**   Yes.

6   **Q.**   And being a letter, it was not funded?

7   **A.**   No.  No funding, no.

8   **Q.**   And the next article on this list is an article by you

9   and Dr. Anderson and Dr. Rice and Dr. Cross, Dr. Hidy,

10   Dr. Hoel, H-o-e-l, Dr. McClellan and you; is that right?

11   **A.**   Yes.

12   **Q.**   This was published -- on your CV, it says that it's in

13   press.  But this article was since published in 2007; is that

14   right?

15   **A.**   It has been published, yes.

16   **Q.**   And the title of this article is *Evidence of Health*

17   *Impacts of Sulfate and Nitrate Containing Particles in*

18   *Ambient Air*.  Right?

19   **A.**   Yes.

20   **Q.**   And it was published in *Inhalation and Toxicology*.

21   **A.**   I believe so, yes.

22   **Q.**   And I ask you, Dr. Moolgavkar, whether or not this

23   article was funded in part -- or funded by the Edison

24   Electric Institute and Industry?

25   **A.**   I believe it's called the Edison Institute.  Yes, it

1  was.

2  **Q.**   But it is a -- the Edison Institute is, in fact, a trade

3  group of the electric power industry; is that right?

4  **A.**   That's my understanding.

5  **Q.**   Have you published other articles since that time,

6  Dr. Moolgavkar, that relate to air pollution?

7  **A.**   No, I have not.

8  **Q.**   Thank you.

9       Also in your CV, Dr. Moolgavkar, you listed some

10 litigation in which you've been a testifying witness; is that

11 right?

12 **A.**   That's correct.

13 **Q.**   And those are listed, are they not, at the -- on page 16

14 of your CV?

15 **A.**   Yes.

16 **Q.**   And the first you have listed, in 2006, you have trial

17 testimony, and that was *Carl and Joyce Holbrook vs. Bondex,*

18 *International?*

19 **A.**   Yes.

20 **Q.**   And you were representing an industry party in this

21 case; is that right?

22 **A.**   I believe it was one or more of the U.S. automobile

23 companies.

24 **Q.**   And *Rebekeh Price vs. Borg-Warner.*  This is in the

25 Superior Court of the State of California.  You were also

1  representing an automobile company; is that right?

2  **A.**    Yes.  One or more automobile companies.

3  **Q.**    And these were defendants in actions alleging exposure

4  to a cancer-causing agent -- allegedly a cancer-causing

5  agent.  Is that right?

6  **A.**    Yes.  These cases have to do with alleged exposure to

7  asbestos from friction products.

8  **Q.**    And in 2006, you also gave a deposition, did you not, in

9  *United States, et al, vs. American Electric Power and Service*

10 *Corporation*?

11 **A.**    Yes, I did.

12 **Q.**    And were you an expert witness for American Electric

13 Power?

14 **A.**    It did not go to trial.

15 **Q.**    Did you give a deposition on behalf of American Electric

16 Power in that?

17 **A.**    Yes, I did.

18 **Q.**    And then it appears you also gave a deposition in the

19 *Price vs. Borg-Warner* matter.  That's the same case that you

20 testified at trial at?

21 **A.**    Yes.

22 **Q.**    And next deposition is the *Holbrook vs. Bondex*.  And,

23 again, you were an expert witness for one or more automobile

24 companies; is that right?

25 **A.**    Yes.

1  Q.   Then, also, in 2006, you testified in the matter of,

2  *Tizcareno*, spelled T-i-z-c-a-r-e-n-o, *vs. Burns*

3  *International*.

4  A.   Yes.

5  Q.   And is this another series of cases involving automobile

6  manufacturers?

7  A.   Yes.

8  Q.   And you were testifying on behalf of one or more of the

9  automobile manufacturers?

10  A.   That's correct.

11  Q.   And the next listed item is a deposition in *Caroline*

12  *Hicks vs. American Asbestos Company*; is that right?

13  A.   Yes.

14  Q.   And you were testifying in this case for American

15  Asbestos Company?  Or was it another company?

16  A.   No.  It was, again, one or more of the automobile

17  companies.

18  Q.   So this was also in that series of litigation; is that

19  right?

20  A.   Yes.

21  Q.   And finally, you gave a deposition in 2006 in the matter

22  of *Halsema*, H-a-l-s-e-m-a, *vs. Allied Packing*?

23  A.   Yes.

24  Q.   And was this another in that series of litigation?

25  A.   For one or more of the automobile companies, yes.

1  **Q.**   And that was your client?

2  **A.**   Yes.

3  **Q.**   And then, in 2005, you also gave a deposition in the

4  matter of *Samuel Gates vs. A-1 Clutch Company*.  Is that

5  right?

6  **A.**   Yes.

7  **Q.**   And once again, you were an expert witness for one or

8  more automotive companies in that matter; is that right?

9  **A.**   Yes.

10 **Q.**   And then you also gave a deposition in the matter of

11 *Louis Zavacky*, Z-a-v-a-c-k-y, *vs. Dana Corporation, et al*, in

12 Ohio?

13 **A.**   Yes.

14 **Q.**   And you were an expert witness for the defendant in this

15 matter, were you not?

16 **A.**   Yes.  Again, one or more of the automobile companies.

17 **Q.**   So this was a similar action about the same general

18 subject matter but in another state?

19 **A.**   Yes.

20 **Q.**   Then, in 2004, you gave a deposition in the matter of

21 *United States, et al, vs. Ohio Edison, et al*.  Is that right?

22 **A.**   Correct.

23 **Q.**   And in that deposition, you were serving as an expert

24 witness for Ohio Edison; is that correct?

25 **A.**   That's correct.

1  Q.   In 2002, you gave a deposition in the case of *United*
2  *States, et al vs. W.R. Grace;* is that right?
3  A.   That's right.
4  Q.   And you were an expert witness for W.R. Grace; is that
5  right?
6  A.   Yes.
7  Q.   And there were two of these matters that involved
8  coal-fired power plants; is that correct?
9  A.   That's right.
10 Q.   And those were *United States, et al vs. American*
11 *Electric Power* and the *United States, et al vs. Ohio Edison;*
12 is that correct?
13 A.   Yes.
14 Q.   Now, I believe, Dr. Moolgavkar, that during your
15 deposition, did you not state that you were agnostic -- I
16 think that was your word -- about whether PM2.5 exposure
17 could cause adverse health effects?  Is that correct?
18 A.   That is correct.  That is exactly what I said today.
19 Q.   And did you not state that even though you agree there
20 is a substantial volume of literature showing associations
21 between air pollution and adverse health effects, adverse
22 effects on human health?  Is that also correct?
23 A.   There is a substantial body of literature on both sides
24 of the issue.
25 Q.   But you did acknowledge, did you not, that there is a

1  substantial volume of literature showing associations between

2  air pollution and adverse health effects?

3  **A.**  Well, there is a substantial volume of literature on

4  both sides.  There's clearly a substantial volume of

5  literature showing associations.

6  **Q.**  So the answer is yes?

7  **A.**  Yes, the answer is yes.

8  **Q.**  And is it not, in fact, the case that there have been

9  both long-term and short-term studies that, in fact, found

10  correlation between PM2.5 -- excuse me -- long-term PM2.5

11  exposure to premature mortality?

12  **A.**  Yes, there are.

13  **Q.**  Is it not, in fact, the case that recent research has

14  bolstered the evidence for the biologically plausible

15  pathways in which PM2.5 could cause adverse cardiovascular

16  effects.  Is that correct?

17  **A.**  As I said, I'm not a toxicologist, particularly in that

18  area, but I am not convinced that there is any evidence

19  bolstering the biological plausibility.

20  **Q.**  But you're not an expert in that area?

21  **A.**  I'm not an expert.  I just follow the literature from

22  the outside.

23  **Q.**  Is it not, in fact, the case that you have no opinion on

24  whether, if PM2.5 exposure could, in fact, cause premature

25  death, that there is a threshold ambient concentration below

1  which there is no effect?

2  **A.**   I believe there is not enough epidemiological

3  information to either support or refute the existence of a

4  threshold.  We simply don't have the data to determine that,

5  if one makes the assumption that the effect is causal in the

6  first place.

7  **Q.**   At your deposition, did you not agree that the control

8  of fine particulate matter may have benefits for public

9  health?

10  **A.**   I did say "may have benefits for public health," yes.

11  **Q.**   So the answer is yes, right?

12  **A.**   The answer to that question as raised is yes.

13  **Q.**   And you also agree that it is entirely reasonable to

14  regulate air pollution on the basis that control of

15  pollutants may have public health benefits, correct?

16  **A.**   Yes, I believe I said on the basis of a precautionary

17  principle, yes.

18  **Q.**   Now, you recall that at your deposition, Dr. Moolgavkar,

19  we took a look at the -- we took a look at the -- your

20  expanded expert judgment assessments of the concentration

21  response relationship between PM2.5 exposure and mortality?

22  **A.**   Yes, we did.

23  **Q.**   Excuse me.  I have too many things in front of me.

24      Dr. Moolgavkar, I'd like to draw your attention to

25  Plaintiff's Exhibit 242.

 1            **MR. GULICK:**  And with Your Honor's permission, I'm

 2   going to go ahead and find this volume up there for him.

 3            **THE COURT:**  All right, sir.

 4            **MR. GULICK:**  And, Your Honor, it is plaintiff's

 5   notebook No. 4.

 6            **THE COURT:**  I have that.

 7   **BY MR. GULICK:**

 8   **Q.**   Now, Dr. Moolgavkar, you are familiar with this

 9   document, are you not?

10   **A.**   Yes, I've seen it.

11   **Q.**   And, in fact, this is entitled *Expanded Expert* -- this

12   is Plaintiff's Exhibit 242.  It's entitled *Expanded Expert*

13   *Judgment* -- excuse me -- *Expanded Expert Judgment Assessment*

14   *of the Concentration-Response Relationship Between PM2.5*

15   *Exposure and Mortality*.  Is that right?

16   **A.**   Yes.

17   **Q.**   And this is the final report?

18   **A.**   Yes.

19   **Q.**   Published September 21, 2006?

20   **A.**   Right.

21   **Q.**   Is that right?

22            I'd like to draw your attention, if you would, to page

23   6.  If you'd look at the top of the page, Dr. Moolgavkar, you

24   will see that there is a printed -- printed in blue at the

25   top of the page, you'll see it's page 6 of 109.

1  A.    Yes.

2  Q.    Have you found it?

3  A.    I see it.

4  Q.    And I wanted to ask you Dr. Moolgavkar, is Daniel

5  Krewski the author of the report that you were referring to

6  earlier?

7  A.    Yes.

8  Q.    He is the same Daniel Krewski with whom you have

9  published articles; is that right?

10 A.    Yes.  He's a member of the panel.

11 Q.    Joe Mauderly?  Am I pronouncing his name correctly?

12 A.    Joe Mauderly, yes.

13 Q.    M-a-u-d-e-r-l-y?

14 A.    Yes.

15 Q.    Is this the same Joe Mauderly that invited you to

16 participate in CASAC?

17 A.    Yes.

18 Q.    But you declined.

19 A.    I declined, yes.

20 Q.    And you are also familiar with most all of these other

21 persons that are named on this final expert list; is that

22 right?

23 A.    Yes.  I believe I know all of them personally, with the

24 exception of Nino Künzli?

25 Q.    And for the sake of the court reporter, that's spelled

1  K-u, with an umlaut over it --

2  **A.**    Yes.

3  **Q.**    -- n-z-l-i?

4  **A.**    Correct.

5  **Q.**    I'd like to draw your attention, Dr. Moolgavkar, to page

6  11 of this same document.  It says page 11 of 109 at the top.

7  **A.**    Yes.

8  **Q.**    Excuse me.  I went one page too many.  Page 10.

9      And here, in bullet form, does it not list a set of

10 conclusions, Dr. Moolgavkar?

11 **A.**    Yes.

12 **Q.**    And the first sentence of the first conclusion says:

13 "The experts in this study tended to be confident that PM2.5

14 exposure can cause premature death"?

15     You don't agree with that, do you?

16 **A.**    Well, I agree with the statement that experts tended to

17 be confident.  I agree with that statement.

18 **Q.**    No, I mean --

19 **A.**    I don't agree --

20 **Q.**    -- you don't agree with their conclusion?

21 **A.**    -- with the conclusion.

22     I might point out that in the pilot phase of this study,

23 three of the five experts were skeptical of the association.

24 **Q.**    In fact, the pilot study is what you listed in your

25 second supplemental report, did you not?

1    A.    That's the one I referenced in my second supplemental

2    report.

3    Q.    You did not reference the final report, did you?

4    A.    I think I referenced the final report.

5    Q.    But you didn't discuss its results.

6    A.    I discussed some of its results.  I'd have to go back to

7    my report to see exactly what I said.

8    Q.    Well, you actually discussed this particular study in

9    your supplemental report; is that right?

10   A.    Which specific study?  I have discussed each one of

11   these studies, Jarrett, Laden, and Sonval (phonetic) in one

12   or another of my reports.

13   Q.    No.  I meant the expert -- this expanded judgment

14   document we're looking at now.

15   A.    I'm sorry.  I don't understand the question.

16   Q.    The document you're looking at right now.

17   A.    Yes.

18   Q.    This exhibit.

19   A.    Yes.

20   Q.    This particular -- this whole document we're looking at

21   right now, which is Defendant's Exhibit 242, that's -- this

22   you did not discuss in your first report, did you?

23   A.    Not in my first report, no.

24   Q.    But you discussed it in your supplemental report.

25   A.    I believe I did.

1  Q.   And does it not state in the second sentence of this,

2  that same bullet point, that 10 of 12 experts believe that

3  the likelihood of a causal relationship was 90 percent or

4  better?  Or higher.  Excuse me.

5  A.   Yes.

6  Q.   I know that's what it says.  But you don't agree with

7  their belief as expressed in this sentence, do you?

8  A.   Well, I'm in agreement with at least two of the 12

9  experts who did not agree with this conclusion.

10 Q.   However --

11 A.   And with the three experts.

12 Q.   That's in the next sentence, is it not, Dr. Moolgavkar,

13 that, quote:  The remaining two experts gave causal

14 probabilities of 35 and 70 percent.

15 A.   I would tend to be at the 35 percent level.

16 Q.   You are at the 35 percent level?

17 A.   Possibly, yes.  It's very difficult to quantify the

18 personal probabilities of the studies.

19 Q.   Was this expert elicitation not conducted entirely for

20 the purpose of characterizing the uncertainties associated

21 with the question in connection between PM2.5 and premature

22 mortality?

23 A.   That's what the elicitation was conducted for.  However,

24 I don't think it was properly done.

25 Q.   The second bullet on the same page, Dr. Moolgavkar, does

1  it not say that only one of 12 experts explicitly

2  incorporated a threshold into its CR -- and that stands for

3  concentration response, does it not?

4  **A.**    That's what this states.

5  **Q.**    CR function.

6  **A.**    That's what it states, yeah.

7  **Q.**    And the rest -- doesn't the next sentence say, "The rest

8  believe that there was a lack of emperical and theoretical

9  support for population threshold"?

10  **A.**    That's what it says.

11  **Q.**    You do not agree with that either?

12  **A.**    I think I said today there is no evidence to assert the

13  existence or non-existence of a threshold, and, to me, that

14  sentence says the same thing.  There is no evidence to

15  support a threshold or not to support a threshold.

16  **Q.**    In the next bullet, which is the last bullet on this

17  page, does it not say that "The experts relied upon the

18  course of cohort epidemiologic" -- let me start again.

19      "The experts relied on a course of cohort epidemiology

20  studies to derive their quantitative estimates, mainly those

21  associated with the ACS and the Six Cities cohorts."  Is that

22  correct?

23  **A.**    That's what it says, yes.

24  **Q.**    And does not the third sentence of this say, quote:  The

25  greater emphasis on Six Cities appeared to result from

1  corroborating evidence in the recent Six Cities follow-up by

2  Laden, et al, in 2006?

3      Is that right?  Is that what it says?

4  **A.**    That's what it says, yes.

5  **Q.**    Is that the same Laden that you were referring to in

6  your earlier testimony?

7  **A.**    Yes.

8  **Q.**    In fact, Dr. Moolgavkar, is it not the case that you

9  agree with the clear majority of the scientists who were

10  involved in this expert elicitation?  Is that right?

11  **A.**    I beg your pardon?

12  **Q.**    You disagree, do you not, with the clear majority of

13  scientists who were involved in this expert elicitation?

14  **A.**    Disagree about what, Mr. Gulick?

15  **Q.**    The causal relationship between PM2.5 exposure and

16  premature mortality.

17  **A.**    Yes.  I'm of the opinion that there isn't sufficient

18  evidence to infer a causal relationship at this time.

19  **Q.**    During your testimony, Dr. Moolgavkar, you mentioned an

20  article by -- or actually you were asked about an article by

21  Pope and Dockery that was published in *Air and Waste*

22  *Management Association* in 2006 entitled *Health Effects of*

23  *Fine Particulate Air Pollution Lines That Connect.*

24  **A.**    I believe counsel read out portions of that paper, yes.

25          **MR. GULICK:**  Your Honor, this article is actually

1 attached as an attachment to Dr. Peden's expert report, as

2 counsel indicated, but rather than hunting around, I'm going

3 to hand a copy to the witness, with your permission, as well

4 as to the Court.

5          **THE COURT:**  All right, sir.

6 **BY MR. GULICK:**

7 **Q.**   Dr. Moolgavkar, I've just handed you what was marked in

8 your deposition as Plaintiff's Exhibit 8.  Was that the

9 article that we've just been talking about?

10 **A.**   Yes.

11 **Q.**   Let me draw your attention to the abstract.  About not

12 quite two-thirds of the way down, there are the words --

13 there is a sentence and it says:  "Despite important gaps in

14 scientific knowledge and continued reasons for some

15 skepticism, a comprehensive evaluation of the research

16 findings provides persuasive evidence that exposure to fine

17 particulate air pollution has adverse effects on

18 cardiopulmonary health."

19 **A.**   I see it.

20 **Q.**   Do you see it?

21 **A.**   Yes.

22 **Q.**   You do not, in fact, agree with that conclusion, do you?

23 **A.**   Well, first, I'm assuming they mean fine particulate air

24 pollution at current ambient levels in western Europe and

25 American cities, because, without that qualification,

1  clearly, if you have very high levels of particulate

2  pollution, they would have adverse effects on cardiopulmonary

3  health.

4  **Q.**   I'm sorry.  I didn't hear what you just said.

5  **A.**   At very high levels, very high concentrations, I would

6  imagine there would be adverse effects on cardiopulmonary

7  health.  But I do not agree with this statement here that

8  ambient levels of air pollution or particulate, fine

9  particulate air pollution in the United States, that there is

10  convincing evidence that it has adverse effects on

11  cardiopulmonary.

12  **Q.**   Doctor, I'd like to take you to the end of this article,

13  on page 721.  Article number is listed at the bottom of the

14  page on the right.

15      Have you found that page?

16  **A.**   Page 721?

17  **Q.**   I'm sorry.  29.  729.

18  **A.**   Yes, sir.  I have it.

19  **Q.**   I'm going to draw your attention to the paragraph that

20  begins the text on this page, and almost in the middle of

21  that paragraph there is a sentence that says, "There are

22  almost certainly multiple mechanistic pathways with complex

23  interactions and interpendencies."  Do you see that sentence?

24  **A.**   Yes, sir, I see it.

25  **Q.**   And this is talking about the mechanistic pathways by

1  which exposure to fine particulates could cause

2  cardiovascular effects; isn't that right?

3  **A.**   With all respect, Mr. Gulick, that sentence basically

4  says nothing.  It just says there are multiple mechanistic

5  pathways with complex interactions and interdependencies.

6  You can say that about any biological phenomenon.

7  **Q.**   Then I'm going to take you to the last sentence.  It

8  begins with the words:  "Although much remains to be

9  learned."

10      You see where it says that?

11  **A.**   Yes, I see that.

12  **Q.**   That sentence says, quote:  "Although much remains to be

13  learned, it is no longer true that there are no known

14  pathophysiological or mechanistic pathways that could

15  plausibly link PM exposure to cardiopulmonary disease and

16  death."

17  **A.**   Well, that again sounds like a very general statement to

18  me.  It doesn't say anything about specific pathways, and,

19  besides which, you know, as I said, I'm not a toxicologist

20  and I can't comment on individual pathways of disease.

21          **MR. GULICK:**  Your Honor, I notice what the time is.

22  I think I only have a few more questions, and I can probably

23  bring it shorter if I can look at this a little bit during a

24  break, if that's all right with you.

25          **THE COURT:**  You think it might shorten it to take a

1  break?

2          MR. GULICK:  Yes, sir.

3          THE COURT:  We'll indulge that and take a break.

4          MR. LANCASTER:  No objection from defense.

5          THE COURT:  Take a recess.

6          (Recess.)

7          THE COURT:  All right.  Mr. Gulick?

8          MR. GULICK:  Your Honor, I was unable to get it

9  down to no more questions, but I'm down to the last little

10  bit.

11          THE COURT:  Go ahead.

12          MR. GULICK:  May I approach the witness?

13          THE COURT:  Yes.

14          MR. GULICK:  Thank you, Your Honor.

15  BY MR. GULICK:

16  Q.   Dr. Moolgavkar, I have just handed you a document that

17  has been marked as Plaintiff's Exhibit 492.  Do you have it?

18  A.   I have it here, yes.

19  Q.   And this was Exhibit No. 5 to your deposition, so you

20  have seen this before at the deposition.

21       Do you remember that?

22  A.   Well, I recall being shown it, yes.

23  Q.   And I'm going to ask you if this is not -- does it not

24  say at the top that this is part of the *Federal Register* at

25  the top?

1  A.    Yes.

2  Q.    Volume 70, No. 091?  Is that right?

3  A.    Yes.

4  Q.    And a little bit below that it says, quote:  "Rule to

5  Reduce Interstate Transport of Fine Particulate Matter and

6  Ozone (Clean Air Interstate Rule)."  Do you see that?

7  A.    Yes.

8  Q.    Now, as I did before, Dr. Moolgavkar, this is a portion

9  of a very long document, so I'd like you to turn just a few

10  pages to what has at the top right-hand corner, it says page

11  285, even though it's only one page over.  Do you see that?

12  A.    Page 285?

13  Q.    Yes.  It's only one page in, in fact, on this because

14  this is a part of a long document.

15  A.    Yes.

16  Q.    It also says at the top, right in the center,

17  "70FR25162," and then an asterisk, correct?

18  A.    Yes.

19  Q.    Do you see in the middle of this page that it indicates

20  *Human Health Benefit Analysis* as a title?

21  A.    I see that.

22  Q.    And does not the very first sentence say:  "Our analysis

23  of the health and welfare benefits anticipated from this rule

24  are presented in this section"?

25  A.    That's what it says.

1  Q.   And then it says briefly, "The analysis projects major

2  benefits from implementation of the rule of 2010 and 2015."

3  Is that right?

4  A.   That's what it says.

5  Q.   It then refers to X-1 in the next paragraph.  See where

6  I'm talking about, the paragraph?

7  A.   Yes.  Table X-1.  Yes.

8  Q.   Okay.  I'm going to read to you the second sentence of

9  this paragraph:

10      "In 2015, we estimate the PM-related annual benefits

11  include approximately 17,000 fewer premature fatalities,

12  8,700 fewer cases of bronchitis, 22,000 fewer non-fatal heart

13  attacks, 10,500 fewer hospitalizations for respiratory and

14  cardiovascular disease combined, and resulting in significant

15  reductions in days of restricted activity due to respiratory

16  illness (with an estimate of 9.9 million fewer cases) and

17  approximately 1,700,000 fewer work-loss days."

18      Did I read that sentence correctly?

19  A.   Yes, you did.

20  Q.   And, indeed, Table X-1 can be found if you turn the page

21  once more and look at what's marked at the top of page 287.

22  Have you found that page?

23  A.   It's coming up on my screen, yes.

24  Q.   Okay.  And what I want to draw your attention to with

25  respect to these findings -- this was the table that was

1  referred to, was it not, in that previous paragraph?

2  **A.**    I believe it is.

3  **Q.**    What I want to draw your attention -- Doctor, you had

4  mentioned early in your testimony that you felt that there

5  was something wrong with the estimates of Dr. Levy and that

6  his estimates of premature mortality exceeded in number the

7  hospital admissions for respiratory and cardiovascular

8  disease.  Did you not?

9  **A.**    Yes, sir, I did.

10  **Q.**    Is that not in fact the result, Dr. Moolgavkar, of the

11  fact that short term -- that Dr. Levy used short-term studies

12  for his concentration-response function of hospital

13  admissions, whereas if he had used long-term studies --

14  **A.**    Mr. Gulick, no matter whether Dr. Levy does it or the

15  USEPA does it, no matter whether short-term study they used

16  or long-term study they used, these numbers are being

17  presented as actual numbers of the benefit that would

18  accrue -- of the benefits that would accrue from lowering air

19  pollution, and if the statistical methods produce numbers

20  that fly in the face of common sense, then the statistical

21  numbers have to be questioned.  And it does not matter

22  whether Dr. Levy does it, doesn't matter whether EPA does it,

23  and doesn't matter whether you use short-term studies or

24  long-term studies.  These numbers, if they are to be taken

25  seriously, they have to meet a very simple test.  They don't

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 76 of 138

1  pass that test.

2  **Q.**  Well, Dr. Moolgavkar, is it, in fact, not the case that

3  hospital admissions from time-series studies only capture

4  today's pollution effects on tomorrow's hospital admissions?

5  **A.**  That may well be true.

6  **Q.**  So this is, in fact -- they are, in fact,

7  underestimating the total hospital admissions?

8  **A.**  These are being presented, as are the numbers presented

9  by Dr. Levy, as a correct representation of what would

10  happen.  Nowhere is it stated that this is not a correct

11  representation.

12  **Q.**  Dr. Moolgavkar, in fact, these are their best estimates

13  of those figures?

14  **A.**  These -- all these estimates presented here are probably

15  best estimates.  I haven't done the calculations, so I don't

16  know whether the calculations are correct or not.  But these

17  are best estimates under a set of assumptions.  You have to

18  accept those assumptions before you can agree with the

19  estimates.

20  **Q.**  If the estimate is that there is definite

21  hospitalization, Dr. Moolgavkar, based on a short-term

22  series, or short-term study, would it not, in fact, be the

23  case that if air pollution causes one to develop

24  cardiovascular disease and you are later hospitalized for it,

25  that that would not be captured in the short-term study?

1  **A.**   Well, these numbers are being presented as serious

2  estimates of the number of events that would be prevented;

3  and no matter where they come from, these numbers cannot be

4  taken seriously in view of this strange feature that the

5  hospital admissions is smaller than the number of deaths.

6  **Q.**   In fact, is it not the case that the hospital admissions

7  are, in fact, conservative estimates because they use the

8  time-series study?

9  **A.**   It might be the case that the mortality figures are

10  exaggerated.

11  **Q.**   Would you answer the question, please?

12  **A.**   Well, I mean, basically you're asking me, Mr. Gulick --

13  **Q.**   I'm asking you about the time series.

14  **A.**   -- why the hospital admissions numbers are smaller than

15  the mortality numbers, and all I'm telling you is that it

16  could be because both the set of numbers are meaningless

17  because the assumptions underlying them are meaningless.  It

18  could be because the hospital admissions are underestimated

19  or it could be because the mortality figures are

20  overestimated.  All of those three scenarios could give rise

21  to numbers of this type.

22  **Q.**   And in fact, Dr. Moolgavkar, you disagree both with

23  Dr. Levy and the USEPA on this subject.

24  **A.**   Well, the USEPA is an agency, and they have put these

25  numbers together on the basis of assumptions about dose

1  response relationships.  These numbers do not indicate

2  causality.  These are numbers that the USEPA is required to

3  produce to talk about the cost benefit analysis of any kind

4  of regulation it is proposing, and it is based on a set of

5  assumptions that I have questioned, and I have given you

6  reasons as to why I questioned those assumptions.

7  **Q.**  In fact, they are findings and estimates that they've

8  made, is that not the case, Dr. Moolgavkar, not assumptions?

9  **A.**  I'm sorry?

10  **Q.**  In fact, they're the findings of the EPA; is that right?

11  **A.**  These are findings of EPA based on a set of assumptions?

12  **Q.**  And you disagree with them?

13  **A.**  Yes.  And I spent the better part of an hour explaining

14  why I disagree with those assumptions.

15          **MR. GULICK:**  Thank you.

16          I have no further questions.  I do want to move

17  into evidence Plaintiff's Exhibit 492.

18          **THE COURT:**  All right.  I'll let that be admitted.

19          **MR. GULICK:**  I have no further questions.

20                  **(Defendant's Exhibit 492 received in**

21      **evidence.)**

22          **MR. LANCASTER:**  I have no redirect, Your Honor.

23          **THE COURT:**  No redirect?

24          All right, Dr. Moolgavkar, that will complete your

25  testimony and you are excused.

1          Mr. Lancaster?

2          **MR. LANCASTER:**  Defendant TVA calls as its next

3  witness Dr. Elizabeth Anderson.

4                        **ELIZABETH ANDERSON,**

5  **being duly sworn, was examined and testified as follows:**

6                        **DIRECT EXAMINATION**

7          **MR. LANCASTER:**  Your Honor, we're still using

8  defendant's book 14.  I would ask Dr. Anderson to retrieve

9  book 14 from the shelf.

10          **THE COURT:**  All right.

11  **BY MR. LANCASTER:**

12  **Q.**    Could you please state your full name for the record.

13  **A.**    Yes.  My name is Elizabeth L. Anderson.

14  **Q.**    And where do you live, Dr. Anderson?

15  **A.**    I live in Alexandria, Virginia.

16  **Q.**    And you've been retained by Tennessee Valley Authority

17  as an expert witness in this matter?

18  **A.**    Yes, I have.

19  **Q.**    And you've offered two reports that I've marked for

20  identification as TVA Exhibit 345 and 346.

21  **A.**    Yes, I have.  One dated February of '07 and the other

22  June of '07.

23  **Q.**    And would you please tell the Court about your

24  education.

25  **A.**    Yes.  I attended undergraduate college at the College of

Case 1:06-cv-00020-LHT  Document 216  Filed 06/22/09  Page 80 of 138

1  William and Mary, where I was a premedical student taking

2  equal credits in biology and chemistry.

3      I ultimately decided to go accept a fellowship to the

4  University of Virginia rather than medical school, where I

5  concentrated on mechanistic organic chemistry and taught the

6  undergraduate program for the premedical school laboratory --

7  Q.   If you wouldn't mind speaking up.  I'm having a little

8  trouble hearing.

9  A.   Okay.  I'm sorry.  I apologize.  I have a problem with

10  my throat.

11      Premedical school students, a laboratory in organic

12  chemistry.

13  Q.   And did you finish describing your education?

14  A.   No.  I didn't.  Then I received a fellowship from the

15  Defense Department to attend -- to get my Ph.D., but the

16  program dictated that I be in a program where I could do my

17  research at a military institution.  I subsequently continued

18  my work in mechanistic organic chemistry, achieving my Ph.D.

19  from American University.

20  Q.   And your Ph.D. is in organic chemistry?

21  A.   Mechanistic organic chemistry.

22  Q.   And you are, in fact, a toxicologist.

23  A.   Yes.  At the time I got my degree, there was no degree

24  in toxicology.

25  Q.   And once you obtained your doctoral degree, that was

1  about the same time EPA came into existence, wasn't it?

2  **A.**   Yes, it was.  It was a very fortunate time for me,

3  because I had finished a year's of research that was required

4  under my fellowship, so that I could then pursue my interest

5  in human health applications.  And my background had been in

6  mechanistic organic chemistry, that is, the science of

7  designing molecules to make them effective or ineffective for

8  human purposes, for example, for pharmaceutical applications,

9  so the opportunity to join EPA and look at the alternative

10  side of that issue of how can toxic chemicals interact with

11  humans when they're exposed to cause harm was a very

12  appealing opportunity.

13  **Q.**   All right.  And what were your first duties at the EPA?

14  **A.**   My first assignment was to be a member of a small

15  technical team.  I worked directly with the administrator,

16  Bill Ruckelshaus, the first administrator of EPA, and the

17  general counsel, John Quarles, in the earliest technical

18  cases that required scientific analysis, but to address some

19  of the most important pollution issues in the United States

20  in the first few years of EPA's existence.

21  **Q.**   And then did you become a science adviser?

22  **A.**   Yes.  Subsequently, after the first three years, I

23  became the Deputy Assistant Administrator for the Air

24  Programs as a scientist, assistant administrator of the

25  attorney, and it was my responsibility, particularly, to

1  focus on the Ambient Air Quality Criteria Standards and the

2  underlying science, and I spent a year in that assignment.

3  And then, right after that period, I was asked then to be the

4  executive director of a committee to address the fact that

5  EPA was having great difficulties with its regulatory

6  policies, which at the time had sought to achieve a zero risk

7  for any agent that was thought to cause cancer in humans or

8  animals.

9      This goal had been taken from the Delaney Clause, the

10  Food, Drug and Cosmetic Act, where intentional food additives

11  had this requirement that there be zero risk for any agent

12  that was found to cause tumor in animals or humans.  And, in

13  fact, that had been transferred to EPA, and the expectation

14  was that EPA would be able to achieve the same zero risk.

15      We, in fact, found that that was impossible.  In the

16  first few years at EPA, the actions that we had taken had

17  brought headline news to the agency, and in a very negative

18  way, because we had been unable to achieve zero risk for

19  agents, such as benzene in gasoline, benzene being a

20  well-characterized carcinogen.  At the same time, we had to

21  account for very economically  important pesticides simply on

22  the basis of the animal, too, with no regard for the response

23  in tech levels or exposure levels.

24      So my committee was asked to write the cancer policy for

25  the agency.  In the early part of the '70s, there was a

1   feeling, a sense in the country, that there was an epidemic

2   of cancer and that that epidemic was perhaps largely caused

3   by environmental agents.  So there was a great deal of

4   attention on this particular early effort at EPA.

5         Our committee decided that we could not write a cancer

6   policy but, rather, we reported out a process, and that

7   process was a two-step process.  It was the first time that

8   any federal agency had adopted risk assessment to address the

9   health effects of environmental agents.  We reported at that

10  policy.  The first step was to perform a risk assessment.

11  The second step was to determine how much risk would be

12  acceptable, the risk management step.  In the risk assessment

13  step, we formulated two questions.  How likely is an agent to

14  cause harm; and on the assumption it can cause harm, how much

15  harm can it cause quantitatively, and it was the first time

16  that any federal agency had really attempted to concentrate

17  on the enormous burden of characterizing dose response

18  relationships, that is, how much exposure to an agent would

19  cause harm, either given epidemiology studies or animal

20  studies, and then to associate that relationship with

21  exposures.

22        I was a co-author of the scientific paper that was the

23  guidelines published in the *Journal of the National Cancer*

24  *Institute,* which was a part of this policy that was announced

25  at that time.

1        Subsequently, I was asked to form the Carcinogen
2   Assessment Group, which was called for by the guidelines that
3   the agency would need to have a scientific body to carry out
4   the responsibility of the risk assessment programs.  I formed
5   the Carcinogen Assessment Group.  And then I formed the
6   expanded components of the risk assessment programs at EPA
7   for other health effects and the two criteria document
8   offices, one that was responsible for the ambient air quality
9   criteria documents and the other for the water program
10  support documents.
11       I spent 14 years at EPA.  Ten of those years I spent
12  directing the central risk assessment activities of EPA.  And
13  for my work at EPA, they gave me their highest award, their
14  Golden, for leadership in these programs.
15  **Q.**   And while you were leading and directing EPA's Central
16  Risk Assessment for about a decade, did you perform any toxic
17  risk assessments?
18  **A.**   Yes, I did.  I was very actively involved in the risk
19  assessment programs.
20       I co-authored literally hundreds of risk assessments
21  during this period, for the air programs, for the water
22  programs, for pesticides, and for the for toxic substances
23  programs once they were -- once that act was passed, and
24  for -- and we also assisted the hazardous waste, the
25  superfund programs.

1      This office was responsible for either doing all of the

2 risk assessments or reviewing risk assessments done anywhere

3 else in the agency.

4      And then, in the final regulatory packages -- at that

5 time we called them red border review packages -- I had the

6 final sign-off authority for the quality of the science in

7 those regulations.

8 **Q.**   And Doctor --

9      May I approach the flip chart, briefly, Your Honor?

10          **THE COURT:**  All right.

11 **BY MR. LANCASTER:**

12 **Q.**   Let me make sure I have it on the right page.

13      Dr. Levy drew a flow chart that's been marked as

14 Plaintiff's Exhibit 485 of a methodology that he says dates

15 back to something he called the Red Book.

16      Do you have any familiarity with the Red Book?

17 **A.**   Yes, I certainly do.  The Red Book is the landmark

18 publication that came from the National Academy of Sciences,

19 the National Research Council in 1983.  It was largely

20 stimulated by our work at EPA.  Since no other federal agency

21 had attempted doing risk assessment, which we had borrowed

22 from a long history of risk assessment applications in other

23 areas, to nuclear power plants, bridges, dams and engineering

24 areas, and radiation.  There was close scrutiny to monitor

25 what EPA was doing and how this whole risk assessment program

1  was really working.

2      The National Academy was called upon to assemble this

3  committee that reported as this Red Book, largely because of

4  the efforts that had been under way at EPA from 1976 until

5  the early '80s, when this committee was formed.

6      I regularly advised the committee.  We had performed

7  100 -- about 150 risk assessments at the time this committee

8  met, and the committee was very interested in how EPA's risk

9  assessment programs had been operating.  So I was very just

10 involved with the committee and knew the work of the

11 committee quite well and know the results of the Red Book.

12 The Red Book reported on both the paradigm -- it was a

13 process -- and a number of other very important findings

14 calling for guidelines which mimicked the program at EPA.

15 The four steps mimicked that, two questions, such as

16 combining the quantitative question, the dose response and

17 exposure.  But they mimicked our risk assessment management,

18 and, in large part, it endorsed what we had been doing since

19 1976.

20 Q.   And then, in the mid 1980s, you left EPA?

21 A.   Yes.  I left EPA in 1993, I believe.  No.  I'm sorry.  I

22 left EPA at the beginning of 1986, and continued doing very

23 much the same kind of work in the private sector as I had

24 been doing at EPA, from a scientific standpoint of course.

25 Q.   And is risk assessment what you continue to do to this

1  day?

2  A.    That's right.  I continue my work in risk assessment.  I

3  am currently vice president to health sciences at Exponent.

4  Our group has five centers:  Epidemiology; a center for

5  toxicology; a center for exposure assessment; a center that

6  is industrial hygiene and public health; and a final center

7  that addresses food safety, nutrition, and chemical

8  regulation.  We have 15 offices in five countries.

9  Q.    Do you hold any professional organization memberships?

10 A.    Yes, I do.  I think the most important involvement I've

11 had for a very long time is with the Society for Risk

12 Analysis.  I was a founding member of that society.  I served

13 as their president.  I served on their council.  I've

14 served -- chaired numerous committees.  I'm a fellow of the

15 society.  And I have, for the last ten years, been the

16 editor-in-chief of the flagship peer-reviewed journal of the

17 society, without a doubt the most important journal

18 internationally that addresses topics in risk assessment.

19 This journal is circulated in over 80 countries and it has, I

20 think, greater than a 4,000-member institutional subscription

21 level and then many individual subscriptions.

22 Q.    And did you receive an award from the society for risk

23 analysis in 2006?

24 A.    Yes, I did.  The society has given me a couple of

25 awards, but I think the most important one was their very

1  unique honor, and they don't give this award very often:  The

2  presidential award for the service of being editor-in-chief

3  for the journal.

4  **Q.**  And are you a member of any toxicological or other

5  scientific associations?

6  **A.**  Yes, I am.  I am a member of the Society for Toxicology;

7  I'm a fellow of the Academy of Toxicological Sciences; a

8  member of the American College of Toxicology; I serve on the

9  board of trustees for the Toxicology Education Foundation,

10  and I'm a member of several other organizations.  I'm on the

11  editorial board of other journals.

12  **Q.**  And have you published in your field?

13  **A.**  Yes, I have.  I've published many articles in the field

14  of risk assessment on different topics in the field.

15  **Q.**  And have you been an invited speaker at any colleges or

16  universities?

17  **A.**  Yes, I have.  I have lectured at most major universities

18  in the United States and many abroad.  I've served on

19  numerous international panels:  The World Health

20  Organization, the Pan American Health Organization, and have

21  lectured for them and conducted course work for them.

22  **Q.**  And have you ever testified as an expert witness before?

23  **A.**  Yes, I have.  At EPA, I was involved in administrative

24  hearings.  I testified on Capitol Hill a number of times

25  while at EPA.  I've been invited to testify on Capitol Hill

1  since I've left EPA.  And I've testified in a few legal

2  proceedings.

3  **Q.**   And in this case, has EPA -- excuse me -- has TVA asked

4  you to evaluate the potential health impacts of emissions

5  from TVA power plants in the state of North Carolina?

6  **A.**   Yes, they have.

7  **Q.**   And have you done that?

8  **A.**   Yes.  Yes, I have.

9  **Q.**   And are your conclusions documented in your written

10  reports that you previously identified?

11  **A.**   Yes, they are.

12         **MR. LANCASTER:**  Your Honor, defendant tenders

13  Dr. Anderson as an expert in the fields of toxicology, risk

14  assessment, and integrating interdisciplinary sciences for

15  risk assessment, which I understand from a brief conversation

16  with Mr. Gulick, is not -- there is no objection.

17         **MR. GULICK:**  I do not object, Your Honor, to the --

18  the State does not object to the stated expertise as was

19  stated.

20         **THE COURT:**  All right.  Let the stipulation be

21  recorded as stated.

22         **MR. LANCASTER:**  At this time, Your Honor, I would

23  also move into evidence TVA Exhibits 345 and 346,

24  Dr. Anderson's reports.

25         **MR. GULICK:**  Your Honor, we have the same objection

1    as before.

2              THE COURT:  All right.  Objections are overruled.

3                    (Defendant's Exhibits 345 and 346

4         received in  evidence.)

5              MR. GULICK:  Thank you, Your Honor.

6              THE COURT:  Yes.

7    BY MR. LANCASTER:

8    Q.   Dr. Anderson, the Court has heard extensive testimony

9    from Mr. Wheeler, Mr. Chinkin, and Dr. Tesche about the air

10   dispersion modeling that was performed in this case to

11   estimate air quality impacts in North Carolina from TVA's

12   plan.

13        Did you base your analysis on the output of those

14   models?

15   A.   Yes, I have.

16   Q.   And was there a particular health end point on which you

17   focused most of your attention?

18   A.   Yes.  I focused particularly on the particulate matter

19   end point, and particularly mortality.  And this is because,

20   in Dr. Deck's analysis, taking the output of Dr. Spengler and

21   Levy's report, he has estimated that 98 percent of the

22   benefits are from reductions in particulate emissions or

23   particulate impacts, and only 2 percent for ozone.  And of

24   those, he's projected approximately 95, 96 percent for the

25   mortality.  And I noted particularly that morbidity, other

1  health impacts other than mortality were very, very small

2  percentages; for example, asthma, .1 percent.  So I have

3  focused particularly on the 95, 96 percent benefit part of

4  that analysis, meaning I have looked particularly at

5  particulate matter and the mortalities.

6       Now, in my report, I discuss extensively other aspects

7  as well as ozone, but I think the most focus is on mortality

8  and particulate reductions.

9  **Q.**   Thank you.

10       And there is an awful lot of data that comes from this

11  computer modeling.  Have you made a summary of some of the

12  data that relates to your specific analysis?

13  **A.**   Yes, I have.  And you're correct, there really -- I

14  received a lot of information.  The information that I have

15  in my reports result from the modeling, the CMAQ modeling for

16  the year 2002 that could present emissions by, I understand

17  something called zeroing out, for each facilitate that TVA

18  owns of the 11 plants.

19       I also received CAMX data with two grids, a smaller grid

20  of 12 and a larger grid of 36, for 2002, and then the same

21  information for particulate matter for 2013.  And in 2013, I

22  received two outputs.  I received the baseline -- what I'm

23  calling baseline -- of what TVA projects its emissions to

24  North Carolina would be in 2013.

25       I also received output that would allow me to look at

1  the difference between that level and how much additional

2  benefit, or how much additional reduction there would be, if

3  TVA were to adopt the additional controls that I understand

4  are associated with North Carolina's Clean Smokestacks Act.

5  Q.   And that's the concept that I believe Dr. Levy described

6  as "Delta."

7  A.   Yes.

8  Q.   And the Delta represents the extra amount of particulate

9  matter in the air in North Carolina alleged to result from

10 what the plaintiff calls TVA's excess emissions?

11 A.   Yes.  And what I was speaking of was the Delta between

12 what TVA projects would be its impacts on North Carolina in

13 2013, and the difference between that level and what would

14 accrue if the Clean Smokestack caps were adopted.

15        MR. LANCASTER:  Your Honor, may I approach the

16 easel?

17        THE COURT:  Yes.

18 BY MR. LANCASTER:

19 Q.   Is Defendant's Exhibit 364 a summary you prepared to

20 illustrate what we call the TVA Delta, the extra emissions,

21 assuming the Court were to accept TVA's projections instead

22 of Dr. Staudt's projections?

23 A.   Yes, it is.  And perhaps I should explain a little bit

24 about what this display is.

25        In my report, I have many of these displays for almost

1  all the outputs I received, 2002, 2013.  What this one

2  displays is, across the bottom, is counties in North Carolina

3  ranging from the western counties to the eastern counties.

4      And Your Honor, you will find this is Figure 36 in my

5  first report.  I don't know the page number.

6          **MR. LANCASTER:**  I believe it's marked as

7  Defendant's Exhibit 364 as well, Your Honor.

8          **THE WITNESS:**  Your Honor, in my first report,

9  that's dated February in '07, it is Figure 36, near the back

10  of that report.

11          **THE COURT:**  All right.  Let me see if I can find

12  that.

13          **THE WITNESS:**  The title is *Annual Average PM2.5 in*

14  *North Carolina Counties and Effective Additional Controls on*

15  *TVA Delta for the year 2013*.

16          **THE COURT:**  All right.

17  **BY MR. LANCASTER:**

18  **Q.**  Dr. Anderson, if you could describe what this figure

19  shows.

20  **A.**  Yes.  What it shows is that, on the horizontal axis, the

21  counties in North Carolina are arranged from western counties

22  to eastern counties as we go from left to right, and on the

23  vertical axis are the concentrations of PM2.5.

24      The red line across the top, 15 micrograms per cubic

25  meter, is the current National Ambient Air Quality Criteria

1  Standard for particulate matter on an average annual basis.

2  And you will see them, there are bars created for each county

3  that represents the total projected PM levels for counties

4  across North Carolina in the year 2013, and the small red tip

5  of each of those bars is that incremental, what's termed the

6  TVA Delta.  It's that incremental reduction that would be

7  achieved should TVA adopt more controls, the Clean

8  Smokestacks caps, I suppose it's called.  So that's what

9  those small red tips represent.  They are obviously

10 exceedingly small.

11 **Q.**   Okay.  And this is the TVA Delta.  There's a separate

12 North Carolina Delta that Dr. Levy used to make his

13 calculations, correct?

14 **A.**   That's correct.  And I have reviewed the data, the

15 modeling outcomes from Chinkin and Wheeler.  They're similar,

16 but in their modeled projections, they actually modeled lower

17 projections for North Carolina across the board.  So their

18 bars are not quite as high.

19      And these small increments that I have termed the TVA

20 Delta are -- the maximum is -- I think it's .06 on the

21 12-meter grid and .03 is an average.  The Deltas that

22 Spengler and Levy's -- Dr. Spengler and Levy's reports used,

23 I think the maximum in any county was approximately .3, and

24 the average across those counties was .15 micrograms per

25 cubic meter.  So they're slightly larger, but still very --

1 still very, very small.

2 **Q.**   Well, I'd like to come back to the TVA Delta in a few

3 minutes, but first I want to examine the implications of

4 Dr. Staudt being right, the implications of the health

5 impacts in North Carolina, of the North Carolina Delta, that

6 assumes that TVA will have a much higher level of emissions

7 in the year 2013 than TVA projects.

8      Are you aware that based on that information, Dr. Levy

9 has prepared a calculation that the additional fine

10 particulate matter in the air in North Carolina will cause 98

11 premature mortalities per year?

12 **A.**   Yes, I am.

13 **Q.**   And do you agree with that conclusion?

14 **A.**   No, for a variety of reasons.

15 **Q.**   Could you summarize those and then we can go through

16 them in detail?

17 **A.**   Yes.  Maybe the best thing to do is place them in four

18 categories.

19      The first category I will call modeling fatalities or

20 mortalities at incrementally vanishingly small levels that

21 are very much lower than where EPA has set the National

22 Ambient Air Quality Criteria Standard to be protective of

23 public health of sensitive individuals, to protect against

24 mortality and morbidity, of 15 micrograms per cubic meter.

25      The second is the fact that the 98 fatalities for PM are

1    associated with very small Delta.  We're not talking about

2    large exposures.  We're talking about very small amounts, .15

3    on the average, .3 micrograms per cubic meter maximum.

4        The third is the differential toxicity.  There is no

5    question and everyone agrees that when EPA decided to

6    regulate particulate matter, to lump everything together in

7    essentially a category of particulates, there was uniform

8    recognition that this category contained different

9    components.  So it's a complex mixture.  And depending upon

10   its composition at any one location or point in time, the

11   toxicity is going to be impacted.  So I think the fact that

12   we are speaking here of sulfates predominantly is an

13   important factor.

14       And the final factor in their calculation is to

15   calculate with such certainty a number of 98 fatalities for

16   these incremental small amounts.

17       So I think those would be my four categories that caused

18   me great concern about their calculations.

19   Q.   Let's start with the first of those, the National

20   Ambient Air Quality Standards.

21       During your work at the EPA, were you involved in any

22   way in any development for setting the National Ambient Air

23   Quality Standards.

24   A.   Yes, I was.  As I mentioned earlier, one year there, as

25   the Deputy Assistant Administrator for the Air Program, as a

1  scientist, focused specifically on this program, and it was

2  because this program is unique across all of EPA's landscape

3  of legislative authorities, this particular one tells EPA

4  that it must regulate to protect public health while

5  considering nothing else.  It is to consider only the

6  science.  So no feasibility to control, no cost to control,

7  no benefit to control.  It's to protect public health in the

8  most sensitive individual from mortality, morbidity, and not

9  only protect but with an adequate margin of safety, to be

10  precautionary.

11      We recognized that this was a very difficult job because

12  it's rare that science can define that very specific point on

13  life.  Science can put bounds around what's known and not

14  known, but it's very difficult to define that one point.  So

15  I spent a year concentrating specifically on the implications

16  of this very unique part of EPA's authorities and the

17  scientific implications.

18      Subsequently, when I organized EPA's Central Risk

19  Assessment offices, I organized and I was responsible for

20  the -- my office was responsible for the group that wrote the

21  National Ambient Air Quality Criteria.  These documents are

22  the underpinnings, the scientific underpinnings of the

23  National Ambient Air Quality Criteria Standards.

24  Q.  How does EPA go about selecting an ambient air quality

25  standard?

**A.** It's a very long and laborious process. The process
begins with the drafting of the Ambient Air Quality Criteria
document. The staff often has outside experts help with
different chapters of the document. There's an enormous body
of literature that must be assembled and reviewed.

Usually, there are multiple drafts of the document. I
think in this last work, on the particulate matter document,
I believe there were five different drafts. Each draft of
the document goes through peer review. It goes to the
legislatively required body, the Clear Air Science Advisory
Committee, the CASAC committee, as the acronym is called, for
review. Public reviews, outside scientist review. There's
the opportunity for the input of opinion from all the
different groups of scientists, and then the criteria
document is made final. It is kind of that risk assessment
part of what I described earlier.

It then becomes the scientific basis for the regulatory
office, the air office, to make decisions about what I call
risk management, how to set the standard. And the -- that
office, in the past, has written what is called the staff
paper, which is to lay out the different options; considering
the science, what would be the option for regulatory action.
And the criteria document, the staff papers, are discussed,
reviewed, made public, and commented on numerous times.

This last process I believe took a total of seven years,

1  and it's a very -- it's intended to be a very thorough

2  process to incorporate all scientific opinion.

3      And then, finally, there's a final rule that's published

4  in the federal registry that is EPA's decision.  The Clean

5  Air Act calls for five-year revisions.  The agency has had

6  difficulty sticking to a five-year schedule in many cases.

7  But the agency is supposed to revisit these criteria every

8  five years.

9  **Q.**   And EPA, in fact, just set a PM2.5 ambient air quality

10 standard that was finalized in late 2006; is that correct?

11 **A.**   That's correct.

12 **Q.**   And is EPA approach to setting a standard, like the

13 particulate matter standard, is it a precautionary approach?

14 **A.**   Yes.  Well, the Clean Air Act anticipates EPA's

15 responsibilities to be precautionary.  That language is

16 instructive to EPA.  And in all of EPA's regulations, when we

17 began or commenced the risk assessment approaches at EPA

18 meaning the agency would accept risk, meaning not that the

19 concept of accepting risk is we're accepting real impacts,

20 but scientific uncertainties prevail.  The agency has pursued

21 a policy across all of its regulatory programs of being

22 precautionary, meaning to be public health protective when it

23 sets standards.

24 **Q.**   And does EPA take into account sensitive sub-populations

25 in setting standards?

1   A.   I'm sorry, I didn't --

2   Q.   Sensitive sub-populations.  Does EPA take that into

3   account?

4   A.   Yes.  And in the Clean Air Act requirements of EPA, EPA

5   is supposed to be protective of sensitive sub-populations.

6   Q.   And in your field, is the existence of an air quality

7   standard, such as the recently adopted EPA standard for fine

8   particulate matter, is that relevant to examining the public

9   health implications associated with exposure to the

10  pollutant?

11  A.   I'm sorry.  I'm not quite --

12  Q.   I'm sorry.  Is the existence of a standard, like the

13  National Ambient Air Quality Standard, is that a relevant

14  consideration in your field for examining the public health

15  implications associated with exposure to a pollutant?

16  A.   Yes, it is.  It essentially is the culmination of EPA's

17  long and arduous risk assessment process.  And when they set

18  the standard and specifically state that this is to be

19  protective of public health of sensitive individuals and to

20  protect against mortality and morbidity, it is -- it is a --

21  one of the EPA's most thoughtful processes and one of their

22  most considered processes to arrive at a standard.

23  Q.   And in this particular case, the facts from all of the

24  computer modeling that each side has done projects that the

25  entire state of North Carolina air quality levels will be

1  superior to what is required by the PM2.5 air quality

2  standard.

3  **A.**    That's correct.  In the year 2013, EPA has also modeled

4  what it projects across the country.  EPA, the North Carolina

5  modelers and TVA's modelers, project that North Carolina will

6  be in compliance, that is, all the counties will be under, as

7  we see here, under the National Ambient Air Quality Criteria

8  Standard of 15 for particulate matter.

9  **Q.**    And do you consider that standard to be effectively a

10  threshold for risk analysis?

11  **A.**    The standard, however we look at it, is effectively a

12  threshold, because EPA has two ways of arriving at its

13  standards.  One is for carcinogens, where it assumes a linear

14  non-threshold model.  And, of course, PM has not been so

15  classified.  But EPA, even for carcinogens, where it emits,

16  or if we don't have mechanisms of action but there is a

17  possibility that there could be risk in a linear,

18  non-threshold way, has accepted risk and has an acceptable

19  risk range, so it regards risk lower than a tenth of minus

20  six as de minimus.

21      For threshold agents, EPA has set levels routinely for

22  threshold agents by ingestion, by referenced doses, and for

23  inhalation, reference concentrations.  This level is

24  effectively, however we look at it, EPA arriving at a level

25  they feel is amply protective of public health for mortality

1  and morbidity with an ample margin of safety for sensitive

2  individuals and sub-population groups.

3  **Q.**   But that is not inconsistent with the standard failing

4  to be a zero risk standard, is it?

5  **A.**   No.  First of all, let's understand what we mean when

6  EPA says it's not a zero risk standard.  We decided in the

7  early '70s that we couldn't achieve zero risk.  It was very

8  easy to understand why.  When we pump gasoline, there is some

9  level of risk that we know is associated with benzene

10  emissions.  Our drinking water standards accept some risk.

11  And what this means is that it's not that we're accepting, in

12  reality, that there are injuries occurring at these levels.

13  Given scientific uncertainty, it's not unique with PM that

14  most often there is no evidence for or against establishing

15  exactly where harm commences.  So EPA routinely, in every

16  standard, virtually every standard it sets, unless we have

17  some exceptional circumstances where we can define the

18  mechanisms of action, will always be accepting the

19  possibility that there is some risk below the standard, but

20  without the knowledge scientifically that there really is any

21  real impact.  So EPA seeks to be protective in a

22  precautionary way.  So that's what EPA means when it says low

23  risk.

24       In the early '70s, we actually tried to achieve zero

25  risk and we found that to ban every risk possibility is not

1    an achievable goal, either socially or economically, in this

2    country.

3    **Q.**    You mentioned something called the Clean Air Scientific

4    Advisory Council, CASAC for short, and so did Dr. Levy.

5    **A.**    Yes.

6    **Q.**    His testimony was that the CASAC advised EPA to set the

7    standard, not at 15, but at a lower level, such as 13 or 14.

8    Does that fact have any bearing on your opinion in this case?

9    **A.**    No.  No, it doesn't.  And let me just go back to

10   something I said earlier when I explained that this is a

11   unique provision in all of EPA's legal authorities, that

12   science is supposed to be the basis for selecting that one

13   point.  There can be debates about where that point is

14   because science cannot always be definitive.  The Clean Air

15   Act Science Advisory Committee suggested to the agency a

16   slightly lower level of 13 and 14.  That's not that far from

17   15, but that's what they suggested.  The administrator, in

18   the end -- when I say administrator, it means the

19   administrator signs these rules, but it's the agency and its

20   deliberation considering all the scientific input -- said

21   that the science -- the CASAC committee does not provide a

22   scientific basis for choosing the 13 or 14, so the agency

23   chose the 15 as being the most scientifically defensible

24   point on that continuum.

25        But the other reason that it's not important to the

1  situation we face here is because even had EPA set a level of

2  14, North Carolina total particulate concentrations across

3  the counties are projected for all of these counties to be

4  below even that level.  So had EPA set a slightly lower

5  level, largely speaking, all of the counties across North

6  Carolina are projected to be below even the level of 13.  And

7  I think using North Carolina's modeling, it's even a much

8  lower, quite a distance below the level of 13.

9  Q.    In other words, North Carolina's modeling predicts its

10  entire state to be below the 13 level, not merely below the

11  15 level?

12  A.    That's correct.

13  Q.    You also mentioned that the extra exposure levels, the

14  Delta attributable to TVA, is quite small.  What bearing does

15  that have on your opinion?

16  A.    Well, when we are studying agents in general, and if the

17  exposures are very high or we're talking about large amounts

18  of exposure, obviously, we're quite concerned about health

19  impacts here.  I mentioned earlier that we're talking about

20  very small amounts.  The incremental amounts that

21  Dr. Spengler and Levy reported in their document are the

22  maximum 0.3 micrograms per cubic meter, and the average that

23  we calculated from that data across the counties is 0.15

24  micrograms per cubic meter.  These are very, very small

25  levels.  And then the TVA, what we spoke of earlier, those

1  levels are even smaller.  The maximum is .06 micrograms per

2  cubic meter from the 12-kilometer grid and .08 from the

3  larger grid, the 36-kilometer grid.  And the average is .03.

4      So we're talking about very, very, very small levels,

5  and it's hard sometimes to grasp, when levels are small, what

6  that really means.  But when I thought about how small these

7  levels are -- and we're not talking about something in a

8  range where we have information that these levels cause any

9  kind of impacts -- I started thinking of a way to frame what

10  these levels really mean.  Now, they are less than 1 percent

11  of the National Ambient Air Quality Criteria Standard where

12  EPA said it doesn't suspect any effects.  They are very far

13  below the chamber study that was reported in one of my

14  papers, in the paper I co-authored, a paper by Schlesinger

15  and Casey that reviewed the literature and reported that they

16  didn't observe effects in human chamber studies until they

17  got to a level of 1,000 micrograms per cubic meter on normal

18  adults and 70 to 100 micrograms per cubic meter in

19  asthmatics.

20      So we're speaking of human chamber studies where humans

21  are exposed, granted, for usually an hour or two.  But these

22  would not even be ethical studies if we were seeing

23  mortalities at levels of .15 or .3 of something as high as

24  this in these chamber studies.

25      Also, I realize, and I wrote about this in my report,

 1  that there is an asthma drug that is used routinely.  It says

 2  it's safe for long-term use, that it allows that -- it's a

 3  sulfate suspension and it's -- I looked at the

 4  concentrations, and the daily dose that's prescribed on

 5  average is about 2 micrograms per cubic meter.  So this means

 6  that someone being exposed, as an asthmatic, is exposed to

 7  about 2 micrograms, as opposed to these very low levels.  So

 8  we can frame how low these levels are by looking at other

 9  concentrations.

10       And then something else we can do is we can ask

11  ourselves how logical it is, if we look at these very small

12  levels, to think that 98 deaths are associated with this

13  incrementally very small level of .3 maximum and .15 on

14  average.  What does that mean?  Well, it means that if we

15  believe these numbers are real, we would be projecting

16  approximately 10,000 deaths at EPA's 15 micrograms per cubic

17  meter, the Ambient Air Quality Criteria Standard.  And does

18  that make sense when EPA sets it to be protective against

19  mortality and morbidity?  The asthma drug, if we look at what

20  people are prescribed to take, we would have about 120 deaths

21  in North Carolina's population of asthmatics.  So we can ask

22  ourselves if projecting these deaths from these very small

23  incremental amounts really make sense.

24       And so this is of concern because, to me, these

25  incrementally small amounts to be associated with these

1  fatalities does not make common sense, and these levels are

2  so far below where we've had human exposures in chambers

3  where the Ambient Air Quality Criteria Standard has been set,

4  that it's very difficult to frame them otherwise and to say

5  they're vanishing and small.

6  Q.    Thank you.  And the third point that I understood you to

7  mention had to do with a particular kind of particulate

8  matter we have at issue here, sulfate; is that right?

9  A.    That's right.

10  Q.    And Dr. Levy testified that the particular component of

11  the particulate matter attributable to TVA here is primarily

12  sulfate.  Are you aware of that?

13  A.    Yes, I am.  And I would agree with him, that that is

14  typically the case with power plant emissions, coal-burning

15  power plants.

16  Q.    In other words, particulate matter -- particulate matter

17  is actually a soup composed of many different kinds of

18  particles?

19  A.    That's right.

20  Q.    And sulfate is only one of them?

21  A.    Correct.

22  Q.    And in your opinion, is there a basis to conclude that

23  exposures to sulfate causes mortality at the levels of TVA's

24  alleged contribution here, which is no greater than about

25  0.31 micrograms per cubic meter on an annual average basis?

1  A.   There is no evidence, scientific evidence, that would

2  support that conclusion that I know of.  And this results

3  from having studied this issue.  I'm a co-author on a paper

4  that we published in 2007.  We had an expert committee review

5  the literature and look very carefully at the issue, and I

6  know of no scientific evidence that would support the

7  toxicity at these very, very small incremental amounts of

8  sulfate.

9  Q.   And if you will look at Defendant's Exhibit 367 in your

10 book.

11 A.   Yes.

12 Q.   Is that a copy of the paper on which you were a

13 co-author examining the health impacts of sulfate and nitrate

14 particles?

15 A.   That's correct.

16 Q.   And what was your conclusion from surveying the

17 literature?

18 A.   This paper concludes that the epidemiology studies are

19 equivocal, but the signals that are given by the epidemiology

20 studies are that sulfate is less toxic, but that because

21 sulfate is highly correlated, meaning it appears in concert

22 with particulate matter, in epidemiology studies it's very

23 difficult to take the two apart in order to separate the

24 sulfate from the particulate matter.

25      In the animal studies, we can go to the literature and

1  study what has been demonstrated in an animal study and we

2  see across the body of literature the fact that sulfate is

3  not toxic, certainly not at these incrementally small levels.

4      And that's the question we are addressing here.  We're

5  not trying to address a question of at any level can an agent

6  be toxic, because most any agent can be toxic even water, if

7  one is exposed to enough.  We're trying to address the issue

8  of toxicity at very incrementally small levels.

9  **Q.**  Dr. Peden, I believe it was, said that he relied on a

10  study by a person named Huang, H-u-a-n-g, examining the

11  toxicity of sulfate.  Are you familiar with that study?

12  **A.**  Yes, I am.

13  **Q.**  And do you believe that it supports the opinions here?

14  **A.**  Well, no.  The Huang study is what's called a panel

15  study, a chamber study, and there were 38 individuals here.

16  I'm sorry.  It's a cap study.

17  **Q.**  Right.

18  **A.**  And there were 38 individuals that he followed.  But the

19  cap -- the concentrated air pollutant particulates were

20  divided into two categories, and one was -- for the chamber

21  study was the mixture of sulfate, iron and selenium.  So it

22  was not a sulfate study.  The individuals were exposed to

23  much higher levels.  I recall, I think Dr. Peden gave a very

24  high level in his testimony.  I recall levels certainly up to

25  10 micrograms per cubic meter that were exposure levels for

1   the individuals in the study.  And the author reports at the

2   end of the study that it's very important to do further

3   research.  The last sentence in this study reports that it's

4   very important to do further research to understand the

5   mechanisms that would apply to environmentally important

6   levels, such as what we're talking about here.

7        So I don't regard the Huang study as being informative

8   for a number of reasons.  It's not a sulfate study.  It's at

9   higher doses by far than what we're talking about here, and

10  even the authors acknowledge that.

11  **Q.**   The fourth point you mentioned had to do with

12  uncertainty.  Are you aware that Dr. Levy testified that he

13  provided no quantitative uncertainty bounds or sensitivity

14  calculations for his calculations of premature mortality

15  theory?

16  **A.**   Yes, I am.

17  **Q.**   And do you have an opinion about whether that's an

18  appropriate method?

19  **A.**   Well, it's totally -- it's not appropriate.  We have any

20  number of reasons to know that there are large uncertainties.

21  We commence with uncertainties about the mixture that we are

22  dealing with here, knowing that we are talking about

23  primarily sulfate secondary particulate formation from TVA to

24  North Carolina.  So that's a large uncertainty.  He's treated

25  all particulate matters as if it's the same.

1     Certainly, the dose response function is highly

2  uncertain.  I think he's used a number of different functions

3  in the past.  So that's an area of great uncertainty.

4     The exposure is uncertain.  That's not something he's

5  done.  He's taken it from the modelers.  But what that

6  incremental Delta amount is has its own uncertainty.  So

7  there are numerous uncertainties that affect these numbers,

8  including the idea that we are working with a non-threshold

9  concept, meaning that, in the absence of information either

10  to show there is or is not a threshold, that Dr. Levy has

11  projected 98 certain deaths in a region of very small

12  exposure, and he's done it with great certainty, as if this

13  is a very certain outcome, and I think it's -- it's

14  unfortunate, because in all of EPA's guidance and all the

15  risk assessment background that all of us have who work in

16  this field, uncertainty is a very important part because we

17  have to admit that the science is uncertain.

18          **MR. LANCASTER:**  May I approach the flip chart once

19  again, Your Honor?

20          **THE COURT:**  Yes.

21  **BY MR. LANCASTER:**

22  **Q.**  Did Dr. Levy, in failing to characterize the

23  uncertainty, actually follow the Red Book methodology he

24  outlined?

25  **A.**  No.  And I have been involved with this methodology for

1  a very long time, for over 30 years.  It has an

2  identification.  EPA has now incorporated mechanisms of

3  action and it has an identification step.  We are clearly

4  dealing here with a mixture and not just particulate matter.

5  So it has an identification.  Where we're addressing the

6  weight of evidence that an agent is in fact capable of

7  causing disease, there is no discussion of the uncertainty,

8  considering particularly that we're dealing with a mixture

9  known to be predominated by sulfates.

10      In the dose response, which I always put as the second

11  step, we know that there are uncertainties in the data, and

12  Dr. Levy, I think, has acknowledged that he's used different

13  functions to address the dose response.  In the exposure

14  effect method, the projections are the basis for the

15  incremental Delta he has used and less exposure.  There is

16  uncertainty in any of that exposure information created with

17  Delta, and there is uncertainty in that function.

18      The risk characterization step is the step where all

19  this information comes together, and there is a discussion of

20  the weight of evidence that an agent is capable of causing

21  disease, and then the quantitative outcome, with some

22  discussion of what confidence you have.  There is no

23  discussion of any of that.  There is just a certainty of 98

24  deaths associated with the incremental amounts, without

25  further discussion.  So the steps in the Red Book are not

1 steps that I believe he has acknowledged or followed.

2 **Q.** Now, the opinions you've been expressing have been based

3 on the assumption of North Carolina's Delta based on

4 Dr. Staudt's emission projections; is that correct?

5 **A.** I'm sorry. I couldn't quite hear you.

6 **Q.** The opinions you've been expressing are based on

7 assuming the validity of Dr. Staudt's projections, his high

8 emissions projections, that lead to the North Carolina Delta;

9 is that correct?

10 **A.** That's correct.

11 **Q.** And if the Delta is, in fact, even smaller than TVA's

12 Delta, your opinion would be altered?

13         **MR. GULICK:** Objection. Leading.

14         **THE WITNESS:** Yes, of course it would, because then

15 the exposure assessment part of the paradigm would be

16 altered.

17 **Q.** Now, recognizing that North Carolina quantified its view

18 of the alleged health impacts in such a way that premature

19 mortalities associated with PM2.5 constituted some 98 percent

20 of the claimed impact, you still examined the other health

21 impacts alleged by North Carolina, didn't you?

22 **A.** Yes, I did.

23 **Q.** And what did you conclude?

24 **A.** I concluded very much the same, that the other health

25 impacts that were projected are below the National Ambient

1  Air Quality Standards and that the incremental amounts are

2  very small in association, and I discussed those observations

3  in my report.

4  **Q.**   In conclusion, is it your opinion that TVA's small

5  contribution to PM2.5 and ozone levels in North Carolina will

6  not pose a threat to the health of the citizens of North

7  Carolina?

8  **A.**   I believe they will not pose a threat.  There is no

9  scientific evidence to support the fact that such small

10  incremental amounts are associated with a mortality or

11  morbidity.

12          **MR. LANCASTER:**  Your Honor, at this time I move to

13  introduce Defendant's Exhibits 364 and 367 identified during

14  the course of Dr. Anderson's testimony.

15          **THE COURT:**  Let those be admitted.

16          **(Defendant's Exhibit No. 364 and 367 received**

17     **in evidence.)**

18          **MR. LANCASTER:**  And we have no further questions.

19          **THE COURT:**  All right.  Mr. Gulick?

20                         **CROSS EXAMINATION**

21  BY MR. GULICK:

22  **Q.**   Good afternoon, Dr. Anderson.  You received your

23  modeling results of your modeling inputs in this case from

24  Dr. Tesche and Mr. Mueller, did you not?

25  **A.**   Yes, we did.

1    Q.   And you also received -- that was based, was it not, on

2    TVA's Clean Air Plan that was provided to you by Mr. Mike

3    Scott?  Is that right?

4    A.   I'm sorry.  I didn't hear the question.

5    Q.   Pardon me.  Dr. Tesche and Mr. Mueller's modeling was

6    based upon TVA's Clean Air Plan; is that right?

7    A.   That's my understanding.

8    Q.   And Mr. Michael Scott actually provided you his

9    explanation of what TVA's plan provided; is that right?

10   A.   I did not review in detail what TVA was planning.  I had

11   used the modeling outputs and I understood that Mr. Scott

12   would be addressing these plans, but I did not review them in

13   detail.

14   Q.   But you did discuss them with Mr. Scott, did you not?

15   A.   Sorry?

16   Q.   Did you not discuss those plans with Mr. Scott?

17   A.   I wanted to be assured that the modeling assumptions

18   were supported, and I was assured by -- is it Dr. Scott?

19   Mr. Scott?  I was assured by Mr. Scott that that was in fact

20   the case.

21   Q.   And are you aware that Mr. Scott's plan or the plan of

22   TVA was based upon -- its main assumption was the Clean Air

23   Interstate Rule and the Clean Air Mercury Rule?

24   A.   I think that's a question for a different witness.  I am

25   not -- I think I'm not the correct person to be discussing

1  that.

2  **Q.**   So you don't know the answer to that?

3  **A.**   I don't know the answer.

4  **Q.**   If, in fact, it was based upon the Clean Air Interstate

5  Rule, you're aware that that rule has been vacated, are you

6  not?

7  **A.**   Yes, I am.

8  **Q.**   You're aware that the Clean Air Mercury Rule has also

9  been vacated?

10  **A.**   I don't -- I just happened to hear about the first.  I'm

11  not an authority on this.

12  **Q.**   Your projections of -- your Exhibit 364 is based upon

13  the projections that were given to you by Dr. Tesche and

14  Mr. Mueller, were they not?

15  **A.**   That's correct.

16  **Q.**   If the vacation of the CAIR rule were to change the

17  inputs into Dr. Tesche and Mr. Mueller's modeling, or to

18  undermine that, that could affect your predictions about what

19  is going to be the actual level of fine air particulate in

20  North Carolina and elsewhere.  Is that not the case?

21  **A.**   I have no idea how the vacating of that rule impacts the

22  modeling.  I think that's a question for -- as I said,

23  unfortunately, I can't answer it.  Whether it does anything

24  to the modeling, changes the modeling, I assume that the

25  other witnesses can address that better than I.

1  **Q.**  My question to you is, if it did change the underlying

2  assumptions of their modeling so that they were not correct,

3  that would affect your projections in your Exhibit 364; is

4  that correct?

5  **A.**  Well, I think the point is I can't know, one, whether it

6  changes assumptions; two, I don't know whether it makes

7  assumptions go up or down.  So I think the point is that I

8  don't know.  But if I'm given different modeling results, I

9  will deal with different modeling results.

10 **Q.**  In regard to the NAAQS, during the time that you were

11 with EPA, did the administrator ever reject the advice of its

12 scientific advisers?

13 **A.**  I can't remember whether the administrator always agreed

14 with the Science Advisory Council or not.  I just -- I don't

15 recall.  It's an advisory body and it's made up of a few

16 individuals.  The administrator has a great deal more

17 information to assimilate, including many, many outside

18 scientific comments, and the criteria document is normally

19 just an enormous document by internal scientists, and the

20 administrator has to, in the end, consider the advice of the

21 CASAC committee, but not follow it.  They are not the

22 dictators of the standard.  So I can't tell whether there's

23 ever been a discrepancy or not.

24 **Q.**  So you can't -- you don't know the answer as to

25 whether --

1  **A.**   I don't know.  I don't know.  But I can tell you that

2  there has never been a point in time when I was in the agency

3  that the administrator felt compelled to be instructed to set

4  a standard just exactly the way the CASAC committee

5  suggested.

6  **Q.**   The CASAC committee, with respect to the PM2.5 standard

7  that was last set, which was a few years ago, recommended

8  that it be lowered, did they not?

9  **A.**   Yes.  We've talked about that.  They recommended a

10  slightly lower level of 13 to 14.

11  **Q.**   And they recommended that it be lowered because there

12  was clear evidence, they indicated, that there were adverse

13  health effects below the 15 micrograms per cubic meter

14  standard.  Is that not right?

15  **A.**   I think that is not correct because, in the end, the

16  administrator said that, while they suggested the slightly

17  lower level, they did not provide a convincing scientific

18  basis for that level.  They just had a feeling that it should

19  be slightly lower.  And I discussed earlier that it really

20  doesn't matter in this particular situation whether it's 13

21  or 15.  It's not that much different.  But the administrator

22  decided that the scientific -- the solid scientific

23  foundation supported the 15 and not the slightly lower 13 or

24  14.

25  **Q.**   Is it not in fact the case that the chairman of the

1  CASAC wrote to the administrator on December 29, 2006, and

2  stated, quote:  The CASAC recommends changes in the annual

3  fine particle standard because there is clear and convincing

4  scientific evidence that significant adverse human health

5  effects occur in response to short-term and chronic

6  particulate matter exposures at and below the 15 micrograms

7  per cubic meter, the level of the PM2.5 standard, unquote.

8       Isn't that the case?

9  A.   Yes.  I read the letter and I am aware of the letter,

10 and I said that the administrator, after considering all the

11 science, said that the committee said that but that they

12 didn't provide a scientific basis.  They didn't point to

13 specific studies or cites that the administrator could use,

14 and so the administrator decided it was amply safe to set the

15 level at 15.

16 Q.   Isn't it in fact the case that the administrator is a

17 political entity?

18 A.   I explained earlier, it's the administrator who signs

19 all of EPA's authorities such as this.  It doesn't mean that

20 the administrator sits in his or her office and makes that

21 decision.  There is a great deal of scientific input.  I was

22 sitting there with my office when these decisions were being

23 made for many years.

24      It is a highly deliberative process with a great deal of

25 scientific input, so it's really unfair to give any taint to

1  this decision as a political decision.

2  **Q.**   I'd like to show you --

3        **MR. GULICK:**   Could you bring up the deposition,

4  Gary?

5  **BY MR. GULICK:**

6  **Q.**   I'd like to go to your deposition transcript at page 84,

7  and it will come up on the screen.  At lines 10 to 16.  You

8  see that in front of you?

9  **A.**   Yes.  Well, of course, the administrator is a

10  politically-appointed --

11  **Q.**   Well, let me ask you what I asked you.

12       Does the question not say:  "No.  I was asking whether

13  the appointment is a political appointment"?

14       And is your answer not:  "Yes, the appointment is a

15  political appointment"?

16       Then you went on to explain.  But is it not the case

17  that you testified that the appointment is a political

18  appointment?

19  **A.**   There is no debate that the administrator of EPA is

20  appointed by the president.

21  **Q.**   Thank you.

22       In fact, in this case, did you not testify in your

23  deposition that you actually did not do a risk assessment in

24  this case?

25  **A.**   No, I didn't, because EPA had done a risk assessment

1  over seven years, and I didn't feel that I needed to go back

2  through that entire process.  And that, in fact, is the risk

3  assessment process.

4  Q.    You mean setting the NAAQS?  Is that what you're

5  referring to?

6  A.    Yes.  In setting the National Ambient Air Quality

7  Criteria Standard, EPA is basically reviewing all the risk

8  information and arriving at a level that it feels is safe.

9        So what I did was review the exposure information,

10 meaning the modeling outcomes, to essentially look at whether

11 or not there would be risk either from the entire

12 contributions to North Carolina from all sources or

13 particularly from the incremental levels from TVA under

14 different circumstances.

15       So I did conduct, in my view, an assessment, a risk

16 assessment, but EPA had done the health-based assessment in a

17 seven-year process, and I did not try to redo that.

18 Q.    You did not try?

19 A.    I said I did not try to redo what EPA had taken seven

20 years to do.  No, I did not try to redo that.

21 Q.    EPA, in setting the NAAQS, was not considering the

22 impacts of TVA's emissions on the state of North Carolina,

23 was it?

24 A.    Well, the NAAQS is anticipating nationwide impact, so,

25 in that sense, it would embrace or would include or cast its

1  meaning over any contribution from any source.

2  **Q.**   In this case, you did not consider the impacts of TVA's

3  emissions on the state of Tennessee, did you?

4  **A.**   Well, I did, in my report, include the entire domain,

5  but as I said in my deposition, I thought the case was about

6  impacts to North Carolina so my analysis primarily focused on

7  North Carolina.

8  **Q.**   So the answer is no?

9  **A.**   I think I just gave the correct answer.

10     My report has plotted the whole domain.  It shows TVA's

11  contributions from the modeling at 1 percent, 2 percent and

12  5 percent in the whole domain, and those figures are

13  presented in my report.  But then I concentrated, by

14  analysis, on North Carolina because it was my understanding

15  that this case was about impacts to North Carolina.

16  **Q.**   Like to show you what's been admitted as Plaintiff's

17  Exhibit 148.  It will come up on your screen.

18     This particular document has already been admitted into

19  evidence.  And I'd like to go to the second page of this

20  document.

21     Are you aware, Dr. Anderson, that there are

22  nonattainment areas for PM2.5 in the state of Tennessee?

23  **A.**   I think I would need to go back to my maps.  That's what

24  I'm aware of.  I have not seen these particular displays

25  before.  And I know in 2013 there are no projected

1  nonattainment areas either in Tennessee or North Carolina, as

2  I recall.

3  Q.   In doing your evaluation and in preparing your expert

4  report in this case, you did not consider current impacts of

5  TVA's facility -- of TVA's emissions on North Carolina or

6  Tennessee.  Isn't that the case?

7  A.   Well, I did in the sense that, you know, Dr. Spengler

8  and Levy did not, but I did -- I had modeling results for the

9  year 2002, and then I had some additional information that

10  told me that what was modeled for the year 2002 was reduced

11  by 2005, I believe, by about 15 percent.

12      So I did consider all of the modeling information I had,

13  and I considered the current contributions and I presented

14  extensive plots like this, showing both the entire

15  particulate contribution from the modeling in 2002 to North

16  Carolina.  I even broke out the contribution of TVA for the

17  annual contribution to particulate matter, the 24-hour

18  contribution, and also I did the same thing for ozone.  And

19  then, in addition, I displayed the monitoring results from

20  North Carolina for both particulate matter and ozone and

21  showed what counties are in nonattainment, and I testified in

22  my deposition that those were 2002 data, and I believe there

23  were three counties that were, from the North Carolina

24  monitoring information, not in attainment.  And then in the

25  rolling average going forward, I looked up the information,

1   and only two of the three counties remained.

2        So, yes, I did consider it.

3   **Q.**   Are you aware that the Environmental Protection Agency

4   found that sources of SO2 and NOx in the state of Tennessee

5   are contributing, or will contribute, significantly to

6   nonattainment of the PM2.5 NAAQS in Catawba County and

7   Davidson County in the year 2010?

8   **A.**   I'm not aware.  I don't know what you speak of.

9   **Q.**   That's a technical finding in support of the CAIR rule.

10  **A.**   I don't have that information.

11  **Q.**   Did you know that --

12  **A.**   But I do have --

13  **Q.**   -- the U.S. -- let me ask you, did you know that the

14  USEPA, as part of its support of the CAIR rule, found that

15  sources of SO2 and NOx emissions in the state of Alabama

16  contributed significantly to the nonattainment of the PM2.5

17  NAAQS in Catawba and Davidson Counties in North Carolina in

18  2010?

19  **A.**   I cannot discuss the CAIR rule.  I know it's been

20  vacated.  I did not discuss the document and I don't -- to be

21  fair, I would have to know what incremental amounts we're

22  speaking of.  And what I do have are EPA's modeling results

23  for the year 2013, 15 and 20, and I have North Carolina's

24  modeling results for 2013 and the incremental contributions,

25  and I have TVA's.  I just don't have the -- I have not

1  reviewed this particular document.

2  **Q.**   I'd like to draw your attention to -- I don't know what

3  exhibit it is, but it's in your first expert report.  And go

4  to Figure 5-A.  Have you been able to find it?

5  **A.**   Yes.

6  **Q.**   And the title of this figure is:  "TVA Contributions to

7  Annual Average PM2.5 Concentrations in North Carolina

8  Counties for the year 2002."  Is that correct?

9  **A.**   That's correct.

10 **Q.**   And this is based on modeling you received from

11 Dr. Tesche?

12 **A.**   Sorry?

13 **Q.**   And this is based upon modeling that you received from

14 Dr. Tesche and Mr. Mueller; is that correct?

15 **A.**   That's correct.

16 **Q.**   And is it not the case that this particular figure

17 shows, by county in North Carolina, the contributions in 2002

18 as figured by Dr. Tesche and Mr. Mueller for -- the yellow

19 shows the contributions from three plants in eastern

20 Tennessee.  Is that correct?

21 **A.**   That's correct.

22 **Q.**   And the blue shows the contributions from TVA's two

23 plants in Alabama.  Excuse me.  In middle and western

24 Tennessee.  It has four plants; is that right?

25 **A.**   That's right.

1   Q.   I got my colors mixed up.

2        And the green shows the contributions to each county in

3   North Carolina from TVA's two plants in Alabama?

4   A.   That's correct.

5   Q.   And the red, finally, shows the contributions from TVA's

6   two plants in Kentucky to each county in North Carolina; is

7   that right?

8   A.   That's correct, yes.

9   Q.   Now, these are annual average concentrations, are they

10  not?

11  A.   Yes.  And the vertical axis displays those

12  concentrations.  It's .1, .2, .3, .4.  So these are not the

13  same.  I didn't want you to think it was the same vertical

14  axis as here.  These are obviously much smaller

15  contributions.

16  Q.   I understand that.  However, these are annual averages,

17  and, in fact, they're going to be additive in the effect, are

18  they not?

19              (Interrupted by court reporter.)

20  Q.   Because these are annual averages, they're going to be

21  additive to each county; is that correct?

22  A.   Yes.  We were breaking out and -- we displayed the total

23  contribution from all of TVA and the counties as well, but we

24  were breaking out each single contribution from the Kentucky,

25  the Alabama and the western Tennessee and eastern Tennessee

1  plants because I was given the information; so that's what I

2  displayed.

3  **Q.**   I understand that.  But, in fact, because they're annual

4  average concentrations, they will be additive in each county?

5  **A.**   If that's what the modeling by zeroing out means, then

6  they would be additive.  But we have the results additive as

7  well displayed.

8  **Q.**   So the answer is yes?

9  **A.**   Well, I said I'm not a modeling expert.  If that's what

10 zeroing out means, I assume that, if we add them up, they

11 will equal the diagram that I presented where they're all put

12 together.

13 **Q.**   So you don't know the answer?

14 **A.**   I said I think that's correct, that if you add them all

15 up and you look at the other diagram, you can put them

16 together.  I assume that you add them all up.  They were

17 zeroing out when they did the modeling.  I assume that there

18 is nothing in the model that prevents you from putting them

19 back together to get the total contribution.

20 **Q.**   Thank you.

21      With respect to Dr. Levy's estimates, he in fact

22 described not his expert opinion but his best central

23 estimate; is that correct?

24 **A.**   That's what he describes it as.  I don't know what

25 his -- I didn't see anything else described, so I really

1  don't know what that means.

2  **Q.**   But that was his description of it, was it not?

3  **A.**   I believe that's what he said.

4  **Q.**   And have you seen the -- have you reviewed the CAIR

5  rule?

6  **A.**   I just said I have seen it, but I have not spent time

7  reviewing the CAIR rule.

8  **Q.**   Were you in the court when I was discussing it -- when I

9  was asking Dr. Moolgavkar about it?

10 **A.**   Yes, I was.  I -- and I have some familiarity about what

11 was done there.

12 **Q.**   In fact, is it not the case that the USEPA estimated

13 that there would be 17,000 fewer premature deaths per year as

14 a result of the controls of the cap-and-trade program they

15 were imposing --

16 **A.**   I saw that.

17 **Q.**   -- in the United States?

18 **A.**   I saw that that's what you were displaying, and I think,

19 if I'm permitted to, I would like to add some perspective.

20     What EPA is obligated to do, particularly since OMB

21 passed its rule that every time EPA sets a standard it has to

22 present a cost-benefit analysis, EPA has been forced in more

23 recent years to do this kind of work.  And it's done because

24 they have to do it, and they have to do it for OMB.

25     They do not use that kind of effort as a basis for

1  setting the Ambient Air Quality Criteria Standard, but,

2  rather, they use that information to get a perspective for

3  alternative -- kind of a sensitivity analysis for alternative

4  decisions and then for their cost-benefit analysis and their

5  submission to OMB.

6  Q.  In fact, it was used to support a rule in which it's

7  going to require installation of pollution controls on power

8  plants in the United States.  Is that not right?

9  A.  I'm sorry.  It was used how?

10      MR. GULICK:  Madam Court Reporter, did you get my

11  question?

12      COURT REPORTER:  Yes, I did.

13      MR. GULICK:  Could you read it back?

14      (The pending question was read by the reporter.)

15      THE WITNESS:  I don't know if that's right, because

16  when you say "support," I would need to know what you mean by

17  support, and I haven't reviewed that information, so I don't

18  know what you mean.

19  Q.  You just said that it was a decision-making tool, did

20  you not?

21  A.  No, that's not what I said.

22      I said that until OMB got involved with the regulatory

23  impact assessment requirements, and in my years at EPA, we

24  were not trying to calculate impacts in this fashion.

25      EPA looks at potential impacts of particular rules, of

1  particular judgments, and it became an approach for doing

2  that because it's required to do so in its regulatory impact

3  analysis.  Even though the Clean Air Act says when it sets

4  the National Ambient Air Quality Criteria Standard, it must

5  do it based only on the science and protection of public

6  health when it looks at the impacts of what rules it's

7  setting, then it makes -- it does this kind of impact

8  analysis, and it's been -- it's been problematical for the

9  situations like this where the science is very uncertain.

10      In fact, the agency went to the National Academy of

11  Sciences to try to get help on how they could go about doing

12  this.

13  **Q.**   You heard Dr. Moolgavkar's testimony about the articles

14  that he authored with you, starting in the middle of the

15  1990s, on the subject of air pollution?

16  **A.**   Yes.

17  **Q.**   And, in fact, is it not the case that the American Iron

18  and Steel Institute was a client of your company?

19  **A.**   I think it's -- yes, and that's true, and I would like

20  to add a perspective to that as well.

21      When I was at EPA, the American Iron and Steel Institute

22  regularly spent all of its money in legal contests with the

23  agency.  When I left the agency, I spoke with them.  They

24  asked me my opinion about the Ambient Air Quality Criteria

25  Standards, and they said the agency would not listen to them.

1  And I said they're not going to listen to you on a legal

2  basis, but if you are willing to sponsor some good scientific

3  work, the agency will listen and they'll be obligated to

4  listen.  And so they did sponsor scientific work, and this

5  was some of the work they began sponsoring.  And I thought it

6  was a good step.  I think private sectors should be

7  responsible for some of the investigations.

8  Q.   At your deposition I asked you if you were familiar with

9  an article called *Short-Term Effects of Air Pollution on*

10 *Heart Rate Variability in Senior Adults in Steubenville,*

11 *Ohio*.  Do you recall that?

12 A.   Yes, I do.

13 Q.   Did you subsequently -- you had not seen that article,

14 as I recall?

15 A.   Yes.  Of course, I looked it up.  I have not seen it.

16 It was published in 2008.  You asked me about two articles, I

17 thought.

18 Q.   I think it was published in 2006.  Did you say 2008 or

19 did I just --

20 A.   I thought you were talking about the Steubenville --

21 which article -- maybe we should resolve what we're speaking

22 of.

23          MR. GULICK:  I, unfortunately, only have one

24 article, Your Honor, so I could put it up on -- I can show it

25 to her and then put it up on this.

Case 1:06-cv-00020-LHT   Document 216   Filed 06/22/09   Page 132 of 138

1    THE COURT:  That will be fine.

2    MR. GULICK:  We can put it up on the screen.

3    THE WITNESS:  Could I have a copy of the article?

4    MR. GULICK:  I'm going to display it to you.

5    THE WITNESS:  I want to look at the whole article,

6  not just selected excerpts.

7    MR. GULICK:  Well, let me do this.  Let me show you

8  the discussion part, and before I ask any questions, I'll

9  give the article back to you.  How about that?

10    THE WITNESS:  All right.

11    MR. GULICK:  Is that fair enough?

12    THE WITNESS:  That's fair enough.

13  BY MR. GULICK:

14  Q.   First of all, this was one of the articles that we

15  had -- that we had discussed during your -- or that I had

16  shown you during your deposition; is that correct?

17  A.   Yes.  I think you showed me two articles.  This one and

18  one by Sarnat in Steubenville.

19  Q.   But this was one of them?

20  A.   I think so, yes.

21  Q.   And what I want to draw your attention to is this

22  discussion, and if you could focus in on the -- do I have to

23  focus this in?

24    I'm sorry.  I'm a complete amateur at this.

25    Have you read the first paragraph?

1   A.    Yes.

2   Q.    I'm going to move it down so that -- before I give it

3   back to you --

4   A.    All right.  Thank you.

5   Q.    -- so that we can read the second paragraph.

6   A.    All right.  I've read it.

7   Q.    Is it not in fact the case, Dr. Anderson, that this

8   study suggests that there is an association -- indeed, an

9   association -- between sulfate exposure and changes in heart

10  rate variability.

11  A.    This is what is called a panel subject.  It has 32

12  subjects.  And what they were monitoring is heart rate

13  variability.

14        First of all, to take one study when there are many

15  studies, many panel studies that show some positive, some

16  negative, is not -- to look at the study alone is not that

17  informative, but looking at the study alone and the

18  particular issues here, which is why I read it after the

19  deposition, we're speaking of North Carolina where we're

20  speaking predominantly of sulfate emissions.  This study is

21  in an area, Steubenville, Ohio, that's highly industrialized,

22  where the pollution levels, the concentrations are much

23  higher than here in North Carolina.  There are many

24  industries there that are not here in North Carolina.

25        The correlations here that were made with particulate

1  matter and sulfates did not discuss other potential

2  contributions of metals and other types of particulate matter

3  that could be involved, so I didn't think this was

4  particularly useful to the discussions we're having here,

5  both because it's one of many panel studies that show many

6  different results and also because Steubenville is very

7  different -- Steubenville, Ohio, is a very different profile

8  than here.

9      There's also a second paper in Steubenville by Sarnat

10  that looks -- in a similar panel study, and he, in his

11  follow-up paper, references our paper, saying that -- and

12  this was in 2008 -- that the results on effects of sulfate is

13  far from resolved, and he references the paper that I

14  co-authored.

15      And the other problem with this paper is heart rate

16  variability is well known to be, as a background matter,

17  highly variable in elderly people.  So to try to superimpose

18  heart rate variability on the effects and correlate them with

19  effects of any particular exposure is a very difficult

20  matter.  And on the expert panel, that was that panel for the

21  paper that I co-authored, Dr. Venditti, who is a leading

22  cardiologist, questioned quite openly -- and he's written a

23  paper on this -- that heart rate variability is not really a

24  very good measure for detecting effects of pollutants.

25  Q.   Well, I'm going to --

1    A.   So, I mean, I did read this, and that's the context.

2    Q.   You're aware of Dr. Peden's testimony that reduction in

3    heart rate variability is a well known precursor for

4    arrhythmia and more serious cardiovascular events?

5    A.   I would say his statement is at odds with Dr. Venditti,

6    who said that heart rate variability, first of all, if it's a

7    5 to 10 percent difference, it doesn't matter, and if it's --

8    heart rate variability is usually symptomatic of something.

9    If it's more than that, it shows an underlying problem and

10   not an etiological agent.

11       But I'm not a cardiologist, so I can only report what I

12   know.  We have differing opinions here from one person who is

13   a renowned cardiologist and one who is not really a

14   cardiologist.  So I would tend to put the weight on the other

15   side, but I can't resolve the differences.

16   Q.   In fact, that is a matter about which you cannot

17   testify.  Is that right?

18   A.   I'm sorry?

19   Q.   You're not a medical doctor?

20   A.   No, I'm not a medical doctor.

21   Q.   So you're just repeating what you say that that doctor

22   said; is that right?

23   A.   Well, you were asking me --

24   Q.   I'm just asking you, you were just repeating what --

25   A.   You were asking me what Dr. Peden said, and you were

1  holding that out as an authority statement, and I'm just

2  saying there are many different sides of the issue, and I

3  think I'm perfectly at liberty to point out that Dr. Peden --

4  that they are differing opinions.  And I can point those out.

5  I said I can't resolve them.

6  **Q.**    And Dr. Peden has given sworn testimony in this case.

7             **MR. GULICK:**  No further questions.

8             **MR. LANCASTER:**  No redirect, Your Honor.

9             **THE COURT:**  Dr. Anderson, that will complete your

10  testimony and you are excused.  Thank you.

11            **MR. GULICK:**  Actually, Your Honor, I would like to

12  put that particular article into evidence, with your

13  permission, and will mark it and make copies for the Court

14  and for --

15            **THE COURT:**  And what number will you give that?

16            **MR. GULICK:**  That will be 493, Your Honor.  And

17  that was the article we were just discussing.

18            **THE COURT:**  All right.  Let that be admitted.

19            **(Plaintiff's Exhibit 493 received.)**

20            **MR. GULICK:**  I will bring copies to the Court as

21  well as to other counsel.

22            **THE COURT:**  That will be fine.  Take a recess until

23  2:30.

24            **(Recess.)**

25                    **[END OF VOLUME 10A]**

1

2

3

4  UNITED STATES DISTRICT COURT

5  WESTERN DISTRICT OF NORTH CAROLINA

6  CERTIFICATE OF REPORTER

7

8           I certify that the foregoing transcript is a

9  true and correct transcript from the record of proceedings

10  in the above-entitled matter.

11           Dated this 26th day of July, 2008.

12

13                              S/ Karen H. Miller

14                              _____
                                Karen H. Miller, RMR-CRR
                                Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25