UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

STATE OF NORTH CAROLINA      )
ex rel. Roy Cooper, Attorney )
General,                     )
            Plaintiff,       )      No. 1:06-CV-20
                             )
        vs.                  )      **VOLUME 12**
                             )
TENNESSEE VALLEY AUTHORITY,  )      [Page 2844-2907]
                             )
            Defendant.       )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE LACY H. THORNBURG
UNITED STATES DISTRICT COURT JUDGE
JULY 30, 2008

APPEARANCES:

On Behalf of the Plaintiff:

    JAMES C. GULICK, Senior Deputy Attorney General
    MARC BERNSTEIN, Special Deputy Attorney General
    North Carolina Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina

    MICHAEL D. GOODSTEIN, Esquire
    ANNE E. LYNCH, Esquire
    Resolution Law Group, P.C.
    5335 Wisconsin Avenue NW, Suite 360
    Washington, DC

On Behalf of the Defendant:

    FRANK H. LANCASTER, Senior Attorney
    HARRIET A. COOPER, Assistant General Counsel
    THOMAS F. FINE, Assistant General Counsel
    MARIA V. GILLEN, Assistant General Counsel
    Tennessee Valley Authority
    400 West Summit Hill Drive
    Knoxville, Tennessee

KAREN H. MILLER, RMR-CRR (828)771-7217

1

2                           **I N D E X**

3                                                    Page

4
CLOSING ARGUMENT BY MR. GULICK                       2846

5
CLOSING ARGUMENT BY MR. LANCASTER                    2871

6
FINAL ARGUMENT BY MR. GULICK                         2901

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2         **THE COURT:**  Are we ready to proceed?

3         Mr. Gulick?

4         **MR. GULICK:**  Thank you, Your Honor.  If I may

5 approach, we have some exhibits and I've got an exhibit book.

6         **THE COURT:**  All right, sir.

7         **MR. GULICK:**  May it please the Court, I'm James

8 Gulick, and I will make the closing argument for the State of

9 North Carolina.  And I'll start, and I would like to reserve

10 the balance of the time I've got left for rebuttal, if

11 necessary.

12         **THE COURT:**  All right.

13         **MR. GULICK:**  Your Honor, the State of North

14 Carolina has presented evidence in the last two weeks, and

15 you've heard all of the evidence from both parties, and this

16 has demonstrated that TVA's emissions of sulfur dioxide and

17 NOx are creating and have created a nuisance which is going

18 on today under the laws of Tennessee, Alabama and Kentucky,

19 and that nuisance is occurring not only in North Carolina,

20 and especially in western North Carolina, but in the states

21 of Alabama, Tennessee and Kentucky.  And, indeed, those

22 emissions are causing harm to public health throughout the

23 region, especially in the eastern part of the United States.

24         The common law of Tennessee, Alabama, and Kentucky

25 all establish that air pollution can constitute a public

Case 1:06-cv-00020-LHT   Document 218   Filed 06/22/09   Page 3 of 65

nuisance, and injunctive relief is an appropriate remedy for that nuisance.

Under the laws of all of these states, as well as under the *Restatement of Torts*, unreasonableness of the conduct can be viewed in terms of the aggregate nuisance resulting from the combination or contributions of all.

The evidence has clearly established that the emissions from TVA's facilities in Alabama and Tennessee and Kentucky all aggregate together to cause the harm that they do in North Carolina, in Tennessee, in Alabama, and Kentucky, as well as throughout the region.

The laws in all these states, Your Honor, make it clear that there is liability if the aggregate effect is substantial and there is unreasonable interference, and all North Carolina is asking of TVA is that it remove its contribution to the nuisance.

The testimony of James Staudt established that TVA's facilities are emitting at an unreasonable rate in view of the available technology which is proven by which they can further reduce their emissions to a reasonable level.  The necessity and feasibility of these controls is well established by his testimony.  Indeed, TVA has offered no expert testimony whatsoever that contradicts his estimate, based upon a very close examination of the availability of labor and the cost, that these can be done by 2013.

Case 1:06-cv-00020-LHT   Document 218   Filed 06/22/09   Page 4 of 65

1          Moreover, the testimony of Susan Tierney,

2  Dr. Tierney, establishes without question that TVA can afford

3  to implement these controls without reasonably disrupting its

4  rates.  There was no contrary expert testimony offered.

5          The evidence establishes, Your Honor, through

6  numerous witnesses and through numerous exhibits that have

7  been admitted through the testimony of Staudt and Neil

8  Wheeler and Lyle Chinkin, the SAMI evidence that you saw on

9  the first day of trial, and, indeed, in Exhibit 5A that was

10 presented by Dr. Anderson, during her cross-examination,

11 that's in her report, that TVA's emissions from each of the

12 states involved, from Alabama, Kentucky, and Tennessee,

13 contribute to the poor air quality in western North Carolina,

14 as well as in those states and throughout the region.

15         And, furthermore, although nonattainment of the

16 imperfect federal National Ambient Air Quality Standards is

17 not the judgment, is not the prerequisite for harm, the

18 evidence clearly establishes that even today there are

19 nonattainment of ozone and other standards in these states.

20         Indeed, if you look at Plaintiff's Exhibit 149,

21 which summarizes the improvement in annual PM2.5, or fine

22 particulate, concentrations, you can see that there are

23 significant areas of nonattainment in and around Bull Run, in

24 and around Chattanooga, as well as in western North Carolina,

25 and you can see the benefits that will accrue to western

1  North Carolina and eastern Tennessee, and Kentucky, and
2  Alabama if TVA implements the controls that North Carolina
3  seeks.
4      Our Exhibit 156, which is now on your screen, shows
5  the maximum improvement in 8-hour ozone concentrations with
6  the additional controls North Carolina seeks.  This reveals
7  very clearly that there will be benefits along the Applachian
8  Trail, along the Blue Ridge Parkway, near the Chattanooga
9  nonattainment area, which is close to Widows Creek in
10 northern Alabama, and an extensive area where there is
11 uncontrolled emissions from John Sevier and on which TVA
12 proposes at some future time to install the latest proven
13 controls for controlling NOx emissions that result in ozone.
14     These are all substantial harms to air quality
15 which TVA can rectify in the near future using proven
16 controls.
17     Your Honor, looking at Plaintiff's Exhibit 155,
18 which is now shown on your screen, you can see the
19 significant number of nonattainment areas for ozone -- and
20 this is using the old standard that has now been replaced,
21 the old 8-hour ozone standard -- that is taking place.  You
22 can see -- on this screen you can see nonattainment near
23 Memphis.  You can see nonattainment area just north of
24 Cumberland and Gallatin plants in Kentucky, and you can see
25 nonattainment areas right around Nashville, where the

1  Gallatin plant is.

2          You've heard testimony that TVA, notwithstanding

3  these long-standing nonattainment areas, that TVA has not

4  installed the most modern controls for either of the

5  Johnsonville plant or the Gallatin plant, although ten years

6  ago in, 1998, they did their own study showing the

7  significant impact of those plants' emissions on

8  nonattainment in the Nashville area, and you continue to see

9  a long strip of nonattainment running from where Widows Creek

10  is, down near Chattanooga, up into the Bull Run and the

11  Kingston area.

12          Your Honor, the laws of these three states

13  establish that conduct which significantly interferes with

14  public health or safety or comfort constitutes a public

15  nuisance.

16          The testimony of Dr. Jonathan Levy of the Harvard

17  School of Public Health and Dr. Peden of the UNC Medical

18  School and the Center for Environmental Research at that

19  school clearly establish, first of all, the causal link

20  between exposure to fine particulates and to ozone to adverse

21  human health consequences.

22          Dr. Moolgavkar and Dr. Anderson, TVA's experts, are

23  clearly representing a distinct minority view, industry's

24  view, about that evidence, but there in the clear --

25  Dr. Moolgavkar's own testimony establishes that he is in the

1  distinct minority on that subject.

2          Dr. Levy used well-established peer-reviewed

3  techniques of estimating the benefits that could be achieved

4  in public health by installing the controls that North

5  Carolina seeks, and they are very substantial in North

6  Carolina, Tennessee, Alabama, and Kentucky, as well as the

7  rest of the region.

8          There are many other health effects that do not

9  result in premature mortality.  They were established by the

10 testimony of Dr. Peden, but they were amplified by the

11 testimony that you heard from Dr. Russell about the

12 significance and disruption in human being's lives with

13 asthma exacerbations, a very large number of which can be

14 avoided as a result of the controls that North Carolina

15 seeks, and the disruption of people's lives to have to adjust

16 their daily activities to avoid breathing polluted air.

17         And you heard more personal testimony from Will

18 Harlan and Morgan Sommerville about their experiences and how

19 they've had to modify either their work schedules or their

20 exercise schedules to avoid this kind of thing, to avoid the

21 adverse impacts of air pollution.

22         You heard from Erik Plakanis from Tennessee, who

23 just very recently had to cancel a trip up onto the

24 Applachian Trail because of the high ozone levels on that

25 trail.

1    Dr. Levy's estimates, working with his colleague,

2  Dr. Spengler, has estimated a very substantial number of

3  premature mortalities, hospital admissions, emergency room

4  visits, asthma exacerbations, and restricted activities that

5  will be avoided in North Carolina, in Kentucky, in Alabama,

6  and Tennessee, as well as throughout the region if these

7  controls are installed.  And those benefits will accrue very

8  quickly upon the -- upon those controls being installed.

9    It's interesting to note that the benefits in

10  Tennessee actually are greater than anywhere else,

11  substantiating SAMI's finding that the state in which the

12  benefits -- in which the reductions are made will see the

13  greatest benefits.  But those benefits will be realized

14  outside those states as well, another finding of SAMI, which

15  is supported by all of the other evidence that follows.

16    North Carolina's expert economist, using EPA's

17  proven techniques which have not been disturbed by later

18  scientific testimony, established that there are very

19  substantial monetary benefits associated with the quantified

20  health benefits.

21    As you can see on the screen before you, in

22  Tennessee, North Carolina, Alabama, and Kentucky alone, using

23  2000 census data, which is already conservative and behind

24  the times, there will be monetized benefits that help -- just

25  of the quantified health benefits of nearly $3 billion a

year.  If you use 2013 population figures, it is probably
going to add an additional half a billion dollars to those
annual health benefits.

In addition to public health -- and I would like to
mention one thing.  There are many unqualified health
benefits, and one I would like to specifically mention, Your
Honor, is one that Dr. Peden mentioned in his testimony, and
that is that the evidence now shows that there is a
significant loss in lung development in children who are
exposed to chronic -- who have chronic ozone exposure.  That
is not quantified in any of these benefits, but that's a
serious impact on the lives of young people.

And Dr. Peden also testified that the data do not
support the suggestion made yesterday by Dr. Smith that the
premature mortalities are simply people who are going to die
soon anyway.  And as Dr. Smith herself recognized, her view
on that has not been accepted by the advisors to the EPA in
valuing of human life.

In addition to the health benefits, Your Honor,
there is substantial environmental benefits as well.  Most
visibly, of course, is the regional  haze.  And you've heard
testimony from numerous witnesses about the value that people
place on visibility, on improving visibility.  You heard it
from many people, testimony from people in this area, such as
Harris Prevost, from Bill Cecil and Todd Morse, as well as

1  from Erik Plakanis.

2         Harris Prevost testified that he has witnessed on

3  numerous occasions that when there is a beautiful view in

4  which you can see ridge after ridge from the top of

5  Grandfather Mountain it's like a spiritual experience for

6  people.  They stay, they don't leave; they just soak it in.

7  And when there is haze, a veil is down over that, that the

8  spiritual experience is lost.

9         You heard from Leah Mathews, who did for the park

10  service an economic valuation of improved visibility just on

11  the Blue Ridge Parkway and a very substantial dollar value

12  that the users of the Blue Ridge Parkway placed on improving

13  visibility along the Parkway.

14         John Molenar's testimony established that the

15  visibility improvements will be widespread in western North

16  Carolina, and although his figure only shows the minimum, he

17  says at least 40 days perceptible visibility improvements in

18  the area that he has highlighted, which includes many of the

19  areas of concern in western North Carolina.

20         It's very clear from the testimony of others, as

21  well as from him, that those benefits will be realized in

22  eastern Tennessee and at Mammoth Cave, which has the worst

23  visibility of any Class I area in the United States, and

24  Sipsey Wilderness in Alabama.

25         Your Honor has also heard testimony about the

longstanding problem of acid deposition on the high forest
mountains in North Carolina and Tennessee and the damage that
it's done to their soils.  This testimony came not only from
our expert Charles Driscoll, but from Bill Jackson of the
U.S. Forest Service.  And their combined view was that,
although it's going to take some time for the soils to
recover and for the streams to recover their acid
neutralizing capacity, that that will not happen until deep
cuts are made in the emissions, especially of sulfur dioxide,
but also of nitrates.

The suggestion by Dr. Grigal, TVA's expert, that
these areas are already ruined and so we might as well get
used to it is really -- it's terrible.  I don't know what to
say about it.  Especially coming from TVA, which has
contributed so much to this problem in eastern Tennessee and
western North Carolina.

Furthermore, although the contribution cannot be
quantified, TVA's emissions also include mercury, just as
they would with any other utility, and that mercury can be --
mercury emissions can be reduced significantly by the
controls that North Carolina seeks.  The fact that those
emissions can be reduced is not disputed by anybody.

The law of all these states provides, as does the
*Restatement of Torts*, that conduct which is proscribed by
statute, ordinance, or administrative regulation goes to the

1  unreasonableness of that conduct.  And you heard the

2  testimony of the former EPA's former Air Enforcement

3  Director, Bruce Buckheit, about what he described as the

4  stunning number and magnitude of TVA's violations of the New

5  Source Review provisions of the Clean Air Act, and he

6  described what those violations were and about EPA's efforts

7  to deal with those violations, which were stymied by TVA's

8  resistance, and a ruling by the Eleventh Circuit that the

9  current administration's policy that while TVA can sue EPA,

10  EPA cannot sue TVA.

11       So, once again, North Carolina is without the

12  protection of the federal government's regulations and

13  statutes.  But the Court does not have to ignore those

14  violations.

15       I thought it was very interesting that when Gordon

16  Park testified for TVA and was asked about it by TVA's own

17  counsel he did not deny the underlying violations.  His

18  response was no court has issued a final adjudication finding

19  us responsible.

20       Moreover, it is well established by a court

21  decision that TVA has committed 3,000 opacity violations at

22  its Colbert facility in northern Alabama in just a matter of

23  two to three years.

24       Furthermore, TVA was fined in Alabama $100,000 for

25  other violations.  And TVA's own Inspector General indicated

1  in his report, which is now in evidence before you, that TVA

2  did not exhibit a standard of care commensurate with

3  applicable regulatory requirements.

4        Your Honor, TVA has known for years about the

5  nature and level of impact that results from its emissions.

6  It's not alone.  Other utilities are the same.  But TVA has

7  known.  Indeed, TVA knew at the outset of the SAMI

8  investigations -- the SAMI investigations were not undertaken

9  in 1992 to find out whether there was acid deposition or

10  whether there was regional haze.  The question was, where is

11  it coming from and what can we do about it.  It took ten

12  years of evaluation to reach those conclusions, and the

13  result was pretty clear as a result of that final report that

14  utilities need to remove -- need to drastically reduce their

15  sulfur dioxide and oxide of nitrogen emissions.  That's the

16  first big step.  They're the ones who emit, by far, the most

17  sulfur dioxide and the biggest reductions have to come from

18  them.

19        North Carolina heard that message and required its

20  two utilities to make drastic reductions on a firm schedule,

21  and the evidence before you shows that Duke and Progress,

22  which, as the evidence clearly shows, had not installed a

23  single scrubber in 2002 of their own volition or under the

24  acid rain amendments of the federal Clean Air Act, the

25  evidence before you clearly establishes that with a firm

KAREN H. MILLER, RMR-CRR  (828) 771-7217

schedule and deadline, without loopholes, that they have installed in three years -- the past three years, more -- scrubbed more capacity than TVA has done in 35 years. And TVA's witness, Mr. Myers, admitted that very fact.

TVA's 1998 ozone report established that in 1998 TVA knew that its emissions of oxides of nitrogen from its Gallatin, Cumberland, Johnsonville plants were having a substantial impact on ozone levels in the Nashville nonattainment area.

Your Honor, these are big projects and it will cost a lot of money in ordinary people's terms for them to install the controls that are sought, but they're not unreasonable. As Jim Staudt testified, this is what you expect to have to pay, this is what industry, what utilities are in fact paying in order to install pollution controls.

TVA's own exhibit and Dr. Staudt's own testimony establish that these controls can be installed not in the manner of billions of dollars a year, but under a billion dollars a year. North Carolina's evidence establishes that for $516 million a year, TVA can install these controls. And we have before you -- that can be broken out by state by TVA's facilities in Alabama, Kentucky, and Tennessee.

And that doesn't take into consideration the fuel cost savings that TVA can realize if it installs pollution controls, the more advanced pollution controls, on its

facilities.  Both James Staudt and TVA's witness Michael

Scott testified about the fact that there are cost savings

that can be had if you install the most advanced controls.

        Your Honor, the health benefits that can be

realized, just the quantified health benefits, of 3 billion

or 3 and a half billion, depending on what population figures

you consider, dwarf by comparison -- those are annual

benefits -- dwarf by comparison the annual cost to TVA in

installing the controls that North Carolina seeks.  And

that's without considering any of the unquantified benefits,

and that's without considering any of the quantified health

benefits that will occur outside of Tennessee, North

Carolina, Alabama, and Kentucky.

        The evidence establishes that these pollution

controls are reasonable, they're necessary, they're

affordable, and that TVA knows how to install these controls.

It's installed each of this type of control on a few of its

facilities.  It knows that it can be done.  However, in its

long-range plan, it actually sets out most of these controls

on a schedule that extends considerably into the future.  So

it's anticipating that at some point it will have to do these

very things, but the evidence very clearly establishes that

TVA does not actually install the controls until it has to do

so.  And that is no different from Duke or Progress or other

utilities.  So it plans for the future, but it takes those

steps and commits the money when it has to do so.  Its
long-range plan takes an unreasonably long period of time in
view of the benefits to be achieved.

Moreover, the testimony of its own witness, in his
deposition, Joseph Bynum, who said -- he testified in his
deposition, which you now have in evidence, that the one
thing you knew for certain is that TVA's plans will change.

The evidence, including the 10-K that was filed by
TVA, put in evidence by North Carolina yesterday, establishes
that TVA's long-range plan is based upon its estimate of what
it needs to do to comply with the CAIR rule and the CAMR
rule, both of which have been vacated.

Now, we have some assurance, not made in writing,
not a commitment, but assurance that TVA is going to continue
with its plans.  But there is a significant -- there is some
significance to the vacation of CAIR which North Carolina
sought to avoid, and that is not only that it will have a
chilling effect on TVA's expenditure of money that it's not
required to spend by CAIR since it is vacated, but that other
utilities, in addition, outside of TVA, will also hold up on
the installation of pollution controls unless there is state
law or something else to require them to do that.  And you
heard that from the testimony of Dr. Staudt, among others.

That fact makes the projections of attainment on
which TVA's experts Tesche and Anderson place so much weight,

it makes those estimates of attainment in North Carolina much
more doubtful.  In fact, it cannot be accountable.

        But TVA has not just changed its unannounced plans,
its confidential plans; TVA has also actually changed plans
that it's announced.  You heard from a couple of TVA
witnesses, including Mr. Kilgore yesterday, that TVA scrapped
the plans for a Colbert scrubber in northern Alabama that it
announced publicly in 2001; and Mr. Park testified that it
was swapped for a scrubber -- or two scrubbers at John
Sevier, close to the North Carolina border.

        And I'd ask you, Your Honor -- no real explanation
was given for that, but the facts surrounding these things
give an explanation, and that is TVA was under pressure of a
lawsuit with regard to the Colbert facility, which was
dismissed, as Mr. Park testified, for statute of limitations
reasons.  And after that happened, then the swap was made.

        But by the time TVA made the announcement of its
John Sevier scrubber, it was already sued by the State of
North Carolina, and the evidence clearly establishes, without
question, both TVA's evidence and North Carolina's evidence,
that the John Sevier facility, which has no SCRs, which has
no scrubbers, and which prior to that time had no plan for
scrubbers, that that was announced in anticipation of the
defense that they planned to raise in this litigation.  But
without a requirement, there is no way for North Carolina or

1  this Court to count on the fact that that will happen.

2         Your Honor, TVA's view on this case is which one,

3  TVA or North Carolina, can better predict what TVA is

4  actually going to do by 2013.  But this case -- the 2013 date

5  is the date that North Carolina says, for a couple of

6  reasons, this is the date by which TVA can install the

7  controls we seek.  But the nuisance is not happening in 2013.

8  The nuisance is happening now, and North Carolina is entitled

9  to relief if this Court finds that there is a nuisance

10  occurring today.  And that nuisance has not just been

11  happening today, it's been happening for a long time, and

12  that's been established by evidence that you have heard in

13  this case.

14         The modelers modeled the benefits that could be

15  achieved in 2013 if controls were put on, based upon the

16  control scenario that is currently -- that was in place at

17  TVA at the time North Carolina's modeling was done, and it is

18  that same set of controls, at least the hard controls, that

19  are operating right now.  And TVA has been visibly at work

20  while this matter has been in litigation building scrubbers

21  at Kingston and at Bull Run.  North Carolina has no doubt

22  that they can finish those scrubbers and more by 2013.  But

23  if that happens, that doesn't mean that the benefits somehow

24  magically disappear.  That simply means that the health

25  benefits and the visibility benefits that North Carolina

1  seeks will happen sooner rather than later.  They don't

2  disappear.  They'll just happen sooner.

3          TVA has also attempted in this case to obscure the

4  impact of its emissions, and its done it in a couple of ways,

5  some of them more obvious than others.

6          The first is that when it, for the most part, when

7  it's showing differences, or deltas as we call them, or the

8  scientists call them -- when it's showing those deltas, it

9  has in every case set out to show the deltas between what it

10  says it's going to do by 2013 and what North Carolina wants

11  it to do, thereby hiding, or obscuring, if you will, the

12  benefit that will be achieved from where they are now and

13  where they were two years ago when this case was filed and

14  what they could be doing.  That's one way that it's been

15  obscured.

16          In addition, you saw some -- you saw a couple of

17  examples of this, where TVA experts Tesche and Dr. Grigal --

18  Dr. Tesche and Dr. Grigal -- both presented examples where

19  they compared TVA's emissions to all the anthropengenic --

20  I'll just say man-made -- all the man-made emissions in North

21  Carolina put together.  So you see a comparison of TVA's

22  emissions, on the one hand, and North Carolina, not only Duke

23  and Progress's emissions, but all of the motor vehicles in

24  the state of North Carolina -- motor vehicles emit NOx -- all

25  of the industrial sources in North Carolina, all of the

non-motor vehicles, the big construction equipment, and all
of the area sources.  That comparison was made -- and they
didn't tell you about it.  They had to be asked about that on
cross-examination.  That comparison was made to diminish the
apparent significance of TVA's contributions.

TVA's experts, Anderson -- Dr. Anderson and
Dr. Smith, argue to you that you should ignore all of the
benefits that will accrue as a result of these emission
controls except those in North Carolina.  And then they ask
you to say, just compare what TVA promises that it's going to
do, an unenforceable promise, in 2013 and what North Carolina
wants in the way of controls and asks this Court to provide.

This seriously understates the magnitude of the
benefits that will actually happen between now and 2013 and
thereafter, and every year thereafter, as a result of the
controls that North Carolina seeks.

I'll remind the Court of the testimony of
Mr. Myers.  And you see this question and answer on your
screen before you.  Mr. Myers was asked last Wednesday:
Mr. Myers, would you agree that, in general, the SO2
emissions reductions that have been undertaken by TVA over
the years have been driven by compliance with federal and
state rules and consent decrees?  And his answer was yes.

Indeed, the first of four scrubbers that TVA
installed at the Paradise plant in Kentucky and Widows Creek,

only two of the units of the eight units at Widows Creek,
were installed as a result of that consent decree.  And then
it took another 10 or 15 years for TVA to install more
scrubbers at Cumberland plant in western Tennessee, and that
was done, as he indicated, to comply with the acid rain
program, a statutory program under the federal law.

             And Mr. Kilgore did not dispute that yesterday.

             In addition, there was a very telling bit of
testimony that was brought forward, and it was also brought
forward from Mr. Myers on last Wednesday, and that was that
Duke and Progress, in the last three years, certainly under
the compulsion of the Clean Smokestacks Act, had scrubbed
more capacity in three years than TVA has scrubbed in the
last 35 years.  And the difference, the difference in that is
not that Duke and Progress are better than TVA or vice-versa.
The difference is that Duke and Progress are under a clear
mandate and a clear schedule to install a large number of
controls on a fixed deadline.  They know how to do it, they
are doing it, and the results are already being seen in
advance of the deadlines for SO2 that come, actually, next
year, because they will, in fact -- they plan, in fact, and
they will, in fact, meet those deadlines.  And TVA can do it,
too.

             The difficulty is that the federal scheme that's
been in place has relied on a lawsuit here, an incomplete

acid rain program there, and it's going to take -- unless

this Court acts, there is no way that North Carolina can be

assured or anyone can be assured that it's not going to take

another 20 years to get these controls in place. That they

need to be done is well established, that TVA knows how to do

it is well established, but only this Court's action is a

real assurance that it will happen and that it will happen in

a reasonable time.

         We recognize, Your Honor, that your concern is most

focused -- or your focus is greatest on Tennessee, Alabama,

Kentucky, and North Carolina, and well it should be, for

North Carolina is the plaintiff, and Alabama, Kentucky, and

Tennessee are the states in which TVA's facilities are, but

it's significant that TVA's emissions are creating a nuisance

in those states, in each of those states, as well as in North

Carolina, but we would ask that you not ignore -- that you

should not ignore the benefits, the significant benefits that

will accrue outside that state, as well, as you contemplate

whether and what remedy to impose in this case.

         **THE COURT:** How many scrubbers did Progress and

Duke have on line before this Clean Smokestacks Act?

         **MR. GULICK:** They had none, Your Honor. Duke and

Progress, however, are not the State of North Carolina.

They're privately-owned companies that make their decisions.

And North Carolina was certainly, certainly not saying that

that was acceptable.  In fact, you heard from Brock Nicholson

that Duke and Progress -- the lack of scrubbers was not an

acceptable situation, and the general assembly of the State

of North Carolina determined that was not acceptable, and

that's why it required the installation -- the pollution

controls that are resulting in those scrubbers.

THE COURT:  So mandates work on that system, too.

MR. GULICK:  Mandates work, Your Honor, when the

mandate is clear and there are no loopholes that can be

exploited.

One of the serious difficulties with the federal

law and the various federal laws that have been designed, is

that they've got a lot of loopholes.  And that's -- Duke and

Progress complied with the acid rain amendments by buying

allowances.  So that was a loophole that they could exploit.

It was available to them.  But under the Clean Smokestacks

Act, they cannot do that.  And they're not doing it.  They're

installing controls as they are required to do.

THE COURT:  Now, if TVA, as it says it's going to

do, continues on the schedule that has been proposed, would

that bring it into line with the North Carolina Clean

Smokestacks Act?

MR. GULICK:  What they propose to do -- what they

say -- Your Honor, what they say they're going to do by 2013,

will not do that.  It's good.  It's a good start, and it will

1   help a lot, but it will not finish the job.  What it's --
2   what its whole plan, the entire -- what their long-range plan
3   has in there probably would do it, but who knows whether it
4   will actually happen and who knows when it will happen.

5          What we would argue to you, Your Honor, is that
6   without the requirement that it happen on a specific schedule
7   there is no way that this Court or the State of North
8   Carolina can count on it happening.  Certainly, TVA's past
9   has shown that it installs controls when it has to do so or
10  when it's under significant legal pressure to do so.  If the
11  pressure is taken off, what we fear, Your Honor, and what the
12  past would suggest, is that the action will stop.  And that's
13  because it costs money to do this.

14         But as Jim Staudt testified, their long-range plan,
15  if it all went into effect and it went into effect at a
16  reasonable time and on a mandated schedule, that would be a
17  reasonable level of control.  But we can't count on that.

18         Your Honor, the relief we think that is most
19  appropriate and that we would ask that you consider is to
20  impose a cap on TVA's facilities.  That's what North Carolina
21  has done with Duke and Progress.  It gives flexibility to the
22  company to find out the most cost-effective way to do it.
23  It's not the only way to do it, but it is a reasonable
24  method.

25         The Court could also cap them by state if it chose

to do so, and there's information in the record by which it
could do that. But the proposal that North Carolina would
make would be a reasonable -- would be a system-wide cap.

    And I would like to --

    **THE COURT:** What is North Carolina contending is a
reasonable period of time for TVA to meet these standards?

    **MR. GULICK:** We believe, Your Honor, that the
testimony of Jim Staudt has established that TVA can meet all
of those things by the year 2013. TVA put on no expert
testimony refuting his evidence that there will be ample
boilermakers available. That's the principal limiting labor
to complete these projects. And now with the CAIR vacated,
it's probably eased up demand -- and that's what he testified
about -- on boilermakers, so there is ample labor available.
And TVA has -- they did not counter that.

    In addition, Your Honor, as TVA's evidence shows,
they're on the way to doing some of this work. They're
already constructing Bull Run. According to the photographs
that they showed you, they've made substantial progress in
the last year. They made substantial progress in Kingston.
So our contention is, Your Honor, that they can do these by
2013.

    It is especially important that there be a mandate,
however, and a schedule and a firm deadline. Deadlines work.
They help focus energy where it needs to be focused. They

1  help focus priorities where they need to be focused.

2        **THE COURT:**  Does the Clean Smokestacks Act leave

3  open any potential for North Carolina companies to stretch

4  out this period beyond 2013?

5        **MR. GULICK:**  No, Your Honor.

6        **THE COURT:**  So they can't come in and say, well, we

7  just can't meet this deadline?

8        **MR. GULICK:**  No.  There is no provision for that in

9  the statute whatsoever.

10        And, indeed, Your Honor, I think at the

11  Cliffside -- well, North Carolina -- if anything, it's going

12  to be more.  In fact, the Cliffside permit, Your Honor,

13  actually requires the retirement of four old unscrubbed

14  units, and that's established in the -- as Cliffside, the new

15  Cliffside unit comes on.  This is in that 2008 report.  I

16  can't remember which exhibit number it is -- four old units

17  are going to come off line, four old units that were

18  unscrubbed.  So, indeed, what is going to happen with that

19  cap, that cap will not change even if there is more demand on

20  the Duke and Progress system.  They will have to clamp down

21  further on their emissions at their plants with their need to

22  use -- to get more capacity out of the existing units.  So if

23  they bring on new units, like the new Cliffside unit, they

24  have to still come in under that cap, so they have to be more

25  efficient.

1        As you heard, I think it was -- I'm blanking at the

2   moment -- it was Bill Ross's testimony, Your Honor, that he

3   does not see any possibility that the general assembly would

4   relax the statutory requirement -- there is nothing in the

5   statute that would allow Duke or Progress to avoid those

6   caps, and he does not foresee any possibility that the

7   general assembly would give them that.

8        So I'd like to reserve the balance of my time,

9   unless Your Honor has more questions.

10       **THE COURT:**  No.

11       **MR. GULICK:**  Thank you.

12       **THE COURT:**  Mr. Lancaster?

13       **MR. LANCASTER:**  Good morning, Your Honor.

14       **THE COURT:**  Good morning to you, sir.

15       **MR. LANCASTER:**  Before I start arguing, I'd like to

16  pause for a moment and say thank you.  The court personnel,

17  from the front door on up, has been hospitable and helpful to

18  us in the last two weeks, and I don't think we could have

19  done it without all the help we've received.  It's been a

20  pleasure to try a case here.

21       Your Honor, when I introduced myself and my

22  colleagues about a couple of weeks ago, I said that we would

23  present the evidence that would show that TVA is not a public

24  nuisance, and that is what we have done, Your Honor.  The

25  evidence that has been presented to this Court does not

1    establish that TVA is a public nuisance.

2          That, of course, begs the question:  What is a

3    public nuisance?  What does one have to show to establish a

4    public nuisance?  What is it that I'm saying the plaintiffs

5    have failed to prove?

6          As the Court is well aware from reading the briefs,

7    there is not a very good definition of public nuisance in the

8    case law, but there are three elements that are common to all

9    the cases.  There must be unreasonable conduct by the

10   defendant that must cause significant harm to the plaintiff.

11   And that is what plaintiff has failed to prove here.  Rather

12   than showing that plaintiff engaged -- excuse me.  Rather

13   than showing that TVA engages in unreasonable conduct, what

14   the evidence shows is that TVA uses this country's most

15   abundant resource, coal, in a responsible way to provide a

16   vital commodity, reliable, affordable electricity to over

17   9 million people living in the Tennessee Valley.

18         Now, there are two legal issues I'd like to address

19   briefly at the very beginning because I think that they need

20   to be faced on.  They cover everything else that happens.

21         The first one is who is it that has to suffer this

22   significant harm.  And the answer, Your Honor, that we submit

23   should be applied here in this case is North Carolina.  North

24   Carolina is the one whose significant harm, if it is proven,

25   should drive a finding, not all these other states.  The

plaintiff throughout this trial has tried to present evidence
that TVA is hurting people or killing people in Ohio and all
kinds of other states; that there is acid deposition in
Virginia; that there is visibility impairment in Mammoth Cave
in Kentucky.  Plaintiff has even argued that there are areas
in Tennessee, Alabama, and Kentucky that aren't attaining the
Clean Air Act air quality standards, and it blames TVA for
that and suggests this Court ought to do something about it.

I respectfully submit that, as Mr. Styke explained
from the witness stand yesterday, the State of Tennessee has
that under control and doesn't need North Carolina's help,
and I dare say, from Mr. Styke's reaction, doesn't want North
Carolina's help.

Your Honor, we respectfully submit that the impacts
that must be assessed are those to North Carolina, and that
if North Carolina fails to prove that it, itself, is
suffering harm sufficient to support a remedy, it should not
be allowed to present a case based on claims of harm to
someone else somewhere else.  In fact, I believe Mr. Gulick
put it best in his opening statement when he said, it is a
fair and reasonable demand on the part of the State of North
Carolina that the air of its territory should not be
polluted, that its mountains should not be destroyed or
threatened by acts of TVA.  That's what this case really
should be about, North Carolina's air and North Carolina's

1  mountains.

2          The second point I'd like to address at the

3  beginning, Your Honor, are the issues in this case which the

4  plaintiff's evidence has not actually addressed.

5          Right before the start of the trial, the Court

6  entered an order setting forth the issues to be tried and

7  making clear that, as the Supreme Court has held, sources can

8  only be held liable under state law, under the source state

9  law; that plaintiff needed to present three different issues:

10  That the Kentucky plants are nuisances under Kentucky law;

11  the Tennessee plants under Tennessee law; and Alabama plants

12  under Alabama law.  And that has not been addressed.  And a

13  good example of that, Your Honor, is TVA's two Kentucky

14  plants.  TVA has the -- they're both in far western Kentucky.

15  The Paradise plant has -- neither one of them is there any

16  evidence have engaged in unreasonable conduct.  The Paradise

17  plant has three units.  All three of them have scrubbers, the

18  Cadillac pollution control for sulfur dioxide.  All three

19  have SCRs, the Cadillac pollution control for nitrogen

20  oxides.  The Shawnee plant has ten smaller units.  Nine of

21  those units burn low-sulfur coal.  Those nine units also

22  employ low-NOx burners.  The tenth is a special kind of unit

23  called a fluidized bed unit, that the testimony has shown, is

24  a low-emitting plant.  So the two Kentucky plants are

25  low-emitting plants to start with.

Further, the testimony yesterday from Mr. Bridgers is that the predominant wind direction during the time of the year when North Carolina has air quality issues is from the southwest. Those plants are to the northwest of North Carolina. And all the air quality modeling that we've heard confirms the common sense belief that the emissions from those plants aren't impacting North Carolina. The numbers -- what the modelers call it is zero out. They run their model and take those plants completely away and see what the effect is, and those numbers were minuscule, Your Honor. A good example is the visibility numbers. Even taking those plants away entirely, the visibility numbers came out to be below the threshold of perceptibility that plaintiff's witness Mr. Molenar testified, and so what that evidence means is that the Paradise and Shawnee plants could disappear and no one in North Carolina would ever be able to tell the difference.

Your Honor, we respectfully submit that the plaintiffs have not proven the issues that are set forth in this case. For that reason alone, plaintiff cannot win this case.

But even if plaintiff were allowed to pursue a claim against TVA's whole system, measuring together all 11 plants in all three states, plaintiff has still not proven a nuisance. Plaintiff has not proven that TVA's plants are a

nuisance now and plaintiff has not proven that TVA's plants
will become a nuisance in the future.

I'd like to start with now.  There has been no
evidence showing that today TVA operates its power plants in
an unreasonable way that causes significant harm to the
plaintiff.  "Unreasonable" is not the word to describe TVA's
operations.  A better word would be "congratulations."  That
was the word that Secretary Ross used.  He met with TVA
several years ago, and then he wrote a letter thanking TVA
for outlining its accomplishments and its plans, and he wrote
congratulations to TVA.

Your Honor, that's a more appropriate word than
"unreasonable," because "congratulations" are indeed in
order, and we can look at a number of different ways to
measure TVA's performance that show it is not unreasonable.

Let's start with the emissions rates.  Dr. Staudt,
one of plaintiff's witnesses, testified that, in his view,
that's the best measurement of a power plant's performance.
How much pollution does it take to make a unit of
electricity?  That measures the trade-off between the
benefit, the electricity, and the cost, the pollution.

The major pollutant in this case is sulfur dioxide.
It is the one that, according to the plaintiff, and the
plaintiff is right, is the largest contributor among the
pollutants to fine particulate matter, to the sulfate.  That

is the pollutant the plaintiff claims accounts for all of
these premature mortalities.  It's the one plaintiff claims
accounts for the visibility impairment.  The sulfur dioxide
piece of the case is the most important part of the case, and
on that piece, TVA's emission rates are far superior to those
that the State of North Carolina allows its own utilities to
have here in North Carolina.  25 to 40 percent better, year
after year, are TVA's sulfur dioxide emission rates.

         The other main pollutant in the case, nitrogen
oxide, or NOx, TVA isn't far superior to North Carolina but
it is on par with North Carolina.  During ozone season, the
two systems have almost exactly the same emission rate.

         Now, there's been a lot of testimony about
year-round operation of nitrogen oxide controls.  It's true
that TVA operates, currently, its SCRs, its Cadillac
pollution controls, during ozone season, May to September,
but the evidence is undisputed that that's the time that's
important.  During the wintertime, as Mr. Bridgers testified
yesterday, the state of North Carolina is code green, as they
put it, for ozone.  There aren't high ozone levels in the
wintertime.  Summertime is the time that it's important to
operate those pollution controls, and TVA does so just as
well as the utilities in North Carolina do.  And those
utilities are not expected to get better on their NOx
controls.  They've already hit their NOx deadline, which came

 1  earlier.

 2          In operating its system to achieve these emission

 3  rates, TVA employs a fleet of these SCRs that is one of the

 4  best in the nation.  The evidence is that 60 percent of TVA's

 5  capacity is equipped with these SCRs, these Cadillacs for NOx

 6  control.

 7          At his deposition, Dr. Staudt told me that a third

 8  of the rest of the nation had what was equipped with SCRs.

 9  He told me at the trial here that it's up to a half, but in

10  neither case is it up to 60 percent.  TVA is already ahead of

11  the curve in NOx controls.  TVA was way ahead of the curve on

12  putting in scrubbers for sulfur dioxide emissions, although

13  it's true that others are catching up with TVA.

14          As Gordon Park testified, TVA put on scrubbers at

15  Widows Creek in the '70s -- that's in Alabama; at Paradise in

16  Kentucky in the '80s; at Cumberland in Tennessee in the '90s.

17          Mr. Gulick is correct that Duke and Progress are

18  catching up; and he characterized it as putting on more

19  scrubbers in three years than TVA put on in 35.  Well,

20  actually, they've been doing it for 35, too, but they did

21  none for the first 32.  TVA's approach is steady reductions

22  over time.  And that is continuing, with more scrubbers

23  coming on line at Bull Run, at Kingston, and John Sevier.

24  Steady reductions.  That's TVA's history and that's TVA's

25  future.

1          Now, Dr. Staudt testified that he believed TVA's

2    operations today are unreasonable because they don't conform

3    to what he calculated as what he called a reasonable emission

4    rate.  And to calculate this reasonable emission rate, Dr.

5    Staudt really had to play some games with the numbers.  He

6    speculated -- and it's based on what he thinks Duke and

7    Progress will do in North Carolina in the year 2013.  And he

8    speculated that Duke and Progress will have very high growth

9    rates on their coal-fired power units, even though they

10   aren't projecting that.  He speculated that Duke will be

11   operating a brand new plant at Cliffside, which isn't built

12   yet and which has a lawsuit which I now understand is on Your

13   Honor's docket and may never be built.  He also speculated

14   that Duke would continue to run a number of units that Duke

15   has announced it is going to close.  And so he came up with a

16   large generation number that goes on the bottom of the

17   fraction.  The bigger the number on the bottom, the smaller

18   the overall rate.

19          So he has a number of problems in the emission rate

20   that he developed.  It's a speculative one.  But what's more,

21   it's clear it doesn't exist anywhere in the real world right

22   now.  Nobody emits at these so-called reasonable emission

23   rates.  He squarely admitted that Duke and Progress don't do

24   it here in North Carolina right now.

25          Then we marched all the way around TVA together.

1  Georgia, Alabama, Mississippi, Arkansas, Kentucky, Virginia.

2  None of those states have utility systems that operate with

3  these so-called reasonable emission rates.  I respectfully,

4  submit, Your  Honor, that TVA cannot be failing to act

5  reasonably by failing to do something that nobody does.

6       Your Honor heard a lot of testimony about computer

7  air dispersion modeling.  We heard almost a full day from the

8  plaintiff combined by Mr. Chinkin and Mr. Wheeler.  The Court

9  heard an entire day from Dr. Tesche from TVA.

10      What all this sophisticated computer modeling shows

11  is two important facts.  It shows that the amount of

12  pollution that TVA sends into North Carolina is less than the

13  amount of pollution that North Carolina's own power plants

14  put into North Carolina.  It also shows that the amount of

15  pollution that TVA sends into North Carolina is less than the

16  amount of pollution that North Carolina's power plants send

17  to their neighbors, like Virginia.  And that's another

18  standard of reasonableness, Your Honor.  TVA is providing

19  less pollution into North Carolina than North Carolina is

20  willing to tolerate from its own power plants, and it's

21  sending less pollution into North Carolina than North

22  Carolina is willing to allow its power plants to send

23  somewhere else.

24      The final point on the reasonableness of TVA's

25  conduct goes to the permits, Your Honor.  All of TVA's power

plants are specifically authorized by their states to do
exactly what they do. They are issued very detailed permits
and they comply with those permits.

Now, I have to correct a statement that I made in
my opening statement. I said those permits were so detailed
they filled two notebooks. When we got into it, I realized
it was actually three. These notebooks provide a lot of
detail that govern TVA's operations, and TVA complies with
them.

The plaintiff has thrown up several red herrings
about the compliance status, and I'd like to cover them
briefly.

First is the Widows Creek duct leak. That
happened, Your Honor. TVA was found to be in violation by
the State of Alabama. It issued a notice of violation.
That's not unusual. It's unfortunate when there is a
violation, but when there are so many power plants and so
many rules and regulations, sometimes one is broke. TVA did
what it should do, as Gordon Park said, when these things
happen. We investigate, we figure it out, we fix it, we do
whatever is required by the state, and we try to make sure it
doesn't happen again. That's what happened here. TVA paid a
$100,000 fine, fixed the problem. There is no evidence it's
going on now or contributing to any kind of a nuisance.

The second one is something called opacity. And

opacity is a measurement of what the smoke looks like when it

comes out of the power plant. It's true that a court found

that TVA violated the opacity rules from 2000 to 2002 at its

Colbert plant, but that has nothing to do with the main

pollutant in this case, which is sulfur dioxide.

Sulfur dioxide is an invisible gas. You can't see

it and so the opacity meter doesn't even register. When you

see the smoke, you don't see it. So this violation has

nothing whatsoever to do with this case. And furthermore,

Your Honor need not take on the burden of dealing with it

because there is a federal judge in Birmingham right now who

is dealing with it, and he is holding a remedy trial later

this year to decide what, if anything, needs to be done about

the opacity.

The third is New Source Review. We heard from a

man named Mr. Buckheit. Mr. Buckheit is a lawyer, and he is

the one who prosecuted TVA for allegedly violating New Source

Review. I don't think I'm going too far into new legal

territory to say that I think even TVA ought to be innocent

until proven guilty, and TVA has never been proven guilty of

these NSR violations. TVA does deny it. No court anywhere

has ever held that TVA actually violated these rules. The

only court ever to reach a final decision was in Alabama, and

it dismissed the case.

And unlike what Mr. Gulick said, North Carolina is

1 not without the protection of federal law.  North Carolina

2 could sue, could sue TVA if North Carolina thought there were

3 New Source Review violations.  In fact, Secretary Ross

4 identified a letter that North Carolina sent to TVA back in

5 2004 saying it would sue TVA within 60 days for violating New

6 Source Review.  North Carolina never did.  Those allegations

7 have never been established in court and TVA denies them.

8          What's important, Your Honor, about the permits is

9 that they exist and that TVA complies with the sulfur dioxide

10 and the nitrogen oxide emissions limits.  Those pollutants,

11 the emissions are measured continuously, 24 hours a day, 7

12 days a week, 365 days a year, reported to the state, and TVA,

13 the evidence showed from Gordon Park, always complies with

14 all of those requirements in its permits about the pollutants

15 at issue in this case.

16          Not only has plaintiff failed to prove that TVA's

17 conduct is currently unreasonable, plaintiff has also failed

18 to prove significant harm.  We've been told that North

19 Carolina's economy is suffering.  We heard from Lynne Minges,

20 the director of tourism in the state, and she confirmed that

21 that's not true.  She stated from the witness stand, we have

22 a strong economy.  She explained that North Carolina has set

23 records for tourism dollars spent year after year and that

24 North Carolina is the top destination state of any in the

25 nation for people to move into.

           One thing that's interesting and fun about trial

work, Your Honor, is you get to meet a lot of interesting

people, and we met a number of very nice people who came and

shared their stories.

           We heard from Mr. Prevost at Chimney Rock, and he

talked about how back in the '80s they were able to advertise

75-mile views, and now they can't do that anymore.  Well, it

doesn't add up, Your Honor, that that has anything to do with

TVA.  Back in the 1980s, TVAs sulfer dioxide emissions were

up around a million tons a year.  Now they're down under

400,000 tons.  There has been no evidence that would show why

TVA's reducing its emissions so substantially would cause

visibility to get worse.

           We heard from Mr. Prevost at Grandfather Mountain,

and he talked about the measurements that he's made of the

rime ice and sent off for analysis, and, as he explained, the

pH levels have jumped recently.  Well, higher pH is good.

What the higher pH levels means is there is less acid in the

ice.  That means that the acid rain program is actually

working and things are getting better.  We heard from

Mr. Harlan and his wife, Dr. Diznoff, about the terrifying

experience they had as he attempted to run 72 miles in the

Smoky Mountains.  It was just an awful experience, Your

Honor, but there was no evidence that TVA had anything to do

with it.  The two plants that TVA has that are closest to the

Smokies already have the top-of-the-line NOx controls, the
ozone precursor, at Bull Run and Kingston.  There is simply
no evidence that that awful experience had anything to do
with TVA.

And those pollution controls for the NOx, that's
good news for Dr. Russell's patients across the mountains
here, too.  And the more good news is that North Carolina has
been seeing record lows of its ozone levels.  And as
Mr. Bridgers testified yesterday, they have gone back up when
the weather was more conducive to forming ozone, but in those
years, they are still substantially lower than prior years
with similar weather.  So air pollution has gotten better.

Now, I don't contend things are perfect.  I don't
contend there is never a hazy day in North Carolina.  Your
Honor could take judicial notice that there are.  But there
has been no evidence that the finger ought to be pointed at
TVA for that.  In fact, we've seen a number of analyses from
North Carolina scientists within the Division of Air Quality
that the finger ought to be pointed at North Carolina's own
pollution sources.

We saw analyses of the ozone levels at Coolamee
that said they came from Charlotte; they didn't come from
TVA.  We saw an analysis of the PM2.5, the fine particulate
matter, in two of the counties that are not attaining the
standard, Catawba and Davidson, and it showed that all of the

1 data show that the prevailing source region of the pollution
2 was North Carolina.  One of the North Carolina scientists put
3 it best in an e-mail when he said that this analysis showed
4 that North Carolina is the major culprit.

5       We heard that there's something called the
6 Charlotte ozone plume, and that many of the days here in the
7 mountains, in the Triad, and Hickory, when ozone is high,
8 it's because of the Charlotte ozone plume.

9       Mr. Nicholson testified the very first day of this
10 trial -- he's the Deputy Air Director of North Carolina
11 Division of Air Quality -- that at the time North Carolina's
12 Clean Smokestacks Act was passed in 2002, its utilities
13 emissions were pretty excessive.  Those were his words.
14 Pretty excessive.

15      Well, for the next four and a half years after that
16 act was passed, they went up.  For the four and a half years,
17 Duke and Progress's emissions, which started out as pretty
18 excessive, were even higher.  That may have something to do
19 with air quality issues that they have.

20      We heard testimony that Catawba County is in a
21 nonattainment area for fine particulate matter.  Right next
22 to Catawba County, in fact, in eastern Catawba County, is
23 Duke's Marshall plant.  It's a very large power plant.  It
24 emitted almost 100,000 tons a year of sulfur dioxide, and it
25 had no scrubber.  Now it does have a scrubber.  That's a good

thing. Instead of putting a scrubber in, say, back in 1995
when TVA put its scrubber on the Cumberland plant, Duke
waited until recently. But now there is a scrubber on that
plant, those emissions are reduced, and now the county is
coming back into attainment of the air quality standard. I
think it's pretty clear what the problem was there and that
the problem has been fixed.

There is another problem, Your Honor, that hasn't
been fixed. Blue Ridge Paper Products. It's a plant -- it's
a paper mill, but it also runs some old power boilers,
coal-burning boilers that date back to 1920, emitting 8,000
tons a year of sulfur dioxide right in the mountains here in
North Carolina.

Back on the first day of trial, we heard from Bill
Jackson, called by the plaintiff, Bill Jackson of the Forest
Service, within the Department of Agricultural, and he
testified of his grave concerns about the impact that this
plant is having, and his analysis, which is in evidence, is
that this little paper mill, with its own 1920 boiler, by
itself, is impacting visibility 200 days a year in places
like Linville Gorge and Shining Rock. 200 days a year just
from that little plant. And we heard from Mr. Nicholson and
Mr. Jackson that the state has decided to give that plant
until 2018 to clean up its act.

Your Honor stated in an order entered before the

1  trial that the Court would require strictest proof that

2  plaintiff's own conduct does not produce the result of which

3  North Carolina complains, and I submit that the plaintiff has

4  not carried that burden.

5       Now, the plaintiff's primary evidence hasn't

6  focused on anything.  The plaintiff's -- on any of these.

7  The plaintiff's primary evidence of TVA supposedly currently

8  being a nuisance is something called the Southeastern

9  Appalachian Mountain Initiative report, or SAMI, as it's been

10 known for short.

11      We never heard anything about SAMI all through the

12 discovery of this case.  When the Court reviews the expert

13 reports, the plaintiff's first set and the plaintiff's second

14 set, you will see they don't talk about SAMI.  SAMI was a

15 last-minute addition to the case, and it came in a third set

16 of reports that were the -- they came out in the last week of

17 discovery.

18      And we heard a lot about SAMI the first day of this

19 trial.  We haven't heard that much about SAMI since North

20 Carolina's witness, Mr. Wheeler, testified that in his view

21 it was scientifically unreliable.  But that report pre-dates

22 all the way back to 2002.  There was nothing new in that

23 report, there was nothing unknown in that report, and the

24 fact of the matter is, it does not support plaintiff's case.

25 It suggests that emissions reductions are good, but TVA is

1  already making those reductions.  It's reduced its sulfur

2  dioxide emissions nearly 200,000 tons a year just since 2002.

3  That report is outdated and does not support plaintiff's

4  case.

5         Your Honor, there has been a complete failure of

6  proof of any current ongoing nuisance, and I would suggest

7  that the reason for that is that this case isn't actually

8  about the present.  This case is about the future.

9         The plaintiff, State of North Carolina, has done a

10  very good thing in passing its Clean Smokestacks Act.  That's

11  a good thing that Duke and Progress will be reducing their

12  emissions.  And the apparent theory that's being presented

13  here, Your Honor, is that if TVA doesn't make emissions

14  reductions, then the state will lose the benefit of what it's

15  doing.  It will spend a lot of money reducing emissions but

16  it won't be able to stop emissions coming in from out of

17  state.  And from a theoretical standpoint, that's not a bad

18  theory, but from a factual standpoint, it's just untrue.  TVA

19  has been making steady reductions for years, and there is no

20  evidence, Your Honor, that TVA will change its course and

21  begin to emit more or fail to reduce.

22         Now, the whole case, as I said in my opening

23  statement, is built on Dr. Staudt.  He made emissions

24  projections of what he expected TVA would do in the year

25  2013.  And as I indicated, every witness that followed Dr.

Staudt to the stand would base their opinions on his

projections, and if his projections were wrong, their

opinions would be wrong.

        Dr. Staudt's projections are wrong.  He expects

that TVA is going to have 450,000 tons of sulfur dioxide in

2013.  But we're already below that.  TVA was down to 374,000

last year and has, coming on, the Bull Run scrubber, which

will cut another 30,000 tons in 2009; the Kingston scrubber,

in 2010, will cut another 50,000 tons; the fuel switch at

Johnsonville, which is already underway, will cut another

40,000 tons by 2011; and the scrubber at John Sevier, which

will be on line by 2012, will cut another 30,000 tons.  In

fact, as Mike Scott, who has been doing this work on an

everyday basis for TVA for ten years, has explained, based on

TVA's own planning documents that it relies on to make

decisions every day, Dr. Staudt's sulfur dioxide emissions

estimates for TVA for the year 2013 are 200,000 tons higher.

There is just no validity to the underpinning of the fear

that TVA will fail to reduce its emissions.  And each of the

witnesses who followed Dr. Staudt to the stand acknowledged

that if he was wrong, they were wrong.  Mr. Chinkin and

Mr. Wheeler acknowledged that that mistake would impact their

calculations.  Dr. Levy acknowledged that if the emissions

estimate were wrong, that would affect his mortality

calculations.  Mr. Molenar acknowledged that, the visibility

1  expert, and Dr. Driscoll acknowledged that.

2       Your Honor, what the witnesses have talked about is

3  a delta, and what the delta comes from is these emissions

4  projections I'm talking about.  North Carolina has identified

5  a level of emissions for TVA that it believes is comparable

6  to the North Carolina Clean Smokestacks Act.  As we discussed

7  with Dr. Staudt, there are some real issues with that.  But

8  let's just take it for the sake of argument.

9       TVA's projections are that it will be a little bit

10  above that.  North Carolina's projections are that it will be

11  a lot above that.

12       This is what I call the real delta, the one that's

13  based on TVA's projections; the other one is what I call the

14  North Carolina delta.  And the real delta, the one based on

15  TVA's projections, what that impact is is almost

16  imperceptible in North Carolina.  It's illustrated by

17  Dr. Anderson's chart, county by county by county.  You can

18  look at the small portion of the pollution that North

19  Carolina attributes to TVA and claims is excessive, and it's

20  so small, one can hardly see it.  In fact, if those are the

21  real facts, if Mike Scott's projections are accepted, North

22  Carolina has presented no evidence of a nuisance.  Dr. Levy

23  didn't do any calculations purporting to find that there will

24  be premature mortalities from this little small amount of

25  excess emissions, as they call it.  Mr. Molenar, in fact,

admitted, if this is the way it turns out, there won't even
be any visibility impact in North Carolina from TVA's whole
system.

          Your Honor, I submit that the only realistic
evidence about what things are going to be like in 2013 comes
from the TVA, and TVA's emissions are going to be lowered to
the point where North Carolina need not worry.  And, in fact,
this extra pollution, as North Carolina calls it, is not
huge, as Mr. Chinkin said.  It's not significant.  It's less
than 0.1 micrograms throughout the whole state.  In fact,
it's, on average, at 0.03, and the best word for that is the
one used in official documents by North Carolina, as
Mr. Bridgers explained yesterday and I wrote on the flip
chart -- the best word for that is "minuscule," Your Honor.

          Now, although we know that Dr. Staudt's projections
are wrong, let's just assume for a minute that they're right.
Let's just assume for a minute that TVA reverses course and
increases -- and although we're 75,000 tons below where
Dr. Staudt projects, TVA reversed its course and increases
its emissions by that 75,000 tons, fails to bring on the
scrubber at Bull Run, fails to bring on the scrubber at
Kingston, calls a halt to the fuel switch at Johnsonville,
pulls the plug on the John Sevier scrubber.  Let's assume TVA
does none of those things -- does those things and does have
all the emissions Dr. Staudt projects.  Well, in that case,

1  Your Honor, the extra pollution, the whole dot is a little

2  bit bigger, but it's still only 0.3 micrograms per cubic

3  meter at its largest in the whole state, and most of the

4  state it's even smaller, and that small amount of pollution

5  is not sufficient to support the claims of harm that North

6  Carolina has put forward.

7          Let's start with the mortality and the health

8  harms.  Dr. Anderson, who worked at TVA for 20 years

9  establishing risk assessment programs, as she explained to

10  the Court, the National Ambient Air Quality Standard set

11  levels of pollution that are safe.  That's EPA's job.  They

12  have to set the level at a level -- they set it at a level

13  that is adequate to protect human health, public health, with

14  an adequate margin of safety even for sensitive

15  sub-populations, even for people with asthma, even for

16  children.  And EPA has set that level at 15.  There are some

17  who have argued that that's not good enough and that it ought

18  to be lower and set at 13.

19          Well, the fact of the matter is, these small

20  pollution increments are projected to take place when the

21  whole state of North Carolina is not only below the 15 safe

22  level, not only below the lower 13 safe level that some argue

23  for, below 12.  The entire state is going to be at a level

24  well below the standards set by the EPA and set by the State

25  of North Carolina, who sets its own health standards.

Your Honor, Dr. Levy testified that he could calculate these premature mortalities, but he also acknowledged in his cross-examination that his methodology was described using the word "unreliable" by EPA and that EPA refused to rely on that kind of methodology when it set the standard.

He also testified that he didn't do the kind of uncertainty analysis that would be required to publish his work in a peer-reviewed journal. The law is clear that a scientist coming into the courtroom should apply the same intellectual rigor in the courtroom that he applies outside of it. And Dr. Levy didn't do that here.

Dr. Peden, from the University of North Carolina, testified about the effects that particulate matter could have on health. But when I asked him in cross-examination, he acknowledged that the studies he was relying upon involved exposures of 200 micrograms per cubic meter, not 0.3 micrograms per cubic meter. That's a hundred -- or a thousand times as much exposure as we have here.

Dr. Peden also informed us that all of these health problems, cardiovascular, hospitalization, and death, stroke, asthma prevalence, heart disease, they're all higher in the eastern part of the state. In other words, the closer you come to TVA's territory, the better the health statistics are, and that's inconsistent with the plaintiff's claim that

1    TVA is causing the problem.

2            Dr. Moolgavkar.  Much has been said of him.  He's

3    the only epidemiologist who testified in this case.  None of

4    the plaintiff's witnesses are epidemiologists.  And as he

5    testified, the epidemiological literature is simply too

6    inconsistent to support the kinds of calculations that

7    Dr. Levy made here.

8            Your Honor, moving from the health impacts to the

9    acid deposition impacts, both sides' witnesses agreed.

10   Plaintiffs called to the stand Mr. Jackson from the

11   Department of Agricultural.  TVA called to the stand

12   Dr. Grigal.  They both testified that places like Linville

13   Gorge are in a steady state resulting from their response to

14   the industrial revolution and reducing emissions by the

15   amount that TVA is being asked to reduce here won't make any

16   difference.  And it is not as Mr. Gulick characterized it:

17   It's already ruined, so who cares?

18           Your Honor, the point of the matter is there would

19   be no remedy.  If TVA were to make reductions even beyond

20   what plaintiff asked for, there is no evidence that that

21   would have an impact for hundreds of years and there is no

22   support for an injunction.

23           As Dr. Grigal also explained, the lower mercury

24   amounts that would be attained, even if plaintiff's evidence

25   were believed, are insignificant and unmeasurable.

1          So, Your Honor, the evidence does not support

2     plaintiff's case even if Dr. Staudt's projections are

3     believed, and we know from all the evidence that we've heard

4     that they're wrong.

5          In addition to the wrong information that Dr.

6     Staudt put forward, there is a question that has been lurking

7     throughout this case that has not been answered, and that

8     question is:  Why 2013?  What's the magic about that year for

9     TVA?

10          Unanswered is the question of why TVA should be

11    given four years to make all these reductions when North

12    Carolina gave its own utilities 10 years to do it when it

13    passed its law in 2002.  Why should TVA have to do in four

14    years what North Carolina gives its utilities 10 years to do?

15          Unanswered is the question of why TVA should have

16    to build SCRs and scrubbers at the same time.  The way that

17    the Clean Smokestacks Act worked in North Carolina allowed

18    North Carolina utilities to sequence those and build the SCRs

19    first and then the scrubbers.  As Mr. Nash, who built 21 SCRs

20    for TVA, explained, that's the smart way to do it, because

21    sometimes you can't fit all the people and equipment on site

22    that are necessary to equip them both at once.

23          Unanswered is the question of why TVA should have

24    to build scrubbers on all its plants, as Dr. Staudt specified

25    in his proposed remedy, when the North Carolina utilities are

1  not building scrubbers except for only on about half of their

2  units.

3          Unanswered is the question of why TVA's rate payers

4  should have to have a rate increase.  The evidence was clear,

5  and it all came from the plaintiff's side, the State of North

6  Carolina was unwilling to pass the Clean Smokestacks Act if

7  it would require a rate increase.  That's what Mr. Nicholson

8  testified.  Dr. Tierney, plaintiff's finance witness,

9  testified that this remedy would require a rate increase of

10 TVA's rate payers, 4 to 6 percent in her estimation.

11         And unanswered is the question of why TVA ought to

12 have to do all these things by 2013, when Blue Ridge Paper,

13 which is causing such problems here in North Carolina, is

14 being given until 2018 to come up with a plan to clean up its

15 act.

16         Secretary Ross, the plaintiff's last witness,

17 testified that he only wanted to see TVA make comparable

18 reductions on a comparable schedule to what North Carolina is

19 doing, but what North Carolina is really asking for is more

20 reductions on a faster schedule.

21         Your Honor, although there is no answer to these

22 questions, there is a good answer about what ought to be done

23 in this case, and it comes out of Supreme Court decisions

24 from Kentucky, Alabama, and Tennessee.  All three of those

25 courts -- and they are cited in our trial brief, pages 53 to

1 55 -- have issued decisions laying out a very commonsensical

2 rule, and I can state that rule without using legalese as

3 "Let's wait and see."

4         If you're talking about something in the future

5 that is uncertain, you don't know it's going to happen -- and

6 in this case we don't even have good reason to believe it's

7 going to happen -- the best thing to do is you don't enjoin

8 the future nuisance; you wait and see if a nuisance actually

9 arises.  And that's what those courts have done in a number

10 of cases, and they set a high, high standard for proving a

11 nuisance in the future, which requires certainty.

12         The case can be dismissed and there will be nothing

13 to stop North Carolina from coming back here in the future if

14 it needs to, if it turns out that TVA does, in fact, cause

15 the problems.  But the good news about that, Your Honor, is

16 that nobody will be coming back here because there won't be

17 any reason to come back here.

18         May I approach the map?

19         **THE COURT:**  Yes.

20         **MR. LANCASTER:**   This case isn't really about TVA's

21 system, Your Honor.  This case is about three plants, John

22 Sevier, Bull Run, and Kingston.  This case is about those

23 three facilities, Your Honor.

24         I'm not acknowledging that those facilities are

25 nuisances.  They're not.  But the evidence from both sides is

clear and undisputed that a power plant has the greatest

impacts near the plant.  Those three power plants are near

North Carolina.  They're virtually in North Carolina.  Those

three power plants are near the Smoky Mountains.  That's

where they would be expected to have their greatest impacts.

The good news about that, Your Honor, is that TVA is doing

everything that can be done to make those three power plants

among the cleanest-burning power plants in the country.

The Bull Run plant, as the Court has heard, already

has a scrubber -- excuse me -- an SCR, the top-of-the-line

NOx control.  The scrubber is slated to come on line this

fall.  When those two work together, the Bull Run plant will

have the best mercury co-benefit controls available.

The Kingston plant has nine units.  All nine are

already equipped with SCRs.  The scrubber, that project is

over 70 percent complete.  The scrubbers for all nine units

are expected to be on line by 2010.  When the scrubbers come

on line, it will have the best mercury co-benefits available.

John Sevier, it's not as far along.  There is, in

fact, an empty field right there.  But there is engineering

work going on, there's design work going on, there is

procurement work going on.  And this John Sevier plant is

putting in SNCRs right now for NOx control; it's putting in a

scrubber for sulfur dioxide control, which is expected to be

in by 2012; and then as soon as it gets in, they can take out

one of the other things and that makes room to put in the SCR, and when that SCR and scrubber are on together, expected to be no later than 2014 for the SCR, John Sevier will have the best mercury co-benefit controls in the country.

That means that these three plants, the ones closest to North Carolina, the ones closest to the Smokies, are being controlled in the best possible way, and that is being paid for by all of these people who live over here, Your Honor. One and a half billion dollars or more those people are putting into these plants that are closest to North Carolina. That's more -- that's as much money as Duke Energy is spending on all the pollution controls it's putting on in the whole state of North Carolina. That's about the amount of money that Progress Energy is spending on all the pollution controls it's putting in the whole state of North Carolina.

If, as Mr. Gulick says, North Carolina has a fair and reasonable demand to make of TVA, that demand is that TVA control these plants, and that is exactly what TVA is doing.

Even Dr. Staudt, who wouldn't admit anything I wanted him to admit, even he testified that when these plants are controlled they'll be operating at better than reasonable emission rates.

But how do we know that's going to happen? How do we know TVA is going to follow through and do those things

1   that it has said?  How do we know that North Carolina isn't
2   going to have to come back to this court and ask for
3   assistance a few years from now?

4           We know that, Your Honor, because Tom Kilgore, the
5   CEO, the president of TVA, sat in that witness chair, took
6   the oath, and he assured this Court and he assured North
7   Carolina that TVA is committed to doing these things.  It
8   isn't true that TVA only does things when it's sued, but sued
9   or not, TVA has made the commitment to do these things and
10  provide major benefits to the state of North Carolina.  And
11  when TVA finishes those projects, when those plants are the
12  cleanest burning plants in the country, providing benefits to
13  North Carolina, we really hope that Secretary Ross will say
14  to us the same thing he said to us when we told him about
15  this before suit was ever filed:  Congratulations.

16          We ask that this case be dismissed, Your Honor.

17          **MR. GULICK:**  Your Honor, the first thing I would
18  like to say is that the -- it is highly relevant to this case
19  that there is not only a nuisance occurring in North Carolina
20  but a nuisance occurring in the states whose law controls;
21  Tennessee, Alabama and Kentucky.  It is the law of those
22  states that controls, and if TVA is creating a nuisance in
23  those states, that is highly relevant to the question of
24  whether TVA is liable for the nuisance it's creating in North
25  Carolina as well.

         1         The evidence establishes very clearly that there
         2    are impacts right now.  This comes from the modeling from
         3    TVA's emissions.
         4         I'd like to draw your attention again to
         5    Dr. Anderson's Exhibit 5A, which showed what she said was
         6    current, although it was 2002.  It shows emissions from
         7    TVA's -- that was attached to her -- that was part of her
         8    report.  Her exhibit showed that TVA's emissions from each
         9    state, from Alabama, separately from Kentucky, separately
        10    from Tennessee, impact every county in the state of North
        11    Carolina.  It's very true.  In fact, greater in western North
        12    Carolina.  And that's where most of the evidence that we
        13    presented about North Carolina harms come from.  But the
        14    Court should not ignore the fact that the USEPA, when it did
        15    its CAIR modeling with respect to Catawba and Davidson
        16    Counties, that modeling, which is in evidence, establishes
        17    very clearly that the majority of the impacts that are
        18    occurring in Catawba and Davidson County of particulate
        19    matter come from out of state.  Certainly, North Carolina's
        20    contribution in 2010, which was the date that it was using,
        21    are more than those from any other single state, but in
        22    Catawba County, TVA -- excuse me -- Tennessee's contribution
        23    was two-thirds of that of North Carolina.  And as you heard
        24    in the testimony, TVA emits 72 percent of the SO2 that's
        25    emitted.  If they contribute, they're part of the problem,

1   and they have to be part of the solution.

2            North Carolina is dealing with its utilities, which

3   SAMI -- and TVA would like to distance itself from SAMI.  But

4   SAMI, which Neil Wheeler testified had been confirmed by

5   VISTAS, a later model in which TVA's modelers and TVA are

6   also involved, confirm those SAMI results, and they show that

7   there are significant contributions to western North Carolina

8   coming from Kentucky, coming from Alabama, as well as from

9   Tennessee, and that the emissions of sulfur dioxide in

10  Tennessee had the biggest impact in all of the Class I areas

11  in western North Carolina.  That is modeling that was done

12  back in 2002 or earlier.

13           So this is not just about the future.  TVA would

14  have it so, so that they can try to show that it's

15  indistinguishable from the remedy that North Carolina seeks.

16           Nor is it the case that their conduct has been

17  steady.  As I have showed, TVA has responded -- and Mr. Myers

18  has admitted -- TVA responded to legal pressure for legal

19  requirements in every case.  Mr. Kilgore here yesterday sat

20  and said that TVA was not going to abandon its Bull Run, its

21  Kingston, or John Sevier plants, but his personal promise is

22  not a requirement.  Who knows how long Mr. Kilgore will be

23  with the TVA?  Maybe it will be a long and happy career

24  there, but who knows.  He's a chief executive, but chief

25  executives do leave.

1          In addition, Mr. Kilgore admitted yesterday, that

2    after substantial investment, TVA abandoned several nuclear

3    facilities that it had made large construction on.

4          If the circumstances change, its priorities could

5    change.  If the pressure is off, other priorities may take

6    effect.

7          TVA, unlike Duke and Progress, is in charge of its

8    own rates.  Exactly how it decides to do that is up to it.

9    Duke and Progress have already filed for rate increases after

10   the end of the five-year -- this is already in evidence, I

11   believe -- after the five-year freeze that was provided -- on

12   rates that was provided under the Clean Smokestacks Act.

13         So the people of the state of North Carolina are

14   going to pay, either in the frozen rates or otherwise, for

15   the reductions that are being made by Duke and Progress to

16   privately-owned utilities.

17         With regard to the NSR violations, there was a

18   thorough investigation by EPA.  I want to point out once

19   again that Mr. Park didn't deny the underlying violations; he

20   denied that they had been found guilty of that.

21         The John Sevier plant has not been built fast

22   enough.  The SCRs that are promised are well after 2013.  If

23   they occur.

24         One thing that Mr. Lancaster has failed to note is

25   that both Duke and Progress and TVA installed a significant

number of SCRs or other controls in order to meet the NOx SIP
Call, which was a legal requirement that had an end date for
performance of not years in advance, but in 2004.  It
required four years to install a very large number of SCRs
and SNCRs.  So that was not a voluntary effort on TVA's part
or on Duke and Progress's part.  That was the result of a
legal requirement that actually had an end date, a legal
requirement.  That was during the Clinton administration.

Dr. Anderson, who up until about 20 years ago
worked for EPA, would have you believe that the imperfectly
created National Ambient Air Quality Standard that is
supposed to be protective of human health with an adequate
margin of safety is actually doing that.  She wants you to
presume that it's an effective threshold, as she said.  But
all of the scientific evidence, including the expert
elicitation, which Dr. Moolgavkar poo-pooed -- but that
expert elicitation of prominent scientists knowledgeable in
this field, all but two believed -- only one of the
scientists incorporated a threshold.  Most of them thought
there was no scientific, either factual or theoretical,
grounds to assume that there was a threshold for the exposure
to either sulfates -- excuse me -- to particulate matter or
to ozone.  I'm sorry.  The elicitation had to do with
particulate matter exposure.  They found no theoretical or
factual basis to assume a threshold.  But Dr. Anderson and

1 Dr. Moolgavkar, whose career in the last ten years has been
2 associated with representing their industry clients, would
3 have you believe that the NAAQS, imperfectly created and
4 certainly imperfectly administered by EPA and by its
5 administrator and political appointee, they would have you
6 believe that that is actually not there to protect the public
7 with an adequate margin of safety but to protect industry
8 from having to install pollution controls.

9 The SAMI program fixes knowledge on TVA about its
10 contribution to the harm in western North Carolina's air
11 pollution. The later modeling has not undermined SAMI. It
12 has confirmed it. It would have you -- TVA would have you
13 ignore the modeling done by Mr. Chinkin and Mr. Wheeler,
14 using the very same modeling techniques that were used by
15 Mr. Tesche and Mr. Mueller, which establishes significant
16 pollution in western North Carolina.

17 If you will look at Mr. Tesche's somewhat truncated
18 maps of the United States, you will see that even his own --
19 even his own exhibits show impacts in western North Carolina
20 and in Kentucky and in Tennessee and in Alabama.

21 Your Honor, the evidence before you shows that TVA is
22 engaging in a current nuisance. Their promises may be well
23 and good, but what the evidence also shows is that it is
24 legal requirements that actually cause things to happen and
25 cause them to happen by a definite date, and the date that we

have chosen is one that is achievable for them.  But a date

certain is what it takes to have these things happen.  And we

ask that you enter judgment for the State of North Carolina

and require reductions on a fixed time table for a fixed

amount of reduction.

Thank you.

**THE COURT:**  Mr. Lancaster?

**MR. LANCASTER:**  I have nothing further to add

unless the Court has a question.

**THE COURT:**  I don't believe I do.

So I believe we agreed that by mid September, the

parties would have till the 15th to submit --

**MR. LANCASTER:**  Yes, sir.  And we appreciate the

accommodation for our schedule.

**THE COURT:**  That will give us an opportunity to

look further at what your positions are and a final analysis.

I want to thank all of you for what I consider to

be exemplary conduct during the course of this trial.  A lot

of my trials don't go this smoothly.  You've all been ladies

and gentlemen, and I appreciate it.

So I'll look forward to hearing from you by the

15th of September.  And with the thanks of the Court, court

may be adjourned until further call.

**(End of proceedings.)**

**[END OF VOLUME 12]**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

        I certify that the foregoing transcript is a
true and correct transcript from the record of proceedings
in the above-entitled matter.

        Dated this 2nd day of August, 2008.


                                S/ Karen H. Miller
                        _____
                        Karen H. Miller, RMR-CRR
                        Official Court Reporter